# United States Court of Appeals
# for the Federal Circuit

BRUKER CELLULAR ANALYSIS, INC.,

*Appellant,*

v.

THE UNIVERSITY OF BRITISH COLUMBIA,

*Appellee.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2021-01249
Administrative Patent Judges Kalan, Kaiser, and Ogden

## JOINT APPENDIX

Karen I. Boyd
Jennifer Seraphine
Keeley I. Vega
Marc David Peters
TURNER BOYD SERAPHINE LLP
155 Bovet Road, Suite 750
San Mateo, CA 94402
(650) 521-5930

*Counsel for Appellant Bruker Cellular
Analysis, Inc.*

Naveen Modi
Daniel Zeilberger
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
(202) 551-1700

(additional counsel listed below)

*Counsel for Appellee The University
of British Columbia*

Rudy Y. Kim
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304
(650) 320-1800

Eric W. Dittmann
Max H. Yusem
PAUL HASTINGS LLP
200 Park Avenue
New York, N.Y. 10166
(212) 318-6689

*Counsel for Appellee The University of British Columbia*

# TABLE OF CONTENTS FOR THE JOINT APPENDIX

## No. 23-2227

| IPR Paper / Exhibit No. | Description | Appendix Page Nos. |
|---|---|---|
| 38 | Final Written Decision | Appx1-72 |
| 41 | Judgment Denying Petitioner's Request on Rehearing | Appx73-88 |
| 1001 | U.S. Pat. No. 10,087,408 | Appx89-129 |
| — | Certified List | Appx130-132 |
| 1 | Petition for *Inter Partes* Review of U.S. Pat. No. 10,087,408 | Appx133-214 |
| 18 | Patent Owner's Response to Petition for *Inter Partes* Review | Appx362-433 |
| 22 | Petitioner's Reply in Support of Petition for *Inter Partes* Review | Appx441-474 |
| 40 | Petitioner's Request for Rehearing | Appx635-654 |
| 43 | Petitioner's Notice of Appeal | Appx655-660 |
| 1002 | Declaration of Carl Meinhart in Support of Petition for *Inter Partes* Review | Appx661-761 |
| 1003 | U.S. Pat. No. 8,906,669 B2 to Dimov *et al.* | Appx762-793 |
| 1004 | WIPO Int'l Pat. App. Publ. WO 2010/040851 A2 to Dimov *et al.* | Appx794-858 |
| 1005 | U.S. Pat. App. Publ. US20110262906 A1 to Dimov *et al.* | Appx859-892 |
| 1006 | Park, J.Y. *et al.*, *Single cell trapping in large microwells capable of supporting cell spreading and proliferation*, 8 MICROFLUID. NANOFLUIDICS 2, 263-268 (Feb. 1, 2010) | Appx893-898 |
| 1007 | Kovac, J.R. and Voldman, J., *Intuitive, Image-Based Cell Sorting Using Opto-fluidic Cell Sorting*, 79 ANAL. CHEM. 24, 9321-9330 (Dec. 15, 2007) | Appx899-908 |

| IPR Paper / Exhibit No. | Description | Appendix Page Nos. |
|---|---|---|
| 1009 | Han, *et al.*, *Integration of single oocyte trapping, in vitro fertilization and embryo culture in a microwell-structured microfluidic device*, LAB CHIP 10, 2848-2854 (2010) | Appx909-915 |
| 1015 | File History of U.S. Pat. App. No. 13/178,395 (U.S. Pat. No. 10,087,408) | Appx1309-1986 |
| 1020 | Declaration of Ingrid Hsieh-Yee, Ph.D. | Appx2099-2450 |
| 1038 | Deposition Transcript of Bruce Gale, conducted on August 3, 2022 | Appx2612-2801 |
| 1039 | Declaration of Carl Meinhart in Support of Petitioner's Reply | Appx2802-2925 |
| 2004 | Supporting Information for Kovac, J.R. and Voldman, J., *Intuitive, Image-Based Cell Sorting Using Opto-fluidic Cell Sorting*, 79 ANAL. CHEM. 24, 9321-9330 (Dec. 15, 2007) | Appx3358-3362 |
| 2010 | Deposition Transcript of Carl Meinhart, Ph.D., conducted on May 4, 2022 | Appx3392-3615 |
| 2012 | Declaration of Bruce K. Gale, Ph.D., dated May 20, 2022 | Appx3657-3755 |
| 2013 | Deposition Transcript of Carl Meinhart, Ph.D., conducted on Sept. 21, 2022 | Appx3756-3975 |

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

BERKELEY LIGHTS, INC.,
Petitioner,

v.

THE UNIVERSITY OF BRITISH COLUMBIA,
Patent Owner.

---

IPR2021-01249
Patent 10,087,408 B2

---

Before KRISTINA M. KALAN, CHRISTOPHER M. KAISER, and
CHRISTOPHER L. OGDEN, *Administrative Patent Judges*.

OGDEN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

Berkeley Lights, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") for *inter partes* review of claims 1, 6, 11, 16, 19, 24, 26, 27, and 30 of U.S. Patent No. 10,087,408 B2 (Ex. 1001, "the '408 patent"). The University of British Columbia ("Patent Owner") filed a Patent Owner Response (Paper 18, "PO Resp."), Petitioner filed a Reply to the Patent Owner Response (Paper 22, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 29, "PO Sur-reply").

We held an oral hearing on November 4, 2022, and the transcript is entered on the record. Paper 37 ("Tr.").

This is a final written decision under 35 U.S.C. § 318(a) as to whether the claims challenged in the *inter partes* review are unpatentable. For the reasons below, we conclude that Petitioner has not shown that any claims of the '408 patent are unpatentable.

# II. BACKGROUND

## A. RELATED PROCEEDINGS

As related matters, the parties identify the following three pending U.S. district court cases: *AbCellera Biologics, Inc. v. Berkeley Lights, Inc.*, No. 5:20-cv-08627 (N.D. Cal. filed July 9, 2020); *AbCellera Biologics, Inc. v. Berkeley Lights, Inc.*, No. 5:20-cv-08626 (N.D. Cal. filed Aug. 25, 2020); *AbCellera Biologics, Inc. v. Berkeley Lights, Inc.*, No. 5:20-cv-08624 (N.D. Cal. filed Sept. 16, 2020) (collectively, "parallel district court proceedings"). Pet. 3–4; Paper 6, 1. The District Court has stayed these proceedings

pending the outcome of this and two other *inter partes* review proceedings. *See* Ex. 1035.

We note that *inter partes* reviews IPR2021-01250 (institution denied on January 21, 2022) and IPR2021-01386 (institution denied on February 1, 2022) also involved the same parties and related technology.

B.    THE '408 PATENT (EX. 1001)

The '408 patent issued from an application filed July 7, 2011, claiming priority from U.S. Provisional Application No. 61/362,213, filed July 7, 2010. Ex. 1001, codes (22), (60). It describes methods, in the context of microfluidic devices, "for perfusing a cell with perfusion fluid," so that "the gravitational forces acting on the cell to keep the cell at or near . . . a retaining position exceed the hydrodynamic forces acting on the cell to move it toward an outlet." *Id.* at code (57).

Figure 1 of the '408 patent, reproduced below, is a top view of the microfluidic device, with two expanded views at medium resolution (top left, with a 1 mm size reference bar) and high resolution (top right, with a 100 μm size reference bar). Ex. 1001, 6:17–21.

3



FIGURE 1

Device 10, as depicted in Figure 1 above, comprises an array of 1,600
chambers 12, each "with integrated microvalves to allow precise control and
exchange of media." Ex. 1001, 23:12–13. Fluid enters chambers 12 from
array inlet 22 via flow channels 14, and fluid exits through array outlet 24.
*Id.* at 23:13–14, 23:18–21. To control cell loading and perfusion rates,
device 10 also includes control lines 18 (connected to an isolation valve)
and 20 (connected to a peristaltic pump). *Id.* at 23:16–18. Hydration lines 16
are located on each side of the array to minimize edge effects. *Id.* at 23:14–
15. In the high-resolution view (shown in top right of Figure 1), arrows point
to the location of single cells in each chamber 12. *Id.* at 23:21–22.

4

Figure 2, reproduced below, is an exploded view of device 10 showing the layers of the device as they are assembled during fabrication. Ex. 1001, 6:22–24, 23:44–46.



As shown above in Figure 2, device 10 includes the following layers (from bottom to top): glass slide 40; chamber layer 38, which includes chambers 12 (not shown); control layer 36, which includes control structures; a 150 µm-thick PDMS[1] membrane 34; iso-osmotic bath layer 32 consisting of a large chamber "filled with medium to prevent evaporation and maintain constant osmolarity inside the chambers [12]"; and "gas-permeable PDMS cover layer 30 to keep the [iso-osmotic] bath sterile." Ex. 1001, 23:46–63.

Figure 4 of the '408 patent, reproduced below, is a cross-sectional view of chamber 12 and channel 14 of microfluidic device 10 while chamber 12 is being perfused with a fluid. Ex. 1001, 6:28–32.

_____

[1] According to the '408 patent, PDMS is an abbreviation for polydimethylsiloxane, "a transparent and biocompatible silicone elastomer . . . widely used for cell-culture applications," which "provide[s] high gas permeability for the efficient exchange of oxygen and carbon dioxide." Ex. 1001, 2:38–42.

5



**FIGURE 4**

Figure 4, above, depicts culture chamber 12 (a cube of 160 μm on each side, forming a volume of about 4.1 nl) and flow channel 14 (100 μm wide and up to 13 μm deep). Ex. 1001, 24:39–40, 24:64–65, 26:20–22. Chamber 12 includes trapped cells 50. *Id.* at 24:36. The '408 patent discusses a numerical simulation that predicts a "sudden expansion when the fluid moves from the flow channel [14] to the chamber [12 that] creates a velocity drop," and "minimal flow rates at the bottom 5/6 of the chamber." *Id.* at 26:12–15, 26:23–24. "[T]he gravitational forces on the cells [are] greater than hydrodynamic forces and cells remain in the cell retaining region while the perfusion fluid exits the chamber through the flow channel outlet." *Id.* at 26:24–28.

After culturing cells 50 in chambers 12, the user can recover them "by simply inverting the device, causing the cells to settle into the higher-flow rate regions of the chambers (as shown in FIG. 4) and then recovering the pooled population by flushing back through the input port." Ex. 1001,

6

26:50–53. Alternatively, "when selective recovery of the contents of specific individual wells is desired, the layer of PDMS [30 as shown in Fig. 2] covering the osmotic bath [32] can first be removed and a sterile micropipette then used to pierce the membrane [34] over any selected chamber followed by aspiration of its contents." *Id.* at 26:57–62.

C.    CHALLENGED CLAIMS AND GROUNDS

Claim 1, representative of the challenged claims, reads as follows:

1. A method of culturing a cell, the method comprising:

[A]    retaining the cell at a retaining position within an individual chamber of a microfabricated device;

[B]    perfusing the cell with a perfusion fluid by flowing the perfusion fluid into the individual chamber through an inlet and out of the chamber through an outlet,

[C]    wherein the outlet is positioned such that gravitational forces acting on the cell to keep it at or near the retaining position exceed hydrodynamic forces acting on the cell to move it toward the outlet;

[D]    culturing the cell within the chamber and monitoring a response in the chamber; and

[E]    selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step.

Ex. 1001, 31:62–32:9 (Petitioner's reference letters added).

Petitioner argues five grounds for *inter partes* review, as summarized in the following table:

7

| Ground | Claim(s) Challenged | 35 U.S.C. §[2] | Reference(s)/Basis |
|--------|---------------------|----------------|--------------------|
| 1 | 1, 6, 11, 19, 24, 26, 27, 30 | 102(a), (e) | Dimov[3] |
| 2 | 1, 6, 11, 19, 24, 26, 27, 30 | 103(a) | Dimov |
| 3 | 1, 6, 11, 19, 24, 26, 27, 30 | 103(a) | Dimov, Kovac[4] |
| 4 | 1, 11, 16, 24, 26, 27, 30 | 103(a) | Park[5] |
| 5 | 1, 11, 16, 24, 26, 27, 30 | 103(a) | Park, Kovac |

Pet. 8.

### D.  DECLARATORY TESTIMONY

Petitioner relies on two declarations of Dr. Carl Meinhart. Exs. 1002, 1039. Petitioner also relies on the declaratory testimony of Dr. Ingrid Hsieh-Yee to establish the date of public availability for certain references. Ex. 1020.

Patent Owner relies on a declaration of Dr. Bruce K. Gale. Ex. 2012.

---

[2] 35 U.S.C. §§ 102, 103 (2006), *amended by* Leahy–Smith America Invents Act, Pub. L. No. 112-29 §§ 102, 103, sec. (n)(1), 125 Stat. 284, 287, 293 (2011) (effective Mar. 16, 2013). These versions of §§ 102 and 103 apply because the effective priority date of the '408 patent (no later than July 7, 2011, *see* Ex. 1001, code (22)) is before the effective date of the AIA amendments.

[3] Dimov et al., US 8,906,669 B2 (issued Dec. 9, 2014 from application filed Oct. 9, 2009) (Ex. 1003). Petitioner also includes, within this ground, published international and US versions of the application which, according to Petitioner, contain the same text as all citations to Dimov in the Petition. Pet. 6 & n.1 (citing Exs. 1004, 1005). We refer to these publications, collectively, as "Dimov."

[4] J.R. Kovac & J. Voldman, *Intuitive, Image-Based Cell Sorting Using Optofluidic Cell Sorting*, 79 Anal. Chem. 9321 (2007) ("Kovac," Ex. 1007).

[5] Joong Yull Park et al., *Single Cell Trapping in Larger Microwells Capable of Supporting Cell Spreading and Proliferation*, 8 Microfluidics & Nanofluidics 263 (2010) ("Park," Ex. 1006).

## III. GROUNDS OF THE PETITION

For the reasons below, we determine that Petitioner has not shown, by a preponderance of the evidence, that any claims of the '408 patent are unpatentable under the grounds of the Petition. Before analyzing these grounds in detail, we address two matters that will underlie our analysis: the level of ordinary skill in the art and the construction of the claim terms.

### A.    LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the pertinent art at the time of the invention is a factor in how we construe patent claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–1313 (Fed. Cir. 2005) (en banc). It is also one of the factors we consider when determining whether a patent claim would have been obvious over the prior art. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To assess the level of ordinary skill, we construct a hypothetical "person of ordinary skill in the art," from whose vantage point we assess obviousness and claim interpretation. *See In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998). This legal construct "presumes that all prior art references in the field of the invention are available to this hypothetical skilled artisan." *Id.* (citing *In re Carlson*, 983 F.2d 1032, 1038 (Fed. Cir. 1993)).

Relying on Dr. Meinhart's testimony, Petitioner argues that a person of ordinary skill in the art "would have had a bachelor's degree in mechanical engineering, chemical engineering, biomedical engineering, molecular biology, (bio)chemistry, or an equivalent degree relevant to microfluidic biological cell analysis, and three to five years of experience with the construction of and application of microfluidic devices to cell

9

culture and analysis." Pet. 8–9 (citing Ex. 1002 ¶ 40). Patent Owner does not contest Petitioner's proposed level of ordinary skill in the art. *See* PO Resp. 3–4 (citing Ex. 2012 ¶¶ 19–20).

We find Petitioner's uncontested articulation to be reasonable in light of the subject matter involved in the '408 patent and its description of the relevant prior-art background. *See, e.g.*, Ex. 1001, 1:15–2:54 (describing the field and related art as relating to the construction and use of microfluidic devices in cell culture and analysis). Thus, we adopt it for our decision.

B.    CLAIM CONSTRUCTION

In an *inter partes* review, we construe a patent claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2020). This generally includes "construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* "[W]e look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415, F.3d at 1312–1317).

The ordinary and customary meaning of a claim term "is its meaning to the ordinary artisan after reading the entire patent," and "as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313, 1321. There are only two circumstances in which we adopt a construction that departs from the ordinary and customary meaning: "1) when a patentee sets out a definition and acts as [their] own lexicographer, or 2) when the

patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Any such special meaning of a term "must be sufficiently clear in the specification that any departure from common usage would be so understood by a person of experience in the field of the invention." *Multiform Desiccants Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

Petitioner contends that "no terms require express construction for purposes of resolving the challenges in this proceeding." Pet. 9; *accord* Pet. 12. Petitioner also notes that in the parallel district court proceedings, Patent Owner has proposed constructions for the terms *chamber* and *retaining position* that differ from Petitioner's proposed constructions. Pet. 9–10 (citing Ex. 1013 App'x A, 1, 3 (Patent Owner's proposed constructions); Ex. 1021, 7, 8 (Petitioner's proposed constructions); Ex. 1002 ¶ 44). In those proceedings, Patent Owner's proposed construction for *chamber* is "an enclosed space within a microfluidic device," and its proposed construction for *retaining position* is "a location in the chamber at which a cell is maintained during cell culture and media exchange." Ex. 1013, 6, 8. Although Petitioner does not contend that its arguments rely on the choice of construction for these terms, Petitioner adopts Patent Owner's constructions for this proceeding. Pet. 11. Patent Owner does not contest these proposed constructions, or propose any other explicit constructions. *See generally* PO Resp.

We agree with Petitioner that we do not need to construe the terms *chamber* and *retaining position* to decide the issues presented in this proceeding, and to the extent we need to interpret the meaning of any claim

language, we address the interpretations below in the context of the prior art. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy' . . . ." (quoting *Vivid Techs., Inc. v. Am. Sci & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

C.   GROUNDS BASED ON DIMOV ALONE (GROUNDS 1 AND 2)

In Grounds 1 and 2, Petitioner contends that Dimov anticipates claims 1, 6, 11, 19, 24, 26, 27, and 30, or alternatively that the claims are obvious over Dimov. *See* Pet. 12–40.

1.   *Overview of Dimov*

Dimov describes "a microfluidic device having a fluid path defined within a substrate between an input and an output," such that "particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber." Ex. 1003, code (57).

12

Figure 2, reproduced below, illustrates the overall microfluidic device:



## FIG. 2

Figure 2, above, depicts identical microfluidic devices 100 (100A, 100B, and many others) formed within substrate 105, and a multiplexed structure by which waste fluids are collected in common waste 140. *See* Ex. 1003, 2:29–30, 3:22–24, 3:54–57, 4:20–22. In use, substrate 105 is situated horizontally. *See id.* at 3:37–41.

Figure 1, reproduced below, shows microfluid device 100 (A or B) in more detail:

13



FIG. 1

As shown in Figure 1, above, each microfluidic device 100 "comprises a fluid path 103 defined within a substrate 105 between an input 120 and an output 130." Ex. 1003, 3:24–26. Capture chambers 160 are also situated within fluid paths 103 and extend perpendicularly into substrate 105 so that cells passing through fluid path 103 are captured in chambers 160 by the downward pull of gravity. *See id.* at 3:27–53. Outputs 130 for each row empty into common waste 140 (shown above in Figure 2). *Id.* at 4:20–22.

Figure 4B, reproduced below, shows an individual capture chamber 160 within the microfluidic device:

14



## FIG. 4B

The capture chamber shown in Figure 4B, above, includes trench 410, formed within substrate 105, with mouth 420 in communication with fluid path 400, and sidewalls 430 that extend downward from mouth 420 to base 440. Ex. 1003, 5:27–32.

Dimov's trench 410 traps cells because "[a]s the fluid passes over the mouth of the trench it enters downwardly into the trench. This . . . causes a deceleration of the fluid," which "causes particles within the fluid to be displaced from the fluid. Once displaced, they settle towards the base 440." Ex. 1003, 6:37–43. Dimov teaches that "the trench is desirably dimensioned relative to the flow rate of the operating conditions such that once displaced the particles will be retained within the trench." *Id.* at 6:44–47.

Dimov teaches that "the dimensions of the capture trench are much greater than the particles which are retained therein." Ex. 1003, 11:3–4. In one embodiment, its depth is approximately 300 μm. *Id.* at 5:39–45. In another embodiment, its horizontal length is 200 μm. *See id.* at 6:57–62, Fig. 5. In yet another embodiment, its horizontal size is 100×400 μm with a

15

depth of 320 μm, *id.* at 9:16–17. Dimov teaches that one benefit of these relatively large dimensions is that the device "can be usefully employed in biomimetic experiments" such as three-dimensional layered structures. *Id.* at 11:5–21.

An example of such three-dimensional layered structures is shown in Figure 21, reproduced below:



## FIG. 21

Figure 21 of Dimov, above, depicts device 100 that "can be used to generate 3D cell structures 2100 of individual cancer cells 2105 so as to recreate cellular conditions similar to in-vivo tumours or other structures." Ex. 1003, 11:7–10. According to Dimov, layered cells 2105 are typically "retained in the order that they were introduced into the chamber," which "allows for subsequent experiments to be conducted within pseudo in vivo conditions." *Id.* at 11:19–21.

Dimov states that "the arrangements described herein preferentially retain the particles within the trench." Ex. 1003, 11:21–23. Alternatively, Dimov also teaches that

16

> [i]t is possible to modify the arrangement so as to provide for
> subsequent movement of the particles—either within the trench
> so as to provide for mixing or the like, *or to effect removal of
> the particles out of the trench*. Such arrangements will typically
> require a capacity to manipulate the particles and this can be
> conducted either before or subsequent to capture of the particles
> within the trench. Examples of techniques that could be
> employed include:
>
> > Acoustic
> > Magnetic
> > Inertial
> > Electric
> > Dielectrophoretic
> > Thermo-hydrodynamic
> > *Laser tweezers*
> > Hydrodynamically induced agitation
> > Specific or unspecific attachment to surface
>
> It will be understood that the use of such techniques may
> require an external source of agitation or manipulation of the
> particles.

*Id.* at 11:23–43 (emphasis added). Thus, Dimov lists a number of techniques, including "[l]aser tweezers," for mixing or removing particles in a trench. *See id.*

### 2.    *Uncontested Limitations 1A–D*

Petitioner contends that Dimov discloses the preamble and limitations 1A–D, and points to passages within Dimov describing retaining a cell in a chamber, perfusing the cell with fluid while the cell is retained in the chamber, and culturing the cell within the chamber while monitoring a response. Pet. 13–26 (citing Ex. 1003, 1:40–47, 1:52–53, 1:57–60, 2:25–27, 2:33–36, 3:37–41, 3:47–53, 5:10–24, 5:27–35, 6:37–47, 7:4–20, 7:24–28, 8:16–18, 8:40–42, 9:32–48, 10:10–11, 10:55–58, 12:13–19, 12:66–13:3,

13:11–18, 13:23–42, 13:59–67, 14:1–6, 14:8–10, 14:13–17, 14:26–56, 15:1–13, 15:20–26, 16:4–7, Figs. 4B, 6, 7, 24; Ex. 1002 ¶¶ 54–84).

Patent Owner does not dispute Petitioner's allegation that Dimov discloses limitations 1A–D. *See generally* PO Resp. We need not address Petitioner's allegations regarding the preamble or limitations 1A–D because we determine, below, that Dimov does not disclose or teach limitation 1E.

### 3. *Asserted Anticipation by Dimov*

Limitation 1E recites "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step." Ex. 1001, 32:7–9. In arguing that Dimov anticipates claim 1, Petitioner contends that Dimov discloses limitation 1E by listing various techniques, such as "[l]aser tweezers," that can be used "within the trench to provide for mixing or the like, *or to effect removal of the particles out of the trench*." Pet. 27 (quoting Ex. 1003, 11:21–26) (citing Ex. 1002 ¶ 85).

Petitioner argues that because "Dimov refers to removal of the particles out of an individual trench ('the trench'), . . . Dimov discloses selectively recovering the individual cell, or a clonal population thereof, from the individual chamber." Pet. 28 (citing Ex. 1002 ¶ 88). According to Petitioner, a person of ordinary skill in the art "would have understood that at least some of the [listed] techniques, such as laser tweezers, are techniques that, by their very natures and because of their technical limitations, would necessarily be directed to individual trenches." Pet. 28 (citing Ex. 1002 ¶ 89).

Petitioner also argues that Dimov motivates "subsequent analysis or experimentation" within the chamber after loading the cells into the device,

18

and a person of ordinary skill in the art would have had the same motivation to remove the cells from the device for later analysis or experimentation. Pet. 29 (quoting Ex. 1003, 12:18) (citing Ex. 1003, 11:29–30, 12:13–18; Ex. 1002 ¶ 90). According to Petitioner, a person of ordinary skill "would have at once envisaged basing the removal of the cell on the response in a monitoring step." Pet. 29 (citing *Kennametal, Inc. v. Ingersoll Cutting Tool, Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015); Ex. 1002 ¶ 91); *see also* Pet. 29–30 (citing Ex. 1002 ¶¶ 92–92) (giving examples of reasons why a person of ordinary skill would have envisioned removing cells for further analysis).

In its Response, Patent Owner contends that Dimov fails to disclose either "selectively recovering cells" or a "mechanism by which a cell could be recovered." PO Resp. 5 (citing Ex. 2012 ¶¶ 24–38, 58–68). Patent Owner argues that all the specific examples in Dimov are directed to the embodiment in which cells are retained in the trenches and analyzed by exposing them to different fluids and conditions while they are still in the trenches. *See id.* at 5–6 (citing Ex. 1003, 7:30–39, 8:4–9, 10:11–12, 10:55–58, 11:1–21, 12:13–18, 13:43–46; Ex. 2010, 161:11–24; Ex. 2012 ¶¶ 23–37, 58–69). Indeed, according to Patent Owner, Dimov contemplates that cell responses will be analyzed by exposing the cells "'to a suitable lysis agent' in the trenches so that they burst and 'their contents may be released' into the liquid media." *Id.* at 7 (citing Ex. 1003, 7:37–41, 8:6–9; Ex. 2010, 173:21–174:5; Ex. 2012 ¶ 63).

Patent Owner also argues that Dimov fails to disclose, within its microfluidic device, any structure that would allow for the selective recovery of a cell or clonal cell population. PO Resp. 6–7. According to Patent Owner, "there is no direct access to the trenches, and all fluid leaving every

trench converges into a single common waste, from which cells cannot be selectively recovered." *Id.* at 7 (citing Ex. 1003, 4:5–8, 4:18–22; Ex. 2012 ¶¶ 58–69); *see also id.* at 29–32. Relying on the testimony of Dr. Gale, Patent Owner argues that the lines leading out of each capture chamber are "very long and convoluted, which introduces additional complications such as loss of cells to interior walls, an inability to follow any specific cells of interest, significant dilution, shear stresses, and congestion, none of which support cell recovery." *Id.* at 7 (citing Ex. 2012 ¶¶ 24, 30, 63). Further, to the extent that lysis agents are used in any of the experiments on the chip, Patent Owner contends that such agents would destroy any intact cells on their path to the common waste. *Id.* at 7–8 (citing Ex. 1003, 4:1–22, Fig. 1; Ex. 2010, 173:1–20; Ex. 2012 ¶¶ 32, 60–62).

Finally, Patent Owner argues that, while Dimov briefly discusses "removal" of particles from the trenches and a "generic list" of nine techniques for mixing or removal, the focus of Dimov "is on what is retained in the trench, not what is discarded or removed." PO Resp. 8 (citing Ex. 2012 ¶¶ 59–69); *see also* Ex. 2012 ¶ 64 (Dr. Gale opining that Dimov's mention of removal techniques relates to "removing waste or other unwanted particles out of the capture chamber/trench"[6]). According to Patent Owner, Dimov provides no disclosure, and no examples, about "(i) how specifically to employ the list of potential techniques, (ii) how to agitate or

---

[6] Petitioner appears to interpret Dr. Gale's testimony in paragraph 64 of his declaration as opining that the "particles" that Dimov mentions are not cells. *See* Pet. Reply 3–4. This is not how we interpret his testimony, and in any event, Dr. Gale agreed on cross-examination that in Dimov, the term *particles* may include cells. *See* Ex. 1038, 46:4–47:10.

manipulate the particles, [or] (iii) how to remove, much less selectively recover *individual* cells without damaging or otherwise altering the cells to be removed." *Id.* at 8–9. Thus, Patent Owner disagrees with Petitioner that a person of ordinary skill in the art "would have at once envisaged" performing a selective cell recovery in response to monitoring a cell response in one of the chambers. *Id.* at 9–10 (quoting Pet. 29).

In its Reply, Petitioner contends that Patent Owner does not dispute that Dimov discloses at least some embodiments that could be used for removing cells from Dimov's individual trenches, or "that removing particles from one of multiple trenches constitutes selectively recovering the particles." Pet. Reply 2–3 (citing Ex. 1001, 26:57–62; Ex. 1003, 11:21–26; Ex. 2012 ¶¶ 37, 66; Ex. 1038, 123:17–125:10; Ex. 1039 ¶¶ 5–9). And according to Petitioner, Dimov's example of using the trenches for biomimetic experiments is not the only disclosed embodiment, and Dimov frames the possibility of cell removal as an alternative embodiment. *Id.* at 3 (citing Ex. 2010, 205:19–206:11; Ex. 1039 ¶¶ 13–20).

Finally, Petitioner argues that Dimov's disclosure is not inconsistent with selectively recovering cells because (a) Dimov's disclosure about retaining and analyzing cells in the trenches does not preclude subsequently removing the cells (Pet. Reply 4 (citing Ex. 1002 ¶ 92; Ex. 1039 ¶¶ 21–30)); (b) Dimov does not teach that every single experiment in its devices will include the use of a lysis agent (*id.* (citing Ex. 1038, 56:2–5, 55:15–20; Ex. 1039 ¶¶ 49–51)); (c) limitation 1E does not impose any requirements on what happens to a cell after it is selectively recovered (*id.* (citing Ex. 1039 ¶¶ 21–30, 52–55)); (d) none of Dimov's structural features, such as the common waste stream, "would prevent selective recovery" (*id.* at 5 (citing

21

Ex. 1039 ¶¶ 31–48[7])); and (e) "Patent Owner fails to show that a [person of ordinary skill in the art] would have lacked the knowledge or skill to implement Dimov's removal techniques—including laser tweezers, which was well known in the art" (*id.* (citing Ex. 1039 ¶¶ 11–12)).

To establish anticipation, a petitioner must find each and every element in a claim, arranged as recited in the claim, in a single prior art reference. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008). The limitations may be present in the reference "either explicitly or inherently." *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997). Further, an anticipating prior art reference must be enabling and must describe the "claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention." *See Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000). We do, however, consider the reference "together with the knowledge of one of ordinary skill in the pertinent art." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (citing *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)).

Based on these principles, we agree with Patent Owner that Petitioner has not identified within the four corners of Dimov a sufficient disclosure of

---

[7] Petitioner improperly cites these eighteen paragraphs (more than ten pages) from Dr. Meinhart's reply declaration in support of this conclusory technical assertion, without any additional commentary. Our rules prohibit this type of incorporation of testimony by reference, and we do not consider the cited paragraphs in our analysis. 37 CFR 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document."); *Cisco Sys., Inc. v. C-Cation Techs., LLC*, IPR2014-00454, Paper 12 at 9 (PTAB Aug. 29, 2014) (informative) (declining to consider "conclusory statements [in an expert declaration] for which the Petition does not otherwise provide an argument or explanation").

selectively recovering a cell based on the response in the monitoring step. Although Dimov discloses non-selective recovery and briefly lists a few general techniques that might be used for either mixing or recovery, Dimov does not specifically indicate which of the techniques would be useful for recovery rather than just mixing, and Dimov does not explicitly disclose that any cell recovery would be selective. Nor has Petitioner shown that Dimov inherently discloses selectively recovering any particular cell that has been cultured and monitored, because, as Dr. Gale persuasively testifies, Dimov's removal techniques could, as far as a person of ordinary skill in the art would have known based on Dimov's disclosure, be merely for "removing . . . unwanted particles out of the capture chamber/trench." Ex. 2012 ¶ 64; *see also id.* ¶ 63 ("Dimov . . . may suggest removing cellular materials (rather than intact cells) after capture . . . ."). In other words, given Dimov's general focus on performing experiments *within* the trenches and the lack of any specific disclosure about how or why to remove cells, Petitioner has not met its burden to show that Dimov's potential cell-removal techniques would have *necessarily* been based on a response of a specific cell being cultured and monitored in limitation 1D.

We also agree with Patent Owner that Dimov does not disclose any specifics about how to carry out a selective cell removal based on one of Dimov's listed techniques, such as laser tweezers. *See* PO Resp. 8–9. Nor does Petitioner meet its burden of showing that such a technique would have been within the ordinary skill in the art at the time of the claimed invention. "In order to anticipate, a prior art disclosure must also be enabling, such that one of ordinary skill in the art could practice the invention without undue experimentation." *Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*, 424

23

F.3d 1347, 1355 (Fed. Cir. 2005) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1342 (Fed. Cir. 2005)). Given the labyrinthine outlet channels leading from Dimov's chambers to the common waste stream and Dimov's lack of any disclosure of a way to identify and extract cells in the outlet streams, we credit Dr. Gale's testimony that there would have been substantial obstacles to recovering any specific cells that had been liberated from a trench in Dimov's device. *See* Ex. 2012 ¶ 63. Petitioner has not shown that a person of ordinary skill in the art would have overcome those obstacles without undue experimentation.

Thus, the evidence of record does not support Petitioner's argument that Dimov discloses limitation 1E or, consequently, that claim 1 is unpatentable under 25 U.S.C. § 102 as anticipated by Dimov.

### 4. Obviousness over Dimov

Alternatively, Petitioner argues in Ground 2 that claim 1 would have been obvious over Dimov, in view of the background knowledge of a person of ordinary skill in the art. Pet. 34–35 (citing Ex. 1002 ¶ 106).

A claim is unpatentable under § 103(a) for obviousness if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). When a ground in a petition is based on a combination of references, we consider "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id.* at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

We base our obviousness inquiry on factual considerations including (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, (3) the level of skill in the art, and (4) any objective indicia of obviousness or non-obviousness that may be in evidence.[8] *See Graham*, 383 U.S. at 17–18.

The main issue in dispute for this ground is whether there was a sufficient motivation and sufficient background knowledge in the art, at the time of the claimed invention, that a person of ordinary skill in the art would have modified Dimov's device to introduce selective recovery as recited in limitation 1E. For the reasons below, we determine that Petitioner has not met its burden of persuasion on this issue by a preponderance of the evidence.

According to Petitioner, Dimov discloses both monitoring a response in the chamber and removing cells from the chamber, and persons of ordinary skill in the art would have been motivated to selectively remove cells based on the monitored response, as recited in limitation 1E, so that they could further investigate cells of interest cultured in the chamber (such as to sequence their DNA or to expand the cells by culturing). Pet. 35–36 (citing Ex. 1002 ¶¶ 107–110).

As with its anticipation ground, Petitioner contends that an ordinarily skilled artisan would have removed cells using used one of the techniques listed in Dimov, such as laser tweezers. Pet. 36 (citing Ex. 1003, 11:30–40).

---

[8] Because neither party argues that there are objective indicia of obviousness or non-obviousness, this does not factor into our decision. *See generally* Pet.; PO Resp.; Pet. Reply; PO Sur-Reply.

In an alternative proposed modification, Petitioner argues that a person of ordinary skill in the art would have inserted a micropipette into a trench to aspirate one or more of the cells of interest for further analysis. Pet. 36 (citing Ex. 1003, 11:30–40; Ex. 1002 ¶ 111). Below, we address each of these alternative theories in turn.

(a)    <u>Modification of Dimov by Using Listed Removal Techniques</u>

Petitioner's first obviousness theory is that a person of ordinary skill in the art would have had reason to use one of the listed cell-removal techniques, such as laser tweezers, for selective cell recovery according to limitation 1E. *See* Pet. 36. As we note above, Petitioner asserts that the motivation for this modification would have been to conduct further investigations on the cells, which may, for example, involve sequencing or culturing. *See* Pet. 35–36 (citing Ex. 1002 ¶¶ 107–110).

In response, Patent Owner contends that, if a person of ordinary skill in the art wanted to conduct further investigations on cells outside of a fluidic device, the evidence does not show that they would have started with Dimov's "lab on a chip," which "was not designed for selective cell recovery, but rather to capture cells in its chambers and retain them there for further analysis, and there is no mechanism by which a cell could be recovered." PO Resp. 11–12 (citing Ex. 1003, 7:30–37; Ex. 2010, 159:2–160:22 (Dr. Meinhart acknowledging that Dimov is an example of lab-on-a-chip technology); Ex. 2012 ¶¶ 23–37, 70–81); *see also id.* at 18 (citing Ex. 2012 ¶¶ 87–90). Moreover, Patent Owner contends that any motivation to conduct subsequent experiments on cells of interest is already met by Dimov's teaching that subsequent experiments take place in the same trench,

26

without removing them. *Id.* at 21–22 (citing Ex. 1003, 8:8–10, 14:1–15:26; Ex. 2010, 186:22–187:2; Ex. 2012 ¶¶ 24–37, 58–69, 79–80, 87–118).

To allow for selective recovery, Patent Owner contends that a person of ordinary skill in the art would have had to essentially redesign Dimov's device to allow for external access to the trenches. PO Resp. 12; *see also id.* at 13 (arguing that the Examiner accepted a similar argument about Dimov during prosecution). According to Patent Owner, persons of ordinary skill in the art would not have made such a modification unless we attribute them with impermissible hindsight. *Id.* at 14 (citing *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1352 (Fed. Cir. 2013)); *see also id.* at 17 (citing Ex. 2012 ¶¶ 88–90; *InSite Vision, Inc. v. Sandoz, Inc.*, 783 F.3d 853, 859–60 (Fed. Cir. 2015) ("Defining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness.")).

Patent Owner also argues that, while Dimov mentions removal of particles from the trenches, Dimov's main focus is conducting experiments, and in particular, biomimetic experiments, fully within the trenches, and Dimov does not give any examples of selective cell recovery for further investigation. PO Resp. 18–19 (citing Ex. 1003, 7:30–37, 11:1–15, 11:21–43, Fig. 21; Ex. 2010, 159:2–160:22, 184:3–9 (Dr. Meinhart agreeing that Dimov does not provide specific examples of successful selective recovery of a cell), 206:12–18 (Dr. Meinhart agreeing that Dimov's discussion of cell

27

removal occurs within the discussion of biomimetic experiments such as shown in Dimov's Figure 21[9]); Ex. 2012 ¶¶ 23–37, 87–90, 109–123).

Thus, according to Patent Owner, Dimov does not actually teach that its listed cell mixing or removal techniques would have been for further investigation of cells exhibiting a particular response. PO Resp. 19 (citing Ex. 1003, 11:1–29; Ex. 2012 ¶¶ 112–118). Rather, given the context, Patent Owner contends that the mixing or removal techniques would have been used to adjust the cell layers during biomimetic experiments; "[f]or example, cells placed in layers for the biomimetic experiments may have needed to be rearranged because they were out of place, or because the researchers wanted a new arrangement for additional experiments." *Id.* (citing Ex. 2012 ¶¶ 112–118).

Patent Owner also argues that, because Dimov's device channels the outlet of hundreds of additional capture chambers toward a common waste line, and describes no other output mechanism, a person of ordinary skill in the art would not have considered Dimov's device to be a viable starting-point for a method of selective cell recovery, particularly if any of the concurrently running experiments involved the use of lysis agents. PO Resp. 19–21 & nn.4–5 (citing Ex. 1003, 1:30–36, 4:1–22, 4:50–61, 7:37–41, 8:6–9; Ex. 2010, 163:8–23, 173:1–174:5, 178:9–179:7, 179:13–23; Ex. 2012 ¶¶ 63, 92–99); *see also supra* Section III.C.3.

---

[9] Petitioner points out that in the same cross-examination testimony, Dr. Meinhart "testified that the discussion of cell removal is *not limited to* biomimetic experiments." Pet. Reply 3 (emphasis added) (citing Ex. 2010, 205:19–206:11; Ex. 1039 ¶¶ 13–20).

In its Reply, Petitioner disagrees that Dimov's mention of cell removal is limited to biomimetic experiments, even though both discussions occur in the same paragraph. Pet. Reply 3. According to Petitioner, Dimov's discussion of mixing or removal techniques "begins with general reference to 'the arrangements described herein,' i.e., in the specification, not just the immediately preceding discussion." *Id.* (quoting Ex. 1003, 11:21–22).

Petitioner also disagrees that a person of ordinary skill in the art would not have started with Dimov to obtain a microfluidic device that can allow for selective recovery as recited in limitation 1E. *See* Pet. Reply 6–7. According to Petitioner, it is undisputed that Dimov "was designed to conduct monitoring and analysis within the device, and reported doing so successfully." *Id.* at 7 (quoting PO Resp. 12) (citing Ex. 1039 ¶¶ 57–59).

As we discuss above in the context of Petitioner's anticipation ground, we disagree with Petitioner that Dimov itself discloses limitation 1E. *See supra* Section III.C.3. We also find that Dimov's limited reference to removal of particles from a trench would have been insufficient to teach a person of ordinary skill in the art to effectively recover a cell if their motivation is, as Petitioner alleges, to conduct further investigations on the cells by, for example, sequencing or culturing. *See* Pet. 35–36.

First, we agree with Patent Owner that Dimov's device is not, without substantial modification that Dimov itself does not teach, designed for selective cell recovery. As Patent Owner persuasively argues, Dimov's device is a "lab on a chip" designed in general to retain cells while performing multiple experiments, so Dimov's design choices reflect that general purpose. *See* PO Resp. 11–12, 18, 21–22; *see also* Ex. 1003, 10:55–67 (teaching the benefits of "lab on a chip" technology which allows a user

29

to conduct sequential investigations within a single structure). This is, in particular, evidenced by the multiplexed outlet streams, which channel all outlets to a common waste stream 140 without any apparent regard for viable cell recovery. *See* Ex. 1003, Figs. 1–3.

In light of this design, Petitioner has not persuasively shown that a person of ordinary skill in the art would have inferred, from Dimov's brief reference to "removal of the particles out of the trench," a teaching to conduct further analyses outside of the device (such as culturing or sequencing) on cells determined to be of interest based on a prior analysis. Given that Dimov's disclosure focuses on conducting sequential experiments on the same chip, we credit Dr. Gale's testimony that a person of ordinary skill in the art may *at least* as plausibly have interpreted this passage to suggest "removing waste or other unwanted particles out of the capture chamber/trench." Ex. 2012 ¶¶ 64–65; *see also* Ex. 1038, 46:18–47:4 (testifying that Dimov also discloses the use of beads within the trenches, which are also "particles"). Petitioner has not pointed to anything in Dimov specifically suggesting that the "particles" to be removed are cells of interest destined for later analysis.

Even if Dimov does suggest removing cells to conduct further analyses outside the device, the reference merely lists a set of techniques and provides no guidance on how to carry out such removal in a way that would still allow for further meaningful analysis of cells. *See* Ex. 1003, 11:21–43. Although Dimov mentions "laser tweezers" as part of its list, Dimov does not address the specifics of liberating a particular cell or its clonal population from the device using a technique such as laser tweezers. Nor is Dimov's mention of laser tweezers sufficient to motivate a person of

30

ordinary skill in the art to remove cells from a trench for further analysis outside the device. Dimov also does not address the difficulties a person of ordinary skill in the art would face in finding and recovering a cell that has been ejected into Dimov's common waste stream.

Based on these considerations, we conclude that Petitioner has not persuasively shown that Dimov's brief mention of cell removal techniques provides sufficient motivation or teachings for a person of ordinary skill in the art to selectively recover cells of interest for further analysis outside the device.

(b)  Modification of Dimov to Allow for Direct Access via Micropipette

Alternatively, Petitioner argues that, based on background knowledge in the art, a person of ordinary skill in the art would have modified Dimov's device "in a way that would permit the top layer of the device to be peeled back so a trench could be accessed directly." Pet. 36–37 (citing Ex. 1002 ¶ 112). According to Petitioner, Dimov already discloses that its device is constructed in two PDMS layers, and the modification would involve making these two layers "at least partially unbonded, permitting [the top layer] to be peeled back so as to allow direct access to the trench." Pet. 37 (citing Ex. 1003, 3:10–12, 5:37–39, 15:27–46, Fig. 25; Ex. 1002 ¶¶ 113–114). Petitioner also contends that Dimov does not actually teach bonding the two layers together. Pet. 38 (citing Ex. 1003, 15:44–45; Ex. 1002 ¶¶ 114–115).

For this peelable-layer embodiment, Petitioner also relies on Chao Han, et al., *Integration of Single Oocyte Trapping, In Vitro Fertilization and Embryo Culture in a Microwell-Structured Microfluidic Device*, 10 Lab on a

Chip 2848 (2010) (Ex. 1009, "Han"). Pet. 38–40. According to Petitioner, Han discloses a device with two PDMS layers, in which the upper layer can be peeled back to aspirate oocyte cells using a micropipette. *Id.* Petitioner contends that Han bears a "Received" date of May 5, 2010, which precedes the earliest filing date (July 7, 2010) to which the '408 patent claims priority. Pet. 38–39 (citing Ex. 1002 ¶ 117); *see* Ex. 1001, code (60). Petitioner contends that it would have been obvious to modify Dimov by adopting Han's peelable, two-layer structure, with a reasonable expectation of success. Pet. 40 (citing Ex. 1002 ¶¶ 113–114, 120).

Petitioner does not identify Han as one of the prior art references upon which the Petition bases its challenges. *See* Pet. 8. Additionally, as Patent Owner points out, Petitioner does not actually assert, in the Petition, that Han is prior art to the '408 patent. PO Resp. 15–16. Indeed, we find that the evidence of record does not establish that Han is a prior art publication. Petitioner's own declarant opines that Han's earliest publication date was September 15, 2010 (for the online version). *See* Ex. 1020 ¶ 68. This is after the '408 patent's earliest priority date of July 7, 2010. Ex. 1001, code (60). As Patent Owner correctly points out, Petitioner has not challenged this earliest priority date as applicable to claim 1. PO Resp. 15–16; PO Sur-reply 7 n.2; *see also* Pet. 8, 38 (noting this priority date, without challenging it); Pet. Reply 9 ("Han arguably was published after the earliest potential priority date . . . .").

In its Reply, Petitioner argues that, even if it Dimov itself did not teach the use of a peelable top layer to allow for micropipetting, its argument is based not just on Dimov, but on the background knowledge of a person of ordinary skill in the art. Pet. Reply 8. Citing testimony of Dr. Meinhart,

Petitioner contends that partially bonded PDMS layers and using a micropipette were "well known in the art." *Id.* (citing Ex. 1003, 8:36–40 (describing use of a pipette); Ex. 1007, 9327–28 (describing pipetting as "standard lab practice"); Ex. 1038, 39:7–22; Ex. 1039 ¶¶ 69–78).

Petitioner argues that, "regardless of its prior art status," Han is still "probative of the fact that those skilled in the art would have been motivated to construct a microfluidic device in a way that allowed the top layer of the device to be peeled back to expose microwells with cells that could be selectively aspirated by micropipette." Pet. Reply 9 (citing *Yeda Research v. Mylan Pharm. Inc.*, 906 F.3d 1031, 1041 (Fed. Cir. 2018)).[10]

Patent Owner counters, and we agree, that Petitioner has not shown that the peelable layer in Han's device reflects the background knowledge of a person of ordinary skill in the art at the time of the claimed invention. *See* PO Sur-reply 7–8. As Patent Owner correctly points out, Han describes its microfluidic device as being "*novel*," and Han particularly distinguishes the ability of its device, which allows extraction of embryos directly from a microwell using partially-bonded PDMS layers, from previous devices known in the art, which "had to generate a backward flow to make embryos return to the inlet" so they could be extracted. *Id.* (quoting Ex. 1009, 2853).

---

[10] Patent Owner challenges this Reply argument as untimely. *See* Paper 24; Paper 27, No. 12. Petitioner disagrees, citing parts of the record to which it is responsive. Paper 28, No. 12 (citing PO Resp. 15:4–16:2, 36 n.11; Ex. 2012 ¶¶ 84, 137; Dec. 18 n.8). We do not need to decide whether the argument was untimely under 37 CFR § 42.23(b) because, ultimately, we find the argument unpersuasive.

Thus, the evidence of record does not suggest that Han's peelable PDMS layers were known in the art before the date of the claimed invention, and Petitioner has not shown that Han's device reflects the background knowledge of a person of ordinary skill in the art at the relevant time. Consequently, we do not find Petitioner's proposed modification to Dimov to be persuasive.

### 5. Conclusion as to Grounds Based on Dimov

For the above reasons, we determine that Petitioner has not shown, by a preponderance of the evidence, that Dimov anticipates claim 1 or that claim 1 would have been obvious over Dimov.

Claims 6, 11, 19, 24, 26, 27, and 30 depend, directly or indirectly, from claim 1, and thus incorporate limitation 1E and its requirement of "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step." *See* Ex. 1001, 32:7–9, 32:23–25, 32:35–38, 32:58–61, 33:6–7, 33:10–14, 33:19–20. Petitioner's analysis of these claims addresses only the added limitations of each dependent claim and does not provide further argument that would remedy the deficiency in Petitioner's analysis comparing claim 1 to Dimov. *See* Pet. 30–34.

Thus, for the reasons given above as to claim 1, Petitioner has not shown that Dimov anticipates claims 6, 11, 19, 24, 26, 27, and 30, or that the claims would have been obvious over Dimov. *See In re Fine*, 837 F.2d 1071, 1076 (Fed. Cir. 1988) ("Dependent claims are nonobvious under section 103 if the independent claims from which they depend are nonobvious.").

D.    GROUND BASED ON DIMOV AND KOVAC (GROUND 3)

In Ground 3, Petitioner contends that claims 1, 6, 11, 19, 24, 26, 27, and 30 are unpatentable as obvious over Dimov in view of Kovac. *See* Pet. 40–45.

1.    *Overview of Kovac*

Kovac describes "a microscope-compatible, array-based microfluidic cell sorting architecture centered around passive hydrodynamic trapping of cells and active release using the optical scattering force" (Ex. 1007, 9322) of "a focused infrared laser to levitate cells of interest from their wells into a flow field for collection" (*id.* at 9321). According to Kovac, such "sorting can be a way to select a desired starting population of cells of known characteristics or can be a tool to analyze the results of an experiment and isolate particularly interesting cells for further investigation." *Id.* (footnote omitted).

Figure 1 of Kovac, which illustrates this cell sorting process, is reproduced below:

35



Figure 1, above, depicts a device with two glass layers between which is sandwiched a PDMS layer containing microwells, and above the microwells is a flow field in communication with a fluid inlet and a fluid outlet. *Id.* at 9322. The microwells are 30 μm wide and 35 μm deep, compared to a cell diameter of about 9 μm. *Id.* at 9326. The portion of the PDMS layer below the cells, through which the laser focuses, is about 2 mm thick. *Id.* at 9322–23, 9325.

As depicted in step (A), a fluid containing cells is injected into the device, and when the device is full, the flow is stopped while the cells sediment into the array while the fluid is stationary. Ex. 1007, 9322, 9324.

In step (B), the user pumps fresh media through the device, both forward and backward, and as a result, any cells remaining outside of wells, or which are trapped unstably in the array, flow away from the array and are removed. Ex. 1007, 9322, 9324. During this stage, the fluid outlet goes to an output waste stream. *Id.* at 9323 & Fig. 2.

In step (C), the system scans the entire array using software, and "[a]fter locating cells of interest, we focus an infrared (IR) laser beam onto target cells, levitating the cells into the flow field with the optical scattering force." Ex. 1007, 9322, 9324–25. This levitation "effect is analogous to a beach ball being pushed vertically by a fire hose." *Id.* at 9325. Kovac acknowledges a situation in which two cells could be stably trapped within the same microwell, and demonstrates that it is possible to remove one but not the other. *See id.* at 9326 & Fig. 3.

The width of the laser beam at its focal point is "roughly equal to the cell diameter (~9 μm)." Ex. 1007, 9326. The laser has an output power of up to 150 mW and a wavelength of 980 nm, and is applied for up to about 30 seconds. *Id.* at 9324–25, 9327. Because of potential damage to the cells, the authors view this as "the most extreme parameters we would consider for cell removal." *Id.* at 9327.

According to Kovac, this laser power and wavelength, beam width, and duration "is considerably gentler than parameters in many optical tweezers applications, where the beam is focused to micrometer-sized spots, sometimes at power levels up to ~1 W for longer durations." Ex. 1007, 9327.

37

Kovac compared these laser parameters to those in other studies and determined that one of the studies, which reported no cell damage using much higher laser power (13.2 W compared to 125 mW in Kovac) and a higher wavelength (1070 nm compared to 980 nm in Kovac) but much shorter exposure time (0.004 seconds compared to 20 seconds in Kovac) and much lower energy density ($2.8 \times 10^5$ J/cm$^2$ compared to $4.3 \times 10^6$ J/cm$^2$ in Kovac) was also "an acceptable operating point." Ex. 2004, Table S-1; Ex. 1007.

Finally, in step (D), as the cell is pushed into the flow stream, "[f]luid drag overcomes lateral optical forces, releasing the cell and washing it downstream for fractionation." Ex. 1007, 9322. During this stage, the fluid outlet, with the liberated cell, goes to a reservoir output that can be pierced so that the cell can be removed with a pipette. *Id.* at 9323 & Fig. 2.

### 2. The Parties' Arguments

For this ground, Petitioner relies on Dimov as teaching limitations 1A–D, as we discuss above in the context of the Dimov-only grounds. Pet. 40; *see supra* Sections III.C.3–.4. In this ground, Petitioner relies on Kovac for teaching limitation 1E. *See* Pet. 40–41.

According to Petitioner, Kovac's method selectively recovers cells by levitating them with a laser so that they "flow to a reservoir of the microfluidic device, where they are removed from the device by micropipette." Pet. 42 (citing Ex. 1007, 9322; Ex. 1002 ¶ 125). In particular, Petitioner argues that an ordinarily skilled artisan would have used a microscope to inspect the trenches of Dimov's device, and then would have "focus[ed] an infrared (IR) laser beam onto target cells from below through the glass substrate and bottom PDMS layer, as described in Kovac, levitating

38

the cells into the flow field with the optical scattering force." Pet. 43 (citing Ex. 1007, 9322; Ex. 1002 ¶¶ 127–128). Petitioner notes that both the upper and lower layers of Dimov's device are transparent, and the chambers would have been visible in either direction using a microscope. *See* Pet. 44 (citing Ex. 1003, 5:38–39, 6:6–14, 9:13–20, 9:23–27, Figs. 11, 13; Ex. 1002 ¶ 128).

Petitioner contends that, "after levitating a cell of interest from a [chamber] in the Dimov device, the levitated cell could then be flowed down 'a fluid path 103 defined within a substrate 105' to 'an output 130' . . . where it could then be removed from the device by micropipette." Pet. 44 (quoting Ex. 1003, 3:22–26) (citing Ex. 1002 ¶ 128).

Petitioner argues that a person of ordinary skill it the art would have been motivated to modify Dimov's device in this way given "the need to 'select a desired population of cells of known characteristics' or 'isolate particularly interesting cells for further investigation.'" Pet. 43 (quoting Ex. 1007, 9321) (citing Ex. 1002 ¶ 126). According to Petitioner, Kovac teaches that its method "was straightforward, user-friendly, and conceivably automatable," and that it "was simple to implement in a standard microscope with minimal modification." *Id.* (citing Ex. 1007, 9325). Petitioner also argues that a person of ordinary skill in the art "would additionally have been motivated to combine Dimov with Kovac as described above because Dimov expressly discloses removing particles, such as cells, from trenches using '[d]ielectrophoretic' and '[l]aser tweezers' techniques, . . . and Kovac uses similar techniques to accomplish its 'selective levitation.'" Pet. 44 (quoting Ex. 1003, 11:36, 11:38) (citing Ex. 1002 ¶ 130).

Finally, Petitioner contends that there would have been a reasonable expectation of success in combining Dimov with Kovac because "Kovac

discloses that experimental results confirmed that the selective levitation technique yielded the 'expected viability given our optical parameters,' and that '[c]ell retrieval from the device requires a simple pipetting step, which is standard lab practice and unlikely to damage cells." Pet. 45 (alteration in original) (quoting Ex. 1007, 9327–28) (citing Ex. 1007, 9328; Ex. 1002 ¶ 131).

In its Response, Patent Owner first argues, as discussed above in the context of Ground 2 based on Dimov, that if the motivation is to recover cells of interest for later analysis, a person of ordinary skill in the art would not have started with Dimov, which unlike Kovac describes a "lab on a chip" for performing sequential experiments within the same microfluidic device. *See* PO Resp. 17–22; *supra* Section III.C.4(a). According to Patent Owner, to the extent that Kovac provides motivation to sort and isolate cells of interest, using Kovac to provide a motivation to use of Dimov's apparatus shows an improper hindsight bias, as "the Dimov device was simply not designed for selective cell recovery (let alone with the laser technique described in Kovac." PO Resp. 22–23 & n.6 (citing Ex. 2010, 16:9–19, 17:4–9 (Dr. Meinhart agreeing that he did not opine that the challenged claims were obvious over either Kovac alone or over Kovac in view of Dimov)). Patent Owner also contends that Petitioner has not shown "why a [person of ordinary skill in the art] would have focused on selective cell recovery over [the] many other problems" known in the art at the time of the claimed invention. *Id.* at 17.

In its Reply, Petitioner contends that the need for selective cell recovery was known in the art, and that Dimov would have been an appropriate starting point for that endeavor. Pet. Reply 10. According to

Petitioner, the '408 patent admits that "[c]ell recovery is often required to enable functional assays to be performed on the progeny of the input cells, or to select cells of interest for larger scale culture. A method to recover defined clonal populations is therefore a critical requirement for many applications of microfluidic cultures." *Id.* at 10–11 (quoting Ex. 1001, 26:1– 6) (citing Ex. 1015, 42 (application as filed)). According to Petitioner, "[s]uch 'applicant admitted prior art' (AAPA) may be used to furnish a motivation to combine." *Id.* at 11.[11] Petitioner also contests that it need not specifically establish why "selective cell recovery," over any other problems, was the motivating reason to modify Dimov's device. *Id.* (citing *KSR*, 550 U.S. at 420).

Next, Patent Owner disagrees with Petitioner that Dimov's mention of laser tweezers as a mixing or removal technique would have led a person of ordinary skill in the art to Kovac's method, because Kovac's laser levitation technique is not laser tweezers, and Kovac distinguishes its technique from laser tweezers. PO Resp. 23 (citing Ex. 2012 ¶¶ 115–118; Ex. 2010, 110:16– 23 (Dr. Meinhart agreeing that Kovac distinguishes its laser levitation technique from "traditional optical tweezers")); *see* Ex. 2012 ¶ 117 (Dr. Gale

---

[11] Patent Owner contends that Petitioner's reliance on the AAPA is untimely because it first appears in the Reply. Paper 27, No. 2. Petitioner counters that this argument is responsive to statements in the Patent Owner Response that question whether Petitioner has established that a person of ordinary skill in the art would have been motivated to modify Dimov by the problem of selective cell recovery. *See* PO Sur-reply 10 n.4; Paper 28, No. 2 (citing PO Resp. 2:12–18, 16:16–18, 17:5–15). Because Petitioner's AAPA argument is not material to our analysis, as discussed below, we need not determine whether the argument was timely. *See infra* note 14.

testifying that "[t]he laser levitation approach proposed by Kovac does not trap particles, as occurs in laser tweezers, but rather balances particles on a column of laser light, meaning the particles are not held tightly in three dimensions."). According to Patent Owner, Kovac makes modifications to its microwells to achieve its laser levitation technique, such as treating the walls to reduce cell adhesion, that are incompatible with Dimov's goal of allowing for biomimetic experiments that require cell adhesion. PO Resp. 24 (citing Ex. 2012 ¶¶ 109–114).

Petitioner counters that Dimov's reference to laser tweezers need not be so specific as to teach "Kovac's particular mode of laser tweezers" to establish a motivation to combine with Kovac, because Dimov would have encompassed any form of laser tweezers known in the art. Pet. Reply 12 (citing Ex. 1039 ¶¶ 142–148). Relying on Dr. Meinhart's testimony and some of the wording in Kovac, Petitioner disagrees that Kovac's laser levitation method is not a form of laser tweezers. *Id.* (citing Ex. 1039 ¶ 145). Petitioner also argues that "nothing in Dimov requires cell adhesion," so nothing about Kovac's efforts to prevent adhesion during cell recovery would be incompatible with Dimov's goals. *Id.* at 12–13 (citing Ex. 1039 ¶¶ 138–141).

Next, Patent Owner argues that the size of the trenches in Dimov's microfluidic device is incompatible with Kovac's laser levitation technique because the laser in Kovac's device is focused in such a way that, "[a]s the cell is levitated away from the laser focus, the local intensity and lateral gradient force drop due to beam divergence." PO Resp. 24 (alteration in original) (quoting Ex. 1007, 9326). Patent Owner contends that this would be an unsolved problem in Dimov's device because "the cells in Dimov,

according to Petitioner, must be levitated to a height about ten times that in Kovac before they can exit the trenches." *Id.*; *see also id.* at 29.

Patent Owner also argues that, because of the large increase in the distance that cells would have to be levitated in Dimov's much deeper trenches, this "would require prolonged and/or increased exposure to lasers, increasing the risk of damage to the cell." PO Resp. 24–25 (citing Ex. 1007, 9327; Ex. 2004; citing Ex. 2012 ¶¶ 55–56, 102–107, 122–123, 167, 169–170); *see also id.* at 29 n.7 (citing Ex. 2012 ¶¶ 105–107, 170) (arguing that Dr. Meinhart recognized that "avoiding damage to the cell is crucial to success of selective recovery" by framing a reasonable expectation of success in terms of what was "unlikely to damage cells" (citing Ex. 1002 ¶¶ 131, 182)).

Additionally, according to Patent Owner, neither Petitioner nor Dr. Meinhart has explained *how*, given how much larger Dimov's trenches are than Kovac's microwells, a person of ordinary skill in the art "would have gone about focusing an IR laser beam onto target cells to levitate the cell into the flow field of Dimov." PO Resp. 27. Patent Owner argues that, on cross-examination, Dr. Meinhart was not able to say whether or not the "Dimov device's deeper wells would require either prolonged or increased exposure to the IR laser compared to what we see in Kovac" because there are "a lot of factors at play" other than just the height of the trench. *Id.* at 27–28 (quoting Ex. 2010, 168:22–171:1, 171:14–15) (citing Ex. 2012 ¶¶ 92–99).

Patent Owner notes that Dr. Gale agrees with Dr. Meinhart that there are many factors at play, including trench depth, that would determine whether it would be possible to levitate cells from Dimov's trenches using

Kovac's levitation technique. PO Resp. 28 (citing Ex. 2012 ¶¶ 92–99, 102–107, 119–128). Patent Owner also argues that Kovac is silent about how difficult it would be to implement its levitation technique on any other apparatus than its own, but notes that Kovac's model for describing the optical forces involved in levitation are so complex that "intuitive reasoning about behavior" is difficult. *Id.* (quoting Ex. 1007, 9325) (citing Ex. 2010, 100:6–20 (Dr. Meinhart stating that for solving the optical equations for multiple cells, "it's very complicated to do [Kovac's optical calculations] analytically, but you could possibly do it numerically with computer simulations. And [Kovac] does not get into that detail because that's beyond the scope of this work.")). As a result, according to Dr. Gale, a person of ordinary skill in the art would not be able to implement Kovac's levitation technique on a different device, such as Dimov's, by relying on Kovac's disclosure, and would have to conduct new experimental studies. *Id.* (citing Ex. 2012 ¶¶ 102–107, 122–128).

Petitioner counters that Patent Owner "does not substantiate [its] claims" that levitating cells out of Dimov's deeper wells would require prolonged exposure and increase the risk of cell damage. Pet. Reply 13 (citing Ex. 1039 ¶¶ 96–135, ¶¶ 149–151; Ex. 2012 ¶ 106). According to Petitioner, Kovac describes its laser parameters as benign, and the other references it cites use much harsher conditions. *Id.* (citing Ex. 1038, 100:9–101:10; Ex. 1039 ¶¶ 117–132). According to Petitioner, Kovac's data also suggests that the time periods or power levels of Kovac's levitation technique could be extended without causing cell damage, and none of the articles that Kovac cites "concluded that optical trapping techniques—even

harsh ones—should not be used for live-cell applications. *Id.* (citing Ex. 1039 ¶¶ 133–135).[12]

Petitioner also argues that Kovac's teachings are not limited to its specific device, and points out that on cross-examination, Dr. Meinhart stated that so long as devices such as Dimov and Kovac are "submillimeter," they would be comparable. Pet. Reply 14 & n.3 (citing Ex. 1007, 9329; Ex. 2010, 153:10–15; Ex. 1002 ¶¶ 102, 131). Petitioner also points to Dr. Meinhart's cross-examination testimony that there is no need for Petitioner to "identify exact optical parameters and a precise exposure time for removing cells from one of Dimov's trenches, and it would be no bar to obviousness if it were difficult to calculate such parameters, a priori, based on theory due to various factors." *Id.* at 14–15 (citing Ex. 2010, 168:22–171:11). Petitioner ascribes such work to develop the combination of Dimov and Kovac as the ordinary creativity of a person of ordinary skill in the art. *Id.* at 15 (citing *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1352 (Fed. Cir. 2020)). Petitioner argues that Patent Owner has not argued that experimentation would be undue or always required, and contends that, according to Dr. Gale, the experimentation would involve either increasing the exposure time or the laser power, but Petitioner denies that such alterations would result in cell damage. *Id.* at 15 (citing Ex. 2012 ¶ 104).

---

[12] Patent Owner contends that Petitioner has improperly incorporated by reference a large portion of Dr. Meinhart's reply declaration without explanation. PO Sur-reply 10–11 n.5. We agree that Petitioner's citations to paragraphs 96–135 and 149–151 (more than 27 pages) are insufficiently explained in the single paragraph on page 13 of Petitioner's Reply. Thus, we do not consider this testimony apart from what Petitioner specifically points out in its Reply. *See* 37 CFR 42.6(a)(3).

Finally, Patent Owner argues that Petitioner has not persuasively shown that, given Dimov's labyrinthine outlet channels that converge from each trench, a person of ordinary skill in the art would have been able to successfully recover for future analysis any cell that has been liberated from Dimov's trench using Kovac's levitation technique. PO Resp. 29–32; *see also supra* Section III.C.3. According to Patent Owner, Dr. Meinhart agreed on cross-examination that in the proposed combination of Dimov and Kovac, the only modification to Dimov's shared output and common waste system would have been to use a "micropipette at the output to extract the cell." *Id.* at 30 (quoting Ex. 2010, 216:9–10) (citing Ex. 2010, 215:2–216:15).

But Patent Owner contends that this proposed modification to Dimov differs from Kovac's device, which includes a "reservoir output" where cells can be collected, separate from the "waste output." PO Resp. 30 n.8 (citing Ex. 1007, 9323–24; Ex. 2010, 67:23–68:25). Patent Owner argues that Petitioner has not explained how a person of ordinary skill in the art would track any cells liberated from the trenches so that they could be recovered somewhere in common waste outputs 130 or 140; for example, the cell would be outside the microscope's field of view. *Id.* at 30–31 (citing Ex. 1003, 4:5–8, 4:20–22, Figs. 1, 2, 4B; Ex. 2012 ¶¶ 63, 97–98, 124–128). According to Patent Owner, a person of ordinary skill in the art "would not have had a reasonable expectation of success following the cell through the device to identify the levitated cell for collection out of the 'common waste.'" *Id.* at 32 (citing Ex. 2012 ¶¶ 30, 97–98, 124–128).

Patent Owner points out that in Dimov's device, each trench shares a common input (120) with seven other trenches, so according to Patent

Owner, flushing a cell out of a trench would involve mixing the trench's outlet stream with fluid from the other neighboring trenches, which adds "a significant amount of fluid to flush the levitated cells through this long path," thus "further disturb[ing] the cell" and possibly mixing the cell with material from other trenches. PO Resp. 31–32 (citing Ex. 2012 ¶¶ 30, 97–98, 124–128). Relying on teachings of Kovac, testimony of Dr. Gale and an acknowledgement of Dr. Meinhart during cross-examination, Patent Owner contends that the convoluted outlet path in Dimov's device would result in "complications such as loss of cells to interior walls, an inability to follow any specific cells of interest, significant dilution, shear stresses, and congestion, none of which support cell recovery." *Id.* at 32 (citing Ex. 1007, 9329 ("[T]he number of contaminating cells collected varies directly with the total time during which target cells are removed."); Ex. 2012 ¶¶ 81, 97–98, 124–128; Ex. 2010, 120:13–121:5 (stating that, according to Kovac, "the longer you spend removing cells, . . . the higher the probability that spurious cells in that solution are collected")).

Petitioner counters that Patent Owner has failed to show that a person of ordinary skill in the art would have been unable to recover levitated cells from Dimov's output stream. Pet. Reply 16 (citing Ex. 1039 ¶¶ 152–156). According to Petitioner, the Petition "never asserted that such monitoring would be required, and Patent Owner does not establish that a [person of ordinary skill in the art] could not accomplish such monitoring, if desired, by using a wider field of view or moving the microscope stage, for example."

*Id.* (citing Ex. 1039 ¶¶ 155–156).[13] Petitioner also contends that "the challenged claims do not require 100% purity," so the "speculation" that flushing the levitated cell into an outlet could result in mixing with other particles "does not defeat a reasonable expectation of success." *Id.* (citing Ex. 1039 ¶¶ 157–158).

### 3. Analysis

Like Petitioner's second ground, Petitioner asserts that the motivation to modify Dimov's microfluidic device in view of Kovac's levitation method would have been to allow a user to selectively recover cells of interest for later analysis outside the device. *See* Pet. 43 (identifying the motivation as "the need to 'select a desired population of cells of known characteristics' or 'isolate particularly interesting cells for further investigation'" (quoting Ex. 1007, 9321)). For the reasons below, we find that Petitioner has not proven this motivation.[14] Thus, Petitioner has not shown, by a preponderance of the evidence, that claim 1 would have been obvious over the combination of Dimov and Kovac.

---

[13] Patent Owner contends that this argument is untimely because Petitioner first raised it in the Reply. Paper 27, No. 4; *see* Paper 28, No. 4 (Petitioner's response). Because Petitioner's assertion is not material to our decision, we do not need to decide whether it is untimely.

[14] As discussed above, Petitioner alleges that the '408 patent includes applicant admitted prior art (AAPA) establishing a known general motivation to selectively recover cells. *See supra* note 11; Ex. 1001, 26:1–6. We need not decide whether this passage is AAPA because, even if it were, it does not establish a motivation to combine Dimov and Kovac, specifically, to achieve the asserted goal of selective cell recovery.

First, we agree with Petitioner that its burden, under *KSR*, does not require it to show why selective cell recovery, over any other known problem in the art, would have been the motivating reason to modify Dimov's device. *See* Pet. Reply 11. *See KSR*, 550 U.S. at 420 ("[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed."). But "[a]lthough the *KSR* test is flexible, the Board 'must still be careful not to allow hindsight reconstruction of references.'" *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir. 2016) (quoting *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368 (Fed. Cir. 2012)). Petitioner must, at least, show that a person of ordinary skill in the art would have had reason to select Dimov's device as a suitable starting point to achieve what Petitioner contends is the motivating objective. *See Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011) ("[O]bviousness requires the . . . showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention.").

Second, we agree with Patent Owner that Petitioner has failed to meet its burden to show that a person of ordinary skill in the art would have selected Dimov's microfluidic device for use with Kovac's cell levitation method. That Dimov briefly mentions "[l]aser tweezers" as a possible mixing or removal technique (Ex. 1003, 11:38) is not persuasive evidence that a person of ordinary skill in the art would have selected Kovac's *specific* laser levitation method for use in Dimov's device to recover cells of interest for further analysis.

49

The evidence shows that the ability to recover useful cells, using laser-based manipulation, is highly dependent on the laser parameters, including power, exposure time, and the shape of the laser focus. *See, e.g.*, Ex. 1007, 9325–26; Ex. 2012 ¶ 104. For example, Kovac teaches that "[a]s the cell is levitated away from the laser focus, the local intensity and lateral gradient force drop due to beam divergence." Ex. 1007, 9326; Ex. 2012 ¶¶ 50, 104. Although Kovac uses a beam divergence such that, despite this drop, maintains cells within the beam while levitating them into the flow stream above Kovac's shallow 35 µm microwells (*see* Ex. 1007, 9326), Petitioner's proposed combination would require focusing the laser beam such that it can raise a cell nearly an order of magnitude higher than in Kovac, and Petitioner has not shown how a person of ordinary skill in the art would have obtained laser parameters suitable for raising the cell that far.

Similarly, Petitioner has not shown how a person of ordinary skill in the art would have addressed the problem, discussed in Kovac, that under certain combinations of power, spot size, and exposure time, there is likely to be unacceptable cell damage that would motivate against using Kovac's method in Dimov's device to recover cells that are still usable for further analysis as per Petitioner's alleged motivation to combine. *See* Ex. 1007, 9326–28; Ex. 2004, Table S-1. Kovac teaches that "the most extreme parameters [the authors] would consider for cell removal" in its 35 µm microwells are 150 mW applied to the cells for 30 seconds. Ex. 1007, 9327. But these parameters are designed for Kovac's device, which uses a microwell that is nearly an order or magnitude narrower and shallower than Dimov's trench.

50

Kovac teaches that, other than knowing that "scattering force is linearly proportional to power," further intuitive reasoning about scattering behavior used in designing a laser levitation column is "difficult without focusing on a specific set of optical parameters." Ex. 1007, 9325. Both Drs. Meinhart and Gale agree that there are "a lot of factors at play" when designing a laser column that could successfully levitate a cell into a flow stream without causing unacceptable cell damage. *See* Ex. 2010, 168:22–171:11; Ex. 2012 ¶¶ 92–99, 102–107, 119–128.

Yet, the uncontested level of ordinary skill in the art, which Petitioner proposed and we have adopted for this decision, involves only a bachelor's degree and as little as three years of experience constructing and using microfluidic devices for cell culture and analysis. *See supra* Section III.A. Beyond that level of expertise, this articulation does not require any specialized knowledge of the use of lasers to manipulate living cells. We find that Petitioner has not shown, by a preponderance of the evidence, that such a person of ordinary skill in the art would have had the background knowledge and experience needed for manipulating the many "factors at play" to successfully adapt Kovac's method for use in Dimov's much deeper trenches. Nor has Petitioner demonstrated that it would have even been feasible to selectively recover cells from Dimov's deep trenches that are suitable for future analysis outside Dimov's device.[15]

---

[15] Because we find that Petitioner has not persuasively proven its purported motivation to combine, we need not address the question of whether there would have been a reasonable expectation of success in modifying Dimov to achieve limitation 1E as claimed (which does not explicitly require the recovery of viable cells). *See Intelligent Bio-Sys., Inc. v. Illumina Cambridge*

51

We also find that Petitioner has not shown that a person of ordinary skill in the art would have considered it feasible to recover liberated cells from Dimov's shared waste stream, given the long path from each trench to the waste stream and the fact that potentially hundreds of other trenches share the same outlet. *See supra* Section III.C.3 (discussing challenges that would be involved in recovering a specific cell from Dimov's device). Dimov's outlet is substantially different from that of Kovac, which has a single outlet for the array and a reservoir output, separate from the waste stream, where individual liberated cells travel to await recovery with a micropipette. *See* Ex. 1007, 9322–23 & Figs. 1, 2A. Given such differences and the lack of any such disclosure in Dimov itself, we determine that Petitioner has not explained, with enough specificity, how a person of ordinary skill in the art would have located and recovered a liberated cell from Dimov's common waste stream. *See Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 994 (Fed. Cir. 2017) ("[A] clear, evidence-supported account of the contemplated workings of the combination is a prerequisite to adequately explaining and supporting a conclusion that a relevant skilled artisan would have been motivated to make the combination and reasonably expect success in doing so.").

For the above reasons, we determine that Petitioner has not shown, by a preponderance of the evidence, that claim 1 would have been obvious over Dimov in view of Kovac.

---

*Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (although reasonable expectation of success considers the invention as claimed, a skilled artisan's ability to achieve the intended outcome is relevant to the motivation to combine).

Beyond its arguments in the context of anticipation, Petitioner does not address the specific additional limitations of dependent claims 6, 11, 19, 24, 26, 27, and 30. *See* Pet. 40–45. Thus, for the reasons given above as to claim 1, Petitioner has not shown sufficiently that claims 6, 11, 19, 24, 26, 27, and 30 would have been obvious over Dimov in view of Kovac. *See Fine*, 837 F.2d at 1076.

E.    GROUND BASED ON PARK (GROUND 4)

In Ground 4, Petitioner contends that claims 1, 11, 16, 24, 26, 27, and 30 are unpatentable under 35 U.S.C. § 103(a) as obvious over Park. *See* Pet. 45–61. As we discuss below, we determine that Petitioner's arguments are not persuasive.

1.    *Overview of Park*

Park is a journal article describing "a flow method that enables single cell trapping in microwells with dimensions of 50 μm, a size sufficient to allow attachment and division of captured cells." Ex. 1006, 263. According to Park, prior studies had described methods for trapping multiple cells in each well, but "[s]ingle cell trapping is necessary to allow identification of differing cell phenotypes within a population of cells" and "enables observation of the direct descendants of single cells cultured under controlled biological conditions . . . , the analysis of intracellular compounds . . . , and the measurement of electrical functionality of cells." *Id.*

Thus, Park designed a triangular microwell array configured so that, "[o]nce a cell is captured, the cell presence in the microwell changes the flow pattern, thereby preventing trapping of other cells." Ex. 1006, 263. This is illustrated in Figures 1a–c of Park, reproduced below:

53



Figure 1b, above, shows the overall system, which includes an "inlet reservoir where the cell suspension is introduced, [a] main channel, microwells (not shown in the figure) patterned on the bottom surface of the main channel, and the outlet which is connected to a pulling syringe pump." Ex. 1006, 264.

Figure 1a, above, is a cross-sectional view of the microwells (20 µm deep and 50 µm wide) and the main channel (200 µm deep). Ex. 1006, 264. "During the perfusion of cell suspension in the channel, the cells sink gradually due to gravity, and some cells are caught in microwells while others pass and are carried away by flow." *Id.* at 264. According to Park, this is because, "[g]enerally, cells are 2–5% heavier than culture medium." *Id.* at 265. "Depending on the velocity of the cell and its position relative to the

54

microwells, a cell may approach a threshold slow speed at which point gravity shifts the cell into a lower streamline that leads into a recirculation zone in the microwell." *Id.*

Figure 1c, above, shows various microwell shapes that the authors tested in simulation, and shows the orientation of triangular microwells compared to the flow direction. *Id.* The authors "determined the equilateral triangle to be the best well shape because it had the strongest recirculation pattern in the microwell from 3D simulations." Ex. 1006, 265–66.

After flowing the cell suspension across the array, the user can "flush the system . . . to remove excess cells" at a flow rate that "is fast enough to wash away untrapped cells, but slow enough not to dislodge trapped cells." Ex. 1006, 268.

### 2. Uncontested Limitations 1A–D

Petitioner contends that Park discloses the preamble and limitations 1A–D, and points to passages within Park describing retaining a cell in a chamber, perfusing the cell with fluid while the cell is retained in the chamber, and culturing the cell within the chamber while monitoring a response. Pet. 45–57 (citing Ex. 1006, 264–68, Figs. 1–3; Ex. 1002 ¶¶ 132–159).

Patent Owner does not dispute Petitioner's allegation that Park discloses limitations 1A–D. *See generally* PO Resp. We need not address Petitioner's allegations regarding the preamble or limitations 1A–D because we determine, below, that Park does not disclose or teach limitation 1E.

### 3. Limitation 1E

For the selective recovery step of limitation 1E, Petitioner argues that because Park discloses culturing cells and monitoring responses in the triangular microwells, "[i]t would have been obvious to a [person of ordinary skill in the art] to make use of this monitoring by selectively removing one or more cells from an individual microwell based on a response—e.g., a long-term cell response or an instantaneous cell reaction—observed through such monitoring." Pet. 57 (citing Ex. 1002 ¶ 160).

To accomplish this, Petitioner contends that a skilled artisan "would have found it obvious to construct the device of Park in a known way that would permit the top layer of the device to be removed or peeled back so a microwell could be accessed directly by micropipette." Pet. 57 (citing Ex. 1002 ¶ 161). Petitioner contends that Park's device has two layers, and although Park does not disclose what materials the layers are made of, "it would have been obvious to a [person of ordinary skill in the art] to make such layers from PDMS." Pet. 57 (citing Ex. 1002 ¶ 162).

Because "Park does not state that the two layers of its device are bonded together," Petitioner contends that this "suggest[s] that the top layer may actually be removable," but even if Park's top layer is not removable, according to Petitioner, an ordinarily skilled artisan "would have found it obvious to construct the device so that it would be removable or to partially bond the top layer to the bottom layer so the top layer could be peeled back to expose the microwell array." Pet. 58 (citing Ex. 1002 ¶¶ 163–164).

As with its ground asserting obviousness based on Dimov, Petitioner relies on Han to support its proposed modification of Park's device. *See*

Pet. 58 (citing Ex. 1009, 2849; Ex. 1002 ¶¶ 164–165); *supra* Section III.C.4(b).

In its Response, Patent Owner contends that nothing in Park suggests selectively recovering cells that had been trapped in its microwells based on a monitored response, or that Park's device would have been suitable for such selective recovery of cells. *See* PO Resp. 33–37. In particular, Patent Owner contends that Park's device was not designed for selective recovery, and focuses instead on ensuring that the microwells trap single cells yet still have space for subsequent attachment and division of captured cells within the microwells. *Id.* at 33–36 & n.10 (citing Ex. 1006, 263–65, 267, 268, Fig. 3c; Ex. 2010, 123:3–6; Ex. 2012 ¶¶ 46–47, 130–136).

According to Patent Owner, Park's device did not "allow external access to the chambers," so to allow for selective access to cells, a user would have had to redesign Park's device in a way that has no basis within Park's teachings. PO Resp. 36–37 (citing Ex. 1006, 265, 268 ("The main limitations of our system are . . . that a cover is required to create the channel, restricting access to the microwells during cell seeding . . . ."); Ex. 2012 ¶¶ 136–138). Thus, Patent Owner contends that Petitioner's argument suffers from improper hindsight bias. *Id.* at 37 (citing *Cheese Sys.*, 725 F.3d at 1352). Patent Owner also contends that Petitioner's reliance on Han for this teaching is improper for the same reasons it is improper in the context of Dimov's disclosure. *Id.* at 36 n.11.

In its Reply, Petitioner counters that Patent Owner does not dispute that Park (1) is relevant prior art, (2) discloses limitations 1A–D, (3) is successful in culturing cells within the microwells, and (4) worked for its intended purpose. Pet. Reply 17. Petitioner also disputes Patent Owner's

57

contention that Park discloses a closed system to which there is no direct access to microwells, because Park "implies the opposite when it discloses that the top layer or cover of its device merely 'fits over' the bottom layer, and notes that this 'cover is required to create the channel, restricting access to the microwells *during cell seeding*." *Id.* at 18 (quoting Ex. 1006, 265, 268). Petitioner contends that "[t]he qualification 'during cell seeding' would have suggested to a [person of ordinary skill in the art] that there is, in fact, access to the microwells at times other than during cell seeding." *Id.* (citing Ex. 1039 ¶¶ 164–173).[16] According to Petitioner, a skilled artisan would have displaced the cover to aspirate cells from a microwell via a micropipette. *Id.* (citing Ex. 1002 ¶¶ 160–165 (relying on Dimov and Han)).

We agree with Patent Owner that Petitioner has not pointed to anything in Park that teaches selectively recovering cells. Petitioner's attempt to infer such a motivation from Park's disclosure relies on improper hindsight bias. *See* PO Sur-reply 17–18. In particular, Park itself does not appear to motivate making the top layer removable and aspirating cells from microwells using a micropipette. At most, Petitioner has only shown why an ordinarily skilled artisan *could have* modified Park, not that there would have been actual motivation to make the proposed modifications. *See Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("obviousness concerns whether a skilled artisan not only *could have made* but *would have*

---

[16] Patent Owner contends that this argument is untimely because it first appears in the Reply. Paper 27 No. 8; see Paper 28, No. 8 (Petitioner's response). Because we ultimately find this argument unpersuasive, we need not decide whether it is untimely.

*been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention").

As to Petitioner's reliance on Han as evidence that it was known in the art to make a microfluidic device peelable to allow access by a micropipette, we find this reliance insufficient for the reasons we discuss above in the context of the obviousness ground based on Dimov. *See supra* Section III.C.4(b); *see also* PO Resp. 18–20 (noting further distinctions between Park and Han).

For the above reasons, we determine that Petitioner has not shown, by a preponderance of the evidence, that claim 1 would have been obvious over Park. Petitioner's arguments as to claims 6, 11, 16, 24, 26, 27, and 30 address only the added limitations of each dependent claim and do not provide further argument that would remedy the deficiency as to limitation 1E. *See* Pet. 59–61. Thus, Petitioner has not shown that these claims would have been obvious over Park. *See Fine*, 837 F.2d at 1076.

F.    GROUND BASED ON PARK AND KOVAC (GROUND 5)

In its Ground 5, Petitioner contends that claims 1, 11, 16, 24, 26, 27, and 30 are unpatentable as obvious over Park in view of Kovac. *See* Pet. 62–63. For the reasons below, we determine that Petitioner has not proven unpatentability based on this ground by a preponderance of the evidence.

1.    *The Parties' Arguments*

For this ground, Petitioner relies on Park for teaching limitations 1A–D, as discussed above in the context of the Park-only ground (Ground 4), and relies on Kovac for teaching limitation 1E. *See* Pet. 62. According to Petitioner, a person of ordinary skill in the art "would have been motivated

59

to add the 'selective levitation' technique of Kovac, as described in [Petitioner's third ground], to the methods disclosed in Park." *Id.*

In particular, Petitioner contends that an ordinarily skilled artisan would have used a microscope to inspect Park's microwells, and then would have "focus[ed] an infrared (IR) laser beam onto target cells from below, as described in Kovac, levitating the cells into the flow field with the optical scattering force." Pet. 62 (citing Ex. 1007, 9322; Ex. 1002 ¶ 180). Petitioner contends that it would have been "obvious to use a transparent or semi-transparent material, such as PDMS, to construct the top layer of the Park device so as to permit visual observation of microwells from above." Pet. 63 (citing Ex. 1002 ¶ 181). After levitating a cell, according to Petitioner, an ordinarily skilled artisan would then allow the cell to "flow[] down the 'main channel' to the existing 'outlet,' 'which is connected to a pulling syringe pump' to evacuate the cell from the device." *Id.* (quoting Ex. 1006, 264) (citing Ex. 1002 ¶ 181).

Petitioner contends that Kovac's microwells, 30 µm in diameter and 35 µm deep, are similar in size to Park's microwells, 50 µm per side and 20 µm deep. Pet. 63 (citing Ex. 1007, 9326; Ex. 1006, 266). Petitioner also contends that Kovac teaches that its method would yield viable cells, and only requires a simple pipetting step to recover the cells. Pet. 63 (citing Ex. 1007, 9327–28).

In its Response, Patent Owner first argues that because Park's device was not designed to allow for selective recovery of cells, "there would have been no reason for a [person of ordinary skill in the art] to have started with the Park device." PO Resp. 38–39 (citing PO Resp. 33–37 (similar argument in the context of the ground based on Park alone); Ex. 2012 ¶¶ 139–159). As

with Dimov, Patent Owner contends that Park's device "was designed to *trap* cells for culturing *within* the microwells of the device." *Id.* at 39 (citing Ex. 2012 ¶¶ 41–46, 139–159). It is "a closed system having a single inlet and outlet" and "there was no way for a [person of ordinary skill in the art] to access the culturing cells without first disassembling the device and losing the flow through the device, which would allow any cells to end up back in the device." *Id.* at 39–40 (citing Ex. 1006, 264–67; Ex. 2010, 142:6–8, 142:19–23; Ex. 2012 ¶¶ 44, 151–159); *see also id.* at 44 (citing Ex. 1006, 264–67; Ex. 2010, 142:6–8, 19–23; Ex. 2012 ¶¶ 52, 155–158) (noting that, unlike Kovac, Park has no outlet reservoir for recovering specific cells); *see also id.* at 53–54 (citing Ex. 2010, 141:14–16, 146:25–147:19, 150:18–151:2; Ex. 2012 ¶¶ 42, 155, 168) (arguing that Petitioner has not explained how a person of ordinary skill in the art would have modified Park's device to allow for recovery of a specific liberated cell, other than disconnecting the syringe pump and thus disrupting the flow).

Next, Patent Owner argues that Petitioner has failed to show a motivation to combine Park with Kovac because, whereas Park's device uses circulation patterns caused by fluid flow to trap cells within a well, "Kovac uses the lack of flow to trap cells, and does not discuss replication of cells in the wells" and "makes efforts to prevent the cells in its wells from becoming adhesive (by using suspension and pre-treating the wells), which is the opposite of Park's goal." PO Resp. 43 (citing Ex. 2010, 202:3–11; Ex. 2012 ¶¶ 45–46, 53, 147–149, 151–159); *see also id.* at 44 (citing Ex. 1006, 264–67; Ex. 2010, 83:23–84:5, 138:2–14, 142:6–8, 19–23; Ex. 2012 ¶¶ 42–46). Patent Owner argues that Park's device is designed so that cells will attach to each other and to the wells during culturing, and Kovac contains no

61

teachings about using its levitation method under these very different circumstances. *Id.* at 49–50 (citing Ex. 1006, 267, Fig. 3c; Ex. 2002, 58:23–26; Ex. 2010, 117:12–119:7; Ex. 2012 ¶¶ 53–56, 161, 165).[17]

According to Patent Owner, "the triangular shaped microwells of Park were specifically designed to retain cells during flow," yet in Kovac's device, fluid flow is necessary for recovering any cells levitated by the laser. PO Resp. 47 (citing Ex. 1007, 9322; Ex. 2010, 89:8–11; Ex. 2012 ¶¶ 162–166). Thus, Patent Owner argues that in Petitioner's proposed combination, "the dynamic flow of fluid through the microwells in Park would suppress the levitation force of the Kovac laser, hampering recovery." *Id.* (citing Ex. 2012 ¶¶ 162–166). According to Patent Owner, counteracting this downward force "would require prolonged and/or increased exposure to lasers, increasing the risk of damage to the cell." *Id.* at 48 (citing Ex. 2012 ¶¶ 55–56, 102–107, 122–123, 167, 169–170).

Next, Patent Owner points to other factors that would have complicated the proposed combination, such as that Park's recirculation pattern drags cells not just downward but to an upstream corner where Stokes drag wall effects would have led to longer removal times from the microwell and failure of cell removal. PO Resp. 48 (citing Ex. 1006, 266–67, Fig. 2c; Ex. 1007, 9326 ("[N]onspecific surface interactions appear to be

---

[17] Although Patent Owner acknowledges that Kovac discusses removing a single cell from a well with multiple cells, Patent Owner contends that this only relates to a doubly loaded cell in which the cells are not the result of replication due to culturing and are not adhered to each other. PO Resp. 43 n.15 (citing Ex. 1007, 9326; Ex. 2010, 221:4–222:4 (Dr. Meinhart agreeing that this example in Kovac is for a single cell in a doubly loaded well); Ex. 2012 ¶¶ 148–149, 157).

62

the primary reason that cell removal fails."); Ex. 2010, 115:5–117:11, 112:22–113:23, 139:5–9; Ex. 2012 ¶¶ 162–166).

Patent Owner also argues that Dr. Meinhart acknowledged that a person of ordinary skill in the art would have needed to modify the laser parameters, such as by using a different lens, to use Kovac's levitation method in Park's device. PO Resp. 50 (citing Ex. 2010, 132:9–136:12). And according to Patent Owner, Dr. Meinhart recognized that there were "a lot of factors at play" that would affect the levitation, such as "cell size, whether cells are conglomerated together, . . . wall interactions . . . recirculation patter[n]s, [and] hydrodynamic drag," such that "[i]t'd be difficult to determine how much time would be necessary to be exposed." *Id.* at 50–51 (first, second, and fourth alterations in original) (quoting Ex. 2010, 168:22–171:7). Patent Owner reiterates its arguments, discussed above in the context of combining Dimov with Kovac, that Kovac's levitation technique involves complicated factors for which intuitive reasoning is difficult, so a person of ordinary skill in the art "would need to experiment to figure out if a cell could be levitated out of a well." *Id.* at 51 (citing Ex. 1007, 9327; Ex. 2010, 100:6–20; Ex. 2012 ¶¶ 96, 120, 160–166).

Patent Owner also contends that if Kovac's levitation method were used in Park's device, any liberated cell would "need to pass over the array of other microwells before reaching the common outlet," which according to Park are only 62% filled, leaving "approximately 40% of the microwells open and in which the levitated cell could be recaptured" by recirculation patterns caused by the flow necessary to extract a cell. PO Resp. 52–53 (citing Ex. 1006, 263–64; Ex. 1007, 9329; Ex. 2010, 120:13–121:5, 141:4–13; Ex. 2012 ¶¶ 167–170).

In its Reply, Petitioner disagrees that it would have been difficult for a person of ordinary skill in the art to use a different lens or otherwise adjust the laser parameters to adapt Kovac's levitation method for use in Park's device. Pet. Reply 23–24. Petitioner only acknowledges that there would be difficulty to say, "a priori, whether levitation out of deeper wells would take longer," and contends that Kovac only stated that intuitive reasoning about its optical equations would be difficult to predict "without focusing on a specific set of optical parameters." *Id.* at 23 (emphasis omitted) (quoting Ex. 1007, 9325). According to Petitioner, Dr. Meinhart testified that it would have been possible to adapt Kovac's technique "without actually calculating numbers from the equation." *Id.* at 23–24 (quoting Ex. 2010, 100:2–5) (citing Ex. 1039 ¶ 149).

Petitioner also provides a number of further rationales for how a person of ordinary skill in the art would have modified Park's device to work with Kovac's levitation method.[18] To address Patent Owner's argument that Petitioner has not explained how to recover specific cells from Park's device, Petitioner contends that an ordinarily skilled artisan would have sucked a liberated cell "directly into the pump's syringe" before disconnecting it. Pet. Reply 20 (citing Ex. 1002 ¶ 181, Ex. 1039 ¶¶ 184–188).

_____

[18] Patent Owner contends that these arguments are untimely, and we agree at least as to certain of the arguments. *See* Paper 27, Nos. 6, 9, 10; *see* Paper 28, Nos. 6, 9, 10 (Petitioner's responses). The new arguments introduce new theories as to how to combine Park and Kovac, including additional steps or new modifications necessary for a successful combination, which could have been presented in the Petition but were not. Nevertheless, as we discuss below, we find these arguments unpersuasive.

64

Petitioner also contends, for the first time, that a person of ordinary skill in the art would have addressed the problem of Park's downward-forcing circulation patterns[19] by starting with flow turned off and then turning on flow "after levitation begins, including after the cell has been pushed up out of a well high enough to be clear of recirculating flow lines created once it is turned on." Pet. Reply 19–20 (citing Ex. 1039 ¶¶ 175–177); *see also id.* at 22 (citing Ex. 1039 ¶ 193).

Alternatively, Petitioner asserts that an ordinarily skilled artisan would have adjusted the size of Kovac's laser column to cover Park's entire triangular microwells, so that a cell would have no place to be pushed out of the laser column by the circulating flow. *See* Pet. Reply 21–22 (citing Ex. 1039 ¶¶ 190–196). Petitioner asserts that, because this wider beam would have lower power density, this would "*decrease* the risk of damage to the cell." *Id.* at 22 (citing Ex. 1039 ¶¶ 193, 205–206).

On the issue of whether cell attachment associated with culturing of the cells in Park's device would hamper the ability to levitate the cells, Petitioner acknowledges that Park "states that its wells are of 'a size sufficient to allow attachment and division of captured cells.'" Pet. Reply 24 (quoting Ex. 1006, 263). But Petitioner asserts that "Park nowhere teaches

---

[19] Petitioner contends that "Patent Owner fails to explain how resisting lateral movement would affect selective recovery by levitation, and does not establish that any resistance to vertical movement would be problematic either." Pet. Reply 24 (citing Ex. 1039 ¶¶ 190–196). This improperly shifts the burden of persuasion onto Patent Owner. *See Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1379–81 (Fed. Cir. 2015) (a petitioner has the burden of persuasion in an *inter partes* review, which does not shift to the patent owner).

that its device can be used only with cells that attach within wells, let alone those that remain attached." *Id.* (citing Ex. 1039 ¶¶ 180–183, 189).

As to the issue that cells liberated in Park's device would have to pass over other empty wells that might recapture the cells, Petitioner responds that a person of ordinary skill in the art could simply repeat the process at the empty well that the cell fell into, which Petitioner contends would not require the use of extraordinary skill or creativity. Pet. Reply 25. Petitioner also argues that "the probability that a levitated cell will be recaptured is very low," which Dr. Meinhart calculates as "about 13.8%." *Id.* (citing Ex. 1006, 268; Ex. 1039 ¶¶ 197–204).

In its Sur-reply, Patent Owner contends that "there are no experiments performed in Park where the flow is turned on and off after cells are permitted to culture." PO Sur-reply 22 (citing Ex. 2013, 358:25–359:9). Thus, Patent Owner contends that it is unknown whether "this would have resulted in additional cells dislodging when the flow was turned on and off for each attempt at selective cell recovery," and "it is unknown how this may have affected the technique or cell health, including overheating due to the lack of cell medium exchange from the flow of the device." *Id.* Patent Owner also contends that "Petitioner and Dr. Meinhart provide no mechanism for a [person of ordinary skill in the art] to have been able to determine when the cell was 'high enough to be clear of recirculating flow.'" *Id.*

Similarly, Patent Owner contends that Petitioner's proposed modification of disconnecting Park's syringe after recovering a cell in the syringe also "would have required a [person of ordinary skill in the art] to turn on and off the flow of Park . . . , which would increase the number of

non-target cells dislodged." PO Sur-reply 24 (citing Ex. 1039 ¶ 188). And Patent Owner contends that Petitioner "does not explain how a [person of ordinary skill in the art] would have been able to determine when the cell enters the pump so it could be disengaged for recovery." *Id.* (citing Ex. 1038, 111:18–113:6).

Patent Owner also argues that Kovac teaches that the width of its laser column was "specifically selected to levitate a single cell from its microwell 'without perturbing cells in neighboring wells.'" PO Sur-reply 23 (quoting Ex. 1007, 9325–26 ("We . . . demonstrated the feasibility of selectively levitating a single . . . cell from a microwell without perturbing cells in neighboring wells. We focused the beam so that the beam waist was roughly equal to the cell diameter (~9 μm).")). But according to Patent Owner, increasing the width of the laser column to cover Park's entire microwell "would have disturbed cells in neighboring wells." *Id.* Patent Owner also contends that if spot size increases to cover Park's microwells (which are about 50 μm per side),[20] Dr. Meinhart acknowledges that this "will decrease the lateral gradient force," but "Dr. Meinhart . . . did not consider how this reduction in force would affect the laser's ability to levitate a cell in Park's well successfully (especially with cultured cells through Park's recirculation pattern)." *Id.* (quoting Ex. 2013, 344:18–345:5).

Finally, Patent Owner disagrees with the methodology of Dr. Meinhart's estimate of a 13.8% probability that cells would be recaptured in

---

[20] Patent Owner contends that "Kovac already used a spot size that was 'larger than those typically used.'" PO Sur-reply 24 (quoting Ex. 1007, 9325).

Park's microwells while passing over the array. PO Sur-reply 24–25. Even if the number is correct, Patent Owner contends, Kovac also discloses a loss of 18–28% of cells with its technique, so compounding the two losses from Park and Kovac "would have resulted in the loss of at least a third of the first cells that [were] successfully levitated." *Id.* at 25 & n.11.

### 2. Analysis

Considering the evidence as a whole, we find that Petitioner has not met its burden to show obviousness based on the combination of Park and Kovac. As discussed above in the context of the combination of Dimov and Kovac, the evidence indicates that Kovac's laser levitation method is highly dependent on the laser parameters including power, exposure time, and the shape of the laser focus. *See supra* Section III.D.3. Petitioner's proposed modifications to Kovac's levitation method, such as substantially increasing the focused spot size (which was already "larger than those typically used in optical tweezers applications," Ex. 1007, 9325), would have required substantial experimentation. Yet, as discussed above in the context of the Dimov–Kovac combination, the uncontested level of ordinary skill in the art only requires a bachelor's degree and 3–5 years of general experience constructing and using microfluidic devices for cell culture analysis. *See id.* Petitioner has not shown that such a person would have had sufficient background in using lasers to manipulate living cells that they could have adapted Kovac's levitation method for use in Park's device without additional inventive steps.

One particular complication would have been that Park's device is designed to create recirculating flow patterns whenever there is flow through the device (as is required in Kovac's method, *see* Ex. 1007, 9322, 9324–25;

68

Ex. 2012 ¶ 162), and we credit Dr. Gale's testimony that these would have worked against any laser levitation. *See* Ex. 2012 ¶¶ 163–164; Ex. 1006, 266, Fig. 2a. We also credit Dr. Gale's testimony that wall effects, or adhesion between cells and walls or other cells, would likely occur after culturing the cells in Park's microwells,[21] and would have been complicating factors for which neither Park nor Kovac provide solutions.[22] *See* Ex. 2012 ¶¶ 161, 165.

We do not find persuasive Petitioner's new argument in the Reply that, to address this complication, a person of ordinary skill in the art would have begun Kovac's levitation procedure with fluid flow turned off, and then turned the fluid on at some point during the levitation where the flow pulling the cell into the fluid stream would be greater than the flow pulling it back into the microwell. Pet. Reply 19–20. Petitioner does not point to anything

---

[21] Kovac does not appear to discuss the problems that would arise from levitating cells after culturing them in a microwell. Although Dr. Meinhart notes, in his deposition, that Kovac refers to "mitosis" (cell division) and the presence of two cells in a single well (*see* Ex. 2010, 219:3–220:7, 221:4–222:4), we find no reference in Kovac to levitation of cells that have been cultured within a microwell. Rather, Kovac refers to the asymmetrical shape of cells that had begun the process of mitosis at the time of levitation, and to the ability of removing two independent cells that had been trapped in the same chamber. Ex. 1007, 9326 ("Significantly aspheric cells, such as those undergoing mitosis, can be removed quickly, as their asymmetry makes them easier to remove via the fluid flow after they are levitated slightly."); *id.*, Fig. 3 (demonstrating that it is possible to "remove a single targeted cell residing in a doubly loaded well").

[22] Kovac addressed this problem by treating the microwells to prevent adhesion. *See* Ex. 2012 ¶¶ 53–54; Ex. 1007, 9323–24, 9326. But Petitioner's proposed combination does not include any surface treatment to Park's microwells. *See* Pet. 62–63; Ex. 2010, 150:18–151:2.

in the prior art that would have suggested this further modification to Kovac's method, and does not explain how a person of ordinary skill in the art would have known when to turn on the fluid flow. *See id.*[23]

Given the challenges that a person of ordinary skill in the art would have faced in adapting Kovac's cell levitation method for use in Park's very different microwells, and the lack of disclosure addressing these problems in either Kovac or Park, we find that Petitioner has not shown, by a preponderance of the evidence, that a person of ordinary skill in the art would have made the combination. Thus, we conclude that Petitioner has not shown that claim 1 is unpatentable as obvious over the combination of Kovac and Park.

For dependent claims 11, 16, 24, 26, 27, and 30, Petitioner relies on the teachings of Park and adds no further argument beyond the contentions in its obviousness ground based on Park alone (Ground 4). *See* Pet. 59–62. Thus, we find Petitioner's arguments as to these claims unpersuasive of obviousness and conclude that Petitioner has not shown these claims unpatentable. *See Fine*, 837 F.2d at 1076.

---

[23] According to Petitioner's combination, the user would be observing the microwells "from above." *See* Pet. 63; Ex. 1002 ¶ 181. Under these circumstances, it is unclear how the user would have been able to determine whether the cell has reached a sufficient height not to be pulled back into the microwell after flow resumes.

IV. CONCLUSION

For the reasons above, Petitioner has not shown by a preponderance of the evidence that any challenged claim of the '408 patent is unpatentable under any ground of the Petition.

V. ORDER

In consideration of the foregoing, it is

ORDERED that claims 1, 6, 11, 16, 19, 24, 26, 27, and 30 of the '408 patent have not been shown to be unpatentable;

FURTHER ORDERED that parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 6, 11, 19, 24, 26, 27, 30 | 102(a), (e) | Dimov | | 1, 6, 11, 19, 24, 26, 27, 30 |
| 1, 6, 11, 19, 24, 26, 27, 30 | 103(a) | Dimov | | 1, 6, 11, 19, 24, 26, 27, 30 |
| 1, 6, 11, 19, 24, 26, 27, 30 | 103(a) | Dimov, Kovac | | 1, 6, 11, 19, 24, 26, 27, 30 |
| 1, 11, 16, 24, 26, 27, 30 | 103(a) | Park | | 1, 11, 16, 24, 26, 27, 30 |
| 1, 11, 16, 24, 26, 27, 30 | 103(a) | Park, Kovac | | 1, 11, 16, 24, 26, 27, 30 |
| **Overall Outcome** | | | | 1, 6, 11, 16, 19, 24, 26, 27, 30 |

71

For PETITIONER:

Keith Orso
Michael R. Fleming
Andrew Krause
IRELL & MANELLA LLP
korso@irell.com
mfleming@irell.com
akrause@irell.com

Marc D. Peters
TURNER BOYD LLP
mdpeters@turnerboyd.com

For PATENT OWNER:

Naveen Modi
Eric W. Dittmann
Daniel Zeilberger
Michael A. Stramiello
PAUL HASTINGS LLP
naveenmodi@paulhastings.com
ericdittmann@paulhastings.com
danielzeilberger@paulhastings.com
michaelstramiello@paulhastings.com

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BERKELEY LIGHTS, INC.,
Petitioner,

v.

THE UNIVERSITY OF BRITISH COLUMBIA,
Patent Owner.

_____

IPR2021-01249
Patent 10,087,408 B2

_____

Before KRISTINA M. KALAN, CHRISTOPHER M. KAISER, and
CHRISTOPHER L. OGDEN, *Administrative Patent Judges*.

OGDEN, *Administrative Patent Judge*.

JUDGMENT
Denying Petitioner's Request on Rehearing
*35 U.S.C. § 314; 37 C.F.R. § 42.71*

# I. INTRODUCTION

Berkeley Lights, Inc. ("Petitioner") filed a Request for Rehearing of the Final Written Decision (Paper 38, "Dec." or "Decision") determining that Petitioner had not shown that any of claims 1, 6, 11, 16, 19, 24, 26, 27, and 30 of U.S. Patent No. 10,087,408 B2 (Ex. 1001, "the '408 patent") were unpatentable. Paper 40 ("Req. Reh'g").[1] Specifically, Petitioner requests rehearing on Grounds 2–5 asserting unpatentability under 35 U.S.C. § 103(a). *See id.* at 1. For the reasons that follow, the Request for Rehearing is *denied*.

# II. STANDARD OF REVIEW

When a party requests rehearing on a final written decision, we "review the decision for an abuse of discretion." 37 C.F.R. § 42.71(d) (2022). There is an abuse of discretion if we have made "a clear error of judgment in weighing relevant factors or in basing [our] decision on an error of law or on clearly erroneous factual findings." *Bayer CropScience AG v. Dow AgroSciences LLC*, 851 F.3d 1302, 1306 (Fed. Cir. 2017) (quoting *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 150 F.3d 1374, 1377 (Fed. Cir. 1998)). In a request for rehearing, "[t]he burden of showing a

---

[1] We further refer to Patent Owner's Response (Paper 18, "PO Resp."), Petitioner's Reply to the Patent Owner Response (Paper 22, "Pet. Reply"), and Patent Owner's Sur-reply (Paper 29, "PO Sur-reply").

decision should be modified lies with the party challenging the decision," and "[t]he request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed" in the record. 37 C.F.R. § 42.71(d).

## III. ANALYSIS

Petitioner's arguments in the Request for Rehearing concern limitation 1E, which recites "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step." Dec. 7; Ex. 1001, 32:7–9; *see generally* Req. Reh'g. We address Petitioner's arguments below.

### A. GROUND 2: CLAIMS 1, 6, 11, 19, 24, 26, 27, AND 30 AS OBVIOUS OVER DIMOV

#### 1. *Motivation to Modify Dimov to Selectively Recover Cells of Interest*

As to the obviousness ground over Dimov, Petitioner asserts that we "misapprehended or overlooked Petitioner's arguments by demanding that Dimov *alone* provide" the proposed motivation to selectively recover cells of interest for further analysis outside the device. Req. Reh'g 2–3. (citing Dec. 25, 30–31). Rather, Petitioner asserts that this ground "is based on Dimov *plus the knowledge of a [person of ordinary skill in the art]*." *Id.* (citing Pet. Reply 8). Petitioner then reiterates its arguments relying the background knowledge in the art for the specific motivation to recover cells selectively. *Id.* at 3–4.

We disagree that we misapprehended Petitioner's reliance, in part, on the background knowledge in the art. We characterized Petitioner's

3

argument as "that claim 1 would have been obvious over Dimov, in view of the background knowledge of a person of ordinary skill in the art." Dec. 24 (citing Pet. 34–35; Ex. 1002 ¶ 106). We also stated that "[t]he main issue in dispute for this ground is whether there was a sufficient motivation *and sufficient background knowledge in the art*, at the time of the claimed invention, that a person of ordinary skill in the art would have modified Dimov's device to introduce selective recovery." Dec. 25 (emphasis added).

In the Decision, we did not find Petitioner's arguments persuasive in light of the background knowledge in the art. In particular, we found that Petitioner had not adequately shown that the background knowledge in the art would have been sufficient to inform a person of ordinary skill in the art how to apply the techniques such as "laser tweezers" that Dimov mentions briefly, in a way that would have allowed further analyses of cells outside Dimov's device. *See* Dec. 29–31. We also found that Petitioner had not persuasively shown that modifying Dimov's device to make its trenches accessible with a micropipette was within the background knowledge in the art at the time of the claimed invention. *See* Dec. 31–34.

Thus, we determine that Petitioner has not shown that we misapprehended or overlooked Petitioner's asserted motivation to modify Dimov in view of the background knowledge in the art.

> 2.    *Modifying Dimov to Recover a Cell from Dimov's "Common Output" or "Common Waste"*

Petitioner argues that a person of ordinary skill in the art "would also be motivated to—and know how to—modify Dimov's device to recover a cell of interest, even if it were true that 'Dimov's device is a "lab on a chip" designed in general to retain cells while performing multiple experiments.'"

4

Req. Reh'g 4 (citing Dec. 29). Specifically, Petitioner argues that one of
ordinary skill in the art, employing Dimov's listed techniques to remove a
cell from a trench, "would know that the cell could be recovered from
Dimov's 'common output' or 'common waste,' as they are convenient
outlets for accessing cells." *Id.* at 4–5 (citing Pet. 35, 44; Pet. Reply 5).
According to Petitioner, the Decision misapprehends "this evidence and
overlooks a [person of ordinary skill in the art]'s ability to collect a *single*
cell exiting from a device." *Id.* at 5 (citing Pet. 44; Ex. 1003, 3:2–26, Fig. 2;
Ex. 1002 ¶ 128).

This argument is unpersuasive. In our Decision, we found that
Petitioner had not shown that Dimov's teaching that the device can be
modified to allow removal of particles from a trench through techniques
such as "laser tweezers" was sufficient to teach selective recovery of cells
suitable for use in further investigations such as sequencing or culturing. *See*
Dec. 29–31; *see also* Dec. 24 (crediting Dr. Gale's testimony that there
would have been substantial obstacles to recovering specific cells liberated
from Dimov's trenches). Even if Dimov were read to include a teaching in
that regard, we found that Petitioner's argument was missing any persuasive
showing that the specifics of conducting such removal would have been
within the ordinary level of skill and creativity in the art at the time of the
claimed invention. *See* Dec. 29–31.

### 3. *Recovering Cells via Micropipette Techniques*

Petitioner next asserts that we failed to consider a modification of
Dimov that involves "insert[ing] a micropipette into the trench and
aspirat[ing] one or more cells . . . , for example, by piercing the top layer of
PDMS (which is only 40 microns thick in Dimov's device) with a

5

micropipette." Req. Reh'g 5–6 (citing Ex. 1003, 5:37–39; Pet. 36–40; Pet. Reply 5, 8; Ex. 1038, 39:18–22). According to Petitioner, this is a different proposed modification than the one we considered in our Decision, which involved peeling back the top layer over a trench so that the trench could be accessed with the micropipette. *Id.* at 6 (citing Dec. 31–34).

Petitioner points to only one brief mention, in its Petition, of piercing the top layer of Dimov's device to retrieve cells with a micropipette. *Id.* at 6 (citing Pet. 40). That argument was not backed by any evidence other than a conclusory statement by Dr. Meinhart repeating the argument in the Petition. Pet. 40; Ex. 1002 ¶ 120. We do not credit that testimony because it lacks factual support. *Xerox Corp v. Bytemark, Inc.*, IPR2022-00624, Paper 9 (PTAB Aug. 24, 2022) (precedential) (the testimony of a declarant that merely repeats, verbatim, conclusory assertions from a petition, without citing additional supporting evidence or providing technical reasoning to support the testimony, is entitled to little weight). In particular, to the extent that Petitioner argues on rehearing that Dimov's top layer could have been pierced successfully by a micropipette because it was only 40 microns thick, Petitioner did not properly make this argument during trial or provide adequate evidentiary support.

Petitioner's related argument is that it would have been obvious to make the top layer of Dimov's device peelable. Req. Reh'g 6. This argument relies on Han as evidence of the purported state of knowledge in the art soon after the time of the claimed invention. *Id.*; Dec. 31–34. On rehearing, Petitioner argues that "[i]t was legal error for the Decision to discredit this probative evidence of a [person of ordinary skill in the art]'s motivation to selectively aspirate cells from a device by micropipette." Req. Reh'g 6.

We did not disregard Han as potentially probative evidence. Rather, after noting that Han was not prior art, we found that "Petitioner has not shown that the peelable layer in Han's device reflects the background knowledge of a person of ordinary skill in the art at the time of the claimed invention." *Id.* at 33 (citing PO Sur-reply 7–8). Specifically, we agreed with Patent Owner that Han characterized its microfluidic device as "novel" and distinguished it from previous devices known in the art. *Id.* (citing PO Sur-reply 7–8; Ex. 1009, 2853).

For these reasons, we are not persuaded of any abuse of discretion in our determination that Petitioner failed to show that any of claims 1, 6, 11, 19, 24, 26, 27, and 30 would have been obvious over Dimov in view of the knowledge of one of ordinary skill in the art.

B.    GROUND 3: CLAIMS 1, 6, 11, 19, 24, 26, 27, AND 30 AS OBVIOUS OVER DIMOV AND KOVAC

Petitioner asserts that we misapprehended its argument for combining Dimov and Kovac. According to Petitioner, our decision only considered "select[ing] Dimov's microfluidic device for use in Kovac's cell levitation method," whereas Petitioner's true argument was that a person of ordinary skill in the art would have modified Dimov's device to incorporate Kovac's laser levitation teachings. Req. Reh'g 9–10 (quoting Dec. 49); *see also id.* at 7–9 (reiterating Petitioner's argument in the Petition and Reply).

We disagree that we misapprehended Petitioner's argument by reversing the order of the references. Although we agreed with Patent Owner that Petitioner had failed to show that Dimov's microfluidic device was a suitable starting point for use with Kovac's cell levitation method (*see* Dec. 49), we summarized Petitioner's position as follows: "Petitioner asserts

7

that the motivation to modify Dimov's microfluidic device in view of Kovac's levitation method would have been to allow a user to selectively recover cells of interest for later analysis outside the device." Dec. 48 (citing Pet. 43); *see* Req. Reh'g 8–10. We also held that Petitioner had not shown evidence in Dimov "that a person of ordinary skill in the art would have selected Kovac's *specific* laser levitation method for use in Dimov's device to recover cells of interest for further analysis." Dec. 49. We further found that Kovac's laser levitation method was highly dependent on a number of parameters, and Petitioner had not persuasively shown that a person of ordinary skill in the art would have had the specific motivation or ability to discover those parameters to levitate cells in Dimov's device in a way that avoided unacceptable cell damage and thus destroyed the very motivation that Petitioner asserts for using Kovac's levitation method. *See* Dec. 49–51. We also found, as with the obviousness ground based on Dimov alone, that Petitioner had not shown it would have been feasible to successfully recover any liberated cells from Dimov's device. Dec. 52.

Next, Petitioner argues that, by focusing on the difficulties a person of ordinary skill in the art would have faced in combining Dimov with Kovac, our analysis confuses "motivation to combine" with "reasonable expectation of success." Req. Reh'g 11–12. We disagree. As Petitioner acknowledges, our Decision did not rely on whether Petitioner had shown a reasonable expectation of success. *See id.* at 7 (citing Dec. 51 n.15). In determining whether there would have been a motivation to combine Dimov with Kovac, we must consider "the background knowledge possessed by a person having ordinary skill in the art" and "the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR Int'l Co. v. Teleflex Inc.*, 550

8

U.S. 398, 418 (2007). In light of these considerations, we found that Petitioner failed to show that a person of ordinary skill in the art (as Petitioner articulated it) would have had the background necessary to adapt Kovac's laser parameters for use in Dimov's device to successfully recover usable cells from Dimov's output or waste streams. *See* Dec. 50–52.

For these reasons, we are not persuaded of any abuse of discretion in our determination that Petitioner failed to show that any of claims 1, 6, 11, 19, 24, 26, 27, and 30 would have been obvious over Dimov in view of Kovac.

C.    GROUND 4: CLAIMS 1, 11, 16, 24, 26, 27, AND 30 AS OBVIOUS OVER PARK

For the obviousness ground based on Park, Petitioner argues that our statement that "Petitioner has not pointed to anything in Park that teaches selectively recovering cells" is in error because "[t]hat may be relevant to anticipation, but not obviousness." Req. Reh'g 12 (quoting Dec. 58). We disagree. That Petitioner has not identified any teaching about selective recovery in Park, itself, means that Petitioner must rely on the background knowledge in the art to establish limitation 1E.

In that regard, Petitioner reiterates its arguments that we found unpersuasive, without identifying any error of law or clear factual error in our Decision. *See* Req. Reh'g 12–13 (citing Pet. 57–59). Thus, we are not persuaded of abuse of discretion in our determination that Petitioner failed to show that claims 1, 11, 16, 24, 26, 27, or 30 would have been obvious over Park.

### D. GROUND 5: CLAIMS 1, 11, 16, 24, 26, 27, AND 30 AS OBVIOUS OVER PARK AND KOVAC

For the ground based on the combination of Park and Kovac, Petitioner contends that "the Decision's analysis does not separately address either motivation to combine them or the reasonable expectation of success of doing so; indeed, it does not even mention either." Req. Reh'g 13–14 (citing Dec. 68–70).

We disagree that we failed to address whether there was a motivation to combine Park and Kovac the way that Petitioner proposes. For example, as with Ground 3, we found that Petitioner had not persuasively shown that a person of ordinary skill in the art would have had the background necessary to determine suitable laser parameters to achieve Petitioner's proposed combination. *See* Dec. 68. We also found that Petitioner failed to persuasively explain how a person of ordinary skill in the art would have been motivated to address the problems identified by Patent Owner's expert Dr. Gale, which would have worked against the ability to levitate and recover individual cells from Park's device. Dec. 68–70.

Petitioner also argues that, by "merely cit[ing] to [our] earlier discussion of laser parameters in Ground 3 (Decision at 68), [we] overlooked two important facts" suggesting "that Kovac's techniques could recover a *single* cell from Park's microwell": (1) that "Kovac demonstrated that it is possible to 'remove a single targeted cell residing in a doubly loaded well,'" and (2) that "Park's microwells have a 'depth of 20 µm,' whereas Kovac's microwells are '35 µm in depth.'" Req. Reh'g 14 (quoting Ex. 1006, 266; and then quoting Ex. 1007, 9326) (citing Ex. 1007, 9326, Fig. 3; Pet. 63). According to Petitioner, "[t]he Decision errs in concluding

10

that it would require 'additional inventive steps' to 'adapt[] Kovac's levitation method for use in Park's device . . . .'" *Id.* (citing Dec. 68).

We disagree. The question is not whether Kovac's techniques "could" recover a single cell from Park's microwell, but whether a person of ordinary skill in the art would have been motivated to make that combination in a predictable way, in light of their background knowledge. *See KSR*, 550 U.S. at 417 ("The mere fact that references can be combined or modified does not render the resultant combination obvious unless the results would have been predictable to one of ordinary skill in the art."). Although Kovac discusses the removal of single cells from Kovac's microwells, our Decision found that Petitioner failed to show that a person of skill in the art would have been able to apply Kovac's teachings predictably within Park's substantially different device. *See* Dec. 68–70 & nn.21–23.

In particular, Petitioner argues that "the Decision overlooks the fact that the lateral gradient force of Kovac's laser column counteracts lateral flows in Park's device." Req. Reh'g. 15 (citing Pet. Reply 24; Ex. 1039 ¶¶ 191, 194; Ex. 1007, 9325). Similarly, Petitioner contends that "the Decision overlooked Kovac's teaching that wall effects can be overcome by slightly increasing the power of the laser, so any resistance to vertical movement would not be problematic to a" person of ordinary skill in the art. *Id.* (citing Pet. Reply 24; Ex. 1039 ¶ 195). These arguments concern Petitioner's response to Patent Owner's argument (supported by testimony by Dr. Gale) that lateral flow and wall effects would hamper the ability to levitate cells in Park's microwells. Pet. Reply 24 (citing PO Resp. 49; Ex. 2012 ¶ 161); PO Resp. 46–50 & nn.18–19 (citing Ex. 2012 ¶¶ 161–166).

Petitioner had argued that "Patent Owner fails to explain how resisting lateral movement would affect selective recovery by levitation, and does not establish that any resistance to vertical movement would be problematic either." Pet. Reply 24 (citing Ex. 1039 ¶¶ 190–196). Petitioner's support for this rebuttal argument was five pages of expert declaration testimony that Petitioner did not explain and did not otherwise discuss. *See* 37 CFR 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document."). We stated in our Decision that this argument "improperly shifts the burden of persuasion to Patent Owner." Dec. 65 n.19. In any event, we did not find Petitioner's argument or Dr. Meinhart's testimony persuasive, and instead, "we credit[ed] Dr. Gale's testimony that [lateral flow effects] would have worked against any laser levitation." Dec. 69 (citing Ex. 2012 ¶¶ 163–164; Ex. 1006, 266, Fig. 2a). We also "credit[ed] Dr. Gale's testimony that wall effects, or adhesion between cells and walls or other cells, would likely occur after culturing the cells in Park's microwells, and would have been complicating factors for which neither Park nor Kovac provide solutions." *Id.* (footnote omitted).

Petitioner also argues on rehearing that, if the asserted lateral gradient force of Kovac's laser were insufficient to counteract lateral flow forces, "an increased laser spot size the size of Park's microwell would be [a sufficient solution], which requires only a simple change of lens, not any substantial experimentation, which the Decision (at 68) overlooks as well." Req. Reh'g 15 (citing Pet. Reply 24; Ex. 1039 ¶¶ 107–108, 192).

Although Dr. Meinhart briefly mentions this in his declaration (*see* Ex. 1039 ¶ 192), Petitioner has not shown that it made this argument during trial, except to the extent that Petitioner improperly incorporated it by

12

reference from Dr. Meinhart's declaration. *See* Reply 24 (citing Ex. 1039 ¶¶ 190–196); 37 CFR § 42.6(a)(3).

In any event, we do not credit Dr. Meinhart's testimony on this point because he provides no factual support. *See* Ex. 1039 ¶ 192; 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."). As Patent Owner pointed out in its Sur-Reply, Dr. Meinhart acknowledged at deposition that increasing the spot size would have reduced the lateral gradient force of the levitation laser. PO Sur-reply 23 (citing Ex. 2013, 344:18–345:5). We agree with Patent Owner that "Dr. Meinhart . . . did not consider how this reduction in force would have affected the laser's ability to levitate a cell in Park's well successfully (especially with cultured cells through Park's recirculation pattern)." *Id.*

Finally, Petitioner contends that "[t]he Decision recognizes that Kovac's laser is applied for up to about 30 seconds . . . but overlooks . . . the fact that a [person of ordinary skill in the art] would simply turn on the flow in Park's device after this amount of time, because a [person of ordinary skill] would know from Kovac that this was sufficient time to levitate a cell out of Park's shallower, 20-μm-deep microwells." Req. Reh'g 14 (citing Dec. 37, 70 n.23). According to Petitioner, a person of ordinary skill in the art "is not an uncreative automaton." *Id.* at 14–15 (citing *KSR*, 550 U.S. at 421).

As we stated in our Decision, Petitioner's theory that a person of ordinary skill would have begun Kovac's levitation procedure with fluid flow turned off, and then turned the fluid on during the levitation, was a new argument first made in the Reply. *See* Dec. 69. Nevertheless, we also found

that theory unpersuasive because "Petitioner does not point to anything in the prior art that would have suggested this further modification to Kovac's method, and does not explain how a person of ordinary skill in the art would have known when to turn on the fluid flow," especially considering that a user would have been observing the microwells from above. Dec. 69–70 & n.23.

On rehearing, Petitioner proposes for the first time that a person of ordinary skill in the art would have had reason to select "about 30 seconds" as the duration to perform levitation before turning the flow back on in Park's device. Req. Reh'g 14. Petitioner does not support that argument with any citations other than to our Decision, and in any event, it is untimely.

For these reasons, we are not persuaded of abuse of discretion in our determination that Petitioner failed to show that any of claims 1, 11, 16, 24, 26, 27, and 30 would have been obvious over Park in view of Kovac.

## IV. CONCLUSION

For the above reasons, Petitioner has not shown abuse of discretion in our determination that Petitioner had not shown that any of claims 1, 6, 11, 16, 19, 24, 26, 27, and 30 of the '408 patent are unpatentable under the grounds of the Petition.

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner's Request for Rehearing is *denied*.

Outcome of Decision on Rehearing:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Denied | Granted |
|---|---|---|---|---|
| 1, 6, 11, 19, 24, 26, 27, 30 | 103(a) | Dimov | 1, 6, 11, 19, 24, 26, 27, 30 | |
| 1, 6, 11, 19, 24, 26, 27, 30 | 103(a) | Dimov, Kovac | 1, 6, 11, 19, 24, 26, 27, 30 | |
| 1, 11, 16, 24, 26, 27, 30 | 103(a) | Park | 1, 11, 16, 24, 26, 27, 30 | |
| 1, 11, 16, 24, 26, 27, 30 | 103(a) | Park, Kovac | 1, 11, 16, 24, 26, 27, 30 | |
| **Overall Outcome** | | | 1, 6, 11, 16, 19, 24, 26, 27, 30 | |

Final Outcome of Final Written Decision after Rehearing:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 6, 11, 19, 24, 26, 27, 30 | 102(a), (e) | Dimov | | 1, 6, 11, 19, 24, 26, 27, 30 |
| 1, 6, 11, 19, 24, 26, 27, 30 | 103(a) | Dimov | | 1, 6, 11, 19, 24, 26, 27, 30 |
| 1, 6, 11, 19, 24, 26, 27, 30 | 103(a) | Dimov, Kovac | | 1, 6, 11, 19, 24, 26, 27, 30 |
| 1, 11, 16, 24, 26, 27, 30 | 103(a) | Park | | 1, 11, 16, 24, 26, 27, 30 |
| 1, 11, 16, 24, 26, 27, 30 | 103(a) | Park, Kovac | | 1, 11, 16, 24, 26, 27, 30 |
| **Overall Outcome** | | | | 1, 6, 11, 16, 19, 24, 26, 27, 30 |

15

For PETITIONER:

Keith Orso
Michael R. Fleming
Andrew Krause
IRELL & MANELLA LLP
korso@irell.com
mfleming@irell.com
akrause@irell.com

Marc D. Peters
TURNER BOYD LLP
mdpeters@turnerboyd.com

For PATENT OWNER:

Naveen Modi
Eric W. Dittmann
Daniel Zeilberger
Max H. Yusem (admitted *pro hac vice*)
PAUL HASTINGS LLP
naveenmodi@paulhastings.com
ericdittmann@paulhastings.com
danielzeilberger@paulhastings.com
maxyusem@paulhastings.com

16



US010087408B2

(12) **United States Patent**
Hansen et al.

(10) **Patent No.:** US 10,087,408 B2
(45) **Date of Patent:** Oct. 2, 2018

(54) **SYSTEM AND METHOD FOR MICROFLUIDIC CELL CULTURE**

(75) Inventors: **Carl L. G. Hansen**, Vancouver (CA);
**Veronique Lecault**, Vancouver (CA);
**James M. Piret**, Vancouver (CA);
**Anupam Singhal**, Mississauga (CA)

(73) Assignee: **The University of British Columbia**,
Vancouver (CA)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 1032 days.

(21) Appl. No.: **13/178,395**

(22) Filed: **Jul. 7, 2011**

(65) **Prior Publication Data**

US 2012/0009671 A1 Jan. 12, 2012

**Related U.S. Application Data**

(60) Provisional application No. 61/362,213, filed on Jul.
7, 2010.

(51) **Int. Cl.**
*C12N 5/0789* (2010.01)
*C12M 3/00* (2006.01)
*C12M 3/06* (2006.01)

(52) **U.S. Cl.**
CPC .................................... *C12M 23/16* (2013.01)

(58) **Field of Classification Search**
CPC .................. C12M 23/16; Y10T 436/25; B01L
2200/0647; B01L 2200/0668; B01L
2300/0816; B01L 2300/0851; B01L
2300/0887; B01L 2400/0457; B01L
2400/0472; B01L 2200/10
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,818,435 | B2 | 11/2004 | Carvalho et al. |
| 2004/0067482 | A1 | 4/2004 | Yasuda et al. |
| 2004/0197905 | A1 | 10/2004 | Hafeman |
| 2004/0229349 | A1* | 11/2004 | Daridon ............ B01L 3/502761 |
| | | | 435/305.2 |
| 2005/0054101 | A1* | 3/2005 | Felder .................... C12M 25/16 |
| | | | 435/383 |
| 2005/0266478 | A1 | 12/2005 | Huang et al. |
| 2006/0134704 | A1 | 6/2006 | Muraguchi et al. |
| 2009/0068170 | A1 | 3/2009 | Weitz et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 2010046775 | 4/2010 |
| WO | WO 2012072822 | 6/2012 |
| WO | WO 2012162779 | 12/2012 |

OTHER PUBLICATIONS

Audet, J. et al. Common and distinct features of cytokine effects on
hematopoietic stem and progenitor cells revealed by dose-response
surface analysis. *Biotechnol. Bioeng.* 80, 393-404 (2002).

(Continued)

*Primary Examiner* — William H. Beisner
*Assistant Examiner* — Danielle B Henkel
(74) *Attorney, Agent, or Firm* — Michael B. Rubin;
Bozicevic, Field & Francis LLP

(57) **ABSTRACT**

Microfluidic devices and methods for perfusing a cell with
perfusion fluid are provided herein, wherein the gravita-
tional forces acting on the cell to keep the cell at or near a
retainer or a retaining position exceed the hydrodynamic
forces acting on the cell to move it toward an outlet.

**34 Claims, 21 Drawing Sheets**



Berkeley Lights Ex 1001-p 1
Berkeley Lights v UBC

(56)                  **References Cited**

U.S. PATENT DOCUMENTS

| 2009/0181859 A1 | 7/2009 | Muraguchi et al. |
| 2011/0124520 A1 | 5/2011 | Love et al. |
| 2011/0262906 A1* | 10/2011 | Dimov ............... B01L 3/50273 |
|  |  | 435/6.1 |
| 2011/0281764 A1 | 11/2011 | Love et al. |
| 2011/0294678 A1 | 12/2011 | Jin et al. |
| 2013/0115606 A1 | 5/2013 | Hansen et al. |
| 2015/0360236 A1* | 12/2015 | Garcia ................... B03C 5/005 |
|  |  | 204/547 |
| 2018/0163166 A1 | 6/2018 | Hansen et al. |

OTHER PUBLICATIONS

Audet, J. et al. Distinct role of gp130 activation in promoting self-renewal divisions by mitogenically stimulated murine hematopoietic stem cells. *Proc. Natl. Acad. Sci. U. S. A.* 98, 1757-1762 (2001).

Balagadde, F.K. et al. Long-term monitoring of bacteria undergoing programmed population control in a microchemostat. *Science* 309, 137-140 (2005).

Belanger, M.C. & Marois, Y. Hemocompatibility, biocompatibility, inflammatory and in vivo studies of primary reference materials low-density polyethylene and polydimethylsiloxane: A review. *Journal of Biomedical Materials Research* 58, 467-477 (2001).

Bennett, M.R., et al. Metabolic gene regulation in a dynamically changing environment. *Nature* 454, 1119-1122 (2008).

Benveniste, P., et al. Intermediate-Term Hematopoietic Stem Cells with Extended but Time-Limited Reconstitution Potential. *Cell Stem Cell* 6, 48-58 (2010).

Berthier, E. et al. Managing evaporation for more robust microscale assays. Part 1. Volume loss in high throughput assays. *Lab Chip* 8, 852-859 (2008).

Bowie, M.B et al. Steel factor responsiveness regulates the high self-renewal phenotype of fetal hematopoietic stem cells. *Blood* 109, 5043-5048 (2007).

Braschler, T. et al. Gentle cell trapping and release on a microfluidic chip by in situ alginate hydrogel formation. *Lab Chip* 5, 553-559 (2005).

Brummendorf, T.H. et al. Asymmetric cell divisions sustain long-term hematopoiesis from single-sorted human fetal liver cells. *J. Exp. Med.* 188, 1117-1124 (1998).

Cheong, R. et al. High Content Cell Screening in a Microfluidic Device. *Molecular & Cellular Proteomics* 8, 433-442 (2009).

Cohen, A.R. et al. Computational prediction of neural progenitor cell fates. *Nat Methods* 7, 213-218 (2010).

Di Carlo, D. et al. Single-cell enzyme concentrations, kinetics, and inhibition analysis using high-density hydrodynamic cell isolation arrays. *Anal. Chem.* 78, 4925-4930 (2006).

Duffy, D.C. et al. Rapid Prototyping of Microfluidic Systems in Poly(dimethylsiloxane). Anal. Chem. 70, 4974-4984 (1998).

Dykstra, B. et al. High-resolution video monitoring of hematopoietic stem cells cultured in single-cell arrays identifies new features of self-renewal. *Proc. Natl. Acad. Sci. USA* 103, 8185-8190 (2006).

Dykstra, B. et al. Long-term propagation of distinct hematopoietic differentiation programs in vivo. *Cell Stem Cell* 1, 218-229 (2007).

Eilken, H.M. et al. Continuous single-cell imaging of blood generation from haemogenic endothelium. Nature 457, 896-900 (2009).

El-Ali, J. et al. Cells on chips. *Nature* 442 , 403-411 (2006).

Faley, S., et al. Microfluidic platform for real-time signaling analysis of multiple single T cells in parallel. *Lab Chip* 8, 1700-1712 (2008).

Faley, S.L. et al. Microfluidic single cell arrays to interrogate signalling dynamics of individual, patient-derived hematopoietic stem cells. *Lab Chip* 9, 2659-2664 (2009).

Figallo, E. et al. Micro-bioreactor array for controlling cellular microenvironments. *Lab Chip* 7, 710-719 (2007).

Gomez-Sjoberg, R. et al. Versatile, fully automated, microfluidic cell culture system. *Anal. Chem.* 79, 8557-8563 (2007).

Hansen, C.L. A microfluidic device for kinetic optimization of protein crystallization and in situ structure determination. *J. Am. Chem. Soc.* 128, 3142-3143 (2006).

Heo, Y.S. et al. Characterization and resolution of evaporation-mediated osmolality shifts that constrain microfluidic cell culture in poly(dimethylsiloxane) devices. *Anal. Chem.* 79, 1126-1134 (2007).

Hosokawa, M., et al. High-Density Microcavity Array for Cell Detection: Single-Cell Analysis of Hematopoietic Stem Cells in Peripheral Blood Mononuclear Cells. *Anal. Chem.* 81, 5308-5313 (2009).

Hung, P.T. et al. Continuous perfusion microfluidic cell culture array for high-throughput cell-based assays. *Biotechnol. Bioeng.* 89, 1-7 (2005).

Kamei, K.I., et al. An integrated microfluidic culture device for quantitative analysis of human embryonic stem cells. *Lab Chip* 9, 555-563 (2009).

Kent, D.G. et al. Prospective isolation and molecular characterization of hematopoietic stem cells with durable self-renewal potential. *Blood* 113 , 6342-6350 (2009).

Kent, D.G. et al. Steel factor coordinately regulates the molecular signature and biologic function of hematopoietic stem cells. *Blood* 112 , 560-567 (2008).

Kim, L. et al. Microfluidic arrays for logarithmically perfused embryonic stem cell culture. *Lab Chip* 6, 394-406 (2006).

King, K.R. et al. A high-throughput microfluidic real-time gene expression living cell array. *Lab Chip* 7, 77-85 (2007).

Kobel, S. et al. Optimization of microfluidic single cell trapping for long-term on-chip culture. *Lab Chip* 10, 857-863 (2010).

Korin, N. et al. Periodic "flow-stop" perfusion microchannel bioreactors for mammalian and human embryonic stem cell long-term culture. *Biomed. Microdevices* 11 , 87-94 (2009).

Kurth, I. et al. Hematopoietic stem and progenitor cells in adhesive microcavities. *Integrative Biology* 1, 427-434 (2009).

Lecault, V. et al. High-throughput analysis of single hematopoietic stem cell proliferation in microfluidic cell culture area. *Nature Methods* 8, 581-586 (2011).

Lecault, V. et al. High-Throughput Culture of Single Cells in Nanovolume Bioreactors Allows Assessment of Heterogeneity in Hematopoietic Stem Cell-Enriched Populations. Poster session presented at Engineering Conferences International Cell Culture Engineering XII. Apr. 25-29, 2010; Banff, AB, Canada.

Lee, P.T. et al. Nanoliter scale microbioreactor array for quantitative cell biology. *Biotechnol. Bioeng.* 94, 5-14 (2006).

Li, P.C.H. et al. Transport, retention and fluorescent measurement of single biological cells studied in microfluidic chips. *Lab Chip* 4, 174-180 (2004).

Li, X. & Li, P.C.H. On-Chip Dye Loading, Cell Contraction by Chemical Stimulation, and Quantitative Fluorescent Analysis of Intracellular Calcium. *Anal. Chem.* 77, 4315-4322 (2005).

Lutolf, M.P. et al. Perturbation of single hematopoietic stem cell fates in artificial niches. *Integr. Biol.* 1, 59-69 (2009).

Ma, N.N. et al. Fabrication and use of a transient contractional flow device to quantify the sensitivity of mammalian and insect cells to hydrodynamic forces. *Biotechnol. Bioeng.* 80, 428-437 (2002).

Marcy, Y. et al. Dissecting biological "dark matter" with single-cell genetic analysis of rare and uncultivated TM7 microbes from the human mouth. *Proc. Natl. Acad. Sci. U. S. A.* 104, 11889-11894 (2007).

Mehta, G. et al. Polyelectrolyte-clay-protein layer films on microfluidic PDMS bioreactor surfaces for primary murine bone marrow culture. *Advanced Functional Materials* 17, 2701-2709 (2007).

Moeller, H.C. et al. A microwell array system for stem cell culture. *Biomaterials* 29, 752-763 (2008).

Neuman, K.C. et al. Characterization of photodamage to *Escherichia coli* in optical traps. *Biophys. J.* 77, 2856-2863 (1999).

Ohta, H. et al. Near-maximal expansions of hematopoietic stem cells in culture using NUP98-HOX fusions. *Exp. Hematol.* 35, 817-830 (2007).

Paguirigan, A.L. & Beebe, D.J. From the cellular perspective: exploring differences in the cellular baseline in macroscale and microfluidic cultures. *Integr. Biol.* 1, 182-195 (2009).

Berkeley Lights Ex 1001-p 2
Berkeley Lights v UBC

(56)        References Cited

OTHER PUBLICATIONS

Paguirigan, A.L. & Beebe, D.J. Microfluidics meet cell biology: bridging the gap by validation and application of microscale techniques for cell biological assays. *Bioessays* 30, 811-821 (2008).

Pineault, N. et al. Differential and common leukemogenic potentials of multiple NUP98-Hox fusion proteins alone or with Meis1. *Molecular and Cellular Biology* 24, 1907-1917 (2004).

Pineault, N. et al. Transplantable cell lines generated with NUP98-Hox fusion genes undergo leukemic progression by Meis1 independent of its binding to DNA. *Leukemia* 19, 636-643 (2005).

Rantala, J.K. et al. A cell spot microarray method for production of high density siRNA transfection microarrays. *BMC Genomics* 12:162 (2011).

Regehr, K.J. et al. Biological implications of polydimethylsiloxane-based microfluidic cell culture. *Lab Chip* 9, 2132-2139 (2009).

Rowat, A.C. et al. Tracking lineages of single cells in lines using a microfluidic device . *Proc Natl Acad Sci USA* 106, 18149-18154 (2009).

Satyanarayana, S. et al. Stamp-and-stick room-temperature bonding technique for microdevices. *J. Microelectromech. Syst.* 14(2): 392-399 (2005).

Schroeder, T. Asymmetric cell division in normal and malignant hematopoietic precursor cells. *Cell Stem Cell* 1, 479-481 (2007).

Skelley, AM et al. Microfluidic control of cell pairing and fusion. *Nat Methods* 6(2):147-152 (2009).

Taylor, R.J. et al. Dynamic analysis of MAPK signaling using a high-throughput microfluidic single-cell imaging platform. *Proc. Natl. Acad. Sci. USA* 106, 3758-3763 (2009).

Thorsen, T. et al. Microfluidic large-scale integration. *Science* 298, 580-584 (2002).

Toriello NM, et al. Integrated microfluidic bioprocessor for single-cell gene expression analysis. *Proc Natl Acad Sci USA* 105(51):20173-20178 (2008).

Uchida, N. et al. Different in vivo repopulating activities of purified hematopoietic stem cells before and after being stimulated to divide in vitro with the same kinetics. *Experimental Hematology* 31, 1338-1347 (2003).

Unger, M.A. et al. Monolithic microfabricated valves and pumps by multilayer soft lithography. *Science* 288, 113-116 (2000).

Voldman, J. et al. A microfabrication-based dynamic array cytometer. *Anal. Chem.* 74, 3984-3990 (2002).

Wang, Z.H. et al. High-density microfluidic arrays for cell cytotoxicity analysis. *Lab Chip* 7, 740-745 (2007).

Warren L, et al. Transcription factor profiling in individual hematopoietic progenitors by digital RT-PCR. *Proc Natl Acad Sci USA* 103(47):17807-17812 (2006).

Wheeler, A.R., et al. Microfluidic device for single-cell analysis. *Anal. Chem.* 75, 3581-3586 (2003).

Wlodkowic, D.et al. Microfluidic Single-Cell Array Cytometry for the Analysis of Tumor Apoptosis. *Anal. Chem.* 81, 5517-5523 (2009).

Yamazaki, S. & Nakauchi, H. Insights into signaling and function of hematopoietic stem cells at the single-cell level. *Curr. Opin. Hematol.* 16 , 255-258 (2009).

Young, J.C. et al. Retention of quiescent hematopoietic cells with high proliferative potential during ex vivo stem cell culture. *Blood* 87, 545-556 (1996).

Bocchi, Massimo et al. "Inverted open microwells for cell trapping, cell aggregate formation and parallel recovery of live cells" Lab Chip, 12, 3168-2176 (2012).

Lecault, Véronique et al. "High-Throughput Clonal Selection of Antibody-Producing CHO Cells Using a Microfluidic Cell Culture Platform" CHO Poster Presented at Single Cell Analysis Summit Sep. 29&30, 2011 San Francisco, California USA.

Lecault, Véronique et al. "High-Throughput Clonal Selection of Antibody-Producing CHO Cells Using a Microfluidic Cell Culture Platform" American Chemical Society Meeting in San Diego, California on Mar. 28, 2012.

Lecault, Véronique et al. "Microfluidic Platform for Rapid Clonal Selection of Highly Productive Cell Lines" ECI Cell Culture Engineering Conference XIII Poster on Apr. 22 to 27, 2012 Scottsdale, Arizona USA.

* cited by examiner

Berkeley Lights Ex 1001-p 3
Berkeley Lights v UBC



FIGURE 1

Berkeley Lights Ex 1001-p 4
Berkeley Lights v UBC



FIGURE 2

Berkeley Lights Ex 1001-p 5
Berkeley Lights v UBC



FIGURE 3

Berkeley Lights Ex 1001-p 6
Berkeley Lights v UBC



FIGURE 4

Berkeley Lights Ex 1001-p 7
Berkeley Lights v UBC



FIGURE 5

Berkeley Lights Ex 1001-p 8
Berkeley Lights v UBC



FIGURE 6

Berkeley Lights Ex 1001-p 9
Berkeley Lights v UBC



FIGURE 7

Berkeley Lights Ex 1001-p 10
Berkeley Lights v UBC



FIGURE 8

Berkeley Lights Ex 1001-p 11
Berkeley Lights v UBC

9a        9b



9c



FIGURES 9a-9c

Berkeley Lights Ex 1001-p 12
Berkeley Lights v UBC



FIGURE 10

Berkeley Lights Ex 1001-p 13
Berkeley Lights v UBC



FIGURE 11

Berkeley Lights Ex 1001-p 14
Berkeley Lights v UBC



FIGURES 12a-c

Berkeley Lights Ex 1001-p 15
Berkeley Lights v UBC



FIGURES 13a-d

Berkeley Lights Ex 1001-p 16
Berkeley Lights v UBC

**a**



**b**



FIGURE 14

Berkeley Lights Ex 1001-p 17
Berkeley Lights v UBC

15a



15b



FIGURES 15a-b

Berkeley Lights Ex 1001-p 18
Berkeley Lights v UBC



FIGURE 16

Berkeley Lights Ex 1001-p 19
Berkeley Lights v UBC

17a



17b



FIGURES 17a-b

Berkeley Lights Ex 1001-p 20
Berkeley Lights v UBC



FIGURE 18

Berkeley Lights Ex 1001-p 21
Berkeley Lights v UBC



FIGURE 19

Berkeley Lights Ex 1001-p 22
Berkeley Lights v UBC



20a



20b



FIGURES 20a-b

Berkeley Lights Ex 1001-p 23
Berkeley Lights v UBC



FIGURE 21

Berkeley Lights Ex 1001-p 24
Berkeley Lights v UBC

1

# SYSTEM AND METHOD FOR MICROFLUIDIC CELL CULTURE

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Patent Application Ser. No. 61/362,213 entitled "SYSTEM AND METHOD FOR MICROFLUIDIC CELL CULTURE" filed on 7 Jul. 2010, which is incorporated herein by reference in its entirety.

## BACKGROUND

### 1. Field

This invention relates to microfluidic devices. In particular, the invention relates to microfluidic devices and their uses and methods for culturing cells for extended periods of time.

### 2. Description of Related Art

Cell population heterogeneity poses a major obstacle to understanding complex processes that govern tissue-specific cellular responses, differentiation, and disease development. Averaged measurements of large numbers of cells often obscure the variable responses of individual or rare cells. New technologies for studying cellular heterogeneity at the single cell level under well-defined chemical environments are therefore of great interest in the study of cells (for example, stem cell fields).

The need for scalable single cell analysis is particularly acute in the study of hematopoietic stem cell (HSCs) growth and differentiation. The analyses of clonal cultures derived from single HSCs have been performed for a number of years and these have already provided some insights into the proliferation kinetics of the input cells, their in vitro responses to varying growth factor conditions, and their rapid loss ex vivo of the differentiation pattern that is typically preserved when they expand in vivo. Such experiments have shown that quiescence and delayed cell cycle entry correlate with higher potency (Brummendorf, T H. et al. J. Exp. Med. 188, 1117-1124 (1998); Audet, J. et al. Biotechnol. Bioeng. 80, 393-404 (2002)), that asymmetric cell divisions are features of HSCs with long-term hematopoietic activity (Ma, N. N. et al. Biotechnology and Bioengineering 80, 428-437 (2002)), and that the probability of HSCs executing a self-renewal decision in vitro is regulated by the types and concentrations of growth factors to which it is exposed (Ma, N. N. et al. Biotechnology and Bioengineering 80, 428-437 (2002); Pineault, N. et al. *Leukemia* 19, 636-643 (2005); Pineault, N. et al. *Molecular and Cellular Biology* 24, 1907-1917 (2004)). Recently, the study of HSCs using automated time-lapse imaging and, in some cases, micropatterned substrates, has enabled increased time resolution and the identification of new phenotypes associated with particular biological behaviors (Audet, J. et al. Biotechnol. Bioeng. 80, 393-404 (2002); El-Ali, J. et al. Nature 442 , 403-411 (2006); Faley, S. L. et al. Lab Chip 9, 2659-2664 (2009); Wang, Z. H. et al. Lab Chip 7, 740-745 (2007); Figallo, E. et al. Lab Chip 7, 710-719 (2007)). These latter approaches indicate the power of higher throughput micro-culture systems, even though they lack desirable features including variable schedules of medium exchange.

Integrated microfluidic systems provide many advantages for live-cell microscopy tracking studies. These advantages include low reagent consumption, precise temporal control over growth conditions, and an ability to work with but not

2

be limited to small numbers of input cells. Although these advantages have been well explored to analyze yeast and bacterial cell responses (Balagadde, F. K. et al. Science 309, 137-140 (2005); Taylor, R. J. et al. Proc. Natl. Acad. Sci. USA 106, 3758-3763 (2009)), applications to mammalian cells are less developed. Whereas fluid- and cell-handling capabilities have been well established (El-Ali, J. et al. Nature 442 , 403-411 (2006)), there have been relatively few reports of the application of programmable microfluidic systems to the long-term analysis of biological responses presumably owing to the difficulties in obtaining robust growth of mammalian cells in microfluidic devices. Previous mammalian microfluidic culture systems have been largely restricted to experiments with adherent cells incubated for short periods of time (hours) (Faley, S. L. et al. Lab Chip 9, 2659-2664 (2009); Wang, Z. H. et al. Lab Chip 7, 740-745 (2007)) in relatively large volumes of medium (Figallo, E. et al. Lab Chip 7, 710-719 (2007)) and/or maintained under high perfusion rates (Kim, L. et al. Lab Chip 6, 394-406 (2006); Korin, N. et al. Biomed. Microdevices 11, 87-94 (2009)). With a few notable exceptions (Lee, P. J. et al. Biotechnol. Bioeng. 94, 5-14 (2006); Hung, P. J. et al. Biotechnol. Bioeng. 89(1) (2005)), longer-term microfluidic mammalian cell culture has been characterized by reduced growth rates and even deviations from normal phenotypes (Korin, N. et al. Biomed. Microdevices 11, 87-94 (2009); Paguirigan, A. L. & Beebe, D. J. Integr. Biol. 1, 182-195 (2009)). Technical hurdles in available devices include dehydration, immobilization of nonadherent cells to facilitate medium exchange and recovery of the cultured cells for subsequent phenotypic or functional analysis. Furthermore, a microfluidic cell culture system that achieves culture conditions similar to those obtained in standard macrocultures, and allows for analysis of heterogeneous cell behaviour to generate differentiated cells both in vitro and in vivo would have practical utility.

Microfluidic devices made of polydimethylsiloxane (PDMS), a transparent and biocompatible silicone elastomer, have been widely used for cell-culture applications and provide high gas permeability for the efficient exchange of oxygen and carbon dioxide. However, PDMS is also permeable to some small molecules (Berthier, E. et al. Lab Chip 8, 852-859 (2008); Regehr, K. J. et al. Lab Chip 9, 2132-2139 (2009)) and allows for rapid transport of water vapor, which may result in dehydration (Heo, Y. S. et al. Anal. Chem. 79, 1126-1134 (2007); Hansen, C. L. G. et al. J. Am. Chem. Soc. 12 8, 3142-3143 (2006)). The high surface-to-volume ratios characteristic of nano-volume culture chambers further promote dehydration of microfluidic devices. In addition, small hydrophobic molecules can diffuse in the elastomeric material and be depleted from the medium. These variations may lead to spurious biological responses, reduced growth rates and even cell death.

## SUMMARY

In a first embodiment, there is provided a method of culturing a cell, the method including: (a) retaining the cell at a retaining position within a chamber having a chamber volume; and (b) flowing a perfusing fluid through the chamber, wherein the perfusing fluid enters the chamber through an inlet at an inlet position and exits the chamber through an outlet at an outlet position, wherein the perfusing fluid has a greater velocity laminar flow adjacent the inlet and outlet positions than at the retaining position, and wherein a first region of the chamber is spaced apart from

Berkeley Lights Ex 1001-p 25
Berkeley Lights v UBC

the retaining position and where the first region is interposed directly between the inlet and outlet positions.

In a further embodiment, there is provided a method of culturing a cell, the method including: (a) retaining the cell at a retaining position within a chamber; (b) flowing a perfusion fluid into the chamber through an inlet; and (c) flowing the perfusion fluid out of the chamber through an outlet wherein the outlet is positioned such that gravitational forces acting on the cell to keep it at or near the retaining position exceed hydrodynamic forces acting on the cell to move it toward the outlet.

In a further embodiment, there is provided a method of culturing a cell, the method including: retaining the cell in a volume of perfusion fluid, wherein the volume is less than about 10 nL; and placing the volume of perfusion fluid in fluid communication with a reservoir fluid, wherein the reservoir fluid has a volume greater than the volume of perfusion fluid.

The first region of the chamber may be defined as the volume of the chamber interposed directly between the inlet and outlet positions. Furthermore, the first region is spaced apart from the retaining position such that the velocity of the perfusion fluid at the retaining position is lower than the velocity of the perfusion fluid adjacent the inlet and outlet positions during perfusion. Similarly, the first region is spaced apart from the retaining position such that the velocity of the perfusion fluid at the retaining position is lower than the velocity of the perfusion fluid within the first region during perfusion. Accordingly, the velocity of the perfusion fluid around a cell at the retaining position may be regulated such that the velocity of the perfusion fluid is lower at the retaining position than adjacent the inlet and outlet positions during perfusion. The velocity of the perfusion fluid around a cell at the retaining position may be regulated such that the velocity of the perfusion fluid is lower at the retaining position than the first region. The speed of the perfusion fluid may be decreased to less than 50 μm/s as the perfusion fluid approaches the retaining position. The speed of the perfusion fluid may be decreased to less than 40 μm/s as the perfusion fluid approaches the retaining position. The speed of the perfusion fluid may be decreased to less than 30 μm/s as the perfusion fluid approaches the retaining position. The speed of the perfusion fluid may be decreased to less than 20 μm/s as the perfusion fluid approaches the retaining position. The speed of the perfusion fluid may be decreased to less than 10 μm/s as the perfusion fluid approaches the retaining position. The speed of the perfusion fluid may be decreased to less than 5 μm/s as the perfusion fluid approaches the retaining position. The speed of the perfusion fluid may be decreased to less than 4 μm/s as the perfusion fluid approaches the retaining position. The speed of the perfusion fluid may be decreased to less than 3 μm/s as the perfusion fluid approaches the retaining position. The speed of the perfusion fluid may be decreased to less than 2 μm/s as the perfusion fluid approaches the retaining position. The speed of the perfusion fluid may be decreased to less than 1 μm/s as the perfusion fluid approaches the retaining position. The speed of the perfusion fluid may be decreased to 0 μm/s as the perfusion fluid approaches the retaining position.

The chamber may have a top and a bottom, and the retaining position may be at the bottom. The inlet position may be proximal to the top. The outlet position may be proximal to the top. The cell may be retained at the bottom by gravitational forces. The method may further include regulating osmolarity of the perfusion fluid within the chamber. The regulating osmolarity of the perfusion fluid within

the chamber may include placing the chamber in fluid communication with a bathing fluid, wherein the bathing fluid has a volume greater than the chamber volume. The regulating osmolarity of the perfusion fluid within the chamber may include placing the chamber in gaseous communication with a bathing fluid, wherein the bathing fluid has a volume greater than the chamber volume. The bathing fluid and the perfusion fluid may be iso-osmotic. The cell may be a suspension cell. The perfusion fluid may include any one or more of: a cell culture medium; an immunostaining agent; an enzymatic reagent; a dye; an oil; and a bead-containing solution.

The length of the first region may be less than or equal to a length of the shortest distance between the retaining position and the first region. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be less than 3:1. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be less than 2:1. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be less than 3:2. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be less than 1:1. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 0.5. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 0.6. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 0.7. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 0.8. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 0.9. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 1.0. The method may further include flowing the cell into the chamber prior to retaining the cell at the retaining position. The method may further include isolating a clone of the cell. The method may further include tracking the progeny of the cell.

The flow of the perfusing fluid may be intermittent. The flow of the perfusing fluid may be continuous. The flow of the perfusing fluid may be intermittent. The flowing of the perfusing fluid may be continuous. The replenishing of the perfusing fluid may be intermittent. The replenishing of the perfusing fluid may be continuous.

A value for x may be less than or equal to the value for y, wherein x is the length of the shortest distance between the inlet and the outlet and y is the length of shortest distance between the retaining position a region of the chamber that is interposed directly between the inlet and outlet positions. The ratio of x:y of the chamber is greater than 0.5.

The method may further include replenishing the perfusion fluid. The perfusion fluid and reservoir fluid may be iso-osmotic.

In a further embodiment, there is provided a microfluidic device for perfusing a cell with perfusion fluid, the device including: a chamber, having: (i) at least one inlet; (ii) at least one outlet; and (iii) a cell retainer; wherein the inlet and the outlet are in fluid communication with the cell retainer, and wherein the outlet is positioned such that, when the device is being perfused, gravitational forces acting on the cell to keep it at or near the retainer exceed hydrodynamic forces acting on the cell to move it toward the outlet.

Berkeley Lights Ex 1001-p 26
Berkeley Lights v UBC

In a further embodiment, there is provided a microfluidic device for perfusing a cell with perfusion fluid, the device including: a chamber, having: (i) at least one inlet; (ii) at least one outlet; and (iii) a cell retainer; wherein the inlet and the outlet are in fluid communication with the cell retainer; and wherein a first region of the chamber is interposed directly between the inlet and outlet positions and is spaced apart from the cell retainer.

The microfluidic device may further include an osmolarity regulator for regulating the osmolarity of the perfusion fluid. The osmolarity regulator may include an iso-osmotic reservoir in fluid communication with the chamber. The microfluidic device may further include a reservoir for holding a reservoir fluid, wherein the reservoir is in fluid communication with the chamber. The reservoir fluid may be iso-osmotic with the perfusion fluid. The microfluidic device may further include flow channels in fluid communication with the chamber via the at least one inlet and the at least one outlet. The chamber may have a top and a bottom, and the cell retainer is at the bottom. The inlet may be proximal to the top. The outlet may be proximal to the top. The cell may be a suspension cell. The perfusion fluid may include any one or more of: a cell culture medium; an immunostaining agent; an enzymatic reagent; a dye; an oil; and a bead-containing medium. The distance between the inlet and the outlet may be less than a distance between the cell retainer and the outlet. The ratio of the length of the distance between the inlet and the outlet to the distance between the cell retainer and the outlet may be less than 2:1. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be less than 3:1. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be less than 2:1. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be less than 3:2. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be less than 1:1. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 0.5. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 0.6. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 0.7. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 0.8. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 0.9. The ratio of the length of the first region to the shortest distance between the retaining position and the first region may be more than 1.0.

The device may be an array of at least 100 chambers. The chambers may be connected in parallel. The chambers may be serially connected. The chambers may be connected in parallel and in series. The chambers may be connected partially in parallel and partially in series. The microfluidic device may be operable to be perfused intermittently. The microfluidic device may be operable to be perfused continuously.

In a further embodiment, there is provided a use of a microfluidic device described herein for tracking progeny of the cell.

In a further embodiment, there is provided a use of a microfluidic device described herein for selection of a clone of the cell.

In a further embodiment, there is provided a use of a microfluidic device described herein for observing cell-cell interactions.

In a further embodiment, there is provided a use of a microfluidic device described herein for observing autocrine effects of the cell.

The selection may be based on the amount of a factor produced by the cell or the clone. The factor may be a protein. The factor may be a nucleic acid. The cell may be a suspension cell. The use may further include recovery of the cell or clone thereof.

## BRIEF DESCRIPTION OF THE DRAWINGS

In drawings which illustrate embodiments of the invention.

FIG. 1 is a top view of a microfluidic device with two expanded views (11×12 chamber view (size reference bar=1 mm) and a 4 chamber view (size reference bar=100 μm)) to magnify details of the microfluidic device according to an embodiment.

FIG. 2 is an exploded oblique view of a portion of the microfluidic device depicted in FIG. 1, showing the various layers associated with an individual microfluidic device.

FIG. 3 is an oblique view from below of 4 microfluidic chambers depicted in FIG. 1 with associated fluid channels and control layers.

FIG. 4 is a cross-sectional view of a chamber and a channel of the microfluidic device depicted in FIG. 1, showing the dimensions and volume of the chamber, and a depiction of fluid speed in the control layer and chamber while the chamber is being perfused.

FIG. 5 is an oblique view of the microfluidic device (array) depicted in FIG. 1, further showing the microfluidic device containing an iso-osmotic bath pressurized by a syringe, the inlet and outlet, and the control lines (pumps and valves) which may be connected to solenoid actuators (not shown).

FIG. 6 shows differences in cell survival during microfluidic culture in the indicated conditions compared to the high [SF] condition, wherein the cells were imaged every 12 min, and survival curves were normalized to a third-order polynomial fit for the high [SF] conditions.

FIG. 7 shows cumulative division kinetics of primary HSCs that are cycling (excluding dead and quiescent cells) in the indicated in vitro conditions for the first and second divisions.

FIG. 8 shows individual growth curves of primary murine HSCs under different Steel factor (SF) exposure conditions, where the growth curves were generated using the enhanced bifocal image analysis algorithm and the analysis was started after 21 hours to allow small quiescent cells to reach a suitable size for detection by image analysis.

FIG. 9a is a scatter plot depicting cell counts before and after medium exchange (2 μL/min for 10 minutes) showing minor variations attributable to cell division and cell death.

FIG. 9b is a graph depicting the efficiency of cell recovery from chambers by cell count in individual chambers and recounting of cells successfully transferred to a well, showing that on average 91% of the cells from individual colonies of different sizes could be recovered.

FIG. 9c is a graph depicting lineage tracking of cells for 3 clones following manual inspection of images, where the cells were imaged every 5 minutes and media was exchanged every 6 hrs.

FIG. 10 is a graph comparing the of average growth rates of ND13 cells in 24-well dish culture, single cell 96-well

Berkeley Lights Ex 1001-p 27
Berkeley Lights v UBC

culture, a microfluidic device as described herein with and without an iso-osmotic reservoir (arrows show growth medium exchange).

FIG. 11 is a graph of cell concentration (1 cell, 2-15 cells, 16-30 cells, 31-45 cells, and >45 cells) over time for various seeding densities grown in a microfluidic device according to an embodiment, but with no medium exchange and no iso-osmotic bath. This Figure shows a strong inverse correlation with the initial number of cells in each chamber.

FIG. 12a are time-lapse images of clonal expansion in a chamber of a microfluidic device according to an embodiment (at 0 hr and at 6 hr intervals thereafter until 66 hrs.).

FIG. 12b is a histogram depicting distribution of average doubling times of clonal ND13 cultures up to 72 hrs. in a microfluidic device according to an embodiment, showing that the cells growth rates are highly heterogeneous, whereby only a small fraction of fast growing cells contributed to the overall growth rate, while 52% of the cells did not give rise to colonies (i.e. cells marked 'no proliferation' (52%) did not divide during this period or died).

FIG. 12c is a graph depicting the proliferation profile of individual clones over time (as counted by automated image analysis for individual ND13 cells) in a microfluidic device according to an embodiment, also showing highly variable growth rates.

FIG. 13a is a graph depicting the proliferation of lin+ clones in ND13 cells grown in a microfluidic device according to an embodiment, wherein the majority of the lin+ cells either died or did not give rise to colonies.

FIG. 13b is a graph depicting the proliferation of lin⁻ clones in a microfluidic device according to an embodiment, wherein the lin⁻ cells gave rise to colonies of different sizes.

FIG. 13c is an image depicting live immunostaining of small clonal populations in a microfluidic device according to an embodiment, wherein Nup98-HOXD13 clones were stained for lineage markers B220, Gr-1, and Mac-1 at 0 Hrs. and after 72 hours inside the microfluidic device.

FIG. 13d is a histogram depicting the progeny of Nup98-HOXD13 clones taken from a microfluidic device according to an embodiment and a control plate to compare colony forming cells (CFC—colonies/100 cells) using methylcellulose assays.

FIG. 14a is a schematic diagram of a study to compare primary hematopoietic stem cells (HSC) activity in NUP98-HOXA10hd (NA10dh)-transduced hematopoietic populations cultured in a microfluidic device according to an embodiment as compared to hematopoietic populations cultured in a macroscale 96-well plate as compared by competitive repopulating cell (CRU) assay.

FIG. 14b shows a comparison of macroscale 96-well plate cultured cells (control) with microarray cultured cells, whereby NUP98-HOXA10hd cells maintained functional HSC activity after being cultured in the microfluidic array according to an embodiment and were able to reconstitute the blood-forming system of lethally irradiated mice.

FIG. 15a is a histogram depicting the ability of NA10 hd hematopoietic populations cultured in a microfluidic device according to an embodiment and hematopoietic populations cultured in a macroscale 96-well plate to produce myeloid and lymphoid lineages as defined by lineage markers Gr-1/ Mac-1, B220, and CD4/CD8.

FIG. 15b is a histogram depicting distribution of average doubling times of single HSC cells (NA10hd) in a microfluidic device according to an embodiment after being transduced with NA10 hd (apparent doubling time 13 hrs).

FIG. 16 shows a microfluidic cell culture array for temporal stimulation and parallelization of experiments,

wherein the microfluidic cell culture array contains 6,144 chambers and can support up to 8 different conditions simultaneously, but only the top half of the array was used to study murine HSCs due to the relatively small cell numbers and 6 different conditions were distributed across the array as shown.

FIG. 17a shows representative images from an automated image analysis algorithm for cell quantification of cells in a chamber of a microfluidic device according to an embodiment, where segmentation was accomplished through three main steps: chamber segmentation (A-E), cell-containing region segmentation (F-J), and then single cell isolation (K-O). First, the individual chambers are segmented from the image background.

FIG. 17b shows a plot comparing automated image analysis depicted in FIG. 17a and manual cell counts, wherein the straight line represents the 1:1 slope.

FIG. 18 shows a mature myeloid population derived from lineage negative ND13 cells, where the ND13 cells were stained for Gr-1, Mac-1 and B220 and sorted by flow cytometry and the lin⁻ fraction was cultured for 9 days and gave rise to a new lin+ population.

FIG. 19 is a graph of average fluorescence intensity as a function of perfused volume.

FIG. 20a is a scatter plot comparing the results of manual cell counts and automated cell counts employing a bifocal algorithm

FIG. 20b is a histogram showing absolute differences between the algorithm and manual counts.

FIG. 21 shows a percentage of dividing cells over time for mouse HSCs cultured in the microfluidic array under high SF concentration (300 ng ml-1), where single cells were imaged every 4 min, and the times for the first, second and third divisions were identified by manual inspections of the videos for 46 cells.

## DETAILED DESCRIPTION

### Definitions

A "microfluidic device", as used herein, refers to any device that allows for the precise control and manipulation of fluids that are geometrically constrained to structures in which at least one dimension (width, length, height) may be less than 1 mm.

"Perfusion" or "perfusing", as used herein, refers to the passage of fluid, such as culture media, over cells for the purposes of nutritive delivery and waste removal. A person skilled in the art will understand that the fluid does not necessarily flow over the cell, but may ultimately arrive at a cell by the process of diffusion. Furthermore, perfusion or perfusing of a chamber or the microfluidic device as a whole may be continual or intermittent provided that the fluid exchange provides sufficient nutrient delivery and/or waste removal and or other factors or reagents to keep the cells viable (if that is the desired result) and/or to maintain desired conditions for the particular cell and/or assay as desired.

A "perfusion fluid", as used herein, refers to any fluid with which a cell in a chamber is perfused. A person skilled in the art will understand that a perfusion fluid may comprise factors or reagents with which it is desired to present to the cell. Factors or reagents may include proteins (e.g. interferon-α, TAT, fibronectin, bovine serum albumin), small molecules (e.g. all-trans retinoic acid, imatinib), growth factors (e.g. IL-3, IL-6, IL-11, SCF, GM-CSF), immunostaining agents (e.g. monoclonal antibodies, polyclonal antibodies, fluorophores, blocking solution), enzymatic reagents (e.g. horseradish peroxidase, luminol), oils (e.g. mineral oil,

Berkeley Lights Ex 1001-p 28
Berkeley Lights v UBC

fluorinated oil), dyes (e.g. rhodamine, fluorescein, Hoescht, functionalized beads (e.g., magnetic beads, polymer beads, protein A-coated beads, protein G-coated beads), buffers (e.g. PBS, Hank's balanced solution, HEPES), PCR solutions (e.g. polymerase, nucleic acids, primers), cell transfection solutions (e.g. fibronectin, retronectin, polyethylenimine), cell fixation solutions (e.g. ethanol, formaldehyde), miRNAs, siRNAs, molecular beacons, amino acids (e.g. glutamine), antigens, semi-solid matrix (e.g. methylcellulose, Matrigel®), etc.

A "chamber" or "cell capture chamber", as used herein, refers to an enclosed space within a microfluidic device in which one or more cells may be isolated from a larger population of cells as the cells are flowed through the device. Each chamber will have at least one inlet for permitting fluid, including fluid containing cells, to enter the chamber, and at least one outlet to permit fluid to exit the chamber. Persons skilled in the art will understand that an inlet or an outlet can vary considerably in terms of structure and dimension, and may be reversibly switched between an open position, to permit fluid to flow into or out of the chamber, and a closed position to seal the chamber and thereby isolate and retain its contents, whereby the aperture may also be intermediate between the open and closed positions to allow some fluid flow. Each chamber will further have at least one cell retaining position which may comprise at least one cell retainer.

The direction of fluid flow through the chamber dictates an "upstream" and a "downstream" orientation of the chamber. Accordingly, an inlet will be located at an upstream position of the chamber, and an outlet will be generally located at a downstream position of the chamber. It will be appreciated by a person of skill in the art, that the designation of an "inlet" or an "outlet" may be changed by reversing the flow within the device or by opening one or more alternative aperture(s).

A "cell retaining position" or "retainer position", as used herein, refers to a location in the chamber at which a cell is maintained during cell culture and media exchange. A retaining position may include at least one cell retainer. According to some embodiments, the retaining position may be a determined position within the chamber. However, a person skilled in the art will understand that a retaining position may comprise a zone within the chamber. The important characteristic of a retaining position is that hydrodynamic forces are insufficient to facilitate the escape of a cell through the outlet while the cell is in the retaining position and shear forces on the cell, if any, do not damage the cell. Depending on the cell type, the cell may adhere, either weakly or strongly, to the cell retaining position or a cell retainer or may be held in place by gravitational forces or a cell trap.

A "cell retainer", as used herein, refers to any structure which serves to maintain a cell within a retaining position. In a simple embodiment, the cell retainer may be the bottom of the chamber and the cells may be held in place by gravitational forces. Alternatively, a cell retainer may include a cell trap positioned to receive (and retain) a cell that is flowed into the chamber. Furthermore, a substrate may be provided at the cell retaining position that facilitates retention of the cells. For example, extracellular matrix (ECM) components or integrin or functionalized beads etc. may be deposited at the retaining position to facilitate retention of cells.

An "inlet" or an "outlet", as used herein, may include any aperture whereby fluid flow is restricted through the inlet or outlet. There may be one or more valves to control flow, or

flow may be controlled by separating the fluid channels, which lead to the inlets and outlets with a layer which prevents flow (for example, a control layer or isolation layer). Alternatively, flow may be regulated by the rate at which passed through the device. An "inlet position", as used herein, refers to a position in the chamber where an inlet is located. Similarly, an "outlet position", as used herein, refers to a position within a chamber where an outlet is located. According to embodiments, the inlet position, outlet position, and retaining position will not be co-linear.

A "first region", as used herein, refers to a region of the chamber that is interposed directly between the inlet and outlet positions. In some embodiments the first region is spaced apart from the retaining position. According to some embodiments described herein, the first region may be generally at the top of the chamber and the cell retaining position may be generally at the bottom of the chamber, such that the velocity of the fluid in the cell retaining position is slower than the velocity of the fluid in and around. In some embodiments the velocity of fluid in cell retaining position is or approaches zero and the only perfusion fluid that enters the cell retaining position is by diffusion or convection, thereby providing fresh diffusion fluids to the cell. According to some embodiments described herein, the speed of the fluid flow in the first region will be sufficiently low such that the hydrodynamic forces of the fluid urging a cell from the retaining position to an outlet are exceeded by forces, e.g. gravitational forces, urging the cell toward the cell retaining position.

A "cell trap", as used herein, refers generally to a means for receiving and retaining cells at a pre-determined location over time. A cell trap may comprise localized surface modifications for chemical immobilization of a cell. Alternatively, the cell trap may be a mechanical trap, a hydrodynamic trap (Skelley, A M et al. Nat Methods 6(2):147-152 (2009); Li, P. C. H. et al. Lab on a Chip 4, 174-180 (2004); Li, X. & Li, P. C. H. On-Chip Dye Loading, Cell Contraction by Chemical Stimulation, and Quantitative Fluorescent Analysis of Intracellular Calcium. Anal. Chem. 77, 4315-4322, doi:10.1021/ac048240a (2005); Di Carlo, D. et al. Anal. Chem. 78, 4925-4930, doi:10.1021/ac060541s (2006)), a hydrodynamic balancing trap (Rowat, A. C. et al. Proceedings of the National Academy of Sciences 106, 18149-18154, doi:10.1073/pnas.0903163106 (2009); and Kobel, S. et al. Lab on a Chip 10, 857-863 (2010)), an active valving trap (Warren L, et al. Proc Natl Acad Sci USA 103(47):17807-17812 (2006); Skelley, A M et al. Nat Methods 6(2):147-152 (2009); Li, P. C. H. et al. Lab on a Chip 4, 174-180 (2004); King, K. R. et al. Lab on a Chip 7, 77-85 (2007); Marcy, Y. et al. Proc. Natl. Acad. Sci. U.S.A. 104, 11889-11894 (2007)), a dielectrophoretic trap (Voldman, J. et al. Anal. Chem. 74, 3984-3990, doi:10.1021/ac0256235 (2002)), a DNA immobilization trap (Toriello N M, et al. Proc Natl Acad Sci USA 105(51):20173-20178 (2008)), a gel encapsulation trap (Braschler, T. et al. Lab on a Chip 5, 553-559 (2005)), a magnetic trap, an acoustic trap or an optical trap (Neuman, K. C. et al. Biophys. J. 77, 2856-2863 (1999)). In various embodiments described herein, a cell trap will generally be positioned directly in the path of the smaller cross sectional of cell flow created by the funnel. Where a mechanical funnel is used according to various embodiments described herein, a trap may be positioned directly after the downstream opening of the funnel. Furthermore, additional cell trapping and funneling methods may be found in PCT/CA2011/000612.

A "mechanical trap", as used herein, refers to a physical cell trap such as a cage.

Berkeley Lights Ex 1001-p 29
Berkeley Lights v UBC

A "hydrodynamic trap", as used herein, refers to a cell trap in which the force of the fluid in motion plays a role in retaining a trapped cell in its position. A hydrodynamic trap may be also be comprised of a mechanical trap in which a cell is captured and retained. Exemplary mechanical traps are described in PCT/CA2011/000612. In certain embodiments hydrodynamic traps may be utilized. However, it may be desirable to have three or more inlets to the cell capture chamber so that the flows may be adjusted in order to direct cells to the traps.

A "dielectrophoretic trap", as used herein, refers to a cell trap in which cells, being dielectric objects, are retained by the forces generated by a non-uniform electric field.

A "magnetic trap", as used herein, refers to a cell trap employing magnetic fields to retain cells. Typically, cells will be labeled with magnetic particles, and then positioned and retained by the magnetic fields. However, magnetic traps can also be used to trap-non-magnetic cells in suitable buffers.

An "acoustic trap", as used herein, refers to a cell trap in which ultrasonic standing waves are used to generate stationary pressure gradients that exert forces that position and retain cells.

An "optical trap", as used herein, refers to a cell trap in which a tightly focused laser beam, typically a near-infra red laser beam, is used to draw cells in the direction of the beam.

The size of the cell trap may be varied according to the size, type, mechanical properties, or number of cells that are desired to be trapped. A microfluidic device according to various embodiments may further include a combination of trap designs for the capture of a range of cell types. Furthermore, each chamber could include multiple traps or each chamber or a subset of chambers may be optimized to capture a particular cell type. In such embodiments, the frequency of cells of a particular size or having particular characteristics that are trapped may be used for diagnostic or other assay purposes. Alternatively, the contents of a group of cells caught in a single trap may be processed and analyzed.

A chamber may further include cell funnel, and a "cell funnel" as used herein, refers to an apparatus which is designed to focus the flow of cells from a first location, where the cells are dispersed, to one or more desired second or more locations within the chamber wherein the cell funnel has a smaller cross sectional area of cell flow. The cell funnel may exert a force to direct cells towards the one or more desired locations within the cell capture chamber. For the purposes of clarity, "force" is defined herein as any influence that causes a free body (e.g. a cell) to undergo a change in velocity. Funnels may either span the entire height and/or width of the cell capture chamber, or partially span the height and/or width. Exemplary cell funnels are described in PCT/CA2011/000612.

A "bathing fluid", as used herein, refers to any fluid which is used to regulate the osmolarity of fluid, e.g. perfusion fluid, within a chamber. A bathing fluid may be iso-osmotic with the perfusion fluid or sufficiently close to iso-osmotic such that the osmolarity of the fluid remains in a range that is suitable for cell culturing. According to an embodiment described herein, bathing fluid will generally be present in a volume greater than a chamber. The bathing fluid may be a in a reservoir that is in gaseous communication with the chamber. For example, the reservoir may be separated from the chamber by a gas-permeable PDMS membrane, wherein the water exchange occurs in vapor phase.

An "osmolarity regulator" is a system for regulating the osmolarity of the perfusion fluid within a chamber and/or a

microfluidic device as a whole. For example, the osmolarity regulator may comprise an iso-osmotic reservoir or bath in fluid communication with the chamber, wherein the iso-osmotic reservoir is filled with or resupplied with a bathing fluid that may be iso-osmotic with the perfusion fluid. The term bath and reservoir are used interchangeably with regards to osmolarity regulation of the device.

Alternatively, osmolarity may be regulated in the chambers by immersing the chambers in a large volume media bath that would be recirculated to maintain osmolarity. Alternatively, the osmolarity may be regulated in the chambers by enclosing the microfluidic device in an environmentally regulated enclosure.

"Aspect ratio", as used herein, refers to the ratio (y:x) of the shortest distance between the cell retaining position and the first region (y) to the length of the first region (x). In various embodiments where the inlet and outlet is at the top of the chamber, such that the first region is horizontal and defines an area that is interposed directly between the inlet and outlet positions, the aspect ratio will effectively been the ratio of the height of the chamber (minus the height of the first region) to the width of the chamber.

A "hydrodynamic force", as used herein, refers to a force exerted by a fluid in motion.

An "adherent cell", as used herein, refers to a cell which requires contact with a surface for growth or proliferation in vitro. For example, SAOS-2; U-2 OS; U-2 OS CycE; A172; T98G; U373MG; U87MG; SVGp12; BT-474; HMEC; MCF-7; MCF-10A; MDA-MB-231; MDA-MB-231M; MDA-MB-436; MDA-MB-468; SK-BR-3; T47D; ZR-75-1; MA11; PM1; SUM1315mo2; JIMT-1; HCC-1937; KPL-4; SUM-102PT; HeLa; HCT-116; SW480R18; SW480; HT29; Caco-2; SW620; DLD-1; LS174T; SW48; RKO; HCT-15; LS1034; AGS; CHO; SVpgC2a; HEK293; HEK293TREX; HA1ER; HA1EB; A549; A549EpoB40; U1690; A549EpoB480; NCI-H460; MDA-MB-435; UACC-257; NIH3T3; 1A9; 1A9/PTX10; 1A9/PTX22; Ascites cells; KF28; KF28Tx; KFr13; KFr13Tx; Primary ovarian solid tumor cells; OVCAR-3; OVCAR-4; OVCAR-5; OVCAR-8; OVCAR-8/ADR; SU.86.86; CAPAN-1; Hs 766T; 22-RV-1; DuCaP; LAPC-4; LnCaP; Primary prostate stromal cells; Primary prostate epithelial cells; MDA-P; CA-1; MDA-PCA-2b; PC-3; PC-3M; PWR-1E; RWPE-1; VCaP; WPE-1/NA22; WPE-1/NB11; WPM4-1; P97E; ALVA-31; RD; and A431. Generally, most cells derived from solid tissues are adherent cells (Rantala, J. K. et al. BMC Genomics 12:162 doi:10.1186/1471-2164-12-162 (2011)).

A "suspension culture", as used herein, refers to a culture in which cells grow or multiply while suspended in a suitable fluid medium. Accordingly, a "suspension cell", as used herein, refers to any cell which is cultured while suspended in a suitable medium. A person skilled in the art will understand that a suspension cell need not naturally exist or multiply while suspended in a fluid medium, provided that the cell is adapted to grow or survive in suspension culture. Furthermore, a person skilled in the art will understand that, while a suspension cell is generally non-adherent, a suspension cell may retain some ability to adhere to a surface while being cultured in suspension. Accordingly, adherent or weakly adherent cells may be cultured as suspension cells under appropriate conditions. Suspension cells may include, for example, Chinese Hamster Ovary (CHO) cells; K562; BAF3; HEK293; Sf21; Sf9; S2; primary bone marrow or bone marrow-derived cells; primary cord blood cells, primary hematopoietic cells, primary hematopoietic stem cells; hybridoma cells or primary blood-

Berkeley Lights Ex 1001-p 30
Berkeley Lights v UBC

13

born cancer cells. Suspension cells may be hematopoietic in origin or may be adapted to suspension culture from an adherent cell line.

A "fluid injection channel", as used herein, refers to any conduit through which fluid may be introduced into a chamber of the device. A fluid injection channel can be used to deliver any fluid to a chamber including cell suspensions, cell culture media, wash buffers, reaction mixes, factors, reagents, functionalized beads, etc.

An "auxiliary chamber", as used herein, refers to any chamber subsidiary to a cell capture chamber. Auxiliary chamber can be used for treatment or assaying of a captured cell, or its isolated contents. Treatment can include cell preparation steps including culture, washing, lysis, and fractionation. Assaying may include DNA and RNA amplification and detection, including mitochondrial PCR; genomic PCR; digital PCR, RT-PCR, RTq-PCR, multiple displacement amplification (DNA), rolling circle amplification sequencing, degenerate PCR, molecular inversion probes, molecular beacons, as well as other DNA/RNA amplification and detection methods, in vitro transcription, ligation, immunochemistry; reporter expression analysis; hybridization studies; and so forth. Several auxiliary chambers may be connected, in tandem and/or in parallel, to a single cell capture chamber, such that multiple treatments may be performed on the contents of a single cell capture chamber. A valve may be positioned between an auxiliary chamber and the cell capture chamber, or between auxiliary chambers, to regulated fluid flow between chambers.

Methods

The following methods were used for the fabrication of embodiments described herein in the examples disclosed below. It will be apparent that other methods, materials and designs are possible for creating other embodiments while remaining within the spirit of the invention described herein.

Microfluidic Cell Culture Array Fabrication

Devices were entirely made out of PDMS (Sylgard 184®, Dow Corning™). The cell culture array, control, and membrane layers were assembled using multilayer soft lithography techniques (Unger, M. A. et al. Science 288, 113-116 (2000); and Thorsen, T. et al. Science 298, 580-584 (2002).) while the iso-osmotic bath and cover layers were integrated by PDMS stamping (Satyanarayana, S. et al. J. Microelectromech. Syst. 1414, 392-399 (2005)). Chips were covalently bound to glass slides by oxygen plasma treatment. Devices were left at 80° C. for at least 5 days and autoclaved prior to use for cell culture applications to drive the curing reaction towards completion. Detailed protocols for mold and device fabrication are as follows.

Wafer Fabrication Protocol. Each new microfluidic design is created with a drawing software such as AutoCAD. A micro-pump is located downstream of the array to avoid crushing the cells and control the speed during the loading process. Depending on the application, microfluidic cell culture arrays may contain from 1,600 to ~20,000 chambers in the order of ~4 nl each. Multiplexers, isolation valves, osmolarity regulator, hydration lines etc. can be added when necessary to offer a better control of the microenvironment. Designs are printed at 20,000 dpi on transparent masks. The fabrication of molds on a silicone substrate is performed using common photolithography techniques as described below.

Flow Wafer

Flow Channels

1. Dehydrate a wafer for 10-15 minutes at 150° C.
2. Treat the wafer with vapor phase HMDS for at least 2 minutes.

14

3. Pour SPR220-7.0 resist on half the diameter of the wafer.
4. Ramp at 500 rpm for 10 seconds, then spin at 1,500 rpm for 90 seconds.
5. Pre-bake the wafer at 115° C. for 120 seconds.
6. Expose for 30 s.
7. Wait 30 minutes to rehydrate the resist.
8. Develop in MF319 primary bath for around 5-10 minutes, then rinse in an MF319 secondary bath.
9. Rinse with DI water and dry the wafer with compressed nitrogen.
10. Ramp from room temperature to 190° C. and leave overnight for hard bake.

Aim: 11-13 μm after reflow

Inlet Channels

1. Pour SU8-50 resist on half the diameter of the wafer.
2. Ramp at 500 rpm for 30 seconds, then spin at 2,500 rpm for 30 seconds.
3. Soft bake the wafer for 2 minutes at 65° C., 10 minutes at 95° C., and 2 minutes at 65° C.
4. Expose for 7 s.
5. Perform a post-exposure bake for 2 minutes at 65° C., 10 minutes at 95° C., and 2 minutes at 65° C.
6. Develop in an SU8 developer primary bath for around 4 minutes, then rinse in a SU8 developer secondary bath.
7. Rinse with IPA and dry the wafer with compressed nitrogen.

Aim: 40 μm

Chambers

1. Pour SU8-100 resist on half the diameter of the wafer.
2. Ramp at 500 rpm for 10 seconds, then spin at 1,300 rpm for 50 seconds.
3. Soft bake the wafer for 5 minutes at 65° C., 70 minutes at 95° C., and 5 minutes at 65° C.
4. Expose for 25 s.
5. Perform a post-exposure bake for 5 minutes at 65° C., 18 minutes at 95° C., and 5 minutes at 65° C.
6. Develop in an SU8 developer primary bath for around 20 minutes, then rinse in a SU8 developer secondary bath.
7. Rinse with IPA and dry the wafer with compressed nitrogen.
8. Ramp up and down from room temperature to 135° C. for 20 minutes.

Aim: 160 μm

Control Wafer

1. Dehydrate a wafer for 10-15 minutes at 150° C.
2. Pour SU8-50 resist on half the diameter of the wafer.
3. Ramp at 500 rpm for 10 seconds, then spin at 4,200 rpm for 40 seconds.
4. Soft bake the wafer for 2 minutes at 65° C., 4 minutes at 95° C., and 2 minutes at 65° C.
5. Expose for 2 minutes.
6. Perform a post-exposure bake for 2 minutes at 65° C., 6 minutes at 95° C., and 2 minutes at 65° C.
7. Develop in an SU8 developer primary bath for around 2 minutes, then rinse in a SU8 developer second bath.
8. Rinse with IPA and dry the wafer with compressed nitrogen.
9. Ramp up and down from room temperature to 135° C. for 20 minutes.

Berkeley Lights Ex 1001-p 31
Berkeley Lights v UBC

Aim: 25 µm

Device Fabrication Protocol

Cleaning

1. Place control wafers in plastic box with TMCS (can clean flow wafers with PDMS, but that requires degassing) for at least 2 minutes.

2. Pour 15.0 g RTV-A and 1.5 g RTV-B (10:1 ratio) per wafer into plastic cup, place cup in mixing machine, and mix together.

3. While machine mixing, wrap 1 Petri dish per wafer with aluminum foil.

4. After mixing is done, remove wafers from TMCS box and place in Petri dishes

5. Pour PDMS onto each wafer and tilt dish so that wafer is covered with PDMS and that PDMS overflows on the foil.

6. Place in 80° C. oven for at least 20 minutes. (Can be left overnight after performing this step.)

Flow Layer

7. Place flow wafers in plastic box with TMCS for at least 2 minutes.

8. Pour 12.5 g RTV-A and 2.5 g RTV-B per wafer in 5:1 plastic cup, place cup in mixing machine, and mix together.

9. While machine mixing, prepare aluminum wrap using metal dish.

10. After mixing is done, remove wafers from TMCS box and place in aluminum holders. Press down wafer on the bottom by folding the aluminum foil on top of wafer edges.

11. Pour PDMS onto each wafer, and level the aluminum holder with 2 micropipette tips.

12. Place into degasser machine, pressurize, and degas for until no visible bubbles are left. Prepare control layer during that time.

13. Remove from degasser and level again with 2 micropipette tips. Let sit for at least 15 min.

14. Place in 80° C. oven for 18 minutes.

Control Layer

15. Cut around cleaned wafer with surgical knife and peel off PDMS to release the cleaned wafer.

16. Place cleaned control wafer in plastic box with TMCS for at least 2 minutes.

17. Pour 15.0 g RTV-A and 0.75 g RTV-B into 20:1 plastic cup, place cup in mixing machine, and mix together.

18. Turn on gas and vacuum for spinner.

19. Ensure spinner recipe ramps in 5 seconds to 500 rpm, dwells at 500 rpm for 10 seconds, ramps to 1630 rpm in 10 seconds, dwells at 1630 rpm for 60 seconds, and ramps down to 0 rpm in 5 seconds.

20. Place wafer carefully on center of spinner chuck, close lid and secure with copper slab, and execute spinner recipe.

21. After spinning is finished, remove wafer from spinner and place in clean, new Petri dish. Let sit for at least 15 minutes.

22. Place in 80° C. oven for 18 minutes (The control and flow layers should go into the oven at the same time.)

Membrane

23. Cut around cleaned wafer with surgical knife and peel off PDMS.

24. Pour 15.0 g RTV-A and 0.75 g RTV-B into 20:1 plastic cup, place cup in mixing machine, and mix together.

25. Turn on gas and vacuum for spinner.

26. Ensure spinner recipe ramps in 5 seconds to 500 rpm, dwells at 500 rpm for 10 seconds, ramps to 500 rpm in

10 seconds, dwells at 500 rpm for 60 seconds, and ramps down to 0 rpm in 5 seconds (A thinner membrane will result in leaky valves while a too thick membrane does not spread evenly on the wafer).

27. Place wafer carefully on center of spinner chuck, close lid and secure with copper slab, and execute spinner recipe.

28. After spinning is finished, remove wafer from spinner and place in clean, new Petri dish.

29. Let sit for at least 15 minutes and align flow/control during that time.

30. Place in 80° C. oven for 12 minutes (13 min after flow/control duo has been placed in the oven)

Flow/Control Alignment

31. Remove both flow and control wafers from the oven.

32. Cut inside the edge of the flow wafer with a surgical knife, then peel off PDMS layer from silicon wafer.

33. Place control wafer under the microscope.

34. Align flow layer to control layer, trying not to peel off and on too much.

35. Push down any bubbles that remain between the two layers, and place in 80° C. oven for 25 min. (The blank should come out of the oven at the same time as the flow/control combo. Time out accordingly.)

Membrane/Duo Alignment

36. Remove both flow/control duo and blank wafers from the oven.

37. Cut around the edge of the control/flow wafer with a surgical knife, then peel off PDMS layer from silicon wafer

38. Place flow/control duo onto blank layer.

39. Push down any bubbles that remain between the two layers, and place in 80° C. oven for at least one hour. (Can be left in the oven overnight after this step.)

Bath Layer

40. Pour 40.0 g RTV-A and 4.0 g RTV-B in 10:1 plastic cup, place cup in mixing machine, and mix together (This amount of PDMS gives a sufficient height to provide good support structure for inlet and outlet ports.).

41. While machine mixing, prepare aluminum wrap using metal dish.

42. Press down wafer on the bottom by folding the aluminum foil on top of wafer edges.

43. Pour PDMS onto blank wafer, and level the aluminum holder with 2 micropipette tips.

44. Place into degasser machine, pressurize, and degas until no visible bubbles are left.

45. Remove from degasser and level again with 2 micropipette tips.

46. Place in 80° C. oven for 20 minutes.

Cover Layer

47. Pour 14.0 g RTV-A and 1.4 g RTV-B in 10:1 plastic cup, place cup in mixing machine, and mix together.

48. While machine mixing, prepare aluminum wrap using metal dish.

49. Press down wafer on the bottom by folding the aluminum foil on top of wafer edges.

50. Pour PDMS onto each wafer, and level the aluminum holder with 2 micropipette tips.

51. Place into degasser machine, pressurize, and degas until no visible bubbles are left.

52. Remove from degasser and level again with 2 micropipette tips.

53. Place in 80° C. oven for 20 minutes.

Berkeley Lights Ex 1001-p 32
Berkeley Lights v UBC

Chip Assembly

54. Remove flow/control/membrane wafer, and blank wafers from the oven and let cool for about 5 minutes.

55. Dice layers into individual chips and place the chips on a ball bearing bed, flow layer down.

56. Dice the bath layer, and cut inside to create a bath having the area of the array. Leave enough space for the ports and the edges.

57. Punch holes that go in the corner of each side of the bath.

58. Dice the cover layers into pieces bigger that each chip.

59. Clean all surfaces with scotch-tape.

60. Mix together about 10.0 g RTV-A and 1.0 g RTV-B in 10:1 plastic cup, in mixing machine, and mix together.

61. Set spinner to spin at 6,000 rpm for 6 minutes.

62. Remove blank wafer and place on spinner, pour on PDMS, and spin.

63. Remove from spinner and place in Petri dish.

64. "Stamp" the bath portion onto the liquid blank wafer and leave for 30 seconds. Make sure to stamp the right side of the bath.

65. Remove from wafer, and stick together with the flow/control portion.

66. Remove bubbles between layers.

67. Mix together about 10.0 g RTV-A and 1.0 g RTV-B in 10:1 plastic cup, place in mixing machine, and mix together.

68. Set spinner to spin at 6,000 rpm for 6 minutes.

69. Remove blank wafer and place on spinner, pour on PDMS, and spin.

70. Remove from spinner and place in Petri dish.

71. "Stamp" the cover layer portion onto the liquid blank wafer and leave for 30 seconds.

72. Remove from wafer, and stick on top of the bath portion.

73. Remove bubbles between layers

74. Leave chips to cure at room temperature overnight on ball bearings and place them in the oven.

(After this step, the chips can be left in the oven.)

Hole Punching/Bonding to Glass

75. Remove chips from the oven and punch appropriate holes with the hole puncher.

76. Clean glass slides with IPA and PDMS chips with Scotch tape.

77. Use plasma bonder to bond together chips and glass slides (25 s).

78. Cure at 80° C. in oven overnight.

The total curing time at 80° C. should equal at least 5 days before testing of chips, and chips should be 12 days old and autoclaved before use for cell culture.

Microfluidic Cell Culture

Microfluidic devices were placed inside a custom environmental chamber (Live Cell Instrument™, Chamlide). The temperature was maintained at 37° C. with 5% CO₂ in humidified air. Humidity saturation was maintained by the addition of two 3 cm-petri dishes filled with water inside the microscope incubator. The iso-osmotic bath and the device were filled with medium 24 hours prior to loading the cells to create equilibrium with the environment. Positive pressure was maintained by gravity in the iso-osmotic bath by connecting a 3 mL syringe filled with medium to the bath, thus preventing the formation of air bubbles that could alter imaging (see FIG. 5). The content of the bath was replaced before cell loading but was not exchanged during the experiment. Assuming a relative humidity of 90% in the microscope incubator, we calculated the water losses from

the bath to be in the order of ~1% over the course of a 5-d experiment. Water vapor loss from the osmotic bath may be modeled as a near-Fickian diffusion and has a flux given by,

$$J = -DVC \qquad (1)$$

where D is the diffusion constant of water vapor in PDMS ($\sim 8.5 \times 10^{-10}$ m² s⁻¹) and C is the concentration of water vapor in the bulk PDMS. The iso-osmotic bath covers the area of the array (20 mm×11 mm) and has a height of ~5 mm. The majority of vapor loss occurs through the top surface of the chamber that is sealed with a 1 mm thick layer of PDMS and through the long and short sides of the bath that are sealed with 5 mm and 3 mm thick edges of PDMS respectively. This is well approximated as a one-dimensional diffusion for problem given by,

$$J = -DACL \qquad (2)$$

where L is the thickness of the PDMS sealing the top and 4 sides of the osmotic bath. A saturated water vapor concentration at 37° C. on the inside surface of the membrane is assumed (~39.3 mol m⁻³). Assuming a 90% relative humidity in the incubator, the water vapor concentration at the outside surface of the chip is approximated to be 0.9×mol m⁻³=35.4 mol m⁻³, giving a total vapor flux of 2.1×10⁻⁸ g s⁻¹. This corresponds to a loss of 13 μl over a 5 day experiment. Given a total osmotic bath volume of 1.1 ml this results in approximately 1.2% change in osmotic strength during an experiment. Cells were concentrated to 2×10⁶ cells/mL, transferred to a Teflon® tube and plugged in the device with a stainless steel pin.

The channels were flushed with medium and cells were pumped into the device at a rate of 1 μL/min. Cells were allowed to settle down in the chambers, then more cells were introduced until an adequate density was reached. In order to prevent air bubbles from forming inside the device, an inlet pressure of 4 psi and an outlet pressure of 1 psi were maintained at all times. When activated, pumps and valves were pressurized at 35 psi.

For cultures of ND13 and NA10hd cells, filtered DMEM with 15% FBS, 1.6 μg ml-1 puromycin, 100 ng ml-1 mouse SF, 10 ng ml-1 human IL-6 and 6 ng ml-1 mouse IL-3 (all cytokines from STEMCELL Technologies™) was exchanged by replacing four times the volume of the chip. Tests with fluorescent dye showed that this amount was sufficient to replace the volume of the chip. Referring to FIG. 19, a microfluidic cell culture array was loaded with medium supplemented with PE-TexasRed-streptavidin and the inlet was replaced by medium only. Pictures of the last 3 columns of the array were taken during perfusion and fluorescence intensity was quantified with Image J (National Institute of Health—Collins, T. J. BioTechniques 43 (1 Suppl): 25-30 (2007).). This demonstrates that perfusing 4-fold the volume of the array (26 μl) is sufficient for complete medium exchange. Each data point in FIG. 19 represents the average of 9 wells and error bars represent the standard deviation. Despite the low flow rates, the small length of the chambers allowed for efficient exchange of nutrients, growth factors and metabolites through a combination of convection and diffusion. For small molecules (diffusion coefficient (D) was ~10⁻⁹ m² s⁻¹) or proteins (D was ~10⁻¹⁰ m² s⁻¹), this diffusion time was approximated by τ of ~x2/D, where x is one half the chamber height, giving exchange times of 10 s or 100 s, respectively. These exchange times are substantially shorter than the 10-15 min periods used for medium perfusion.

Medium was exchanged by replacing 3 times the volume of the chip after 24, 36, 48, 54, 60, 66 and 72 hours of

Berkeley Lights Ex 1001-p 33
Berkeley Lights v UBC

19

culture. For single-cell cultures of ND13 cells, we found that medium exchanges at 24, 36, 48, 54, 60, 66 and 72 h were sufficient to avoid conditions that led to decreased growth rates (owing to nutrient limitations and/or build-up of growth-inhibiting metabolites). Integrated micro-pumps and micro-valves were automatically controlled by custom scripts (LabVIEW™, National Instruments). The average doubling time (τd) for each clone was calculated by $\tau d = 72 \times \ln(2)/\ln(N72)$, where N72 is the number of cells per clone at 72 h. Primary E-SLAM cells were isolated as described previously (Kent, D. G. et al. Blood 113:6342-6350 (2009)) and cultured in Iscove modified Dulbecco medium supplemented with 10 mg ml-1 bovine serum albumin, 10 µg ml$^{-1}$ insulin, 200 µg ml$^{-1}$ transferrin, 40 µg ml-1 low-density lipoproteins, 100 U ml$^{-1}$ penicillin, 100 µg ml$^{-1}$ streptomycin, 2 mM glutamine (all from STEMCELL Technologies™), $10^{-4}$ M β-mercaptoethanol (Sigma™) plus 20 ng ml$^{-1}$ IL-11 (Genetics Institute) and SF, as indicated. Before starting the experiment, the volume needed to completely exchange the medium in the array (including the dead volume from the medium inlets to the multiplexer) was tested using a fluorescent dye. Ten minutes of perfusion was sufficient to remove the dye below detectable levels. Medium was exchanged every 2 h, and we pumped for 15 min for each condition to ensure that any medium remaining from a previous condition would be washed out of the array. Images were taken every 12 min in two focal planes. Cell survival and early division times were assessed manually by looking at the videos, and the individual growth curves for each clone were generated using the bifocal image analysis algorithm described below. The content of the bath was replaced before cell loading but was not exchanged during the experiment. Assuming a relative humidity of 90% in the microscope incubator, the water losses from the bath were calculated to be in the order of ~1% over the course of a 5-day experiment.

Image Acquisition

The environmental chamber and the microfluidic devices were mounted onto an inverted microscope (Axiovert 200™, Carl Zeiss™). Bright field images were acquired with a 20× objective and a CCD camera (Orca ER, Hamamatsu) connected to a computer. The entire microfluidic cell culture array was automatically scanned with a motorized staged (ProScan II™, Prior Scientific) every 6 hours or selected wells were imaged every 5 min.

Alignment and Autofocus

Chamber alignment and autofocus scripts were implemented to acquire homogeneous images, which in turn, improved the efficiency of cell segmentation. Each of the 400 image frames contained 4 chambers. The coordinates of the 4 corners of the array were first determined manually; then coordinates for the entire grid were automatically calculated by extrapolation based on the device geometry. In order to adjust for small, local device distortions introduced during device fabrication, each image frame was automatically aligned and focused. For each image frame, both a row and column average was calculated. The dark edges of the chambers produced reproducible valleys in these signals. The locations of these valleys were then found and used to calculate the shift needed in order to align the wells to the image. Once cells were loaded into the device, the images were automatically focused by minimizing the variance of the intensity of the pixels contained within each chamber. A constant offset was then applied to each focus position to increase the accuracy of the cell segmentation algorithm. These scripts were implemented in LabVIEW™ (National Instruments).

20

Image Analysis

To manage the large number of images generated per experiment, a custom image analysis software program was developed to automatically count the cells at each time point in individual chambers. Cell segmentation scripts were written in MATLAB™ (MathWorks™). Referring to FIG. 17a, segmentation was accomplished from three main steps: chamber segmentation (A-E), cell-containing region segmentation (F-J), and then single cell isolation (K-O). First, the individual chambers are segmented from the image background. This step of the segmentation is accomplished by applying a bandpass filter (B) and then creating a binary image through an automatically determined threshold (C). The resulting binary image is enhanced by removing objects touching the image borders and suppressing noise by removing small objects (D). Finally, the chambers are segmented from the rest of the background by filling in the holes created by the edges of the chambers. Next, the regions containing cells are separated from the rest of the chamber. This is achieved by first applying a local standard deviation filter to enhance the highly variable regions (G). The noise in the filter response is then suppressed by removing small regions, and this result is converted into a binary image through an empirically determined threshold (H). Any holes in this result are then filled in to create the final region mask (I). To segment the individual cells from the rest of the group, a bandpass filter is applied to the output of a local standard deviation filter applied to the image (K). A top hat filter is then used to enhance the edges (L), and the bounded regions are subsequently filled (M). This result is then converted to a binary image using an automatically determined threshold, and further enhanced by removing small objects (N). FIG. 17b shows the results of a comparison between automated and manual cell counts, which demonstrated that the automated cell count was in agreement with the manual quantification of the cells The straight line represents the 1:1 slope. Deviations at higher cell numbers are caused by the shadow around the edges some chambers, thereby resulting in a slight underestimate of cell numbers using the image algorithm. An enhanced bifocal algorithm can correct this error.

For experiments requiring a high count accuracy, for instance to generate growth curves of primary HSCs, an enhanced cell-segmentation algorithm was developed based on sets of images taken at two different focal points (~50 µm apart). One image remained in focus, and the other was taken above the focal plane for use in segmentation. After segmenting the well as described above, the portion of the image that was hidden by edge shadows was identified by comparing the intensity of the region inside the perimeter to the global mean intensity of the well. The shadow was removed by calculating a brightness gradient mask around the obstructed region, combining it with the well mask and applying it to the original image. Next, the high-contrast image was used to identify the center of cells, which appeared as high-intensity spots, by applying a brightness threshold. The centers were then dilated to achieve accurate cell size representation. The focused image was used to identify cell boundaries. The image intensity was inverted and sharpened using a negative Laplacian filter to enhance the cell edges. The sharpened image was then subtracted from the original, leaving only the cell contours and well. A bandpass size filter was then applied to remove objects that did not correspond to cell perimeters. The mask containing the cell contours was combined with the cell center mask, and the image was dilated. A watershed cut algorithm was then applied to separate adjacent cells that may have been

Berkeley Lights Ex 1001-p 34
Berkeley Lights v UBC

connected during the dilation and filling processes. Finally, the segmented image was compared to an initial image without cells, and objects common to both were removed. This enhanced bifocal algorithm gave high-accuracy cell counts with excellent correspondence to cell counts with excellent correspondence to cell counts determined by manual counting, as demonstrated in FIGS. **20a** and **20b**. FIG. **20a** shows a comparison between automated and manual cell counts. The straight line corresponds to a linear least square regression. FIG. **20b** shows absolute differences between the algorithm and manual counts.

Live Cell Immunostaining

For live cell immunostaining, the microincubator was turned off, and the main body containing the microfluidic device was placed on ice. For each step, at least ~26 µL (4-fold the volume of the entire array) was pumped into the array to ensure complete replacement of the solution. The device was filled with blocking solution for 20 min. The biotinylated antibody cocktail (anti-B220, Gr-1, and Mac-1-biotin) was then pumped into the device followed by incubation of the device for 40 min, and was then flushed with a solution of Hank's Balanced Salt Solution supplemented with 2% fetal bovine serum (2% Hanks). A PE-Texas-Red-streptavidin solution was then pumped into the device, which was then incubated for another 40 minutes, and flushed again with 2% Hanks until all background fluorescence had disappeared. The array was then filled with fresh medium and placed on the microscope for imaging. Bright field and fluorescent images (exposure time, 1 second) were taken for the entire array.

Cell Recovery

Micropipettes were pulled from glass capillaries to a diameter ranging between 80 to 140 µm. At the end of an experiment, the cover layer was delaminated from the chip, and selected colonies were recovered by piercing the membrane with a micropipette. To recover the entire content of the microfluidic device, the chip was flipped upside down and flushed with medium by pumping backwards at a rate of 1 µL/min. Cells were then recovered from the Teflon® tube and placed in a tissue culture plate for further analysis. To assess the efficiency of recovery, the plate was centrifuged for 5 min at 400 g, the cells were allowed to settle for 1 hour and then manually counted using an inverted microscope.

Macroscale Cultures

ND13 cells (Pineault, N. et al. Leukemia 19, 636-643 (2005)) were cultured in the same medium as in the microfluidic device (e.g. DMEM with 15% fetal bovine serum supplemented with growth factors (100 ng/mL murine stem cell factor, 10 ng/mL human interleukin-6, 6 ng/mL murine interleukin-3 and selected by puromycin). Cells were passaged every 2-3 days and kept in culture for at most 60 days post-infection. Control growth curves were generated with the help of an automated cell culture analyzer (Cedex™, Innovatis™). For single cell control cultures, cells were diluted to a concentration of 5 cells/mL, and separated in 200 µL cultures in a U-shaped 96-well plate. Cells were centrifuged at 400 g for 5 minutes and allowed to settle for one hour in the incubator. Wells containing single cells to start with were counted manually every 12 hours. For colony-forming cell assays, approximately 720 cells (corresponding to 11 starting cell equivalents) were recovered from the microfluidic array or conventional 96-well plates after 72 h in culture and plated into triplicate methylcellulose assays for 14 d (MethoCult 3484™, STEMCELL Technologies™), after which the number of colonies obtained was manually counted under a microscope.

In vivo hematopoietic reconstitution assays. Bone marrow cells obtained from C57B1/6Ly-Pep3b mice were highly enriched (~50% purity) for HSCs (Kent, D. G. et al. *Blood* 113, 6342-6350 (2009)), and a total of 50 cells (representing 25 HSCs) were retrovirally transduced with a NUP98-HOXA10hd retroviral vector and cultured for 11 days as previously described in Ohta, H. et al. (*Experimental Hematology* 35, 817-830 (2007)). On day 11, the cells were harvested and split equally between cultures in a 96 well dish (control) or a microfluidic array for a further 3 days of culture. Cells were harvested from both conditions, and then fractions representing $1/1,520^{th}$ or $1/15,200^{th}$ of the starting cells (estimated as a limiting dose of HSCs assuming a minimum of 60-fold or 600-fold expansion during the culture period respectively) were transplanted into lethally irradiated (810 cGy of x-rays) C57B1/6-C2J mice along with 100,000 BM helper cells. Six weeks, and 3 and 5 months later, peripheral blood samples obtained from each recipient were analyzed for evidence of donor-derived (GFP+) lymphoid and/or myeloid cells as follows. Erythrocytes were lysed with ammonium chloride (STEMCELL™) and leukocytes were suspended in 2% Hanks (STEMCELL™) and then incubated with a combination of PE-labeled anti-Ly6G/Mac-1, perCP-Cy5.5-labelled anti-B220 and APC-labeled anti-CD4/CD8 (BD Pharmingen™). Flow cytometric analysis was then performed on a FACSAria (Becton-Dickinson™)

Transport Equations for Mathematical Modeling. The simulation of the system was performed with a three-dimensional, steady state, single phase, laminar flow model. The CFD (computational fluid dynamics) simulation has been done using FLUENT™ 6.3.26 (Fluent Inc.™). In laminar flow the Navier-Stokes equations describe the momentum transport. Therefore, the conservation of momentum in the micro-bioreactor is described by Eq. (3)

$$\frac{\partial}{\partial t}(\rho \vec{V}) + \chi \cdot (\rho \vec{V} V) = -\nabla P + \nabla \cdot \bar{\bar{\tau}} \tag{3}$$

The conservation of mass is described by the continuity equation as follows,

$$\frac{\partial \rho}{\partial t} + \nabla \cdot \left( \rho \vec{V} \right) = 0 \tag{4}$$

where ρ (Kg m-3) is the fluid density, $\vec{V}$ (m s-1) is the velocity vector of the fluid, P (Pa) is the pressure, and $\bar{\bar{\tau}}$ is the stress tensor. Water has been used as a model to estimate the physical properties of fluid at 37° C.

Boundary Conditions for Mathematical Modeling

The uniform velocity profile has been defined as the inlet boundary condition. At the outflow boundary, the diffusion fluxes for all flow variables in the direction normal to the exit plane are assumed to be zero. The fluid temperature is assumed to be constant at 37° C., and a no-slip boundary condition has been specified for the velocity at the walls.

Statistical Analysis

Error bars were calculated using s.d. of the mean. Relative risk and 95% confidence intervals for the Cox proportional hazard model were calculated using the 'coxph' function from the R package 'survival' with tied times of death being handled using the Efron approximation.

Berkeley Lights Ex 1001-p 35
Berkeley Lights v UBC

EXAMPLES

Example 1.1

Design of a Microfluidic Device for Suspension Cell Culture

Referring to FIG. 1, a schematic drawing of a microfluidic device according to one embodiment is shown generally at 10, with micrographs as insets. The microfluidice device 10 comprises an array of 1,600 chambers 12, each having a volume of 4.1 nL with integrated microvalves to allow precise control and exchange of media. The chambers 12 are connected by flow channels 14. Hydration lines 16 are located on each side of the array to minimize edge effects. Control lines consist of an isolation valve 18 and control lines (for example, a peristaltic pump) 20 to control cell loading and perfusion rates. Fluid can be introduced to the microfluidic device 10 through an array inlet 22 in order to access the flow channels 14 and chambers 12. Fluid may leave the device through an array outlet 24. Arrows point at single cells. The left scale bar represents 1 mm and the right scale bar represents 100 µm. Alternative embodiments could contain 1 to 50,000 chambers with volumes ranging from 1 nL to 20 µL. Alternatively, if one large chamber was connected by flow channels on top the volume may be about 5 mL. Chamber geometries exploit the properties of laminar flow to allow for immobilization of non-adherent cells without significant mechanical stress during and between medium exchanges. Various embodiments of the device also allow facile and efficient recovery of the pooled or individual contents of the chambers.

In order to exploit microfabrication methods that allow dense integration of microvalves (Unger, M. A. et al. Science 288, 113-116 (2000); Duffy, D. C. et al. Analytical Chemistry 70, 4974-4984 (1998); Thorsen, T. et al. Science 298, 580-584, doi:10.1126/science.1076996 (2002)), PDMS was chosen as a preferred material. Other biocompatible polymers such as poly(methyl methacrylate) (PMMA), poly (L-lactic-coglycolic acid) (PLGA) or poly(glycerol sebacate) (PGS) PDMS could also be used for fabricating similar devices. In addition it will be appreciated by one skilled in the art that other materials such as alternative elastomers, polymers, semiconductors, or glass could be used. FIG. 2 is a schematic diagram of the layers that are assembled during the fabrication of microfluidic device. The previously mentioned problems of microfluidic devices made from PDMS were address by incorporating an integrated iso-osmotic bath 32 into the design of microfluidic device. This was achieved by fabricating the nanovolume chambers in the chamber layer (cell culture array) 38 and control structures in the control layer 36 under a 150 µm thick PDMS membrane 34 that separates them from an "iso-osmotic bath" 32 consisting of a macroscopic chamber filled with medium (~750 µL in volume) and enclosed by a gas-permeable PDMS cover layer 30 to keep the bath sterile. The cell culture layer, control layer and membrane were bound to each other by multilayer soft lithography while the membrane, iso-osmotic reservoir 32 and cover layer 30 were assembled through PDMS stamping. The PDMS chips were then bound to a glass slide 40. The integrated iso-osmotic bath 32 reservoir was filled with medium to prevent evaporation and maintain constant osmolarity inside the chambers. The iso-osmotic bath can be filled with medium and pressurized by gravity to avoid formation of air bubbles. The bath can, in some examples, be scaled proportionally to fit the area of the cell culture array, and the membrane can

range from less than 1 µm to 5 mm thick depending on the application and the choice of material. The relatively high volume ratio of the osmotic bath to the culture volume (~100 times) and the lower surface to volume ratio of the osmotic bath as well as the near-saturation humidity provided by the microscope incubator, together allow a preferred osmotic strength to be maintained in each microculture for many days. Continuous exchange through the membrane also keeps PDMS-permeable medium components in equilibrium and dilutes any potentially toxic organic molecules into the large volume of the osmotic bath (Regehr, K. J. et al. Lab on a Chip 9, 2132-2139, doi:10.1039/b903043c (2009)). In a an embodiment a static bath may be used. However, smaller bath volumes could also be used if the bath content was exchanged frequently. This could for instance be done using channels overlaying the chambers that are refreshed with new medium. In an embodiment illustrated in FIG. 5, the bath content can be replaced by removing a bath plug 13 and introducing fresh medium from a pump, such as syringe 19, which may connect to the array via bath inlet 17. In this embodiment, the array inlet 22 and array outlet 24 are pressurized by air and control lines 20 are connected to solenoid actuators and rest on a glass plate 40.

Example 1.2

Cell Immobilization

Various embodiments allow for perfusion of cells without disturbing cell position. This capability may be exploited for experiments requiring dynamic medium exchange or immunolabeling of the cells during or at the end of an experiment. This is particularly useful for suspension cells.

Referring to FIG. 3, one embodiment shows a microfluidic device is a non-perturbing microfluidic cell capture and retention mechanism that uses gravity to trap cells 50 in chambers with an inverted geometry with flow channels 14 running over the top and control lines 18. In the disclosed embodiment, the chambers 12 have cubic dimensions of 160 µm×160 µm×160 µm. However, larger (up to 1 mm×1 mm×1 mm) or smaller (down to 10 µm×10 µm×10 µm) could be used depending on the cell type and the intended application of the device. The chambers according to this embodiment have an aspect ratio of 1:1. However, chambers having an aspect ratio as low as 0.5 may be utilized to minimize shear forces on the cells (for example, when non-adherent cells are used).

The chamber dimensions and flow rates may be designed to ensure that a permissible maximum force (for example, shear force) is exerted on cells during medium exchange and this may be adjusted as appropriate depending on the cell types being used. If cells are completely non-adhering the chambers may be designed such that the forces do not produce any significant motion. The degree of motion considered significant will be dictated by the application for which the device is being used. For example, in an imaging application or manual cell lineage analysis it may be required that the cells move less than one diameter between image capture events which may be anywhere from seconds to several hours to days. The microfluidic cell culture arrays may exploit laminar flow to deliver the cells to the chambers and then to ensure that the cells are not disturbed by subsequent perfusion. During medium refreshment or cell loading the volume expansion from the flow channels (≤13 µm×100 µm) to the chambers (160 µm×160 µm) creates a large reduction in velocity that drops off quickly to very low levels at the bottom of the culture chambers (e.g. FIGS. 3

Berkeley Lights Ex 1001-p 36
Berkeley Lights v UBC

and 4). In alternative embodiments where the depth of the chamber (i.e. length of the shortest distance between the retaining position and first region) was 80 μm (y) and the length of the first region was 160 μm (x), it was observed that the velocity of the perfusion fluid at the retaining position was such that the cells at the retaining position were being moved by the flow of perfusion fluid. The flow channel could be positioned at different heights within the chamber, as long as the bottom of the chamber is far enough from the channel so that the velocity at the bottom of the well is low enough to maintain cells immobilized by gravity. In the tested embodiment, the suspended cells were first loaded into the array using the microfabricated peristaltic pump 20 (FIG. 1) at an overall flow rate of 1 μL/min. This corresponds to a maximum velocity of ~1 mm/sec and shear stresses of <0.3 Pa (not shown), which is well below levels that elicit physiological responses (Ma, N. N. et al. Biotechnology and Bioengineering 80, 428-437, doi:10.1002/bit.10387 (2002)). Syringe pumps, manual, gravity or pneumatic pressurization could be used as alternatives to the integrated micropump to control the flow rates. Both pulsatile and continuous flows may be used to ensure minimal cell motion during medium exchange. During loading, cells essentially follow the streamlines at the top of the chambers, and thus pass through the array without having the time to settle in the chambers. Once the array is filled, the flow is stopped, and this then allows the cells to settle into the bottom of the chambers where they are sequestered from the flow streamlines. When necessary, cells may be concentrated on the chip by repeating this loading process in a step-wise fashion. Typical loading efficiencies of 10-30% of chambers may be achieved for clonal analyses (i.e., approximately 160-480 single cells per device). A person of skill would be able to direct the desired number of cells to a chamber by adjusting cell concentrations, flow rates, flow times, etc. Cell trapping cups could be integrated in the flow channels to increase the seeding efficiency in other embodiments. Additionally, other trapping mechanisms, including dielectric forces, magnetic forces, and optical forces could be used as appropriate. Alternatively, valve structures could be designed to deterministically place cells in chambers.

In the preferred embodiment, medium exchange through the array at a flow rate of 2 μL/min, results in a maximum shear stress <10⁻⁴ Pa at a distance of one cell diameter from the chamber bottom (not shown). Direct observation of cells in arrays being perfused at this rate to exchange media or for immunolabeling showed that the positions of the cells remained undisturbed (FIG. 9a), thereby validating the use of these strategies while monitoring the growth of individual clones. This capability is demonstrated in FIG. 9b where frequent imaging (<5 min) was used to track the progeny of three single HSCs and build cell lineage trees over 60 hours while replacing the cell culture media every 6 hours (see FIG. 9c). The frequency of image acquisition can be adjusted based on the number of wells being observed and the time required to capture images of all the chambers.

In an embodiment described herein, the small chamber length-scale allows for efficient exchange of nutrients, growth factors and metabolites by a combination of convection and diffusion. For small molecules (D~10⁻⁹ m²/sec) or proteins (D~10⁻¹⁰ m²/sec), this diffusion time is approximated by $\tau \sim x^2/D$ since x is one half the chamber height, giving exchange times of 10 sec or 100 sec, respectively. This is significantly shorter than our medium perfusion protocols that have refresh times of 10 minutes.

Recovery of Cells Post-culture

Cell recovery is often required to enable functional assays to be performed on the progeny of the input cells, or to select cells of interest for larger scale culture. A method to recover defined clonal populations is therefore a critical requirement for many applications of microfluidic cultures.

FIG. 4 shows a numerical simulation of the flow profile through a culture chamber of an embodiment. With a flow rate of 0.0625 μl/min through the flow channel, the velocity in mm s⁻¹ for the flow channel 14 is 2.4 mm s⁻¹ at the center of the flow channel, with a gradual decrease at the edges of the flow channel to about 1.0-1.2 mm s⁻¹. The sudden expansion when the fluid moves from the flow channel to the chamber creates a velocity drop, and the velocity in the cell retaining region is reduced to less than 50 μm/s. The velocity in mm s⁻¹ for the culture chamber 12 ranges from about 1.6 to about 0.4 mm s⁻¹ immediately adjacent the inlet and outlet (see bright flares) of the flow channel and the remainder of the culture chamber 12 ranges from about 0.4 to about 0.0 mm s⁻¹. The culture chamber 12 dimensions (160 μm×160 μm), flow channel 14 dimensions (100 μm×13 μm) and culture chamber 12 volume (4.1 nl) are also shown. The modeling predicts minimal flow rates at the bottom 5/6 of the chamber. In accordance with embodiments, the gravitational forces on the cells is greater than hydrodynamic forces and cells remain in the cell retaining region while the perfusion fluid exits the chamber through the flow channel outlet. Similarly, modeling of fluid velocity during cell loading (modeled for a total flow rate of 1 μL/min) suggests that a maximum velocity in the flow channels 14 does not exceed 1.2×10⁻³ m/s and that the maximum velocity in the majority of the chamber 12 is at or near 0 m/s (not shown) during cell loading. When the flow is stopped, cells settle down in the chamber 12 by gravity to the cell retaining region. Additionally, modeling of the sheer stress (Pa) on the channel walls 14 suggests during cell loading, the flow rate of 0.03 μl/min through the flow channel results in a maximum shear stress exerted on the cells is 0.3 Pa next to the channel wall (not shown). Similarly, modeling of sheer stress on cells within a chamber 12 during media exchange (i.e. perfusion) at a flow rate of 0.0625 μl/min through the flow channel suggests that the maximum shear exerted on the cells while at the bottom of the chamber (i.e. cell retaining region) during medium exchange (based on a total flow rate of 2 μl min⁻¹) does not exceed 3.1×10⁻⁴ Pa and would be about 0.0004 Pa in the middle of the cell retaining region.

Embodiments of the chamber design and microfluidic apparatus described also allow for facile recovery of cells from the entire array by simply inverting the device, causing the cells to settle into the higher-flow rate regions of the chambers (as shown in FIG. 4) and then recovering the pooled population by flushing back through the input port. This recovery method is simple and efficient, allowing for the harvesting of approximately 90% of cells with losses mainly attributable to the nonspecific adherence of cells on the surface of chambers. However, when selective recovery of the contents of specific individual wells is desired, the layer of PDMS covering the osmotic bath can first be removed and a sterile micropipette then used to pierce the membrane over any selected chamber followed by aspiration of its contents (not shown). This method was found to be remarkably reliable and easy, allowing more than 90% of the cells in each well harvested to be recovered as determined by direct cell counts before and after (FIGS. 9a and 9b). It can be performed either manually of automatically if greater throughput is needed. Furthermore, aspiration through a

Berkeley Lights Ex 1001-p 37
Berkeley Lights v UBC

capillary (controlled with micron precision) or optical forces could be used to recover select cells. Alternatively, cells could be labeled individually using optical means while in the device, recovered together by flowing out of the device, and then subsequently identified using the marker. One such marker may be a fluorophore that changes spectral properties when illuminated by a light source such as a focused laser or other light source capable of selectively labeling cells.

Example 1.3

Culture of Hematopoietic Cells

Culture of single hematopoietic cells in microfluidic cell culture arrays. We tested the applicability of this microfluidic device to the study primitive hematopoietic cells. We first examined the growth of a preleukemic murine cells created by genetically engineering primitive adult mouse bone marrow cells to express a NUP98-HOXD13 (ND13) fusion gene[9,10]. Matched cultures of these "ND13" cells were set up in 24-well plates seeded at 150,000 cells/mL. 96-well plates seeded with single cells, and microfluidic cell culture arrays with or without the integrated iso-osmotic bath. In the presence of the iso-osmotic bath, the population doubling time averaged over all chambers loaded with single cells faithfully reproduced the bulk growth rate seen in the culture plates, indicating comparable conditions had been achieved. In addition, the average rates of expansion of the clones generated in the microfluidic chambers were equivalent to the average growth rates obtained in the 200 µl 96-well cultures (FIG. 10). However, in devices that lacked the iso-osmotic bath, cell division and survival was severely compromised (e.g. FIG. 10), in spite of humidity control in the microscope incubator and the initiation of medium exchanges 24 hours after starting the experiment, indicating that permeation effects occur within hours, which can in turn affect cell growth. In cases where other materials are used that have reduced transport properties the osmotic bath may not be required. Alternatively, the use of perfusion with sufficient frequency may be used to reduce the need for the osmotic bath.

A single cell in a 4.1 nL isolated chamber is at an effective concentration ~2.5×10^5 cells/mL. At confluence, a chamber contains ~150 cells; i.e., a concentration of ~4×10^7 cells/mL. This concentration greatly exceeds the limits of conventional batch cultures. Thus, it is not surprising that cultures exhibited a strongly inverse correlation between the number of cells inoculated into each isolated chamber and the duration of cell growth, in the absence of the iso-osmotic bath batch mode (FIG. 11). This underscores the importance of medium exchange to sustain the continued optimal growth of these cells in nanolitre-volume chambers, and the need to progressively increase the frequency of medium exchange as the number of cells in each culture increases. For the single ND13 cell cultures, we found that medium exchanges at 24, 36, 48, 54, 60, 66 and 72 hours were sufficient to avoid nutrient limitations and the build-up of growth-inhibiting metabolites, although this feeding pattern can be adjusted based on cell types, seeding density and required nutrient concentrations.

Example 1.4

Assessment of Growth Heterogeneity by Defined Cell Populations

Time-lapse imaging and automated image analysis was used to generate individual growth curves for 243 single

ND13 cells over a period of 72 hours (a sample is shown in FIG. 12a). After that time, the fastest growing clones became multilayered and too large for further tracking by image analysis. Although the average doubling time for all cells was 16.8 hours, we observed substantial heterogeneity in the growth characteristics of individual clones. 52% of the input cells either did not divide or produced progeny that died before the end of the experiment. This widespread death was offset by the rapid proliferation of other cells that divided as frequently as every 12 hours, but with large variability between clones (FIGS. 12b and 12c). Such variable clone size distribution was also observed for ND13 cells generating clones in the 96 well plate cultures (not shown). Furthermore, similar distributions of doubling times were found for both ND13 cells grown in microfluidic arrays and multiwell macro plate controls (not shown). A similar experiment was conducted using normal primary HSCs. Microfluidic culture of freshly isolated CD45+EPCR+ CD48−CD150+ (E-SLAM) adult mouse bone marrow cells, which are approximately 50% pure HSCs (Schroeder, T. Cell Stem Cell 1, 479-481 (2007)), over 5 days showed that the kinetics of three successive divisions were comparable to those obtained in macroscale cultures (Dykstra, B. et al. Proc. Natl. Acad. Sci. USA 103, 8185-8190 (2006); Kent, D. G. et al. Blood 112 , 560-567 (2008)) (see FIG. 21).

To further investigate this heterogeneity, we stained ND13 cells for the lineage (lin) markers (Gr-1, Mac-1, and B-220) and compared the clonal growth kinetics of single differentiated (lin+) and primitive (lin−) cells. We opted for lineage staining to characterize cells in this particular experiment but antibody staining, enzymatic assays, dyes, RT-qPCR, sequencing, functional assays, or bead capture could also be used to characterize the cells. After staining, cells were introduced into the device and imaged every 5 minutes for 72 hours. We used the perfusion capabilities to perform a second lineage staining on clones at the end of the experiment without disturbing colony locations. This experiment showed that most of the lin+ cells did not produce colonies (FIG. 13a), which replicated the failure of lin+ cells to form colonies in 96-well cultures. In contrast, the single lin− cells produced clones efficiently but of different sizes and phenotypes (FIG. 13b). Some of the lin− clones gave rise to exclusively lin+ or lin− clones. In other cases, the clones were of mixed phenotypes (FIG. 13c). This suggests that ND13 cells maintain a lin− clonogenic progenitor population that can produce both more of themselves (i.e., lin− cells) as well as more mature non-clonogenic lin+ cells. Further support for this model was obtained by isolating lin− cells by FACS, expanding them in macroscale cultures, and then demonstrating after 12 days that a new lin+ population had again been produced (FIG. 18).

In a different experiment, unseparated ND13 cells were cultured in the microfluidic device for 72 hours and then approximately 720 cells from 5 chambers (corresponding to 11 starting cell equivalents) recovered (FIG. 13d) and plated in triplicate colony-forming cell assays in methylcellulose-containing medium. Parallel methylcellulose assays were set up with the progeny of 11 starting cell equivalents generated in standard control cultures. The number of colonies obtained from each source was again similar, further demonstrating the equivalence of the microfluidic device in supporting ND13 progenitor expansion (FIG. 13d).

Example 1.5

Expansion of HSCs

To test the suitability of these microfluidic cell culture arrays to support HSC self-renewal divisions, we examined

Berkeley Lights Ex 1001-p 38
Berkeley Lights v UBC

the growth of mouse bone marrow cells transduced with a NUP98-HOXA10homeodomain (NA10hd) fusion gene, which potently stimulates their ability to expand in vitro without any signs of leukemic transformation (Ohta, H. et al. Experimental Hematology 35, 817-830, doi:10.1016/j.exphem.2007.02.012 (2007); and Pineault, N. et al. Molecular and Cellular Biology 24, 1907-1917 (2004)). To obtain these cells, we first isolated a highly purified population of primary HSCs (with a CD45+CD48−EPCR+CD150+ phenotype), and then transduced these cells with a NA10hd-encoding retroviral vector. The transduced cells were then expanded for 11 days in a macroscale culture. At the end of this period, replicate aliquots were then transferred either to the microfluidic array or a control macroscale vessel and cultured for an additional 60 hours. The cells from each of these latter cultures were then recovered and decreasing fractions of the same starting equivalent number injected into groups of 6 mice each. The total number of cells obtained from the chip and the control macrocultures were similar (FIG. 14a). All mice showed similar reconstitution levels by the transplanted cells for >16 weeks post-transplant, indicative of an overall stem cell expansion of more than 600-fold compared to the stem cell content of the purified cells initially transduced (FIG. 14b). The mice repopulated with cells from the microfluidic array also showed reconstitution of both their myeloid and lymphoid compartments (FIG. 15a). Notably, the cultured NA10 HSC population contained a greater proportion of fast growing cells compared to the ND13 cells (FIG. 12b), consistent with the lack of highly mature cells in the NA10 population.

Example 1.6

HSC Response to Temporally Varied SF Stimulation

Previous work has shown that in vitro exposure of HSCs to low concentrations of steel factor (SF) (1 ng ml⁻¹) leads to rapid loss of HSC function, delayed proliferation and increased death compared to culture in higher concentrations (300 ng ml⁻¹) (Kent 2008 supra). However, the reversibility of the effect of low SF concentrations on HSC survival and proliferation is not known. To address this question microfluidic system as described herein were used to test how long quiescent adult HSCs could be exposed to a low SF concentration before rescue by exposure to a high concentration was no longer possible. An enlarged microfluidic device consisting of 6,144 individual chambers and additional inlets and flow control valves to enable parallel studies with many temporally varied conditions was used (FIG. 16). Six different conditions in which primary mouse HSCs (E-SLAM isolates of adult mouse bone marrow) were exposed to 20 ng ml⁻¹ of interleukin-11 (IL-11) plus either 1 ng ml⁻¹ SF for the first 8, 16, 24 or 48 h followed by 300 ng ml⁻¹ SF for the remainder of the experiment, or constant SF concentrations of 1 ng ml⁻¹ or 300 ng ml⁻¹ for the entire experiment (not shown). The experiment was repeated twice yielding 5 days of imaging data for a total of 769 single E-SLAM cells cultured in the device. By day 5, the fastest growing clones reached confluence, and we could no longer quantitatively monitor their size. Growth rates of all clones were compared to the results for the constant high SF concentration. As a control, the same cells were grown in conventional macrocultures in 20 ng ml⁻¹ IL-11 plus either 1 ng ml⁻¹ or 300 ng ml⁻¹ SF and these yielded the same growth kinetics as in the microfluidic device. Compared to the high [SF] condition, a Cox proportional hazard analysis

of the cell survival over time, defined as the fraction of starting cells that remained viable or gave rise to clones, showed no significant difference (P>0.1) in survival when the cells were rescued from 1 ng ml⁻¹ SF exposure within the first 16 h of culture (Table 1).

TABLE 1

Cox proportional hazard analysis of mouse HSC survival

| Condition | n | Relative risk (95% CI) | P value |
|---|---|---|---|
| High [SF] (300 ng ml−1) | 294 | 1.00 | — |
| 8 h in low [SF] | 107 | 0.82 (0.64-1.06) | 0.13 |
| 16 h in low [SF] | 76 | 1.03 (0.78-1.36) | 0.84 |
| 24 h in low [SF] | 24 | 1.27 (0.81-1.99) | 0.29 |
| 48 h in low [SF] | 79 | 1.78 (1.37-2.31) | <0.0001 |
| Low [SF] (1 ng ml−1) | 189 | 1.53 (1.25-1.86) | <0.0001 |

CI, confidence interval. —, not applicable. Relative risks and P values were calculated based on the high [SF] condition.

Prolonged initial exposure to 1 ng ml⁻¹ SF led to a rapid decrease in viability between 16 and 24 h, and after that time, the cells could not be rescued by exposure to 300 ng ml⁻¹ SF (FIG. 6). Most dividing cells completed a first mitosis between 24 and 60 h of culture for all conditions, and the SF concentration did not affect the cell division kinetics (FIG. 7 and FIG. 8). Analysis of the second division showed comparable kinetics, with more than 80% of the clones remaining viable after a first division regardless of the SF concentration to which they had been initially exposed. Thus, although a high SF concentration influenced the viability of HSCs as they exited quiescence, it did not directly impact the subsequent division kinetics of cells that complete a first division.

Microfluidic technology brings the potential of chemical control of the culture medium in combination with single cell imaging to create new opportunities for the high throughput analysis of clonogenic cell responses to varying extracellular cues. The embodiments described herein introduce several design features which enable experiments with heterogeneous populations of suspension cells, even those that have stringent medium requirements. Some particular embodiments may include the incorporation of an enclosed and sterile iso-osmotic reservoir to control unwanted permeation and dehydration effects separated by a membrane from high aspect ratio wells to contain and immobilize non-adherent test cells during perfusion, and the use of a reverse perfusion strategy or selective aspiration to recover all cells or selected clones.

Using aspects and embodiments described herein, it is demonstrated herein that successful culture of cytokine-dependent hematopoietic cells is possible with expansion and enhanced HSC function. Maintaining equilibrium with the macroscopic volume of the osmotic bath allows for high-throughput microfluidic single cell cultures in volumes that are 4 orders of magnitude smaller than conventional macroscale cultures. A single cell isolated in a 4 nL chamber is at an effective density of 2.5×10⁵/mL, thus making possible the investigation of autocrine signaling by isolated cells, with the potential of increasing plating efficiency for cell types that might otherwise require conditioned medium or a high cell density. Co-culture of different cell types at limiting dilution could further be used to investigate the effect of cell-cell influences through secreted factors. It is

Berkeley Lights Ex 1001-p 39
Berkeley Lights v UBC

also worth noting that with sufficient medium exchange, we were able to maintain cell proliferation to densities that resulted in the creation of multiple layers of cells. This ability to maintain high-density cultures offers new opportunities for studying the effects of cell concentration on cell behavior.

Various embodiments also provide flexibility to monitor the clonal growth (or other responses) of single non-adherent cells over time in the presence of dynamic changes in medium conditions by combined time-lapse imaging with programmed medium exchanges that do not disturb the spatial position of each cell or colony. It has been shown, for instance, that exposure of HSC in vitro to sub-optimal steel factor concentrations can induce their differentiation within 16 hours even prior to their entry into the cell cycle (Kent, D. G. et al. Blood 112, 560-567, doi:10.1182/blood-2007-10-117820 (2008)). Thus, it is relevant to anticipate that other schedules of growth factor delivery can further modulate HSC fate decisions. The fully programmable system for both perfusion and image acquisition allows automated and dynamic temporal operation over the entire duration of the culture experiment, thereby providing a mean to analyze the evolution of clonal cultures in time rather than measuring only end-point outcomes. In addition, the ability to replace the culture medium is a key feature to avoid nutrient limitations that occur in longer-term experiments in which even a small amount of proliferation causes a significant increase in the local cell concentration.

Imaging the cellular contents of 1,600 chambers requires less than 5 minutes allowing the changes to be monitored at high temporal resolution. When coupled with emerging image processing tools for identifying new morphological phenotypes (Cohen, A. R. et al. Nat Meth 7, 213-218 (2010)) and for tracking different cell divisions identified by specific markers or fluorescent reporters (Eilken, H. M. et al., Nature 457, 896-900 (2009); and Satyanarayana, S. et al. Journal of Microelectromechanical Systems 14, 392-399 (2005)), the combined advantages of high throughput and medium control will now allow previously impossible large-scale studies of fate-choices by rare cell types.

The growth kinetics analysis performed on the ND13 population yielded findings that can only be revealed from clonal analyses. The scale of the perfusion microfluidic cell culture array described here was purposefully optimized for the study of small numbers of hematopoietic cells, but can be readily modified to give designs with other features; e.g. more or larger chambers. Situations where only a small fraction of the cells are responsible for the long-term maintenance of the overall population are not exclusive to the hematopoietic system. The technology is highly suitable for adaptation to other cell types/organisms and other applications such as drug-response screens, culture optimization, clone selection, recombinant protein production and cell characterization. Various aspects and embodiments described herein are also ideally suited to controlled experiments investigating the interaction of two or more cell types. The extended use of microfluidic systems coupled with live-cell microscopy thus offers great promise for many applications of scientific investigation in biology and medicine.

What is claimed is:

1. A method of culturing a cell, the method comprising:

retaining the cell at a retaining position within an individual chamber of a microfabricated device;

perfusing the cell with a perfusion fluid by flowing the perfusion fluid into the individual chamber through an inlet and out of the chamber through an outlet,

wherein the outlet is positioned such that gravitational forces acting on the cell to keep it at or near the retaining position exceed hydrodynamic forces acting on the cell to move it toward the outlet;

culturing the cell within the chamber and monitoring a response in the chamber; and

selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step.

2. The method of claim 1, further comprising regulating osmolarity of the perfusion fluid within the chamber.

3. The method of claim 2, wherein regulating osmolarity of the perfusion fluid within the chamber comprises placing the chamber in gaseous communication with a bathing fluid, wherein the bathing fluid has a volume greater than the chamber volume.

4. The method of claim 3, wherein the bathing fluid and the perfusion fluid are iso-osmotic.

5. The method of claim 1, wherein a speed of the perfusion fluid is decreased to less than 50 μm/s as the perfusion fluid approaches the retaining position.

6. The method of claim 5, wherein the speed of the perfusion fluid is decreased to about 0 μm/s as the perfusion fluid approaches the retaining position.

7. The method of claim 1, wherein the chamber has a top and a bottom, and the retaining position is at the bottom.

8. The method of claim 7, wherein the inlet position is proximal to the top.

9. The method of claim 7 or 8, wherein the outlet position is proximal to the top.

10. The method of claim 1, wherein the cell is a suspension cell.

11. The method of claim 1, wherein the perfusion fluid comprises any one or more of a cell culture medium, an immunostaining agent, an enzymatic reagent, a dye, a buffer, an oil, and a bead-containing solution.

12. The method of claim 1, wherein x is less than or equal to y and x is the length of the shortest distance between the inlet and the outlet and y is the length of the shortest distance between the retaining position and a region of the chamber that is interposed directly between the inlet and outlet positions.

13. The method of claim 12, wherein the ratio of x:y of the chamber is greater than 0.5.

14. The method of claim 1, further comprising a step of flowing the cell into the chamber prior to retaining the cell at the retaining position.

15. The method of claim 1, further comprising isolating a clone of the cell.

16. The method of claim 1, further comprising tracking the progeny of the cell.

17. The method of claim 1, wherein the flow of the perfusing fluid is intermittent.

18. The method of claim 1, wherein the flowing of the perfusing fluid is continuous.

19. The method of claim 1, further comprising characterizing the cells by lineage staining, antibody staining, enzymatic assaying, RT-PCR analysis, sequencing, functional assaying, or bead capturing to characterize the cells.

20. The method of claim 19, further comprising selecting cell clones based on said characterizing.

21. The method of claim 2, wherein the bathing fluid is located in a reservoir, wherein the reservoir is separated from the chamber by a gas-permeable polydimethylsiloxane (PDMS) layer.

Berkeley Lights Ex 1001-p 40
Berkeley Lights v UBC

**22**. The method of claim **2**, wherein regulating osmolarity within the chamber comprises placing the chamber in gaseous communication with an osmolarity regulator.

**23**. The method of claim **22**, wherein the osmolarity regulator comprises a vapor and gas-permeable PDMS layer.

**24**. The method of claim **1**, wherein the chamber volume is less than about 10 nL.

**25**. The method of claim **24**, wherein the chamber volume is about 4.1 nL.

**26**. The method of claim **1**, further comprising imaging the chamber to obtain an image of the chamber comprising the cell.

**27**. The method of claim **26**, further comprising analyzing the image of the chamber to determine a cellular response.

**28**. The method of claim **1**, wherein the cellular response is growth rate kinetics.

**29**. The method of claim **1**, wherein the cellular response is cell death.

**30**. The method of claim **1**, wherein the cellular response is determined using a fluorescent reporter.

**31**. The method of claim **1**, wherein recovering the cell comprises piercing the chamber and aspirating the chamber's contents or a portion thereof to obtain the recovered cell.

**32**. The method of claim **1**, wherein the inlet is operable as the outlet.

**33**. The method of claim **1**, wherein the outlet is operable as the inlet.

**34**. The method of claim **1**, further comprising exchanging the perfusion fluid.

\* \* \* \* \*

Berkeley Lights Ex 1001-p 41
Berkeley Lights v UBC

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**September 11, 2023**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes* Review proceeding identified below.

**PHENOMEX INC.,**

**Petitioner,**

**v.**

**THE UNIVERSITY OF BRITISH COLUMBIA,**

**Patent Owner.**

———————

**IPR2021-01249**
**U.S. Patent No. 10,087,408**

———————

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*/s/ Michael W. Domenico*

**Certifying Officer**



# Prosecution History for IPR2021-01249

| Date | Document |
|---|---|
| 07/09/2021 | Petition for *Inter Partes* Review |
| 07/09/2021 | Power of Attorney |
| 07/09/2021 | Power of Attorney |
| 07/23/2021 | Notice of Accord Filing Date |
| 07/30/2021 | Power of Attorney for Patent Owner |
| 07/30/2021 | Patent Owner's Mandatory Notices |
| 10/25/2021 | Patent Owner's Preliminary Response for Petition for *Inter Partes* Review |
| 12/06/2021 | Petitioner's Updated Exhibit List |
| 01/21/2022 | Institution Decision:  Granting Institution of *Inter Partes* Review |
| 01/21/2022 | Order:  SCHEDULING ORDER |
| 04/12/2022 | Petitioner's Notice of Deposition of C. Meinhart |
| 04/12/2022 | Joint Stipulation to Revise Scheduling Order |
| 04/19/2022 | Patent Owner's Motion for *Pro Hac Vice* Admission of M. Yusem |
| 04/27/2022 | ORDER Conditionally Granting Patent Owner's Motion for *Pro Hac Vice* Admission of M. Yusem |
| 04/29/2022 | Updated Power of Attorney for Patent Owner |
| 04/29/2022 | Patent Owner's Updated Mandatory Notices |
| 05/10/2022 | Joint Stipulation to Revise Schedule Order |
| 05/20/2022 | Patent Owner's Response to Petition for *Inter Partes* Review |
| 05/20/2022 | Patent Owner's Current List of Exhibits |
| 07/20/2022 | Petitioner's Notice of Deposition of B. Gale, Ph.D |
| 08/10/2022 | Joint Stipulation to Revise Scheduling Order |
| 08/19/2022 | Petitioner's Reply in Support of Petition for *Inter Partes* Review |

1

| Date | Document |
|---|---|
| 08/26/2022 | Patent Owner's Objections to Petitioner's Exhibits |
| 09/12/2022 | ORDER Conduct of the Proceeding |
| 09/12/2022 | Joint Stipulation to Revise Scheduling Order |
| 09/12/2022 | Petitioner's Notice of Deposition of C. Meinhart |
| 09/19/2022 | Patent Owner's List of Improper Reply Arguments and Evidence |
| 09/26/2022 | Petitioner's Identification of Support for Proper Reply Arguments |
| 10/03/2022 | Patent Owner's Sur-Reply to Petitioner's Reply |
| 10/03/2022 | Patent Owner's Current List of Exhibits |
| 10/03/2022 | Patent Owner's Request for Oral Argument |
| 10/03/2022 | Petitioner's Request for Oral Hearing |
| 10/11/2022 | Order:  Setting Oral Argument |
| 11/01/2022 | Patent Owner's Current List of Exhibits |
| 11/01/2022 | Petitioner's Updated Exhibit List |
| 11/02/2022 | Patent Owner's Identification of Objections to Petitioner's Demonstratives |
| 01/13/2023 | Other:  Hearing transcript |
| 01/19/2023 | Final Written Decision:  original |
| 01/19/2023 | Erratum |
| 02/21/2023 | Petitioner's Request for Rehearing |
| 07/20/2023 | Final Written Decision:  rehearing |
| 07/26/2023 | Petitioner's updated mandatory notices |
| 07/26/2023 | Petitioner's notice of appeal |

# UNITED STATES PATENT AND TRADEMARK OFFICE

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

BERKELEY LIGHTS, INC.,

Petitioner,

v.

THE UNIVERSITY OF BRITISH COLUMBIA,

Patent Owner.

———————————

IPR2021-01249
U.S. Patent No. 10,087,408

———————————

## PETITION FOR INTER-PARTES REVIEW
## OF U.S. PATENT NO. 10,087,408

Mail Stop: PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

10968904

# I.  INTRODUCTION

Berkeley Lights, Inc. ("Petitioner") requests *inter partes* review and cancellation of claims 1, 6, 11, 16, 19, 24, 26, 27, 30 of U.S. Patent No. 10,087,408 ("the '408 patent"), entitled "System and Method for Microfluidic Cell Culture."

Well before the earliest filing date for the '408 patent, Ivan Dimov and a team of researchers at Dublin City University developed, and filed a U.S. patent application for, a microfluidic multiplexed cellular and molecular analysis system and various methods of using it. The system comprised a collection of microfabricated devices each exemplified by the following "FIG. 4B" schematic showing a fluid path leading to a capture chamber, preferably a trench, to capture "particles" such as cells that fall out from the fluid under the influence of gravity:



*FIG. 4B*

Dimov et al. explained that once captured, the cells are retained in the trench, where they can be perfused with culture media that is flowed through the fluid path above, cultured, monitored for responses, and removed from the trench.

Later, Hansen et al. filed the application that would ultimately issue as the '408 patent. That application described a microfluidic system for cell culture comprising devices exemplified by a schematic—also labeled Figure 4—that is strikingly similar to the schematic of the Dimov device that came before it. Below is a diagram of the two devices side by side, near mirror-images of each other.



FIG. 4B

**Dimov et al.**

FIGURE 4

**Hansen et al.**

The '408 patent claims the methods disclosed by Dimov et al. It also claims obvious variations of methods disclosed in a prior paper published by Park et al. Park itself discloses all but one limitation of the challenged claims, and the single

## V.    THE '408 PATENT

According to its face, the '408 patent issued on October 2, 2018 from

application 13/178,395 filed on July 7, 2011, and claims priority to provisional

application No. 61/362,213, filed on July 7, 2010.

## VI.    GROUNDS FOR THE CHALLENGES

| Ground | Claims Challenged | 35 U.S.C. § | Reference(s) |
|:---:|:---|:---:|:---:|
| 1 | 1, 6, 11, 19, 24, 26, 27, 30 | 102(a) 102(e)(1) 102(e)(2) | Dimov |
| 2 | 1, 6, 11, 19, 24, 26, 27, 30 | 103(a) | Dimov |
| 3 | 1, 6, 11, 19, 24, 26, 27, 30 | 103(a) | Dimov, Kovac |
| 4 | 1, 11, 16, 24, 26, 27, 30 | 103(a) | Park |
| 5 | 1, 11, 16, 24, 26, 27, 30 | 103(a) | Park, Kovac |

## VII.    LEVEL OF ORDINARY SKILL IN THE ART

As explained by Petitioner's expert Dr. Carl Meinhart, Ex. 1002

(Appendix A), a person having ordinary skill in the art at the time of the alleged

invention of the '408 patent (POSA) would have had a bachelor's degree in

mechanical engineering, chemical engineering, biomedical engineering,

molecular biology, (bio)chemistry, or an equivalent degree relevant to

microfluidic biological cell analysis, and three to five years of experience with

the construction of and application of microfluidic devices to cell culture and

analysis. Ex. 1002, ¶40.

## VIII. CLAIM CONSTRUCTION

"[C]laim terms need only be construed 'to the extent necessary to resolve

the controversy.'" *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361

(Fed. Cir. 2011).

Here, Petitioner believes that no terms require express construction for

purposes of resolving the challenges in this proceeding. In its Northern District

of California Patent Local Rule 4-1 disclosure for the litigation, Patent Owner

took the position that no claim terms require construction. Ex. 1012. And in its

Patent Local Rule 4-2 disclosure of preliminary claim constructions and

evidence, Patent Owner contended, for all but two of the claim terms identified

by Petitioner, either that no construction is necessary because the term should be

given its plain and ordinary meaning or that the court should adopt a construction

that is essentially the same as Petitioner's construction based on an express

definition in the specification. Ex. 1013 (Patent Owner); Ex. 1021 (Petitioner).

The two exceptions are the claim terms "chamber" and "retaining position." Ex.

1013 at 6, 8; Ex. 1021 at 7, 8.

In the litigation, Patent Owner is proposing "an enclosed space within a

microfluidic device" as the construction for "chamber," and is reading the

claimed "chamber" onto Petitioner's NanoPens, such as those depicted in plan view below, which are not enclosed spaces. Ex. 1002, ¶44.



Ex. 1014 at 23. Patent Owner also is taking the position that no construction is necessary for the chamber "inlet" and "outlet" on the ground that these terms should be given their plain and ordinary meanings, and is reading those terms on any openings and such that the same opening is in operation simultaneously both an inlet and an outlet. Ex. 1002, ¶44.

As for "retaining position," Patent Owner and Petitioner agree that the term is expressly defined in the patent and that the definition includes: "A location in the chamber at which a cell is maintained during cell culture and media exchange" based on column 9, lines 37-39. Ex. 1013 at 8; Ex. 1021 at 8.

This petition challenges the claims of the '408 patent based on how Patent Owner is reading those claims, including its own constructions, onto the accused devices in the litigation, as evidenced by Patent Owner's Patent Local Rule 3-1 disclosure of asserted claims and infringement contentions. Ex. 1014.

Petitioner disagrees with many of Patent Owner's claim construction positions, including its positions with respect to "chamber," "inlet," "outlet," and "retaining position."[2] Without waiving its right to continue advancing appropriately narrower claim constructions in the litigation, Petitioner makes the present challenge based on the claim constructions urged by Patent Owner—at least implicitly—in the litigation, including as evidenced by Patent Owner's reading of the claims onto the accused products. *See 10X Genomics, Inc. v. Bio-Rad Labs., Inc.*, IPR2020-00086, Paper 8 at 21 (PTAB April 27, 2020) (permitting the petitioner to base its challenge "on claim constructions implied by Patent Owner's district court infringement contentions without expressing subjective agreement with those constructions"); *id.* at 18 (concluding that 37 C.F.R. § 42.104(b)(3) "does not prohibit Petitioner from submitting a claim construction it believes is incorrect and relying on that construction to show how the claim is unpatentable"); *Western Digital Corp. v. SPEX Techs., Inc.*, IPR2018-00084, Paper 14 (PTAB April 25, 2018) ("We agree with Petitioner that 37 C.F.R. § [42.]104(b)(3) does not require Petitioner to express its

---

[2] With respect to "retaining position," Petitioner believes that the construction should include the part of the express definition found later in the paragraph in which the agreed language is found. Ex. 1001 at 9:44-49.

subjective agreement regarding correctness of its proffered claim constructions

or to take ownership of those constructions."). None of these terms requires

express construction, however, for purposes of resolving the challenges in this

proceeding.

## IX. THE BOARD SHOULD CANCEL THE CHALLENGED CLAIMS OF THE '408 PATENT.

### A. GROUND 1: Claims 1, 6, 11, 19, 24, 26, 27, 30 are anticipated by Dimov.

A claim is anticipated "if each and every element as set forth in the claim

is found, either expressly or inherently described, in a single prior art reference."

*Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir.

1987).

#### 1. Claim 1 is anticipated by Dimov.

Claim 1 is "[a] method of culturing a cell, the method comprising" various

steps, including a step that expressly includes "culturing the cell within the

chamber." Ex. 1001 at 32:5. Dimov discloses a method of culturing a cell, as

explained in the analysis of that step in Section VIII.A.1.d) below. For example,

Dimov describes a microfluidic device having one or more capture chambers or

trenches and explains that such a device "is especially useful within the context

of cell capture and in sequential flow analysis where a plurality of fluids may be

passed through the same device in sequential fashion," Ex. 1003 at 7:4-7, and

"is suitable for in situ cell culturing." *Id.* at 13:42. Thus, to the extent the

(Step **2435**) and luminescent analysis of the chambers will provide information on the protein." *Id.* at 15:20-26. Ex. 1002, ¶82.

Additionally, Dimov teaches that "different optical biosensing techniques could be used within the context of the present invention for assessing the properties of the captured cellular or particulate matter within the capture chambers or wells heretofore described." *Id.* at 16:4-7. Ex. 1002, ¶¶83-84.

Thus, Dimov discloses culturing the cell within the chamber and monitoring a response in the chamber.

> **e)** **[1E] "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step."**

As discussed above, Dimov discloses a device in which "particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber," Ex. 1003 at 1:46-47, and that "[t]he capture or collection chamber is desirably in the form of a trench." *Id.* at 1:52-53. Ex. 1002, ¶85.

Dimov discloses that "[a] device provided in accordance with the present teaching is especially useful within the context of cell capture," where "the particles described heretofore can be considered cells." *Id.* at 7:4-5, 8-9; *see also id.* at 1:57 (highlighting that "[i]n a first arrangement the particles are cells."). Ex. 1002, ¶86.

Dimov states that "[w]hile the arrangement described herein preferentially retain the particles within the trench it is possible to modify the arrangement so as to provide for subsequent movement of the particles—either within the trench so as to provide for mixing or the like, ***or to effect removal of the particles out of the trench***." *Id.* at 11:21-26 (emphasis added). Ex. 1002, ¶85.

Dimov explains that "[s]uch arrangements will typically require a capacity to manipulate the particles and this can be conducted either before or subsequent to capture of the particles within the trench." *Id.* at 11:27-30. Dimov states that "[e]xamples of techniques that could be employed include:

Acoustic

Magnetic

Inertial

Electric

Dielectrophoretic

Thermo-hydrodynamic

Laser tweezers

Hydrodynamically induced agitation

Specific or unspecific attachment to surface."

*Id.* at 11:30-40. Dimov points out that "[i]t will be understood that the use of such techniques may require an external source of agitation or manipulation of the particles." *Id.* at 11:41-43. Ex. 1002, ¶87.

Dimov discloses "integrating a plurality of individual devices **100** onto a single substrate and effecting simultaneous experiments within each." *Id.* at 8:52-55; *see also id.* at 3:56-62 ("Each of the devices **100** of FIGS. 1 and 2 may be considered identical and are usefully employed as Cell Capture and Processing Elements (CCPE) such that the completely integrated and multiplexed device shown in FIGS. 1 and 2 provides five hundred and twelve identical Cell Capture and Processing Elements (CCPE) multiplexed into a single monolithic device."). But Dimov refers to removal of the particles out of an individual trench ("the trench"), *id.* at 11:26, not out of all trenches on a substrate integrating a plurality of individual devices, which would instead result in recovery of a pooled population of particles. Ex. 1002, ¶88. Thus, Dimov discloses selectively recovering the individual cell, or a clonal population thereof, from the individual chamber. *Id.* ¶88.

Moreover, a POSA would have understood that at least some of the above techniques, such as laser tweezers, are techniques that, by their very natures and because of their technical limitations, would necessarily be directed to individual trenches, as opposed to over all of the trenches spread out on an integrated substrate. Ex. 1002, ¶89. Thus, even the disclosed removal techniques demonstrate that Dimov teaches selectively removing one or more particles from an individual trench. *Id.*

Additionally, a POSA would have understood Dimov's reference to removing particles out of the trench "subsequent to capture of the particles within the trench," Ex. 1003 at 11:29-30, to disclose removal after, and based on, the "subsequent analysis or experimentation" that motivated the capturing of the particles in the first place. *Id.* at 12:13-18 ("It will be appreciated that the capture chamber may be considered as a sediment trap whereby the particles within the fluid, such as for cells or other living organisms, which are entrained within the fluid on passing the capture chamber are displaced out of the fluid and remain in the capture chamber for subsequent analysis or experimentation."); Ex. 1002, ¶90.

Further, a POSA, reading Dimov's disclosures of monitoring a response in the chamber and removing a cell from the chamber, would have at once envisaged basing the removal of the cell on the response in the monitoring step. Ex. 1002, ¶91. *See Kennametal, Inc. v. Ingersoll Cutting Tool, Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) ("[A] reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination.") (quoting *In re Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962)).

For example, a POSA would have envisioned removing a macrophage from the trench in the above study using "FITC-labeled anti-CD86 antibodies"

based on the detected surface protein concentration, as doing so would permit the macrophage to be further characterized, including via DNA sequencing. Ex. 1002, ¶92. Likewise, a POSA would have envisioned removing one or more cells from the trench in the above protein analysis experiment based on the detected fluorescence, as doing so would permit further characterization of the cell, including sequencing, or expansion of the cell via conventional cell culture techniques into a larger population of cells for further analysis. *Id.*

Dimov's disclosure of enhancing the above measurement techniques "by simultaneously using several antibodies with different fluorophore labels to generate simultaneous real time multiple surface protein readout with **single cell resolution**," Ex. 1003 at 14:52-56, would also have caused a POSA to at once envisage basing the removal of the cells on the response in the monitoring step. Ex. 1002, ¶93.

### 2. Claim 6 is anticipated by Dimov

Claim 6 recites "[t]he method of claim 5, wherein the speed of the perfusion fluid is decreased to about 0 μm/s as the perfusion fluid approaches the retaining position." Claim 5, in turn, depends from claim 1 and recites that the "speed of the perfusion fluid is decreased to less than 50 μm/s." Claim 1 is anticipated by Dimov. *See supra* Section VIII.A.1.

Dimov further discloses that the retaining position is at the bottom of the trench, *see supra* Section IX.A.1.a), and teaches exemplary trench depths of

### 7. Claim 27 is anticipated by Dimov

Claim 27 recites "[t]he method of claim 26, further comprising analyzing the image of the chamber to determine a cellular response." Claim 26 is anticipated by Dimov. *See supra* Section VIII.A.7.

As discussed above, Dimov discloses imaging the chamber to detect fluorescently labeled antibodies bound to surface proteins expressed on the cells and teaches analyzing the image to find the surface protein concentration, which "is directly correlated to the signal from the surface labels." *Id.* at 14:8-10. *See also* FIG. 23 (showing the results of the image analysis). Ex. 1002, ¶104. Expression of a surface protein on a cell is a cellular response. *Id.*

### 8. Claim 30 is anticipated by Dimov.

Claim 30 recites "[t]he method of claim 1, wherein the cellular response is determined using a fluorescent reporter." Claim 1 is anticipated by Dimov. *See supra* Section VIII.A.1. Dimov further discloses monitoring surface protein expression on cells using fluorescently labeled antibodies, as discussed above. *See supra* Section VIII.A.5. Ex. 1002, ¶105.

### B. GROUND 2: Claims 1, 6, 11, 19, 24, 26, 27, 30 are obvious over Dimov in view of the knowledge of a POSA.

Dimov discloses each of the limitations of claims 1, 6, 11, 19, 24, 26, 27, and 30, as discussed above. *See supra* Section VIII.A.1. If Dimov had not disclosed the step of "selectively recovering the cell or a clonal population

thereof from the individual chamber based on the response in the monitoring step," these claims would have been obvious over Dimov in view of the knowledge of a POSA. Ex. 1002, ¶106.

As discussed above, Dimov expressly discloses both monitoring a response in the trench of its device, *see supra* Section VIII.A.1.d), and removing particles, such as cells, from the trench. *See supra* Section VIII.A.1.e). Dimov also discloses integrating a plurality of individual devices, each having its own trench, onto a single substrate and effecting simultaneous experiments within each. Ex. 1002, ¶107.

It would have been obvious to a POSA to make use of Dimov's individual trench monitoring, in connection with a single substrate integrating a plurality of individual devices, by selectively removing one or more cells from a trench of a device based on a response observed through such monitoring. Ex. 1002, ¶108.

For example, it would have been obvious for a POSA to selectively remove, based on a monitored surface protein concentration, one or more macrophage cells from a trench in the Dimov experiment that used fluorescently-labeled anti-CD86 antibodies as markers. *See supra* Section VIII.A.1.d); Ex. 1002, ¶109. A particularly high surface protein concentration observed via fluorescence for one or more cells in a trench during the monitoring step, for example, would have motivated a POSA to remove one or more cells for further

investigation. *Id*. Such investigation could have included further characterization of the cell, including by sequencing. *Id*.

Likewise, it would have been obvious to selectively remove, based on detected fluorescence, one or more cells from a trench in the protein analysis experiment disclosed in column 15 of Dimov. *See supra* Section VIII.A.1.d); Ex. 1002, ¶110. For example, a high concentration of a surface protein on one or more cells in a trench, as observed by monitoring the fluorescent signal in the trench, would have motivated a POSA to remove one or more cells from the trench for further study. *Id*. Again, such further study could have included sequencing the DNA in the cell or expansion of the cell, via conventional cell culture techniques, into a larger population of cells for further analysis. *Id*.

It would have been obvious to a POSA that, in addition to any of the techniques that Dimov expressly discloses for removing one or more cells from a trench, *see* Ex. 1003 at 11:30-40, use of a micropipette (e.g., under microscopic observation) would accomplish such removal. Ex. 1002, ¶111. A POSA would have been familiar with the use of micropipettes and would have found it obvious, for example, to simply insert a micropipette into a trench and aspirate one or more cells. Ex. 1002, ¶111.

A POSA would have identified multiple ways to access the trench for aspiration by micropipette. For example, a POSA would have found it obvious

to construct the device of Dimov in a way that would permit the top layer of the device to be peeled back so a trench could be accessed directly. Ex. 1002, ¶112.

Dimov discloses that the device of FIG. 4 "is made of two layers," including a top layer "for the channels having dimensions of approx. 40 microns high." Ex. 1003 at 5:37-39. Figure 25 of Dimov shows "steps that may be used to fabricate a device in accordance with the present teaching" using PDMS, *id.* at 3:10-12, along with an "Assembled Device," excerpted below. *Id.* at 15:27-46.



*Id.* (FIG. 25). A POSA would have found it obvious to construct the device so that layers 1 and 2 are at least partially unbonded, permitting layer 1 to be peeled back so as to allow direct access to the trench, as depicted in the modified excerpt below. Ex. 1002, ¶¶ 113-114.



Notably, Dimov teaches "bringing the first and second layers together and **assembling** them relative to one another onto a glass substrate," Ex. 1003 at 15:44-45 (emphasis added), but does not teach bonding the two layers together. Ex. 1002, ¶¶114-115.

It would have been obvious to a POSA to only partially bond the two layers, for example, so as to provide direct access to the trench for removal of cells. Ex. 1002, ¶116. Indeed, this same technique was known in the art and used around the time of the priority date by scientists studying embryo culturing, as reflected in a paper by Han et al. ("Han") published at least as early as September 15, 2010, which is before the July 7, 2011 non-provisional filing date for the '408 patent. Ex. 1009; Ex. 1020, ¶68. Han bears a "*Received*" date of May 5,

2010, which is before the filing date of provisional application 61/362,213.

Ex. 1002, ¶117.

Like the Dimov device, the Han device "consists of two PDMS layers." Ex. 1009 at 2849. The Han device includes "a microchannel in the upper layer and a microwell array in the lower layer," as shown below. *Id.*



Han explains that "the PDMS layers are partially bonded and the microchannel layer can be lifted while each embryo is still trapped in the microwell layer at its fixed position." *Id.* at 2853. Han teaches that "[t]his feature allowed us to directly remove embryos from the microwells by pipetting with the retrieval rate close to 100%." *Id.*; *id.* at 2850 ("The microchamber region was left unbonded so that the upper layer can be partially lifted for the retrieval of blastocysts."). Han includes a picture of its "microfluidic device with the upper layer lifted," shown below. *Id.* at 2849.



*Id.* A POSA would have found it obvious to adapt this same, known concept to the integrated substrate of Dimov so as to permit direct access to individual trenches by micropipette. Ex. 1002, ¶¶ 113-114.

Given the simple and straightforward nature of the above methods, and a POSA's familiarity with the use of a micropipette, a POSA would have had a reasonable expectation of success in piercing the top layer of PDMS, or only partially bonding the two PDMS layers and peeling back the top layer, and aspirating one or more cells from a trench in Dimov using a micropipette. Ex. 1002, ¶120. None of the other limitations in claims 1, 6, 11, 19, 24, 26, 27, or 30 alters the above analysis. *Id.*

### C. GROUND 3: Claims 1, 6, 11, 19, 24, 26, 27, 30 are obvious over Dimov in view of Kovac.

Dimov discloses each of the limitations of claims 1, 6, 11, 19, 24, 26, 27, and 30, as discussed above. *See supra* Section VIII.A.1. If Dimov had not

disclosed the step of "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step," these claims would have been obvious over Dimov in view of Kovac. Ex. 1002, ¶121.

Kovac teaches a method of trapping individual cells in a microfluidic device and subsequently interrogating the cells using imaging techniques, similar to the methods described in Dimov. Ex. 1007 at 9321. *See supra* Section IX.A.1.d). Like the Dimov device, the Kovac device is made of PDMS on a glass substrate. Ex. 1007 at 9322 (Fig. 1(A)). The Kovac device also includes a glass top layer. *Id.* Ex. 1002, ¶122.

Kovac identifies a need to "select a desired starting population of cells of known characteristics" or "isolate particularly interesting cells for further investigation." *Id.* at 9321 ("The need to isolate small numbers of specific cells from background populations is ubiquitous, with applications in pathology, clinical diagnosis, cloning, and cell biology research."). Ex. 1002, ¶122.

Kovac acknowledges that "[v]iable retrieval of small numbers of single cells from microwell arrays using micropipettes/micromanipulators based on temporal fluorescence behavior has [] been demonstrated," *id.* at 9322, but characterizes such a retrieval method as suboptimal. Ex. 1002, ¶123.

As an alternative to using micropipettes, Kovac discloses "us[ing] the scattering force from a focused infrared laser to levitate cells of interest from

their wells into a flow field for collection" from a microfluidic device, *id.* at 9321

(Abstract), thereby "combining the steps of physical selection and target removal

into a single step." *Id.* at 9325; *id.* at 9322 ("Here we present a microscope-

compatible, array-based microfluidic cell sorting architecture centered around

passive hydrodynamic trapping of cells and active release using the optical

scattering force (Figure 1)."). Ex. 1002, ¶124. Kovac refers to this technique as

"selective levitation," *id.* at 9325, illustrated in Figure 1(c) below.



*Id.* at 9322 (Fig. 1(a) caption) ("After locating cells of interest, we focus an

infrared (IR) laser beam onto target cells, levitating the cells into the flow field

with the optical scattering force.").

The selectively levitated cells flow to a reservoir of the microfluidic

device, where they are removed from the device by micropipette. *Id.* at 9323

(explaining that after "target cells flow into the reservoir, we use a standard 200

µL pipettor to transfer cells" out of the microfluidic device). Ex. 1002, ¶125.

Kovac asserts that this technique "was straightforward, user-friendly, and conceivably automatable," and "was simple to implement in a standard microscope with minimal modification," *id.* at 9325, "requir[ing] only flow and a clear optical path to the chip." *Id.* at 9322. Given this, and the need to "select a desired starting population of cells of known characteristics" or "isolate particularly interesting cells for further investigation," as disclosed in Kovac, *id.* at 9321, a POSA would have been motivated to modify Dimov to add the selective recovery method described in Kovac. Ex. 1002, ¶126.

Specifically, in connection with the trench monitoring expressly disclosed in Dimov, a POSA would have been motivated by Kovac to inspect the trenches "using any desired microscopy technique (brightfield, DIC, fluorescence, etc.)," Ex. 1007 at 9322 (Fig. 1 caption), and then focus an infrared (IR) laser beam onto target cells from below through the glass substrate and bottom PDMS layer, as described in Kovac, levitating the cells into the flow field with the optical scattering force." *Id.*; Ex. 1002, ¶¶127-128.



**Kovac**  **Dimov + Kovac**

A POSA would have either inspected the trenches from below to identify the targets before bringing to bear the laser, or would have inspected the trenches from above through the top layer of PDMS, which is approximately 40 microns thick, Ex. 1003 at 5:38-39, and is transparent. Ex. 1002 at ¶128. Dimov includes several images of trenches/capture chambers through the PDMS top layer. *See, e.g.,* Ex. 1003 at 9:13-20 and FIG. 11 (showing a top-down view of Dimov trenches under barely-visible outlines of the flared-out portions of overlaying fluid paths as described at 6:6-14); *id.* at 9:23-27 and FIG. 13. Ex. 1002, ¶128.

A POSA would have recognized that after levitating a cell of interest from a trench or "capture chamber **160**" in the Dimov device, the levitated cell could then be flowed down "a fluid path **103** defined within a substrate **105**" to "an output **130**," *id.* at 3:22-26; *id.* (FIG. 1), Ex. 1002, ¶128, or even further to the structure labeled "common waste **140**," *id.* at 4:21-22, where it could then be removed from the device by micropipette, including by accessing the device as described above. *See* Section VIII.B.

A POSA would additionally have been motivated to combine Dimov with Kovac as described above because Dimov expressly discloses removing particles, such as cells, from trenches using "Dielectrophoretic" and "Laser tweezers" techniques, Ex 1003 at 11:36, 38, and Kovac uses similar techniques to accomplish its "selective levitation." Ex. 1002, ¶130.

A POSA would have had a reasonable expectation of success in combining Dimov and Kovac as described above. Kovac discloses that experimental results confirmed that the selective levitation technique yielded the "expected viability given our optical parameters," and that "[c]ell retrieval from the device requires a simple pipetting step, which is standard lab practice and unlikely to damage cells. Ex. 1007 at 9327-28; *id.* at 9328 ("Therefore, we consider our technique to be within the parameter space for healthy, viable cell sorting."). Accordingly, a POSA would have reasonably expected the removed cells to be viable. Ex. 1002, ¶131.

### D. GROUND 4: Claims 1, 11, 16, 24, 26, 27, 30 are obvious by Park in view of the knowledge of a POSA.

#### 1. Claim 1 is rendered obvious by Park plus the knowledge of a POSA.

Park discloses a method of culturing a cell, as explained below in Section VIII.D.1.d). For example, Park describes "a method for high-throughput single cell trapping in larger, more readily fabricated microwells" than were used in the past, Ex. 1006 at 264, and explains that this "method has the advantage ... that cell culture is possible due to the ample space of the microwells." *Id.* at 268. Thus, to the extent the preamble of claim 1 is limiting, Park discloses the subject matter of the preamble. Ex. 1002, ¶132.

a) **[1A] "retaining the cell at a retaining position within an individual chamber of a microfabricated device"**

Park discloses a device that "consists of a microwell array that covers the bottom of the chip, and a long narrow channel . . . that guides fluid flow over it." Ex. 1006 at 265. "The overall system geometry in Fig. 1b" is reproduced below.



*Id.* at 264. "The system consists of four parts: the inlet reservoir where [a] cell suspension is introduced, main channel, microwells, (not shown in the figure) patterned on the bottom surface of the main channel, and the outlet which is connected to a pulling syringe pump." *Id.* at 264. Ex. 1002, ¶133.

The microarray, under the main channel, is "[a] 50 x 200 array of triangular microwells (typical side length dimension of 50 μm with depth of

20 μm) [that] extends downward into the bottom layer giving a total of 10,000 microwells." *Id.* at 265.



*Id.* at 264. Each triangular microwell in the array is an individual chamber according to Patent Owner's construction, which does not require the inlet and the outlet of a chamber to be different openings, as discussed above. *See supra* Section VIII. Ex. 1002, ¶134.

A POSA would have understood from Park's disclosure of the device as a "***microchip***" having a "50 x 200 array of triangular microwells" that have

"typical side length dimension of 50 μm with depth of 20 μm" and are "***patterned*** on the bottom surface of the main channel," Ex. 1006 at 266, 265 (emphasis added), that the system is a microfabricated device. Ex. 1002, ¶135. In any event, a POSA would have found it obvious and expeditious to microfabricate Park's device by, for example, patterning photoresist on a silicon wafer and casting PDMS onto the wafer to create the bottom layer having the 50 x 200 array of triangular microwells. *Id.* Similarly, a POSA would have found it obvious and expeditious to fabricate the layer containing the main channel by molding it to a patterned silicon wafer. *Id.*

These microfabrication techniques would have been well known to a POSA, as evidenced, for example, by Dimov's use of them to construct microfluidic devices for trapping and analyzing cells. *See supra* Section IX.A.1.a); Ex. 1002, ¶136. A POSA's knowledge of these microfabrication techniques is also evidenced by Han et al.'s use of them to construct a microwell device very similar to Park's. Ex. 1009 at 2849-50 (disclosing that "[t]he device was fabricated by following standard photolithography and micromolding procedures," whereby "photoresist was patterned onto a 4 inch silicon wafer to form a master," "[l]iquid PDMS prepolymer solution was poured onto the master, cured at 70 ºC for 1.5 h, and then peeled off the master, producing the final replica with the microstructures"); Ex. 1002 at ¶137. Given that such microfabrication techniques are "standard photolithography and micromolding

procedures," Ex. 1009 at 2849, a POSA would have had a reasonable expectation

of success in using them to fabricate the Park device. Ex. 1002, ¶138.

Park discloses that, in operation, a "cell suspension enters the microchip,

flows through the channel, and cells settle into the microwells," Ex. 1006. at 265,

where they "are caught," as shown in Fig. 1a below. *Id.* at 264.



"As a typical cell flows through a microchannel, it will gradually settle toward

the bottom surface due to gravity (Fig. 1a)." *Id.* at 265. Park explains that

"[d]epending on the velocity of the cell and its position relative to the micro-

wells, a cell may approach a threshold slow speed at which point gravity shifts

the cell into a lower streamline that leads into a recirculation zone in the

microwell." *Id.* Park further explains that "[r]ecirculation is a unique flow

phenomenon that effectively captures and traps particles in this zone." *Id.; see

also id.* at Ex. 266 (describing an experiment that "proved the existence of

- 49 -

recirculation flow, helping to trap cells as illustrated in Figs. 1a and 2b").

Ex. 1002, ¶¶139-140.

Park depicts recirculation flow lines inside a triangular microwell in

Fig. 2b, which is reproduced in part below:



*Id.* at 266 (explaining that "the triangular microwell has the most efficient profile

(strong recirculation) of streamlines for trapping a cell"). Ex. 1002, ¶141.

Park describes testing in the triangular microwells of "the effect of

recirculation of the flow by using commercial latex beads" and reports that "the

trapped beads at the downstream part of the triangular microwells moved slowly

to the upstream corner (Fig. 2c), and this proved the existence of recirculation

flow, helping to trap cells as illustrated in Figs. 1a and 2b." *Id.* Shown below is

Fig. 2c.



*Id.* "However," Park notes, "cells are stick[i]er than beads and thus some cells did not show such movements in our experiments." *Id.* at 266. Ex. 1002, ¶142.

Park teaches that "[t]he system design is such that after a cell suspension is flown across the microarray, the user can easily flush the system with either cell culture media or phosphate buffer saline (PBS) at 0.18 ml/h to remove excess cells." *Id.* at 268. "This is fast enough to wash away untrapped cells," Park discloses, "but slow enough to not dislodge trapped cells." *Id.* In other words, the trapped cells are maintained in the triangular microwells even as additional fluids are flushed through the system. Ex. 1002, 143.

Given Patent Owner's construction of a "retaining position" as "[a] location in the chamber at which a cell is maintained during cell culture and media exchange," as discussed above, *see supra* Section *VIII*, the location in a triangular microwell where a cell is maintained, e.g., because of a "recirculation

zone," while fluid is being flushed through the system constitutes a "retaining position." Ex. 1002, ¶144.

Park discloses that its "device does not kill or damage the cells during the trapping process," Ex. 1006 at 266 (discussing flow velocities and shear stresses and reporting the use of a flow rate in a range that "was safe from harmful shear stress effect"), or thereafter. *Id.* at 267 ("After 2 days of culture, single or multiple cells (DsRed-transfected PC3 cells) were observed in microwells, showing the well space is large enough for cell growth and division."). Ex. 1002, ¶¶145-146.

Accordingly, Park discloses "retaining the cell at a retaining position within an individual chamber of a microfabricated device," both alone and in combination with the knowledge of a POSA.

> **b) [1B] "perfusing the cell with a perfusion fluid by flowing the perfusion fluid into the individual chamber through an inlet and out of the chamber through an outlet"**

Park discloses that "[t]he system design is such that after a cell suspension is flown across the microarray, the user can easily flush the system with either cell culture media or a phosphate buffer saline (PBS) at 0.18 ml/h to remove excess cells" with a flow "slow enough to not dislodge trapped cells" from the triangular microwells. Ex. 1006 at 268; Ex. 1002, ¶147.

Moreover, Park discloses that flowing fluid through the microarray causes the fluid to enter and exit the triangular microwells, as depicted in Fig. 1b, excerpted in part below:



Ex. 1006 at 266; Ex. 1002, ¶148. Because Patent Owner's construction of the claims does not require the inlet and the outlet of a chamber to be different openings, *see supra* Section VIII, the mouth of a triangular microwell simultaneously counts as both an inlet and an outlet under Patent Owner's construction, and a fluid that enters and exits a triangular microwell as shown in Fig. 1b of Park flows into the microwell through an inlet and out of the microwell through an outlet under Patent Owner's construction. *Id.*

Park's disclosure of using "culture media" to flush the system indicates that the flushing is not just to remove excess cells, but also for purposes of

delivering nutrients, for example, and as a necessary byproduct, removing waste, from the triangular microwells. *Id.*, ¶149.

Accordingly, Park's disclosure of flushing the system with either cell culture media or PBS slow enough not to dislodge trapped cells from the triangular microwells, Ex. 1006 at 268, is disclosure of perfusing the trapped cells with a perfusion fluid (culture media or PBS) by flowing the perfusion fluid into the individual chamber through an inlet and out of the chamber through an outlet. Ex. 1002, ¶149.

Moreover, given that Park discloses using its microfluidic device to culture cells in the triangular microwells, *see, e.g., infra* Section VIII.D.1.d), a POSA would have found it obvious—to the extent not already at least implicitly described via the disclosure of culturing—to likewise perfuse trapped cells with perfusion fluid, even after excess cells have been removed, by flushing Park's device with culture media so as to refresh the culture fluid in the microwells, keeping the trapped cells alive and/or promoting cell growth. Ex. 1002, ¶151.

c) **[1C] "wherein the outlet is positioned such that gravitational forces acting on the cell to keep it at or near the retaining position exceed hydrodynamic forces acting on the cell to move it toward the outlet;"**

As discussed above, Park discloses a microfluidic device with a triangular microwell structure into which a cell falls, via gravity, to a retaining position

where it is maintained, e.g., because of a "recirculation zone," despite fluid being flushed through the device. *See supra* Section VIII.D.1.a).

In the retaining position in the triangular microwell, the cell continues to be subject to gravitational forces, which keep it at or near the retaining position. Ex. 1002, ¶153. The triangular microwell is open and the cell inside is not mechanically restrained from exiting through the outlet of the microwell by some physical structure, such as a sieve. *Id.*, ¶154.

Because the cell does not exit the triangular microwell through the open mouth of the microwell, which is both the inlet and the outlet of the chamber according to Patent Owner's claim construction, the gravitational forces acting on the cell to keep it at or near the retaining position necessarily exceed any hydrodynamic forces acting on the cell to move it toward the outlet, and the outlet is necessarily positioned to result in the same. *Id.*, ¶155.

> d) **[1D] "culturing the cell within the chamber and monitoring a response in the chamber"**

Park discloses culturing a cell within a triangular microwell—a chamber under Patent Owner's construction—of its microfluidic device.

As discussed above, Park describes its method of cell trapping as advantageous because "cell culture is possible due to the ample space of the microwells," Ex. 1006 at 268, and discloses perfusing trapped cells with "culture media." *See supra* Section VIII.D.1.b). Ex. 1002, ¶¶156-157.

Park also reports data showing that "[a]fter 2 days of culture, single or multiple cells (DsRed-transfected PC3 cells) were observed in microwells, showing the well space is large enough for cell growth and division," *id.* at 267, referring to the images shown in Fig. 3c below:



*Id.*; *see also id.* at 268 ("The methodology introduced in this article will lead to an effective and high-throughput cell-trapping device for screening that requires single cell capture and culture."). Ex. 1002, ¶158.

Park teaches that its microwells "provide enough room for cell growth and division" *id.* at 264, "allowing investigation of both long-term cell responses and instantaneous cell reactions." *Id.* at 268 (citing Fig. 3c). Moreover, Park describes monitoring the specific response of "cell spreading and proliferation" in the study of PC3 cells by taking "fluorescent images . . . using an inverted fluorescence microscope (Eclipse TE300, Nikon, Tokyo, Japan)" of the

triangular microwells, resulting in the images of Fig. 3c. *Id.* at 265. Thus, Park not only discloses culturing the cell within the chamber, but also monitoring a response in the chamber—e.g., long-term cell responses and instantaneous cell reactions, including cell spreading and proliferation. Ex. 1002, ¶159.

      e)    **[1E] "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step."**

As discussed above, Park discloses culturing cells and monitoring responses in the triangular microwells. *See supra* Section VIII.D.1.d). It would have been obvious to a POSA to make use of this monitoring by selectively removing one or more cells from an individual microwell based on a response—e.g., a long-term cell response or an instantaneous cell reaction—observed through such monitoring. Ex. 1002, ¶160.

A POSA would have found it obvious to construct the device of Park in a known way that would permit the top layer of the device to be removed or peeled back so a microwell could be accessed directly by micropipette. *Id.*, ¶161.

As discussed above, Park describes a device with two layers, a "bottom layer" comprising an array of triangular microwells, and a top layer with a main channel that "fits over the microwell array to allow cell solution [to] flow across the array." Ex. 1006 at 265. Park does not disclose what materials these layers are made from, but it would have been obvious to a POSA to make such layers from PDMS, for example, using standard microfabrication techniques known in

that art at the time, as evidenced by Dimov and Han. *See supra* Section

VIII.D.1.a). Ex. 1002, ¶162.

Park does not state that the two layers of its device are bonded together.

Rather, it simply states that the top layer "fits over" the bottom layer, suggesting

that the top layer may actually be removable. Ex. 1002, ¶163. But even assuming

the top layer is not removable, a POSA would have found it obvious to construct

the device so that it would be removable or to partially bond the top layer to the

bottom layer so the top layer could be peeled back to expose the microwell array.

*Id.*, 164.

This technique was known in the art, as evidenced, for example, by Han.

Like Park, Han discloses a device that includes "a microchannel in the upper

layer and a microwell array in the lower layer," Ex. 1009 at 2849, and Han only

partially bonded the two layers so the top layer could be lifted to directly remove

cells from the microwells. *See supra* Section VIII.B. A POSA would have found

it obvious to adapt this same, known concept to the device of Park so as to permit

direct access to individual trenches by micropipette. Ex. 1002, ¶¶164-165.

Given the simple and straightforward nature of the above methods, and a

POSA's familiarity with the use of a micropipette, a POSA would have had a

reasonable expectation of success in only partially bonding—or leaving

unbonded—the two PDMS layers, peeling back the top layer, and aspirating one

or more cells from a triangular microwell in the Park device using a micropipette.

*Id.*, ¶166.

### 2. Claim 11 is rendered obvious by Park plus the knowledge of a POSA.

Claim 11 depends from claim 1, which is rendered obvious by Park plus the knowledge of a POSA, as discussed above. *See supra* Section VIII.D.1. Because Park discloses cell culture media and PBS as perfusion fluids, *see supra* Section VIII.D.1.b), Park discloses the method of claim 1, wherein the perfusion fluid comprises a cell culture medium or a buffer. Ex. 1002, ¶167.

### 3. Claim 16 is rendered obvious by Park plus the knowledge of a POSA.

Claim 16 recites "[t]he method of claim 1, further comprising tracking the progeny of the cell." Claim 1 is rendered obvious by Park plus the knowledge of a POSA, as discussed above. *See supra* Section VIII.D.1.

Park further discloses tracking the progeny of the cell, under Patent Owner's reading of the claims, when it describes loading microwells with individual cells, imaging cells in microwells "[a]fter 2 days of culture," and observing "single or multiple cells . . . in microwells, showing the well space is large enough for cell growth ***and division***." Ex. 1006 at 267. Park also discloses that "[s]ingle cell manipulation using microwells also enables observation of the direct descendants of single cells cultured under controlled biological conditions." *Id.* at 263. Ex. 1002, ¶¶168-169.

### 4. Claim 24 is rendered obvious by Park plus the knowledge of a POSA.

Claim 24 depends from claim 1, which is rendered obvious by Park plus the knowledge of a POSA, as discussed above. *See supra* Section VIII.D.1.

Park discloses equilateral triangular microwells each having a "side length dimension of 50 μm with depth of 20 μm." Ex. 1006 at 265; *id.* at 264 (Fig. 1c). Thus, each triangular microwell has a volume of 21,650 μm$^3$, which equals 0.02165 nanoliters (nL). Ex. 1002, ¶¶170-171, 173.

Park also discloses 50 μm x 50 μm square microwells that are 20 μm deep and therefore have volumes of 50,000 μm$^3$, Ex. 1006 at 264 (Fig. 1a, Fig 1c), which equals 0.05 nL. Ex. 1002, 172.

Thus, Park discloses the method of claim 1, wherein the chamber has a volume of less than about 10 nL.

### 5. Claim 26 is rendered obvious by Park plus the knowledge of a POSA.

Claim 26 depends from claim 1, which is rendered obvious by Park plus the knowledge of a POSA, as discussed above. *See supra* Section VIII.D.1.

Park discloses imaging cells in the triangular microwells, as discussed above. *See supra* Section VIII.D.1.d); *see also* Ex. 1006 at 265 ("To show cell spreading and proliferation, fluorescent images were taken by using an inverted fluorescence microscope); *id.* at 267 ("In each experiment, images (~100 micro-wells in each image) were taken at three random locations in the microchannels

(see Fig. 3b)" and "[a]mong the microwells with cells, 5.7% were occupied by two cells and less then 0.2% were occupied by three cells."). Ex. 1002, ¶¶174-176.

Thus, Park discloses imaging the chamber to obtain an image of the chamber comprising the cell, as required by claim 26.

### 6. Claim 27 is rendered obvious by Park plus the knowledge of a POSA.

Claim 27 depends from claim 26 which is rendered obvious by Park plus the knowledge of a POSA, as discussed above. *See supra* Section VIII.D.6. Park discloses analyzing images of the microwells to determine whether there was "cell spreading and proliferation," *id.* (quoting Ex. 1006 at 265 and citing *id.* at 267 (Fig. 3c)), which is a cellular response. Ex. 1002, ¶177.

### 7. Claim 30 is rendered obvious by Park plus the knowledge of a POSA.

Claim 30 depends from claim 1, which is rendered obvious by Park plus the knowledge of a POSA, as discussed above. *See supra* Section VIII.D.1. Park discloses determining whether there has been cell spreading and proliferation in a microwell using DsRed, Ex. 1006 at 267, which is well known in the art as a fluorescent reporter protein. Ex. 1024; Ex. 1002, ¶178. Thus, Park discloses the method of claim 1, wherein the cellular response is determined using a fluorescent reporter.

**E.    GROUND 5: Claims 1, 11, 16, 24, 26, 27, 30 are obvious over Park in view of Kovac and the knowledge of a POSA.**

Claims 1, 11, 16, 24, 26, 27, and 30 are rendered obvious by Park in view of the knowledge of the POSA, as discussed above. *See supra* Section VIII.D. If the combination of Park and the knowledge of a POSA had not disclosed the step of "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step," these claims would have been rendered obvious by Park in view of Kovac plus the knowledge of the POSA. Ex. 1002, ¶179.

A POSA would have been motivated to add the "selective levitation" technique of Kovac, as described in Section VIII.C above, to the methods disclosed in Park. Specifically, in connection with the microwell monitoring expressly disclosed by Park, a POSA would have been motivated by Kovac to inspect the microwells of the Park device "using any desired microscopy technique (brightfield, DIC, fluorescence, etc.)," Ex. 1007 at 9322, and then focus an infrared (IR) laser beam onto target cells from below, as described in Kovac, levitating the cells into the flow field with the optical scattering force." *Id.*; Ex. 1002, ¶180.

A POSA would have either inspected the microwells from below to identify target cells, as Park disclosed for monitoring cell spreading and proliferation "using an inverted fluorescence microscope," Ex. 1006 at 265, or

would have inspected the microwells from above through the top layer of the Park device. Ex. 1002, ¶181. A POSA would have found it obvious to use a transparent or semi-transparent material, such PDMS, to construct the top layer of the Park device so as to permit visual observation of microwells from above. *Id.*, ¶181.

A POSA would have readily recognized that after levitating a cell of interest from a microwell in the Park device, the levitated cell could then be flowed down the "main channel" to the existing "outlet," "which is connected to a pulling syringe pump" to evacuate the cell from the device. Ex. 1006 at 264. *Id.*, ¶181.

Kovac discloses selectively levitating cells out of microwells "30-μm in diameter and 35-μm in depth." Ex. 1007 at 9326. Park discloses triangular microwells having a comparable "side length dimension of 50 μm with depth of 20 μm." Ex. 1006 at 266. Moreover, Kovac discloses that experimental results confirmed that the selective levitation technique yielded the "expected viability given our optical parameters," and that "[c]ell retrieval from the device requires a simple pipetting step, which is standard lab practice and unlikely to damage cells." Ex. 1007 at 9327-28. Accordingly, a POSA would have had a reasonable expectation of success in combining Park and Kovac in view of the knowledge of a POSA, as described above.

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

BERKELEY LIGHTS, INC.,
Petitioner,

v.

THE UNIVERSITY OF BRITISH COLUMBIA,
Patent Owner.

---

Case IPR2021-01249
U.S. Patent No. 10,087,408

---

**Patent Owner's Response
to Petition for *Inter Partes* Review
of U.S. Patent No. 10,087,408**

step" fails.[2]  (Pet., 29 (citing *Kennametal, Inc. v. Ingersoll Cutting Tool, Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015)).)  Moreover, as the Board recognized (Decision, 17), the Federal Circuit has explained that *Kennametal* does not permit the Board to fill in missing limitations as Petitioner proposes.  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 851 F.3d 1270, 1274-75 (Fed. Cir. 2017).

As the Board recognized, and for the reasons given above as to claim 1, Petitioner has not shown that Dimov anticipates claims 6, 11, 19, 24, 26, 27, and 30. (Decision, 20.)

### B.  Ground 2:  Petitioner Fails to Show Obviousness over Dimov

Recognizing the inability to establish that Dimov disclosed a device for selective cell recovery, Petitioner asserts that, "[i]f Dimov had not disclosed the step

---

[2] Petitioner argues that a POSA reading Dimov's discussion of monitoring a response in the chamber "would have at once envisaged basing the removal of the cell on the response in the monitoring step." (Pet., 29.) But none of these disclosures or examples disclose or even mention removing cells from the device, let alone the selective recovery of cells or clonal populations based on a monitored response. (*See* Ex. 1003, 8:8-10, 14:1-15:26; Ex. 2012, ¶¶59-68; Ex. 2010, 186:22-187:2 (Dr. Meinhart agreeing that "the monitoring of the cells occurs in the trenches" of Dimov).)

10

of 'selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step,' these claims would have been obvious over Dimov in view of the knowledge of a POSA." (Pet., 34-35.) One of the most important aspects of the "motivation" analysis is to define the "problem facing those skilled in the art at the time the invention was made," which "is not [limited to] the specific problem solved by the invention." *InSite Vision, Inc. v. Sandoz, Inc*., 783 F.3d 853, 859 (Fed. Cir. 2015) ("Defining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness."). Instead, "[w]hether a [POSA] would narrow the research focus to lead to the invention depends on the facts." *Id.* at 860.

Petitioner does not establish, however, that a POSA would have started with Dimov in the first place if selective cell recovery was a desired function of the microfluidic device (which also is not established by Petitioner). *See, e.g.*, *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011) ("[O]bviousness requires the additional showing that a [POSA] would have **selected** and combined those prior art elements ***in the normal course of research and development*** to yield the claimed invention.") (emphasis added). As explained in Section III.A above, Dimov's "lab on a chip" device was not designed for selective cell recovery, but rather to capture cells in its chambers and retain them there for further analysis, and there is no mechanism by which a cell could be recovered. (Ex. 1003, 7:30-37;

Ex. 2012, ¶¶23-37, 70-81; Ex. 2010, 159:2-160:22.) Petitioner argues that Dimov's "trench monitoring" would have provided a POSA the motivation to modify the device to allow for selective cell recovery. (Pet., 35-36.) As Dr. Meinhart recognized, however, Dimov (as a "lab on a chip" device) performed its cell monitoring within the chambers of the device. (Ex. 2010, 159:2-160:22.) A POSA would not have been motivated to attempt to modify the Dimov device, as Petitioner asserts, when it was designed to conduct cell monitoring and analysis within the device, and reported doing so successfully without a suggestion that any cells should be recovered for further or subsequent analysis. (Ex. 2012, ¶¶75-80.) Had a POSA been generally motivated to solve the problem of selective cell recovery based on a monitoring step (which Petitioner has not established), there would have been no specific motivation to use Dimov as a starting point. (Ex. 2012, ¶¶71-81.)

Further, because Dimov's "lab on a chip" device did not allow for external access to the trenches, Petitioner argues that a POSA would have disassembled the device and redesigned it to allow access to the individual chambers and then use a micropipette to extract cells. (Pet., 36-38.) As the Board recognized, nothing in Dimov teaches or suggests using a micropipette to selectively recover cells from the chambers. Nor does it teach or suggest a top layer of the device that can be peeled back, as Petitioner proposes. And Petitioner has not "demonstrated persuasively that one of ordinary skill in the art would have been motivated to make the proposed

expectation of success selectively recovering cells from the Dimov device using Kovac's technique. (Ex. 2012, ¶¶87-129.)

### 1. A POSA Focused on Solving the Problem of Selective Cell Recovery Would Not Have Started with Dimov

As Dr. Meinhart explained at his deposition, Petitioner's obviousness analysis for Ground 3 assumes that a POSA "would want to selectively recover cells" (Ex. 2010, 31:16-32:23), which he identified as one of the many problems in the area of microfluidic devices for the POSA to solve (*see id.*, 37:24-38:4). Dr. Meinhart stated that "[t]here could be many problems" that a POSA would be looking to solve. (*Id.*; *see also* Ex. 2010, 38:13-40:20 ("There are many, many problems that relate to this particular technology, right. Some are – you're trying to answer questions. Others you're trying to implement the device. So, many problems.") Neither Petitioner nor Dr. Meinhart, however, establish why a POSA would have focused on selective cell recovery over these many other problems (especially if a POSA had started with the Dimov device). *See, e.g.*, *InSite*, 783 F.3d at 859-60 ("Defining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness."). Indeed, Dimov provides no motivation for a POSA to have made modifications to selectively recover cells from the described device, as discussed in Section III.B above. (Ex. 2012, ¶¶88-90.)

Even if Petitioner had established that a POSA would have been focused on the selective recovery of cells from microfluidic devices among these many other problems (which it has not), there would have been no reason for a POSA to have then started with the Dimov device. *See, e.g.*, *Unigene*, 655 F.3d at 1360. In the attempt to support its argument that Dimov is a starting place for a POSA seeking to selectively recover cells from a microfluidic device, Petitioner again cites the mention of "removing particles" from the chambers in column 11 of Dimov. (Pet., 44.) As explained in Sections III.A above, however, Dimov's "lab on a chip" device was not designed for selective cell recovery, but rather to capture cells in its chambers and **keep them there** for experimentation and analysis. (Ex. 1003, 7:30-37; Ex. 2012, ¶¶23-37, 87-90; Ex. 2010, 159:2-160:22.).) While column 11 of Dimov discusses the possibility of using various techniques to move particles "within the trench" or remove particles "out of the trench" (Ex. 1003, 11:21-43), Dr. Meinhart agreed that Dimov does not provide "any specific examples" where a cell was selectively recovered from the device (Ex. 2010, 184:3-9). Further, as Dr. Meinhart explained, the mention of "removal" in column 11 of Dimov is "within the discussion of . . . biomimetic experiments." (Ex. 2010, 206:12-18; Ex. 1003, 11:1-15.) As described in Dimov, these "biomimetic experiments" are efforts to generate 3D structures of cells to mimic *in vivo* conditions of cellular activities, which are conducted in the trenches of the device (designed for this purposes). (Ex. 2010,

206:12-18; Ex. 1003, 11:1-15; Ex. 2012, ¶¶35-37, 109-114; *see also id.*, ¶¶115-118.) As seen in Figure 21 of Dimov, these types of "biomimetic experiments" require the layering of different types of cells on top of one another. (Ex. 2010, 206:12-18; Ex. 1003, 11:1-15, Fig. 21; *see also* Ex. 2012, ¶¶111-123.)

As discussed in Section III.A above, Petitioner's reliance on the word "removal" in this portion of Dimov is misplaced as Dimov clarifies that the focus is on what is retained in the trench, not on what is discarded. Given the focus throughout Dimov on retaining cells in the chamber for analysis, and the context provided for column 11 regarding biomimetic experiments, a POSA would have understood Dimov's discussion of moving particles "within the trench" or removing particles "out of the trench" to be describing a potential method of adjusting layers of cells in the chamber for the biomimetic experiments, not selective recovery of individual cells of interest. (Ex. 2012, ¶¶112-118; Ex. 1003, 11:1-29.) For example, cells placed in layers for the biomimetic experiments may have needed to be rearranged because they were out of place, or because the researchers wanted a new arrangement for additional experiments. (*See* Ex. 2012, ¶¶112-118.)

The common waste and output described in Dimov would have only confirmed a POSA's understanding that the device was not an appropriate starting place for selective cell recovery. Specifically, as seen in Figure 2, Dimov describes multiplex devices as having hundreds of individual capture chambers that all "share

a common waste," which Dimov describes as an "advantage." (Ex. 1003, 4:18-20

("Where a plurality of arrays are provided along a common axis, they may

***advantageously*** be configured so as to ***share a common waste***.") (emphasis added);

Ex. 2012, ¶¶63, 92-99.)[4] As Dr. Meinhart agreed, this common waste was the only

output described in Dimov. (Ex. 2010, 179:13-23). As the name implies, however,

this "common waste" was the collection point for all the discarded materials from

the various experiments conducted in the various chambers of the device. (Ex. 2012,

¶¶98-99; Ex. 1003, 4:15-22.) A POSA would not have understood Dimov's

"common waste" to be a viable location for selective cell recovery.

Additional discussions in Dimov of the uses of its device further confirm it is

not designed for selective cell recovery. For example, Dimov contemplates

exposing cells to a lysis agent in the chamber so that they burst and "their contents

may be released." (Ex. 1003, 7:37-41; *see also id.*, 8:6-9.) No cells could be

recovered from such experiments because the cells would be "opened up and its

---

[4] While Dr. Meinhart attempted to reinterpret this portion of Dimov to mean only

that sharing a common waste "[m]ay be an advantage" (Ex. 2010, 178:9-179:7), he

agreed that Dimov did not describe any other output configuration to be an advantage

(*id.*, 179:13-23).

contents are out" (Ex. 2010, 173:21-174:5), and such an experiment using a lysis agent anywhere in the multiplex Dimov device of hundreds of chambers would have prevented such recovery because all chambers share a common waste and "that lysing agent will most likely show up in the outlet" as Dr. Meinhart agreed (Ex. 2010, 173:1-20; *see also* Ex. 2012, ¶63; Ex. 1003, FIG. 1; 4:1-22.)[5]

Petitioner also points to "trench monitoring" again as a reason a POSA would have started with Dimov to selectively recover cells. (Pet., 43; *see also* Ex. 1002, ¶128 ("[I]n connection with the trench monitoring expressly disclosed in Dimov, a POSA would have been motivated by Kovac to inspect the trenches."); Ex. 2010, 186:8-12, 18-21 (discussing "monitoring of cells in Dimov as one of the reasons for

---

[5] As Dr. Meinhart agreed, Dimov's multiplex device was designed with a variety of arrays so many analyses could be conducted in various sequences. (Ex. 2010, 163:8-23; *see also* Ex. 1003, 1:30-36, 4:50-61 ("[B]y providing a plurality of difference devices coupled to the same input that each of the device serves to replicate the process being conducted in the other devices of the array. . . . Two or more separate arrays can be loaded concurrently with the same or different materials — be that particles within a fluid or particles directly — such that each array either replicates the process of the other or is operable to conduct a different process concurrently with that of the other.").)

the motivation" to combine Dimov with Kovac to selectively recover a cell).)  But Petitioner overlooks that even subsequent monitoring, as well as subsequent experiments, occur within the trench.  (*See* Ex. 1003, 8:8-10, 14:1-15:26; Ex. 2012, ¶¶24-37, 58-69, 79-80, 89-90; Ex. 2010, 186:22-187:2 (Dr. Meinhart agreeing that "the monitoring of the cells occurs in the trenches" of Dimov).)

Given the design of the Dimov device discussed above in this Section, Dimov's discussion of monitoring cells within the trenches would not have motivated a POSA seeking to selectively recover cells from a microfluidic device to start with Dimov.  (Ex. 2012, ¶¶80, 87-118.)

Petitioner and Dr. Meinhart also attempt to rely on Kovac's discussion of cell recovery to support a POSA's motivation to start with Dimov for selective cell recovery.  (*See* Pet, 41; *see also* Ex. 1002, ¶122.)  But without first establishing a motivation to start with Dimov for selective cell recovery, using Kovac to provide this motivation is hindsight.[6]  Indeed, despite Dr. Meinhart's reliance on Kovac's discussion of "[t]he need to isolate small numbers of specific cells from background populations" being "ubiquitous" (Ex. 1002, ¶122), the Dimov device was simply not

---

[6] Dr. Meinhart agreed at the deposition that he was not providing an opinion that the challenged claims of the '408 patent were "obvious over Kovac alone" (Ex. 2010, 16:9-19), or "obvious over Kovac in view of Dimov" (*id*., 17:4-9).

POSA would have been motivated to use the laser technique discussed in Kovac to selectively recover cells from the Park device. (*See* Pet, 62-63.) As explained in more detail below, however, Petitioner failed to establish that a POSA would have: (1) been motivated to solve the problem of selective cell recovery, much less starting with the Park device; (2) been motivated to combine Park with Kovac for selective cell recovery; or (3) had a reasonable expectation of success selectively recovering cells from the Park device using Kovac's technique.

### 1.   A POSA Focused on Solving the Problem of Selective Cell Recovery Would Not Have Started with Park

As explained in Section III.C.1 above, Petitioner's obviousness analysis assumes that a POSA "would want to selectively recover cells." (Ex. 2010, 31:16-32:23.)[12] Even if Petitioner had established that a POSA would have been focused on the problem of selective recovery of cells from microfluidic devices (which it has not), there would have been no reason for a POSA to have started with the Park device. *See, e.g.*, *InSite*, 783 F.3d at 859-60 ("Defining the problem in terms of its

---

[12] As explained in footnote 3 above, Petitioner and Dr. Meinhart do not establish why a POSA would have focused on selective cell recovery over the "many, many problems that relate to this particular technology" (Ex. 2010, 37:24-38:4, 38:13-40:20), especially if a POSA had started with the Park device.

solution reveals improper hindsight in the selection of the prior art relevant to obviousness."); *see also Unigene*, 655 F.3d at 1360 ("[O]bviousness requires the additional showing that a [POSA] would have **selected** and combined those prior art elements **in the normal course of research and development** to yield the claimed invention.") (empahsis added). Indeed, Park provides no motivation for a POSA to have made modifications to selectively recover cells from the described device, as discussed in Section IV.A above. (*See* Ex. 2012, ¶¶139-144, 145-159.)

In attempting to support its argument that Park would have been a starting place for a POSA seeking to selectively recover cells from a microfluidic device, Petitioner again references the "microwell monitoring expressly disclosed by Park." (Pet., 62; *see also* Ex. 2010, 145:18-25 (Dr. Meinhart asserting that the motivation to modify Park is "because Park discusses monitoring")). As Dr. Gale explains, however, the monitoring described in Park was to monitor cell growth and performed within the microwells of the device (*see* Ex. 1006, 267, Fig. 3c), and a POSA would not have been motivated to attempt to modify the Park device to recover cells when the device was designed to **trap** cells for culturing **within** the microwells of the device. (Ex. 2012, ¶¶139-144; *see also id.*, ¶¶41-46, 145-159.)

The design of the device described in Park would have added to a POSA's understanding that the device was not an appropriate starting place for selective cell recovery. As explained in Section IV.A above, Park was designed as a closed system

having a single inlet and outlet. As seen in Figure 1b, Park explains that the single outlet "is connected to a pulling syringe pump," which is what generates flow through the device. (Ex. 1006, 264-7; *see also* Ex. 2010, 142:6-8, 19-23.) As such, there was no way for a POSA to access the culturing cells without first disassembling the device and losing the flow through the device, which would allow any cells to end up back in the device (Ex 2012, ¶¶44, 151-159). *Cook Grp., Inc. v. Boston Sci. Scimed, Inc*., 809 Fed. App'x. 990 (Fed. Cir. 2020) (finding the Board "properly weighed the loss of key functions as a relevant factor in the motivation to combine analysis" when rejecting obviousness).

Petitioner and Dr. Meinhart also attempt to rely on Kovac's discussion of cell recovery to support a POSA's motivation to start with the Park device. (*See* Pet., 62; *see also* Ex. 1002, ¶180 ("A POSA would have been motivated to add the 'selective levitation' technique of Kovac, as described in Section IX, above, to the methods disclosed in Park."); Ex. 2010, 144:16-145:15 (agreeing that the reference to "Section IX" in paragraph 180 of his declaration was only referencing his description of Kovac).) But without first establishing a motivation to start with Park

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

BERKELEY LIGHTS, INC.,

Petitioner,

v.

THE UNIVERSITY OF BRITISH COLUMBIA,

Patent Owner.

————————————

IPR2021-01249
U.S. Patent No. 10,087,408

————————————

## REPLY IN SUPPORT OF PETITION FOR INTER-PARTES REVIEW OF U.S. PATENT NO. 10,087,408

Mail Stop: PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

11110721

to form co-cultures, Ex. 1003 at 11:10-18, and Patent Owner states that the "'biomimetic experiments' require the layering of different types of **cells** on top of one another." POR 19. Patent Owner also states that "a POSA would have understood Dimov's discussion of moving particles 'within the trench' or removing particles 'out of the trench' to be describing a potential method of adjusting layers of **cells** in the chamber for the biomimetic experiments." *Id.* Thus, even under Patent Owner's interpretation, Dimov discloses selectively recovering cells out of a trench/chamber. Ex. 1039, ¶18-20.

Contrary to Patent Owner's additional scattershot arguments about ways Dimov allegedly is inconsistent with selectively recovering cells:

- Capturing and retaining cells in a trench for analysis and experimentation is in no way inconsistent with **subsequently** removing such cells from the trench. Ex. 1039, ¶¶21-30; Ex. 1002, ¶92.

- Dimov does not teach that every one of its devices must include a lysis experiment, Ex. 1039, ¶¶49-51, and Patent Owner admits that "[t]here are some applications in Dimov that don't require lysis." Ex. 1038, 56:2-5; *see also* 55:15-20.

- Dimov nowhere articulates a focus on what is retained in the trench after removing particles, and the claims of the '408 patent do not require any focus on what is selectively recovered. Ex. 1039, ¶¶21-30, ¶¶52-55.

- None of the structural features that Patent Owner identifies in Dimov—including the "common output" and "common waste," which provide convenient outlets for accessing cells—would prevent selective recovery. *Id.*, ¶¶31-48

- Patent Owner fails to show that a POSA would have lacked the knowledge or skill to implement Dimov's removal techniques—including laser tweezers, which was well known in the art. *Id.*, ¶¶11-12.

A POSA would have understood Dimov's reference to selectively recovering particles out of a trench "subsequent to capture of the particles within the trench," Ex. 1003 at 11:29-30, to be disclosing removal after, and based on, the "analysis or experimentation" that Dimov describes as motivating the capturing of the particles in the first place, Ex. 1002, ¶90, including the responses that Dimov describes monitoring in the trench. *Id.*, ¶¶76-84; Ex. 1039, ¶¶25-30. Accordingly, Dimov is anticipatory per Ground 1.

## B. Basing the selective cell recovery disclosed by Dimov on the response in the monitoring step also disclosed by Dimov would have been obvious to a POSA.

At minimum, a desire "to make use of Dimov's individual trench monitoring" would have motivated a POSA to base Dimov's selective recovery "on a response observed through such monitoring." Ex. 1002, ¶108. Although Patent Owner argues that Dimov does not disclose basing its removal or selective recovery step on the

response in its monitoring step, Patent Owner does not dispute that basing the former on the latter would have been obvious to a POSA. Accordingly, the challenged claims are unpatentable per Ground 2. Ex. 1039, ¶¶60-68.

Patent Owner's arguments in response do not withstand scrutiny.

### 1. Obviousness does not require identification of a problem to be solved.

Contending that "Petitioner has failed to establish an appropriate problem facing a POSA," POR 2, Patent Owner asserts that "[o]ne of the most important aspects of the 'motivation' analysis is to define the 'problem facing those skilled in the art at the time the invention was made.'" POR at 11. Patent Owner cites *InSite Vision*, but that case offers no support for its position. A petitioner "does not need to show that there was a known problem with the prior art system in order to articulate the required rational underpinning for [a] proposed combination." *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1003 (Fed. Cir. 2016). "For a technique's use to be obvious, the skilled artisan need only be able to recognize, based on her background knowledge, its potential to improve the device and be able to apply the technique." *Id.*

### 2. The record establishes Dimov as an appropriate starting point for a POSA.

Patent Owner does not dispute that Dimov is relevant prior art. Patent Owner argues that "Petitioner does not establish, however, that a POSA would have started

with Dimov in the first place if selective recovery was a desired function of the microfluidic device." POR 11. Setting aside that Dimov actually teaches selective recovery, a reference need not disclose every element or "desired function" of an obvious combination in order to be a starting point, or primary reference. If it did, then it would be anticipatory. And if a missing claim element disqualified prior art as a primary reference, then patent claims could never be invalid based on combinations of elements from multiple references.

Here, Patent Owner does not dispute that Dimov discloses numerous desired functions of a microfluidic device, including those recited by claim elements [1A]-[1D]. Moreover, Patent Owner admits reasons why a POSA would have started with Dimov—e.g., because Dimov "was designed to conduct cell monitoring and analysis within the device, and reported doing so successfully." POR 12. Patent Owner raises no questions about whether the systems of Dimov worked for their intended purposes. Ex. 1039, ¶¶57-59.

### C.   Constructing Dimov's devices to allow direct access to trenches would have been obvious to a POSA.

Patent Owner attacks Petitioner's additional showing that it would have been obvious to construct Dimov's devices so that the top layer of PDMS could be peeled back to allow direct access to the trenches, which could then be individually

aspirated by micropipette to selectively recover cells inside based on a response in the monitoring step.

Patent Owner argues that "nothing in Dimov teaches or suggests" partial bonding of the top layer or micropipetting. POR 12; *id.* at 14 (stating also that "micropipettes are not even included among the nine possible [removal] methods," though Dimov describes those methods merely as "[e]xamples"). But even if true, it would not make this specific implementation of Dimov's devices nonobvious per Ground 2, which is based on Dimov ***plus the knowledge of a POSA***.

Petitioner showed that such an implementation is one of the ways that a POSA would have known how to address the motivation to selectively recover cells from the device. *See* Ex. 1002, ¶¶106-110; *see infra* Section I.D.1.

Patent Owner nowhere contends that a POSA would not have known how to partially bond the PDMS layers or how to aspirate cells with a micropipette. Both techniques were well known in the art. Ex. 1039, ¶¶69-78. For example, Dimov discloses loading fluids into its devices using pipettes, *see, e.g.,* Ex. 1003, 8:36-40, and the prior art describes "[c]ell retrieval from [a] device" using "a simple pipetting step, which is standard lab practice." Ex. 1007 at 9327-28; *see also* Ex. 1038, 39:7-22.

Patent Owner contends that the Han reference, which further shows that micropipetting and partial bonding were known in the art, is not prior art and is

therefore irrelevant. But Han is probative regardless of its prior art status. In *Yeda Research v. Mylan Pharmaceuticals Inc.*, for example, the patentee argued that the Board erred by finding that a reference, "Khan 2009," that was published after the applicable priority date but reported on a clinical study that began two years before the priority date, was "probative of the fact that those skilled in the art were motivated to investigate dosing regimens of [a drug] with fewer injections to improve patient compliance." 906 F.3d 1031, 1041 (Fed. Cir. 2018). The Federal Circuit found that "the Board's use of Khan 2009 falls squarely within [the] stated purpose of providing evidence of the motivation of a POSITA to explore less frequent dosing regimens as of the priority date." *Id.*

Here, although Han arguably was published after the earliest potential priority date, it reports on a study performed before that date, given that it was "Received 5th May 2010." Ex. 1009 at 2848; *see also* Ex. 1020, Appendix 1009B at 5; Ex. 1039, ¶¶74-76. Han is therefore probative of the fact that those skilled in the art would have been motivated to construct a microfluidic device in a way that allowed the top layer of the device to be peeled back to expose microwells with cells that could be selectively aspirated by micropipette.

> **D.** **A POSA would have found it obvious to combine Dimov and Kovac to arrive at the claimed subject matter.**

>> **1.** **Starting with Dimov would have been appropriate, and a POSA would have been motivated to solve the problem of selective cell recovery.**

The record establishes that Dimov would have been an appropriate starting point for a POSA, as discussed above. *See* Section I.B.2.

Although a patent challenger need not establish a problem to be solved, as also discussed above, the record shows that selective cell recovery was a problem facing a POSA, and that a POSA would have been motivated to selectively recover cells. *See, e.g.,* POR 17 (noting that Dr. Meinhart identified selectively recovering cells "as one of the many problems in the area of microfluidic devices for a POSA to solve"); Ex. 2010 at 31:24-32:23; 37:24-38:4; Ex. 1007 at 9321 (explaining that "[t]he need to isolate small numbers of specific cells from background populations is ubiquitous" and that sorting "can be a tool to analyze the results of an experiment and isolate particularly interesting cells for further investigation"); Ex. 1039, ¶¶80-81.

Even Patent Owner admitted, in a section of its provisional application entitled "Recovery of cells post-culture," that:

> Cell recovery is often required to enable functional assays to be performed on the progeny of the input cells, or to select cells of interest for larger scale culture. A method to recover defined clonal populations is therefore a critical requirement for many applications of microfluidic cultures.

Ex. 1001, 26:1-6; Ex. 1015 at 40 (p 42 of exhibit). Such "applicant admitted prior art" (AAPA) may be used to furnish a motivation to combine. *Qualcomm Inc. v. Apple Inc.*, 24 F.4th 1367, 1369, 1376 (Fed. Cir. 2022).

Patent Owner argues that Petitioner did not "establish why a POSA would have focused on selective cell recovery over [] many other problems" in the area of microfluidic devices. POR 17. But Patent Owner fails to cite any authority requiring such a showing. The Supreme Court has explained that "***any*** need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). There can be many different motivations to combine references to arrive at many different devices and methods with a reasonable expectation of success. A POSA would have pursued all paths from known problems to obvious subject matter. Establishing that a POSA would have focused on any particular problem over other problems is not required.

### 2. A POSA would have been motivated to combine Dimov and Kovac.

Each of Kovac, *see* Ex. 1007 at 9321; Ex. 2010 at 31:16–32:23; and the knowledge in the art, *see* Ex. 1002, ¶126; Ex. 2010 at 37:24-38:4, 39:4-6, 40:16-20; independently establishes a motivation to combine Dimov and Kovac to arrive at the

### 3. A POSA would have had a reasonable expectation of success in combining Dimov and Kovac

Kovac reported selectively recovering cells from microwells while maintaining cell viability,[3] *see* Ex. 1002, ¶131, and expressly contemplated application to microfluidic devices other than its own, *see, e.g.,* Ex. 1007, 9329 (noting that "[m]icrowells need not be arranged in a gridlike fashion" like its microwells), teaching that its "technique generalizes easily to any application where the goal is to position cells in an environment, observe them using microscopy, and later retrieve particular cells." *Id.*

### a) Petitioner was not required to further detail how a POSA would have combined Dimov and Kovac.

Contrary to Patent Owner's suggestions, Petitioner was not required to identify exact optical parameters and a precise exposure time for removing cells from one of Dimov's trenches, and it would be no bar to obviousness if it were

---

[3] Noting Petitioner's point that Park and Kovac describe wells having comparable dimensions, Patent Owner questions whether "the dimensions of the wells in Dimov and Kovac are 'comparable' enough to support reasonable expectation of success" too. POR 46 n.17. Dr. Meinhart explained that "while you are submillimeter [as are both Dimov's and Kovac's wells], they would be comparable as well." Ex. 2010 at 153:10-15; Ex. 1039, ¶102.

difficult to calculate such parameters, a priori, based on theory due to various factors. Ex. 2010, 168:22-171:11.

Moreover, the challenged claims would have been obvious even if a POSA would have had to exercise some creativity to incorporate into Dimov the selective cell recovery described in Kovac. "[T]he fact that it would take some creativity to carry out the combination does not defeat a finding of obviousness." *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1352 (Fed. Cir. 2020).

The challenged claims also would have been obvious even if "depending on the specific device and experimental needs, a POSA would need to experiment to figure out if a cell could be levitated out of a well." POR 28. Patent Owner does not argue that such experimentation would be undue or always required, or that the Kovac technique could never be used to selectively levitate any cells from the devices of Dimov (or Park). To the contrary, Dr. Gale opined on how "a cell or group of cells could be levitated to a height of 300 microns and exit the Dimov capture chamber/trench." Ex. 2012, ¶104. Dr. Gale argued that to do so, either the exposure time or power/strength of the laser would have to increase, and that a POSA "would have been concerned with any resulting damage," Ex. 2012, ¶104, but no such damage would be expected, as discussed above.

## II. Petitioner has established unpatentability based on Park.

Patent Owner does not dispute that Park discloses the preamble and limitations [1A]–[1D], and that if claim 1 is unpatentable based on either of Grounds 4 or 5, then so are claims 11, 16, 24, 26-27, and 30.

### A. The challenged claims are obvious over Park in view of the knowledge of a POSA.

Patent Owner's argument that "Petitioner has not established that the problem to solve was selective cell recovery," POR 33, fails for the reasons discussed above. *See* Section I.B.1.

The argument that Petitioner failed to justify "starting with the device in Park," POR 33, also fails for similar reasons as above. Ex. 1039, ¶¶160-163 Patent Owner does not dispute that Park is relevant prior art or that Park discloses numerous desired functions of a microfluidic device, including claim elements [1A]-[1D]. Patent Owner admits that Park "reports that they observed successful proliferation of trapped cells in their wells," Ex. 2012, ¶46, and raises no questions about whether Park's devices worked for their intended purposes. Patent Owner's argument that a POSA would not have started with Park if Park does not disclose selectively recovering cells fails for the same reasons discussed above. *See* Section I.B.2.

Patent Owner contends that there would have been no motivation to start with Park on the ground that "the design of Park's device did not even allow external access to the chambers." POR 36. But Park nowhere states that such access is

lacking, and it in fact implies the opposite when it discloses that the top layer or cover of its device merely "fits over" the bottom layer, and notes that this "cover is required to create the channel, restricting access to the microwells *during cell seeding*." Ex. 1006 at 265, 268. The qualification "during cell seeding" would have suggested to a POSA that there is, in fact, access to the microwells at times other than during cell seeding. Ex. 1039, ¶¶164-173.

A POSA would have known that this access could be obtained by, for example, displacing the cover and aspirating the cells from a microwell via micropipette, Ex. 1002, ¶¶160-164, like others in the field had done before the priority date, as evidenced by Han.[4] *Id.* ¶165.

Patent Owner does not dispute that Park discloses monitoring a response in a microwell, that removing cells from a microwell based on a monitored response would have been obvious to a POSA, or that a POSA would have had a reasonable expectation of success in micropipetting cells out of a microwell based on a monitored response. Accordingly, the challenged claims are obvious per Ground 4.

### B. The challenged claims are obvious over Park in view of Kovac.

Patent Owner's arguments against Ground 5 parallel those it made against Ground 3 and fail for the same reasons.

---

[4] Han is probative for the same reasons discussed above. *See* Section I.C.

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BERKELEY LIGHTS, INC.,

Petitioner,

v.

THE UNIVERSITY OF BRITISH COLUMBIA,

Patent Owner.

_____

IPR2021-1249

U.S. Patent No. 10,087,408

_____

**PETITIONER'S REQUEST FOR REHEARING**

Mail Stop: PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## **TABLE OF CONTENTS**

**Page**

**I.    INTRODUCTION AND REQUESTED RELIEF**............................ 1

**II.   LEGAL STANDARDS**........................................................................ 2

**III.  BASIS FOR RELIEF REQUESTED** ................................................. 2

     A.    GROUND 2: Claims 1, 6, 11, 19, 24, 26, 27, and 30 are
          rendered obvious by Dimov.......................................................... 2

     B.    GROUND 3: Claims 1, 6, 11, 19, 24, 26, 27, and 30 are
          rendered obvious by Dimov in view of Kovac ........................... 6

     C.    GROUND 4: Claims 1, 11, 16, 24, 26, 27, and 30 are
          rendered obvious by Park............................................................ 12

     D.    GROUND 5: Claims 1, 11, 16, 24, 26, 27, and 30 are
          rendered obvious by Park in view of Kovac.............................. 13

**IV.  CONCLUSION**................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

## Cases

*Apple Inc., et al. v. Uniloc Luxembourg S.A.*,
  IPR2017-00225, Paper 31 (P.T.A.B. Sept. 6, 2018) ................................2

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
  8 F.4th 1331 (Fed. Cir. 2021) ...................................................................11

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
  983 F.3d 1334 (Fed. Cir. 2020) ..................................................................5

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
  821 F.3d 1359 (Fed. Cir. 2016) ................................................................11

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ...............................................................................4, 8

*Qualcomm Inc. v. Apple Inc.*,
  24 F.4th 1367 (Fed. Cir. 2022) ..................................................................8

*Unigene Labs., Inc. v. Apotex, Inc.*,
  655 F.3d 1352 (Fed. Cir. 2011) ................................................................10

*Yeda Research v. Mylan Pharm. Inc.*,
  906 F.3d 1031 (Fed. Cir. 2018) ..................................................................6

## Statutes

37 C.F.R. § 42.71(d) ...........................................................................1, 2

## I. INTRODUCTION AND REQUESTED RELIEF

Petitioner Berkeley Lights, Inc. requests rehearing under 37 C.F.R. § 42.71(d) of the Board's Final Written Decision ("Decision," Paper 38) finding, *inter alia*, that claims 1, 6, 11, 16, 19, 24, 26, 27, and 30 were not shown to be unpatentable by a preponderance of the evidence according to Grounds 2-5.

Using a microfluidic device to isolate, culture, and monitor cells was not new as of the priority date of the '408 patent. This idea is reflected in limitations 1A-1D of claim 1, and as the Decision recognized, it is admitted that Dimov and Park disclose them. Decision at 17-18, 55 (citing Pet. at 13-26; Pet. at 45-57; POR).

Removing a particular cell (or cells) of interest from a microfluidic device (as reflected in Limitation 1E) was also not new. Pet. at 29-30, 36, 41; Reply at 5, 10, 11-12; Ex. 1007 at 9321; Ex. 1002 at ¶¶92-93, ¶¶108-110, ¶¶122-123. In fact, it was a known need in the art—one described as "ubiquitous." Ex. 1007 at 9321 (cited in Decision at 48; Pet. at 41). Selective cell removal was needed to "isolate particularly interesting cells for further investigation." *Id.* With this motivation, a person having ordinary skill in the art ("POSA") would apply known techniques to recover cells from Dimov's and Park's devices, with a reasonable expectation of success.

Because Petitioner's arguments on these issues were misapprehended or overlooked, Petitioner requests that the Board grant rehearing, modify its Decision, and find claims 1, 6, 11, 16, 19, 24, 26, 27, and 30 unpatentable.

## II. LEGAL STANDARDS

A request for rehearing "must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, or a reply." 37 C.F.R. § 42.71(d). The request has the burden of showing that the decision from which rehearing is sought should be modified. *Apple Inc., et al. v. Uniloc Luxembourg S.A.*, IPR2017-00225, Paper 31, at 2 (P.T.A.B. Sept. 6, 2018).

## III. BASIS FOR RELIEF REQUESTED

### A. GROUND 2: Claims 1, 6, 11, 19, 24, 26, 27, and 30 are rendered obvious by Dimov

The Decision misapprehended Petitioner's argument regarding a POSA's motivation to modify Dimov to selectively recover a cell determined to be of interest in the monitoring step. The Decision initially characterized Petitioner's argument correctly: that a POSA's motivation for this modification was "so that they could further investigate cells of interest cultured in the chamber (such as to sequence their DNA or to expand the cells by culturing)." Decision at 25 (citing Pet. at 35-36; Ex. 1002 at ¶¶107-110). But at its conclusion, the Decision characterized Petitioner's argument incorrectly: "Petitioner has not persuasively shown that Dimov's brief mention of cell removal techniques provides sufficient motivation or teachings for a person of ordinary skill in the art to selectively recover cells of interest for further analysis outside the device." Decision at 31.

That difference demonstrates that the Decision misapprehended or overlooked Petitioner's arguments by demanding that Dimov **alone** provide that motivation. Two additional examples further illustrate this error:

> In light of [Dimov's] design, Petitioner has not persuasively shown that a person of ordinary skill in the art would have inferred, from Dimov's brief reference to "removal of the particles out of the trench," a teaching to conduct further analyses outside of the device (such as culturing or sequencing) on cells determined to be of interest based on a prior analysis. (Decision at 30.)

> Nor is Dimov's mention of laser tweezers sufficient to motivate a person of ordinary skill in the art to remove cells from a trench for further analysis outside the device. (Decision at 30-31.)

These statements demonstrate the Decision's misapprehension. Petitioner's Ground 2 "is based on Dimov **plus the knowledge of a POSA**." Reply at 8. There is ample evidence that a POSA would have been motivated to recover a cell from **any** microfluidic device, including Dimov's, regardless of Dimov's specific teachings. Pet. at 29-30, 36 (citing Ex. 1002 at ¶¶92-93, 110); Reply at 5; Ex. 1002 at ¶¶108-110. After using a microfluidic device to run experiments that show one or more cells respond differently than others, a POSA would want to recover them for further investigation (e.g., by sequencing or culturing them) to determine why. Pet. at 36; Ex. 1002 at ¶110.

Dimov's teachings are important, because they inform a POSA that cells trapped in Dimov's trench (Pet. at 26; Ex. 1003 at 7:4-5, 8-9) can be removed using a variety of well-known techniques, including laser tweezers. Pet. at 36 (citing Ex. 1003 at 11:30-40); Reply at 5 (citing Ex. 1039 at ¶¶ 11-12). Thus, a POSA, who is motivated to further investigate cells of interest, would be motivated to use Dimov's techniques to remove them, regardless of whether Dimov *itself* "suggest[s] that the 'particles' to be removed are cells of interest destined for later analysis." Decision at 30. It is thus error to hold that Petitioner has not met its burden because "Petitioner has not persuasively shown that Dimov's brief mention of cell removal techniques provides sufficient motivation . . . ." Decision at 31. That conclusion improperly overlooks the contributions of the knowledge (and pre-existing motivation) of a POSA. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (approving the use of a POSA's background knowledge in determining motivation to combine).

A POSA would also be motivated to—and know how to—modify Dimov's device to recover a cell of interest, even if it were true that "Dimov's device is a 'lab on a chip' designed in general to retain cells while performing multiple experiments." Decision at 29. For example, a POSA who employed Dimov's listed techniques to remove a cell from a trench would know that the cell could be recovered from Dimov's "common output" or "common waste," as they are convenient outlets for accessing cells. Pet. at 44 (citing Ex. 1003 at 3:22-26, FIG.

1; Ex. 1002 at ¶128); Reply at 5 (citing Ex. 1039 at ¶¶31-48). Such a recovery would be selective, because at least some techniques (including laser tweezers) are necessarily directed to individual trenches (maintaining other cells in place). Pet. at 35 (citing Pet. at 28, Ex. 1002 at ¶89). The Decision's finding that "Dimov also does not address the difficulties a person of ordinary skill in the art would face in finding and recovering a cell that has been ejected into Dimov's common waste stream" (Decision at 31) is a misapprehension of this evidence and overlooks a POSA's ability to collect a *single* cell exiting from a device. Pet. at 44 (citing Ex. 1003 at 3:22-26, FIG. 1; Ex. 1002 at ¶128); *KSR*, 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton."); *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1352 (Fed. Cir. 2020) ("[T]he fact that it would take some creativity to carry out the combination does not defeat a finding of obviousness.").

Another method known to a POSA for selective recovery of cells from a microfluidic device was to insert a micropipette into the trench and aspirate one or more cells (Pet. at 36-40), for example, by piercing the top layer of PDMS (which is only 40 microns thick in Dimov's device) with a micropipette. Pet. at 40 (citing Ex. 1002 at ¶120); Pet. at 36-37 (citing Ex. 1003 at 5:37-39; Ex. 1002 at ¶111); Reply at 8 (citing Ex. 1039 at ¶¶69-78; Ex. 1038 at 39:7-22); *see also* Ex. 1038 at 39:18-22 (Dr. Gale admitting "there were times before 2010 where cells were moved around

using micropipettes.") (cited in Ex. 1039 at ¶48; Reply at 5).

The Decision did not address this known, simple technique to achieve selective recovery, instead focusing on an alternative pipetting method: modifying Dimov's two-layer PDMS device "in a way that would permit the top layer of the device to be peeled back so a trench could be accessed directly." Decision at 31-34. Demonstrating that a POSA would have been motivated to do so, Petitioner cited to Han (Ex. 1009), which reported results of studies performed before the priority date. Pet. at 38-40; Reply at 8-9. The Decision discounted Han because it found Han was not prior art. Decision at 32. But the law is clear that non-prior-art publications that report on pre-priority-date work can be evidence of a POSA's motivation. Reply at 9 (citing *Yeda Research v. Mylan Pharm. Inc.*, 906 F.3d 1031, 1041 (Fed. Cir. 2018)). It was legal error for the Decision to discredit this probative evidence of a POSA's motivation to selectively aspirate cells from a device by micropipette.

A POSA would have been motivated to apply known techniques to selectively recover cells of interest from Dimov's device, and would have had a reasonable expectation of success in doing so.

### B.    GROUND 3: Claims 1, 6, 11, 19, 24, 26, 27, and 30 are rendered obvious by Dimov in view of Kovac

It is undisputed that Dimov discloses limitations 1A-1D and that Kovac discloses limitation 1E. Kovac describes the use of "a focused infrared laser to levitate cells of interest from their wells into a flow field for collection." Decision

at 17-18 (citing Pet. at 13-26; POR), 35 (citing Ex. 1007 at 9321)). The disputed

issues in Ground 3 are whether there was a motivation to combine the references to

modify Dimov to include limitation 1E, and whether there would have been a

reasonable expectation of success in doing so. The Decision did not address the

latter, resting instead on the former. Decision at 48, 51 n.15.

As discussed above, a POSA, using Dimov's device to perform any one of a

variety of experiments, would have been motivated to selectively recover a cell of

interest: "so that they could further investigate cells of interest cultured in the

chamber (such as to sequence their DNA or to expand the cells by culturing)."

Decision at 25 (citing Pet. at 35-36; Ex. 1002 at ¶¶ 107-110); Decision at 48; Reply

at 10. Kovac expressly states that POSAs have this motivation:

> The need to isolate small numbers of specific cells from background
> populations **_is ubiquitous_**, with applications in pathology, clinical
> diagnosis, cloning, and cell biology research. In the context of cell
> biology experiments, sorting can be a way to select a desired starting
> population of cells of known characteristics or **_can be a tool to analyze_**
> **_the results of an experiment and isolate particularly interesting cells_**
> **_for further investigation_**.

Ex. 1007 at 9321 (cited in Decision at 48; Pet. at 41) (emphasis added). The Patent

Owner agrees; the applicants wrote in their provisional application that

> Cell recovery is **_often_** required to enable functional assays to be
> performed on the progeny of the input cells, or to select cells of interest

for larger scale culture. ***A method to recover defined clonal populations is therefore a critical requirement for many applications of microfluidic cultures.***

Ex. 1001 at 26:1-6; Ex. 1015 at 40 (p. 42 of exhibit) (emphasis added); *see also* Ex. 1039 at ¶¶80-81. Applicant's admission that cell recovery is "often" required is a restatement of the known, "ubiquitous" need. Reply at 10. Such "applicant admitted prior art" may be used to furnish a motivation to combine. Reply at 11 (citing *Qualcomm Inc. v. Apple Inc.*, 24 F.4th 1367, 1369, 1376 (Fed. Cir. 2022)).

"[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420. After monitoring cellular responses in a microfluidic device to identify cells of interest, recovering those cells from the device for further analysis was a known need.

For this reason, a POSA would have been motivated to modify Dimov to selectively recover cells based on the monitoring step. Dimov describes a PDMS microfluidic device in which cells are trapped in trenches, and how various analyses can be performed on the cells (e.g., measuring the cells' level of surface protein expression using fluorescent imaging techniques). Pet. at 41 (citing Pet. at 24-26; Ex. 1003 at 13:59-14:10, 14:26-56, 15:1-2, 15:20-26, Fig. 23; Ex. 1002 at ¶¶79-84). A POSA working with Dimov's device and methods, who observed a high

concentration of a surface protein on particular cells but not others, would have been motivated to selectively remove those cells to "isolate particularly interesting cells for further investigation" (e.g., sequencing or culturing them). Pet. at 36, 41, 43; Ex. 1007 at 9321; Ex. 1002 at ¶110.

Kovac teaches a method, similar to Dimov, of trapping individual cells in a PDMS microfluidic device, and identifying cells of interest using fluorescent imaging techniques. Pet. at 41 (citing Ex. 1007 at 9321, 9322 (Fig. 1(a))). Kovac also teaches using a mode of laser tweezers (Reply at 12; Ex. 1007 at 9325; Ex. 2010 at 48:14-51:7; 104:9-105:23) to selectively levitate cells out of their traps so they flow out of the device. Pet. at 42 (citing Ex. 1007 at 9325, 9322, Fig. 1(a)). Kovac teaches its selective levitation method "was straightforward, user-friendly, and conceivably automatable," "was simple to implement in a standard microscope with minimal modification," and "requires only flow and a clear optical path to the chip" (Pet. at 43 (citing Ex. 1007 at 9322, 9325)), both of which Dimov discloses. Pet. at 44 (citing Ex. 1003 at 5:38-39, 9:13-20, Fig. 11, 9:23-27, Fig. 13; Ex. 1002 at ¶128).

It follows that a POSA, using Dimov's device to perform various cell analyses, knowing of Dimov's teaching to use "laser tweezers" to remove cells from the trenches, and knowing of Kovac's selective levitation method, would be motivated to modify Dimov to incorporate Kovac's selective levitation to "isolate particularly interesting cells for further investigation"—a known need. Pet. at 41

(citing Ex. 1007 at 9321).

The misapprehension of Petitioner's arguments is demonstrated by the Decision's placing a burden on Petitioner "to show that a person of ordinary skill in the art would have selected Dimov's microfluidic device for use with Kovac's cell levitation method." Decision at 49. This is backwards: Petitioner has not argued that claim 1 is obvious over Kovac in view of Dimov (POR at 22 n.6, cited in Decision at 40), it argues claim 1 is obvious over Dimov in view of Kovac. The obviousness question is whether a POSA, starting with Dimov, would have been motivated to *improve* Dimov, resulting in claim 1. The answer is unequivocally "yes." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011), is not to the contrary. Indeed, in *Unigene*, the analysis began with a "reference composition" and then determined whether secondary references would motivate a modification of that composition. *Id.* at 1363-64. Here, the obviousness analysis begins with Dimov, which "was designed to conduct cell monitoring and analysis within the device, and reported doing so successfully" (Reply at 7 (quoting POR at 12)), and then shows that the prior art would motivate improvements to what Dimov disclosed, with obviousness being the result. A POSA would have known that lasers can selectively remove cells of interest from a microfluidic device and that Kovac's laser levitation technique "generalizes easily to any application where the goal is to position cells in an environment, observe them using microscopy, and later retrieve

particular cells." Reply at 14; Ex. 1007 at 9329; Pet. at 36 (citing Ex. 1003 at 11:30-40); Reply at 5 (citing Ex. 1039 at ¶¶ 11-12).

The remainder of the Decision's analysis is directed to supposed difficulties with applying Kovac's techniques to Dimov's trenches (e.g., deeper wells, potential for cell damage) and recovering a cell from Dimov's output. *See, e.g.*, Decision at 50; *id.* at 52. But "motivation to combine" and "reasonable expectation of success" are separate and distinct requirements. *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed. Cir. 2021). *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.* holds these are "two different legal concepts." 821 F.3d 1359, 1367 (Fed. Cir. 2016) (cited by Decision at 51 n.15). A POSA, who would want to recover cells of interest from Dimov's device, would be motivated to use Kovac's techniques to do so, as they were successfully used to retrieve particular cells. Pet. at 45 (citing Ex. 1007 at 9328); Reply at 14 (citing Ex. 1007 at 9329).

A POSA also could overcome ordinary difficulties and would have a reasonable expectation of success in achieving their intended goal and the claimed invention. Kovac's levitation techniques would be effective to levitate a cell to a height of 300 microns, and thus could remove a cell from Dimov's trench; even Patent Owner's expert Dr. Gale admitted it. Reply at 15; Ex. 2012 at ¶104. Because there is so much room between Kovac's "benign" laser parameters and the much harsher conditions (e.g., ~10,000%-800,000% greater energy densities) required for

cellular damage in the studies cited by Kovac (Reply at 13; Ex. 1039 at ¶¶121-125 (Liang), ¶¶126-129 (Neuman), ¶¶130-132 (Mohanty)), a POSA would have a reasonable expectation of achieving cell removal using only ordinary creativity. Reply at 15. Specialized experience with lasers is not required—Kovac's technique "generalizes easily." Reply at 14 (citing Ex. 1007 at 9329). A POSA who employed Kovac's laser levitation technique to remove a cell from a trench would know that the cell could be recovered from Dimov's "common output," or "common waste," as they are convenient outlets for accessing cells with a micropipette. Pet. at 44; Reply at 5, 16; Ex. 1039 at ¶¶31-48.

A POSA would have been motivated to apply Kovac's selective levitation techniques to selectively recover cells of interest from Dimov's device and would have had a reasonable expectation of success in doing so.

## C.  GROUND 4: Claims 1, 11, 16, 24, 26, 27, and 30 are rendered obvious by Park

The Decision's analysis of obviousness over Park states that "we determine, below, that Park does not disclose or teach limitation 1E" and that "[w]e agree with Patent Owner that Petitioner has not pointed to anything in Park that teaches selectively recovering cells." Decision at 55, 58. That may be relevant to anticipation, but not obviousness.

A POSA using Park's device and method, having identified one or more cells of interest by observing, for example, a long-term cell response or an instantaneous

cell reaction, would have been motivated to remove one or more of those cells for further analysis (and thus perform limitation 1E). Pet. at 57 (citing Ex. 1002 at ¶160); Reply at 17-18; *see supra* at 2, 7-8. Achieving that goal was well within the knowledge of a POSA, given a POSA's familiarity with the use of a micropipette and that there would be access to Park's microwells other than during cell seeding. Pet. at 58-59 (citing Ex. 1002 at ¶166); Reply at 18 (citing Ex. 1039 at ¶¶164-173). A POSA would have been motivated to ensure that access by partially bonding the layers of Park's device as was done by Han before the priority date. Pet. at 58; Reply at 18. Petitioner's reliance on Han in this manner is appropriate, whether or not Han is itself prior art, as discussed above. *See supra* at 6.

A POSA would have been motivated to apply known pipetting techniques to selectively recover cells of interest from Park's device, and would have had a reasonable expectation of success in doing so.

### D.   GROUND 5: Claims 1, 11, 16, 24, 26, 27, and 30 are rendered obvious by Park in view of Kovac

The Decision misapprehended or overlooked important portions of Petitioner's argument and evidence demonstrating that claim 1 is rendered obvious by Park in view of Kovac. It is undisputed that Park discloses limitations 1A-1D and that Kovac discloses limitation 1E (Decision at 35, 55), but the Decision's analysis does not separately address either motivation to combine them or the reasonable expectation of success of doing so; indeed, it does not even mention

either.  Decision at 68-70.

The Decision misapprehends Petitioner's argument that Kovac's techniques could recover a ***single*** cell from Park's microwell.  Patent Owner acknowledges this was Petitioner's argument.  Pet. at 63 (discussing "levitating a cell of interest" from Park's microwell and flowing it out); POR at 44 (discussing "recovery of a cell"); Reply at 20 (discussing how "the levitated cell" would be accessed).  Instead, the Decision merely cites to its earlier discussion of laser parameters in Ground 3 (Decision at 68), overlooking two important facts.  First, Kovac demonstrated that it is possible to "remove a single targeted cell residing in a doubly loaded well," as the Decision recognizes.  Ex. 1007 at 9326, Fig. 3 (cited in Decision at 69 n.21).  Second, Park's microwells have a "depth of 20 µm," whereas Kovac's microwells are "35-µm in depth."  Pet. 63 (citing Ex. 1006 at 266; Ex. 1007 at 9326).  No significant change to Kovac's laser parameters would be needed to levitate a cell a shorter distance.  The Decision errs in concluding that it would require "additional inventive steps" to "adapt[] Kovac's levitation method for use in Park's device . . . ."  Decision at 68.  The Decision recognizes that Kovac's laser is applied for up to about 30 seconds (Decision at 37) but overlooks (Decision at 70 n.23) the fact that a POSA would simply turn on the flow in Park's device after this amount of time, because a POSA would know from Kovac that this was sufficient time to levitate a cell out of Park's shallower, 20-µm-deep microwells.  A POSA is not an uncreative automaton.

*KSR*, 550 U.S. at 421.

As for Park's recirculating flow patterns, the Decision overlooks the fact that the lateral gradient force of Kovac's laser column counteracts lateral flows in Park's device. Reply at 24; Ex. 1039 at ¶191, ¶194; Ex. 1007 at 9325. If this were not sufficient, an increased laser spot size the size of Park's microwell would be, which requires only a simple change of lens, not any substantial experimentation, which the Decision (at 68) overlooks as well. Reply at 24; Ex. 1039 at ¶192 (citing Ex. 1039 at ¶¶107-108). Finally, the Decision overlooked Kovac's teaching that wall effects can be overcome by slightly increasing the power of the laser, so any resistance to vertical movement would not be problematic to a POSA. Reply at 24; Ex. 1039 at ¶195 (citing Ex. 1007 at 9329).

A POSA would have been motivated to apply Kovac's selective levitation techniques to selectively recover cells of interest from Park's device, and would have had a reasonable expectation of success in doing so.

## IV.    CONCLUSION

Petitioner respectfully requests the Board reconsider its Decision and find that claims 1, 6, 11, 19, 24, 26, 27, and 30 are unpatentable under Grounds 2 and 3, and claims 1, 11, 16, 24, 26, 27, and 30 are unpatentable under Grounds 4 and 5.

Dated: February 21, 2023      Respectfully submitted,

*/ Marc David Peters /*

Keith A. Orso, Reg. No. 52,084
Michael R. Fleming, Reg. No. 67,933
Andrew Krause, Reg. No. 76,276
Alan Heinrich, *PHV to be requested*
Dennis J. Courtney, *PHV to be requested*
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Marc David Peters (Reg. No. 46,988)
TURNER BOYD LLP
155 Bovet Road, Suite 750
San Mateo, California 94402-3158
Telephone: (650) 521-5930
Facsimile: (650) 521-5931

*Attorneys for Petitioner*
Berkeley Lights Inc.

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to 37 C.F.R. § 42.6, the undersigned certifies that on February 21, 2023, a copy of the foregoing document was served electronically via electronic mail on counsel for the Patent Owner as follows:

**Paul Hastings LLC**
Naveen Modi (Reg. No. 46,224)
Eric W. Dittman (Reg. No. 51,188)
Daniel Zeilberger (Reg. No. 65,349)
Iman Kholdebarin (Reg. No. 63,334)
Max H. Yusem (admitted *pro hac vice*)
ABCellera@paulhastings.com

*/ Marc David Peters /*
Marc David Peters

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

PHENOMEX INC.,

Petitioner,

v.

THE UNIVERSITY OF BRITISH COLUMBIA,

Patent Owner.

_____

IPR2021-01249
U.S. Patent No. 10,087,408
_____

**PETITIONER'S NOTICE OF APPEAL**

Pursuant to 35 U.S.C. §§ 141, 142, and 319; 37 C.F.R. §§ 90.2-90.3; Federal

Rule of Appellate Procedure 15; and Federal Circuit Rule 15, Petitioner PhenomeX

Inc. hereby provides notice that it appeals to the United States Court of Appeals for

the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal

Board ("Board") entered on January 19, 2023 in IPR2021-01249 (Paper No. 38)

("Final Written Decision"), the Judgment Denying Petitioner's Request on

Rehearing entered July 20, 2023 (Paper No. 41) ("Judgment Denying Rehearing"),

and from all underlying findings, determinations, rulings, opinions, orders, issues,

and decisions regarding the inter partes review of U.S. Patent No. 10,087,408 (the

"'408 Patent"). This notice is timely under 37 C.F.R. § 90.3, having been filed no

later than 63 days after the Judgment Denying Rehearing.

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Petitioners state that the issues

on appeal include, but are not limited to: the Board's determination that claims 1,

6, 11, 16, 19, 24, 26, 27, and 30 of the '408 Patent have not been shown to be

unpatentable; the Board's determination that Dimov (US 8,906,669 B2) does not

render obvious claims 1, 6, 11, 19, 24, 26, 27, and 30 of the '408 Patent; the

Board's determination that Dimov in view of Kovac (J.R. Kovac & J. Voldman,

*Intuitive, Image-Based Cell Sorting Using Optofluidic Cell Sorting*, 79 Anal.

Chem. 9321 (2007)) does not render obvious claims 1, 6, 11, 19, 24, 26, 27, and 30

of the '408 Patent; the Board's determination that Park (J.Y. Park et al., *Single Cell*

*Trapping in Larger Microwells Capable of Supporting Cell Spreading and Proliferation*, 8 Microfluidics & Nanofluidics 263 (2010)) does not render obvious claims 1, 11, 16, 24, 26, 27, and 30 of the '408 Patent; the Board's determination that Park in view of Kovac does not render obvious claims 1, 11, 16, 24, 26, 27, 3 and 0 of the '408 Patent; the Board's determination that Han (C. Han et al., *Integration of Single Oocyte Trapping, In Vitro Fertilization and Embryo Culture in a Microwell-Structured Microfluidic Device*, 10 Lab on a Chip 2848 (2010)) does not reflect the background knowledge of a person of ordinary skill in the art at the time of the claimed invention; the Board's consideration of the expert testimony, fact witness testimony, and other evidence in the record; and the Board's factual findings, conclusions of law, or other determinations supporting or related to the foregoing issues, as well as all other issues decided adversely to Petitioner in any orders, decisions, rulings, or opinions.

This Notice of Appeal is being e-filed with the Clerk's Office for the United States Court of Appeals for the Federal Circuit, along with payment of the required docketing fees. In addition, a true and correct copy of this Notice of Appeal is being filed simultaneously with the Director of the United States Patent and Trademark Office.

Dated: July 26, 2023

Respectfully submitted,

*/ Marc David Peters /*

Keith A. Orso, Reg. No. 52,084
Michael R. Fleming, Reg. No. 67,933
Andrew Krause, Reg. No. 76,276
Alan Heinrich, *PHV to be requested*
Dennis J. Courtney, *PHV to be requested*
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Marc David Peters, Reg. No. 46,988
TURNER BOYD LLP
155 Bovet Road, Suite 750
San Mateo, California 94402-3158
Telephone: (650) 521-5930
Facsimile: (650) 521-5931

*Attorneys for Petitioner*
PhenomeX Inc.

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6, the undersigned certifies that on July 26, 2023, a true and correct copy of the foregoing document was served electronically via electronic mail on counsel for the Patent Owner as follows:

**Paul Hastings LLC**
Naveen Modi (Reg. No. 46,224)
Eric W. Dittman (Reg. No. 51,188)
Daniel Zeilberger (Reg. No. 65,349)
Iman Kholdebarin (Reg. No. 63,334)
Max H. Yusem (admitted *pro hac vice*)
ABCellera@paulhastings.com

The undersigned also certifies that on July 26, 2023, in addition to being filed electronically through the PTAB's P-TACTS System, a true and correct copy of the foregoing document is being filed in paper by Priority Mail Express or equivalent with the Director of the U.S. Patent and Trademark Office at the following address:

Director of the United States Patent and Trademark Office
c/o Office of the General Counsel
United States Patent and Trademark Office
Post Office Box 1450
Alexandria, VA 22313-1450

The undersigned also certifies that on July 26, 2023, a true and correct copy of the foregoing document is being filed with the Clerk's Office of the U.S. Court of Appeals for the Federal Circuit via the CM/ECF electronic filing system.

*/ Marc David Peters /*
Marc David Peters, Reg. No. 46,988

# UNITED STATES PATENT AND TRADEMARK OFFICE

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BERKELEY LIGHTS, INC.,

Petitioner,

v.

THE UNIVERSITY OF BRITISH COLUMBIA,

Patent Owner.

_____

IPR2021-01249
U.S. Patent No. 10,087,408

_____

## DECLARATION OF CARL MEINHART IN SUPPORT OF PETITION FOR *INTER PARTES* REVIEW

Mail Stop: PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

10969666

Berkeley Lights Ex 1002-p 1
Berkeley Lights v UBC

### 5. [1E] "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step."

85.   As discussed above, Dimov discloses a device in which "particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber," Ex. 1003 at 1:46-47, and that "[t]he capture or collection chamber is desirably in the form of a trench." *Id.* at 1:52-53. Dimov states that "[w]hile the arrangement described herein preferentially retain the particles within the trench it is possible to modify the arrangement so as to provide for subsequent movement of the particles—either within the trench so as to provide for mixing or the like, ***or to effect removal of the particles out of the trench***." *Id.* at 11:21-26 (emphasis added).

86.   Dimov discloses that "[a] device provided in accordance with the present teaching is especially useful within the context of cell capture," where "the particles described heretofore can be considered cells." *Id.* at 7:4-5, 8-9; *see also id.* at 1:57 (highlighting that "[i]n a first arrangement the particles are cells.").

87.   Dimov explains that "[s]uch arrangements will typically require a capacity to manipulate the particles and this can be conducted either before or subsequent to capture of the particles within the trench." *Id.* at 11:27-30. Dimov states that "[e]xamples of techniques that could be employed include:

Berkeley Lights Ex 1002-p 42
Berkeley Lights v UBC

Acoustic

Magnetic

Inertial

Electric

Delectrophoretic

Thermo-hydrodynamic

Laser tweezers

Hydrodynamically induced agitation

Specific or unspecific attachment to surface."

*Id.* at 11:30-40. Dimov points out that "[i]t will be understood that the use of such techniques may require an external source of agitation or manipulation of the particles." *Id.* at 11:41-43

88.　Dimov discloses "integrating a plurality of individual devices **100** onto a single substrate and effecting simultaneous experiments within each." *Id.* at 8:52-55; *see also id.* at 3:56-62 ("Each of the devices **100** of FIGS. 1 and 2 may be considered identical and are usefully employed as Cell Capture and Processing Elements (CCPE) such that the completely integrated and multiplexed device shown in FIGS. 1 and 2 provides five hundred and twelve identical Cell Capture and Processing Elements (CCPE) multiplexed into a single monolithic device."). But Dimov refers to removal of the particles out of

10969666

Berkeley Lights Ex 1002-p 43
Berkeley Lights v UBC

an individual trench ("the trench"), *id.* at 11:26, not out of all trenches on a substrate integrating a plurality of individual devices, which would instead result in recovery of a pooled population of particles. Thus, Dimov discloses selectively recovering the individual cell, or a clonal population thereof, from the individual chamber.

89.     Moreover, a POSA would have understood that at least some of the above techniques, such as laser tweezers, are techniques that, by their very natures and because of their technical limitations, would necessarily be directed to individual trenches, as opposed to over all of the trenches spread out on an integrated substrate. Optical tweezers have been used since the 1970s to manipulate the position of micron-sized particles in three dimensions using focused light beams. The technique is based upon optical scattering of light being refracted by the micron-sized particles, which causes changes in the momentum of the scattered photons.  The optical tweezer technique is used to selectively levitate particles with sizes on the order of microns, such as cells, by opposing gravitational forces. Thus, even the disclosed removal techniques demonstrate that Dimov teaches selectively removing one or more particles from an individual trench.

90.     Additionally, a POSA would have understood Dimov's reference to removing particles out of the trench "subsequent to capture of the particles

Berkeley Lights Ex 1002-p 44
Berkeley Lights v UBC

within the trench," Ex. 1003 at 11:29-30, to disclose removal after, and based on, the "subsequent analysis or experimentation" that motivated the capturing of the particles in the first place. *Id.* at 12:13-18 ("It will be appreciated that the capture chamber may be considered as a sediment trap whereby the particles within the fluid, such as for cells or other living organisms, which are entrained within the fluid on passing the capture chamber are displaced out of the fluid and remain in the capture chamber for subsequent analysis or experimentation.").

91.    Further, a POSA, reading Dimov's disclosures of monitoring a response in the chamber and removing a cell from the chamber, would have at once envisaged basing the removal of the cell on the response in the monitoring step.

92.    For example, a POSA would have envisioned removing a macrophage from the trench in the above study using "FITC-labeled anti-CD86 antibodies," Ex. 1003 at 14:26-56, based on the detected surface protein concentration, as doing so would permit the macrophage to be further characterized, including via DNA sequencing. Likewise, a POSA would have envisioned removing one or more cells from the trench in the above protein analysis experiment based on the detected fluorescence, as doing so would permit further characterization of the cell, including sequencing, or expansion of

Berkeley Lights Ex 1002-p 45
Berkeley Lights v UBC

the cell via conventional cell culture techniques into a larger population of cells for further analysis.

93.     Dimov's disclosure of enhancing the above measurement techniques "by simultaneously using several antibodies with different fluorophore labels to generate simultaneous real time multiple surface protein readout with ***single cell resolution***," Ex. 1003 at 14:52-56, would also have caused a POSA to at once envisage basing the removal of the cells on the response in the monitoring step.

### B.     Claim 6 is anticipated by Dimov.

94.     Claim 6 recites "[t]he method of claim 5, wherein the speed of the perfusion fluid is decreased to about 0 μm/s as the perfusion fluid approaches the retaining position." Claim 5, in turn, recites that the "speed of the perfusion fluid is decreased to less than 50 μm/s."

95.     Dimov discloses that the retaining position is at the bottom of the trench, *see, e.g.,* VII.A.3, *supra*, and teaches exemplary trench depths of approximately 300-320 microns. *See, e.g., id.* at 9:38 (describing "a 300 micron deep trench"); *id.* at 9:15-16 (describing trenches having "dimensions 100x400 [μ]m with a depth of 320 [μ]m").

96.     Figure 6 of Dimov "shows how fluid velocity varies with depth of the collection trench," *id.* at 2:39-40, and that in trench depths of around 300

Berkeley Lights Ex 1002-p 46
Berkeley Lights v UBC

concentration, which "is directly correlated to the signal from the surface labels."

Ex. 1003 at 14:8-10. *See also* FIG. 23 (showing the results of the image analysis).

### H. Claim 30 is anticipated by Dimov.

105.    Claim 30 recites "[t]he method of claim 1, wherein the cellular response is determined using a fluorescent reporter." Dimov anticipates this claim because it discloses monitoring surface protein expression on cells using fluorescently labeled antibodies, as discussed above. *See supra* Section VII.A.4; Ex. 1003 at 13:66-67 (describing an exemplary procedure for characterizing cells "based on the specific binding of labeled antibodies to [a] surface protein of interest"). Specifically, Dimov explains that "[a]s the stimulated macrophages began to express the CD86 proteins on the cell surface, the fluorescent CD86 antibodies generated a fluorescent signal from the cell surface." *Id.* at 14:42-43. Thus, Dimov anticipates claim 30.

## VIII. Ground 2: Claims 1, 6, 11, 19, 24, 26, 27, 30 are obvious over Dimov in view of the knowledge of a POSA.

106.    Dimov discloses each of the limitations of claims 1, 6, 11, 19, 24, 26, 27, and 30, as discussed above. *See supra* Section VII. If Dimov had not disclosed the step of "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step," these claims would have been obvious over Dimov in view of the knowledge of a POSA.

Berkeley Lights Ex 1002-p 50
Berkeley Lights v UBC

107.   As discussed above, Dimov expressly discloses both monitoring a response in the trench of its device, *see supra* Section VII.A.4, and removing particles, such as cells, from the trench. *See supra* Section VII.A.5. Dimov also discloses integrating a plurality of individual devices, each having its own trench, onto a single substrate and effecting simultaneous experiments within each. *Id.*

108.   In the context of a single substrate integrating a plurality of individual devices, it would have been obvious to a POSA to make use of Dimov's individual trench monitoring by selectively removing one or more cells from a trench based on a response observed through such monitoring.

109.   For example, it would have been obvious for a POSA to selectively remove, based on a monitored surface protein concentration, one or more macrophage cells from a trench in the Dimov experiment that used fluorescently-labeled anti-CD86 antibodies as markers. *See* Sections VII.A.4-VII.A.5, above. A particularly high surface protein concentration observed via fluorescence for one or more cells in a trench during the monitoring step, for example, would have motivated a POSA to remove one or more cells for further investigation. Such investigation could have included further characterization of the cell, including by sequencing.

10969666

Berkeley Lights Ex 1002-p 51
Berkeley Lights v UBC

110.   Likewise, it would have been obvious to selectively remove, based on detected fluorescence, one or more cells from a trench in the protein analysis experiment disclosed in column 15 of Dimov. *See supra* Section VII.A.5. For example, a high concentration of a surface protein on one or more cells in a trench, as observed by monitoring the fluorescent signal in the trench, would have motivated a POSA to remove one or more cells from the trench for further study. Again, such further study could have included sequencing the DNA in the cell or expansion of the cell, via conventional cell culture techniques, into a larger population of cells for further analysis.

111.   It would have been obvious to a POSA that, in addition to any of the techniques that Dimov expressly discloses for removing one or more cells from a trench, *see* Ex. 1003 at 11:30-40, use of a micropipette (e.g., under microscopic observation) would accomplish such removal. A POSA would have been familiar with the use of micropipettes and would have found it obvious, for example, to simply insert a micropipette into a trench and aspirate one or more cells, as evidenced below by the Han reference.

112.   A POSA would have identified multiple ways to access the trench for aspiration by micropipette. For example, a POSA would have found it obvious to construct the device of Dimov in a way that would permit the top layer of the device to be peeled back so a trench could be accessed directly.

Berkeley Lights Ex 1002-p 52
Berkeley Lights v UBC

113.   Dimov discloses that the device of FIG. 4 "is made of two layers," including a top layer "for the channels having dimensions of approx. 40 microns high." Ex. 1003 at 5:37-39. Figure 25 of Dimov shows "steps that may be used to fabricate a device in accordance with the present teaching" using PDMS, *id.* at 3:10-12, along with an "Assembled Device," excerpted below. *Id.* at 15:27-46.



*Id.* (FIG. 25).

114.   A POSA would have found it obvious to construct the device so that layers 1 and 2 are at least partially unbonded, permitting layer 1 to be peeled back so as to allow direct access to the trench, as depicted in the modified excerpt below.

Berkeley Lights Ex 1002-p 53
Berkeley Lights v UBC



115.   Notably, Dimov teaches "bringing the first and second layers together and assembling them relative to one another onto a glass substrate," Ex. 1003 at 15:44-45, but does not teach bonding the two layers together completely.

116.   It would have been obvious to a POSA to only partially bond the two layers of PDMS, for by treating exposure of the PDMS surfaces with an oxygen plasma to allow for a weaker bond. This would allow the two layers to remain attached, while also allowing the layers to be peeled apart, providing direct access to the trench or microwells in the region that was not bonded.

117.   An example of such a partially bonded layers can be seen, for example, in Han's Figure 1A and 1B. Ex. 1009 at 2849. Han, which is pertinent to the field of microfluidic cell culture, demonstrates that this technique was well

Berkeley Lights Ex 1002-p 54
Berkeley Lights v UBC

known in the art and used around the time of the priority date by scientists studying embryo culturing, as the Han et al. paper was published at least as early as September 15, 2010 and bears a "*Received*" date of May 5, 2010 and an "*Accepted*" date of July 23, 2010—both before the priority date of the '408 patent. Ex. 1009 at 2848.

118.   Like the Dimov device, the Han device "consists of two PDMS layers." Ex. 1009 at 2849. The Han device includes "a microchannel in the upper layer and a microwell array in the lower layer," as shown below. *Id.*



119.   Han explains that "the PDMS layers are partially bonded and the microchannel layer can be lifted while each embryo is still trapped in the microwell layer at its fixed position." *Id.* at 2853. Han teaches that "[t]his feature allowed us to directly remove embryos from the microwells by pipetting with the retrieval rate close to 100%." *Id.*; *id.* at 2850 ("The microchamber region was left unbonded so that the upper layer can be partially lifted for the retrieval of

Berkeley Lights Ex 1002-p 55
Berkeley Lights v UBC

blastocysts."). Han includes a picture of its "microfluidic device with the upper layer lifted," shown below. *Id.* at 2849.



*Id.* A POSA would have found it obvious to adapt this same, known concept to the integrated substrate of Dimov so as to permit direct access to individual trenches by micropipette.

120.    Given the simple and straightforward nature of the above methods, and a POSA's familiarity with the use of a micropipette, a POSA would have had a reasonable expectation of success in piercing the top layer of PDMS, or only partially bonding the two PDMS layers and peeling back the top layer, and aspirating one or more cells from a trench in Dimov using a micropipette. None of the other limitations in claims 1, 6, 11, 19, 24, 26, 27, or 30 alters the above analysis.

## IX.    GROUND 3: Claims 1,  6, 11, 19, 24, 26, 27,  30 are obvious over Dimov in view of Kovac.

121.    Dimov discloses each of the limitations of claims 1, 6, 11, 19, 24, 26, 27, and 30, as discussed above. *See* Section VII, above. If Dimov had not disclosed the step of "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step," these claims would have been obvious over Dimov in view of Kovac.

122.    Kovac teaches a method of trapping individual cells in a microfluidic device and subsequently interrogating the cells using imaging techniques, similar to the methods described in Dimov. *See* Ex. 1007 at 9321. Kovac further identifies a need to "select a desired starting population of cells of known characteristics" or "isolate particularly interesting cells for further investigation." Ex. 1007 at 9321 ("The need to isolate small numbers of specific cells from background populations is ubiquitous, with applications in pathology, clinical diagnosis, cloning, and cell biology research.").

123.    Kovac asserts that "[v]iable retrieval of small numbers of single cells from microwell arrays using micropipettes/micromanipulators based on temporal fluorescence behavior has [] been demonstrated," *id.* at 9322, but characterizes such a retrieval method as suboptimal.

124.    As an alternative, Kovac discloses "us[ing] the scattering force from a focused infrared laser to levitate cells of interest from their wells into a

Berkeley Lights Ex 1002-p 57
Berkeley Lights v UBC

flow field for collection" from a microfluidic device, *id.* at 9321 (Abstract), thereby "combining the steps of physical selection and target removal into a single step." *Id.* at 9325; *id.* at 9322 ("Here we present a microscope-compatible, array-based microfluidic cell sorting architecture centered around passive hydrodynamic trapping of cells and active release using the optical scattering force (Figure 1)."); *Id.* at 9322 (Fig. 1(a) caption) ("After locating cells of interest, we focus an infrared (IR) laser beam onto target cells, levitating the cells into the flow field with the optical scattering force.").



125. The selectively levitated cells flow to a reservoir of the microfluidic device, where they are removed from the device by micropipette. *Id.* at 9323 (explaining that after "target cells flow into the reservoir, we use a standard 200 µL pipettor to transfer cells" out of the microfluidic device).

126. Kovac asserts that this technique "was straightforward, user-friendly, and conceivably automatable," and "was simple to implement in a

Berkeley Lights Ex 1002-p 58
Berkeley Lights v UBC

Appx718

standard microscope with minimal modification," *id.* at 9326, "requir[ing] only flow and a clear optical path to the chip." *Id.* at 9322. Given this, and the need to "select a desired starting population of cells of known characteristics" or "isolate particularly interesting cells for further investigation," as disclosed in Kovac, *id.* at 9321, and as discussed above in connection with Dimov, *see supra* Section VII.A.5, a POSA would have been motivated to modify Dimov to add the selective recovery method described in Kovac.

127. In connection with the trench monitoring disclosed in Dimov, a POSA would have been motivated to replace "Layer 1" of the Dimov device with a glass slide or plate to provide the clear optical path to the chip required to implement Kovac's selective levitation and flow technique to remove cells from Dimov's trench. Bonding glass and PDMS together is a commonly used technique in microfluidics to provide high-quality optical access to microfluidic channels.

128. Specifically, in connection with the trench monitoring expressly disclosed in Dimov, a POSA would have been motivated by Kovac to inspect the trenches "using any desired microscopy technique (brightfield, DIC, fluorescence, etc.)," Ex. 1007 at 9322 (Fig. 1 caption), and then focus an infrared (IR) laser beam onto target cells from below through the glass substrate and

Berkeley Lights Ex 1002-p 59
Berkeley Lights v UBC

bottom PDMS layer, as described in Kovac, levitating the cells into the flow field with the optical scattering force." *Id.*



**Kovac**                    **Dimov + Kovac**

A POSA would have either inspected the trenches from below to identify the targets before bringing to bear the laser, or would have inspected the trenches from above through the top layer of PDMS, which is approximately 40 microns thick, Ex. 1003 at 5:38-39, and is transparent. Dimov includes several images of trenches/capture chambers through the PDMS top layer. *See, e.g.,* Ex. 1003 at 9:13-20 and FIG. 11 (showing a top-down view of Dimov trenches under barely-visible outlines of the flared-out portions of overlaying fluid paths as described at 6:6-14); *id.* at 9:23-27 and FIG. 13.

129.   A POSA would have recognized that after levitating cells of interest from a trench or "capture chamber **160**" in the modified Dimov device, the levitated cells could then be flowed down "a fluid path **103** defined within a substrate **105**" to "an output **130**," Ex. 1003 at 3:22-26, as shown, for example in FIG. 1 of Dimov. *Id.* (FIG. 1) or even further to the structure labeled "common

Berkeley Lights Ex 1002-p 60
Berkeley Lights v UBC

waste **140**," *id.* at 4:21-22, where it could then be removed from the device by micropipette, including by accessing the device as described above.

130. A POSA would additionally have been motivated to combine Dimov with Kovac as described above because Dimov expressly discloses removing particles, such as cells, from trenches using "Dielectrophoretic" and "Laser tweezers" techniques, Ex 1003 at 11:36, 38, and Kovac uses similar techniques to accomplish its "selective levitation."

131. A POSA also would have had a reasonable expectation of success in making these modifications. Substituting one or more glass slides or plates for the top PDMS layer on the Dimov substrate would have been routine. Moreover, Kovac discloses that experimental results confirmed that the selective levitation technique yielded the "expected viability given our optical parameters," and that "[c]ell retrieval from the device requires a simple pipetting step, which is standard lab practice and unlikely to damage cells." Ex. 1007 at 9327-28; *id.* at 9328 ("Therefore, we consider our technique to be within the parameter space for healthy, viable cell sorting."). Accordingly, a POSA would have reasonably expected the removed cells to be viable.

Berkeley Lights Ex 1002-p 61
Berkeley Lights v UBC

*Id.*; *see also id.* at 268 ("The methodology introduced in this article will lead to an effective and high-throughput cell-trapping device for screening that requires single cell capture and culture.").

159.    Park teaches that its microwells "provide enough room for cell growth and division" *id.* at 264, "allowing investigation of both long-term cell responses and instantaneous cell reactions." *Id.* at 268 (citing Fig. 3c). Moreover, Park describes monitoring the specific response of "cell spreading and proliferation" in the study of PC3 cells by taking "fluorescent images . . . using an inverted fluorescence microscope (Eclipse TE300, Nikon, Tokyo, Japan)" of the triangular microwells, resulting in the images of Fig. 3c. *Id.* at 265. Thus, Park not only discloses culturing the cell within the chamber, but also monitoring a response in the chamber—e.g., long-term cell responses and instantaneous cell reactions, including cell spreading and proliferation.

### 5.    [1E] "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step."

160.    As discussed above, Park discloses culturing cells and monitoring responses in the triangular microwells. *See supra* Section VIII.D.1.d). It would have been obvious to a POSA to make use of this monitoring by selectively removing one or more cells from an individual microwell based on a response—

Berkeley Lights Ex 1002-p 74
Berkeley Lights v UBC

e.g., a long-term cell response or an instantaneous cell reaction—observed through such monitoring.

161.  A POSA would have found it obvious to construct the device of Park in a known way that would permit the top layer of the device to be removed or peeled back so a microwell could be accessed directly by micropipette.

162.  As discussed above, Park describes a device with two layers, a "bottom layer" comprising an array of triangular microwells, and a top layer with a main channel that "fits over the microwell array to allow cell solution [to] flow across the array." Ex. 1006 at 265. Park does not disclose what materials these layers are made from, but it would have been obvious to a POSA to make such layers from PDMS, for example, using standard microfabrication techniques known in that art at the time, as evidenced by Dimov and Han. *See* Section X.A.1, above.

163.  Park does not state that the two layers of its device are bonded together. Rather, it simply states that the top layer "fits over" the bottom layer, suggesting that the top layer may actually be removable. Ex. 1006 at 265.

164.  But even assuming the top layer is not removable, a POSA would have found it obvious to construct the device so that it would be removable or to partially bond the top layer to the bottom layer so the top layer could be peeled back to expose the microwell array.

Berkeley Lights Ex 1002-p 75
Berkeley Lights v UBC



US008906669B2

(12) **United States Patent**     (10) **Patent No.:**   **US 8,906,669 B2**

Dimov et al.     (45) **Date of Patent:**    **Dec. 9, 2014**

(54) **MICROFLUIDIC MULTIPLEXED CELLULAR AND MOLECULAR ANALYSIS DEVICE AND METHOD**

(75) Inventors: **Ivan Dimov**, Puerto Montt (CL); **Jens Ducree**, Ashbourne (IE); **Luke Lee**, Orinda, CA (US); **Gregor Kijanka**, Dublin (IE)

(73) Assignee: **Dublin City University**, Dublin (IE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 117 days.

(21) Appl. No.: **13/123,491**

(22) PCT Filed: **Oct. 9, 2009**

(86) PCT No.: **PCT/EP2009/063229**

§ 371 (c)(1),
(2), (4) Date: **Jul. 12, 2011**

(87) PCT Pub. No.: **WO2010/040851**

PCT Pub. Date: **Apr. 15, 2010**

(65) **Prior Publication Data**

US 2011/0262906 A1    Oct. 27, 2011

(30) **Foreign Application Priority Data**

Oct. 10, 2008   (GB) .................................. 0818579.5

(51) **Int. Cl.**
| | |
|---|---|
| *C12M 1/00* | (2006.01) |
| *C12M 1/34* | (2006.01) |
| *C12M 3/00* | (2006.01) |
| *C12Q 1/68* | (2006.01) |
| *G01N 33/53* | (2006.01) |
| *B01L 3/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ..... ***B01L 3/50273*** (2013.01); *B01L 2400/0457* (2013.01); *B01L 2300/0851* (2013.01); *B01L 2200/10* (2013.01); *B01L 2200/0668* (2013.01); *B01L 2200/027* (2013.01); *B01L 2200/0647* (2013.01); ***B01L 3/502761*** (2013.01); *B01L 2300/0887* (2013.01); *B01L 2300/0816* (2013.01); *B01L 2400/0472* (2013.01)
USPC ....... **435/283.1**; 435/6.1; 435/7.1; 435/287.2; 435/288.5; 422/68.1

(58) **Field of Classification Search**
USPC .................. 435/6.1, 7.1, 283.1, 287.2, 288.5; 422/68.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,180,415 | B1 | 1/2001 | Schultz et al. ................ 436/518 |
| 6,818,435 | B2 * | 11/2004 | Carvalho et al. ...... 435/286.5 |
| 2004/0224300 | A1 * | 11/2004 | Terashima et al. ........... 435/2 |

FOREIGN PATENT DOCUMENTS

EP     1833693     2/2008

OTHER PUBLICATIONS

Dimov et al, Integrated microfluidic array plate (iMAP) for cellular and molecular analysis, 2011, Lab Chip, 11, 2701-2710.*
Cioffi et al., "Shear Stress and Cell Docking Inside Microfluidic Systems: A Computational and Experimental Study," Journal of Biomechanics 41(S1), 1 page, 2008.
Deutsch et al., "A Novel Miniature Cell Retainer for Corelative High-Content Analysis of Individual Untethered Non-Adherent Cells," Lab on a Chip 6:995-1000, 2006.
Figallo et al., "Micro-Bioreactor Array for Controlling Cellular Microenvironments," Lab on a Chip 7:710-719, 2007.
Horner et al., "Transport in a Grooved Perfusion Flat-Bed Bioreactor for Cell Therapy Applications," Biotechnol. Prog. 14:689-698, 1998.
Khademhosseini et al., "Molded Polyethylene Glycol Microstructures for Capturing Cells Within Microfluidic Channels," Lab on a Chip 4:425-430, 2004.
Khademhosseini et al., "Cell Docking Inside Microwells Within Reversibly Sealed Microfluidic Channels for Fabricating Multiphenotype Cell Arrays," Lab on a Chip 5:1380-1386, 2005.
Manbachi et al., "Microcirculation Within Grooved Substrates Regulates Cell Positioning and Cell Docking Inside Microfluidic Channels," Lab on a Chip 8:747-754, 2008.
Park et al., "Microfabricated Grooved Substrates as Platforms for Bioartificial Liver Reactors," Biotechnology and Bioengineering 90(5):632-644, 2005.
Park et al., "Radial Flow Hepatocyte Bioreactor Using Stacked Microfabricated Grooved Substrates," Biotechnology and Bioengineering 99(2):455-467, 2008.
International Search Report, mailed Apr. 23, 2010, for PCT/EP2009/063229, 8 pages.
International Preliminary Report on Patentability and Written Opinion, mailed Apr. 21, 2011, for PCT/EP2009/063229, 15 pages.

* cited by examiner

*Primary Examiner* — Narayan Bhat

(74) *Attorney, Agent, or Firm* — Seed IP Law Group PLLC

(57) **ABSTRACT**

A sequential flow analysis tool comprising a microfluidic device having a fluid path defined within a substrate between an input and an output is described. The device includes a capture chamber provided within but offset from the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber.

**21 Claims, 21 Drawing Sheets**

Berkeley Lights Ex 1003-p 1
Berkeley Lights v UBC



FIG. 1

Berkeley Lights Ex 1003-p 2
Berkeley Lights v UBC



FIG. 2

Berkeley Lights Ex 1003-p 3
Berkeley Lights v UBC



FIG. 3

Berkeley Lights Ex 1003-p 4
Berkeley Lights v UBC



*FIG. 4B*

*FIG. 4A*

Berkeley Lights Ex 1003-p 5
Berkeley Lights v UBC



FIG. 5

FIG. 6

Berkeley Lights Ex 1003-p 6
Berkeley Lights v UBC



FIG. 7

Berkeley Lights Ex 1003-p 7
Berkeley Lights v UBC



FIG. 8

Berkeley Lights Ex 1003-p 8
Berkeley Lights v UBC



FIG. 9

FIG. 10

Berkeley Lights Ex 1003-p 9
Berkeley Lights v UBC





FIG. 11



FIG. 12

Berkeley Lights Ex 1003-p 10
Berkeley Lights v UBC



FIG. 13



FIG. 14

Berkeley Lights Ex 1003-p 11
Berkeley Lights v UBC



Day 1    Day 5    CA Stain    PI Stain

FIG. 15

Berkeley Lights Ex 1003-p 12
Berkeley Lights v UBC



Step 1:

Culture media.

410

705

440

700



Step 3:

700A

410

1600

705



410

1600

705

Step 2:



1605

410

1600

Step 5:



1610

Step 4:

410

1600

FIG. 16

Berkeley Lights Ex 1003-p 13
Berkeley Lights v UBC



FIG. 17

0 sec.

20 sec.

40 sec.

1105

1100

Berkeley Lights Ex 1003-p 14
Berkeley Lights v UBC



FIG. 18

Berkeley Lights Ex 1003-p 15
Berkeley Lights v UBC



FIG. 19

Poly L Lysine

BSA

PBS

PDMS

Berkeley Lights Ex 1003-p 16
Berkeley Lights v UBC



FIG. 20

Berkeley Lights Ex 1003-p 17
Berkeley Lights v UBC



FIG. 21

Berkeley Lights Ex 1003-p 18
Berkeley Lights v UBC



FIG. 22

Berkeley Lights Ex 1003-p 19
Berkeley Lights v UBC



FIG. 23

Berkeley Lights Ex 1003-p 20
Berkeley Lights v UBC



FIG. 24

Berkeley Lights Ex 1003-p 21
Berkeley Lights v UBC



Si Wafer

Layer 1 SU-8

Layer 2 SU-8

Layer 2 PDMS

PDMS

2500

2505

2510

2525

2530

2515

2520

Layer 1 PDMS

Peel & Punch Inlets

Layer 1 PDMS
Layer 2 PDMS
Glass

Assembled Device

2535

Trench

FIG. 25

Berkeley Lights Ex 1003-p 22
Berkeley Lights v UBC

# MICROFLUIDIC MULTIPLEXED CELLULAR AND MOLECULAR ANALYSIS DEVICE AND METHOD

## FIELD OF THE INVENTION

The present invention relates to microfluidic devices and to analysis conducted using such devices. The invention more particularly relates to microfluidic device and method that can be used for multiplexed cellular and molecular analysis and treatment.

## BACKGROUND

Microfluidic devices are well known for use in analysis and sample treatment. Such devices provide for the precise control and manipulation of fluids and are generally considered to have geometric dimensions of the micro, i.e. sub-millimeter scale. These devices are particularly useful in that they provide measurements in scenarios where there are only small volumes of the analyte available or small amounts of reagents should be used, e.g. in high-throughput screening for drug discovery. Furthermore they tend to provide results with reduced reagent consumption and analysis time, ease of integration, and the potential for high-throughput analysis.

While conventional microfluidic devices provide many advantages commensurate with their dimensions there are still problems in using these devices for complete analysis systems, i.e. the type of systems that enables the provision of an analyte, the modification of that analyte and the obtaining of results from that modification. There is a further need for systems that provide a plurality of data signal outputs that can be used for statistical analysis and for parallel processing of a plurality of different tests. Also the costs of manufacturing have to be minimized, restricting the scope of fabrication technologies and hence also the degree of freedom available for the device features geometries.

## SUMMARY

These and other problems are addressed by a sequential flow microfluidic device having a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber. The chamber is desirably dimensioned to allow for the sequential flow of a plurality of fluids passed the chamber, a second fluid flow providing for a change in the medium within the chamber resultant from the first fluid flow.

The capture or collection chamber is desirably in the form of a trench having a mouth adjacent to and in fluid communication with the fluid path, the trench having sidewalls that extend downwardly into the substrate from the mouth of the trench.

In a first arrangement the particles are cells and the capture chamber is desirably dimensioned such that cells entrained within the fluid will preferentially be displaced from the fluid and will remain in the capture chamber.

The fluid path is desirably along an axis substantially parallel to the surface of the substrate. The fluid path is desirably provided proximal to an upper surface of the substrate.

In one arrangement the inlet is dimensioned to receive a pipette funnel such that fluid may be introduced downwardly into the device and then pass within the fluid path along the surface of the substrate.

The fluid path may include a funnel constriction provided between the inlet and the capture chamber so as to effect a filtering of particulate matter of a predetermined dimension prior to the capture chamber.

The device may be configured in an array structure with a plurality of capture chambers. Desirably the plurality of capture chambers share a common input and output, the input being arranged in a branch structure such that fluid introduced into the input will be directed towards each of the capture chambers.

There is also provided a multiplexed structure including a plurality of devices arranged on a common substrate.

The invention also provides a methodology for effecting cell or molecular analysis.

Accordingly, a first embodiment of the invention provides an apparatus as detailed in claim 1. A tool according to claim 13 is also provided. Advantageous embodiments are provided in the dependent claims.

These and other features will be better understood with reference to the exemplary arrangements which follow.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will now be described with reference to the accompanying drawings in which:

FIG. 1 shows an array of devices provided in a row configuration in accordance with the present teaching

FIG. 2 is a photograph of an exemplary multiplexed structure including a plurality of devices.

FIG. 3 is a photograph showing the loading of a structure of FIG. 2.

FIG. 4A shows in plan view a device provided in accordance with the present teaching.

FIG. 4B shows in perspective sectional view elements of such a device.

FIG. 5 shows how fluid velocity varies within the fluid path.

FIG. 6 shows how fluid velocity varies with depth of the collection trench.

FIG. 7 shows schematically how a fluid may be introduced so as to effect capture of cells within the capture region.

FIG. 8 shows a sequence of steps that may be implemented in a multi-flow through arrangement.

FIG. 9 shows exemplary results that may be concurrently obtained using a structure in accordance with the present teaching.

FIG. 10 shows how the volume of fluid within the inlet tip may be used to control flow rates within a device.

FIG. 11 shows example of cell loading.

FIG. 12 shows exemplary statistical data demonstrating cell loading in different cells.

FIG. 13 shows how efficient capture is effected using an example of beads within a fluid flow.

FIG. 14 shows how fluids within the trench may be replaced by flowing new fluids passed.

FIG. 15 shows exemplary data demonstrating how devices may be usefully employed in long term cell culturing.

FIG. 16 shows how cell lysis may be effected.

FIG. 17 shows exemplary data showing the effects of such cell lysis.

FIG. 18 shows exemplary steps that may be used in effecting NASBA.

FIG. 19 shows fluorescence images of approx. 16 individual devices at the beginning of a NASBA reaction.

FIG. 20 shows simultaneous change in fluorescence within 16 devices during a NASBA reaction.

Berkeley Lights Ex 1003-p 23
Berkeley Lights v UBC

FIG. **21** shows examples of application of a device in accordance with the present teaching within a biomimetic environment.

FIG. **22** shows how mixing may be effected within a device in accordance with the present teaching.

FIG. **23** shows how a device in accordance with the present teaching may be used for real time protein analysis.

FIG. **24** shows a protocol that may be employed for gene and or protein expression analysis.

FIG. **25** shows in schematic flow exemplary steps that may be used to fabricate a device in accordance with the present teaching.

## DETAILED DESCRIPTION OF THE DRAWINGS

The teaching of the invention will now be described with reference to exemplary arrangements thereof which are provided to assist in an understanding of the teaching of the invention but which are not in any way intended to limit the scope of the invention to that described.

FIGS. **1** and **2** show an exemplary structure incorporating a microfluidic device **100** in accordance with the present teaching. Each device **100** comprises a fluid path **103** defined within a substrate **105** between an input **120** and an output **130**. A capture chamber **160** is provided within the fluid path. The capture chamber is configured so as to extend into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber by means of a substantially perpendicular force field enforcing sedimentation. In this exemplary arrangement the capture chamber extends downwardly into the substrate. In this way it can be considered as having a major axis which is substantially perpendicular to the plane of the substrate surface.

Typically the device will be operated in a horizontal arrangement such that the direction of extension of the chamber is parallel with gravitational force lines, i.e. the particles within the fluid will be biased towards the bottom of the chamber under the influence of gravity. It will be understood that gravity is an example of a non-centrifugal force in that it acts on the particles without requiring a movement of the device, and within the context of the present teaching any force that does not rely on rotation of the device to effect retention of the particles within the chamber can be considered suitable. In contrast to the forces causing retention of the particles within the chamber, centrifugal forces could be considered suitable for effecting movement of the fluid within the fluid flow. It will be appreciated that the forces that effect displacement of the particles from the fluid and their subsequent retention in the chamber act substantially perpendicular to the direction of flow of the fluid.

The device is particularly suitable for configuring in array structures, a plurality of arrays being integrated into a multiplexed structure. Each of the devices **100** of FIGS. **1** and **2** may be considered identical and are usefully employed as Cell Capture and Processing Elements (CCPE) such that the completely integrated and multiplexed device shown in FIGS. **1** and **2** provides five hundred and twelve identical Cell Capture and Processing Elements (CCPE) multiplexed into a single monolithic device. It will be appreciated that the specific number is related to the exemplary arrangement of nine non-identical rows of arrays, the total structure having sixty four arrays each having eight microfluidic devices, but different configurations could be provided without departing from the teaching of the present invention.

Each array **110** in this configuration comprises eight identical devices **100**, sharing a common input **120** and a common output **130**. The common input branches into 8 feed lines **122***a*, **122***b*, **122***c* etc., provided upstream of capture chambers for each device respectively. Each device has a dedicated waste line **132***a*, **132***b*, **132***c* etc., provided downstream of the capture chamber and configured to distribute fluid out of the devices into the common output **130**. Within each array it will therefore be understood that a plurality of capture chambers are provided. Where they share a common input the fluids that are discharged into the individual chambers will be the same. However by pre-treating individual chambers it may be possible to vary the conditions experienced by those fluids within the individual chambers.

Individual arrays **110** may be arranged in rows **150***a*, **150***b* etc., on the substrate **105**. In this way a plurality of arrays may be aligned; in this exemplary arrangement along a common row. Where a plurality of arrays are provided along a common axis, they may advantageously be configured so as to share a common waste. In this exemplary arrangement the common output **130** for each row is then in fluid communication with common waste **140** for the multiplexed structure.

In this exemplary arrangement, each inlet is evenly connected to 8 CCPEs **100** and the inlets **120** have the same distribution as a 96 conventional well micro titter plate—approximately 9 mm apart from one another as shown in FIG. **1**. The devices of this arrangement are configured to be loaded with fluid under the influence of a hydrostatic pressure head. Such loading of the fluid into the devices and then the subsequent propulsion of the fluid within the devices can be provided by coupling the devices to a pipette arrangement whereby the volume of fluid in the pipette generates a pressure that causes the fluid to enter downwardly into device from the pipette and then travel within the fluid path. In this way the multiplexed microfluidic structure **115** may be used with conventional loading equipment such that for example sample loading may be done with a standard 8 channel pipette such as those manufactured and provided by the company Eppendorf.

An example of such a loading configuration is shown in FIG. **3**, where 4 conventional pipettes **300** are mated with 4 inlets respectively. Fluid within each of the 4 pipettes can be transferred into 8 individual microfluidic devices **100** arranged in an array structure, each of the devices sharing the common input **120**. In the arrangement of FIG. **3**, it will be observed that the loading of the multiplexed structure can be achieved on a per row basis such that each of the rows does not have to be concurrently loaded. In this way the number of experiments that is conducted can be defined relative to either the nature of experiment or the volume of analyte available. It will be appreciated that by providing a plurality of different devices coupled to the same input that each of the device serves to replicate the process being conducted in the other devices of the array. This allows statistical analysis of the process to be conducted with the comfort that the conditions of each device in the array should be identical. Two or more separate arrays can be loaded concurrently with the same or different materials—be that particles within a fluid or particles directly—such that each array either replicates the process of the other or is operable to conduct a different process concurrently with that of the other.

While pipette loading is an example of a hydrostatic pressure head delivery system other configurations such as a tilting of the device to allow for flow of the pure fluid or particle suspension within the device also could be utilised to take advantage of the principles of hydrostatic pressure. Other arrangements for fluid delivery or fluid propulsion

Berkeley Lights Ex 1003-p 24
Berkeley Lights v UBC

could combine or alternate these techniques with others such as those means providing a pressure driven or a centrifugally driven or propelled flow. Another example which could be employed would be a process taking advantage of the electrokinetic phenomena. Generally speaking, any of the various flow-generating mechanisms such as those described in D J Laser and J G Santiago, J. Micromech. Microeng. 14 (2004) R35-R64 may in principle be used to generate the flow in the here described device.

The devices of the present invention are particularly well suited for providing analysis and/or treatment of very small volumes of available analyte. For example in the arrangement of FIG. 4, which is a schematic of a single device 100, typical capture volumes are about 10 nL. A device in accordance with the present teaching provides a capture chamber 160 provided in a fluid path 400 between the fluid input 120 and the output 130, the fluid path providing a conduit for fluid flowing in a direction 405 between the input and the output. In an array structure, the capture chamber is desirably located between the feed line 122 and the waste line 132. The capture chamber 160 is provided to selectively capture particles travelling within the fluid such that these particles will be displaced out of the fluid and remain in the capture chamber while the fluid exits the device.

As shown in FIG. 4B, the capture chamber is desirably a 3-D structure having a depth that extends substantially perpendicular to the fluid path. This geometry may be provided in the form of a trench 410 having a mouth 420 provided adjacent to and in fluid communication with the fluid path 400. The trench 410 has sidewalls 430 that extend downwardly into the substrate 105 from the mouth 420 of the trench. As is evident from an inspection of FIG. 4, the fluid path is desirably along an axis substantially parallel to the surface of the substrate and is desirably provided proximal to an upper surface of the substrate. While it is not intended to limit the teaching of the present invention to any one specific arrangement or geometry, the device is made of two layers, one is for the channels having dimensions of approx. 40 microns high. The trench, in contrast has a depth that extends downwardly from the surface of the substrate such that while the mouth 420 is proximal to the surface of the substrate, a base 440 of the trench is distally located to the surface of the substrate and also to the fluid path 400. This depth provided by a second layer within the device, this having a depth of approximately 300 microns.

In this exemplary arrangement the surface walls of the trench are untreated and are empty prior to the initial loading of fluid into the device. However it will be appreciated that surface coatings could be provided onto the walls of the trench for specific experiments or analysis, these coatings typically exhibiting a predefined disposition for particles of interest within the analysis to be conducted. In another modification the trench could be pre-provided with reagents such that analysis conducted using devices of the present teaching could effectively introduce particles into a reagent loaded trench.

In this exemplary configuration, and as is evident from the plan view of FIG. 4A, the trench is substantially rectangular in form having two pairs of side walls, each pair differing from the other pair in length. Desirably the trench is arranged such that its major axis (A-A') is substantially perpendicular to the direction of fluid flow 405. The minor axis (B-B') is provided parallel with the fluid flow 405. In this way the distance between a first pair of side walls 431, 432 is greater than the distance between a second pair of side walls 433, 434. The height of each pair of side walls—i.e. the overall depth of the trench is in this arrangement the same. Particles

that are displaced within the chamber are biased towards the base 440 of the chamber under the influence of a force having a force vector acting in the direction of the arrow 406 which will be understood as being substantially perpendicular to the direction of fluid flow 405.

So as to allow fluid within the fluid feed line 122 to pass over the entire mouth of the trench 410, the fluid path desirably tapers outwardly in the region immediately preceding the mouth of the trench. In the fluid feed line region 122, the side walls defining the fluid path are substantially parallel. In this first taper region 450 side walls 451 452 flare away from one another such that the distance between the side walls increases as the fluid approaches the mouth 420 of the trench. This increase in cross-sectional area of the fluid path causes fluid within the fluid path to decelerate as it approaches the mouth of the trench. The length of the taper region, i.e. the distance from the fluid feed line region 122 to the mouth of the trench is desirably sufficient to allow the particles to sediment to the bottom of the trench. It will be appreciated that this is related to the speed at which the fluid is passing over the mouth of the trench and this defines an aspect ratio between the dimensions of the trench and the fluid flow rate. This can be used to design specific trenches for preferential use with specific flow rate conditions.

In a similar fashion on the far side of the trench, i.e. the region closer to the fluid waste line 132, a funnel region 455 is provided. Side walls 456, 457 of this funnel region 455 taper inwardly towards one another as the distance from the mouth of the trench increases until they form the waste line 132 where the side walls are once again parallel with one another. This funnelling is provided to redirect the fluid that was at the edge portions of the trench, i.e. adjacent to the side walls 431, 432, into a more constricted volume. This constriction results in an acceleration of the fluid as it approaches the waste line 132.

As the fluid passes over the mouth of the trench it enters downwardly into the trench. This movement out of its plane of travel causes a deceleration of the fluid. As it then exits the trench there is a corresponding increase in the velocity of the fluid. The change of velocity within the trench region causes particles within the fluid to be displaced from the fluid. Once displaced, they settle towards the base 440 of the trench under action of an external force. It will be appreciated that the trench is desirably dimensioned relative to the flow rate of the operating conditions such that once displaced the particles will be retained within the trench. It should also be noted that apart from the previously described geometrical expansion of the flow channel, the flow rate can also be adjusted in a flow channel of constant cross-section by adjusting its hydrodynamic resistance, e.g. by varying the length, cross-section of the channel or the viscosity of the fluid, and/or the pumping force, e.g. by adjusting the height of the water column or the frequency of rotation in a centrifugally pumped system.

Simulation results of a fluid velocity within the taper region 450, the trench 410 and the funnel region 455 show these changes in velocity. As is evident from FIG. 5, the velocity of fluid within the fluid path decreases as it passes over the trench region—coincident with the region between 200 and 400 microns. It then increases again as it enters the funnel region, the area within the graph greater than 400 microns on the X axis. As it is also evident from an inspection of exemplary lengths, it is desirable that the taper region is of greater length than the funnel region.

FIG. 6 shows how fluid entering downwardly into the trench will also decelerate. As a result of this, it will be appreciated that the throughput of fluid in upper regions of the

Berkeley Lights Ex 1003-p 25
Berkeley Lights v UBC

trench is greater than throughput in lower regions. This has significance in mixing of fluid samples, as will be discussed later.

A device provided in accordance with the present teaching is especially useful within the context of cell capture and in sequential flow analysis where a plurality of fluids may be passed through the same device in a sequential fashion. In such an arrangement the particles described heretofore can be considered cells and the capture chamber is desirably dimensioned such that cells entrained within the fluid will preferentially be displaced from the fluid and will remain in the capture chamber.

FIG. 7 shows an exemplary arrangement of how cells can be effectively captured using a device **100** such as that described heretofore. A fluid **700** having a culture medium with cells of interest entrained therein is provided in a sample pipette **300**. Volumes of the order of 1 to 400 microliters may be provided in the pipette. By providing an open configuration the fluid will be gravity fed in that it will enter downwardly into the device under the effect of gravity. On introduction its direction of flow is substantially parallel to the surface of the substrate prior to encountering the capture chamber or trench. In this region the fluid will pass downwardly and slow down—per FIG. **6**. Any cell matter **705** within the fluid will displace from the fluid and settle on the bottom **440** of the trench under the impact of a sedimentation force with a substantial component in the direction of the capture chamber. This cell matter can be tested in any one of a number of different arrangements.

While the device heretofore described has application in any analysis technique that requires capture of cellular or other particulate matter, in that it provides for an effective capture of the cellular matter from a fluid medium in which it is conveyed, it will be further appreciated that such a capture region provides an effective experimental region wherein a capture cell can be stimulated or modified by suitable experimental techniques. By changing the fluid that is introduced in the device, captured cells can be exposed to different environments and their responses can be tested or for example their contents may be released to the surrounding solution in the capture chamber by exposure to a suitable lysis agent.

An example of such a multi-step analysis that may be effected using a device in accordance with the present teaching is NASBA analysis which it will be appreciated is a specific example of nucleic acid amplification.

Nucleic Acid Sequence-Based Amplification (NASBA) is a transcription-based RNA amplification system. Initially developed by Compton in 1991, NASBA is an isothermal (41° C.) process that can produce more than 109 copy cycles in 90 min. Compared to other in-vitro amplification methods such polymerase chain reaction (PCR), strand-displacement amplification (SDA) or rolling-circle amplification (RCA), NASBA has the unique characteristic that it can, in a single step, amplify RNA sequences. To achieve this NASBA involves the simultaneous action of three enzymes (avian myeloblastosis virus reverse transcriptase, RNase H, and T7 RNA polymerase). Several nucleic acid types, including mRNA, rRNA, tmRNA, and ssDNA, as well as nucleic acids from virus particles, can be analysed with NASBA, enabling a range of diagnostics, along with gene expression and cell viability measurements. In some cases the one step NASBA protocol can achieve levels of detection of extracted RNA a hundred times lower compared to the three step RT-PCR protocol. Furthermore, NASBA has the unique ability to specifically amplify RNA in a background of DNA of a comparable sequence, this reduces the sample purification requirements. A device such as that provided in accordance with the

present teaching has specific application in NASBA analysis or indeed in other techniques that require the sequential delivery of multiple fluids.

Each microfluidic device **100** or COPE element module can be configured to capture cells from a fluid passing within the device flow, long term culture them, stimulate them with drugs and agonists, stain them, lyse them and finally perform real-time NASBA analysis and/or an immuno assay analysis all within the same chamber. An example of such a methodology will be described with reference to FIG. **8**.

In a first step, Step **800**, a culture medium **700** is introduced into the device. This may be done in one or more repeated steps and during this cell culture phase the entire device is placed in a standard cell culture incubator where, if required, conditions such as concentration of $CO_2$ can be controlled. The presence of the culture medium and the controlled ambient conditions allow for a culturing of the cells captured within the trench. Once these have been cultured, it is then possible to change the fluid within the device.

As an example, in Step **810**, a lysis mixture **700**A is introduced into the device. The lysis mixture once introduced can be left in-situ within the device (Step **820**) for a sufficient period of time to allow for cell lysis.

Once this period has expired, the flow through fluid can be changed again such that for example NASBA reagents **700**B may be introduced into the device (Step **830**). Analysis of the reaction of the lysate mixture **850** to the introduced NASBA reagents can be assessed in real time. During the real-time NASBA and immuno-assay analysis phase the device may be mounted on a standard automated temperature controlled fluorescence microscope stage and the change in fluorescence from each trench may be measured as a function of time. To simplify the operation the device is designed in such a way that the fluidic resistivity of all the inlets is equal and low enough so that the pressure generated by a standard pipette is sufficient to drive fluids into the device. This enables all fluid loading of the device to be done directly with a standard pipette and furthermore when the filled pipette tips are left plugged into the inlets they function as gravity driven pumps or hydrostatic delivery devices. This gravity driven pumping action is used for cell loading and the perfusion of culture media, drugs and labelling dyes, lysis mixture, immuno-assay and real time NASBA reagents. By varying the height of the fluid in the inlet tip the gravity driven pumping flow velocity can be controlled.

FIG. **9** shows exemplary results achieved from a multiplexed array structure such as that shown in FIG. **2**. In this exemplary arrangement the signal responses **900** for each of the individual devices are evident. For example in the array **910**, eight individual responses are evident. Each response is reflective of the reaction that has occurred within an individual capture chamber. It will be appreciated that by integrating a plurality of individual devices **100** onto a single substrate and effecting simultaneous experiments within each, that it is possible to obtain a plurality of results within the same time frame. Furthermore as each experiment, i.e. the results from cells captured within the individual chambers, has been conducted within the same ambient conditions, statistical errors are reduced.

Experimental Results

It will be appreciated from the foregoing that the device described utilises gravitational driven flow and the fact that fluids are responsive to hydrostatic pressure to effect a flowing of the fluid from regions of higher pressure to regions of lower pressure. To understand the effect of the device's capability of harnessing gravity driven flow inlet pipettes are filled with different volumes and measuring the flow velocity

Berkeley Lights Ex 1003-p 26
Berkeley Lights v UBC

generated at the inlet of each device **100** was measured. The results are shown in FIG. **10**. It is evident that by increasing the volume of fluid provided initially in each pipette that the flow rate within the device can be controlled. In this way for example, if it is desired to have a low flow rate, a smaller volume of fluid may be provided in the pipette.

The injection flow rate has an effect on cell and particulate matter loading within the trench or capture region. Cells or particles suspended in a fluid are flown into the device, and as long as the injection flow rate is below a certain threshold all cells that pass over the cavity region will sediment and be trapped within the cavity.

FIG. **11** illustrates a scenario where HeLa cells **1105** are trapped within several trenches **1100A**, **1100B**, **1100C**, **1100D**. Each of the four trenches has identical dimensions 100×400 μm with a depth of 320 μm, while the flow path had a height of 40 μm. The injection flow rate was 50 mL/min. As is seen from a visual inspection of each of the four chambers **1100A**, **1100B**, **1100C**, **1100D**, the HeLa **1105** cells are trapped within the chambers. Further statistical analysis on additional chambers as shown in FIG. **12** shows cell loading relative standard deviation of 7.8%.

FIG. **13** shows a modification where 1.5 μm silica beads were captured within the cavity; the reference numerals used are the same as what was used for FIG. **4**. After 30 min of loading the beads have begun to fill the cavity and almost no beads were detected escaping the cavity. The same experimental conditions were employed for the arrangement of FIG. **11** as for FIG. **13**. The injection flow rate was 50 mL/min in the direction of the arrow **1301**. Statistical measurements have shown 99.75% capture efficiency.

Using devices such as that provided within the context of the present disclosure, the fluid volume within the trench can be easily replaced with a new solution by just flowing the new solution over the cavity. This is demonstrated in the context of FIG. **14** where a fluorescent dye solution was introduced into a device having previously received water, the water being retained within a 300 micron deep trench. The flow rate was approx. 500 μm/s. Within 5 min the dye solution had completely replaced the pure water.

To demonstrate the usefulness of a device or structure such as that heretofore described cell culture, drug stimulation and staining procedures were performed. After loading the cells into the capture regions, the device was placed within an incubation chamber at 37 C and culture media dynamically perfused over the cells through the gravity driven flow. The inlet tips were generally reloaded with new media every 2 days. The waste fluids were also cleaned off every 48 hrs. When the cells had to be stained then the media in the inlet tips was replaced with the dye solutions. After approx. 20 min of gravity driven flow of the dye solutions the cells are labelled and can be fluorescently interrogated with a microscope. Results from such steps are provided in FIG. **15** where long term cell culture and viability staining results are evident.

To demonstrate lysis and purification a layer of beads were provided on top of the cells. The beads were provided with pre-coated antibodies or oligo-nucleotide sequences that would specifically bind to the target of interest that will be purified. The cells are lysed by diffusion mixing a lysis agent and washing off the rest of the lysate. The steps are shown in FIG. **16**, which again uses the same reference numerals as have been previously used for FIGS. **7** and **8**.

In step **1**, the cells **705** were loaded and cultured by introduction of a culture medium **700**. Step **2** shows the provision of a layer of pre-coated RNA capture beads **1600** on top of the cells **705**. A lysis mixture **700A** is introduced in Step **3**. This effects a break down of the cell walls and generates a lysate

mixture **1605**. The lysate mixture mixes with the beads and after about 30 minutes incubation the beads capture the cell RNA. In Step **4**, the remains may be washed away by flowing through another volume of liquid such as PBS **1610**.

The results from a lysis experiment are shown in FIG. **17** where HeLa cells were lysed with a lysis agent in the form of 100 mM NaOH. The effective breakdown of the cell walls is complete within 40 seconds, as is evident from the disintegration of the cells shown with elapse of time.

A variety of tests may be conducted on cells that are constrained within the capture region. For example immunoassay and real time NASBA analysis can then be performed by following the steps shown in FIG. **18**. During the real-time NASBA and immuno-assay analysis phase the device is mounted on a standard automated temperature controlled fluorescence microscope stage and the change in fluorescence from each capture region is measured as a function of time (FIGS. **19** & **20**).

Steps **1** through **4** are the same as what was described with reference to FIG. **16**. In Step **5** a fluorescently labelled antibody mixture **1800** was introduced into the device. Unbound fluorescent anti-bodies may be washed away with PBS **1610** or other suitable washing or dilution materials, and the fluorescence measured. It will be appreciated that a complete washing may not be required in that the sequential flow of the additional fluid may simply effect a dilution of the previously entrained fluid within the chamber. —Step **6**. Any fluorescence around an antibody coated bead is due to protein in the target. This fluorescence may be optically analysed. In Step **7** a NASBA reagent mixture **1810** was introduced into the device. Step **8** demonstrates how real time NASBA may be done by incubating the device at 41° C. and monitoring the increase in fluorescence in the capture region. Any increase in fluorescence can be attributed to generation of more amplicons and opening of molecular beacons. It will be appreciated that this sequence of steps shows how the same capture chamber **410** may be used as a receiving volume for a plurality of different fluids, each of the fluids having an effect on the cells or subsequent mixture resultant from the exposure of the cells to a previously introduced fluid.

FIG. **19** shows fluorescence images of approximately sixteen individual devices at the beginning of the NASBA reaction. The different chamber coatings are also indicated. FIG. **20** shows simultaneous change in fluorescence within sixteen devices during the NASBA reactions. The coatings within the different capture regions was varied. Twelve positive control experiments were done, together with four negative controls within a single monolithic device.

It will be appreciated that the exemplary application of use of a device provided in accordance with the present teaching as a reaction chamber for NASBA type experiments demonstrates the useful employment of such a device for experiments that require contact between a captured cell and a sequence of fluids. By retaining the cell within a capture chamber or trench and then simply flowing different fluids past that captured cell, it is possible to achieve capture, labelling and analysis within a single structure. Therefore it will be understood that while the teaching has benefit and application in NASBA that it could also be used in other applications that require exposure of a captured cell to different fluids. Such application to lab on a chip technology with sample-in, experiment and answer out capability will be evident to those skilled in the art. Use of devices such as those heretofore described have benefit in that they can enable screening and diagnostics with lower cost, less contamination, and smaller sample volumes.

Berkeley Lights Ex 1003-p 27
Berkeley Lights v UBC

The retention characteristics of the capture region make it particularly effective for also mimicking in vivo conditions of cellular activities. As the dimensions of the capture trench are much greater than the particles which are retained therein, devices such as those heretofore described can be usefully employed in biomimetic experiments. For example as shown in FIG. 21 a device 100 can be used to generate 3D cell structures 2100 of individual cancer cells 2105 so as to re-create cellular conditions similar to in-vivo tumours or other structures. This can also be combined with the fact that multiple cell types can be incorporated in a layered fashion to form co-cultures that further approximate in-vivo like conditions. An example of such a 3D co-culture like experimental setup for investigating cancer cell dynamics close to blood vessels 2110 (endothelial cells) is shown in Step 2 of FIG. 21. By selectively varying the nature of the fluid passing over the capture chamber it is possible to selectively layer the particles that are ultimately captured within the chamber. As these will typically be retained in the order that they were introduced into the chamber, this allows for subsequent experiments to be conducted within pseudo in vivo conditions. While the arrangements described herein preferentially retain the particles within the trench it is possible to modify the arrangement so as to provide for subsequent movement of the particles—either within the trench so as to provide for mixing or the like, or to effect removal of the particles out of the trench. Such arrangements will typically require a capacity to manipulate the particles and this can be conducted either before or subsequent to capture of the particles within the trench. Examples of techniques that could be employed include:

Acoustic

Magnetic

Inertial

Electric

Dielectrophoretic

Thermo-hydrodynamic

Laser tweezers

Hydrodynamically induced agitation

Specific or unspecific attachment to surface

It will be understood that the use of such techniques may require an external source of agitation or manipulation of the particles.

A further example of the use of such a capture chamber is in the analysis of E. Coli bacterial cells. To provide for such analysis, a solution containing the E. Coli is flown into the device in a manner as described heretofore. This capture allows for cell based assays to be conducted. As part of the process for such analysis initially the device is loaded with the bacterial solution. After this initial loading, a washing or dilution solution is flown in to rinse out any non captured bacteria. Due to the low flow field at the bottom of the processing chamber trench, the bacteria present there will be effectively captured and not washed away. Due to the very low density of the E. Coli bacteria, the capture efficiency is much lower than that of denser particles or cells such as cancer cells.

If mixing of fluids is required between a new input fluid and the previous contents of the processing chamber, then that may be achieved by stopping the input fluid flow before it has completely replaced the previous contents as shown in FIG. 22. In this specific example it is shown how a FITC dye (44 μM) is flown into a previously water filled device and allowed to mix with the water within the trench chamber. The input flow velocity is ~400 μm/sec.

In cases where reagent or sample volumes are very limited and scarce an oil layer may be used to hydrostatically drive in the low volume reagents. Experiments with 20 microliter tips demonstrated that volumes as low 400 nL can be readily loaded into the processing module. Since each module consists of 8 processing chambers each chamber is loaded with 50 mL. Due to the oils lower density, input flow rates can be up to 25% slower compared to water solution based hydrostatic flow.

With on-chip gravity driven flow control, an array structure such as described heretofore is flexible and can be easily integrated into existing infrastructure and workflows such as robotic pipetting systems, incubators, and fluorescent microscope systems.

It will be appreciated that the capture chamber may be considered as a sediment trap whereby the particles within the fluid, such as for cells or other living organisms, which are entrained within the fluid on passing the capture chamber are displaced out of the fluid and remain in the capture chamber for subsequent analysis or experimentation. As they simply fall out of the fluid they are exposed to minimum shear stress. These particles will consolidate on the bottom of the capture chamber to provide what may be considered a sediment on the chamber base. As more particles are retained within the capture chamber, the height of the sediment will increase.

The devices described herein have been illustrated with reference to a single flow path and a single trench provided within that flow path. It will be appreciated that modifications to the individual devices described could include an array of sequentially defined trenches within the flow path, each of the trenches differing from the others in their affinity for particles of different sizes so as to enable sorting of particles based on their sedimentation characteristics.

In the context of a primary force providing for the delivery and/or movement of the fluid/particles within the devices, it is also possible in combination with a primary force to employ a second force which acts on the particles or the fluid flow to either supplement or counteract the effects of the first force on the fluid or particles. This could be employed either locally within the devices to cause specific movement of the flow/particles within specific regions of the device or could be applied as a general force to affect the overall flow/movement characteristics. Examples of such a second force which can be used to reinforce or suppress particle sedimentation/retention into the trench and/or liquid flow patterns the particle is exposed include:

Magnetic force (static or dynamic)

Buoyancy of high- or low-density particles

Dielectrophoresis

It will be understood that in order to operate efficiently that specific second forces may require use of materials/particles/fluids that exhibit response to these forces. For example use of paramagnetic beads could be employed where it is desirable to apply a magnetic force to effect movement of the beads.

Heretofore the liquids described have been generally homogenous in nature. It is possible to provide liquid sequencing within the context of devices provided in accordance with the present invention. Such liquid sequencing could employ one or more immiscible liquids where for example a second liquid, e.g. oil phase, seals a previously provided aqueous phase residing in trench. Within the context of the present teaching it is also possible to provide a train of mutually immiscible phases to feed different reagents to trenches. As another example, one of the liquids in the sequence may be (another) particle suspension from which particles might differentially sediment into the trench(es).

Devices provided in accordance with the present invention desirably provide for changes in the flow rate of the fluid

Berkeley Lights Ex 1003-p 28
Berkeley Lights v UBC

passing through the device in regions proximal to the trench, the change of flow rate effecting a collection of particles from that fluid. It will be understood that different fluids may have different flow rates when exerted to the same force. This could be used as a means to preferentially collect particles from a first fluid in a first trench and particles from a second fluid in a second trench. While it is not intended to limit the teaching of present invention to any one set of specific parameters simulation analysis has shown the variations in the flow velocity magnitudes in the processing chamber and trench. Cell capture is achieved due to the flow velocity magnitude in the trench being approximately 3 orders of magnitude lower the flow above it. As a result of these variances, the particles that enter the low flow velocity region are effectively captured.

The particles/fluid that are collected and retained in the trenches can be subjected to a number of different tests such as for example:

Microscopy techniques including staining

Surface sensitive excitation and detection such as SPR, TIRF

Other excitation and/or detection techniques.

The fabrication of devices provided in accordance with the present teaching may be effected using one of a number of different processes. While it is not intended to limit the teaching to any one specific process exemplary techniques that could be employed include:

Injection moulding

Hot embossing

Thermoforming

Precision engineering

Laser ablation

Lamination

Lithography

Dry and wet etching

other microfabrication schemes including sealing schemes as will be appreciated by those skilled in the art.

It will be appreciated that a device such as that fabricated in accordance with the present teaching has a number of advantages including its application to efficient cell capture with minimal clogging and exposure of the cells to shear stress. The device is suitable for in situ cell culturing and can also be considered for providing 3-D cell co-culturing. An exemplary application has been demonstrated in multi-flow analysis techniques which may be effected without removal of the captured cells from their capture chamber. Such devices may be provided in single element packages or could be arranged in array structures where a plurality of devices share a common input. Further modification has been described in the context of a multiplexed structure that provides multiple capture regions within the same substrate. These devices can be implemented or fabricated using conventional microfluidic engineering principles. Use of plurality of devices provides for fluidic isolation of separate modules on a single chip. While it is not intended to limit the teaching to any one specific arrangement, the introduction of a fluid into the devices using integrated gravity driven pumping units on a monolithic micro device is particularly useful.

A further example of use of such a multi-flow sequential analysis tool is in real-time protein analysis whereby it is possible to monitor live cell interactions with stimulation agents and/or other cells and in real time detect with high specificity the expression of surface proteins. FIG. 23 shows an example of such an application whereby the real time measurement of the level of surface protein expression may be effected. This exemplary procedure is based on the specific binding of labelled antibodies to the surface protein of interest

(target proteins). The real-time measurement is achieved by having the surface protein within a microfluidic system that constantly refreshes a low concentration of antibodies in the medium. As new target proteins are expressed on the surface, the labelled antibodies in the medium solution specifically bind and label the proteins. The consumed anti-bodies are replaced by microfluidic refreshment so as to keep a constant supply of dissolved antibodies. The surface protein concentration is directly correlated to the signal from the surface labels.

It will be understood that this application advantageously employs the use of the microfluidic trench structure that has been described heretofore. Whereas in the previous applications described herein the structure has been demonstrated to be capable of very efficient cell capture and retention coupled with constant perfusion and refreshment of the soluble factors within the trench, in this application the present inventors have realised that the exact elements required for real time surface protein expression detection can be achieved with microfluidic systems. The capability of real time protein expression detection has not been previously demonstrated or reproduced in the macro-scale or with conventional equipment. The real time protein expression measurement was achieved by maintaining a very low concentration of fluorescently labelled antibodies in the perfusion medium.

In this exemplary experiment of the applicability of the apparatus for this application FITC-labelled anti-CD86 antibodies were used at concentration $\frac{1}{100}$ of neat. The fluorescent antibody in this case was specific to the CD86 co-stimulatory molecule. During an antigen-dependent inflammatory response macrophage cells are activated and over express co-stimulatory molecules such as CD80, CD86 and CD40 on their surface which helps induce an effective T-cell response. This is one of the key mechanisms and outcomes of activated macrophages that makes them behave as antigen presenting cells (APCs) and activates the adaptive immune system. During the real time monitoring of surface protein expression J774 macrophages 2300 were activated with LPS (200 ng/ml) in the positive control case, while in the negative control no LPS was present in the culture medium. As the stimulated macrophages began to express the CD86 proteins on the cell surface, the fluorescent CD86 antibodies generated a fluorescent signal from the cell surface. As the free solution antibodies are being consumed and bound on the cell surface, new ones replace them through the continuous perfusion and diffusion. This maintains a constant supply of in solution antibodies and enables the real time monitoring of the CD86 protein expression on the surface of the macrophage cells. Furthermore the micro-scale dimensions of the device keep the background fluorescence generated by the in solution antibody to a minimum, lowering the LOD to physiologically relevant levels. This measurement technique can be further enhanced by simultaneously using several antibodies with different fluorophore labels to generate simultaneous real time multiple surface protein readout with single cell resolution.

It will be appreciated that this application of the sequential flow analysis tool is based on the capabilities of the described microfluidic system to refresh dissolved agents. By using a low concentration of in-solution labelled antibodies combined with the small micro-dimensions of microfluidic cavities, a low background signal can be maintained while always having antibodies available for labelling. This way any incubation and washing steps, usually required in conventional immunoassays become unnecessary, enabling the real time labelling and monitoring of surface proteins as they are generated.

Berkeley Lights Ex 1003-p 29
Berkeley Lights v UBC

FIG. **24** shows in schematic form how the same device may be used for RNA analysis and protein analysis; the variation being on the reagents that are introduced into the individual chambers. While the figure schematically shows the two different analysis occurring in parallel, it will be understood that this is shown purely to emphasise the application of the sequential flow analysis apparatus of the present teaching to two different analysis.

In Step **2400**, a common step, cells are loaded in a similar fashion to that which was described before. In Step **2405**, these cells may be cultured and stimulated through introduction of a culture medium. The technique branches thereafter depending on whether RNA or protein analysis is desired.

In RNA analysis, firstly a fixing buffer followed by a lysis buffer are introduced to fix and lysis the cells (Step **2410**). After a predetermined time period a real time NASBA mixture is introduced (Step **2415**). After incubation at desired temperatures (about 41° C.) a fluorescence analysis (Step **2420**) will provide the RNA analysis.

If protein analysis is preferred, then after the culturing of the cells (Step **2405**), a fixing buffer is introduced to fix the cells within the chamber (Step **2425**). Subsequent loading of an antibody buffer provides an immuno-stain (Step **2430**). The subsequent washing of the unbound antibodies (Step **2435**) and luminescent analysis of the chambers will provide information on the protein.

While a sequential multi-flow array may be fabricated in any one of a number of different methodologies, FIG. **25** shows an exemplary flow sequence that may be adopted to advantageously simplify the alignment and complexity of manufacture. In this exemplary arrangement two layers of PDMS (a fluidic layer and a lid/inlet layer) and a support glass substrate are employed. In Step **2500** two different Si wafers are provided. On a first wafer, a layer of SU-8 photoresist is provided (Step **2505**). A second layer of SU-8 is then provided on the first layer to define an upstanding profile on the first layer (step **2510**). On the second wafer a layer of PDMS is provided. This layer is then peeled and punched to generate what will ultimately form inlets to the device (Step **2520**). On the first wafer a PDMS layer is provided over the SU-8 layer so as to encapsulate the layers (Step **2525**). By suitable etching, the SU-8 may be eroded to define a pattern within the PDMS layer (Step **2530**). By inverting this layer and then bringing the first and second layers together and assembling them relative to one another onto a glass substrate a trench and inlets are fabricated (Step **2535**).

A technique such as that described herein can be used for analysis of cell secretion where cells secrete proteins into their surrounding extracellular fluid. By being able to spatially discriminate the detected optical signal it is possible to analyse the nature of the origin of the optical signal. To provide for spatial discrimination as to the origin of the desired optical signal it is necessary to be able to discriminate between the bulk contribution to the detected signal and that signal that originates from the sample or analyte of interest. One way of achieving this is to effect a mathematical integral technique whereby the detected intensity of the luminescent signal originating from the top of the collection chamber down to the surface of the sample region is compared with that originating from proximal or at the surface of the sample region. By ensuring adequate heights and dimensions of the collection chamber relative to the sample type and analysis technique effected it is possible to provide an adequate signal to noise ratio of sufficient level to allow for bulk and analyte contribution to the detected luminescence signal.

While the use of a luminescence based analysis methodology is particularly advantageous within the present context it

will be understood that different optical agents could be used to allow for a spatial discrimination between the sample region and the bulk fluid within the collection chamber. For example different optical biosensing techniques could be used within the context of the present invention for assessing the properties of the captured cellular or particulate matter within the capture chambers or wells heretofore described.

It will therefore be appreciated that while the present teaching has been exemplified with reference to the heretofore and the attached drawings that these are provided to assist in an understanding of the teaching and are not to be construed as limiting in any fashion. Modifications can be made without departing from the spirit or scope of the invention. Where integers or components are described with reference to any one figure it will be understood that these could be changed for other integers or components without departing from the present teaching.

While a preferred arrangement of the present teaching will be evident from the claims that follow, the invention also relates to a microfluidic device substantially as described in the following numbered clauses.

1. A microfluidic device comprising a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber due to action of a non-centrifugal force on the particles, the non-centrifugal force acting in a direction substantially parallel to the direction of extension of the capture chamber into the substrate.

2. The device of clause 1 wherein the fluid path is provided within the substrate, the fluid path defining a conduit having a base, top and side walls.

3. The device of clause 2 wherein the fluid path is disposed along an axis substantially parallel with an upper surface of the substrate.

4. The device of any preceding clause wherein the fluid path is proximal to an upper surface of the substrate.

5. The device of any preceding clause wherein the capture chamber is in the form of a trench having a mouth adjacent to and in fluid communication with the fluid path, the trench having sidewalls that extend substantially parallel to the direction of the of the capture force into the substrate from the mouth of the trench.

6. The device of clause 2 wherein the trench has a major axis that is substantially perpendicular to the fluid path, the trench being longer than it is wide.

7. The device of clause 6 dimensioned such that operably fluid travelling within the fluid path and entering downwardly into the trench will undergo deceleration and the fluid exiting the trench will undergo acceleration, the change of velocity within the trench causing particles within the fluid to be displaced from the fluid.

8. The device of any preceding clause wherein the particles are cells and the capture chamber is dimensioned such that cells entrained within the fluid will preferentially be displaced from the fluid and will remain in the capture chamber.

9. The device of clause 5 wherein the fluid path defines a taper region immediately upstream of the mouth of the trench, the taper region operably providing for a deceleration of fluid within the fluid path immediately preceding the mouth.

Berkeley Lights Ex 1003-p 30
Berkeley Lights v UBC

10. The device of clause 9 wherein the fluid path defines a funnel region immediately downstream of the mouth of the trench such that fluid exiting the trench will undergo acceleration.

11. The device of clause 9 wherein the fluid path includes a fluid feed line upstream of the taper region, and wherein the side walls of the fluid path flare away from another between the feed line and the mouth of the trench.

12. The device of clause 10 wherein the fluid path includes a fluid waste line downstream of funnel region, and wherein the side walls of the fluid path tapering towards one another between the mouth of the trench and the fluid waste line.

13. The device of clause 10 wherein the taper region has a length greater than the funnel region.

14. The device of any preceding clause wherein the inlet is dimensioned to receive a pipette funnel such that fluid may be introduced into the device and then pass within the fluid path.

15. The device of clause 14 wherein the volume of the fluid within the pipette is related to the fluid flow rate within the device.

16. The device of clause 14 or 15 wherein the fluid enters into the device under hydrostatic pressure.

17. The device of any one of clauses 1 to 14 being dimensioned such that a fluid loaded into the device enters or moves within the device under the influence of one or more of:

Hydrostatic pressure head (e.g. pipette tip or tilt)
Pressure-driven flow
Centrifugally propelled flow
Electrokinetic mechanisms

18. The device of any preceding clause wherein the fluid path defines a filter between the inlet and the capture chamber so as to effect a filtering of particulate matter of a predetermined dimension prior to the capture chamber.

19. The device of any preceding clause including a plurality of capture chambers sequentially provided within the fluid path.

20. The device of clause 19 wherein individual capture chambers are configured so as to be operably predisposed to capture of particles of a particular characteristic.

21. The device of any preceding clause wherein the capture chambers comprises surfaces having a surface coating which operably exhibits an affinity for predefined particles.

22. The device of any preceding clause wherein the capture chamber comprises a preloaded reagent.

23. A microfluidic array comprising a plurality of devices as detailed in any preceding clause.

24. The array of clause 23 wherein selected ones of the plurality of devices share a common input.

25. The array of clause 23 or 24 wherein selected ones of the plurality of devices share a common output.

26. The array of clause 25 wherein the input is arranged in a branch structure such that fluid introduced into the input will be directed towards each of the capture chambers of the selected ones of the plurality of devices.

27. The array of clause 26 wherein the output is arranged in a branch structure such that fluid exiting each of the capture chambers of the selected ones of the plurality of devices will collect with fluid of others of the selected ones of the plurality of devices.

28. A multiplexed microfluidic structure including a plurality of arrays as detailed in any one of clauses 23 to 28.

29. The structure of clause 28 wherein the plurality of arrays are arranged in rows on a common substrate.

30. The structure of clause 28 or 29 wherein the plurality of arrays are spaced apart from one another such that the plurality of arrays can be concurrently loaded with fluid.

31. A biomimetic analysis tool comprising a device as detailed in any one of clause 1 to 22.

32. The tool of clause 31 wherein the capture chamber is dimensioned to receive a plurality of cells which on receipt within the chamber are predisposed to adopt a 3-D configuration.

The words comprises/comprising when used in this specification are to specify the presence of stated features, integers, steps or components but does not preclude the presence or addition of one or more other features, integers, steps, components or groups thereof.

The invention claimed is:

**1**. A multi-sequential flow sedimentary sample apparatus comprising a microfluidic device, the device comprising:

a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within and extending transverse to and fully across the fluid path, the capture chamber configured within the device to selectively capture particles travelling within a fluid in the fluid path such that these particles must traverse the capture chamber and will be displaced into the capture chamber from the fluid in the fluid path and remain in the capture chamber as the fluid flows over the capture chamber, the capture chamber being dimensioned and extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles of a predefined dimension provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber due to action of a gravitational force on the particles, the gravitational force acting in a direction substantially parallel to the direction of extension of the capture chamber into the substrate such that the particles will operably sediment in the capture chamber, and

wherein the apparatus is configured for sequential fluid engagement with a plurality of fluid supply lines, an engagement of the apparatus with a fluid supply line and receipt of fluid from that supply line operably effecting a discharge from the capture chamber of a previously provided fluid.

**2**. The apparatus of claim **1** wherein the device fluid path provided within the substrate includes a conduit having a base, top and side walls.

**3**. The apparatus of claim **2** wherein the device fluid path is disposed along an axis substantially parallel with an upper surface of the substrate.

**4**. The apparatus of claim **1** wherein the device fluid path is proximal to an upper surface of the substrate.

**5**. The apparatus of claim **1** wherein the device capture chamber is in the form of a trench having a mouth adjacent to and in fluid communication with the fluid path, the trench having sidewalls that extend substantially parallel to the direction of the capture force into the substrate from the mouth of the trench.

**6**. The apparatus of claim **5** wherein the trench has a major axis that is substantially perpendicular to the fluid path, the trench having a length parallel to the major axis greater than a length of the trench that is perpendicular to the major axis.

**7**. The apparatus of claim **6** wherein the number of dimensions of the device are such that operably, fluid travelling within the fluid path and entering downwardly into the trench will undergo deceleration and the fluid exiting the trench will

Berkeley Lights Ex 1003-p 31
Berkeley Lights v UBC

19

undergo acceleration, the change of velocity within the trench causing particles within the fluid to be displaced from the fluid.

**8**. The apparatus of claim **1** wherein at least one of the fluid supply lines comprises a filter provided between the inlet and the capture chamber such that operably particles of a predetermined dimension provided within the fluid travelling within the fluid path are filtered prior to the capture chamber.

**9**. The apparatus of claim **1** wherein the capture chamber is dimensioned such that discharge of a previously provided fluid does not effect corresponding discharge of the particles collected within the capture chamber.

**10**. The apparatus of claim **8** wherein the capture chamber is dimensioned such that introduction of a second fluid into the device effects a mixing of that second fluid with a previously provided fluid within the capture chamber.

**11**. The apparatus of claim **1** wherein the apparatus forms at least part of a real-time protein analysis tool.

**12**. The apparatus of claim **1** wherein the apparatus comprises at least part of a nucleic acid sequence-based amplification (NASBA) tool.

**13**. A sequential flow analysis tool comprising:

a microfluidic device comprising a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within and extending transverse to and fully across the fluid path, the capture chamber configured within the device to selectively capture particles travelling within a fluid in the fluid path such that these particles must traverse the capture chamber and will be displaced into the capture chamber from the fluid in the fluid path and remain in the capture chamber as the fluid flows over the capture chamber, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber due to action of a gravitational force on the particles, the gravitational force acting in a direction substantially parallel to the direction of extension of the capture chamber into the substrate such that the particles will operably sediment in the single capture chamber;

20

means for introducing a flow of a first fluid into the input of the device and past the capture chamber, the introduction of the first fluid into the device effecting capture of particles within the first fluid within the capture chamber;

means for introducing a flow of a second fluid into the input of the device and past the capture chamber subsequent to the introduction of the first fluid, the flow of the second fluid past the capture chamber effecting a diffusion of the second fluid into the capture chamber so as to expose the retained particles to the second fluid.

**14**. The tool of claim **13** wherein a solution is formed on exposure of the retained particles to the second fluid, the tool further comprising:

means for introducing a flow of a third fluid into the device, the introduction of the third fluid and flow of that third fluid past the capture chamber effecting a diffusion of the third fluid into the capture chamber so as to expose the solution to the third fluid.

**15**. The tool of claim **14** wherein the second fluid comprises particles, diffusion of the second fluid into the capture chamber effecting a collection of the particles of the second fluid within the capture chamber.

**16**. The tool of claim **15** wherein the captured particles are cells.

**17**. The tool of claim **14** wherein the capture chamber is dimensioned such that on introduction of the second fluid, a layering of the particles from the first and second fluids is provided within the capture chamber.

**18**. The tool of claim **14** wherein on introduction of the second fluid the particles of the first fluid react with the particles of the second fluid.

**19**. The tool of claim **14** comprising means for effecting movement of the particles within the capture chamber.

**20**. The tool of claim **14** configured for nucleic acid amplification.

**21**. The tool of claim **14** wherein the orientation of the extension of the capture chamber into the substrate is such that operably an external force acting on the particles within the capture chamber acts in a direction substantially parallel to the direction of extension of the capture chamber into the substrate.

* * * * *

Berkeley Lights Ex 1003-p 32
Berkeley Lights v UBC

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau



(43) International Publication Date
15 April 2010 (15.04.2010)

PCT



(10) International Publication Number
**WO 2010/040851 A2**

(51) **International Patent Classification:**
*BOIL 3/00* (2006.01)          *C12Q 1/00* (2006.01)
*C12M 1/00* (2006.01)          *G0IN 33/483* (2006.01)

(21) **International Application Number:**
PCT/EP2009/063229

(22) **International Filing Date:**
9 October 2009 (09.10.2009)

(25) **Filing Language:** English

(26) **Publication Language:** English

(30) **Priority Data:**
0818579.5     10 October 2008 (10.10.2008)     GB

(71) **Applicant** *(for all designated States except US):*
**DUBLIN CITY UNIVERSITY** [IE/IE]; Collins Avenue, Glasnevin, Dublin, 9 (E).

(72) **Inventors; and**

(75) **Inventors/Applicants** *(for US only):* **DIMOV, Ivan** [BG/CL]; 814 Puerto Montt, Chile (CL). **DUCREE, Jens** [DE/IE]; 32 Bachelors Walk, Ashbourne, Meath, Meath (E). **LEE, Luke** [US/US]; 5 Meadow Court, Orinda, California 94563 (US). **KIJANKA, Gregor** [DE/IE]; 5 Glasnevin Woods, Dublin, D1 1 (E).

(74) **Agents: HANNA MOORE & CURLEY** et al; 13 Lower Lad Lane, Dublin, D2 (IE).

(81) **Designated States** *(unless otherwise indicated, for every kind of national protection available):* AE, AG, AL, AM, AO, AT, AU, AZ, BA, BB, BG, BH, BR, BW, BY, BZ, CA, CH, CL, CN, CO, CR, CU, CZ, DE, DK, DM, DO, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT, HN, HR, HU, E), E , IN, IS, JP, KE, KG, KM, KN, KP, KR, KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD, ME, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI, NO, NZ, OM, PE, PG, PH, PL, PT, RO, RS, RU, SC, SD, SE, SG, SK, SL, SM, ST, SV, SY, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, ZA, ZM, ZW.

(84) **Designated States** *(unless otherwise indicated, for every kind of regional protection available):* ARIPO (BW, GH, GM, KE, LS, MW, MZ, NA, SD, SL, SZ, TZ, UG, ZM, ZW), Eurasian (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European (AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HR, HU, E , IS, **IT**, LT, LU, LV, MC, MK, MT, NL, NO, PL, PT, RO, SE, SI, SK, SM, TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

**Published:**
— *without international search report and to be republished upon receipt of that report (Rule 48.2(g))*



(54) **Title:** MICROFLUIDIC MULTIPLEXED CELLULAR AND MOLECULAR ANALYSIS DEVICE AND METHOD

(57) **Abstract:** A sequential flow analysis tool comprising a microti iridic device having a fluid path defined within a substrate between an input and an output is described. The device includes a capture chamber provided within but offset from the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber.

Berkeley Lights Ex 1004-p 1
Berkeley Lights v UBC

**Title**

MICROFLUIDIC MULTIPLEXED CELLULAR AND MOLECULAR ANALYSIS
DEVICE AND METHOD

**Field of the Invention**

5       The present invention relates to microfludic devices and to analysis
conducted using such devices. The invention more particularly relates to a
microfluidic device and method that can be used for multiplexed cellular and
molecular analysis and treatment.

**Background**

10      Microfluidic devices are well known for use in analysis and sample
treatment.  Such devices provide for the precise control and manipulation of
fluids and are generally considered to have geometric dimensions of the micro,
i.e. sub-millimeter scale. These devices are particularly useful in that they
provide measurements in scenarios where there are only small volumes of the
15   analyte available or small amounts of reagents should be used, e.g. in high-
throughput screening for drug discovery.  Furthermore they tend to provide
results with reduced reagent consumption and analysis time, ease of
integration, and the potential for high-throughput analysis.


20      While conventional microfluidic devices provide many advantages
commensurate with their dimensions there are still problems in using these
devices for complete analysis systems, i.e. the type of systems that enables the
provision of an analyte, the modification of that analyte and the obtaining of
results from that modification. There is a further need for systems that provide a
25   plurality of data signal outputs that can be used for statistical analysis and for
parallel processing of a plurality of different tests. Also the costs of
manufacturing have to be minimized, restricting the scope of fabrication
technologies and hence also the degree of freedom available for the device
features geometries.

Berkeley Lights Ex 1004-p 2
Berkeley Lights v UBC

## Summary

These and other problems are addressed by a sequential flow microfluidic device having a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber. The chamber is desirably dimensioned to allow for the sequential flow of a plurality of fluids passed the chamber, a second fluid flow providing for a change in the medium within the chamber resultant from the first fluid flow.

The capture or collection chamber is desirably in the form of a trench having a mouth adjacent to and in fluid communication with the fluid path, the trench having sidewalls that extend downwardly into the substrate from the mouth of the trench.

In a first arrangement the particles are cells and the capture chamber is desirably dimensioned such that cells entrained within the fluid will preferentially be displaced from the fluid and will remain in the capture chamber.

The fluid path is desirably along an axis substantially parallel to the surface of the substrate. The fluid path is desirably provided proximal to an upper surface of the substrate.

In one arrangement the inlet is dimensioned to receive a pipette funnel such that fluid may be introduced downwardly into the device and then pass within the fluid path along the surface of the substrate.

Berkeley Lights Ex 1004-p 3
Berkeley Lights v UBC

The fluid path may include a funnel constriction provided between the inlet and the capture chamber so as to effect a filtering of particulate matter of a predetermined dimension prior to the capture chamber.

5      The device may be configured in an array structure with a plurality of capture chambers. Desirably the plurality of capture chambers share a common input and output, the input being arranged in a branch structure such that fluid introduced into the input will be directed towards each of the capture chambers.

10     There is also provided a multiplexed structure including a plurality of devices arranged on a common substrate.

The invention also provides a methodology for effecting cell or molecular analysis.

15

Accordingly, a first embodiment of the invention provides an apparatus as detailed in claim 1. A tool according to claim 13 is also provided. Independent methods such as those detailed in claims 22, 30, 31, or 32 are also provided. Advantageous embodiments are provided in the dependent claims.

20

These and other features will be better understood with reference to the exemplary arrangements which follow.

### Brief Description Of The Drawings

25     The present invention will now be described with reference to the accompanying drawings in which:

Figure 1 shows an array of devices provided in a row configuration in accordance with the present teaching

Figure 2 is a photograph of an exemplary multiplexed structure including a

30     plurality of devices.

Berkeley Lights Ex 1004-p 4
Berkeley Lights v UBC

Figure 3 is a photograph showing the loading of a structure of Figure 2.

Figure 4A shows in plan view a device provided in accordance with the present teaching.

Figure 4B shows in perspective sectional view elements of such a device.

Figure 5 shows how fluid velocity varies within the fluid path.

Figure 6 shows how fluid velocity varies with depth of the collection trench.

Figure 7 shows schematically how a fluid may be introduced so as to effect capture of cells within the capture region.

Figure 8 shows a sequence of steps that may be implemented in a multi-flow through arrangement.

Figure 9 shows exemplary results that may be concurrently obtained using a structure in accordance with the present teaching.

Figure 10 shows how the volume of fluid within the inlet tip may be used to control flow rates within a device.

Figure 11 shows example of cell loading.

Figure 12 shows exemplary statistical data demonstrating cell loading in different cells.

Figure 13 shows how efficient capture is effected using an example of beads within a fluid flow.

Figure 14 shows how fluids within the trench may be replaced by flowing new fluids passed.

Figure 15 shows exemplary data demonstrating how devices may be usefully employed in long term cell culturing.

Figure 16 shows how cell lysis may be effected.

Figure 17 shows exemplary data showing the effects of such cell lysis.

Figure 18 shows exemplary steps that may be used in effecting NASBA.

Figure 19 shows fluorescence images of approx.16 individual devices at the beginning of a NASBA reaction.

Figure 20 shows simultaneous change in fluorescence within 16 devices during a NASBA reaction.

Berkeley Lights Ex 1004-p 5
Berkeley Lights v UBC

Figure 21 shows examples of application of a device in accordance with the present teaching within a biomimetic environment.

Figure 22 shows how mixing may be effected within a device in accordance with the present teaching.

Figure 23 shows how a device in accordance with the present teaching may be used for real time protein analysis.

Figure 24 shows a protocol that may be employed for gene and or protein expression analysis.

Figure 25 shows in schematic flow exemplary steps that may be used to fabricate a device in accordance with the present teaching.


**Detailed Description Of The Drawings**


The teaching of the invention will now be described with reference to exemplary arrangements thereof which are provided to assist in an understanding of the teaching of the invention but which are not in any way intended to limit the scope of the invention to that described.

Figures 1 and 2 show an exemplary structure incorporating a microfluidic device 100 in accordance with the present teaching. Each device 100 comprises a fluid path 103 defined within a substrate 105 between an input 120 and an output 130. A capture chamber 160 is provided within the fluid path. The capture chamber is configured so as to extend into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber by means of a substantially perpendicular force field enforcing sedimentation. In this exemplary arrangement the capture chamber extends downwardly into the substrate. In this way it can be considered as

Berkeley Lights Ex 1004-p 6
Berkeley Lights v UBC

having a major axis which is substantially perpendicular to the plane of the
substrate surface.

5      Typically the device will be operated in a horizontal arrangement such that
the direction of extension of the chamber is parallel with gravitational force lines,
i.e. the particles within the fluid will be biased towards the bottom of the
chamber under the influence of gravity. It will be understood that gravity is an
example of a non-centrifugal force in that it acts on the particles without
requiring a movement of the device, and within the context of the present
10     teaching any force that does not rely on rotation of the device to effect retention
of the particles within the chamber can be considered suitable. In contrast to the
forces causing retention of the particles within the chamber, centrifugal forces
could be considered suitable for effecting movement of the fluid within the fluid
flow. It will be appreciated that the forces that effect displacement of the
15     particles from the fluid and their subsequent retention in the chamber act
substantially perpendicular to the direction of flow of the fluid.

       The device is particularly suitable for configuring in array structures, a
plurality of arrays being integrated into a multiplexed structure. Each of the
20     devices 100 of Figure 1 and 2 may be considered identical and are usefully
employed as Cell Capture and Processing Elements (CCPE) such that the
completely integrated and multiplexed device shown in Figures 1 and 2
provides five hundred and twelve identical Cell Capture and Processing
Elements (CCPE) multiplexed into a single monolithic device. It will be
25     appreciated that the specific number is related to the exemplary arrangement
of nine non-identical rows of arrays, the total structure having sixty four arrays
each having eight microfluidic devices, but different configurations could be
provided without departing from the teaching of the present invention.

Berkeley Lights Ex 1004-p 7
Berkeley Lights v UBC

Each array 110 in this configuration comprises eight identical devices 100, sharing a common input 120 and a common output 130. The common input branches into 8 feed lines 122a, 122b, 122c etc., provided upstream of capture chambers for each device respectively. Each device has a dedicated waste line

5     132a, 132b, 132c etc., provided downstream of the capture chamber and configured to distribute fluid out of the devices into the common output 130. Within each array it will therefore be understood that a plurality of capture chambers are provided. Where they share a common input the fluids that are discharged into the individual chambers will be the same. However by pre-

10    treating individual chambers it may be possible to vary the conditions experienced by those fluids within the individual chambers.

Individual arrays 110 may be arranged in rows 150a, 150b etc., on the substrate 105. In this way a plurality of arrays may be aligned; in this exemplary

15    arrangement along a common row. Where a plurality of arrays are provided along a common axis, they may advantageously be configured so as to share a common waste. In this exemplary arrangement the common output 130 for each row is then in fluid communication with common waste 140 for the multiplexed structure.

20

In this exemplary arrangement, each inlet is evenly connected to 8 CCPEs 100 and the inlets 120 have the same distribution as a 96 conventional well micro titter plate- approximately 9mm apart from one another as shown in Figure 1. The devices of this arrangement are configured to be loaded with fluid

25    under the influence of a hydrostatic pressure head. Such loading of the fluid into the devices and then the subsequent propulsion of the fluid within the devices can be provided by coupling the devices to a pipette arrangement whereby the volume of fluid in the pipette generates a pressure that causes the fluid to enter downwardly into device from the pipette and then travel within the fluid path. In

30    this way the multiplexed microfluidic structure 115 may be used with

Berkeley Lights Ex 1004-p 8
Berkeley Lights v UBC

conventional loading equipment such that for example sample loading may be done with a standard 8 channel pipette such as those manufactured and provided by the company Eppendorf.

5          An example of such a loading configuration is shown in Figure 3, where 4 conventional pipettes 300 are mated with 4 inlets respectively. Fluid within each of the 4 pipettes can be transferred into 8 individual microfluidic devices 100 arranged in an array structure, each of the devices sharing the common input 120. In the arrangement of Figure 3, it will be observed that the loading of the

10       multiplexed structure can be achieved on a per row basis such that each of the rows does not have to be concurrently loaded. In this way the number of experiments that is conducted can be defined relative to either the nature of experiment or the volume of analyte available. It will be appreciated that by providing a plurality of different devices coupled to the same input that each of

15       the device serves to replicate the process being conducted in the other devices of the array. This allows statistical analysis of the process to be conducted with the comfort that the conditions of each device in the array should be identical. Two or more separate arrays can be loaded concurrently with the same or different materials - be that particles within a fluid or particles directly- such that

20       each array either replicates the process of the other or is operable to conduct a different process concurrently with that of the other.

          While pipette loading is an example of a hydrostatic pressure head delivery system other configurations such as a tilting of the device to allow for

25       flow of the pure fluid or particle suspension within the device also could be utilised to take advantage of the principles of hydrostatic pressure. Other arrangements for fluid delivery or fluid propulsion could combine or alternate these techniques with others such as those means providing a pressure driven or a centrifugally driven or propelled flow. Another example which could be

30       employed would be a process taking advantage of the electrokinetic

Berkeley Lights Ex 1004-p 9
Berkeley Lights v UBC

phenomena. Generally speaking, any of the various flow-generating mechanisms such as those described in D J Laser and J G Santiago, J. Micromech. Microeng. 14 (2004) R35-R64 may in principle be used to generate the flow in the here described device.

5

The devices of the present invention are particularly well suited for providing analysis and / or treatment of very small volumes of available analyte. For example in the arrangement of Figure 4, which is a schematic of a single device 100, typical capture volumes are about 10nL. A device in accordance

10   with the present teaching provides a capture chamber 160 provided in a fluid path 400 between the fluid input 120 and the output 130, the fluid path providing a conduit for fluid flowing in a direction 405 between the input and the output. In an array structure, the capture chamber is desirably located between the feed line 122 and the waste line 132. The capture chamber 160 is provided to

15   selectively capture particles travelling within the fluid such that these particles will be displaced out of the fluid and remain in the capture chamber while the fluid exits the device.

As shown in Figure 4B, the capture chamber is desirably a 3-D structure

20   having a depth that extends substantially perpendicular to the fluid path. This geometry may be provided in the form of a trench 410 having a mouth 420 provided adjacent to and in fluid communication with the fluid path 400. The trench 410 has sidewalls 430 that extend downwardly into the substrate 105 from the mouth 420 of the trench. As is evident from an inspection of Figure 4,

25   the fluid path is desirably along an axis substantially parallel to the surface of the substrate and is desirably provided proximal to an upper surface of the substrate. While it is not intended to limit the teaching of the present invention to any one specific arrangement or geometry, the device is made of two layers, one is for the channels having dimensions of approx. 40 microns high. The

30   trench, in contrast has a depth that extends downwardly from the surface of the

Berkeley Lights Ex 1004-p 10
Berkeley Lights v UBC

substrate such that while the mouth 420 is proximal to the surface of the substrate, a base 440 of the trench is distally located to the surface of the substrate and also to the fluid path 400. This depth provided by a second layer within the device, this having a depth of approximately 300 microns.

5

In this exemplary arrangement the surface walls of the trench are untreated and are empty prior to the initial loading of fluid into the device. However it will be appreciated that surface coatings could be provided onto the walls of the trench for specific experiments or analysis, these coatings typically exhibiting a predefined disposition for particles of interest within the analysis to be conducted. In another modification the trench could be pre-provided with reagents such that analysis conducted using devices of the present teaching could effectively introduce particles into a reagent loaded trench.

15

In this exemplary configuration, and as is evident from the plan view of Figure 4A, the trench is substantially rectangular in form having two pairs of side walls, each pair differing from the other pair in length. Desirably the trench is arranged such that its major axis (A-A') is substantially perpendicular to the direction of fluid flow 405. The minor axis (B-B') is provided parallel with the fluid flow 405. In this way the distance between a first pair of side walls 431, 432 is greater than the distance between a second pair of side walls 433, 434. The height of each pair of side walls- i.e. the overall depth of the trench is in this arrangement the same. Particles that are displaced within the chamber are biased towards the base 440 of the chamber under the influence of a force having a force vector acting in the direction of the arrow 406 which will be understood as being substantially perpendicular to the direction of fluid flow 405.

So as to allow fluid within the fluid feed line 122 to pass over the entire mouth of the trench 410, the fluid path desirably tapers outwardly in the region

Berkeley Lights Ex 1004-p 11
Berkeley Lights v UBC

immediately preceding the mouth of the trench. In the fluid feed line region 122, the side walls defining the fluid path are substantially parallel. In this first taper region 450 side walls 451 452 flare away from one another such that the distance between the side walls increases as the fluid approaches the mouth

5    420 of the trench. This increase in cross-sectional area of the fluid path causes fluid within the fluid path to decelerate as it approaches the mouth of the trench. The length of the taper region, i.e. the distance from the fluid feed line region 122 to the mouth of the trench is desirably sufficient to allow the particles to sediment to the bottom of the trench. It will be appreciated that this is related to

10   the speed at which the fluid is passing over the mouth of the trench and this defines an aspect ratio between the dimensions of the trench and the fluid flow rate. This can be used to design specific trenches for preferential use with specific flow rate conditions.

15        In a similar fashion on the far side of the trench, i.e. the region closer to the fluid waste line 132, a funnel region 455 is provided. Side walls 456, 457 of this funnel region 455 taper inwardly towards one another as the distance from the mouth of the trench increases until they form the waste line 132 where the side walls are once again parallel with one another. This funnelling is provided to

20   redirect the fluid that was at the edge portions of the trench, i.e. adjacent to the side walls 431 , 432, into a more constricted volume. This constriction results in an acceleration of the fluid as it approaches the waste line 132.

As the fluid passes over the mouth of the trench it enters downwardly into

25   the trench. This movement out of its plane of travel causes a deceleration of the fluid. As it then exits the trench there is a corresponding increase in the velocity of the fluid. The change of velocity within the trench region causes particles within the fluid to be displaced from the fluid. Once displaced, they settle towards the base 440 of the trench under action of an external force. It will be

30   appreciated that the trench is desirably dimensioned relative to the flow rate of

Berkeley Lights Ex 1004-p 12
Berkeley Lights v UBC

the operating conditions such that once displaced the particles will be retained
within the trench. It should also be noted that apart from the previously
described geometrical expansion of the flow channel, the flow rate can also be
adjusted in a flow channel of constant cross-section by adjusting its
5    hydrodynamic resistance, e.g. by varying the length, cross-section of the
channel or the viscosity of the fluid, and / or the pumping force, e.g. by adjusting
the height of the water column of the frequency of rotation in a centrifugally
pumped system.

10    Simulation results of a fluid velocity within the taper region 450, the trench
410 and the funnel region 455 show these changes in velocity. As is evident
from Figure 5, the velocity of fluid within the fluid path decreases as it passes
over the trench region- coincident with the region between 200 and 400
microns. It then increases again as it enters the funnel region, the area within
15    the graph greater than 400 microns on the X axis. As it is also evident from an
inspection of exemplary lengths, it is desirable that the taper region is of greater
length than the funnel region.

Figure 6 shows how fluid entering downwardly into the trench will also
20    decelerate. As a result of this, it will be appreciated that the throughput of fluid
in upper regions of the trench is greater than throughput in lower regions. This
has significance in mixing of fluid samples, as will be discussed later.

A device provided in accordance with the present teaching is especially
25    useful within the context of cell capture and in sequential flow analysis where a
plurality of fluids may be passed through the same device in a sequential
fashion. In such an arrangement the particles described heretofore can be
considered cells and the capture chamber is desirably dimensioned such that
cells entrained within the fluid will preferentially be displaced from the fluid and
30    will remain in the capture chamber.

Berkeley Lights Ex 1004-p 13
Berkeley Lights v UBC

Figure 7 shows an exemplary arrangement of how cells can be effectively captured using a device 100 such as that described heretofore. A fluid 700 having a culture medium with cells of interest entrained therein is provided in a sample pipette 300. Volumes of the order of 1 to 400 microlitres may be provided in the pipette. By providing an open configuration the fluid will be gravity fed in that it will enter downwardly into the device under the effect of gravity. On introduction its direction of flow is substantially parallel to the surface of the substrate prior to encountering the capture chamber or trench. In this region the fluid will pass downwardly and slow down- per Figure 6. Any cell matter 705 within the fluid will displace from the fluid and settle on the bottom 440 of the trench under the impact of a sedimentation force with a substantial component in the direction of the capture chamber. This cell matter can be tested in any one of a number of different arrangements.

While the device heretofore described has application in any analysis technique that requires capture of cellular or other particulate matter, in that it provides for an effective capture of the cellular matter from a fluid medium in which it is conveyed, it will be further appreciated that such a capture region provides an effective experimental region wherein a capture cell can be stimulated or modified by suitable experimental techniques. By changing the fluid that is introduced in the device, captured cells can be exposed to different environments and their responses can be tested or for example their contents may be released to the surrounding solution in the capture chamber by exposure to a suitable lysis agent.

An example of such a multi-step analysis that may be effected using a device in accordance with the present teaching is NASBA analysis which it will be appreciated is a specific example of nucleic acid amplification.

Berkeley Lights Ex 1004-p 14
Berkeley Lights v UBC

Nucleic Acid Sequence-Based Amplification (NASBA) is a transcription-based RNA amplification system. Initially developed by Compton in 1991, NASBA is an isothermal (41 $^0$C) process that can produce more than 109 copy cycles in 90 min. Compared to other in-vitro amplification methods such

5    polymerase chain reaction (PCR), strand-displacement amplification (SDA) or rolling-circle amplification (RCA), NASBA has the unique characteristic that it can, in a single step, amplify RNA sequences. To achieve this NASBA involves the simultaneous action of three enzymes (avian myeloblastosis virus reverse transcriptase, RNase H, and T7 RNA polymerase). Several nucleic acid types,

10    including mRNA, rRNA, tmRNA, and ssDNA, as well as nucleic acids from virus particles, can be analysed with NASBA, enabling a range of diagnostics, along with gene expression and cell viability measurements. In some cases the one step NASBA protocol can achieve levels of detection of extracted RNA a hundred times lower compared to the three step RT-PCR protocol.

15    Furthermore, NASBA has the unique ability to specifically amplify RNA in a background of DNA of a comparable sequence, this reduces the sample purification requirements. A device such as that provided in accordance with the present teaching has specific application in NASBA analysis or indeed in other techniques that require the sequential delivery of multiple fluids.

20

Each microfluidic device 100 or CCPE element module can be configured to capture cells from a fluid passing within the device flow, long term culture them, stimulate them with drugs and agonists, stain them, lyse them and finally perform real-time NASBA analysis and/or an immuno assay analysis all within

25    the same chamber. An example of such a methodology will be described with reference to Figure 8.

In a first step, Step 800, a culture medium 700 is introduced into the device. This may be done in one or more repeated steps and during this cell

30    culture phase the entire device is placed in a standard cell culture incubator

Berkeley Lights Ex 1004-p 15
Berkeley Lights v UBC

where, if required, conditions such as concentration of $CO_2$ can be controlled. The presence of the culture medium and the controlled ambient conditions allow for a cultuhng of the cells captured within the trench. Once these have been cultured, it is then possible to change the fluid within the device.

5

As an example, in Step 810, a lysis mixture 700A is introduced into the device. The lysis mixture once introduced can be left in-situ within the device (Step 820) for a sufficient period of time to allow for cell lysis.

10      Once this period has expired, the flow through fluid can be changed again such that for example NASBA reagents 700B may be introduced into the device (Step 830). Analysis of the reaction of the lysate mixture 850 to the introduced NASBA reagents can be assessed in real time. During the real-time NASBA and immuno-assay analysis phase the device may be mounted on a standard automated temperature controlled fluorescence microscope stage and the change in fluorescence from each trench may be measured as a function of time. To simplify the operation the device is designed in such a way that the fluidic resistivity of all the inlets is equal and low enough so that the pressure generated by a standard pipette is sufficient to drive fluids into the device. This enables all fluid loading of the device to be done directly with a standard pipette and furthermore when the filled pipette tips are left plugged into the inlets they function as gravity driven pumps or hydrostatic delivery devices. This gravity driven pumping action is used for cell loading and the perfusion of culture media, drugs and labelling dyes, lysis mixture, immuno-assay and real time NASBA reagents. By varying the height of the fluid in the inlet tip the gravity driven pumping flow velocity can be controlled.

Figure 9 shows exemplary results achieved from a multiplexed array structure such as that shown in Figure 2. In this exemplary arrangement the signal responses 900 for each of the individual devices are evident. For

Berkeley Lights Ex 1004-p 16
Berkeley Lights v UBC

example in the array 910, eight individual responses are evident. Each response is reflective of the reaction that has occurred within an individual capture chamber. It will be appreciated that by integrating a plurality of individual devices 100 onto a single substrate and effecting simultaneous

5     experiments within each, that it is possible to obtain a plurality of results within the same time frame. Furthermore as each experiment, i.e. the results from cells captured within the individual chambers, has been conducted within the same ambient conditions, statistical errors are reduced.

10    *Experimental Results*

      It will be appreciated from the foregoing that the device described utilises gravitational driven flow and the fact that fluids are responsive to hydrostatic pressure to effect a flowing of the fluid from regions of higher pressure to

15    regions of lower pressure. To understand the effect of the device's capability of harnessing gravity driven flow inlet pipettes were filled with different volumes and measuring the flow velocity generated at the inlet of each device 100 was measured. The results are shown in Figure 10. It is evident that by increasing the volume of fluid provided initially in each pipette that the flow rate within the

20    device can be controlled. In this way for example, if it is desired to have a low flow rate, a smaller volume of fluid may be provided in the pipette.

      The injection flow rate has an effect on cell and particulate matter loading within the trench or capture region. Cells or particles suspended in a fluid are

25    flown into the device, and as long as the injection flow rate is below a certain threshold all cells that pass over the cavity region will sediment and be trapped within the cavity.

      Figure 11 illustrates a scenario where HeLa cells 1105 are trapped within

30    several trenches 1100A, 1100B, 110OC, 1100D. Each of the four trenches has

Berkeley Lights Ex 1004-p 17
Berkeley Lights v UBC

identical dimensions 100x400 μm with a depth of 320 μm, while the flow path had a height of 40 μm. The injection flow rate was 50 nL/min. As is seen from a visual inspection of each of the four chambers 1100A, 1100B, 110OC, 1100D, the HeLA 1105 cells are trapped within the chambers. Further statistical

5   analysis on additional chambers as shown in Figure 12 shows cell loading relative standard deviation of 7.8%.

Figure 13 shows a modification where 1.5 μm silica beads were captured within the cavity; the reference numerals used are the same as what was used

10   for Figure 4. After 30 min of loading the beads have begun to fill the cavity and almost no beads were detected escaping the cavity. The same experimental conditions were employed for the arrangement of Figure 11 as for Figure 13. The injection flow rate was 50 nL/min in the direction of the arrow 1301. Statistical measurements have shown 99.75% capture efficiency.

15

Using devices such as that provided within the context of the present disclosure, the fluid volume within the trench can be easily replaced with a new solution by just flowing the new solution over the cavity. This is demonstrated in the context of Figure 14 where a fluorescent dye solution was introduced into a

20   device having previously received water, the water being retained within a 300 micron deep trench. The flow rate was approx. 500 μm/s. Within 5 min the dye solution had completely replaced the pure water.

To demonstrate the usefulness of a device or structure such as that

25   heretofore described cell culture, drug stimulation and staining procedures were performed. After loading the cells into the capture regions, the device was placed within an incubation chamber at 37C and culture media dynamically perfused over the cells through the gravity driven flow. The inlet tips were generally reloaded with new media every 2 days. The waste fluids were also

30   cleaned off every 48 hrs. When the cells had to be stained then the media in the

Berkeley Lights Ex 1004-p 18
Berkeley Lights v UBC

inlet tips was replaced with the dye solutions. After approx. 20 min of gravity driven flow of the dye solutions the cells are labelled and can be fluorescently interrogated with a microscope. Results from such steps are provided in Figure 15 where long term cell culture and viability staining results are evident.

5

To demonstrate lysis and purification a layer of beads were provided on top of the cells. The beads were provided with pre-coated antibodies or oligo-nucleotide sequences that would specifically bind to the target of interest that will be purified. The cells are lysed by diffusion mixing a lysis agent and

10  washing off the rest of the lysate. The steps are shown in Figure 16, which again uses the same reference numerals as have been previously used for Figures 7 and 8.

In step 1, the cells 705 were loaded and cultured by introduction of a

15  culture medium 700. Step 2 shows the provision of a layer of pre-coated RNA capture beads 1600 on top of the cells 705. A lysis mixture 700A is introduced in Step 3. This effects a break down of the cell walls and generates a lysate mixture 1605. The lysate mixture mixes with the beads and after about 30 minutes incubation the beads capture the cell RNA. In Step 4, the remains may

20  be washed away by flowing through another volume of liquid such as PBS 1610.

The results from a lysis experiment are shown in Figure 17 where HeLA cells were lysed with a lysis agent in the form of 10OmM NaOH. The effective

25  breakdown of the cell walls is complete within 40 seconds, as is evident from the disintegration of the cells shown with elapse of time.

A variety of tests may be conducted on cells that are constrained within the capture region. For example immuno-assay and real time NASBA analysis can

30  then be performed by following the steps shown in Figure 18. During the real-

Berkeley Lights Ex 1004-p 19
Berkeley Lights v UBC

time NASBA and immuno-assay analysis phase the device is mounted on a standard automated temperature controlled fluorescence microscope stage and the change in fluorescence from each capture region is measured as a function of time (Figure 19 & 20).

5

Steps 1 through 4 are the same as what was described with reference to Figure 16. In Step 5 a fluorescently labelled antibody mixture 1800 was introduced into the device. Unbound fluorescent anti-bodies may be washed away with PBS 1610 or other suitable washing or dilution materials, and the fluorescence measured. It will be appreciated that a complete washing may not be required in that the sequential flow of the additional fluid may simply effect a dilution of the previously entrained fluid within the chamber. - Step 6. Any fluorescence around an antibody coated bead is due to protein in the target. This fluorescence may be optically analysed. In Step 7 a NASBA reagent mixture 1810 was introduced into the device. Step 8 demonstrates how real time NASBA may be done by incubating the device at 41$^0$C and monitoring the increase in fluorescence in the capture region. Any increase in fluorescence can be attributed to generation of more amplicons and opening of molecular beacons. It will be appreciated that this sequence of steps shows how the same capture chamber 410 may be used as a receiving volume for a plurality of different fluids, each of the fluids having an effect on the cells or subsequent mixture resultant from the exposure of the cells to a previously introduced fluid.

Figure 19 shows fluorescence images of approximately sixteen individual devices at the beginning of the NASBA reaction. The different chamber coatings are also indicated. Figure 20 shows simultaneous change in fluorescence within sixteen devices during the NASBA reactions. The coatings within the different capture regions was varied. Twelve positive control experiments were done, together with four negative controls within a single monolithic device.

30

Berkeley Lights Ex 1004-p 20
Berkeley Lights v UBC

It will be appreciated that the exemplary application of use of a device provided in accordance with the present teaching as a reaction chamber for NASBA type experiments demonstrates the useful employment of such a device for experiments that require contact between a captured cell and a

5    sequence of fluids. By retaining the cell within a capture chamber or trench and then simply flowing different fluids past that captured cell, it is possible to achieve capture, labelling and analysis within a single structure. Therefore it will be understood that while the teaching has benefit and application in NASBA that it could also be used in other applications that require exposure of a

10    captured cell to different fluids. Such application to lab on a chip technology with sample-in, experiment and answer out capability will be evident to those skilled in the art. Use of devices such as those heretofore described have benefit in that they can enable screening and diagnostics with lower cost, less contamination, and smaller sample volumes.

15

The retention characteristics of the capture region make it particularly effective for also mimicking in vivo conditions of cellular activities. As the dimensions of the capture trench are much greater than the particles which are retained therein, devices such as those heretofore described can be usefully

20    employed in biomimetic experiments. For example as shown in Figure 21 a device 100 can be used to generate 3D cell structures 2100 of individual cancer cells 2105 so as to recreate cellular conditions similar to in-vivo tumours or other structures. This can also be combined with the fact that multiple cell types can be incorporated in a layered fashion to form co-cultures that further

25    approximate in-vivo like conditions. An example of such a 3D co-culture like experimental setup for investigating cancer cell dynamics close to blood vessels 2110 (endothelial cells) is shown in Step 2 of Figure 21. By selectively varying the nature of the fluid passing over the capture chamber it is possible to selectively layer the particles that are ultimately captured within the chamber.

30    As these will typically be retained in the order that they were introduced into the

Berkeley Lights Ex 1004-p 21
Berkeley Lights v UBC

chamber, this allows for subsequent experiments to be conducted within pseudo in vivo conditions. While the arrangements described herein preferentially retain the particles within the trench it is possible to modify the arrangement so as to provide for subsequent movement of the particles - either within the trench so as to provide for mixing or the like, or to effect removal of the particles out of the trench. Such arrangements will typically require a capacity to manipulate the particles and this can be conducted either before or subsequent to capture of the particles within the trench. Examples of techniques that could be employed include:

- Acoustic
- Magnetic
- Inertial
- Electric
- Dielectrophoretic
- Thermo-hydrodynamic
- Laser tweezers
- Hydrodynamically induced agitation
- Specific or unspecific attachment to surface

It will be understood that the use of such techniques may require an external source of agitation or manipulation of the particles.

A further example of the use of such a capture chamber is in the analysis of E. Coli bacterial cells. To provide for such analysis, a solution containing the E. Coli is flown into the device in a manner as described heretofore. This capture allows for cell based assays to be conducted. As part of the process for such analysis initially the device is loaded with the bacterial solution. After this initial loading, a washing or dilution solution is flown in to rinse out any non captured bacteria. Due to the low flow field at the bottom of the processing chamber trench, the bacteria present there will be effectively captured and not

Berkeley Lights Ex 1004-p 22
Berkeley Lights v UBC

washed away. Due to the very low density of the E. Coli bacteria, the capture efficiency is much lower than that of denser particles or cells such as cancer cells.

5      If mixing of fluids is required between a new input fluid and the previous contents of the processing chamber, then that may be achieved by stopping the input fluid flow before it has completely replaced the previous contents as shown in Figure 22. In this specific example it is shown how a FITC dye (44 µM) is flown into a previously water filled device and allowed to mix with the water

10    within the trench chamber. The input flow velocity is -400 µm/sec

       In cases where reagent or sample volumes are very limited and scarce an oil layer may be used to hydrostatically drive in the low volume reagents. Experiments with 20 microliter tips demonstrated that volumes as low 400 nl

15    can be readily loaded into the processing module. Since each module consists of 8 processing chambers each chamber is loaded with 50 nl. Due to the oils lower density, input flow rates can be up to 25% slower compared to water solution based hydrostatic flow.

20    With on-chip gravity driven flow control, an array structure such as described heretofore is flexible and can be easily integrated into existing infrastructure and workflows such as robotic pipetting systems, incubators, and fluorescent microscope systems.

25    It will be appreciated that the capture chamber may be considered as a sediment trap whereby the particles within the fluid, such as for cells or other living organisms, which are entrained within the fluid on passing the capture chamber are displaced out of the fluid and remain in the capture chamber for subsequent analysis or experimentation. As they simply fall out of the fluid they

30    are exposed to minimum shear stress. These particles will consolidate on the

Berkeley Lights Ex 1004-p 23
Berkeley Lights v UBC

bottom of the capture chamber to provide what may be considered a sediment on the chamber base. As more particles are retained within the capture chamber, the height of the sediment will increase.

5      The devices described herein have been illustrated with reference to a single flow path and a single trench provided within that flow path. It will be appreciated that modifications to the individual devices described could include an array of sequentially defined trenches within the flow path, each of the trenches differing from the others in their affinity for particles of different sizes

10     so as to enable sorting of particles based on their sedimentation characteristics.

       In the context of a primary force providing for the delivery and/or movement of the fluid/particles within the devices, it is also possible in combination with a primary force to employ a second force which acts on the

15     particles or the fluid flow to either supplement or counteract the effects of the first force on the fluid or particles. This could be employed either locally within the devices to cause specific movement of the flow/particles within specific regions of the device or could be applied as a general force to affect the overall flow/movement characteristics. Examples of such a second force which can be

20     used to reinforce or suppress particle sedimentation / retention into the trench and / or liquid flow patterns the particle is exposed include:
       o Magnetic force (static or dynamic)
       o Buoyancy of high- or low-density particles
       o Dielectrophoresis

25

       It will be understood that in order to operate efficiently that specific second forces may require use of materials/particles/fluids that exhibit a response to these forces. For example use of paramagnetic beads could be employed where it is desirable to apply a magnetic force to effect movement of the beads.

30

Berkeley Lights Ex 1004-p 24
Berkeley Lights v UBC

Heretofore the liquids described have been generally homogenous in nature. It is possible to provide liquid sequencing within the context of devices provided in accordance with the present invention. Such liquid sequencing could employ one or more immiscible liquids where for example a second liquid,

5    e.g. oil phase, seals a previously provided aqueous phase residing in trench. Within the context of the present teaching it is also possible to provide a train of mutually immiscible phases to feed different reagents to trenches. As another example, one of the liquids in the sequence may be (another) particle suspension from which particles might differentially sediment into the

10   trench(es).

Devices provided in accordance with the present invention desirably provide for changes in the flow rate of the fluid passing through the device in regions proximal to the trench, the change of flow rate effecting a collection of

15   particles from that fluid. It will be understood that different fluids may have different flow rates when exerted to the same force. This could be used as a means to preferentially collect particles from a first fluid in a first trench and particles from a second fluid in a second trench. While it is not intended to limit the teaching of present invention to any one set of specific parameters

20   simulation analysis has shown the variations in the flow velocity magnitudes in the processing chamber and trench. Cell capture is achieved due to the flow velocity magnitude in the trench being approximately 3 orders of magnitude lower the flow above it. As a result of these variances, the particles that enter the low flow velocity region are effectively captured.

25

The particles/fluid that are collected and retained in the trenches can be subjected to a number of different tests such as for example:
   • Microscopy techniques including staining
   • Surface sensitive excitation and detection such as SPR, TIRF

30      • Other excitation and / or detection techniques.

Berkeley Lights Ex 1004-p 25
Berkeley Lights v UBC

The fabrication of devices provided in accordance with the present
teaching may be effected using one of a number of different processes. While it
is not intended to limit the teaching to any one specific process exemplary
5    techniques that could be employed include:

- Injection moulding
- Hot embossing
- Thermoforming
- Precision engineering
10   - Laser ablation
- Lamination
- Lithography
- Dry and wet etching
- other microfabrication schemes including sealing schemes as will be
15   appreciated by those skilled in the art.

It will be appreciated that a device such as that fabricated in accordance
with the present teaching has a number of advantages including its application
to efficient cell capture with minimal clogging and exposure of the cells to shear
20   stress. The device is suitable for in situ cell culturing and can also be
considered for providing 3-D cell co-cultuhng. An exemplary application has
been demonstrated in multi-flow analysis techniques which may be effected
without removal of the captured cells from their capture chamber. Such devices
may be provided in single element packages or could be arranged in array
25   structures where a plurality of devices share a common input. Further
modification has been described in the context of a multiplexed structure that
provides multiple capture regions within the same substrate. These devices can
be implemented or fabricated using conventional microfluidic engineering
principles. Use of plurality of devices provides for fluidic isolation of separate
30   modules on a single chip. While it is not intended to limit the teaching to any

Berkeley Lights Ex 1004-p 26
Berkeley Lights v UBC

one specific arrangement, the introduction of a fluid into the devices using integrated gravity driven pumping units on a monolithic micro device is particularly useful.

5        A further example of use of such a multi-flow sequential analysis tool is in real-time protein analysis whereby it is possible to monitor live cell interactions with stimulation agents and/or other cells and in real time detect with high specificity the expression of surface proteins. Figure 23 shows an example of such an application whereby the real time measurement of the level of surface
10      protein expression may be effected. This exemplary procedure is based on the specific binding of labelled antibodies to the surface protein of interest (target proteins). The real-time measurement is achieved by having the surface protein within a microfluidic system that constantly refreshes a low concentration of antibodies in the medium. As new target proteins are expressed on the surface,
15      the labelled antibodies in the medium solution specifically bind and label the proteins. The consumed anti-bodies are replaced by microfluidic refreshment so as to keep a constant supply of dissolved antibodies. The surface protein concentration is directly correlated to the signal from the surface labels.

20      It will be understood that this application advantageously employs the use of the microfluidic trench structure that has been described heretofore. Whereas in the previous applications described herein the structure has been demonstrated to be capable of very efficient cell capture and retention coupled with constant perfusion and refreshment of the soluble factors within the trench,
25      in this application the present inventors have realised that the exact elements required for real time surface protein expression detection can be achieved with microfluidic systems. The capability of real time protein expression detection has not been previously demonstrated or reproduced in the macro-scale or with conventional equipment. The real time protein expression measurement was

Berkeley Lights Ex 1004-p 27
Berkeley Lights v UBC

achieved by maintaining a very low concentration of fluorescently labelled antibodies in the perfusion medium.

In this exemplary experiment of the applicability of the apparatus for this
5    application FITC-labelled anti-CD86 antibodies were used at concentration
1/100 of neat. The fluorescent antibody in this case was specific to the CD86
co-stimulatory molecule. During an antigen-dependent inflammatory response
macrophage cells are activated and over express co-stimulatory molecules
such as CD80, CD86 and CD40 on their surface which helps induce an
10   effective T-cell response. This is one of the key mechanisms and outcomes of
activated macrophages that makes them behave as antigen presenting cells
(APCs) and activates the adaptive immune system. During the real time
monitoring of surface protein expression J774 macrophages 2300 were
activated with LPS (200 ng/ml) in the positive control case, while in the negative
15   control no LPS was present in the culture medium. As the stimulated
macrophages began to express the CD86 proteins on the cell surface, the
fluorescent CD86 antibodies generated a fluorescent signal from the cell
surface. As the free solution antibodies are being consumed and bound on the
cell surface, new ones replace them through the continuous perfusion and
20   diffusion. This maintains a constant supply of in solution antibodies and enables
the real time monitoring of the CD86 protein expression on the surface of the
macrophage cells. Furthermore the micro-scale dimensions of the device keep
the background fluorescence generated by the in solution antibody to a
minimum, lowering the LOD to physiologically relevant levels. This
25   measurement technique can be further enhanced by simultaneously using
several antibodies with different fluorophore labels to generate simultaneous
real time multiple surface protein readout with single cell resolution.

It will be appreciated that this application of the sequential flow analysis
30   tool is based on the capabilities of the described microfluidic system to refresh

Berkeley Lights Ex 1004-p 28
Berkeley Lights v UBC

dissolved agents. By using a low concentration of in-solution labelled antibodies combined with the small micro-dimensions of microfluidic cavities, a low background signal can be maintained while always having antibodies available for labelling. This way any incubation and washing steps, usually required in

5      conventional immunoassays become unnecessary, enabling the real time labelling and monitoring of surface proteins as they are generated.

        Figure 24 shows in schematic form how the same device may be used for RNA analysis and protein analysis; the variation being on the reagents that are

10     introduced into the individual chambers. While the figure schematically shows the two different analysis occurring in parallel, it will be understood that this is shown purely to emphasise the application of the sequential flow analysis apparatus of the present teaching to two different analysis.

15     In Step 2400, a common step, cells are loaded in a similar fashion to that which was described before. In Step 2405, these cells may be cultured and stimulated through introduction of a culture medium. The technique branches thereafter depending on whether RNA or protein analysis is desired.

20     In RNA analysis, firstly a fixing buffer followed by a lysis buffer are introduced to fix and lysis the cells (Step 2410). After a predetermined time period a real time NASBA mixture is introduced (Step 2415). After incubation at desired temperatures (about 41$^0$C) a fluorescence analysis (Step 2420) will provide the RNA analysis.

25

        If protein analysis is preferred, then after the culturing of the cells (Step 2405), a fixing buffer is introduced to fix the cells within the chamber (Step 2425). Subsequent loading of an antibody buffer provides an immuno-stain (Step 2430). The subsequent washing of the unbound antibodies (Step 2435)

Berkeley Lights Ex 1004-p 29
Berkeley Lights v UBC

and luminescent analysis of the chambers will provide information on the protein.

While a sequential multi-flow array may be fabricated in any one of a number of different methodologies, Figure 25 shows an exemplary flow sequence that may be adopted to advantageously simplify the alignment and complexity of manufacture. In this exemplary arrangement two layers of PDMS (a fluidic layer and a lid/inlet layer) and a support glass substrate are employed. In Step 2500 two different Si wafers are provided. On a first wafer, a layer of SU-8 photoresist is provided (Step 2505). A second layer of SU-8 is then provided on the first layer to define an upstanding profile on the first layer (step 2510). On the second wafer a layer of PDMS is provided. This layer is then peeled and punched to generate what will ultimately form inlets to the device (Step 2520). On the first wafer a PDMS layer is provided over the SU-8 layer so as to encapsulate the layers (Step 2525). By suitable etching, the SU-8 may be eroded to define a pattern within the PDMS layer (Step 2530). By inverting this layer and then bringing the first and second layers together and assembling them relative to one another onto a glass substrate a trench and inlets are fabricated (Step 2535).

A technique such as that described herein can be used for analysis of cell secretion where cells secrete proteins into their surrounding extracellular fluid. By being able to spatially discriminate the detected optical signal it is possible to analyse the nature of the origin of the optical signal. To provide for spatial discrimination as to the origin of the desired optical signal it is necessary to be able to discriminate between the bulk contribution to the detected signal and that signal that originates from the sample or analyte of interest. One way of achieving this is to effect a mathematical integral technique whereby the detected intensity of the luminescent signal originating from the top of the collection chamber down to the surface of the sample region is compared with

Berkeley Lights Ex 1004-p 30
Berkeley Lights v UBC

that originating from proximal or at the surface of the sample region. By
ensuring adequate heights and dimensions of the collection chamber relative to
the sample type and analysis technique effected it is possible to provide an
adequate signal to noise ratio of sufficient level to allow for bulk and analyte
5      contribution to the detected luminescence signal.

While the use of a luminescence based analysis methodology is
particularly advantageous within the present context it will be understood that
different optical agents could be used to allow for a spatial discrimination
10     between the sample region and the bulk fluid within the collection chamber. For
example different optical biosensing techniques could be used within the
context of the present invention for assessing the properties of the captured
cellular or particulate matter within the capture chambers or wells heretofore
described.
15

It will therefore be appreciated that while the present teaching has been
exemplified with reference to the heretofore and the attached drawings that
these are provided to assist in an understanding of the teaching and are not to
be construed as limiting in any fashion. Modifications can be made without
20     departing from the spirit or scope of the invention. Where integers or
components are described with reference to any one figure it will be understood
that these could be changed for other integers or components without departing
from the present teaching.

25     While a preferred arrangement of the present teaching will be evident from
the claims that follow, the invention also relates to a microfluidic device
substantially as described in the following numbered clauses.

1. A microfluidic device comprising a fluid path defined within a
30          substrate between an input and an output, the device including a

Berkeley Lights Ex 1004-p 31
Berkeley Lights v UBC

capture chamber provided within the fluid path, the capture chamber
extending into the substrate in a direction substantially perpendicular
to the fluid path such that operably particles provided within a fluid
flowing within the fluid path will preferentially collect within the
5           capture chamber due to action of a non-centrifugal force on the
particles, the non-centrifugal force acting in a direction substantially
parallel to the direction of extension of the capture chamber into the
substrate.

2. The device of clause 1 wherein the fluid path is provided within the
10         substrate, the fluid path defining a conduit having a base, top and
side walls.

3. The device of clause 2 wherein the fluid path is disposed along an
axis substantially parallel with an upper surface of the substrate.

4. The device of any preceding clause wherein the fluid path is proximal
15         to an upper surface of the substrate.

5. The device of any preceding clause wherein the capture chamber is
in the form of a trench having a mouth adjacent to and in fluid
communication with the fluid path, the trench having sidewalls that
extend substantially parallel to the direction of the of the capture
20         force into the substrate from the mouth of the trench.

6. The device of clause 2 wherein the trench has a major axis that is
substantially perpendicular to the fluid path, the trench being longer
than it is wide.

7. The device of clause 6 dimensioned such that operably fluid
25         travelling within the fluid path and entering downwardly into the
trench will undergo deceleration and the fluid exiting the trench will
undergo acceleration, the change of velocity within the trench
causing particles within the fluid to be displaced from the fluid.

8. The device of any preceding clause wherein the particles are cells
30         and the capture chamber is dimensioned such that cells entrained

Berkeley Lights Ex 1004-p 32
Berkeley Lights v UBC

within the fluid will preferentially be displaced from the fluid and will remain in the capture chamber.

9.  The device of clause 5 wherein the fluid path defines a taper region immediately upstream of the mouth of the trench, the taper region operably providing for a deceleration of fluid within the fluid path immediately preceding the mouth.

10. The device of clause 9 wherein the fluid path defines a funnel region immediately downstream of the mouth of the trench such that fluid exiting the trench will undergo acceleration.

11. The device of clause 9 wherein the fluid path includes a fluid feed line upstream of the taper region, and wherein the side walls of the fluid path flare away from another between the feed line and the mouth of the trench.

12. The device of clause 10 wherein the fluid path includes a fluid waste line downstream of funnel region, and wherein the side walls of the fluid path tapering towards one another between the mouth of the trench and the fluid waste line.

13. The device of clause 10 wherein the taper region has a length greater than the funnel region.

14. The device of any preceding clause wherein the inlet is dimensioned to receive a pipette funnel such that fluid may be introduced into the device and then pass within the fluid path.

15. The device of clause 14 wherein the volume of the fluid within the pipette is related to the fluid flow rate within the device.

16. The device of clause 14 or 15 wherein the fluid enters into the device under hydrostatic pressure.

17. The device of any one of clauses 1 to 14 being dimensioned such that a fluid loaded into the device enters or moves within the device under the influence of one or more of:

    • Hydrostatic pressure head (e.g. pipette tip or tilt)

Berkeley Lights Ex 1004-p 33
Berkeley Lights v UBC

- Pressure-driven flow
- Centrifugally propelled flow
- Electrokinetic mechanisms

18. The device of any preceding clause wherein the fluid path defines a filter between the inlet and the capture chamber so as to effect a filtering of particulate matter of a predetermined dimension prior to the capture chamber.

19. The device of any preceding clause including a plurality of capture chambers sequentially provided within the fluid path.

20. The device of clause 19 wherein individual capture chambers are configured so as to be operably predisposed to capture of particles of a particular characteristic.

21. The device of any preceding clause wherein the capture chambers comprises surfaces having a surface coating which operably exhibits an affinity for predefined particles.

22. The device of any preceding clause wherein the capture chamber comprises a preloaded reagent.

23. A microfluidic array comprising a plurality of devices as detailed in any preceding clause.

24. The array of clause 23 wherein selected ones of the plurality of devices share a common input.

25. The array of clause 23 or 24 wherein selected ones of the plurality of devices share a common output.

26. The array of clause 25 wherein the input is arranged in a branch structure such that fluid introduced into the input will be directed towards each of the capture chambers of the selected ones of the plurality of devices.

27. The array of clause 26 wherein the output is arranged in a branch structure such that fluid exiting each of the capture chambers of the

Berkeley Lights Ex 1004-p 34
Berkeley Lights v UBC

selected ones of the plurality of devices will collect with fluid of others of the selected ones of the plurality of devices.

28. A multiplexed microfluidic structure including a plurality of arrays as detailed in any one of clauses 23 to 28.

29. The structure of clause 28 wherein the plurality of arrays are arranged in rows on a common substrate.

30. The structure of clause 28 or 29 wherein the plurality of arrays are spaced apart from one another such that the plurality of arrays can be concurrently loaded with fluid.

31. A biomimetic analysis tool comprising a device as detailed in any one of clause 1 to 22.

32. The tool of clause 31 wherein the capture chamber is dimensioned to receive a plurality of cells which on receipt within the chamber are predisposed to adopt a 3-D configuration.

The words comprises/comprising when used in this specification are to specify the presence of stated features, integers, steps or components but does not preclude the presence or addition of one or more other features, integers , steps, components or groups thereof.

Berkeley Lights Ex 1004-p 35
Berkeley Lights v UBC

Claims

1. A multi-sequential flow sample apparatus comprising a microfluidic device, the device comprising:

   a. a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber due to action of a non-centrifugal force on the particles, the non-centrifugal force acting in a direction substantially parallel to the direction of extension of the capture chamber into the substrate, and

   wherein the apparatus is configured for sequential fluid engagement with a plurality of fluid supply lines, an engagement of the apparatus with a fluid supply line and receipt of fluid from that supply line operably effecting a discharge from the capture chamber of a previously provided fluid.

2. The apparatus of claim 1 the device fluid path is provided within the substrate, the fluid path defining a conduit having a base, top and side walls.

3. The apparatus of claim 2 wherein the device fluid path is disposed along an axis substantially parallel with an upper surface of the substrate.

4. The apparatus of any preceding claim wherein the device fluid path is proximal to an upper surface of the substrate.

5. The apparatus of any preceding claim wherein the device capture chamber is in the form of a trench having a mouth adjacent to and in fluid communication with the fluid path, the trench having sidewalls that extend substantially parallel to the direction of the of the capture force into the substrate from the mouth of the trench.

Berkeley Lights Ex 1004-p 36
Berkeley Lights v UBC

6. The device of claim 5 wherein the trench has a major axis that is substantially perpendicular to the fluid path, the trench having a length parallel to that major axis greater than its length perpendicular to that major axis.

7. The device of claim 6 dimensioned such that operably fluid travelling within the fluid path and entering downwardly into the trench will undergo deceleration and the fluid exiting the trench will undergo acceleration, the change of velocity within the trench causing particles within the fluid to be displaced from the fluid.

8. The apparatus of any preceding claim wherein the capture chamber is dimensioned such that on receipt of a fluid from a fluid supply line, particles of a predefined dimensioned within that fluid will collect within the capture chamber.

9. The apparatus of any one of claims 1 to 7 wherein the capture chamber is dimensioned such that discharge of a previously provided fluid does not effect corresponding discharge of the particles collected within the capture chamber.

10. The apparatus of claim 8 wherein the capture chamber is dimensioned such that introduction of a second fluid into the device effects a mixing of that second fluid with the previously provided fluid within the capture chamber.

11. A real time protein analysis tool comprising the apparatus as claimed in any preceding claim.

12. A NASBA tool comprising the apparatus as claimed in any one of claims 1 to 10.

13. A sequential flow analysis tool comprising:

    a. A microfluidic device comprising a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within the fluid path, the capture chamber extending into the substrate in a direction substantially

Berkeley Lights Ex 1004-p 37
Berkeley Lights v UBC

     perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber;

    b. Means for introducing a flow of a first fluid into the input of the device and past the capture chamber, the introduction of the first fluid into the device effecting capture of particles within the first fluid within the capture chamber;

    c. Means for introducing a flow of a second fluid into the input of the device and past the capture chamber subsequent to the introduction of the first fluid, the flow of the second fluid past the capture chamber effecting a diffusion of the second fluid into the capture chamber so as to expose the retained particles to the second fluid.

14. The tool of claim 13 wherein a solution is formed on exposure of the retained particles to the second fluid, the tool further comprising:

    a. Means for introducing a flow of a third fluid into the device, the introduction of the third fluid and flow of that fluid past the capture chamber effecting a diffusion of the third fluid into the capture chamber so as to expose the solution to the third fluid.

15. The tool of claim 14 wherein the second fluid comprises particles, diffusion of the second fluid into the capture chamber effecting a collection of the particles of the second fluid within the capture chamber.

16. The tool of claim 14 wherein the capture chamber is dimensioned such that on introduction of the second fluid, a layering of the particles from the first and second fluids is provided within the capture chamber.

17. The tool of claim 14 wherein on introduction of the second fluid the particles of the first fluid react with the particles of the second fluid.

18. The tool of claim 14 comprising means for effecting movement of the particles within the capture chamber.

19. The tool of claim 15 to 18 wherein the captured particles are cells.

Berkeley Lights Ex 1004-p 38
Berkeley Lights v UBC

20. The tool of claim 14 configured for nucleic acid amplification, such as NASBA, RCA, or PCR.

21. The tool of any one of claims 14 to 20 wherein the orientation of the extension of the capture chamber into the substrate is such that operably an external force acting on the particles within the capture chamber acts in a direction substantially parallel to the direction of extension of the capture chamber into the substrate

22. A method of performing sequential flow analysis, the method comprising:

   a. Providing a microfluidic device comprising a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber

   b. Introducing a first fluid flow into the device, the flow of the fluid past the capture chamber effecting a capture of particles within the capture chamber of the device;

   c. Flowing a reagent through the device, the flow of the reagent past the capture chamber effecting an interaction between the reagent and the previously captured particles within the capture chamber;

   d. Analysing the capture chamber.

23. The method of claim 22 wherein the flow of the reagent past the capture chamber effects a diffusive mixing within the capture chamber of the reagent with the first fluid.

24. The method of claim 22 or 23 wherein the analysing of the capture region is effected using fluorescence measurements.

25. The method of any one of claims 22 to 24 comprising a treatment of particles or where the particles are cells, a culturing of the cells, collected within the capture chamber

Berkeley Lights Ex 1004-p 39
Berkeley Lights v UBC

26. The method of any one of claims 22 to 25 for use in nucleic acid
    amplification.

27. The method of any one of claims 22 to 24 for use in bio-chemical
    reaction.

28. The method of any one of claims 22 to 24 for use in protein analysis.

29. The method of any one of claims 22 to 27 wherein the particles captured
    within the capture chamber are captured through a sedimentation
    process under influence of a force acting on the particles in a direction
    substantially parallel to the direction of extension of the capture chamber
    into the substrate.

30. A method of performing Immuno-assay and nucleic acid amplification
    analysis comprising:

    a. Introducing a fluid into a collection device, the collection device
       defining fluid path and a collection chamber, the collection
       chamber defining a well offset from the fluid path, the well having
       dimensions such that cellular matter within the fluid are
       preferentially collected within the well,

    b. Cultuhng the cellular matter within the collection chamber,

    c. Introducing a second fluid containing beads into the collection
       device, the second fluid effecting bead capture within the
       chamber,

    d. Introducing a third fluid into the collection device, the third fluid
       effecting a lysing of the cellular matter,

    e. Introducing a fourth fluid into the collection device, the fourth fluid
       effecting a dilution of the cellular debris,

    f. Introducing a fifth fluid into the collection device, the fifth fluid
       effecting an immuno fluorescent staining of material within the
       collection device ,

    g. Introducing a sixth fluid into the collection device, the sixth fluid
       effecting a dilution of unbound flurophores,

Berkeley Lights Ex 1004-p 40
Berkeley Lights v UBC

h. Analysing the response of the beads within the collection chamber

i. Introducing a seventh fluid into the collection device, the seventh fluid including nucleic acid amplification reagents and/or fluorescent probes,

5

j. Analysing the response of the contents within the collection chamber to the introduced nucleic acid amplification reagents.

31. A method of performing protein analysis comprising:

a. Introducing a fluid into a collection device, the collection device defining fluid path and a collection chamber, the collection

10

chamber defining a well offset from the fluid path, the well having dimensions such that cellular matter within the fluid are preferentially collected within the well,

b. Cultuhng the cellular matter within the collection chamber,

c. Introducing a fixing buffer into the collection device, the second

15

fluid effecting a fixing of the cells previously captured within the chamber,

d. Introducing an antibody buffer into the collection device, the antibody buffer effecting a staining of the cellular matter,

e. Introducing a fourth fluid into the collection device, the fourth fluid

20

effecting a dilution of unbound antibodies,

f. Analysing the luminescent response of the contents of the collection chamber.

32. A method of performing cellular or particulate matter analysis

25    comprising

a) providing a collection device, the collection device defining a fluid path and a micro -scaled collection chamber, the collection chamber being offset from the fluid path

b) providing cellular matter or particulate matter within the collection

30    chamber

Berkeley Lights Ex 1004-p 41
Berkeley Lights v UBC

c) introducing one or more fluids into the collection device such that the cellular matter or particulate matter within the collection chamber is exposed to the introduced fluids and its optical response modified, and

b) optically analyzing the collected cellular matter or particulate matter within the chamber and

wherein the collection chamber is dimensioned such that collected cellular matter or particulate within the chamber provides an optical response which may be discriminated from an optical response from other contents of the chamber.

33. The method of claim 32 further comprising biasing the cellular or particulate matter towards specific regions of the chamber.

34. The method of claim 32 or 33 wherein the collected matter is cellular matter, the method further comprising staining the cellular matter.

35. The method of claim 34 wherein the staining is effected within the collection chamber.

36. The method of any one of claims 32 to 35 comprising creating optical contrast regions within the chamber.

37. The method of any one of claims 32 to 36 comprising luminescent tagging the collected cellular or particulate matter.

38. The method of claims 32 to 37 comprising cultuhng, stimulating and detecting the cellular matter within the collection chamber by introducing a flow of culture, stimulation and a labelled antibody buffers into the micro scaled collection chamber, the labelled antibody buffer effecting a staining of the cellular matter.

Berkeley Lights Ex 1004-p 42
Berkeley Lights v UBC

39. The method of any one of claims 32 to 38 wherein the optical analysis is effected by analysing a luminescent response of the contents of the collection chamber.

40. The method of claim 39 wherein the luminescent response is a fluorescence response.

41. The method of any one of claims 32 to 40 wherein the optical analysis spatially discriminates between the origin of the optical response from within the chamber.

42. The method of claim 41 wherein the spatial discrimination is effected through an integration of the luminescent intensity over an optical pathway from a top of the chamber to the cellular or particulate matter within the chamber to provide a bulk intensity value and comparing that bulk intensity value with a luminescent signal originating from a region at or proximal to the surface of the particulate or cellular matter.

43. The method of any one of claims 32 to 42 comprising introducing the cellular or particulate matter into the chamber through a flowing of a liquid into the collection device.

44. The method of claim 43 wherein the cellular or particulate matter is captured within the the chamber through one or more of sedimentation, centhfugation or magnetic processes.

45 The method as claimed in any one of claims 32 to 44 used in protein or gene expression analysis.

Berkeley Lights Ex 1004-p 43
Berkeley Lights v UBC

46. The method as claimed in any one of claims 32 to 45 used in cell secretion analysis.

Berkeley Lights Ex 1004-p 44
Berkeley Lights v UBC



FIG. 1

Berkeley Lights Ex 1004-p 45
Berkeley Lights v UBC



100B

100A

115

140

105

FIG. 2

Berkeley Lights Ex 1004-p 46
Berkeley Lights v UBC



FIG. 3

Berkeley Lights Ex 1004-p 47
Berkeley Lights v UBC



FIG. 4

Berkeley Lights Ex 1004-p 48
Berkeley Lights v UBC



FIG. 5



FIG. 6

Berkeley Lights Ex 1004-p 49
Berkeley Lights v UBC



FIG. 7

Berkeley Lights Ex 1004-p 50
Berkeley Lights v UBC



FIG. 8



FIG. 9

FIG. 10

Model:
y=P1+P*x^(1/3)
P1   -196.38004    ±53.6852
P2   124.95061     ±10.35502
R^2  = 0.97981

Inlet Tip Volume [µL]

Flow Velocity [µm/s]

Berkeley Lights Ex 1004-p 52
Berkeley Lights v UBC





FIG. 11



FIG. 12

Berkeley Lights Ex 1004-p 53
Berkeley Lights v UBC



455 — Very few bead escape
455

430 —
430

450 —
450

5 min                30 min
450

1301

FIG. 13



FIG. 14

Berkeley Lights Ex 1004-p 54
Berkeley Lights v UBC



FIG. 15

Berkeley Lights Ex 1004-p 55
Berkeley Lights v UBC





FIG. 16

Berkeley Lights Ex 1004-p 56
Berkeley Lights v UBC



FIG. 17

Berkeley Lights Ex 1004-p 57
Berkeley Lights v UBC



FIG. 18

Berkeley Lights Ex 1004-p 58
Berkeley Lights v UBC



FIG. 19



FIG. 20

Berkeley Lights Ex 1004-p 60
Berkeley Lights v UBC



FIG. 21

Berkeley Lights Ex 1004-p 61
Berkeley Lights v UBC



FIG. 22

Berkeley Lights Ex 1004-p 62
Berkeley Lights v UBC



FIG. 23

Berkeley Lights Ex 1004-p 63
Berkeley Lights v UBC



FIG. 24

Berkeley Lights Ex 1004-p 64
Berkeley Lights v UBC



FIG. 25



(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: **US 2011/0262906 A1**
　　　Dimov et al. (43) **Pub. Date:** **Oct. 27, 2011**

(54) **MICROFLUIDIC MULTIPLEXED CELLULAR AND MOLECULAR ANALYSIS DEVICE AND METHOD**

(75) Inventors: **Ivan Dimov**, Puerto Montt (CL); **Jens Ducree**, Ashbourne (IE); **Luke Lee**, Orinda, CA (US); **Gregor Kijanka**, Dublin (IE)

(73) Assignee: **DUBLIN CITY UNIVERSITY**, Dublin (IE)

(21) Appl. No.: **13/123,491**

(22) PCT Filed: **Oct. 9, 2009**

(86) PCT No.: **PCT/EP2009/063229**

§ 371 (c)(1),
(2), (4) Date: **Jul. 12, 2011**

(30) **Foreign Application Priority Data**

Oct. 10, 2008 (GB) ................................... 0818579.5

**Publication Classification**

(51) **Int. Cl.**
　　*C12Q 1/68* (2006.01)
　　*C12M 1/40* (2006.01)
　　*G01N 1/28* (2006.01)
　　*G01N 33/00* (2006.01)
　　*G01N 33/68* (2006.01)
　　*G01N 21/75* (2006.01)
　　*G01N 33/50* (2006.01)
　　*B01L 3/00* (2006.01)
　　*C12M 1/00* (2006.01)
　　*C12Q 1/02* (2006.01)

(52) **U.S. Cl.** ..................... **435/6.1**; 435/283.1; 435/289.1; 436/174; 435/29; 436/86; 436/166; 435/7.1; 422/502; 422/68.1; 436/172

(57) **ABSTRACT**

A sequential flow analysis tool comprising a microfluidic device having a fluid path defined within a substrate between an input and an output is described. The device includes a capture chamber provided within but offset from the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber.



Berkeley Lights Ex 1005-p 1
Berkeley Lights v UBC



FIG. 1

Berkeley Lights Ex 1005-p 2
Berkeley Lights v UBC



FIG. 2

Berkeley Lights Ex 1005-p 3
Berkeley Lights v UBC



FIG. 3

Berkeley Lights Ex 1005-p 4
Berkeley Lights v UBC



FIG. 4

Berkeley Lights Ex 1005-p 5
Berkeley Lights v UBC



FIG. 5



FIG. 6

Berkeley Lights Ex 1005-p 6
Berkeley Lights v UBC



FIG. 7

Berkeley Lights Ex 1005-p 7
Berkeley Lights v UBC



FIG. 8

Berkeley Lights Ex 1005-p 8
Berkeley Lights v UBC



FIG. 9

FIG. 10

Berkeley Lights Ex 1005-p 9
Berkeley Lights v UBC

1105            1106A                1100B



1105



1105

1105            1100D                1100C

FIG. 11



FIG. 12

Berkeley Lights Ex 1005-p 10
Berkeley Lights v UBC



FIG. 13



FIG. 14

Berkeley Lights Ex 1005-p 11
Berkeley Lights v UBC



**Day 1**  **Day 5**  **CA Stain**  **PI Stain**

FIG. 15

Berkeley Lights Ex 1005-p 12
Berkeley Lights v UBC





FIG. 16

Berkeley Lights Ex 1005-p 13
Berkeley Lights v UBC



FIG. 17

Berkeley Lights Ex 1005-p 14
Berkeley Lights v UBC



FIG. 18

Berkeley Lights Ex 1005-p 15
Berkeley Lights v UBC



Poly L Lysine

BSA

PBS

PDMS

FIG. 19

Berkeley Lights Ex 1005-p 16
Berkeley Lights v UBC



FIG. 20

Berkeley Lights Ex 1005-p 17
Berkeley Lights v UBC



FIG. 21

Berkeley Lights Ex 1005-p 18
Berkeley Lights v UBC



FIG. 22

Berkeley Lights Ex 1005-p 19
Berkeley Lights v UBC



FIG. 23

Berkeley Lights Ex 1005-p 20
Berkeley Lights v UBC



FIG. 24

Berkeley Lights Ex 1005-p 21
Berkeley Lights v UBC



FIG. 25

Berkeley Lights Ex 1005-p 22
Berkeley Lights v UBC

# MICROFLUIDIC MULTIPLEXED CELLULAR AND MOLECULAR ANALYSIS DEVICE AND METHOD

## FIELD OF THE INVENTION

[0001]    The present invention relates to microfluidic devices and to analysis conducted using such devices. The invention more particularly relates to a microfluidic device and method that can be used for multiplexed cellular and molecular analysis and treatment.

## BACKGROUND

[0002]    Microfluidic devices are well known for use in analysis and sample treatment. Such devices provide for the precise control and manipulation of fluids and are generally considered to have geometric dimensions of the micro, i.e. sub-millimeter scale. These devices are particularly useful in that they provide measurements in scenarios where there are only small volumes of the analyte available or small amounts of reagents should be used, e.g. in high-throughput screening for drug discovery. Furthermore they tend to provide results with reduced reagent consumption and analysis time, ease of integration, and the potential for high-throughput analysis.

[0003]    While conventional microfluidic devices provide many advantages commensurate with their dimensions there are still problems in using these devices for complete analysis systems, i.e. the type of systems that enables the provision of an analyte, the modification of that analyte and the obtaining of results from that modification. There is a further need for systems that provide a plurality of data signal outputs that can be used for statistical analysis and for parallel processing of a plurality of different tests. Also the costs of manufacturing have to be minimized, restricting the scope of fabrication technologies and hence also the degree of freedom available for the device features geometries.

## SUMMARY

[0004]    These and other problems are addressed by a sequential flow microfluidic device having a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber. The chamber is desirably dimensioned to allow for the sequential flow of a plurality of fluids passed the chamber, a second fluid flow providing for a change in the medium within the chamber resultant from the first fluid flow.

[0005]    The capture or collection chamber is desirably in the form of a trench having a mouth adjacent to and in fluid communication with the fluid path, the trench having sidewalls that extend downwardly into the substrate from the mouth of the trench.

[0006]    In a first arrangement the particles are cells and the capture chamber is desirably dimensioned such that cells entrained within the fluid will preferentially be displaced from the fluid and will remain in the capture chamber.

[0007]    The fluid path is desirably along an axis substantially parallel to the surface of the substrate. The fluid path is desirably provided proximal to an upper surface of the substrate.

[0008]    In one arrangement the inlet is dimensioned to receive a pipette funnel such that fluid may be introduced downwardly into the device and then pass within the fluid path along the surface of the substrate.

[0009]    The fluid path may include a funnel constriction provided between the inlet and the capture chamber so as to effect a filtering of particulate matter of a predetermined dimension prior to the capture chamber.

[0010]    The device may be configured in an array structure with a plurality of capture chambers. Desirably the plurality of capture chambers share a common input and output, the input being arranged in a branch structure such that fluid introduced into the input will be directed towards each of the capture chambers.

[0011]    There is also provided a multiplexed structure including a plurality of devices arranged on a common substrate.

[0012]    The invention also provides a methodology for effecting cell or molecular analysis.

[0013]    Accordingly, a first embodiment of the invention provides an apparatus as detailed in claim 1. A tool according to claim 13 is also provided. Independent methods such as those detailed in claim 22, 30, 31, or 32 are also provided. Advantageous embodiments are provided in the dependent claims.

[0014]    These and other features will be better understood with reference to the exemplary arrangements which follow.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0015]    The present invention will now be described with reference to the accompanying drawings in which:

[0016]    FIG. 1 shows an array of devices provided in a row configuration in accordance with the present teaching

[0017]    FIG. 2 is a photograph of an exemplary multiplexed structure including a plurality of devices.

[0018]    FIG. 3 is a photograph showing the loading of a structure of FIG. 2.

[0019]    FIG. 4A shows in plan view a device provided in accordance with the present teaching.

[0020]    FIG. 4B shows in perspective sectional view elements of such a device.

[0021]    FIG. 5 shows how fluid velocity varies within the fluid path.

[0022]    FIG. 6 shows how fluid velocity varies with depth of the collection trench.

[0023]    FIG. 7 shows schematically how a fluid may be introduced so as to effect capture of cells within the capture region.

[0024]    FIG. 8 shows a sequence of steps that may be implemented in a multi-flow through arrangement.

[0025]    FIG. 9 shows exemplary results that may be concurrently obtained using a structure in accordance with the present teaching.

[0026]    FIG. 10 shows how the volume of fluid within the inlet tip may be used to control flow rates within a device.

[0027]    FIG. 11 shows example of cell loading.

[0028]    FIG. 12 shows exemplary statistical data demonstrating cell loading in different cells.

[0029]    FIG. 13 shows how efficient capture is effected using an example of beads within a fluid flow.

[0030]    FIG. 14 shows how fluids within the trench may be replaced by flowing new fluids passed.

[0031]    FIG. 15 shows exemplary data demonstrating how devices may be usefully employed in long term cell culturing.

Berkeley Lights Ex 1005-p 23
Berkeley Lights v UBC

[0032] FIG. **16** shows how cell lysis may be effected.

[0033] FIG. **17** shows exemplary data showing the effects of such cell lysis.

[0034] FIG. **18** shows exemplary steps that may be used in effecting NASBA.

[0035] FIG. **19** shows fluorescence images of approx. 16 individual devices at the beginning of a NASBA reaction.

[0036] FIG. **20** shows simultaneous change in fluorescence within 16 devices during a NASBA reaction.

[0037] FIG. **21** shows examples of application of a device in accordance with the present teaching within a biomimetic environment.

[0038] FIG. **22** shows how mixing may be effected within a device in accordance with the present teaching.

[0039] FIG. **23** shows how a device in accordance with the present teaching may be used for real time protein analysis.

[0040] FIG. **24** shows a protocol that may be employed for gene and or protein expression analysis.

[0041] FIG. **25** shows in schematic flow exemplary steps that may be used to fabricate a device in accordance with the present teaching.

DETAILED DESCRIPTION OF THE DRAWINGS

[0042] The teaching of the invention will now be described with reference to exemplary arrangements thereof which are provided to assist in an understanding of the teaching of the invention but which are not in any way intended to limit the scope of the invention to that described.

[0043] FIGS. **1** and **2** show an exemplary structure incorporating a microfluidic device **100** in accordance with the present teaching. Each device **100** comprises a fluid path **103** defined within a substrate **105** between an input **120** and an output **130**. A capture chamber **160** is provided within the fluid path. The capture chamber is configured so as to extend into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber by means of a substantially perpendicular force field enforcing sedimentation. In this exemplary arrangement the capture chamber extends downwardly into the substrate. In this way it can be considered as having a major axis which is substantially perpendicular to the plane of the substrate surface.

[0044] Typically the device will be operated in a horizontal arrangement such that the direction of extension of the chamber is parallel with gravitational force lines, i.e. the particles within the fluid will be biased towards the bottom of the chamber under the influence of gravity. It will be understood that gravity is an example of a non-centrifugal force in that it acts on the particles without requiring a movement of the device, and within the context of the present teaching any force that does not rely on rotation of the device to effect retention of the particles within the chamber can be considered suitable. In contrast to the forces causing retention of the particles within the chamber, centrifugal forces could be considered suitable for effecting movement of the fluid within the fluid flow. It will be appreciated that the forces that effect displacement of the particles from the fluid and their subsequent retention in the chamber act substantially perpendicular to the direction of flow of the fluid.

[0045] The device is particularly suitable for configuring in array structures, a plurality of arrays being integrated into a multiplexed structure. Each of the devices **100** of FIGS. **1** and **2** may be considered identical and are usefully employed as Cell Capture and Processing Elements (CCPE) such that the completely integrated and multiplexed device shown in FIGS. **1** and **2** provides five hundred and twelve identical Cell Capture and Processing Elements (CCPE) multiplexed into a single monolithic device. It will be appreciated that the specific number is related to the exemplary arrangement of nine non-identical rows of arrays, the total structure having sixty four arrays each having eight microfluidic devices, but different configurations could be provided without departing from the teaching of the present invention.

[0046] Each array **110** in this configuration comprises eight identical devices **100**, sharing a common input **120** and a common output **130**. The common input branches into 8 feed lines **122a**, **150b** etc., provided upstream of capture chambers for each device respectively. Each device has a dedicated waste line **132a**, **132b**, **132c** etc., provided downstream of the capture chamber and configured to distribute fluid out of the devices into the common output **130**. Within each array it will therefore be understood that a plurality of capture chambers are provided. Where they share a common input the fluids that are discharged into the individual chambers will be the same. However by pre-treating individual chambers it may be possible to vary the conditions experienced by those fluids within the individual chambers.

[0047] Individual arrays **110** may be arranged in rows **150a**, **150b** etc., on the substrate **105**. In this way a plurality of arrays may be aligned; in this exemplary arrangement along a common row. Where a plurality of arrays are provided along a common axis, they may advantageously be configured so as to share a common waste. In this exemplary arrangement the common output **130** for each row is then in fluid communication with common waste **140** for the multiplexed process.

[0048] In this exemplary arrangement, each inlet is evenly connected to 8 CCPEs **100** and the inlets **120** have the same distribution as a 96 conventional well micro titter plate—approximately 9 mm apart from one another as shown in FIG. **1**. The devices of this arrangement are configured to be loaded with fluid under the influence of a hydrostatic pressure head. Such loading of the fluid into the devices and then the subsequent propulsion of the fluid within the devices can be provided by coupling the devices to a pipette arrangement whereby the volume of fluid in the pipette generates a pressure that causes the fluid to enter downwardly into device from the pipette and then travel within the fluid path. In this way the multiplexed microfluidic structure **115** may be used with conventional loading equipment such that for example sample loading may be done with a standard 8 channel pipette such as those manufactured and provided by the company Eppendorf.

[0049] An example of such a loading configuration is shown in FIG. **3**, where 4 conventional pipettes **300** are mated with 4 inlets respectively. Fluid within each of the 4 pipettes can be transferred into 8 individual microfluidic devices **100** arranged in an array structure, each of the devices sharing the common input **120**. In the arrangement of FIG. **3**, it will be observed that the loading of the multiplexed structure can be achieved on a per row basis such that each of the rows does not have to be concurrently loaded. In this way the number of experiments that is conducted can be defined relative to either the nature of experiment or the volume of analyte available. It will be appreciated that by providing a plurality of different devices coupled to the same input that each of the device serves to replicate the process being conducted in the other devices of the array. This allows statistical analysis of the

Berkeley Lights Ex 1005-p 24
Berkeley Lights v UBC

process to be conducted with the comfort that the conditions of each device in the array should be identical. Two or more separate arrays can be loaded concurrently with the same or different materials—be that particles within a fluid or particles directly—such that each array either replicates the process of the other or is operable to conduct a different process concurrently with that of the other.

[0050] While pipette loading is an example of a hydrostatic pressure head delivery system other configurations such as a tilting of the device to allow for flow of the pure fluid or particle suspension within the device also could be utilised to take advantage of the principles of hydrostatic pressure. Other arrangements for fluid delivery or fluid propulsion could combine or alternate these techniques with others such as those means providing a pressure driven or a centrifugally driven or propelled flow. Another example which could be employed would be a process taking advantage of the electrokinetic phenomena. Generally speaking, any of the various flow-generating mechanisms such as those described in D J Laser and J G Santiago, J. Micromech. Microeng. 14 (2004) R35-R64 may in principle be used to generate the flow in the here described device.

[0051] The devices of the present invention are particularly well suited for providing analysis and/or treatment of very small volumes of available analyte. For example in the arrangement of FIG. 4, which is a schematic of a single device 100, typical capture volumes are about 10 nL. A device in accordance with the present teaching provides a capture chamber 160 provided in a fluid path 400 between the fluid input 120 and the output 130, the fluid path providing a conduit for fluid flowing in a direction 405 between the input and the output. In an array structure, the capture chamber is desirably located between the feed line 122 and the waste line 132. The capture chamber 160 is provided to selectively capture particles travelling within the fluid such that these particles will be displaced out of the fluid and remain in the capture chamber while the fluid exits the device.

[0052] As shown in FIG. 4B, the capture chamber is desirably a 3-D structure having a depth that extends substantially perpendicular to the fluid path. This geometry may be provided in the form of a trench 410 having a mouth 420 provided adjacent to and in fluid communication with the fluid path 400. The trench 410 has sidewalls 430 that extend downwardly into the substrate 105 from the mouth 420 of the trench. As is evident from an inspection of FIG. 4, the fluid path is desirably along an axis substantially parallel to the surface of the substrate and is desirably provided proximal to an upper surface of the substrate. While it is not intended to limit the teaching of the present invention to any one specific arrangement or geometry, the device is made of two layers, one is for the channels having dimensions of approx. 40 microns high. The trench, in contrast has a depth that extends downwardly from the surface of the substrate such that while the mouth 420 is proximal to the surface of the substrate, a base 440 of the trench is distally located to the surface of the substrate and also to the fluid path 400. This depth provided by a second layer within the device, this having a depth of approximately 300 microns.

[0053] In this exemplary arrangement the surface walls of the trench are untreated and are empty prior to the initial loading of fluid into the trench. However it will be appreciated that surface coatings could be provided onto the walls of the trench for specific experiments or analysis, these coatings typically exhibiting a predefined disposition for particles of interest within the analysis to be conducted. In another modification the trench could be pre-provided with reagents such that analysis conducted using devices of the present teaching could effectively introduce particles into a required trench.

[0054] In this exemplary configuration, and as is evident from the plan view of FIG. 4A, the trench is substantially rectangular in form having two pairs of side walls, each pair differing from the other pair in length. Desirably the trench is arranged such that its major axis (A-A') is substantially perpendicular to the direction of fluid flow 405. The minor axis (B-B') is provided parallel with the fluid flow 405. In this way the distance between a first pair of side walls 431, 432 is greater than the distance between a second pair of side walls 433, 434. The height of each pair of side walls—i.e. the overall depth of the trench is in this arrangement the same. Particles that are displaced within the chamber are biased towards the base 440 of the chamber under the influence of a force having a force vector acting in the direction of the arrow 406 which will be understood as being substantially perpendicular to the direction of fluid flow 405.

[0055] So as to allow fluid within the fluid feed line 122 to pass over the entire mouth of the trench 410, the fluid path desirably tapers outwardly in the region immediately preceding the mouth of the trench. In the fluid feed line region 122, the side walls defining the fluid path are substantially parallel. In this first taper region 450 side walls 451 452 flare away from one another such that the distance between the side walls increases as the fluid approaches the mouth 420 of the trench. This increase in cross-sectional area of the fluid path causes fluid within the fluid path to decelerate as it approaches the mouth of the trench. The length of the taper region, i.e. the distance from the fluid feed line region 122 to the mouth of the trench is desirably sufficient to allow the particles to sediment to the bottom of the trench. It will be appreciated that this is related to the speed at which the fluid is passing over the mouth of the trench and this defines an aspect ratio between the dimensions of the trench and the fluid flow rate. This can be used to design specific trenches for preferential use with specific flow rate conditions.

[0056] In a similar fashion on the far side of the trench, i.e. the region closer to the fluid waste line 132, a funnel region 455 is provided. Side walls 456, 457 of this funnel region 455 taper inwardly towards one another as the distance from the mouth of the trench increases until they form the waste line 132 where the side walls are once again parallel with one another. This funnelling is provided to redirect the fluid that was at the edge portions of the trench, i.e. adjacent to the side walls 431, 432, into a more constricted volume. This constriction results in an acceleration of the fluid as it approaches the waste line 132.

[0057] As the fluid passes over the mouth of the trench it enters downwardly into the trench. This movement out of its plane of travel causes a deceleration of the fluid. As it then exits the trench there is a corresponding increase in the velocity of the fluid. The change of velocity within the trench region causes particles within the fluid to be displaced from the fluid. Once displaced, they settle towards the base 440 of the trench under action of an external force. It will be appreciated that the trench is desirably dimensioned relative to the flow rate of the operating conditions such that once displaced the particles will be retained within the trench. It should also be noted that apart from the previously described geometrical expansion of the flow channel, the flow rate can also be

Berkeley Lights Ex 1005-p 25
Berkeley Lights v UBC

4

adjusted in a flow channel of constant cross-section by adjusting its hydrodynamic resistance, e.g. by varying the length, cross-section of the channel or the viscosity of the fluid, and/or the pumping force, e.g. by adjusting the height of the water column of the frequency of rotation in a centrifugally pumped system.

[0058] Simulation results of a fluid velocity within the taper region 450, the trench 410 and the funnel region 455 show these changes in velocity. As is evident from FIG. 5, the velocity of fluid within the fluid path decreases as it passes over the trench region—coincident with the region between 200 and 400 microns. It then increases again as it enters the funnel region, the area within the graph greater than 400 microns on the X axis. As it is also evident from an inspection of exemplary lengths, it is desirable that the taper region is of greater length than the funnel region.

[0059] FIG. 6 shows how fluid entering downwardly into the trench will also decelerate. As a result of this, it will be appreciated that the throughput of fluid in upper regions of the trench is greater than throughput in lower regions. This has significance in mixing of fluid samples, as will be discussed later.

[0060] A device provided in accordance with the present teaching is especially useful within the context of cell capture and in sequential flow analysis where a plurality of fluids may be passed through the same device in a sequential fashion. In such an arrangement the particles described heretofore can be considered cells and the capture chamber is desirably dimensioned such that cells entrained within the fluid will preferentially be displaced from the fluid and will remain in the capture chamber.

[0061] FIG. 7 shows an exemplary arrangement of how cells can be effectively captured using a device 100 such as that described heretofore. A fluid 700 having a culture medium with cells of interest entrained therein is provided in a sample pipette 300. Volumes of the order of 1 to 400 microlitres may be provided in the pipette. By providing an open configuration the fluid will be gravity fed in that it will enter downwardly into the device under the effect of gravity. On introduction its direction of flow is substantially parallel to the surface of the substrate prior to encountering the capture chamber or trench. In this region the fluid will pass downwardly and slow down—per FIG. 6. Any cell matter 705 within the fluid will displace from the fluid and settle on the bottom 440 of the trench under the impact of a sedimentation force with a substantial component in the direction of the capture chamber. This cell matter can be tested in any one of a number of different arrangements.

[0062] While the device heretofore described has application in any analysis technique that requires capture of cellular or other particulate matter, in that it provides for an effective capture of the cellular matter from a fluid medium in which it is conveyed, it will be further appreciated that such a capture region provides an effective experimental region wherein a capture cell can be stimulated or modified by suitable experimental techniques. By changing the fluid that is introduced in the device, captured cells can be exposed to different environments and their responses can be tested or for example their contents may be released to the surrounding solution in the capture chamber by exposure to a suitable lysis agent.

[0063] An example of such a multi-step analysis that may be effected using a device in accordance with the present teaching is NASBA analysis which it will be appreciated is a specific example of nucleic acid amplification.

[0064] Nucleic Acid Sequence-Based Amplification (NASBA) is a transcription-based RNA amplification system. Initially developed by Compton in 1991, NASBA is an isothermal (41° C.) process that can produce more than 109 copy cycles in 90 min. Compared to other in-vitro amplification methods such polymerase chain reaction (PCR), strand-displacement amplification (SDA) or rolling-circle amplification (RCA), NASBA has the unique characteristic that it can, in a single step, amplify RNA sequences. To achieve this NASBA involves the simultaneous action of three enzymes (avian myeloblastosis virus reverse transcriptase, RNase H, and T7 RNA polymerase). Several nucleic acid types, including mRNA, rRNA, tmRNA, and ssDNA, as well as nucleic acids from virus particles, can be analysed with NASBA, enabling a range of diagnostics, along with gene expression and cell viability measurements. In some cases the one step NASBA protocol can achieve levels of detection of extracted RNA a hundred times lower compared to the three step RT-PCR protocol. Furthermore, NASBA has the unique ability to specifically amplify RNA in a background of DNA of a comparable sequence, this reduces the sample purification requirements. A device such as that provided in accordance with the present teaching has specific application in NASBA analysis or indeed in other techniques that require the sequential delivery of multiple fluids.

[0065] Each microfluidic device 100 or COPE element module can be configured to capture cells from a fluid passing within the device flow, long term culture them, stimulate them with drugs and agonists, stain them, lyse them and finally perform real-time NASBA analysis and/or an immuno assay analysis all within the same chamber. An example of such a methodology will be described with reference to FIG. 8.

[0066] In a first step, Step 800, a culture medium 700 is introduced into the device. This may be done in one or more repeated steps and during this cell culture phase the entire device is placed in a standard cell culture incubator where, if required, conditions such as concentration of $CO_2$ can be controlled. The presence of the culture medium and the controlled ambient conditions allow for a culturing of the cells captured within the trench. Once these have been cultured, it is then possible to change the fluid within the device.

[0067] As an example, in Step 810, a lysis mixture 700A is introduced into the device. The lysis mixture once introduced can be left in-situ within the device (Step 820) for a sufficient period of time to allow for cell lysis.

[0068] Once this period has expired, the flow through fluid can be changed again such that for example NASBA reagents 700B may be introduced into the device (Step 830). Analysis of the reaction of the lysate mixture 850 to the introduced NASBA reagents can be assessed in real time. During the real-time NASBA and immuno-assay analysis phase the device may be mounted on a standard automated temperature controlled fluorescence microscope stage and the change in fluorescence from each trench may be measured as a function of time. To simplify the operation the device is designed in such a way that the fluidic resistivity of all the inlets is equal and low enough so that the pressure generated by a standard pipette is sufficient to drive fluids into the device. This enables all fluid loading of the device to be done directly with a standard pipette and furthermore when the filled pipette tips are left plugged into the inlets they function as gravity driven pumps or hydrostatic delivery devices. This gravity driven pumping action is used for cell loading and the perfusion of culture media, drugs and labelling dyes, lysis mixture,

Berkeley Lights Ex 1005-p 26
Berkeley Lights v UBC

immuno-assay and real time NASBA reagents. By varying the height of the fluid in the inlet tip the gravity driven pumping flow velocity can be controlled.

[0069] FIG. 9 shows exemplary results achieved from a multiplexed array structure such as that shown in FIG. 2. In this exemplary arrangement the signal responses 900 for each of the individual devices are evident. For example in the array 910, eight individual devices are evident. Each response is reflective of the reaction that has occurred within an individual capture chamber. It will be appreciated that by integrating a plurality of individual devices 100 onto a single substrate and effecting simultaneous experiments within each, that it is possible to obtain a plurality of results within the same time frame. Furthermore as each experiment, i.e. the results from cells captured within the individual chambers, has been conducted within the same ambient conditions, statistical errors are reduced.

[0070]  Experimental Results

[0071]  It will be appreciated from the foregoing that the device described utilises gravitational driven flow and the fact that fluids are responsive to hydrostatic pressure to effect a flowing of the fluid from regions of higher pressure to regions of lower pressure. To understand the effect of the device's capability of harnessing gravity driven flow inlet pipettes were filled with different volumes and measuring the flow velocity generated at the inlet of each device 100 was measured. The results are shown in FIG. 10. It is evident that by increasing the volume of fluid provided initially in each pipette that the flow rate within the device can be controlled. In this way for example, if it is desired to have a low flow rate, a smaller volume of fluid may be provided in the pipette.

[0072]  The injection flow rate has an effect on cell and particulate matter loading within the trench or capture region. Cells or particles suspended in a fluid are flown into the device, and as long as the injection flow rate is below a certain threshold all cells that pass over the cavity region will sediment and be trapped within the cavity.

[0073]  FIG. 11 illustrates a scenario where HeLa cells 1105 are trapped within several trenches 1100A, 11008, 1100C, 1100D. Each of the four trenches has identical dimensions 100×400 μm with a depth of 320 μm, while the flow path had a height of 40 μm. The injection flow rate was 50 mL/min. As is seen from a visual inspection of each of the four chambers 1100A, 11008, 1100C, 1100D, the HeLA 1105 cells are trapped within the chambers. Further statistical analysis on additional chambers as shown in FIG. 12 shows cell loading relative standard deviation of 7.8%.

[0074]  FIG. 13 shows a modification where 1.5 μm silica beads were captured within the cavity; the reference numerals used are the same as what was used for FIG. 4. After 30 min of loading the beads have begun to fill the cavity and almost no beads were detected escaping the cavity. The same experimental conditions were employed for the arrangement of FIG. 11 as for FIG. 13. The injection flow rate was 50 mL/min in the direction of the arrow 1301. Statistical measurements have shown 99.75% capture efficiency.

[0075]  Using devices such as that provided within the context of the present disclosure, the fluid volume within the trench can be easily replaced with a new solution by just flowing the new solution over the cavity. This is demonstrated in the context of FIG. 14 where a fluorescent dye solution was introduced into a device having previously received water, the water being retained within a 300 micron deep trench. The

flow rate was approx. 500 μm/s. Within 5 min the dye solution had completely replaced the pure water.

[0076]  To demonstrate the usefulness of a device or structure such as that heretofore described cell culture, drug stimulation and staining procedures were performed. After loading the cells into the capture regions, the device was placed within an incubation chamber at 37 C and culture media dynamically perfused over the cells through the gravity driven flow. The inlet tips were generally reloaded with new media every 2 days. The waste fluids were also cleaned off every 48 hrs. When the cells had to be stained then the media in the inlet tips was replaced with the dye solutions. After approx. 20 min of gravity driven flow of the dye solutions the cells are labelled and can be fluorescently interrogated with a microscope. Results from such steps are provided in FIG. 15 where long term cell culture and viability staining results are evident.

[0077]  To demonstrate lysis and purification a layer of beads were provided on top of the cells. The beads were provided with pre-coated antibodies or oligo-nucleotide sequences that would specifically bind to the target of interest that will be purified. The cells are lysed by diffusion mixing a lysis agent and washing off the rest of the lysate. The steps are shown in FIG. 16, which again uses the same reference numerals as have been previously used for FIGS. 7 and 8.

[0078]  In step 1, the cells 705 were loaded and cultured by introduction of a culture medium 700. Step 2 shows the provision of a layer of pre-coated RNA capture beads 1600 on top of the cells 705. A lysis mixture 700A is introduced in Step 3. This effects a break down of the cell walls and generates a lysate mixture 1605. The lysate mixture mixes with the beads and after about 30 minutes incubation the beads capture the cell RNA. In Step 4, the remains may be washed away by flowing through another volume of liquid such as PBS 1610.

[0079]  The results from a lysis experiment are shown in FIG. 17 where HeLa cells were lysed with a lysis agent in the form of 100 mM NaOH. The effective breakdown of the cell walls is complete within 40 seconds, as is evident from the disintegration of the cells shown with elapse of time.

[0080]  A variety of tests may be conducted on cells that are constrained within the capture region. For example immunoassay and real time NASBA analysis can then be performed by following the steps shown in FIG. 18. During the real-time NASBA and immuno-assay analysis phase the device is mounted on a standard automated temperature controlled fluorescence microscope stage and the change in fluorescence from each capture region is measured as a function of time (FIGS. 19 & 20).

[0081]  Steps 1 through 4 are the same as what was described with reference to FIG. 16. In Step 5 a fluorescently labelled antibody mixture 1800 was introduced into the device. Unbound fluorescent anti-bodies may be washed away with PBS 1610 or other suitable washing or dilution materials, and the fluorescence measured. It will be appreciated that a complete washing may not be required in that the sequential flow of the additional fluid may simply effect a dilution of the previously entrained fluid within the chamber. —Step 6. Any fluorescence around an antibody coated bead is due to protein in the target. This fluorescence may be optically analysed. In Step 7 a NASBA reagent mixture 1810 was introduced into the device. Step 8 demonstrates how real time NASBA may be done by incubating the device at 41° C. and monitoring the increase in fluorescence in the capture region. Any increase in fluorescence can be attributed to generation of more amplicons and opening of molecular beacons. It will

Berkeley Lights Ex 1005-p 27
Berkeley Lights v UBC

be appreciated that this sequence of steps shows how the same capture chamber **410** may be used as a receiving volume for a plurality of different fluids, each of the fluids having an effect on the cells or subsequent mixture resultant from the exposure of the cells to a previously introduced fluid.

[0082] FIG. **19** shows fluorescence images of approximately sixteen individual devices at the beginning of the NASBA reaction. The different chamber coatings are also indicated. FIG. **20** shows simultaneous change in fluorescence within sixteen devices during the NASBA reaction. The coatings within the different capture regions was varied. Twelve positive control experiments were done, together with four negative controls within a single monolithic device.

[0083] It will be appreciated that the exemplary application of use of a device provided in accordance with the present teaching as a reaction chamber for NASBA type experiments demonstrates the useful employment of such a device for experiments that require contact between a captured cell and a sequence of fluids. By retaining the cell within a capture chamber or trench and then simply flowing different fluids past that captured cell, it is possible to achieve capture, labelling and analysis within a single structure. Therefore it will be understood that while the teaching has benefit and application in NASBA that it could also be used in other applications that require exposure of a captured cell to different fluids. Such application to lab on a chip technology with sample-in, experiment and answer out capability will be evident to those skilled in the art. Use of devices such as those heretofore described have benefit in that they can enable screening and diagnostics with lower cost, less contamination, and smaller sample volumes.

[0084] The retention characteristics of the capture region make it particularly effective for also mimicking in vivo conditions of cellular activities. As the dimensions of the capture trench are much greater than the particles which are retained therein, devices such as those heretofore described can be usefully employed in biomimetic experiments. For example as shown in FIG. **21** a device **100** can be used to generate 3D cell structures **2100** of individual cancer cells **2105** so as to recreate cellular conditions similar to in-vivo tumours or other structures. This can also be combined with the fact that multiple cell types can be incorporated in a layered fashion to form co-cultures that further approximate in-vivo like conditions. An example of such a 3D co-culture like experimental setup for investigating cancer cell dynamics close to blood vessels **2110** (endothelial cells) is shown in Step 2 of FIG. **21**. By selectively varying the nature of the fluid passing over the capture chamber it is possible to selectively layer the particles that are ultimately captured within the chamber. As these will typically be retained in the order that they were introduced into the chamber, this allows for subsequent experiments to be conducted within pseudo in vivo conditions. While the arrangements described herein preferentially retain the particles within the trench it is possible to modify the arrangement so as to provide for subsequent movement of the particles—either within the trench so as to provide for mixing or the like, or to effect removal of the particles out of the trench. Such arrangements will typically require a capacity to manipulate the particles and this can be conducted either before or subsequent to capture of the particles within the trench. Examples of techniques that could be employed include:

[0085] Acoustic

[0086] Magnetic

[0087] Inertial

[0088] Electric

[0089] Dielectrophoretic

[0090] Thermo-hydrodynamic

[0091] Laser tweezers

[0092] Hydrodynamically induced agitation

[0093] Specific or unspecific attachment to surface

[0094] It will be understood that the use of such techniques may require an external source of agitation or manipulation of the particles.

[0095] A further example of the use of such a capture chamber is in the analysis of *E. Coli* bacterial cells. To provide for such analysis, a solution containing the *E. Coli* is flown into the device in a manner as described heretofore. This capture allows for cell based assays to be conducted. As part of the process for such analysis initially the device is loaded with the bacterial solution. After this initial loading, a washing or dilution solution is flown in to rinse out any non captured bacteria. Due to the low flow field at the bottom of the processing chamber trench, the bacteria present there will be effectively captured and not washed away. Due to the very low density of the *E. Coli* bacteria, the capture efficiency is much lower than that of denser particles or cells such as cancer cells.

[0096] If mixing of fluids is required between a new input fluid and the previous contents of the processing chamber, then that may be achieved by stopping the input fluid flow before it has completely replaced the previous contents as shown in FIG. **22**. In this specific example it is shown how a FITC dye (44 μM) is flown into a previously water filled device and allowed to mix with the water within the trench chamber. The input flow velocity is ~400 μm/sec

[0097] In cases where reagent or sample volumes are very limited and scarce an oil layer may be used to hydrostatically drive in the low volume reagents. Experiments with 20 microliter tips demonstrated that volumes as low 400 nL can be readily loaded into the processing module. Since each module consists of 8 processing chambers each chamber is loaded with 50 mL. Due to the oils lower density, input flow rates can be up to 25% slower compared to water solution based hydrostatic flow.

[0098] With on-chip gravity driven flow control, an array structure such as described heretofore is flexible and can be easily integrated into existing infrastructure and workflows such as robotic pipetting systems, incubators, and fluorescent microscope systems.

[0099] It will be appreciated that the capture chamber may be considered as a sediment trap whereby the particles within the fluid, such as for cells or other living organisms, which are entrained within the fluid on passing the capture chamber are displaced out of the fluid and remain in the capture chamber for subsequent analysis or experimentation. As they simply fall out of the fluid they are exposed to minimum shear stress. These particles will consolidate on the bottom of the capture chamber to provide what may be considered a sediment on the chamber base. As more particles are retained within the capture chamber, the height of the sediment will increase.

[0100] The devices described herein have been illustrated with reference to a single flow path and a single trench provided within that flow path. It will be appreciated that modifications to the individual devices described could include an array of sequentially defined trenches within the flow path, each of the trenches differing from the others in their affinity

Berkeley Lights Ex 1005-p 28
Berkeley Lights v UBC

for particles of different sizes so as to enable sorting of particles based on their sedimentation characteristics.

[0101] In the context of a primary force providing for the delivery and/or movement of the fluid/particles within the devices, it is also possible in combination with a primary force to employ a second force which acts on the particles or the fluid flow to either supplement or counteract the effects of the first force on the fluid or particles. This could be employed either locally within the devices to cause specific movement of the flow/particles within specific regions of the device or could be applied as a general force to affect the overall flow/movement characteristics. Examples of such a second force which can be used to reinforce or suppress particle sedimentation/retention into the trench and/or liquid flow patterns the particle is exposed include:

[0102] Magnetic force (static or dynamic)

[0103] Buoyancy of high- or low-density particles

[0104] Dielectrophoresis

[0105] It will be understood that in order to operate efficiently that specific second forces may require use of materials/particles/fluids that exhibit a response to these forces. For example use of paramagnetic beads could be employed where it is desirable to apply a magnetic force to effect movement of the beads.

[0106] Heretofore the liquids described have been generally homogenous in nature. It is possible to provide liquid sequencing within the context of devices provided in accordance with the present invention. Such liquid sequencing could employ one or more immiscible liquids where for example a second liquid, e.g. oil phase, seals a previously provided aqueous phase residing in trench. Within the context of the present teaching it is also possible to provide a train of mutually immiscible phases to feed different reagents to trenches. As another example, one of the liquids in the sequence may be (another) particle suspension from which particles might differentially sediment into the trench(es).

[0107] Devices provided in accordance with the present invention desirably provide for changes in the flow rate of the fluid passing through the device in regions proximal to the trench, the change of flow rate effecting a collection of particles from that fluid. It will be understood that different fluids may have different flow rates when exerted to the same force. This could be used as a means to preferentially collect particles from a first fluid in a first trench and particles from a second fluid in a second trench. While it is not intended to limit the teaching of present invention to any one set of specific parameters simulation analysis has shown the variations in the flow velocity magnitudes in the processing chamber and trench. Cell capture is achieved due to the flow velocity magnitude in the trench being approximately 3 orders of magnitude lower the flow above it. As a result of these variances, the particles that enter the low flow velocity region are effectively captured.

[0108] The particles/fluid that are collected and retained in the trenches can be subjected to a number of different tests such as for example:

[0109] Microscopy techniques including staining

[0110] Surface sensitive excitation and detection such as SPR, TIRF

[0111] Other excitation and/or detection techniques.

[0112] The fabrication of devices provided in accordance with the present teaching may be effected using one of a number of different processes. While it is not intended to limit

the teaching to any one specific process exemplary techniques that could be employed include:

[0113] Injection moulding

[0114] Hot embossing

[0115] Thermoforming

[0116] Precision engineering

[0117] Laser ablation

[0118] Lamination

[0119] Lithography

[0120] Dry and wet etching

[0121] other microfabrication schemes including sealing schemes as will be appreciated by those skilled in the art.

[0122] It will be appreciated that a device such as that fabricated in accordance with the present teaching has a number of advantages including its application to efficient cell capture with minimal clogging and exposure of the cells to shear stress. The device is suitable for in situ cell culturing and can also be considered for providing 3-D cell co-culturing. An exemplary application has been demonstrated in multi-flow analysis techniques which may be effected without removal of the captured cells from their capture chamber. Such devices may be provided in single element packages or could be arranged in array structures where a plurality of devices share a common input. Further modification has been described in the context of a multiplexed structure that provides multiple capture regions within the same substrate. These devices can be implemented or fabricated using conventional microfluidic engineering principles. Use of plurality of devices provides for fluidic isolation of separate modules on a single chip. While it is not intended to limit the teaching to any one specific arrangement, the introduction of a fluid into the devices using integrated gravity driven pumping units on a monolithic micro device is particularly useful.

[0123] A further example of use of such a multi-flow sequential analysis tool is in real-time protein analysis whereby it is possible to monitor live cell interactions with stimulation agents and/or other cells and in real time detect with high specificity the expression of surface proteins. FIG. 23 shows an example of such an application whereby the real time measurement of the level of surface protein expression may be effected. This exemplary procedure is based on the specific binding of labelled antibodies to the surface protein of interest (target proteins). The real-time measurement is achieved by having the surface protein within a microfluidic system that constantly refreshes a low concentration of antibodies in the medium. As new target proteins are expressed on the surface, the labelled antibodies in the medium solution specifically bind and label the proteins. The consumed antibodies are replaced by microfluidic refreshment so as to keep a constant supply of dissolved antibodies. The surface protein concentration is directly correlated to the signal from the surface labels.

[0124] It will be understood that this application advantageously employs the use of the microfluidic trench structure that has been described heretofore. Whereas in the previous applications described herein the structure has been demonstrated to be capable of very efficient cell capture and retention coupled with constant perfusion and refreshment of the soluble factors within the trench, in this application the present inventors have realised that the exact elements required for real time surface protein expression detection can be achieved with microfluidic systems. The capability of real time protein expression detection has not been previously demonstrated or reproduced in the macro-scale or with con-

Berkeley Lights Ex 1005-p 29
Berkeley Lights v UBC

ventional equipment. The real time protein expression measurement was achieved by maintaining a very low concentration of fluorescently labelled antibodies in the perfusion medium.

[0125] In this exemplary experiment of the applicability of the apparatus for this application FITC-labelled anti-CD86 antibodies were used at concentration $1/100$ of neat. The fluorescent antibody in this case was specific to the CD86 co-stimulatory molecule. During an antigen-dependent inflammatory response macrophage cells are activated and over express co-stimulatory molecules such as CD80, CD86 and CD40 on their surface which helps induce an effective T-cell response. This is one of the key mechanisms and outcomes of activated macrophages that makes them behave as antigen presenting cells (APCs) and activates the adaptive immune system. During the real time monitoring of surface protein expression J774 macrophages 2300 were activated with LPS (200 ng/ml) in the positive control case, while in the negative control no LPS was present in the culture medium. As the stimulated macrophages began to express the CD86 proteins on the cell surface, the fluorescent CD86 antibodies generated a fluorescent signal from the cell surface. As the free solution antibodies are being consumed and bound on the cell surface, new ones replace them through the continuous perfusion and diffusion. This maintains a constant supply of in solution antibodies and enables the real time monitoring of the CD86 protein expression on the surface of the macrophage cells. Furthermore the micro-scale dimensions of the device keep the background fluorescence generated by the in solution antibody to a minimum, lowering the LOD to physiologically relevant levels. This measurement technique can be further enhanced by simultaneously using several antibodies with different fluorophore labels to generate simultaneous real time multiple surface protein readout with single cell resolution.

[0126] It will be appreciated that this application of the sequential flow analysis tool is based on the capabilities of the described microfluidic system to refresh dissolved agents. By using a low concentration of in-solution labelled antibodies combined with the small micro-dimensions of microfluidic cavities, a low background signal can be maintained while always having antibodies available for labelling. This way any incubation and washing steps, usually required in conventional immunoassays become unnecessary, enabling the real time labelling and monitoring of surface proteins as they are generated.

[0127] FIG. 24 shows in schematic form how the same device may be used for RNA analysis and protein analysis; the variation being on the reagents that are introduced into the individual chambers. While the figure schematically shows the two different analysis occurring in parallel, it will be understood that this is shown purely to emphasise the application of the sequential flow analysis apparatus of the present teaching to two different analysis.

[0128] In Step 2400, a common step, cells are loaded in a similar fashion to that which was described before. In Step 2405, these cells may be cultured and stimulated through introduction of a culture medium. The technique branches thereafter depending on whether RNA or protein analysis is desired.

[0129] In RNA analysis, firstly a fixing buffer followed by a lysis buffer are introduced to fix and lysis the cells (Step 2410). After a predetermined time period a real time NASBA mixture is introduced (Step 2415). After incubation at desired

temperatures (about 41° C.) a fluorescence analysis (Step 2420) will provide the RNA analysis.

[0130] If protein analysis is preferred, then after the culturing of the cells (Step 2405), a fixing buffer is introduced to fix the cells within the chamber (Step 2425). Subsequent loading of an antibody arrangement provides an immuno-stain (Step 2430). The subsequent washing of the unbound antibodies (Step 2435) and luminescent analysis of the chambers will provide information on the protein.

[0131] While a sequential multi-flow array may be fabricated in any one of a number of different methodologies, FIG. 25 shows an exemplary flow sequence that may be adopted to advantageously simplify the alignment and complexity of manufacture. In this exemplary arrangement two layers of PDMS (a fluidic layer and a lid/inlet layer) and a support glass substrate are employed. In Step 2500 two different Si wafers are provided. On a first wafer, a layer of SU-8 photoresist is provided (Step 2505). A second layer of SU-8 is then provided on the first layer to define an upstanding profile on the first layer (step 2510). On the second wafer a layer of PDMS is provided. This layer is then peeled and punched to generate what will ultimately form inlets to the device (Step 2520). On the first wafer a PDMS layer is provided over the SU-8 layer so as to encapsulate the layers (Step 2525). By suitable etching, the SU-8 may be eroded to define a pattern within the PDMS layer (Step 2530). By inverting this layer and then bringing the first and second layers together and assembling them relative to one another onto a glass substrate a trench and inlets are fabricated (Step 2535).

[0132] A technique such as that described herein can be used for analysis of cell secretion where cells secrete proteins into their surrounding extracellular fluid. By being able to spatially discriminate the detected optical signal it is possible to analyse the nature of the origin of the optical signal. To provide for spatial discrimination as to the origin of the desired optical signal it is necessary to be able to discriminate between the bulk contribution to the detected signal and that signal that originates from the sample or analyte of interest. One way of achieving this is to effect a mathematical integral technique whereby the detected intensity of the luminescent signal originating from the top of the collection chamber down to the surface of the sample region is compared with that originating from proximal or at the surface of the sample region. By ensuring adequate heights and dimensions of the collection chamber relative to the sample type and analysis technique effected it is possible to provide an adequate signal to noise ratio of sufficient level to allow for bulk and analyte contribution to the detected luminescence signal.

[0133] While the use of a luminescence based analysis methodology is particularly advantageous within the present context it will be understood that different optical agents could be used to allow for a spatial discrimination between the sample region and the bulk fluid within the collection chamber. For example different optical biosensing techniques could be used within the context of the present invention for assessing the properties of the captured cellular or particulate matter within the capture chambers or wells heretofore described.

[0134] It will therefore be appreciated that while the present teaching has been exemplified with reference to the heretofore and the attached drawings that these are provided to assist in an understanding of the teaching and are not to be construed as limiting in any fashion. Modifications can be made without departing from the spirit or scope of the inven-

Berkeley Lights Ex 1005-p 30
Berkeley Lights v UBC

tion. Where integers or components are described with reference to any one figure it will be understood that these could be changed for other integers or components without departing from the present teaching.

[0135] While a preferred arrangement of the present teaching will be evident from the claims that follow, the invention also relates to a microfluidic device substantially as described in the following numbered clauses.

[0136] 1. A microfluidic device comprising a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber due to action of a non-centrifugal force on the particles, the non-centrifugal force acting in a direction substantially parallel to the direction of extension of the capture chamber into the substrate.

[0137] 2. The device of clause 1 wherein the fluid path is provided within the substrate, the fluid path defining a conduit having a base, top and side walls.

[0138] 3. The device of clause 2 wherein the fluid path is disposed along an axis substantially parallel with an upper surface of the substrate.

[0139] 4. The device of any preceding clause wherein the fluid path is proximal to an upper surface of the substrate.

[0140] 5. The device of any preceding clause wherein the capture chamber is in the form of a trench having a mouth adjacent to and in fluid communication with the fluid path, the trench having sidewalls that extend substantially parallel to the direction of the of the capture force into the substrate from the mouth of the trench.

[0141] 6. The device of clause 2 wherein the trench has a major axis that is substantially perpendicular to the fluid path, the trench being longer than it is wide.

[0142] 7. The device of clause 6 dimensioned such that operably fluid travelling within the fluid path and entering downwardly into the trench will undergo deceleration and the fluid exiting the trench will undergo acceleration, the change of velocity within the trench causing particles within the fluid to be displaced from the fluid.

[0143] 8. The device of any preceding clause wherein the particles are cells and the capture chamber is dimensioned such that cells entrained within the fluid will preferentially be displaced from the fluid and will remain in the capture chamber.

[0144] 9. The device of clause 5 wherein the fluid path defines a taper region immediately upstream of the mouth of the trench, the taper region operably providing for a deceleration of fluid within the fluid path immediately preceding the mouth.

[0145] 10. The device of clause 9 wherein the fluid path defines a funnel region immediately downstream of the mouth of the trench such that fluid exiting the trench will undergo acceleration.

[0146] 11. The device of clause 9 wherein the fluid path includes a fluid feed line upstream of the taper region, and wherein the side walls of the fluid path flare away from another between the feed line and the mouth of the trench.

[0147] 12. The device of clause 10 wherein the fluid path includes a fluid waste line downstream of funnel region, and wherein the side walls of the fluid path tapering towards one another between the mouth of the trench and the fluid waste line.

[0148] 13. The device of clause 10 wherein the taper region has a length greater than the funnel region.

[0149] 14. The device of any preceding clause wherein the inlet is dimensioned to receive a pipette funnel such that fluid may be introduced into the device and then pass within the fluid path.

[0150] 15. The device of clause 14 wherein the volume of the fluid within the pipette is related to the fluid flow rate within the device.

[0151] 16. The device of clause 14 or 15 wherein the fluid enters into the device under hydrostatic pressure.

[0152] 17. The device of any one of clauses 1 to 14 being dimensioned such that a fluid loaded into the device enters or moves within the device under the influence of one or more of:

[0153] Hydrostatic pressure head (e.g. pipette tip or tilt)

[0154] Pressure-driven flow

[0155] Centrifugally propelled flow

[0156] Electrokinetic mechanisms

[0157] 18. The device of any preceding clause wherein the fluid path defines a filter between the inlet and the capture chamber so as to effect a filtering of particulate matter of a predetermined dimension prior to the capture chamber.

[0158] 19. The device of any preceding clause including a plurality of capture chambers sequentially provided within the fluid path.

[0159] 20. The device of clause 19 wherein individual capture chambers are configured so as to be operably predisposed to capture of particles of a particular characteristic.

[0160] 21. The device of any preceding clause wherein the capture chambers comprises surfaces having a surface coating which operably exhibits an affinity for predefined particles.

[0161] 22. The device of any preceding clause wherein the capture chamber comprises a preloaded reagent.

[0162] 23. A microfluidic array comprising a plurality of devices as detailed in any preceding clause.

[0163] 24. The array of clause 23 wherein selected ones of the plurality of devices share a common input.

[0164] 25. The array of clause 23 or 24 wherein selected ones of the plurality of devices share a common output.

[0165] 26. The array of clause 25 wherein the input is arranged in a branch structure such that fluid introduced into the input will be directed towards each of the capture chambers of the selected ones of the plurality of devices.

[0166] 27. The array of clause 26 wherein the output is arranged in a branch structure such that fluid exiting each of the capture chambers of the selected ones of the plurality of devices will collect with fluid of others of the selected ones of the plurality of devices.

[0167] 28. A multiplexed microfluidic structure including a plurality of arrays as detailed in any one of clauses 23 to 28.

[0168] 29. The structure of clause 28 wherein the plurality of arrays are arranged in rows on a common substrate.

Berkeley Lights Ex 1005-p 31
Berkeley Lights v UBC

**[0169]** 30. The structure of clause 28 or 29 wherein the plurality of arrays are spaced apart from one another such that the plurality of arrays can be concurrently loaded with fluid.

**[0170]** 31. A biomimetic analysis tool comprising a device as detailed in any one of clause 1 to 22.

**[0171]** 32. The tool of clause 31 wherein the capture chamber is dimensioned to receive a plurality of cells which on receipt within the chamber are predisposed to adopt a 3-D configuration.

**[0172]** The words comprises/comprising when used in this specification are to specify the presence of stated features, integers, steps or components but does not preclude the presence or addition of one or more other features, integers, steps, components or groups thereof.

1. A multi-sequential flow sample apparatus comprising a microfluidic device, the device comprising:
   a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within the fluid path, the capture chamber being dimensioned and extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles of a predefined dimension provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber due to action of a non-centrifugal force on the particles, the non-centrifugal force acting in a direction substantially parallel to the direction of extension of the capture chamber into the substrate, and
   wherein the apparatus is configured for sequential fluid engagement with a plurality of fluid supply lines, an engagement of the apparatus with a fluid supply line and receipt of fluid from that supply line operably effecting a discharge from the capture chamber of a previously provided fluid.

2. The apparatus of claim 1 wherein the device fluid path provided within the substrate includes a conduit having a base, top and side walls.

3. The apparatus of claim 2 wherein the device fluid path is disposed along an axis substantially parallel with an upper surface of the substrate.

4. The apparatus of claim 1 wherein the device fluid path is proximal to an upper surface of the substrate.

5. The apparatus of claim 1 wherein the device capture chamber is in the form of a trench having a mouth adjacent to and in fluid communication with the fluid path, the trench having sidewalls that extend substantially parallel to the direction of the capture force into the substrate from the mouth of the trench.

6. The device of claim 5 wherein the trench has a major axis that is substantially perpendicular to the fluid path, the trench having a length parallel to the major axis greater than a length of the trench that is perpendicular to the major axis.

7. The device of claim 6 wherein the a number of dimensions of the device are such that operably, fluid travelling within the fluid path and entering downwardly into the trench will undergo deceleration and the fluid exiting the trench will undergo acceleration, the change of velocity within the trench causing particles within the fluid to be displaced from the fluid.

8. The apparatus of claim 1 wherein at least one of the fluid supply lines comprises a filter provided between the inlet and the capture chamber such that operably particles of a pre-determined dimension provided within the fluid travelling within the fluid path are filtered prior to the capture chamber.

9. The apparatus of claim 1 wherein the capture chamber is dimensioned such that discharge of a previously provided fluid does not effect corresponding discharge of the particles collected within the capture chamber.

10. The apparatus of claim 8 wherein the capture chamber is dimensioned such that introduction of a second fluid into the device effects a mixing of that second fluid with a previously provided fluid within the capture chamber.

11. The apparatus of claim 1 wherein the apparatus forms at least part of a real-time protein analysis tool.

12. The apparatus of claim 1 wherein the apparatus comprises at least part of a nucleic acid sequence-based amplification (NASBA) tool.

13. A sequential flow analysis tool comprising:
   a microfluidic device comprising a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber;
   means for introducing a flow of a first fluid into the input of the device and past the capture chamber, the introduction of the first fluid into the device effecting capture of particles within the first fluid within the capture chamber;
   means for introducing a flow of a second fluid into the input of the device and past the capture chamber subsequent to the introduction of the first fluid, the flow of the second fluid past the capture chamber effecting a diffusion of the second fluid into the capture chamber so as to expose the retained particles to the second fluid.

14. The tool of claim 13 wherein a solution is formed on exposure of the retained particles to the second fluid, the tool further comprising:
   means for introducing a flow of a third fluid into the device, the introduction of the third fluid and flow of that fluid past the capture chamber effecting a diffusion of the third fluid into the capture chamber so as to expose the solution to the third fluid.

15. The tool of claim 14 wherein the second fluid comprises particles, diffusion of the second fluid into the capture chamber effecting a collection of the particles of the second fluid within the capture chamber.

16. The tool of claim 14 wherein the capture chamber is dimensioned such that on introduction of a second fluid, a layering of the particles from the first and second fluids is provided within the capture chamber.

17. The tool of claim 14 wherein on introduction of the second fluid the particles of the first fluid react with the particles of the second fluid.

18. The tool of claim 14 comprising means for effecting movement of the particles within the capture chamber.

19. The tool of claim 15 wherein the captured particles are cells.

20. The tool of claim 14 configured for nucleic acid amplification.

21. The tool of claim 14 wherein the orientation of the extension of the capture chamber into the substrate is such that operably an external force acting on the particles within

Berkeley Lights Ex 1005-p 32
Berkeley Lights v UBC

the capture chamber acts in a direction substantially parallel to the direction of extension of the capture chamber into the substrate

**22**. A method of performing sequential flow analysis, the method comprising:

providing a microfluidic device comprising a fluid path defined within a substrate between an input and an output, the device including a capture chamber provided within the fluid path, the capture chamber extending into the substrate in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber

introducing a first fluid flow into the device, the flow of the fluid past the capture chamber effecting a capture of particles within the capture chamber of the device;

flowing a reagent through the device, the flow of the reagent past the capture chamber effecting an interaction between the reagent and the previously captured particles within the capture chamber;

analysing the capture chamber.

**23**. The method of claim **22** wherein the flow of the reagent past the capture chamber effects a diffusive mixing within the capture chamber of the reagent with the first fluid.

**24**. The method of claim **22** wherein the analysing of the capture region is effected using fluorescence measurements.

**25**. The method of claim **22** comprising a treatment of particles or where the particles are cells, a culturing of the cells, collected within the capture chamber

**26**. The method of claim **22** for use in nucleic acid amplification.

**27**. The method of claim **22** for use in bio-chemical reaction.

**28**. The method of claim **22** for use in protein analysis.

**29**. The method of claim **22** wherein the particles captured within the capture chamber are captured through a sedimentation process under influence of a force acting on the particles in a direction substantially parallel to the direction of extension of the capture chamber into the substrate.

**30**. A method of performing Immuno-assay and nucleic acid amplification analysis comprising:

introducing a fluid into a collection device, the collection device defining fluid path and a collection chamber, the collection chamber defining a well offset from the fluid path, the well having dimensions such that cellular matter within the fluid are preferentially collected within the well,

culturing the cellular matter within the collection chamber,

introducing a second fluid containing beads into the collection device, the second fluid effecting bead capture within the chamber,

introducing a third fluid into the collection device, the third fluid effecting a lysing of the cellular matter,

introducing a fourth fluid into the collection device, the fourth fluid effecting a dilution of the cellular debris,

introducing a fifth fluid into the collection device, the fifth fluid effecting an immuno fluorescent staining of material within the collection device,

introducing a sixth fluid into the collection device, the sixth fluid effecting a dilution of unbound fluorophores,

analysing the response of the beads within the collection chamber

introducing a seventh fluid into the collection device, the seventh fluid including nucleic acid amplification reagents and/or fluorescent probes, and

analysing the response of the contents within the collection chamber to the introduced nucleic acid amplification reagents.

**31**. A method of performing protein analysis comprising:

introducing a fluid into a collection device, the collection device defining fluid path and a collection chamber, the collection chamber defining a well offset from the fluid path, the well having dimensions such that cellular matter within the fluid are preferentially collected within the well,

culturing the cellular matter within the collection chamber,

introducing a fixing buffer into the collection device, the second fluid effecting a fixing of the cells previously captured within the chamber,

introducing an antibody buffer into the collection device, the antibody buffer effecting a staining of the cellular matter,

introducing a fourth fluid into the collection device, the fourth fluid effecting a dilution of unbound antibodies, and

analysing the luminescent response of the contents of the collection chamber.

**32**. A method of performing cellular or particulate matter analysis comprising

providing a collection device, the collection device defining a fluid path and a micro-scaled collection chamber, the collection chamber being offset from the fluid path,

providing cellular matter or particulate matter within the collection chamber,

introducing one or more fluids into the collection device such that the cellular matter or particulate matter within the collection chamber is exposed to the introduced fluids and its optical response modified; and

optically analyzing the collected cellular matter or particulate matter within the chamber,

wherein the collection chamber is dimensioned such that collected cellular matter or particulate within the chamber provides an optical response which may be discriminated from an optical response from other contents of the chamber.

**33**. The method of claim **32** further comprising biasing the cellular or particulate matter towards specific regions of the chamber.

**34**. The method of claim **32** wherein the collected matter is cellular matter, the method further comprising staining the cellular matter.

**35**. The method of claim **34** wherein the staining is effected within the collection chamber.

**36**. The method of claim **32** comprising creating optical contrast regions within the chamber.

**37**. The method of claim **32** comprising luminescent tagging the collected cellular or particulate matter.

**38**. The method of claim **32** comprising culturing, stimulating and detecting the cellular matter within the collection chamber by introducing a flow of culture, stimulation and a labelled antibody buffers into the micro scaled collection chamber, the labelled antibody buffer effecting a staining of the cellular matter.

**39**. The method of claim **32** wherein the optical analysis is effected by analysing a luminescent response of the contents of the collection chamber.

Berkeley Lights Ex 1005-p 33
Berkeley Lights v UBC

**40**. The method of claim **39** wherein the luminescent response is a fluorescence response.

**41**. The method of claim **32** wherein the optical analysis spatially discriminates between the origin of the optical response from within the chamber.

**42**. The method of claim **41** wherein the spatial discrimination is effected through an integration of the luminescent intensity over an optical pathway from a top of the chamber to the cellular or particulate matter within the chamber to provide a bulk intensity value and comparing that bulk intensity value with a luminescent signal originating from a region at or proximal to the surface of the particulate or cellular matter.

**43**. The method of claim **32** comprising introducing the cellular or particulate matter into the chamber through a flowing of a liquid into the collection device.

**44**. The method of claim **43** wherein the cellular or particulate matter is captured within the chamber through one or more of sedimentation, centrifugation or magnetic processes.

**45**. The method as claimed in claim **32** used in protein or gene expression analysis.

**46**. The method as claimed in claim **32** used in cell secretion analysis.

\* \* \* \* \*

Berkeley Lights Ex 1005-p 34
Berkeley Lights v UBC

Microfluid Nanofluid (2010) 8:263–268
DOI 10.1007/s10404-009-0503-9

# Single cell trapping in larger microwells capable of supporting cell spreading and proliferation

Joong Yull Park · Mina Morgan · Aaron N. Sachs ·
Julia Samorezov · Ryan Teller · Ye Shen ·
Kenneth J. Pienta · Shuichi Takayama

Received: 7 August 2009 / Accepted: 16 September 2009 / Published online: 10 October 2009
© Springer-Verlag 2009

**Abstract** Conventional cell trapping methods using microwells with small dimensions (10–20 μm) are useful for examining the instantaneous cell response to reagents; however, such wells have insufficient space for longer duration screening tests that require observation of cell attachment and division. Here we describe a flow method that enables single cell trapping in microwells with dimensions of 50 μm, a size sufficient to allow attachment and division of captured cells. Among various geometries tested, triangular microwells were found to be most efficient for single cell trapping while providing ample space for cells to grow and spread. An important trapping mechanism is the formation of fluid streamlines inside, rather than over, the microwells. A strong flow recirculation occurs in the triangular microwell so that it efficiently catches cells. Once a cell is captured, the cell presence in the microwell changes the flow pattern, thereby preventing trapping of other cells. About 62% of microwells were filled with single cells after a 20 min loading procedure.

**Electronic supplementary material** The online version of this article (doi:10.1007/s10404-009-0503-9) contains supplementary material, which is available to authorized users.

J. Y. Park · M. Morgan · A. N. Sachs · J. Samorezov ·
R. Teller · Y. Shen · S. Takayama (✉)
Department of Biomedical Engineering, College of Engineering,
University of Michigan, 2200 Bonisteel Blvd, Ann Arbor,
MI 48109, USA
e-mail: takayama@umich.edu

K. J. Pienta
Departments of Internal Medicine and Urology, Michigan Center
for Translational Pathology and the Comprehensive Cancer
Center, University of Michigan, 1500 E. Medical Center Drive,
Ann Arbor, MI 48109, USA

Human prostate cancer cells (PC3) were used for validation of our system.

**Keywords** Single cell trapping · Microwell ·
Recirculation · Continuous flow

## 1 Introduction

Microwells are frequently used in biology and tissue engineering research such as embryoid body formation (Mohr et al. 2006; Karp et al. 2007; Moeller et al. 2008), multicellular organization (Ungrin et al. 2008), and three-dimensional (3D) tissue cultivation (Gottwald et al. 2007). However, many of these research applications allow (or must achieve) trapping of multiple cells in each microwell. Single cell trapping is necessary to allow identification of differing cell phenotypes within a population of cells (Di Carlo and Lee 2006). Single cell manipulation using microwells also enables observation of the direct descendants of single cells cultured under controlled biological conditions (Inoue et al. 2001), the analysis of intracellular compounds (Chao and Ros 2008), and the measurement of electrical functionality of cells (Moss et al. 2007). The above reports, however, are limited in throughput, mainly because of the difficulty in achieving high-throughput single cell trapping, and also because of the innate limitations in imaging capacity.

Therefore, there is a need for development of tools for high-throughput single cell trapping, culture, and analysis. Folch's group has developed a large-scale single-cell trapper using microwell arrays (Rettig and Folch 2005). They fabricated microwell arrays with microwell diameters of 20–40 μm, and correlated the microwell size with cell trapping rate, showing that the single cell trapping rate

🍃 Springer

Berkeley Lights Ex 1006
Berkeley Lights v UBC

drops rapidly when the microwell size becomes larger (30–40 μm) than the single cell size (10–20 μm). Another outstanding report was made by Lee's group (Di Carlo et al. 2006) where U-shaped microstructures were utilized to trap single cells. However, these two systems provide only limited room for cell growth and division or allow only limited cell motion/activity (though one should note that the systems are very good for short-term culture or observing instantaneous response of cells). Also, the fabrication process for these systems requires high-end facilities with single-digit micron scale resolution of features. Takeuchi's group proposed a robust system for trapping and releasing cells in a series of micropockets using a unique feature of hydrodynamic confinement (Tan and Takeuchi 2007); however, the lack of space for cell growth and division was yet unsolved. Rosenthal and Voldman (2005) proposed another trapping method that provides space for cell growth by using dielectrophoresis for single

cell patterning on 5 × 5 arrayed electrodes, but the need of electrode patterning and circuit control is complicating.

Here, we report a method for high-throughput single cell trapping in larger, more readily fabricated microwells by utilizing slow laminar flow and optimized microwell shape to achieve high cell-entrapment rates (Fig. 1a). Two requirements were set for the test of this method: (1) cmicrowells should trap single cells and (2) the size of microwells should be 50 μm or larger to provide enough room for cell growth and division as well as to simplify fabrication. We note that microwells with dimensions of 50 μm will typically trap multiple cells in each microwell if no other mechanism prevents this (Rettig and Folch 2005). Previously, the Khademhosseini group cleverly showed that trapping of multiple cells can be achieved by microcirculation of flow within long parallel microchannels (Manbachi et al. 2008); they used experimental methods and computational simulations to optimize trapping of



**Fig. 1** **a** During the perfusion of cell suspension in the channel, the cells sink gradually due to gravity, and some cells are caught in microwells while others pass and are carried away by flow. The in-well recirculating flow patterns can trap cells effectively. **b** The system consists of four parts: inlet reservoir where the cell suspension is introduced, main channel, microwells (not shown in the figure) patterned on the bottom surface of the main channel, and the outlet which is connected to a pulling syringe pump. Cell settling in the inlet reservoir was prevented by frequent pipettings. **c** Five different shapes of microwell were tested in simulations. The flow direction and the microwell geometry are aligned in the directions shown in this figure. Scale bar is 50 μm



Berkeley Lights Ex 1006
Berkeley Lights v UBC

multiple cells in long microscale grooves useful for cell alignment. In this article, we investigate more closely how geometry of microwells affects the flow pattern and ability of microwells to trap single cells. The overall system geometry in Fig. 1b shows the two components of the device—the microwell array and the main channel. The microwell array had a typical well side length and spacing of 50 μm, and depth of 20 μm, providing ~10,000 total microwells in a channel. The main channel measures 200 μm, 5 mm, and 15 mm in height, width, and length, respectively; it fits over the microwell array to allow cell solution flow across the array. Prostate cancer cells were used for validation of this method. Even though we specify one microwell dimension in detail in this article, the logic introduced in this article will be applicable to different microwell sizes and different types of cells.

## 2 Materials and methods

### 2.1 System design

The system consists of a microwell array that covers the bottom of the chip, and a long narrow channel (5 mm width, 15 mm length, and 200 μm height) that guides fluid flow over it. A $50 \times 200$ array of triangular microwells (typical side length dimension of 50 μm with depth of 20 μm) extends downward into the bottom layer giving a total of 10,000 microwells. At the inlet of this chip, a reservoir (diameter of 5 mm, height of 5 mm, and total volume of about 100 μl) was equipped, and at the outlet (see Fig. 1b), a syringe pump (KDS 210 Syringe Pump; KD Scientific, Holliston, MA), loaded with a 1 ml syringe, pulls the fluid to generate flow rates varying from 0.05 to 0.18 ml/h (average velocity in channel = 14–50 μm/s). The cell suspension enters the microchip, flows through the channel, and cells settle into the microwells. Cell perfusion times were limited to 20 min. To prevent the cells from settling down onto the bottom of inlet reservoir, we intentionally mixed the cell suspension in the inlet reservoir using pipette at about 1 min intervals.

### 2.2 Computational evaluation of microwell designs

Simulations were performed to observe the effect of streamlines generated near individual microwells for trapping cells. 3D simulations were generated using a commercial program, FLUENT 6.3 (Fluent Inc., Canonsburg, PA) for five different shapes of microwell: triangle, square, circle, diamond, and cone shape (see Fig. 1c). The working fluid was assumed to be water (a homogeneous, incompressible, Newtonian fluid; density 998.2 kg/m³, dynamic viscosity 0.001 kg/m s), and the flow was assumed to be laminar and steady. The Navier–Stokes equations and the conservation equation were calculated. For boundary conditions, a periodic condition was used for inlet/outlet faces (the flow profile calculated at the outlet face of computational domain is to be used for the inlet flow profile, iteratively), a symmetric condition for the side faces, and a no slip condition for the top and bottom of the channel (Fig. 2a). Use of periodic and symmetric conditions reduced the required computing power greatly without losing accuracy in computational result. The flow velocity of 100 μm/s was applied. Convergence was regarded as having been achieved when residuals of momentum and conservation equations reached $10^{-6}$.

### 2.3 Cell culture

Human PC3 prostate cancer cells originally isolated from vertebral metastases in a prostate cancer patient was obtained from ATCC (Rockville, MD). PC3 cells were cultured in T-25 flasks (Corning, Acton, MA) and maintained in complete media consisting of RPMI-1640 (61870; Gibco, Carlsbad, CA) supplemented with 10% (v/v) fetal bovine serum (FBS; 10082; Gibco), and 1% (v/v) penicillin–streptomycin (Invitrogen, Carlsbad, CA). All cultures were maintained in a humidified incubator at 37°C, 5% $CO_2$, and 95% humidity. The prepared cells were then loaded into the device at the density of $1.5 \times 10^6$ cells/ml. To show cell spreading and proliferation, fluorescent images were taken by using an inverted fluoresence microscope (Eclipse TE300; Nikon, Tokyo, Japan).

## 3 Results and discussion

### 3.1 Microwell shape analysis

As a typical cell flows through a microchannel, it will gradually settle toward the bottom surface due to gravity (Fig. 1a). Generally, cells are 2–5% heavier than culture medium (although there are exceptions such as adipocytes) (Wolff and Pertoft 1972; Park et al. 2008). As the cell nears the bottom surface, it follows streamlines leading into the microwells while losing velocity. Depending on the velocity of the cell and its position relative to the microwells, a cell may approach a threshold slow speed at which point gravity shifts the cell into a lower streamline that leads into a recirculation zone in the microwell. Recirculation is a unique flow phenomenon that effectively captures and traps particles in this zone. Among the five different microwell geometries listed in Fig. 1c (equilateral triangle, square, circle, rhombus, and cone), we determined the equilateral triangle to be the best well shape because it had the strongest recirculation pattern in the microwell

&#8203;Springer

Berkeley Lights Ex 1006
Berkeley Lights v UBC



**Fig. 2 a** A simple computational domain was constructed by applying a periodic condition and a symmetric condition. Scale bar is 20 μm. **b** Flow field visualized by streamlines in each microwell model shows that the triangular microwell has the most efficient profile (strong recirculation) of streamlines for trapping of a cell. Streamlines of each model are in same intensity. Scale bar is 20 μm. **c** Due to recirculation of flow in the microwell, trapped beads (diameter 10 μm) move slowly to the upper corner of the triangular microwells. **d** Geometry of microwell affects the trapping rate. There are more possibilities for trapping multiple cells in circular and square microwells because when cells travel over any regions of circular or square wells they travel the nearly same distance over the well, providing about equal chances of being trapped anywhere. On the contrary, the triangular well provides different trapping possibilities when the cell travels through the middle path and side paths

from 3D simulations (Fig. 2b). The rest of the shapes (square, circle, rhombus, and cone) had smaller recirculation zones in the corners of the experiments. For the triangular geometry, we tested the effect of recirculation of the flow by using commercial latex beads ($1.5 \times 10^6$ beads/ml, diameter 10 μm; Beckman Coulter, Fullerton, CA); the trapped beads at the downstream part of the triangular microwells moved slowly to the upstream corner (Fig. 2c), and this proved the existence of recirculation flow, helping to trap cells as illustrated in Figs. 1a and 2b. However, cells are sticker than beads and thus some cells did not show such movements in our experiments.

The triangular geometry has another advantage for single cell trapping in that it can be easily scaled to accommodate variations in target cell size. The sample cell type used for our study was prostate cancer cells, with a typical size distribution of 20 ± 3.4 μm (manually measured). Typically, single cell filling of microwells is accomplished by using small wells. By using a combination of triangular wells and laminar flow, however, we can take advantage of

cell trapping mediated streamline profile changes to prevent other cells from being trapped in the same microwell. As illustrated in Fig. 2d, triangular wells are advantageous for single cell trapping as compared to square and circular microwells because cells crossing the edge of the triangle microwell will not encounter any strong recirculation of streamlines. This means that only cells crossing the center will be trapped, limiting multiple cell trapping.

Our device does not kill or damage the cells during the trapping process. It has been shown experimentally that at shear stresses above 0.5 Pa, cells start to die, and at shear stresses above 0.2 Pa, cells experience phenotypical changes (Manbachi et al. 2008). In our 3D microwell simulations, an average velocity of 100 μm/s was chosen for an appropriate starting point for trapping considering two main parameters: maximum shear stress at the channel walls, and the pattern of the streamlines in the wells. However, we ran simulations with the triangle geometry at three different fluid velocities: 10, 100, and 1,000 μm/s. At 10 and 1,000 μm/s compared to the 100 μm/s average fluid


Berkeley Lights Ex 1006
Berkeley Lights v UBC

velocities, the streamline pattern is slightly raised, implying that the fluid passes over instead of into the wells (see Fig. S1 in Supplementary Information). This indicates that the velocity in this range of magnitude does not change the streamline pattern. At 1,000 μm/s the maximum shear stress occurring at the channel walls is 0.2 Pa, which is approaching our design limit; at 0.2 Pa we cannot be positive that the cell phenotype will not be altered. The combination of a strong, low recirculation pattern and a safe 0.02 Pa maximum shear stress led us to choose 100 μm/s as a starting point for our average fluid velocity. However, experimentation led us to find an average fluid velocity range of 14–50 μm/s is best for cell trapping; this range of velocity was safe from harmful shear stress effect and also allowed cells to be dragged downward into the microwells. In our system cells attached on the channel floor (not in the microwell) would experience shear stress (τ) as follows. Here, the cell shape is simplified to be a hemisphere (Gaver and Kute 1998; Manbachi et al. 2008; Farokhzad et al. 2005).

$$\tau_{\text{max-cell}} = 2.95\tau_{\text{free-cell}} = 2.95\left(6\mu Q/H^2W\right) \quad (1)$$

where $\mu$ is the viscosity of water (0.001 Pa s), $Q$ is the flow rate, $H$ is the height of the channel (200 μm), and $W$ is the width (5 mm). The calculated shear stress from Eq. 1, according to the level of flow rate used in our device, is 0.001 Pa for 0.05 ml/h (14 μm/s) and 0.004 Pa for 0.18 ml/h (50 μm/s).

## 3.2 Quantification of cell trapping rate

Our system design utilizes a syringe pump to generate flow of a cell suspension, captures cells in a microarray (10,000 microwells) using the principle of recirculation in microwells, and eliminates excess media using a second rinsing step. A long main channel (15 × 5 mm) was appropriate because it increased the possibility of trapping due to longer residence time. Validation of the trapping rate was conducted using PC3 cells. With the PC3 cells at a cell solution density of $1.5 \times 10^6$ cells/ml, a trial was conducted using a step-down flow rate sequence; initially 0.18 ml/h for 5 min to fill the channel with cells, and then 0.1 ml/h (for better results we controlled the flow rate in a range of 0.05–0.15 ml/h) for cell trapping for 10 min, followed by washing out 0.18 ml/h for 5 min. The total experiment time was 20 min. The typical cell trapping images are as shown in Fig. 3a. The trapping rate was 62 ± 10%, with a minimum rate of 48% and a maximum rate of 79%. Trapping rates were determined from three experiments. In each experiment, images (∼100 microwells in each image) were taken at three random locations in the microchannels (see Fig. 3b). Among the microwells with cells, 5.7% were occupied by two cells and less than 0.2% were occupied by three cells. One may extend the duration of cell flow to increase trapping rate; however, it should be noted that the probability of trapping cells in a new empty microwell decreases as they are filled with



**Fig. 3** **a** Time lapse images of a trapping cell (*white arrowhead*). A cell starts to lose momentum to travel in the flow direction by friction provided by recirculating flow and bottom surface. However, other cells (*black arrow-heads*) are not trapped because they do not meet the strong recirculation. Scale bar is 100 μm. **b** By controlling the flow, a capture rate of 62% was observed for PC3 cells with less than 6% of multiple cells trapping. Scale bar is 100 μm. **c** After 2 days of culture, single or multiple cells (DsRed-transfected PC3 cells) were observed in microwells, showing the well space is large enough for cell growth and division

Berkeley Lights Ex 1006
Berkeley Lights v UBC

cells. For example, the first cell entering the channel has the highest probability to be trapped because all microwells are vacant, and the last cell has a very limited chance to be trapped because many microwells are already filled. It was also observed that lower flow velocities slightly increased the trapping rate but also increased the likelihood of multiple-cell trapping. Overall trapping rate was more strongly dependent on cell density in suspension and duration of operation. In addition, it should be noticed that the recirculating streamline profile in the microwell does not change according to the flow rates (Fig. S1, Supplementary Information), implying same efficacy for trapping cells in different flow velocities.

The system design is such that after a cell suspension is flown across the microarray, the user can easily flush the system with either cell culture media or a phosphate buffer saline (PBS) at 0.18 ml/h to remove excess cells. This is fast enough to wash away untrapped cells, but slow enough to not dislodge trapped cells. In addition, the unique feature of the flowing method, which continuously washes away cells in the channel, effectively prevented a channel-blocking problem which can easily happen by cell gathering and sticking onto substrates in static conditions.

In summary, our system design utilizes continuous flow to deliver a cell suspension to the microarray and captures single cells via recirculation in each triangular well. Single cell trapping was successful even using large size microwells because the trapping of cells is controlled by fluid dynamics and assisted by the triangular geometry of each microwell. Current testing indicated a cell-trapping rate of $62 \pm 10\%$ with PC3 cells. The main limitations of our system are that trapping rate cannot exceed 60–70% in 20 min due to the settling probability, that a cover is required to create the channel, restricting access to the microwells during cell seeding and that a pump is necessary. However, our method has the advantage that many pre-reported microfluidic systems which utilize microfluidic networks can be conveniently applied to our system and that cell culture is possible due to the ample space of the microwells (Fig. 3c) allowing investigation of both long-term cell responses and instantaneous cell reactions. The methodology introduced in this article will lead to an effective and high-throughput cell-trapping device for screening that requires single cell capture and culture.

**Acknowledgments** The authors would like to thank Chentian Zhang for assisting experiments, and Dr. Rachel Schmedlen for supporting a student team consisting of five authors who contributed equally to this study: M. Morgan, A. N. Sachs, J. Samorezov, R. Teller, and Y. Shen. This study was supported by the Wilson Foundation, Coulter Foundation, and the UMCCC Prostate SPORE P50 CA69568 pilot grant. Dr. J. Y. Park was supported by the Korea Research Foundation Grant, Republic of Korea (KRF-2008-357-D00030). Dr. K. J. Pienta is supported by NIH Grant PO1 CA093900, an American Cancer Society Clinical Research Professorship, NIH SPORE in prostate cancer Grant P50 CA69568, and the Cancer Center support Grant P30 CA46592. This work was supported in part by a generous grant from Mr. and Mrs. Turner.

## References

Chao TC, Ros A (2008) Microfluidic single-cell analysis of intracellular compounds. J R Soc Interface 5(Suppl 2):S139–S150

Di Carlo D, Lee LP (2006) Dynamic single-cell analysis for quantitative biology. Anal Chem 78:7918–7925

Di Carlo D, Wu LY, Lee LP (2006) Dynamic single cell culture array. Lab Chip 6:1445–1449

Farokhzad OC, Khademhosseini A, Jon S, Hermmann A, Cheng J, Chin C, Kiselyuk A, Teply B, Eng G, Langer R (2005) Microfluidic system for studying the interaction of nanoparticles and microparticles with cells. Anal Chem 77:5453–5459

Gaver DP III, Kute SM (1998) A theoretical model study of the influence of fluid stresses on a cell adhering to a microchannel wall. Biophys J 75:721–733

Gottwald E, Giselbrecht S, Augspurger C, Lahni B, Dambrowsky N, Truckenmuller R, Piotter V, Gietzelt T, Wendt O, Pfleging W, Welle A, Rolletschek A, Wobus AM, Weibezahn KF (2007) A chip-based platform for the in vitro generation of tissues in three-dimensional organization. Lab Chip 7:777–785

Inoue I, Wakamoto Y, Moriguchi H, Okano K, Yasuda K (2001) On-chip culture system for observation of isolated individual cells. Lab Chip 1:50–55

Karp JM, Yeh J, Eng G, Fukuda J, Blumling J, Suh KY, Cheng J, Mahdavi A, Borenstein J, Langer R, Khademhosseini A (2007) Controlling size, shape and homogeneity of embryoid bodies using poly(ethylene glycol) microwells. Lab Chip 7:786–794

Manbachi A, Shrivastava S, Cioffi M, Chung BG, Moretti M, Demirci U, Yliperttula M, Khademhosseini A (2008) Microcirculation within grooved substrates regulates cell positioning and cell docking inside microfluidic channels. Lab Chip 8:747–754

Moeller HC, Mian MK, Shrivastava S, Chung BG, Khademhosseini A (2008) A microwell array system for stem cell culture. Biomaterials 29:752–763

Mohr JC, de Pablo JJ, Palecek SP (2006) 3-D microwell culture of human embryonic stem cells. Biomaterials 27:6032–6042

Moss ED, Han A, Frazier AB (2007) A fabrication technology for multi-layer polymer-based microsystems with integrated fluidic and electrical functionality. Sensors Actuat B 121:689–697

Park K, Jang J, Irimia D, Sturgis J, Lee J, Robinson JP, Toner M, Bashir R (2008) 'Living cantilever arrays' for characterization of mass of single live cells in fluids. Lab Chip 8:1034–1041

Rettig JR, Folch A (2005) Large-scale single-cell trapping and imaging using microwell arrays. Anal Chem 77:5628–5634

Rosenthal A, Voldman J (2005) Dielectrophoretic traps for single-particle patterning. Biophys J 88:2193–2205

Tan WH, Takeuchi S (2007) A trap-and-release integrated microfluidic system for dynamic microarray applications. Proc Natl Acad Sci USA 104:1146–1151

Ungrin MD, Joshi C, Nica A, Bauwens C, Zandstra PW (2008) Reproducible, ultra high-throughput formation of multicellular organization from single cell suspension-derived human embryonic stem cell aggregates. PLoS ONE 3:e1565

Wolff DA, Pertoft H (1972) Separation of HeLa cells by colloidal silica density gradient centrifugation. I. Separation and partial synchrony of mitotic cells. J Cell Biol 55:579–585



Berkeley Lights Ex 1006
Berkeley Lights v UBC

*Anal. Chem.* **2007,** *79,* 9321–9330

# Intuitive, Image-Based Cell Sorting Using Optofluidic Cell Sorting

## J. R. Kovac and J. Voldman*

*Department of Electrical Engineering and Computer Science, Massachusetts Institute of Technology, 77 Massachusetts Avenue, Building 36-824, Cambridge, Massachusetts 02139*

Downloaded via UNIV OF CALIFORNIA SANTA BARBARA on July 5, 2021 at 00:52:34 (UTC).
See https://pubs.acs.org/sharingguidelines for options on how to legitimately share published articles.

**We present a microfluidic cell-sorting device which augments microscopy with the capability to perform facile image-based cell sorting. This combination enables intuitive, complex phenotype sorting based on spatio–temporal fluorescence or cell morphology. The microfluidic device contains a microwell array that can be passively loaded with mammalian cells via sedimentation and can be subsequently inspected with microscopy. After inspection, we use the scattering force from a focused infrared laser to levitate cells of interest from their wells into a flow field for collection. First, we demonstrate image-based sorting predicated on whole-cell fluorescence, which could enable sorting based on temporal whole-cell fluorescence behavior. Second, we demonstrate image-based sorting predicated on fluorescence localization (nuclear vs whole-cell fluorescence), highlighting the capability of our approach to sort based on imaged subcellular events, such as localized protein expression or translocation events. We achieve postsort purities up to 89% and up to 155-fold enrichment of target cells. Optical manipulation literature and a direct cell viability assay suggest that cells remain viable after using our technique. The architecture is highly scalable and supports over 10 000 individually addressable trap sites. Our approach enables sorting of significant populations based on subcellular spatio–temporal information, which is difficult or impossible with existing widespread sorting technologies.**

The need to isolate small numbers of specific cells from background populations is ubiquitous, with applications in pathology, clinical diagnosis, cloning, and cell biology research. In the context of cell biology experiments, sorting can be a way to select a desired starting population of cells of known characteristics[1] or can be a tool to analyze the results of an experiment and isolate particularly interesting cells for further investigation.

Our ability to sort cells is dictated by our ability to both detect useful criteria for sorting and physically sort cells in response to that information. Present cell-sorting technologies can base sorts on an impressive range of criteria. Fluorescence-activated cell sorting (FACS) enables high-throughput viable cell sorting based on fluorescent probes designed to report a wide range of cellular

parameters.[2] Laser capture microdissection (LCM)[3] permits microscopy-based imaging of samples immediately before selection, allowing a user to base selection on information-rich images. However, despite the breadth of sorting criteria available with mature techniques, there is a strong tradeoff between the ability to image cells and to sort them easily and viably. For instance, while FACS offers high-throughput viable cell sorting, it cannot resolve fluorescence localization and constrains sorting decisions to a single decision time point. These limitations rule out sorts based on temporal, spatial, or spatio–temporal fluorescence dynamics. Traditional LCM, meanwhile, offers the ability to use microscopy techniques to select cells but is typically applied to fixed cells. Laser microdissection has also been adapted to allow viable cell selection in commercial systems (e.g., Zeiss PALM MicroBeam system, Zeiss CellScience Clonis). These commercial solutions offer a powerful level of control, precision, and user-friendly selection of target cells in a turnkey system. However, LCM systems require the purchase of specific, dedicated instruments, often require use of proprietary films, and have not been widely adopted by individual labs for routine work, largely owing to cost.

Recent progress has started to erode this tradeoff between imaging and user-friendly sorting. Optical manipulation methods centered around optical tweezers[4] have been adapted to cell sorting[5] and are intuitive—a user directly focuses a laser onto a target cell and uses the beam to tweeze or push the cell to a desired location. Optical tweezer arrays and optical lattices can optically manipulate and sort multiple cells and particles simultaneously.[6,7] However, the high numerical aperture (NA) requirements of optical tweezers greatly restrict imaging field size and constrain device architecture due to the short working distances of the objective lenses typically used. While a small field size is sufficient to work with large numbers of small particles or small cells such as bacteria, only small numbers of mammalian cells can fit in such a small field ($\sim$2500 $\mu m^2$) for optical tweezer array-based manipulation. Further, power requirements are high, as

---

* To whom correspondence should be addressed. E-mail: voldman@mit.edu.
Fax: 617-258-5846.

(1) Eisenstein, M. *Nature* **2006,** *441,* 1179 ff.
(2) Ashcroft, R. G.; Lopez, P. A. *J. Immunol. Methods* **2000,** *243,* 13–24.
(3) EmmertBuck, M. R.; Bonner, R. F.; Smith, P. D.; Chuaqui, R. F.; Zhuang, Z. P.; Goldstein, S. R.; Weiss, R. A.; Liotta, L. A. *Science* **1996,** *274,* 998–1001.
(4) Ashkin, A.; Dziedzic, J. M.; Bjorkholm, J. E.; Chu, S. *Opt. Lett.* **1986,** *11,* 288–290.
(5) Buican, T. N.; Smyth, M. J.; Crissman, H. A.; Salzman, G. C.; Stewart, C. C.; Martin, J. C. *Appl. Opt.* **1987,** *26,* 5311–5316.
(6) Grier, D. G. *Nature* **2003,** *424,* 810–816.
(7) MacDonald, M. P.; Spalding, G. C.; Dholakia, K. *Nature* **2003,** *426,* 421–424.

10.1021/ac071366y CCC: $37.00 © 2007 American Chemical Society
Published on Web 11/16/2007

Berkeley Lights Ex 1007
Berkeley Lights v UBC

Appx899

each trap site might require upward of ~100 mW of optical power. Optoelectronic tweezers (OETs)[8] employ lower-NA optics and, thus, enable larger area (~1 mm²) manipulation fields via optically mediated dielectrophoretic (DEP) trap arrays, extending "virtual" optical manipulation to field areas better suited for mammalian cell manipulation. Unfortunately, owing to buffer incompatibilities, OET forces exerted on cells suspended in standard cell culture medium are weak, and an ~1 mm² manipulation area, while an improvement over traditional optical tweezers, is still insufficient to simultaneously manage large populations of cells. Use of a large-area display to directly actuate OETs without lenses circumvents the issue of lens field size but decreases manipulation resolution and suffers from the same buffer incompatibilities of traditional OETs.[9]

Array-based systems employing nonoptical confinement methods can form arrays of cells extending beyond a single imaged field. DEP trap arrays have successfully demonstrated trap and release sorting capability and can, in principle, be scaled to large array sizes.[10] Unfortunately, such site-addressable electrical approaches require complex on-chip interconnects and significant off-chip support circuitry when scaled to large array sizes. Hydrodynamic trap arrays, utilizing either microwells[11] or obstacles[12] for cell confinement, offer simple, passive, mostly single-cell loading over large areas with minimal complexity, allowing microscopy-based imaging of large arrays over time to investigate single-cell behavior. Viable retrieval of small numbers of single cells from microwell arrays using micropipettes/micromanipulators based on temporal fluorescence behavior has also been demonstrated,[13,14] but the retrieval method is time-consuming and cumbersome.

Here we present a microscope-compatible, array-based microfluidic cell-sorting architecture centered around passive hydrodynamic trapping of cells and active release using the optical scattering force (Figure 1). As with the simplest microfluidic devices, our platform requires only flow and a clear optical path to the chip. As a result, we minimize on-chip complexity, and the approach requires no fabrication outside of a traditional SU-8/PDMS molding process. Array loading is passive, requires no interconnects to individual sites, and thereby allows straightforward scaling to large array sizes and minimizes off-chip complexity. Addressing during release also requires no permanent interconnects and merely requires incorporation of a laser into the microscope, making the platform truly scalable to sort large cell populations.

Our device enables cell sorting based on spatial and temporal fluorescence characteristics of single cells or any other property apparent under an arbitrary microscopy technique. Utilizing strengths of other array and sorting techniques, our platform combines the simplicity and wide-area advantages of microwell arrays with the intuitive operation of optical techniques. Operation



**Figure 1.** Device overview. (A) Following injection into the device, cells sediment into the microwell array. (B) Cells remaining outside wells flow away after flow resumes. We then inspect the array using any desired microscopy technique (bright-field, DIC, fluorescence, etc.). (C) After locating cells of interest, we focus an infrared (IR) laser beam onto target cells, levitating the cells into the flow field with the optical scattering force. (D) Fluid drag overcomes lateral optical forces, releasing the cell and washing it downstream for fractionation.

is highly amenable to automation and requires no cumbersome, direct physical handling of cells. Here we demonstrate user-friendly, image-based selection and removal of particular target cells from a background population using this method.

## EXPERIMENTAL SECTION

**Microfabrication and Packaging.** We used a two-layer SU-8 process to fabricate silicon wafer masters for PDMS (poly-(dimethylsiloxane)) molding. The first SU-8 layer (105 μm thick, 1600 rpm, SU-8 2050, MicroChem, Newton, MA) defined flow channels, while the second SU-8 layer (35 μm thick, 2750 rpm, SU-8 2035, MicroChem) defined arrays of 25 and 30 μm diameter posts to pattern microwell arrays into the bottom of the flow channels after molding. Flow channels were 3 mm wide in the vicinity of the microwell array. We silanized wafers for 24 h with (tridecafluoro-1,2,2-tetrahydrooctyl)-1-trichlororosilane (T2492-KG, United Chemical Technologies, PA) evaporated in a desiccator with the masters to decrease adhesion of PDMS to the master during molding. After mixing PDMS (Sylgard 184, Dow Corning, MI) at a 10:1 base/curing agent ratio and degassing the PDMS for ~1 h in a desiccator, we poured the PDMS onto the wafer, cured the PDMS for 2 h in a 65 °C convection oven, and peeled the cured PDMS off of the master, achieving a PDMS thickness

(8) Chiou, P. Y.; Ohta, A. T.; Wu, M. C. *Nature* **2005**, *436*, 370−372.

(9) Choi, W.; Kim, S. H.; Jang, J.; Park, J. K. *Microfluid. Nanofluid.* **2007**, *3*, 217−225.

(10) Taff, B. M.; Voldman, J. *Anal. Chem.* **2005**, *77*, 7976−7983.

(11) Rettig, J. R.; Folch, A. *Anal. Chem.* **2005**, *77*, 5628−5634.

(12) Di Carlo, D.; Wu, L. Y.; Lee, L. P. *Lab Chip* **2006**, *6*, 1445−1449.

(13) Love, J. C.; Ronan, J. L.; Grotenbreg, G. M.; van der Veen, A. G.; Ploegh, H. L. *Nat. Biotechnol.* **2006**, *24*, 703−707.

(14) Yamamura, S.; Kishi, H.; Tokimitsu, Y.; Kondo, S.; Honda, R.; Rao, S. R.; Omori, M.; Tamiya, E.; Muraguchi, A. *Anal. Chem.* **2005**, *77*, 8050−8056.

Berkeley Lights Ex 1007
Berkeley Lights v UBC



**Figure 2.** Microfluidic device and system. (A) Support fluidics and device layout. We use syringe pumps and an injection valve to load cells into our device. At collection time, we puncture the PDMS membrane with a needle and close the waste output, allowing target cells to flow into the reservoir for subsequent removal via a 200 μL pipettor. (B) Incorporation into a standard automated upright microscope. A three-axis stage mounted on a switchable magnetic base allows rapid incorporation and alignment of the laser. Use of KG5 filter glass throughout the microscope protects components from laser damage.

of ~2 mm. Using diamond-tipped drill bits (Tripple Ripple product line, CR Laurence, CA), we drilled tubing ports into 1 mm thick glass slides and glued PEEK (poly(etheretherketone)) tubing (1532, Upchurch Scientific, WA) to the ports using epoxy (High-Performance Epoxy, 99393, Loctite, Avon, OH). We drilled an additional interfacing hole into the glass to connect the micro-fluidic chamber to a reservoir that we would epoxy to the top side of the glass. After exposing the PDMS layer to an oxygen plasma (PDC-001, Harrick Scientific, Ossining, NY) we bonded the PDMS to the glass slide, resulting in a sealed flow chamber with a microwell array patterned into the chamber floor (Figure 2A). We then attached a reservoir to the top side of the glass with epoxy and plasma bonded a thin piece of PDMS over the interfacing hole to isolate the reservoir from the microfluidic chamber until we pierced the membrane with a needle at collection time. After plasma bonding and attaching the reservoir, we placed the chip in a convection oven set to 65 ° C for 12 h to accelerate PDMS hydrophobicity recovery after plasma bonding to facilitate later adsorption of bovine serum albumin (BSA). Lee et al. postulated that fibronectin more readily adsorbs to hydrophobic PDMS than hydrophilic PDMS;[15] we found that cells adhered less to BSA-treated hydrophobic PDMS than to BSA-treated hydrophilic PDMS, suggesting that BSA adsorption might be similarly enhanced to hydrophobic PDMS.

(15) Lee, J. N.; Jiang, X.; Ryan, D.; Whitesides, G. M. *Langmuir* **2004**, *20*, 11684–11691.

**Fluid Handling.** We detail the fluid connections in Figure 2A. The flushing buffer input is arranged to provide sheath flow for the cell loading input, preventing cells from flowing into the entry to the path to the collection reservoir during loading. The waste output connection is toggled with a simple off-chip valve. After we pierce the PDMS membrane at collection time and target cells flow into the reservoir, we use a standard 200 μL pipettor to transfer cells from the output to a 96-well plate. Syringe pumps drive both inputs via four-way valves (V-101D, Upchurch Scientific) which allows for switching between the syringe pump medium and another fluid (ethanol as illustrated) in a bubble-free manner. We use an injection valve (V-451, Upchurch Scientific) with a 100 μL PEEK sample loop to inject cell suspensions into the device.

**Optics and Laser Incorporation.** All experiments utilized an upright Axioplan 2-MOT (Zeiss, Thornwood, NY) microscope with a computer-controllable motorized stage (999000, Ludl). For fluorescence imaging, we used an EXFO X-Cite 120 fluorescence source (EXFO Photonic Solutions, Inc., Richardson, TX), Chroma 41001 FITC, 41007a Cy3, and 31004 Texas Red fluorescence filter sets (Chroma Technology Corp., Rockingham, VT). We used a LaVision Imager 3 QE CCD digital camera (LaVision GmbH, Goettingen, Germany) for all image recording. Our computer-controllable laser diode system utilized a 980 nm fiber-coupled semiconductor diode laser (3CN00283AL, Avanex, Fremont, CA) capable of outputting up to 290 mW of single-mode output power. A butterfly package holder (LM14S2, Thorlabs, Newton, NJ)

*Analytical Chemistry, Vol. 79, No. 24, December 15, 2007* **9323**

Berkeley Lights Ex 1007
Berkeley Lights v UBC

interfaced with the diode, and laser output levels were controllable using a laser diode/thermoelectric cooler (LD/TEC) controller (LDTC 2/2, Wavelength Electronics, Bozeman, MT). We controlled the LD/TEC controller remotely through a USB-interfaced A/D and D/A converter (USB-1408 FS, Measurement Computing, Norton, MA) via the MatLab Data Acquisition Toolbox (MathWorks, Natick, MA).

A simple cage-mounted collimation/focusing apparatus allowed simple incorporation of the fiber-coupled laser into the microscope. We positioned the assembly underneath the microscope stage using optomechanics mounted on switchable magnetic bases for straightforward insertion and removal of the laser (Figure 2B). To collimate and focus the beam, we used identical 0.15 NA aspheric lenses (C280TM-B, Thorlabs). During laser exposures, we protected microscope components from IR damage by using a filter cube with 3 mm thick KG5 glass in the fluorescence excitation and emission paths (Chroma Technology) and 2 mm thick KG5 glass in two filter sliders leading to the light sources (Figure 2B). We shut off eyepiece transmission during laser exposures, and used a 20× Achroplan objective (440040, Zeiss) for all imaging during laser exposure. The switcher in the dual video output tube of the microscope diverted imaging from the LaVision CCD to a Bullet CCD connected to a television during laser exposures that we wished to visualize, protecting the LaVision CCD. When recording videos, we replaced the Bullet CCD with a FireWire CCD (Fire-i 400, Unibrain, San Ramon, CA), again in the interest of protecting the LaVision CCD from damage. The above modifications are straightforward, temporary, and can be applied or adapted to a wide range of existing upright and inverted microscopes, unlike commercialized versions of LCM which require more dedicated, semipermanent, and less flexible equipment.

**Computer Automation and Interfacing.** We wrote software using MatLab to simultaneously interface with the laser, microscope, and motorized stage. The software automatically scanned over the microwell array and recorded multiwavelength fluorescence/bright-field images of the entire array. The software also allowed us to perform rapid image-based inspection of individual array sites and easy marking of sites of interest. Subsequently, the software generated a list of marked sites and allowed for rapid, automatic return to those sites for removal of target cells. The software isolates the user from bookkeeping and registration of large arrays. The interface allows for natural extension of the software to incorporate automatic image-based selection of cells of interest through image algorithms.

**Device Preparation.** Prior to all experiments, we used the fluidic arrangement shown in Figure 2A. We first opened the output valve and flowed an ethanol mixture (80% ethanol, 20% deionized water) into both inputs to facilitate device filling and sterilize the device. After closing the output path, we degassed the microwells by applying pressure to both input syringes, driving bubbles in the microwells out through the PDMS. After filling the device, we opened the output and flushed the device with phosphate-buffered saline (PBS) (14190, Gibco, Carlsbad, CA). Next, we flowed a 75 mg/mL BSA fraction V solution prepared in PBS (15260, Invitrogen, Carlsbad, CA) into the cell injection and flushing inputs and filled the device. The BSA remained in the chamber at room temperature for 1 h to adsorb to the PDMS

surface to help block cell adhesion in the subsequent experiment. Afterward, we flushed the chamber with PBS.

**Cell Culture and Preparation.** Cell incubation conditions were 37 °C, 7.5% $CO_2$, in a humidified atmosphere. We cultured BA/F3 pro B cells and WeHi-3B myelomonocytic leukemia cells (a kind gift from Susan Lindquist, Whitehead Institute, Cambridge, MA). B cell culture medium was RPMI 1640 (21870, Gibco), supplemented with 10% v/v fetal bovine serum (FBS) (SH30088.03, Hyclone, Logan, UT), 2% v/v L-glutamine (25030, Gibco), 1% v/v penicillin−streptomycin (15140, Gibco), and 10% v/v WeHi-3B conditioned medium. Leukemia cell medium was Iscove's modified Dulbecco's medium (IMDM) (12440, Gibco) supplemented with 10% v/v FBS, 1% v/v penicillin−streptomycin, and 25 μM 2-mercaptoethanol (21985, Gibco). We prepared WeHi-3B conditioned media by collecting media from WeHi-3B cells grown in T75 flasks (3 days after seeding), spinning media down at 1000 rpm for 7 min, and collecting the supernatant. After collection, we filtered the media through a 0.2 μm vacuum filter bottle, aliquotted the media, and stored it at −20 °C for future use in B cell culture.

Additionally, we cultured two lines of MCF7 epithelial breast cancer cells, one of which was transfected with a construct expressing the red fluorescent protein mCherry[16] fused to the mouse ornithine decarboxylase PEST sequence and three copies of the SV40 large T-antigene nuclear localization sequence (NLS) under the control of the p21 promoter. Selection with blasticidin established a stable, clonal cell line. This cell line will be published in detail elsewhere. A second line was not transfected. Both lines were a kind gift from Galit Lahav, Harvard Medical School, Boston, MA. MCF7 culture medium for the nontransfected line was RPMI 1640 supplemented with 10% v/v FBS, 1% v/v L-glutamine, and 1% v/v penicillin−streptomycin. Culture medium for the transfected cell line additionally contained 5 μg/mL blasticidin (ant-bl-1, InvivoGen, San Diego, CA).

For experiments using CellTracker dyes, we used either CellTracker Green CMFDA (C7025, Invitrogen) or CellTracker Orange CMRA (C34551, Invitrogen), at concentrations of 5−10 μM, and stained cells as per product datasheet, unless noted otherwise. Prior to injection into the device, we resuspended cells in standard culture medium at total cell concentrations of 1−10 × 10⁶ cells/mL.

**Device Operation.** After injecting cells into a 100 μL sample loop via the injection port/valve assembly, we pumped the cell suspension into the cell loading input at a flow rate of 100 μL/min with the syringe pump while flowing media through the flushing input at 30 μL/min to provide sheath flow. After the cell suspension filled the device, we stopped flow for ∼5 min, allowing cells to sediment into the wells. We then pumped fresh media first through both inputs at ∼40 μL/min, and then solely through the flushing input, and briefly from the flushing input backward through the cell loading input. This protocol removed cells residing outside the microwell array in all chip regions as well as cells trapped unstably in the array while avoiding introduction of residual cells through the cell loading input. Using our software, we scanned the entire array, inspected and marked individual sites, and returned to specific sites to remove cells using the laser. During removal, we used a flow rate of 2.5−5 μL/min and applied

(16) Shaner, N. C.; Campbell, R. E.; Steinbach, P. A.; Giepmans, B. N. G.; Palmer, A. E.; Tsien, R. Y. *Nat. Biotechnol.* **2004**, *22*, 1567−1572.

Berkeley Lights Ex 1007
Berkeley Lights v UBC

100−150 mW of laser power to each cell until the cell was levitated high enough that the flow displaced the cell and carried it downstream.

**Cell Experiments.** For initial whole-cell fluorescence sorting validation, we labeled a majority of BA/F3 cells with CellTracker Green and a minority with CellTracker Orange in a ratio of ∼50:1 to demonstrate the removal of rare cells from a background population. For localization-based sorting, we double-stained a nontransfected population of MCF7 cells with CellTracker Green (2.4 $\mu$M) and CellTracker Orange (0.4 $\mu$M), staining the entire cell. We mixed this double-stained population with a population of transfected MCF7 cells expressing nuclear-confined mCherry fluorescence. We used the low concentration of CellTracker Orange to roughly match the mCherry fluorescence levels in the transfected cells for demonstration purposes. In this localization-based sort, we used bright-field images to define the edge of the cell and the overlaid fluorescence image to qualitatively determine fluorescence localization via user interpretation.

Subsequently we performed three sorting experiments to quantify aspects of device operation. We injected binary mixtures of BA/F3 cells distinguishable by whole-cell fluorescence in known concentrations measured using a Coulter counter (Z2, Beckman Coulter, Fullerton, CA) and quantified performance parameters of our device. We also used our basic reservoir collection and pipet retrieval method to quantify the final retrieval efficiency in two of the experiments.

We used Trypan Blue exclusion to assay viability of cells handled by our technique. We used a standard Trypan Blue exclusion protocol, adapted to chip by excluding the BSA coating step, thereby promoting cells to stick to the bottoms of microwells. After loading BA/F3 cells, we irradiated 50 cells at 150 mW for 30 s, and then injected the Trypan Blue solution into the chamber, and compared the exclusion rates to dish controls.

**Safety Considerations.** The optical power levels used are dangerous without safety precautions. When using the laser, we wore appropriate laser eyewear, wrapped a laser curtain (Kentek, Pittsfield, NH) around our entire working area around the microscope, shut off the microscope eyepieces, and performed all imaging with a CCD. SU-8 processing is hazardous and must be carried out in an appropriately ventilated environment as per manufacturer's guidelines. In addition, the silane used during silanization is highly hazardous; the silanization step must be carried out in a chemical hood, and all manufacturer's warnings must be considered.

## RESULTS

**Selective Levitation of Single Cells from Microwells.** We desired to remove single cells from microwells in a manner that was straightforward, user-friendly, contact-free, and conceivably automatable. We decided that using the optical scattering force to levitate cells from microwells met these criteria and that such a system was simple to implement in a standard microscope with minimal modification. Rather than use the laser as a film-cutting or -melting tool for indirect cell actuation as in many LCM applications, we therefore used our IR laser to directly apply radiation pressure to actuate and levitate cells of interest, combining the steps of physical selection and target removal into a single step. In most optical tweezers applications, the laser is focused into a high-divergence beam shape, producing strong

optical gradient forces in both the axial and lateral directions on cells in the laser beam. In contrast, we focus the laser into a low-divergence shape, which results in gradient forces that are significant in the lateral direction but miniscule in the axial direction.

In our low-divergence case, the result is that the radiation pressure induced onto the cell by photon scattering is greater than the axial gradient force. Therefore, when we focus our beam onto a cell, the lateral gradient force quickly translates the cell to the lateral beam center, and the scattering force causes the cell to levitate axially. This operational mode has been used by others to both push cells along channels[5] and levitate cells between vertically connected channels.[17] This effect is analogous to a beach ball being pushed vertically by a fire hose[6] and offers a couple of advantages over traditional optical tweezers in our case. First, while many high-NA lenses used for 3-D optical trapping must be used through substrates of specified (usually thin) thickness and have short working distances, the low-divergence of the beam allows for longer working distances, and actuation ease is much less sensitive to substrate thickness. In our case, we easily focused the beam through an ∼2 mm PDMS substrate whose thickness varied throughout the device and achieved adequate actuation. Second, focused spot sizes are larger than those typically used in optical tweezers applications, which can lower peak optical intensities and thus mitigate cell damage, as discussed later.

Ashkin derived a ray-optics regime model of the optical forces exerted on a partially reflecting sphere, applicable in cases where particle size significantly exceeds the wavelength.[18] This approach breaks the incident beam into rays each independently contributing to the total scattering and gradient force. Each ray contributes a scattering force $F_S$ of

$$F_S = \frac{n_1 P}{c} \left\{ 1 + R \cos 2\theta - \frac{T^2[\cos(2\theta - 2r) + R \cos 2\theta]}{1 + R^2 + 2R \cos 2r} \right\} \tag{1}$$

where $n_1$ is the refractive index of the medium, $P$ is the ray power, $c$ is the speed of light in free space, $R$ and $T$ are the Fresnel reflection and transmission coefficients, respectively, for the ray, and $\theta$ and $r$ are the incidence and refraction angles, respectively, of the ray on the particle. Summing contributions of all incident rays yields the predicted total force on the particle.

Equation 1 clearly shows that the scattering force is linearly proportional to power. However, the underlying richness of the Fresnel coefficients makes further intuitive reasoning about behavior difficult without focusing on a specific set of optical parameters. Kim and Kim discuss consequences of manipulating particles with weakly focused Gaussian beams.[19] Their findings, while outside the immediate scope of this paper, carry implications for future performance optimization with respect to beam intensity profile and beam waist size relative to the particle size, among other parameters.

We first demonstrated the feasibility of selectively levitating a single BA/F3 cell from a microwell without perturbing cells in

(17) Ozkan, M.; Wang, M.; Ozkan, C.; Flynn, R.; Birkbeck, A.; Esener, S. *Biomed. Microdevices* **2003**, *5*, 61−67.
(18) Ashkin, A. *Biophys. J.* **1992**, *61*, 569−582.
(19) Kim, S. B.; Kim, S. S. *J. Opt. Soc. Am. B* **2006**, *23*, 897−903.

Berkeley Lights Ex 1007
Berkeley Lights v UBC

Appx903

neighboring wells. We focused the beam so that the beam waist was roughly equal to the cell diameter (~9 μm). To a first approximation, a larger beam waist could waste power, as photons missed the cell, while a smaller one would create unnecessarily high local intensities and increase the axial gradient force, which competes against the levitating scattering force. On average, levitation and release of a cell from a well takes about 15–20 s but can ultimately range from 3 to 30 s. This range is largely due to variations in cell size and shape. As the cell diameter approaches the well diameter, Stokes drag wall effects become more significant, leading to longer removal times for larger cells in the population. Significantly aspheric cells, such as those undergoing mitosis, can be removed quickly, as their asymmetry makes them easier to remove via the fluid flow after they are levitated slightly. The removal efficiency, defined as the percentage of cells we successfully removed from a well out of the total number of cells which we attempted to remove, can vary between 25% and 100%, depending on the well dimensions used. In some trials, we achieved a 100% removal efficiency by using wells 30 μm in diameter and 35 μm in depth and therefore used these dimensions for experiments reported here. In cases with less than 100% removal efficiency, nonspecific surface interactions appear to be the primary reason that cell removal fails. Use of larger (i.e., 30 μm diameter) wells allows the optical forces to more directly compete with these surface effects rather than with increased Stokes drag wall effects seen in smaller wells.

The actual process of cell removal has two qualitative phases, which are predicted by the theory described earlier. First, after the laser is focused onto the cell, the gradient force in the lateral beam dimension quickly drags the cell laterally into the beam center, just as with traditional optical tweezers. Next, the scattering force overwhelms gravity and the small axial gradient force, and the cell is levitated up into the flow field. As the cell is levitated away from the laser focus, the local intensity and lateral gradient force drop due to beam divergence, and eventually Stokes drag from the fluid flow overcomes the lateral gradient force, releasing the cell into the flow stream (Figure 3A, Supporting Information movie S-1). A single cell can, in general, even be removed selectively from a well with multiple cells (Figure 3B, Supporting Information movie S-2), a testament to the tight localization of the optical force.

**Whole-Cell Fluorescence-Based Cell Sorting.** While FACS allows straightforward whole-cell fluorescence-based sorting, an image-based approach to whole-cell fluorescence-based sorting could allow sorting based on single-cell fluorescence levels monitored over time. LCM could offer such monitoring over time, but without including cell confinement or computational cell tracking techniques, monitoring fluorescence dynamics over time could be difficult, especially for non-anchorage-dependent cells such as the BA/F3 cells. Our microwell structures, however, are especially suited for cell confinement. For these reasons, we demonstrated the capability of our platform to image thousands of single cells and release single target cells from their trap sites based on whole-cell fluorescence. After loading the microwell array with a 50:1 ratio of CellTracker Green/CellTracker Orange-labeled BA/F3 cells, we scanned the entire array under bright-field and fluorescence illumination and inspected the images to determine the location of orange-labeled cells. We then automatically

## (A)



## (B)

**Figure 3.** Cell release. (A) Sequence of images showing levitation and removal of a target cell. Illustrations qualitatively show the cell state in each frame. 1—Cell at rest, 100 ms before the laser is turned on. 2—Lateral optical gradient force moves the cell to the lateral center of the beam. 3—Optical scattering force begins to levitate the cell. 4—Scattering force levitates the cell into flow field. 5—Fluid drag force overwhelms the optical gradient force, releasing the cell. (B) Tight localization of the optical force. We demonstrate the ability to remove a single targeted cell residing in a doubly loaded well.

returned to array sites containing orange-labeled cells, reinstated buffer flow, and levitated orange-labeled cells into the flow field for selective removal (Figure 4). Currently, the process of releasing a cell takes about 18–45 s, with selecting and scanning to an array site, aligning the laser to the array site, and levitating and releasing a cell taking about 10, 5, and 3–30 s, respectively. Attempting removal of 60–70 cells per hour is reasonable, which is a useful throughput in applications where tens to ~100 rare cells are desired. Our result demonstrates that a >10 000-site array can be iteratively imaged using fluorescence to predicate single-cell sorting decisions.

**Fluorescence Localization-Based Cell Sorting.** FACS cannot resolve localization of a fluorophore within a cell. Such localization can be important when studying translocation events of proteins within cells or protein localization, among other applications. To demonstrate a sort predicated on fluorescence localization, we imaged and sorted a mixed population of MCF7 cells exhibiting nuclear fluorescence and MCF7 cells double-stained with CellTracker Orange and Green, which exhibited diffuse whole-cell fluorescence (Figure 5). We used the green double-stain for demonstrating sorting verification. Our platform allowed us to selectively remove the nuclear-fluorescent cells, despite the fact that the diffuse fluorescent signal was spectrally indistinguishable from the nuclear signal. We used a slightly higher power (150 mW) for this experiment because of the slightly larger size of the MCF7 cells as compared with the BA/F3 cells, although the short removal times for the two cells (6 and 12 s) suggest that they could have also been removed with a typical exposure of 100 mW for ~20–30 s. This experiment demonstrates predication of sorts on fluorescence localization or any other image-based criteria. Our method therefore has the ability to

Berkeley Lights Ex 1007
Berkeley Lights v UBC



**(A)** Whole-chip Fluorescence Scan

1 mm

**(B)** 100 μm

Merged Brightfield + Fluorescence Detail

Before Target Cell Removal                    After Target Cell Removal

**Figure 4.** Whole-cell fluorescence-based cell sorting. We scanned a loaded 10 000-site array and located orange-labeled cells. We selectively released orange cells (false-colored red) from their trap sites, demonstrating the ability of image-based sorting based on time-resolved, whole-cell fluorescence, a capability effectively missing from FACS. Chip-level detail, shown in (A), is intentionally oversaturated in order to make cell-containing sites more visible for viewing/printing.

combine spatial and temporal fluorescence information from multiple channels with any other image data, (i.e., bright-field images as shown in Figure 5) to allow sorting of cells based on phenotypes far more complex than is practical or possible with FACS and without the investment and significant overhead required by LCM.

**Cell Health.** Cell viability and potential for cell damage is a point of concern when using any cell manipulation technique. Our method is likely to be relatively benign, as our use of a weakly focused 980 nm beam for up to 30 s at power levels of ~100−150 mW for cell manipulation is considerably gentler than parameters in many optical tweezers applications, where the beam is focused to micrometer-sized spots, sometimes at power levels up to ~1 W for longer durations. Considerable effort has been made to determine cell damage thresholds for optical manipulation. Studies have considered metrics including postexposure clonability,[20] motility,[21] DNA damage,[22,23] and viability.[22] We compare the laser beam parameters present in our platform with the minimum harmful levels found in literature in Supporting Information Table S-1, adapted from Wang et al.[24] Wang et al. evaluated stress pathway gene expression levels in a HeLa line to show that their particularly high powers used were not damaging; their param-

eters are shown as an acceptable operating point in Table S-1 for comparison.

These health studies did not explicitly separate thermal damage effects from strictly photon damage effects. This is largely because, in general, heating due to optical tweezers is influenced heavily by absorption of the trapping medium, and typical temperature rises in water have been reported between ~1−10 K/100 mW optical power, with the lower end of the range reported for cell manipulation.[22,25,26]

The large spot size used by our method results in power and energy densities orders of magnitude lower than reported damage thresholds. Further, three of the examples in Table S-1 use wavelengths of ~1064 nm. Liang et al. showed that the 990 nm wavelength is considerably less harmful than 1064 nm,[20] so damage thresholds from Liu and Mohanty may be more pessimistic than those possible at 980 nm.

We additionally performed a measurement of viability on-chip using Trypan Blue exclusion. Upon irradiating 50 cells at 150 mW for 30 s, the most extreme parameters we would consider for cell removal, we observed no statistical differences in viability between irradiated BA/F3 cells (97.3%, $n = 37$) and nonirradiated cells (97.3%, $n = 195$) in the device, and both were similar to viability measured in dish controls (97.9%, $n = 512$). These results suggest that neither the cell loading procedure, nor hydrodynamic transport and trapping on the device, nor upper limit of laser irradiation impacted viability, confirming the results of expected viability given our optical parameters and standard microfluidic architecture. Cell retrieval from the device requires a simple

(20) Liang, H.; Vu, K. T.; Krishnan, P.; Trang, T. C.; Shin, D.; Kimel, S.; Berns, M. W. *Biophys. J.* **1996**, *70*, 1529−1533.

(21) Neuman, K. C.; Chadd, E. H.; Liou, G. F.; Bergman, K.; Block, S. M. *Biophys. J.* **1999**, *77*, 2856−2863.

(22) Liu, Y.; Sonek, G. J.; Berns, M. W.; Tromberg, B. J. *Biophys. J.* **1996**, *71*, 2158−2167.

(23) Mohanty, S. K.; Rapp, A.; Monajembashi, S.; Gupta, P. K.; Greulich, K. O. *Radiat. Res.* **2002**, *157*, 378−385.

(24) Wang, M. M.; Tu, E.; Raymond, D. E.; Yang, J. M.; Zhang, H. C.; Hagen, N.; Dees, B.; Mercer, E. M.; Forster, A. H.; Kariv, I.; Marchand, P. J.; Butler, W. F. *Nat. Biotechnol.* **2005**, *23*, 83−87.

(25) Peterman, E. J.; Gittes, F.; Schmidt, C. F. *Biophys. J.* **2003**, *84*, 1308−1316.

(26) Liu, Y.; Cheng, D. K.; Sonek, G. J.; Berns, M. W.; Chapman, C. F.; Tromberg, B. J. *Biophys. J.* **1995**, *68*, 2137−2144.

Berkeley Lights Ex 1007
Berkeley Lights v UBC



**Figure 5.** Fluorescence localization-based cell sorting. We demonstrate the ability to sort cells based on subcellular fluorescence localization. We loaded a mixture of transfected cells exhibiting a nuclear-localized protein coupled to mCherry and nontransfected cells doubled-stained with CellTracker Orange and Green which exhibited diffuse, whole-cell fluorescence. We distinguish between the two populations by overlaying orange fluorescence and bright-field images. The laser is then used to remove cells exhibiting nuclear-confined fluorescence while leaving behind cells exhibiting whole-cell fluorescence, demonstrating that our platform could perform fluorescence localization/translocation-predicated sorts. CellTracker Green is used as a double-stain for validation.

pipetting step, which is standard lab practice and unlikely to damage cells. Therefore, we consider our technique to be within the parameter space for healthy, viable cell sorting.

**Quantification of Sorting Performance.** Our device demonstrated purification performance that would be useful in applications with small numbers of starting target cells. Supporting Information Table S-2 extensively quantifies the capabilities of our present design. We define population purity as the percentage of target cells comprising a total cell population, while target cell ratio is the ratio of target cells to unwanted cells. Enrichment is the target cell ratio after sorting divided by the target cell ratio before sorting. We determined these numbers by analyzing cell array images before sorting and by analyzing images of the bottom of the collection reservoir after sorting, as implied in Supporting Information Figure S-1.

When using a total cell starting number of ~3000 and an initial target cell ratio of ~1/20, output purities ranged from 81−89%, and enrichment ranged from 78× to 155×. Impurities came primarily from two paths. The first impurity source was random release of cells stuck nonspecifically outside of microwells during the time of target cell selection. This impurity source was small compared with random release of untargeted cells from microwells at release time due to their partial instability within traps. This release rate correlated positively with flow rate, necessitating the use of the slowest flow rate during release which manages to avoid retrapping of removed cells (> ~1 $\mu$L/min). However, flow rates

smaller than 4 $\mu$L/min unreliably maintained flow through the device during release, possibly due to reclosing of the punctured membrane in the reservoir at low flow rates. These constraints dictated the lowest useable flow rate and, by implication, the ceiling on purity, for the current design.

Cell losses between removal and transport to the collection reservoir are small (~18−28%) and could be due to nonspecific adhesion within the device or possibly recapture by the array. The most inefficient step at present is the manual transfer of target cells from the collection reservoir to a 96-well plate via pipet. In two attempts at transfer, one attempt transferred 74% of target cells, while the other transferred 26%. These losses existed largely because cells tended to sediment just under the glass interface between the PDMS and the reservoir, while the hole in the glass between the reservoir and flow channel was slightly too small for a pipet tip to directly fit into the channel. These losses are straightforward to eliminate in future redesigns of the device; our focus in this report is on the laser-based sorting aspect of the system.

## DISCUSSION

We have demonstrated examples of image-based sorting that are either cumbersome or impossible to carry out with existing technologies. Because our device allows cells to be observed over time before sorting, we can sort based on combinations of spatial and temporal information obtained through any microscopy

Berkeley Lights Ex 1007
Berkeley Lights v UBC

Appx906

technique, enabling complex phenotype sorting. We have demonstrated that our platform presently allows straightforward image-based inspection and sorting of thousands of cells. Our platform offers simple scalability to large sizes with minimal additional complexity. We have successfully demonstrated a functional 10 000-site array, and fabricating larger arrays is trivial. The strongest limitation of further scaling will likely not be the complexity of fabricating a larger array and the bookkeeping of information regarding each site but, rather, the array inspection speed and image processing time to make sorting decisions. With respect to data mining, the platform is therefore limited by a constraint common to all array-based methods and LCM-based approaches, inspection and data analysis time, rather than by the specific technology used.

Array inspection time ultimately dictates the temporal resolution of assays. We can presently inspect a 10 000-site array under bright-field illumination and two fluorescence wavelengths in about 25 min when using a $10\times$ objective lens. We can achieve even faster image-based screening in specific types of assays with minor modifications. In temporal whole-cell fluorescence applications, where total cell fluorescence signal is the critical information to capture, simply placing a $0.5\times$ demagnifier before the CCD while using the same $10\times$ objective lens could reduce this time by a factor of 4. Wells could likely be packed more densely; reducing the center-to-center distance between 30 $\mu$m diameter wells from 65 $\mu$m to 45 $\mu$m would double the area density of trapped cells. With these two simple changes, we could achieve an 8-fold increase in sampling rate for a given number of cells, yielding a 3 min inspection time for a 10 000-site array. The use of a larger CCD could further increase the rate.

Cell removal is currently simple and straightforward; software stores locations of target cells and scans the automated stage back to target sites for removal automatically. Automating fine laser alignment (which is now done manually) immediately before cell release would quicken release by $\sim 5-7$ s per site. The use of slightly higher laser powers briefly to overcome surface interactions may also quicken cell release by a few seconds. The most dramatic improvements could be made by incorporating multiple beams, allowing quasi-parallel release. For instance, we could use a four-beam system with 125 mW beams (Avanex produces low-cost 980 nm, 600 mW single-mode output semiconductor laser diodes) and independently steer the beams via mirrors. This off-chip complexity is easily abstracted from the user and provides a realistic avenue for scale-up in release. These two changes could reduce the average total removal time per cell to $\sim 10$ s or less, making removal of $100-300$ cells per hour practical, independent of the type of imaging assay employed.

The current purity and enrichment performance is useful for numerous assays even without expansion of sorted cells. With target cell purities between $\sim 80-90\%$ versus $\sim 5\%$ before sorting, enrichment of $\sim 2$ orders of magnitude, and sorted population sizes of $\sim 50-100$ cells, using our technique in conjunction with RT-PCR and/or engineered cell lines with fluorescent reporters could allow useful, quantitative assay readout with our current setup. However, purity performance can be even further improved. Purity can be increased by operating at lower flow rates, causing random release from the array to decrease. We did not observe flow stalling at low flow rates when the waste output was open, further

suggesting that the membrane-puncture valve was responsible for the observed flow stalling. Replacing the membrane-puncture valve with a true on-chip valve-based architecture could ideally allow operation at lower flow rates. Furthermore, the array could be angled relative to the release flow path, reducing the number of transitions a released cell must make over wells, reducing retrapping probability and allowing even lower flow rates to be used. Improving removal speed would also improve purity, as the number of contaminating cells collected varies directly with the total time during which target cells are removed. Therefore, the postsorting target cell fraction will approximately double for each halving of average cell removal time. We therefore believe that significant improvements to purity and enrichment are possible with further automation and more robust valve schemes. Moving to a valve-based architecture could also improve interfacing with a pipettor for more efficient transfer of cells from the device, as well as simplify the necessary support fluidics.

Pathways to automated localization-based screens also extend naturally from our platform. We demonstrated fluorescence localization-based sorting predicated on user input. Alternatively, the platform could support quantitative localization analysis via algorithms. Bright-field images or secondary whole-cell fluorescent staining could be used to quantitatively define cell area, and the fractional area of the cell occupied by obtained fluorescence data from the fluorophore of interest could be used to determine the extent of localization. Any image segmentation-based approach would be compatible with our platform, limited only by the time required to execute the algorithms.

Microwells need not be arranged in a gridlike fashion for large array-type experiments—microwell traps could be positioned throughout a substrate to enable addressable retrieval of particular cells in arbitrary alternative experiments. The technique generalizes easily to any application where the goal is to position cells in an environment, observe them using microscopy, and later retrieve particular cells.

Both FACS and LCM are essential, mainstay tools optimized for numerous applications and ideal for a core facility. Commercial LCM systems offer multiple approaches to fixed and live cell isolation based on image-based selection. Many offer immediate, direct registration between images of target cells and excised cell samples immediately after removal, offering a direct method for cell isolation. Our architecture trades the throughput of FACS for the ability to sort based on spatio—temporal fluorescence. Complementing the capabilities of commercially available LCM, our optofluidic approach provides ordered cell confinement during imaging and trades the complete transparency between selection and collection of target cells in LCM for practical portability to existing in-lab microscopy platforms, helping transform image-based sorting into a more routine capability.

## CONCLUSIONS

We have presented an intuitive, user-friendly platform for image-based cell sorting. Our device combines the simplicity of microwell arrays with the intuitive operation of optical manipulation techniques in a system that is simple to fabricate and replicate. We have demonstrated an example of image-based cell sorting predicated on whole-cell fluorescence which is easily extendable to temporal, whole-cell, fluorescence-based assays. Furthermore, we have shown sorting based on spatial localization of fluores-

Berkeley Lights Ex 1007
Berkeley Lights v UBC

cence, addressing the need to sort based on protein translocations and protein localization, among other applications. In addition, the simple scalability of the architecture has enabled us to implement a 10 000-site addressable array, allowing us to perform assays with significantly large cell populations. Our architecture exhibits core sorting functionality with enrichment and purity performance immediately useful in applications where low-incidence cell purification and isolation is desired. Our device fills a role effectively unaddressed with traditional cell-sorting techniques: practical selection of cells based on microscopy. We intend to use this platform to perform new types of viable cell-sorting assays where critical information is encoded in temporal, morphological, or spatio−temporal fluorescence behavior in cells.

## ACKNOWLEDGMENT

This work was supported by the NIH (RR19652), the Singapore−MIT Alliance (SMA), and an American Society for Engineering Education Department of Defense fellowship. We thank David Appleyard and Professor Matthew Lang for help with preliminary experiments, Salil Desai for culturing WeHi-3B cells for creating conditioned media, and Brianna Petrone for help in optimizing device protocols. We also thank the Microsystems Technology Laboratories for microfabrication facilities.

## SUPPORTING INFORMATION AVAILABLE

A table comparing the power/energy parameters of our method with known damage thresholds, a table and figure describing the performance of our device, and videos demonstrating the selective levitation and release of single cells from microwells. This material is available free of charge via the Internet at http://pubs.acs.org.

Received for review June 27, 2007. Accepted September 27, 2007.

AC071366Y

Berkeley Lights Ex 1007
Berkeley Lights v UBC

Published on 15 September 2010. Downloaded by North Carolina State University on 25/02/2016 00:20:38.

# Integration of single oocyte trapping, *in vitro* fertilization and embryo culture in a microwell-structured microfluidic device†‡

Chao Han,[ab] Qiufang Zhang,[c] Rui Ma,[ab] Lan Xie,[ab] Tian Qiu,[ab] Lei Wang,[b] Keith Mitchelson,[ab] Jundong Wang,[d] Guoliang Huang,*[ab] Jie Qiao*[c] and Jing Cheng[ab]

Received 5th May 2010, Accepted 23rd July 2010
DOI: 10.1039/c005296e

*In vitro* fertilization (IVF) therapy is an important treatment for human infertility. However, the methods for clinical IVF have only changed slightly over decades: culture medium is held in oil-covered drops in Petri dishes and manipulation occurs by manual pipetting. Here we report a novel microwell-structured microfluidic device that integrates single oocyte trapping, fertilization and subsequent embryo culture. A microwell array was used to capture and hold individual oocytes during the flow-through process of oocyte and sperm loading, medium substitution and debris cleaning. Different microwell depths were compared by computational modeling and flow washing experiments for their effectiveness in oocyte trapping and debris removal. Fertilization was achieved in the microfluidic devices with similar fertilization rates to standard oil-covered drops in Petri dishes. Embryos could be cultured to blastocyst stages in our devices with developmental status individually monitored and tracked. The results suggest that the microfluidic device may bring several advantages to IVF practices by simplifying oocyte handling and manipulation, allowing rapid and convenient medium changing, and enabling automated tracking of any single embryo development.

## 1 Introduction

Since the world's first test-tube baby was born in 1978,[1] assisted reproductive technology (ART) such as *in vitro* fertilization (IVF) has been used as an important therapy for the treatment of human infertility worldwide during the past three decades. The standard protocols for clinical IVF practice include gametes collection, fertilization and embryo culture, which remain nearly unchanged since its initiation, with culture medium held in oil-covered drops in Petri dishes, and manipulation performed manually by pipetting.[2] In these protocols, frequent pipetting of gametes is required, which is labor-intensive and time-consuming. In addition, fertilization and embryo culture require different media, therefore presumed zygotes have to be washed several times and transported to different drops for further development. Although some culture media have been developed to support both fertilization and embryo development (Complete Human Tubal Fluid (HTF) Medium with Serum Substitute Supplement (SSS), Irvine Scientific, Santa Ana, CA), the oocyte-washing step is still mandatory in order to remove the debris in the fertilization medium, which mainly consists of dead sperm. Another remaining issue is the ability to track the fertilization and development of an individual oocyte, since they are typically fertilized, washed, transferred and cultured in groups.

Microfluidic technology is an emerging field and has found increasing applications in recent years. In studies of assisted reproduction, microfluidics has the following unique advantages. The consumption of media in microfluidic devices is very low, thus only a small amount of sperm sample is needed to reach the same concentration as on a macro-scale.[3] Fluid in microchannels can be precisely predicted and controlled, allowing gametes to be manipulated for specific purposes. As a result of the ability to control and manipulate cells easily, microfluidic devices have already been used for sperm behavior analyses,[4–6] sperm motility evaluation and selection,[7–12] cumulus removal,[13,14] fertilization[3,15] and embryo culture.[16–19]

As a 'lab-on-a-chip' technology, the ultimate goal of microfluidic IVF devices is to integrate all IVF procedures together. The integration of fertilization and embryo culture has been suggested,[20–24] but is yet to be realized, mainly due to the difficulties in medium exchange and washing without disturbing the gametes. Clark *et al.* and Suh *et al.* achieved microfluidic fertilization on gametes from pigs and mice, respectively, by designing narrowing paths in a straight microchannel which can park oocytes while allowing the passage of medium and sperm.[3,15] However, these devices are not convenient for medium changing, because they only permit very low flow speed, due to the restriction of the narrowing paths and the potential harm of fluidic shear stress on oocytes.

Microwell structures have already been used to trap single cells in microfluidic devices.[25] By minimizing the flow speed inside microwells, cells can be protected from fluidic shear stress,[26] and paracrine and/or autocrine factors produced by embryos which are believed to enhance their development[16] can also be preserved

*aDepartment of Biomedical Engineering, Tsinghua University School of Medicine, Beijing, 100084, China. E-mail: tshgl@mail.tsinghua.edu.cn; Fax: +86-10-62773059; Tel: +86-10-62772239*

*bNational Engineering Research Center for Beijing Biochip Technology, 18 Life Science Parkway, Beijing, 102206, China*

*cCenter of Reproduction Medicine, Department of Obstetrics and Gynecology, Third Hospital of Peking University, Beijing, 100191, China. E-mail: jie.qiao@263.net; Fax: +86-10-62013283; Tel: +86-10-82265080*

*dShanxi Key Laboratory of Ecological Animal Science and Environmental Medicine, Shanxi Agricultural University, Taigu, Shanxi, 030801, China*

† Published as part of a LOC themed issue dedicated to Chinese Research: Guest Editor Professor Bingcheng Lin.

‡ Electronic supplementary information (ESI) available: Fig. S1, Fig. S2, Fig. S3, Movie S1. See DOI: 10.1039/c005296e

This journal is © The Royal Society of Chemistry 2010

Berkeley Lights Ex 1009
Berkeley Lights v UBC

Appx909



Published on 15 September 2010. Downloaded by North Carolina State University on 25/02/2016 00:20:38.

making a potentially preferable environment for cell culture. Heo and co-workers proposed an on-chip flow actuation system which can load and culture embryos in microwells without considering the fertilization process.[17] In addition, the microwell depth for effective oocyte/embryo entrapment was not suggested.

In this study, we used a microwell array to capture individual oocytes in the flow, followed by *in situ* insemination, medium changing and embryo culture. Different microwell depths were designed and compared by finite element modeling and flow washing experiments, and the depth as high as 200 μm was found most effective in oocyte trapping and debris removal during the rapid *in situ* medium changing process, facilitating the integration of fertilization and embryo culture within a single microfluidic device. In addition, since each oocyte is lodged in an individual microwell, we can then for the first time track the entire fertilization and development process of any individual oocyte, providing convenience for the observation of embryo development and selection of healthy embryos for clinical use.

## 2 Materials and methods

### 2.1 Materials and reagents

Polydimethylsiloxane (PDMS, Sylgard 184) was supplied by Dow Corning Inc (Midland, MI). SU-8 photoresist was purchased from Microchem Inc (Newton, MA). Human tubal fluid (HTF) and potassium simplex optimized medium (KSOM) were purchased from Millipore (Temecula, CA). Pregnant mare's serum gonadotropin (PMSG) and human chorionic gonadotropin (hCG) were supplied by Hede Biotechnology (Beijing, China). Hyaluronidase, mineral oil and bisbenzimide (Hoechst 33342) were obtained from Sigma-Aldrich (St. Louis, MO).

### 2.2 Computational model

Microwell dimension is critical for reliable oocyte trapping and medium changing. Here we built finite element models (COMSOL 3.5, Comsol AB, Burlington, MA) and used 2D simulations to study the flow behavior in microwells with different depths. The model is based on the steady-state Navier–Stokes equation for an incompressible Newtonian fluid:

$$\rho(v \cdot \nabla)v = -\nabla p + \eta \nabla^2 v \qquad (1)$$

where $v$ is the velocity vector field, $p$ is the pressure, $\rho$ is the medium density, and $\eta$ is the dynamic viscosity. The medium was modeled with a density of 1000 kg m$^{-3}$ and a dynamic viscosity of 1 mPa·s, as in previous studies.[27] A uniform inlet velocity of 3 mm s$^{-1}$ was used to simulate the experimental conditions. A zero pressure condition was applied to the outlet. No-slip boundary conditions were applied for the channel walls and microwell surfaces. Steady-state 2D velocity profiles and streamlines were plotted.

### 2.3 Device design and fabrication

The microfluidic device was designed based on the one used in our previous study.[14] The device consists of two PDMS layers, with a microchannel in the upper layer and a microwell array in the lower layer, as illustrated in Fig. 1(a) and (b). The microchannel is 1 mm in width and 200 μm in depth to transport sperm

and oocytes, with a 10 mm long and 3 mm wide microchamber above the microwell array to receive all the oocytes in microwells, and the inlet (I1) and outlet (I2) are connected with the microchannel (Fig. 1(a)). Square-shaped microwells are 200 μm in width at a 50 μm interval, and each microwell row has a shift of 80 μm from its adjacent row to trap oocytes at different positions (Fig. 1(b), also see ESI, Fig. S1‡). Four microwell depths (50, 100, 150 and 200 μm) are designed on respective devices to compare their performance in oocyte entrapment and debris removal. During the experiment, oocytes are loaded into the microchannel, transported and lodged in the microwell array. Then sperm suspension is loaded, bringing motile sperm around the trapped oocytes to allow fertilization to occur, as illustrated in Fig. 1(c).

The device was fabricated by following standard photolithography and micromolding procedures.[28] Briefly, SU-8 photoresist was patterned onto a 4 inch silicon wafer to form a master. Liquid PDMS prepolymer solution was poured onto

**Fig. 1** The microwell-structured microfluidic device with two PDMS layers. (a) Illustration of the upper microchannel layer. The microchannel is 1 mm in width to transport sperm and oocytes, with a 3 mm wide microchamber to receive all the oocytes in the microwells. (b) Illustration of the lower microwell layer. Square-shaped microwells are 200 μm in width at a 50 μm interval, and each microwell row has a shift of 80 μm from its adjacent row to trap oocytes at different positions. The upper and lower layers are plasma bonded at the gray region. (c) Illustration of the cross section of the double-layer microfluidic device. (d) View of the microfluidic device fixed on a 76.2 mm × 25.4 mm microscopic slide, as well as the microwell array. The microchannel and the two reservoirs were filled with red dye. Scale bar is 500 μm. (e) View of the microfluidic device with the upper layer lifted.

Berkeley Lights Ex 1009
Berkeley Lights v UBC

Appx910

View Article Online

Published on 15 September 2010. Downloaded by North Carolina State University on 25/02/2016 00:20:38.

the master, cured at 70 °C for 1.5 h, and then peeled off the master, producing the final replica with the microstructures. The upper and lower layers were diced from the replica, treated in an oxygen plasma generator (FEMTO, Diener Plasma-Surface-Technology, Ebhausen, Germany), and irreversibly bonded together at the gray region shown in Fig. 1(a) and (b). The microchamber region was left unbonded so that the upper layer can be partially lifted for the retrieval of blastocysts. Two medium reservoirs were glued to the inlet and outlet on the upper layer with an epoxy structural adhesive (WD3620, Shanghai Kangda Chemical, Shanghai, China). An additional PDMS layer was molded on top of the glue to prevent the glue from contacting the culture medium. A view of the assembled device is shown in Fig. 1(d), and the device with the upper layer lifted is illustrated in Fig. 1(e).

### 2.4 Gametes collection

Sperm and oocytes were collected from 10-week and 8-week old Institute of Cancer Research (ICR) strain mice, respectively, by following standard procedures in accordance with institutional guidelines for care and use of animals. Briefly, female mice were intraperitoneally injected with 10 IU PMSG, and 10 IU hCG 48 h later. Fourteen hours following hCG injection, mice were sacrificed by cranial/cervical dislocation. Each oviduct was surgically removed, and the cumulus-oocyte masses were harvested into pre-equilibrated HTF drops then transported into 3 mg ml$^{-1}$ hyaluronidase solution and denuded of cumulus cells. Males were sacrificed by cranial/cervical dislocation. Cauda epididymides and vasa deferentia were dissected out into a pre-equilibrated HTF drop, minced with ophthalmic scissors, then placed in a humidified 5% $CO_2$ incubator at 37 °C for 1 h for sperm to swim out and experience capacitation. Sperm concentration was assessed with a hemocytometer (Qiujing, Shanghai, China).

### 2.5 Oocyte trapping and debris removal tests

Microfluidic devices with 50, 100, 150 and 200 μm depths were tested for their effectiveness of oocyte entrapment and debris removal. In the oocyte entrapment test, microfluidic devices were pre-filled with HTF, then oocytes were loaded into microwells and rested for 2 min. A syringe pump (PHD 2000, Harvard Apparatus, Holliston, MA) was connected to reservoir I2 to generate a negative-pressure driven flow. The flow lasted for 2 min at each velocity, which kept increasing until an oocyte was washed out of its microwell. In the debris removal test, dead sperm samples were loaded into the devices and settled for 5 min. The flow was generated by the syringe pump and lasted for 2 min at each velocity. Images of microwells were captured before and after the flow using an inverted microscope (DM-IRB, Leica Microsystems GmbH, Wetzlar, Germany) under a 20× objective lens, and converted to binary images by MATLAB 7.1 (The Mathworks Inc, Natick, MA). The amount of debris was estimated by counting the number of black pixels (NBP) in these binary images, and the removal rate was calculated as the relative difference between the pre-flow NBP and post-flow NBP.

### 2.6 Fertilization and embryo culture

Each microfluidic device with 200 μm microwell depth was washed with ethanol, dried in a vacuum oven, treated in the plasma generator for hydrophilic surface modification, filled with HTF and placed in a 100 mm Petri dish with 15 ml distilled water to prevent evaporation of medium, followed by a 30 min UV exposure for sterilization. The devices were then equilibrated overnight in the humidified 5% $CO_2$ incubator at 37 °C. For the control group, 50 μl HTF and KSOM drops were prepared in 35-mm Petri dishes, covered by mineral oil, and equilibrated overnight in the incubator. All the HTF and KSOM used in the experiments were equilibrated overnight.

Denuded oocytes were loaded into reservoir I1 using a pipette (Eppendorf, Hamburg, Germany), and a gravity-driven flow from I1 to I2 was generated to guide oocytes into the microwell array area. By adjusting the flow using the pipette, each oocyte was individually aligned above a single microwell and then sank into the well by gravity. Sperm were then added into I1 and transported by the gravity-driven flow into the microchamber. For the control group, oocytes and sperm were sequentially added into the oil-covered HTF drops in Petri dishes. Microfluidic devices and Petri dishes were then placed back in the humidified 5% $CO_2$ incubator at 37 °C. The final sperm concentration was adjusted to ~1 × 10$^6$ sperm ml$^{-1}$ in both the microchannels and the oil covered drops.

After incubation for 8 h, I1 and I2 reservoirs were depleted, and KSOM was added into I1, generating a flow speed in the range of 2–5 mm s$^{-1}$ to substitute all the HTF in the microchannels while removing the debris. Substituted medium was depleted from I2. For the control group, oocytes were washed in KSOM drops three times, and transferred to a KSOM embryo culture drop. Fertilization was determined by the occurrence of two pronuclei, which was assessed after 9 h incubation. Embryo development status was examined and individually tracked after 24, 48, 72 and 96 h incubation. Each phase contrast image was taken by using the DM-IRB microscope under 20× objective lens. Data derived from microwells and conventional oil-covered drops in Petri dishes were statistically compared using Student $t$-test, where $P < 0.05$ was considered significantly different.

Blastocysts were individually retrieved from the microwells after 104 h incubation with the following steps (see ESI, Fig. S2‡). Under microscopic observation, a pipette is aligned above a trapped blastocyst, and pressed down towards the sidewall of the microwell, which deforms due to the elastic nature of PDMS. The blastocyst is then retrieved from the microwell by the flow generated by pipetting. The retrieved blastocysts were transported into 10 μg ml$^{-1}$ Hoechst 33342 staining solution and incubated at 37 °C, 5% $CO_2$ for 30 min. The stained blastocysts were then mounted on a glass slide with a cover slip on top. Fluorescent images were captured using the DM-IRB microscope under 40× objective lens. The excitation and emission spectra wavelengths for Hoechst 33342 are 346 nm and 460 nm respectively.

## 3 Results

### 3.1 Computational analysis for different microwell depths

Fig. 2(a) and (b) illustrates the velocity contours and streamlines of four microwells with different depths (50, 100, 150 and

Berkeley Lights Ex 1009
Berkeley Lights v UBC

Appx911

Published on 15 September 2010. Downloaded by North Carolina State University on 25/02/2016 00:20:38.









**Fig. 2** Computational analysis of microwells with different depths. (a) Velocity contours for microwells with different depths. (b) Streamlines for microwells with different depths. (c) Velocity at the microwell horizontal slice center as a function of its vertical distance to the bottom.

for the 50 μm depth, 0.05 mm s⁻¹ for the 100 μm depth, 0.5 mm s⁻¹ for the 150 μm depth and 1 mm s⁻¹ for the 200 μm depth. Five replications were made, and the oocyte washing out velocities for these four depths are $0.128 \pm 0.011$, $0.500 \pm 0.035$, $5.10 \pm 0.42$ and $15.4 \pm 0.9$ mm s⁻¹, respectively, as illustrated in Fig. 3(a). Since the flow speed in our medium changing process is normally larger than 1 mm s⁻¹, the 50 and 100 μm depths are not suitable for use.

200 μm) in a 200 μm deep microchannel. Medium flows from left to right with an inlet velocity of 3 mm s⁻¹, comparable to the experimental conditions. As shown in Fig. 2(a), the flow velocity is higher in shallow wells (50 and 100 μm) than in deep ones (150 and 200 μm), making it more difficult for shallow wells to hold oocytes. As observed in the streamline analysis (Fig. 2(b)), eddies are formed in the corners for shallow wells (50 and 100 μm) but enlarge and occupy the entire wells for deep ones (150 and 200 μm). Fig. 2(c) represents the flow velocity at the horizontal slice center of a microwell as a function of the vertical distance to the microwell bottom. The distance ranges from 0 to 100 μm, since a normal mouse oocyte has a diameter close to 100 μm. Compared to the inlet velocity (3 mm s⁻¹), the maximum flow velocity around a trapped oocyte is reduced by 50%, 90% and 97% for the 100, 150 and 200 μm depths respectively, but not significantly changed for the 50 μm depth.

### 3.2 Oocyte trapping and debris removal tests for different microwell depths

In the oocyte trapping test, the flow speed kept increasing until the oocyte was washed out. The increasing step was 0.02 mm s⁻¹

**Fig. 3** Oocyte trapping and debris removal tests. (a) The oocyte washing out velocity for different microwell depths. The trapped oocytes were washed out at $0.128 \pm 0.011$, $0.500 \pm 0.035$, $5.10 \pm 0.42$ and $15.4 \pm 0.9$ mm s⁻¹ for the 50, 100, 150 and 200 μm depths, respectively. The velocity is plotted on a logarithmic scale. (b) The debris removal rate for the microwells as a function of flow velocity ranging from 1 mm s⁻¹ to 15.4 mm s⁻¹. The velocity is plotted on a logarithmic scale. (c) Demonstration of the medium changing process in the 200 μm deep microwells at the speed of 3 mm s⁻¹. An oocyte (solid arrow) was already trapped in a microwell. Before medium changing, microwells were filled with debris (dashed arrow). After washing for 1 min, part of the debris was washed out by the eddies formed in the microwells. After 2 min, most of the debris was removed. Scale bar is 100 μm.

Berkeley Lights Ex 1009
Berkeley Lights v UBC

Appx912

Published on 15 September 2010. Downloaded by North Carolina State University on 25/02/2016 00:20:38.

In the debris removal test, flow velocities of 1, 2, 5, 10 and 15.4 mm s⁻¹ were applied to the devices with the four depths. We examined six microwells for each depth, and the relationship between the removal rate and flow speed is illustrated in Fig. 3(b). The 150 and 200 μm depths have similar debris removal performance, with 70%+ debris removed at 2 mm s⁻¹ and 80%+ at 5 mm s⁻¹. However, according to Fig. 3(a), the 150 μm depth can no longer hold oocytes when the flow speed increased to 5 mm s⁻¹, and is therefore not able to support oocyte/debris separation at high flow speed. Consequently, we finally selected the 200 μm depth for our IVF experiments.

To confirm that the 200 μm deep microwell is able to clean the debris while holding the oocytes during medium changing, a microfluidic device containing both oocytes and sperm debris after 9 h insemination was examined. The syringe pump was connected to reservoir I2 to generate a flow speed of 3 mm s⁻¹. The medium substitution process also lasted for 2 min, which is approximately the time taken in our microfluidic IVF experiments, and is faster than the standard Petri dish IVF (normally ~5 min in our hands, depending on the operator's skill and the number of oocytes). Fig. 3(c) illustrates the medium changing process. Before medium changing (0 min), microwells were filled with debris (dashed arrow). After washing for 1 min, debris was partially removed. Meanwhile, the trapped oocyte (solid arrow) rotated in the microwell, demonstrating the existence of eddies predicted by our previous simulation (see ESI, Movie S1‡). After 2 min, most of the debris was swept out, with the oocyte still resting in the microwell.

### 3.3 In vitro fertilization

The experiments were independently repeated four times. At 9 h post-insemination, similar fertilization rates were obtained between microwells (69.0 ± 6.1%, N = 64) and controls (71.4 ± 12.3%, N = 109) without significant difference (P > 0.1), as shown in Fig. 4.

### 3.4 Embryo culture and single embryo development tracking

After medium exchange, embryo development was observed and recorded. Among all the zygotes, the percentages of two-cell, four-cell, morula and blastocyst stage embryos after 24, 48, 72

and 96 h of incubation were recorded and calculated, respectively, as illustrated in Table 1. No significant differences (P > 0.1) were observed between the two groups in each development stage.

Since each zygote was lodged in a particular microwell, the fertilization and development status of each oocyte can be tracked individually. Fig. 5(a) illustrates the development tracking process of a normal zygote. Two pronuclei appeared at 9 h post-insemination, and two-cell, four-cell, morula and blastocyst stages were observed at 24, 48, 72 and 96 h, respectively. The blastocyst was then retrieved and stained by Hoechst 33342 at 104 h, shown in Fig. 5(b). Abnormal development can also be discerned and studied. As shown in Fig. 5(c), an oocyte attacked by many sperm at 9 h fractured at 24 h.

## 4 Discussion

In this study, we have proposed a microfluidic oocyte trapping method which supports rapid medium exchange, and demonstrated the integration of fertilization and embryo culture. A microwell-structured device was designed, and microwells with 50, 100, 150 and 200 μm depths were studied and compared for their performance on oocyte trapping and debris removal, based on both computational simulation methods and flow washing experiments. The 3 mm wide and 200 μm high microchamber above the microwell array ensures the uniformity of flow rates for microwells in different positions (see ESI, Fig. S3‡). According to the simulation, the maximum flow velocity near a trapped oocyte is reduced by 0, 50, 90 and 97% for the four microwell depths, respectively, compared to the inlet, suggesting that it is more difficult for the oocytes to exit deeper microwells. This is consistent with the observed oocyte washing out velocities for the four depths, which are 0.128, 0.500, 5.10 and 15.4 mm s⁻¹. The 50 and 100 μm depths allow only very low washing-out velocities, and are not capable of holding oocytes against flow fluctuations occurred during sperm loading and medium perfusion. For the medium exchange velocity in the range of 2–5 mm s⁻¹, both the 150 and 200 μm depths are able to remove over 70%–80% debris. However, the 150 μm deep microwell fails to hold the oocyte at the flow speed of 5 mm s⁻¹, while the 200 μm deep microwell has a much higher threshold of 15.4 mm s⁻¹. As a result, the 200 μm deep microwell surpasses the other three depths in the effectiveness of oocyte trapping and debris removal, and was therefore selected for our IVF experiments.

The microwell width is 200 μm throughout the device to accommodate the dimension of oocytes and embryos. A murine oocyte is ~100 μm in diameter and a hatched blastocyst may expand to more than 150 μm, so the dimension of the microwell could provide enough space for embryo development. During



**Fig. 4** Fertilization rates of oocytes from microwell IVF and control Petri dish IVF.

**Table 1** Embryo development comparison between microwell IVF and control Petri dish IVF

|  | Microwell IVF rate (%) | Control IVF rate (%) |
| --- | --- | --- |
| Two-cell (24 h) | 96.9 ± 6.3 | 96.4 ± 4.2 |
| Four-cell (48 h) | 92.7 ± 6.3 | 91.7 ± 6.4 |
| Morula (72 h) | 93.8 ± 7.2 | 92.7 ± 6.7 |
| Blastocyst (96 h) | 87.5 ± 10.2 | 87.8 ± 8.2 |

Berkeley Lights Ex 1009
Berkeley Lights v UBC

Appx913

Published on 15 September 2010. Downloaded by North Carolina State University on 25/02/2016 00:20:38.



**Fig. 5** Single embryo development tracking. Scale bars are 100 µm. (a) Normal development of a zygote (arrow). Two pronuclei in the zygote were marked by dashed circles. (b) Fluorescent image of the retrieved blastocyst in (a). (c) An oocyte (arrow) attacked by many sperm at 9 h fractured at 24 h.

oocyte trapping, it takes only a few seconds for an oocyte to sink into a microwell by gravity. Oocyte trapping and debris removal tests were performed under continuous flow generated by using a syringe pump. To save manipulation time, we used a pipette instead of a syringe pump in our IVF experiments to exchange medium, resulting in a fluctuation in the flow speed from 2 to 5 mm s⁻¹. Since the effectiveness of the 200 µm deep microwell has already been proven within this range, the device can still produce satisfactory oocyte trapping and debris removal results. Our microwell design overcomes the medium changing problem faced by previous microfluidic IVF devices,[3,15] and hence facilitates the integration of fertilization and embryo culture.

We used a standard sperm concentration of ∼1 × 10⁶ sperm ml⁻¹ in both our microfluidic device and conventional Petri dishes. Suh *et al.* claimed that they needed a lower sperm concentration (2–8 × 10⁴ sperm ml⁻¹) in microchannels to improve fertilization outcome,[3] possibly because their device exposed oocytes directly in the course of sperm so that more sperm encountered oocytes. In contrast, in our design, the microwells shield the oocytes from the sperm flow, preventing them from encountering too many sperm. Therefore, the ∼1 × 10⁶ sperm ml⁻¹ concentration led to satisfactory rates of fertilization in our devices.

During insemination, rotation and movement of oocytes can be observed immediately after sperm attachment, as discussed in previous studies.[29] This phenomenon makes it difficult for conventional methods to allocate oocytes in one place and track their fertilization and development status individually. In contrast, it has been made possible for our device to confine oocyte movement within a square-shaped microwell. Microwell depth is critical for effective confinement. Sperm–oocyte clusters were observed to exit from the 50, 100 and 150 µm deep wells, however, this phenomenon was not observed when the depth of the microwell increased to 200 µm.

Currently, microfluidic systems have been reported to perform embryo culture in both static and dynamic conditions. For the static systems, embryos were parked in straight channels[16] or microchambers[19] and cultured without moving the medium. For the dynamic systems, embryos experienced changing medium environment[20] or constant stimulation[18] during their development. Those static systems tend to produce higher blastocyst rates.[16,19] We therefore choose to culture our embryos under static culture conditions to allow for the direct comparison with the control, *i.e.*, oil-covered drops in Petri dishes. However, the *in vivo* embryo culture environment in Fallopian tubes is quite dynamic, providing renewing medium for embryos. In addition, exposure to appropriate flow stress and mechanical stimulation during embryo development is believed to mimic the *in vivo* conditions and may further enhance the *in vitro* culture outcome,[18] which will also be taken into account in our future study.

After *in vitro* embryo culture, blastocysts need to be collected and transferred back to the uterus. However, the embryo retrieval step is not convenient for the reported microfluidic IVF and embryo culture devices, for they had to generate a backward flow to make embryos return to the inlet.[3,15,16] Whereas with our device, the PDMS layers are partially bonded and the microchannel layer can be lifted while each embryo is still trapped in the microwell layer at its fixed position. This feature allowed us to directly remove embryos from the microwells by pipetting with the retrieval rate close to 100%.

## 5  Conclusion

IVF is a crucial therapy to treat human infertility. In this work, we developed a microwell array structured microfluidic device to simplify the medium changing process in IVF, and achieved the integration of single oocyte trapping, fertilization and embryo

Berkeley Lights Ex 1009
Berkeley Lights v UBC

Appx914

View Article Online

Published on 15 September 2010. Downloaded by North Carolina State University on 25/02/2016 00:20:38.

culture within a microfluidic device. Embryos can be individually monitored and tracked in our devices during their development, and conveniently retrieved afterwards. These results demonstrate the great potential for a microfluidic lab on a chip system being a powerful tool towards integration and automation in reproductive science research and clinical applications.

## Acknowledgements

This work was supported by the grant of National High-Tech Program (2006AA020701).

## References

1 P. C. Steptoe and R. G. Edwards, *Lancet*, 1978, **312**, 366.
2 A. Nagy, M. Gertsenstein, K. Vintersten and R. Behringer, in *Manipulating the mouse embryo: a laboratory manual*, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, 3rd edn, 2003, ch. 14, pp. 576–579.
3 R. S. Suh, X. Y. Zhu, N. Phadke, D. A. Ohl, S. Takayama and G. D. Smith, *Hum. Reprod.*, 2006, **21**, 477–483.
4 L. J. Kricka, O. Nozaki, S. Heyner, W. T. Garside and P. Wilding, *Clin. Chem.*, 1993, **39**, 1944–1947.
5 S. Koyama, D. Amarie, H. A. Soini, M. V. Novotny and S. C. Jacobson, *Anal. Chem.*, 2006, **78**, 3354–3359.
6 M. D. C. Lopez-Garcia, R. L. Monson, K. Haubert, M. B. Wheeler and D. J. Beebe, *Biomed. Microdevices*, 2008, **10**, 709–718.
7 L. J. Kricka, X. Y. Ji, O. Nozaki, S. Heyner, W. T. Garside and P. Wilding, *Clin. Chem.*, 1994, **40**, 1823–1824.
8 L. J. Kricka, I. Faro, S. Heyner, W. T. Garside, G. Fitzpatrick, G. McKinnon, J. Ho and P. Wilding, *J. Pharm. Biomed. Anal.*, 1997, **15**, 1443–1447.
9 B. S. Cho, T. G. Schuster, X. Y. Zhu, D. Chang, G. D. Smith and S. Takayama, *Anal. Chem.*, 2003, **75**, 1671–1675.
10 T. G. Schuster, B. Cho, L. M. Keller, S. Takayama and G. D. Smith, *Reprod. BioMed. Online*, 2003, **7**, 75–81.
11 M. C. McCormack, S. McCallum and B. Behr, *J. Urol.*, 2006, **175**, 2223–2227.
12 J. M. Wu, Y. Chung, K. J. Belford, G. D. Smith, S. Takayama and J. Lahann, *Biomed. Microdevices*, 2006, **8**, 99–107.
13 H. C. Zeringue, J. J. Rutledge and D. J. Beebe, *Lab Chip*, 2005, **5**, 86–90.
14 C. Han, R. Ma, Z. Sun, Z. Yu, G. Huang, Y. Zhou, J. Qiao, J. Wang and J. Cheng, *Proceedings of the 13th International Conference on Miniaturized Systems for Chemistry and Life Sciences*, Jeju, 2009.
15 S. G. Clark, K. Haubert, D. J. Beebe, C. E. Ferguson and M. B. Wheeler, *Lab Chip*, 2005, **5**, 1229–1232.
16 S. Raty, E. M. Walters, J. Davis, H. Zeringue, D. J. Beebe, S. L. Rodriguez-Zas and M. B. Wheeler, *Lab Chip*, 2004, **4**, 186–190.
17 Y. S. Heo, L. M. Cabrera, J. W. Song, N. Futai, Y. C. Tung, G. D. Smith and S. Takayama, *Anal. Chem.*, 2007, **79**, 1126–1134.
18 M. S. Kim, C. Y. Bae, G. Wee, Y. M. Han and J. K. Park, *Electrophoresis*, 2009, **30**, 3276–3282.
19 J. Melin, A. Lee, K. Foygel, D. E. Leong, S. R. Quake and M. W. M. Yao, *Dev. Dyn.*, 2009, **238**, 950–955.
20 R. S. Suh, N. Phadke, D. A. Ohl, S. Takayama and G. D. Smith, *Hum. Reprod. Update*, 2003, **9**, 451–461.
21 M. B. Wheeler, E. M. Walters and D. J. Beebe, *Theriogenology*, 2007, **68**, S178–S189.
22 G. D. Smith and S. Takayama, *Theriogenology*, 2007, **68**, S190–S195.
23 S. G. Clark, E. M. Walters, D. J. Beebe and M. B. Wheeler, *Theriogenology*, 2003, **59**, 441.
24 J. Mizuno, S. Ostrovidov, H. Nakamura, K. Akaishi, H. Inui, Y. Sakai, T. Fujii, K. Anzai and A. Watanabe, *Hum. Reprod.*, 2007, **22**, I169–I170.
25 J. R. Rettig and A. Folch, *Anal. Chem.*, 2005, **77**, 5628–5634.
26 N. Korin, A. Bransky, M. Khoury, U. Dinnar and S. Levenberg, *Biotechnol. Bioeng.*, 2009, **102**, 1222–1230.
27 A. Manbachi, S. Shrivastava, M. Cioffi, B. G. Chung, M. Moretti, U. Demirci, M. Yliperttula and A. Khademhosseini, *Lab Chip*, 2008, **8**, 747–754.
28 D. C. Duffy, J. C. McDonald, O. J. A. Schueller and G. M. Whitesides, *Anal. Chem.*, 1998, **70**, 4974–4984.
29 A. Nir, *J. Theor. Biol.*, 2002, **214**, 171–179.

Berkeley Lights Ex 1009
Berkeley Lights v UBC

Appx915

# SYSTEM AND METHOD FOR MICROFLUIDIC CELL CULTURE

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Patent Application Serial No. 61/362,213 entitled "SYSTEM AND METHOD FOR MICROFLUIDIC CELL CULTURE" filed on 7 July 2010, which is incorporated herein by reference in its entirety.

## BACKGROUND

### 1.    Field

This invention relates to microfluidic devices.  In particular, the invention relates to microfluidic devices and their uses and methods for culturing cells for extended periods of time.

### 2.    Description of Related Art

Cell population heterogeneity poses a major obstacle to understanding complex processes that govern tissue-specific cellular responses, differentiation, and disease development. Averaged measurements of large numbers of cells often obscure the variable responses of individual or rare cells. New technologies for studying cellular heterogeneity at the single cell level under well-defined chemical environments are therefore of great interest in the study of cells (for example, stem cell fields).

The need for scalable single cell analysis is particularly acute in the study of hematopoietic stem cell (HSCs) growth and differentiation.  The analyses of clonal cultures derived from single HSCs have been performed for a number of years and these have already provided some insights into the proliferation kinetics of the input cells, their *in vitro* responses to varying growth factor conditions, and their rapid loss ex vivo of the differentiation pattern that is typically preserved when they expand *in vivo*.  Such experiments have shown that quiescence and delayed cell cycle entry correlate with higher potency (Brummendorf, TH. *et al.* J. Exp. Med. 188, 1117–1124 (1998); Audet, J. *et al.* Biotechnol. Bioeng. 80, 393–404 (2002)), that asymmetric cell divisions are features of HSCs with long-term hematopoietic activity (Ma, N.N. *et al.* Biotechnology and Bioengineering 80, 428-437 (2002)), and that the probability of HSCs executing a self-renewal decision *in vitro* is regulated by the types and

1

Berkeley Lights Ex 1015-p 3
Berkeley Lights v UBC

times of 10 sec or 100 sec, respectively. This is significantly shorter than our medium perfusion protocols that have refresh times of 10 minutes.

### Recovery of cells post-culture

Cell recovery is often required to enable functional assays to be performed on the progeny of the input cells, or to select cells of interest for larger scale culture. A method to recover defined clonal populations is therefore a critical requirement for many applications of microfluidic cultures.

**Figure 4** shows a numerical simulation of the flow profile through a culture chamber of an embodiment. With a flow rate of 0.0625 µl/min through the flow channel, the velocity in mm s$^{-1}$ for the flow channel **14** is 2.4 mm s$^{-1}$ at the center of the flow channel, with a gradual decrease at the edges of the flow channel to about 1.0-1.2 mm s$^{-1}$. The sudden expansion when the fluid moves from the flow channel to the chamber creates a velocity drop, and the velocity in the cell retaining region is reduced to less than 50 µm/s. .The velocity in mm s$^{-1}$ for the culture chamber **12** ranges from about 1.6 to about 0.4 mm s$^{-1}$ immediately adjacent the inlet and outlet (see bright flares) of the flow channel and the remainder of the culture chamber **12** ranges from about 0.4 to about 0.0 mm s$^{-1}$. The culture chamber **12** dimensions (160 µm x 160 µm), flow channel **14** dimensions (100 µm x 13 µm) and culture chamber **12** volume (4.1 nl) are also shown. The modeling predicts minimal flow rates at the bottom 5/6 of the chamber. In accordance with embodiments, the gravitational forces on the cells is greater than hydrodynamic forces and cells remain in the cell retaining region while the perfusion fluid exits the chamber through the flow channel outlet. Similarly, modeling of fluid velocity during cell loading (modeled for a total flow rate of 1 µL/min) suggests that a maximum velocity in the flow channels **14** does not exceed 1.2 x 10$^{-3}$ m/s and that the maximum velocity in the majority of the chamber **12** is at or near 0 m/s (not shown) during cell loading. When the flow is stopped, cells settle down in the chamber **12** by gravity to the cell retaining region. Additionally, modeling of the sheer stress (Pa) on the channel walls **14** suggests during cell loading, the flow rate of 0.03 µl/min through the flow channel results in a maximum shear stress exerted on the cells is 0.3 Pa next to the channel wall (not shown). Similarly, modeling of sheer stress on cells within a chamber **12** during media exchange (i.e.

40

Berkeley Lights Ex 1015-p 42
Berkeley Lights v UBC

1.      The present application is being examined under the pre-AIA first to invent

provisions.

## DETAILED ACTION

### *Response to Amendment*

1.      The amendment filed 4/27/16 has been entered and fully considered.

2.      Claims 1-83 are pending, of which claims 1-17, 34-55, 58-62, 64, 66-67 are

withdrawn and claims 68-83 are new.

### *Claim Rejections - 35 USC § 103*

2.      The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102, if the differences between the subject matter sought to be patented
> and the prior art are such that the subject matter as a whole would have been obvious at the
> time the invention was made to a person having ordinary skill in the art to which said subject
> matter pertains. Patentability shall not be negatived by the manner in which the invention was
> made.

3.      The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under pre-AIA 35 U.S.C. 103(a) are summarized as follows:

        1. Determining the scope and contents of the prior art.

        2. Ascertaining the differences between the prior art and the claims at issue.

        3. Resolving the level of ordinary skill in the pertinent art.

        4. Considering objective evidence present in the application indicating

obviousness or nonobviousness.

Berkeley Lights Ex 1015-p 470
Berkeley Lights v UBC

4.      This application currently names joint inventors. In considering patentability of the claims under pre-AIA 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary.  Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of pre-AIA 35 U.S.C. 103(c) and potential pre-AIA 35 U.S.C. 102(e), (f) or (g) prior art under pre-AIA 35 U.S.C. 103(a).

3.      Claims 18-33, 56-57, 63, 65, 68-75, 77-78, 80-83 is/are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over DIMOV (US 2011/0262906) in view of FELDER (US 2005/0054101).

        a.      With respect to claim 18, 80, DIMOV discloses a method of culturing comprising retaining cell matter at a bottom of a trench (retaining position within chamber), flowing a fluid of culture medium with cells therein into the trench through a fluid feed line (inlet), and flowing the fluid out of the chamber through fluid waste line (outlet) wherein the outlet is positioned such that gravity causes the cells to cells at the bottom (keep it at retaining position) (0051-0056, Figure 4, 0061, Figure 7, 0044); and long term culturing of the cells (culturing the cell within the chamber) in which the cellular responses can be tested (to monitor a response in the chamber) (0062-65). DIMOV further discloses that fluids are removed from the chamber (0076) and that pipettes are mated with the chamber inlets such that conventional loading equipment may be used (0048-49) but does

Berkeley Lights Ex 1015-p 471
Berkeley Lights v UBC

not explicitly disclose recovering the cell from the chamber. However, FELDER

discloses an automated cell cultures system and process comprising a culture

vessel (chamber) for culturing cells (0007-0010) and monitoring them (0085), in

which the cells are harvested once they have reached their desired state of

confluence or growth by automated pipettes (pierces chamber) or pumps

(aspirating chamber's contents or portion thereof to obtain recovered cell) (0086).

At the time of the invention it would have been obvious to modify the invention of

DIMOV to include the step of harvesting the cells via pipette aspiration as taught

by FELDER because it allows for use of an automated pipette and the harvested

cells are useful for a variety of purposes including drug discovery, research and

cell product production, or as protein or cell product factories (0086-87).

b.       With respect to claim 19-21, DIMOV discloses the device is placed in a

standard cell culture incubator (placing in gaseous communication with a fluid

bath of greater volume) for controlling conditions (regulating osmolarity), wherein

the gas and fluid are iso-osmotic (0066).

c.       With respect to claim 22-23, DIMOV discloses the speed of the fluid is

decreased to less than 50 um/s, and to about 0um/s as it approaches the trench

(0058-59, Figures 5-6).

d.       With respect to claims 24-26, DIMOV discloses the trench (chamber) has

a top and bottom, with the cells settling at the bottom, and the feed line and fluid

waste lines are proximal to the top (Figure 4, 7).

Berkeley Lights Ex 1015-p 472
Berkeley Lights v UBC

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BERKELEY LIGHTS, INC.

Petitioner

v.

THE UNIVERSITY OF BRITISH COLUMBIA

Patent Owner

_____

US Patent Nos. 10,087,408 and 10,421,936
_____

**DECLARATION OF INGRID HSIEH-YEE, PH.D.**

Berkeley Lights Ex 1020
Berkeley Lights v UBC
1
Berkeley Lights v UBC

### B. Scope of This Declaration

**17.** I have been asked to offer an opinion on the authenticity and public availability date of the following documents:

(1) Park, J. Y., et al., (2010, Feb. 1), "Single cell trapping in larger microwells capable of supporting cell spreading and proliferation," *Microfluidics and Nanofluidics*, vol. 8, no. 2, pp. 263-268, obtained from the publisher on July 4, 2021, **Ex. 1006** ("*Park*");

(2) Kovac, J. R., & Voldman, J., (2007, Dec. 15), "Intuitive, image-based cell sorting using opto-fluidic cell sorting," *Analytical Chemistry*, vol. 79, no. 24, pp. 9321-9330, obtained from the Linda Hall Library on June 16, 2021, **Ex. 1007** ("*Kovac*");

(3) Han, C., et al., (2010, Nov. 7), "Integration of single oocyte trapping, in vitro fertilization and embryo culture in a microwell-structured microfluidic device," *Lab on a Chip*, vol. 10, no. 21, pp. 2848-2854, obtained from the Linda Hall Library on June 17, 2021, **Ex. 1009** ("*Han*");

(4) Di Carlo, D., & Lee, L. P., (2006, December), "Dynamic single-cell analysis for quantitative biology," *Analytical Chemistry*, vol. 78, no. 23, pp. 7918-7925, obtained on June 29, 2021, from the publisher's

Berkeley Lights Ex 1020
Berkeley Lights v UBC
12
Berkeley Lights v UBC

website at https://pubs.acs.org/doi/10.1021/ac069490p, **Ex. 1010** ("*Di Carlo*");

(5) Lecault, V., VanInsberghe, M., Sekulovic, S., Knapp, D. J., Wohrer, S., Bowden, W., ... & Hansen, C. L., (2011), "High-throughput analysis of single hematopoietic stem cell proliferation in microfluidic cell culture arrays," *Nature Methods*, vol. 8, no. 7, pp. 581-586, obtained from the publisher on July 4, 2021, **Ex. 1011** ("*Lecault*").

## C.  Evidence Considered in Forming My Opinions

**18.**    In the preparation of this declaration, I have reviewed the documents referenced below and any other documents I reference herein, and each of these is a type of material that experts in my field would reasonably rely upon when forming their opinions:

(1)    The document referenced above in Section I.B;

(2)    Publisher's website for *Park*, available at https://link.springer.com/article/10.1007%2Fs10404-009-0503-9, accessed and obtained on July 1, 2021, **Appendix 1006A**;

(3)    PubMed records for *Park*, available from PubMed at https://pubmed.ncbi.nlm.nih.gov/20352022/, accessed and obtained

Berkeley Lights Ex 1020
Berkeley Lights v UBC
13
Berkeley Lights v UBC

# IV. AUTHENTICATION AND PUBLIC AVAILABILITY OF *HAN* (EX. 1009)

## A. Authentication

**52.** **Ex. 1009** is a true and correct copy of "Integration of single oocyte trapping, in vitro fertilization and embryo culture in a microwell-structured microfluidic device," ("*Han*"), by Han et al., in *Lab on a Chip*, vol. 10, no. 21 (2010, Nov. 7), pp. 2848-2854, that I obtained from Linda Hall Library. When I began preparing this declaration I searched WorldCat by the title of *Han* for records, and the search results informed me that the Linda Hall Library held *Lab on a Chip* that contains *Han*. I searched their online catalog for records for this journal, and the search results confirmed the holdings information. I then requested a copy of *Han* from the Linda Hall Library Document Delivery Service and received the copy on June 17, 2021. This copy includes the *Han* article (downloaded from the online version of the journal) and the front matter of the print issue. This copy is presented as **Ex. 1009** in this declaration.

**53.** **Ex. 1009** is a true and correct copy of *Han*. Page 1 is the cover page that shows "Integration of single oocyte trapping, in vitro fertilization and embryo culture in a microwell-structured microfluidic device" is featured in *Lab on a Chip*, "2010, 10, 2848-2854" and the journal is published by RSC Publishing whose website is at www.rsc.org. Page 2 is the first page of *Han* (internal page 2848) that shows the authors, title, and abstract. It also shows the manuscript was "Received

Berkeley Lights Ex 1020
Berkeley Lights v UBC
39
Berkeley Lights v UBC

5th May 2010, Accepted 23rd July 2010" and the article's DOI (digital object identifier) is "10.1039/c005296e." The bottom of the page shows a "2010" copyright date, with The Royal Society of Chemistry as the copyright holder. **Ex. 1009** shows *Han* has a total of seven pages, including one equation, one table, five figures (some color) and 29 references.

54.     Page 9 is the cover of volume 10, no. 21 (7 November 2010) of *Lab on a Chip* that contains pages 2825-2996. It carries a date stamp of "LINDA HALL LIBRARY NOV 17 2010" that indicates the date when the library received this print issue. A tag line of "Micro- & nano- fluidic research for chemistry, physics, biology, & bioengineering" appears below the journal title. The cover also shows that the journal's ISSN is "1473-0197," the publisher is RSC Publishing, and this issue is the "10th Anniversary: Focus on China." Page 10 is the inside cover that shows the same information as the cover. The table of contents begins on page 11 and shows the journal's CODEN (six character unique serial identifier) is "LCAHAM" and the theme of this issue is "10TH ANNIVERSARY: FOCUS ON CHINA." It also shows a date stamp of "LINDA HALL LIBRARY NOV 17 2010." Page 12 is the publisher information page that shows the ISSN of the print version of *Lab on a Chip* is "1473-0197," the electronic version's ISSN is "1473-0189" and the journal "is published 24 times a year by the Royal Society of Chemistry" of Cambridge, UK. The table of contents continues from pages 12 to 18 of **Ex. 1009**.

Berkeley Lights Ex 1020
Berkeley Lights v UBC
40
Berkeley Lights v UBC

to the publisher's website to access the online version of *Han*, which had been published on the Web on September 15, 2010. If a user was affiliated with a library with a subscription to the online version of *Lab on a Chip*, the user would have been able to access *Han* freely. If not, the user could purchase *Han* from the publisher's website.

### D.    Citation Records for *Han*

**67.**    Actual usage of a publication is reflected by the papers that make reference to it. The citation history on Google Scholar shows *Han* has been cited at least 101 times and at least 12 times from 2010 to 2011. Excluding self-citations, I have selected three early citations (**Appendix 1009C**) to demonstrate usage. The earliest citation appeared in February 2011.

### E.    Summary of My Opinion on *Han*

**68.**    Taken together, the "NOV 17 2010" date stamp in **Ex. 1009**, the bibliographic and MARC records of the Linda Hall Library (**Appendix 1009A**), the PubMed record for *Han* (**Appendix 1009B**), my understanding of the ordinary and customary cataloging and processing practices of libraries, and my knowledge of scholarly publishing and indexing practices inform my opinion that vol. 10, no. 21 of *Lab on a Chip* that contains *Han* was published online on September 15, 2010. *Han* was also published in print in the November 7, 2010 issue of the journal, and a copy of the print journal was received by the Linda Hall Library on November 17,

Berkeley Lights Ex 1020
Berkeley Lights v UBC
48
Berkeley Lights v UBC

2010. As discussed above, a customary cataloging practice of serials is to create one record for the entire serial, without creating records for individual issues; and newly received serial issues usually go through a serial check-in process, then become available for user access soon after serial check in, usually on the same day and no later than a week. It is therefore my opinion that vol. 10, no. 21 (November 7, 2010) of *Lab on a Chip* (and *Han* contained therein) would have been publicly accessible at the Linda Hall Library as early as late November 17, 2010, and no later than November 24, 2010. The PubMed record for *Han* (**Appendix 1009B**) shows that the indexing of *Han* was completed on December 10, 2010. It is therefore my opinion that the PubMed record for *Han* would have been available to users on December 10 or 11 of 2010, and users would have been able to follow the full text link in the PubMed record to reach the publisher's website to access *Han*, because the online version of *Han* had been published on September 15, 2010. Citation history shows that the earliest citation to *Han* appeared in February 2011.

# Appendix B

Berkeley Lights Ex 1020
Berkeley Lights v UBC
94
Berkeley Lights v UBC

Library of Congress >> MARC >> Understanding MARC

# MARC 21 Reference Materials

Part VII: A Summary of Commonly Used MARC 21 Fields
Part VIII: A List of Other Fields Often Seen in MARC Records
Part IX: The Leader
Part X: Field 008 for Books

## Part VII:

## A Summary of
## Commonly Used MARC 21 Fields

**This is a summary of the MARC 21 tags used most frequently by libraries in entering their own bibliographic records.** For full listings of all MARC 21 tags, indicators, and subfield codes, see *MARC 21 Format for Bibliographic Data*.

In the explanations on these pages:

**Tags --** The tags (3-digit numbers) are followed by the names of the fields they represent. In this summary, and in the *MARC 21 Format for Bibliographic Data*, if a tag can appear more than once in one bibliographic record, it is labeled repeatable (R). If it can only be used once, it is labeled non-repeatable (NR). For example, a catalog record can have several subjects, so the tags for subject added entries (6XX) are labeled repeatable (R).

**Indicators --** The use of indicators is explained in fields where they are used. Indicators are one-digit numbers. Beginning with the 010 field, in every field -- following the tag -- are two character positions, one for Indicator 1 and one for Indicator 2. The indicators are not actually defined in all fields, however. And it is possible that a 2nd indicator will be used, while the 1st indicator remains undefined (or vice versa). When an indicator is undefined, the character position will be represented by the character # (for blank space).

**Subfield codes --** All the data in each field (beginning with the 010 field) is divided into subfields, each of which is preceded by a delimiter-subfield code combination. The most common subfield codes used with each tag are shown. Each subfield code is preceded by the character $, signifying a delimiter. The name of the subfield follows the code.

In general, every field MUST have a subfield 'a' (**$a**). One exception that is often seen is in Field 020 (ISBN), when the ISBN information (subfield **$a**) is unavailable but the price (subfield **$c**) is known. Some subfields are repeatable. In this summary, repeatability is noted for only the more common repeatable subfields.

**Examples:** Examples follow the explanation for each field. For clarity, one space has

Berkeley Lights Ex 1020
Berkeley Lights v UBC
95
Berkeley Lights v UBC

Appx2193

been placed between the tag and the first indicator, one space has been placed between the second indicator and the first delimiter- subfield code, and one space has been inserted between the delimiter-subfield code and the subfield data.

### 010 Library of Congress Control Number -- (LCCN)
(NR, or Not Repeatable

>*Indicators undefined.*
>*Subfield used most often:*
>>**$a** -- Library of Congress control number

```
   Example:    010 ##  $a ###86000988#
```

### 020 International Standard Book Number -- (ISBN)
(R, or Repeatable)

>*Indicators undefined.*
>*Subfields used most often:*
>>**$a** -- International Standard Book Number
>>**$c** -- Terms of availability (often a price)
>>**$z** -- Cancelled/invalid ISBN (R)

```
   Example:    020 ##  $a 0877547637
```

### 040 Cataloging source -- (NR)

>*Indicators undefined.*
>*Subfields used most often:*
>>**$a** -- Original cataloging agency
>>**$c** -- Transcribing agency
>>**$d** -- Modifying agency (R)

```
   Example:    040 ## $a DLC
                      $c DLC
                      $d gwhs
```

### 100 Main entry -- Personal name -- (primary author)
(NR; there can be only one main entry)

Berkeley Lights Ex 1020
Berkeley Lights v UBC
96
Berkeley Lights v UBC

Appx2194

*Indicator 1:* Type of personal name entry element
  0 -- Forename
  1 -- Surname (this is the most common form)
  3 -- Family name
*Indicator 2 undefined.*
  Indicator 2 became obsolete in 1990. Older records may display 0 or 1
*Subfields used most often:*
  **$a** -- Personal name
  **$b** -- Numeration
  **$c** -- Titles and other words associated with a name (R)
  **$q** -- Fuller form of name
  **$d** -- Dates associated with a name (generally, year of birth)

```
   Example:      100 1# $a Gregory, Ruth W.
                         $q (Ruth Wilhelme),
                         $d 1910-
```

## 130 Main entry -- Uniform title -- (NR)

*Indicator 1:* Nonfiling characters
  0-9 -- Number of nonfiling characters present (for initial articles, including spaces)
*Indicator 2 undefined.*
  Indicator 2 became obsolete in 1990. (See 100 above.)
*Subfields used most often:*
  **$a** -- Uniform title
  **$p** -- Name of part/section of a work (R)
  **$l** -- Language of a work
  **$s** -- Version
  **$f** -- Date of a work

```
   Example:      130 0# $a Bible.
                         $p O.T.
                         $p Psalms.
```

## 240 Uniform title (NR)

*Indicator 1:* Uniform title printed or displayed
  0 -- Not printed or displayed
  1 -- Printed or displayed (most common)
*Indicator 2:* Nonfiling characters

Berkeley Lights Ex 1020
Berkeley Lights v UBC
97
Berkeley Lights v UBC

Appx2195

0-9 -- Number of nonfiling characters present (for initial articles, including spaces)

*Subfields used most often:*

**$a** -- Uniform title

**$l** -- Language of a work

**$f** -- Date of a work

```
Example:    240 10 $a Ile mystérieuse.
                   $l English.
                   $f 1978
```

### 245 Title Statement (NR)

*Indicator 1:* Title added entry

(Should the title be indexed as a title added entry?)

0 -- No title added entry

(indicates a title main entry; i.e. no author is given)

1 -- Title added entry

(the proper indicator when an author given in 1XX; the most common situation)

*Indicator 2:* Nonfiling characters

0-9 -- Number of nonfiling characters present, including spaces; usually set at zero, except when the title begins with an article; e.g., for *The robe*, the second indicator would be set to 4. The letters *T, h, e,* and the space following them are then ignored in alphabetizing titles. The record will be automatically filed under "*r*" -- for *Robe*.

*Subfields used most often:*

**$a** --    Title proper

**$h** --    Medium (often used for non-book media)

**$p** --    Name of part/section of a work (R)

**$b** --    Reminder of title (subtitles, etc.)

**$c** --    Remainder of title page transcription/Statement of responsibility

```
Example:    245 14 $a The DNA story :
                   $b a documentary history of gene
                   cloning /
                   $c James D. Watson, John Tooze.
```

### 246 Varying form of title (R)

Berkeley Lights Ex 1020
Berkeley Lights v UBC
98
Berkeley Lights v UBC

Appx2196

*Indicator 1:* Note/title added entry controller
    1 -- Note, title added entry
    3 -- No note, title added entry
*Indicator 2:* Type of title
    # -- No information provided
    0 -- Portion of title
    1 -- Parallel title
    4 -- Cover title
    8 -- Spine title
*Subfield used most often:*
    **$a** -- Title proper

```
   Example:    246 3# $a Four corners power review
```

## 250 Edition statement (NR)

*Indicators undefined.*
*Subfield used most often*:
    **$a** -- Edition statement

```
   Example:    250 ## $a 6th ed.
```

## 260 Publication, distribution, etc. (Imprint) (R)

*Indicator 1:* Sequence of publishing statements
    # -- No information provided
*Indicator 2: Undefined*
Subfields used most often:
    **$a** -- Place of publication, distribution, etc. (R)
    **$b** -- Name of publisher, distributor, etc. (R)
    **$c** -- Date of publication, distribution, etc. (R)

```
   Example:    260 ## $a New York :
                   $b Chelsea House,
                   $c 1986.
```

## 300 Physical description (R)

Berkeley Lights Ex 1020
Berkeley Lights v UBC
99
Berkeley Lights v UBC

Appx2197

1  U.S. PATENT AND TRADEMARK OFFICE
2  BEFORE THE PATENT TRIAL AND APPEAL BOARD
3  IPR2021-01249
4  U.S. Patent No. 10,087,408
5  ----------------------------------x

   BERKELEY LIGHTS, INC.,

6
            Petitioner,

7

8
        - against -

9

10

   THE UNIVERSITY OF BRITISH COLUMBIA,

11

            Patent Owner.

12  ----------------------------------x
              August 3, 2022
13              9:13 a.m.

14

15

16      Deposition of BRUCE K. GALE, Ph.D.,
17  taken by Petitioner, pursuant to Notice,
18  held at the offices of Paul Hastings LLP,
19  200 Park Avenue, New York, New York, before
20  Todd DeSimone, a Registered Professional
21  Reporter and Notary Public of the State of
22  New York.
23

24

25

Veritext Legal Solutions
866 299-5127

Berkeley Lights Ex 1038
Berkeley Lights v UBC
IPR2021-01249

```
 1   A P P E A R A N C E S :
 2   IRELL & MANELLA LLP
     1800 Avenue of the Stars
 3   Suite 900
     Los Angeles, California 90067
 4        Attorneys for Petitioner
     BY:    ANDREW KRAUSE, ESQ.
 5           akrause@irell.com
 6
 7
     PAUL HASTINGS LLP
 8   200 Park Avenue
     New York, New York 10166
 9        Attorneys for Patent Owner
     BY:    MAX H. YUSEM, ESQ.
10           maxyusem@paulhastings.com
11
             - and -
12
13   PAUL HASTINGS LLP
     2050 M Street NW
14   Washington, DC 20036
     BY:   DANIEL ZEILBERGER, ESQ.
15          danielzeilberger@paulhastings.com
           (Via Telephone)
16
17
18   QUINN EMANUEL URQUHART & SULLIVAN, LLP
     51 Madison Avenue
19   New York, New York 10010
             Attorneys for Patent Owner
20   BY:     ERIC STOPS, ESQ.
              ericstops@quinnemanuel.com
21
22
23
24
25
```

Page 2

Berkeley Lights Ex 1038
Berkeley Lights v UBC
IPR2021-01249

Appx2613

```
 1        Q.       And is it common to move cells
 2   around the 96 well plates?
 3                 MR. YUSEM:  I object to form.
 4        A.       It depends on the application.
 5   Sometimes you move things, sometimes you
 6   don't.
 7        Q.       And in some of those
 8   applications where people moved things from
 9   well to well, did they use a micropipette
10   to do so?
11                 MR. YUSEM:  I object to form.
12        A.       Again, it depends on the
13   application.  There are instances where
14   pipettes are used to move cells in and out
15   of 96 well plates.
16        Q.       And people did that before
17   2010, correct?
18        A.       Again, it depends on the
19   application, it depends on the
20   circumstance, but there were times before
21   2010 where cells were moved around using
22   micropipettes.
23                 MR. KRAUSE:  We have been going
24   about an hour.  Is this a good time to take
25   a break?
```

Page 39

Berkeley Lights Ex 1038
Berkeley Lights v UBC
IPR2021-01249

Appx2650

# UNITED STATES PATENT AND TRADEMARK OFFICE

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BERKELEY LIGHTS, INC.,

Petitioner,

v.

THE UNIVERSITY OF BRITISH COLUMBIA,

Patent Owner.

_____

IPR2021-01249
U.S. Patent No. 10,087,408

_____

## DECLARATION OF CARL MEINHART IN SUPPORT OF PETITIONER'S REPLY

Mail Stop: PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

11119932

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

## 2. A POSA would not have read Dimov in the narrow manner urged by Dr. Gale.

10. In my opinion, Dr. Gale concludes that Dimov does not disclose or allow the selective recovery of cells from individual chambers of its devices based on a reading of Dimov that is in many ways inconsistent with how a POSA would have read the reference.

### a) A POSA would have already known how to employ the techniques listed by Dimov.

11. Dr. Gale suggests that Dimov does not disclose selective recovery using the aforementioned techniques because "Dimov does not disclose any examples where any of the nine exemplary techniques is used to manipulate particles in any way." Ex. 2012 at ¶ 64. However, techniques listed by Dimov—like laser tweezers– were well-known in the art, and a POSA would have known how to use them, including with microfluidic devices.

12. As particularly relevant here, laser tweezers (which are interchangeably referred to in the literature, and in this proceeding by both me and Dr. Gale as "optical tweezers") have been known since at least the 1970s. As Dr. Gale concedes, a POSA would have known that in the 3D trapping mode, "[l]aser tweezers are specifically used for trapping particles, such as cells, at a specific location in 3D space and then moving them around by moving the 'trap' location relative to the fluid device." Ex. 2012 (Gale Decl.) at ¶ 117. *See also* Ex. 1002 (Meinhart Decl.) at ¶ 89

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

("Optical tweezers have been used since the 1970s to manipulate the position of micron-sized particles in three dimensions using focused light beams."). Thus, in the context of Dimov, a POSA would have known that to implement laser tweezers with Dimov's devices, the POSA could use them in conjunction with a microscope, trap the "particles, such as cells" using the focused laser beam, and "mov[e] the 'trap' location relative to the fluid device," such as Dimov's devices, in order to remove such cells from Dimov's trenches. Ex. 2012 at at ¶ 117.

**b) Dimov's disclosure of selective recovery is not limited to biomimetic experiments.**

13.     Dr. Gale argues that Dimov's express disclosure of selectively removing particles from trenches is limited to biomimetic experiments in which the particles are cells layered in the trenches. Ex. 2012 (Gale Decl.) at ¶ 60. He states that "[p]art of the relied-upon passage plainly states that 'the arrangements described herein preferentially ***retain*** the particles ***within*** the trench," and that "it is ***possible to modify*** the arrangement so as to provide for subsequent movement of the particles." *Id.* (citing Ex. 1003 (Dimov) at 11:21-26) (emphasis Dr. Gale's). Thus, Dr. Gale argues that "the focus is on what remains inside the capture chamber/trench," and that "any removal would be removal of unwanted particles from the capture chamber/trench." *Id.*

- 6 -

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

on-a-chip" devices would preclude applications in which cells are recovered is clearly incorrect.

30.     Moreover, Dr. Gale confirmed at deposition that the journal *Lab on a Chip* is "a prestigious journal in microfluidics," Ex. 1038 (Gale Tr.) at 123:4-8, and agreed "[t]he focus of the journal is lab on chip devices." *Id.* at 123:14-16. Han, which expressly contemplates the removal of cells from its device, was published in *Lab on a Chip*. Moreover, Han expressly described its device and methods as "a 'lab-on-a-chip' technology." Ex. 1009 (Han) at 2848.

### d)     The structure of Dimov's devices do not foreclose selective recovery.

31.     Dimov describes examples of retaining and analyzing cells within chambers that in no way preclude further analysis of cells recovered from the device. *See* Ex. 1002 at ¶¶ 79-82, 92.

### (1)     The channel structures in exemplary embodiments of Dimov do not preclude selective recovery.

32.     Dr. Gale places great emphasis on exemplary fluid pathways depicted in Dimov in support of his arguments that one skilled in the art would not have been motivated to recover cells from the device. For example, he states that "Dimov describes the configuration of the multiplex device that shares a common waste as 'advantageous[.]'" Ex. 2012 (Gale Decl.) at ¶ 63. Dimov discloses:

> Where a plurality of arrays are provided along a common axis, they may advantageously be configured so as to share a common waste. In this exemplary arrangement the common output 130 for each row is then in fluid communication with common waste 140 for the multiplexed structure.

Ex. 1003 (Dimov) at 4:18-22. By indicating that its devices "may advantageously be configured" in certain circumstances in a manner that uses a "common waste," however, Dimov is making clear that its device can also be configured in ways in which dedicated waste lines are used, as distinct from "this exemplary arrangement." Dimov thus clearly envisions and discloses to a POSA arrangements or embodiments in which each capture chamber or subset of capture chambers has its own dedicated output or waste line. Dimov's disclosure also readily suggests an alternative embodiment in which the "common output 130 for each row" remains an independent structure, rather than joining in fluid communication with other outputs.

33.     Moreover, even in situations where the structure does make use of a "common waste," which is really just a "common output," Dimov's devices can still be utilized for the selective recovery of cells. *See* Ex. 1003 (Dimov) at 4:18-22 ("In this exemplary arrangement the common output 130 for each row is then in fluid communication with common waste 140 for the multiplexed structure."). The labels placed on particular aspects of a device do not preclude their use for other functions. Dr. Gale himself recognized this when explaining that the '408 patent describes

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

"inverting the contents and then flowing the device backwards to recover the cells of the input port." Ex. 1038 (Gale Tr.) at 123:25-124:6. In the instance described by Dr. Gale here, the "input port" is of course being used as an "output port." Regardless of the label used, Dimov's "common waste" is merely an output port when it is located on the downstream side of fluid flow through the device.

34.     Moreover, if a POSA would have desired to branch an output line in Dimov's devices into separate waste and recovery lines, as described in Kovac, a POSA would have been well aware of how to do so. For example, a POSA would have known ways to manage fluid lines in order to branch one line into two, or two lines into one, using Y-connectors. *See* Ex. 1038 (Gale Tr.) at 45:25-46:3 ("[T]here are ways to use a Y connector to take some tubing and split it into two or combine two into one for that matter."). The fluid flow and selection of which line to use could be readily controlled using routine methods, such as the use of valves and/or hemostats to guide the direction of flow to a particular line.

35.     In addition, even when used as a "waste" port, the "waste" being expelled from the device is fluid that previously coexisted with the cells. Thus, this fluid is unlikely to cause harm or otherwise perturb cells that remain within it. Much of Dr. Gale's argument on this point stems from his argument that lysis agents or other harmful compounds would necessarily be present in the device. But since Dimov's devices need not be used to conduct lysis experiments, as discussed below,

a POSA would have been able to conduct experiments in the device without introducing lysis agents into the device, Dr. Gale's hypothetical concerns about stray lysis agents from elsewhere in the device mixing with cells intended to be selectively recovered are therefore off base. Accordingly, a POSA would have been able to readily make use of a common output or common waste of Dimov's devices to recover levitated cells.

36.    Dimov's microfluidic devices are not structured in a way that precludes selective recovery. Dr. Gale contends that:

> [T]he channels leading out of the structure 100 to the output are very long and convoluted, which also would not be conducive to recovery of viable cells as the lengths of the channels and regular changes in flow direction result in increased time of recovery which introduces complications such as loss of cells to interior walls, an inability to follow any specific cells of interest, significant dilution, shear stresses, and congestion which can be associated with completely losing the cells of interest or at least an increased time of recovery.

Ex. 2012 (Gale Decl.) at ¶ 63; see also ¶ 81 (referring to alleged "existence of very long, maze-like waste channels that lead to a single common waste output").

37.    As Dr. Gale agreed at deposition, however, Dimov includes depictions of channels leading *into* the structures "100" that also contain multiple branches and changes of flow direction. Ex. 1003 (Dimov) at Fig. 1; Ex. 1038 (Gale Tr.) at 52:25-

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

53:14 ("Yeah, the feed lines are – there is multiple branches before any trenches occur."). Dimov did not report any issues with loss of cells to interior walls, an inability to follow any specific cells of interest, significant dilution, shear stresses, and congestion with respect to these branched input structures, which in the multiplexed examples upon which Dr. Gale relies, are depicted to be substantially similar to the output structures on the opposite side of the capture chambers. Dr. Gale does not dispute that Dimov's devices are able to successfully load cells into capture chambers through the input port; rather, he repeatedly refers to Dimov's ability to seed and retain cells in such chambers. *See also* Ex. 1038 (Gale Tr.) at 53:9-21 (stating that he did not "specifically recall" if Dimov reported "any cell blockages or other negative consequences arising from" the branched "fluid paths leading from the input port to the capture chamber.").

> **(2)** **Dimov's use of multiplexing and/or branched fluid lines in exemplary embodiments does not preclude selective recovery.**

38.    Dr. Gale contends that features of Dimov's fluid network allegedly "show[] that the Dimov device is not designed for recovery of intact cells." I disagree, including because Dr. Gale incorrectly opines that Dimov only discloses a single structure for its devices.

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

39.    Dr. Gale confirms that Dimov's "device *can* include a multiplex of arrays that all likewise share a common output." Ex. 2012 (Gale Decl.) at ¶ 24 (emphasis added). He further acknowledges that:

> Figures 1 and 2 show how Dimov configured the devices into multiple arrays that were integrated into a multiplexed structure. [Dimov] at 3:54-56. Figures 1 and 2 provide 512 identical devices multiplexed into a single monolithic device. *Id.* at 3:56-62.

*Id.* at ¶ 30.  As I explained at my deposition, Dimov states that its Figures 1 and 2 "show an exemplary structure incorporating a microfluidic device in accordance with the present teaching." Ex. 2010 (Meinhart Tr.) at 218:2-9. I further explained that "my read on that is it's an example of the structure, not the structure," or in other words, that Dimov is expressly disclosing to POSAs that there's more than one way to fabricate devices according to its teachings. *Id.*

40.    A POSA would have understood that, by explaining that multiplexing capture chambers into arrays is an option, Dimov is teaching that multiplexing is not always required. At deposition, Dr. Gale stated that "Dimov always shows this [i.e., the device] as an array, and I hadn't really thought about whether you could make one by itself and what impacts that would have on the device." Ex. 1038 (Gale Tr.) at 52:3-7; see also *id*. at 51:11-14 (Q. Does Dimov always require using this many arrays to form its device? A. I don't specifically recall what Dimov stated about

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

numbers of devices.); 51:15-52:10. But in addition to repeatedly identifying multiplexed embodiments as "exemplary," Dimov expressly states that its "devices may be provided in ***single element packages*** or could be arranged in array structures where a plurality of devices share a common input." Ex. 1003 (Dimov) at 13:46-49 (emphasis added). As an example, Figure 25, which according to Dr. Gale is the only way that Dimov depicts how to manufacture its device, shows a device with a single trench (i.e. a "single element package"), and not an array of trenches. *Id.* at Fig. 25. Those skilled in the art would have been readily able to fabricate Dimov's devices with varying numbers of microwells/trenches according to well-known techniques.

41.     Dimov does not require multiplexing at all, much less to the extent depicted in Figure 1, and thus branched fluid lines are not a requirement for utilizing Dimov's devices to capture, analyze, and subsequently remove cells. Indeed, Dr. Gale stated that Figure 25 of Dimov was "the example that they provide" for how to construct the device and that he was "not aware of any other examples that they provided," Ex. 1038 (Gale Tr.) at 59:3-9, and Figure 25 shows an embodiment of Dimov's devices in which there is a single trench/capture chamber with a dedicated input and output. Ex. 1003 (Dimov) at Fig. 25 (annotated below); *see also id.* at 13:46-47 (teaching that "devices may be provided in single element packages"). Dimov is teaching that its devices can be made with one trench, or alternatively, a

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

POSA could implement similar fabrication strategies to manufacture devices with more than one trench, including in arrays of various sizes.



42.     Column 15 introduces Figure 25 by stating that "[w]hile a sequential multi-flow array may be fabricated in any one of a number of methodologies, FIG. 25 shows an exemplary flow sequence that may be adopted to advantageously simplify the alignment and complexity of manufacture." *Id.* at 15:27-31. Accordingly a POSA would understand that Dimov is explaining methods of making its devices in ways that include a single trench, as well as arrays of two or more trenches.

**(3)     The PDMS fabrication of Dimov's devices allows selective recovery.**

43.     Dimov describes its device as made of PDMS. In his declaration, Dr. Gale states that "it was known that PDMS had a number of limitations." Ex. 2012 (Gale Decl.) at ¶ 85. But he confirmed at deposition that by 2009 or earlier, those

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

skilled in the art regularly used PDMS to manufacture microfluidic devices similar to Dimov's:

> Q. So the layers of the Dimov device are made out of PDMS, correct?
>
> A. That's correct.
>
> Q. And at the time Dimov was filed those skilled in the art commonly used PDMS to create microfluidic devices?
>
> A. Yeah, **PDMS was used regularly for these kind of devices**.

Ex. 1038 (Gale Tr.) at 59:10-17 (emphasis added).

44.     And although Dr. Gale suggests that PDMS has limitations, nowhere does Dr. Gale contend that using PDMS would be inconsistent with selective recovery. Nor could it, given that the device of the '408 patent is described as being made of PDMS too. Dimov's PDMS top layer permits direct access to trenches, as in the '408 patent itself. *See* Ex. 1003 (Dimov) at FIG. 25. As I observed in my opening declaration, Dimov describes a number of methodologies for manufacturing its devices, which are not limited to sealed devices, and do not foreclose piercing the top layer of PDMS. Ex. 1002 (Meinhart Decl.) at ¶¶ 50; 58 ("Dimov explains that '[t]he fabrication of devices provided in accordance with the present teaching may be effected using one of a number of different processes,' including injection moulding, hot embossing, thermoforming, precision engineering, laser ablation, lamination, lithography, dry and wet etching, and 'other microfabrication schemes including sealing schemes as will be appreciated by those skilled in the art.' [Ex.

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

1003] at 13:23-37."); ¶ 120 ("[A] POSA would have had a reasonable expectation of success in piercing the top layer of PDMS, or only partially bonding the two PDMS layers and peeling back the top layer, and aspirating one or more cells from the trench in Dimov using a micropipette.").

45. Dr. Gale agreed at deposition that those skilled in the art would have been familiar with a number of well-known techniques for fabricating multilayered microfluidic devices using PDMS, consistent with Dimov's instruction to use any one of a number of well-known manufacturing techniques. Specifically, Dr. Gale 'testified, consistent with Dimov, that "there were a variety of methods available for building PDMS devices." Ex. 1038 (Gale Tr.) at 59:18-25. He further confirmed that "there are a variety of different ways to bond PDMS" that would result in layers with different bonding strengths, *id.* at 60:1-7, and specifically noted that by 2009, "ways to make microfluidic devices that have multiple layers" were known. *Id.* at 60:8-15. Indeed, with respect to his own lab, Dr. Gale testified that "By 2009 we had used PDMS to make multilayer devices for our own applications." *Id.* at 60:16-20.

46. Moreover, in his lab, Dr. Gale's "graduate students would do most of the manufacturing," *id.* at 60:21-25, indicating that the fabrication of these devices was routinely performed by those with lower levels of skill and experience than the POSA defined for these proceedings. *See* Ex. 1002 (Meinhart Decl.) at ¶ 40 (in addition to an undergraduate degree, the POSA would have had "at least three to five

years of experience with the construction and application of microfluidic devices to cell culture and analysis."). This is true in my own lab as well, where device fabrication is typically performed by graduate students, or even undergraduate students, having a level of experience below that of a POSA in this case. The delegation of the manufacture of these devices to less experienced individuals confirms the routine nature of implementing such manufacturing processes.

47.     Consistent with the POSA's knowledge of various PDMS fabrication schemes at the time the '408 application was filed, Dimov, by its own terms is not limited to sealed devices. For example, it lists "sealing schemes" as one option among the many known techniques available for constructing its devices. As Dr. Gale and I agree, by 2009, there were many well-known ways of manufacturing multi-layer devices from PDMS, including ways of varying the bonding strength between layers. In this way, a POSA would have been able, using the known-methods referenced by Dimov, to manufacture Dimov's devices in a manner that would allow access to the microwells, such as by making the top layer removable or able to be peeled back. In sum, Dimov's devices can be manufactured by any number of well-known methodologies that were familiar to POSAs. *See, e.g.,* Ex. 1002 (Meinhart Decl.) at ¶¶ 58, 112-120.

48.     With such access to the microwells, a POSA would have been able to routinely recover cells of interest from microwells using a micropipette. Dr. Gale

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

and Kovac both confirm my opinion that removing cells from a microwell device using a micropipette was well known before the priority date. *See* Ex. 1038 (Gale Tr.) at ("[T]here were times before 2010 where cells were moved around using micropipettes."); Ex. 1007 at 9327-28 ("[A] simple pipetting step . . . is standard lab practice and unlikely to damage cells.").

### (4) Dimov's devices were used for experiments that did not involve cell lysis agents.

49. Dr. Gale relies heavily on the fact that Dimov discloses some experiments in which lysis agents are used to argue that one skilled in the art would not have been motivated to selectively recover cells from Dimov's devices. *See, e.g.,* Ex. 2012 (Gale Decl.) at ¶¶ 33-34, 61, 80. It does not follow, from Dimov's disclosure of certain examples involving lysing cells in trenches, that Dimov's devices—which Dimov also describes using without lysing—are inconsistent with selective recovery. *See, e.g.,* Ex. 1002 (Meinhart Decl.) at ¶¶ 49; 78-83.

50. At deposition, Dr. Gale agreed that, at a minimum, "there is an example where the cells are not lysed." Ex. 1038 (Gale Tr.) at 55:15-20. He further conceded that "[t]here are some applications in Dimov that don't require lysis." *Id*. at 56:2-5; *see also id*. at 57:11-15 ("There may be instances where you can do the analysis without lysing the cells.").

11119932

\- 26 -

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

Appx2836

Decl.) at ¶¶ 18, 58, 70, 87 (disputing only that Dimov discloses element [1E] of claim 1).

58.    Moreover, Dr. Gale admits reasons why a POSA would have started with Dimov and Park. For example, Dr. Gale admits that Dimov "describes conducting experiments on the captured cells within the capture chamber/trench." Ex. 2012 at ¶ 34. He then notes that "Dimov includes several examples of applying this kind of 'lab on chip' analysis using its device." *Id.* As I note above, the "lab on chip" label does not preclude a subsequent step of selectively recovering a cell from Dimov's devices. Dr. Gale does not dispute or question that Dimov discloses devices for capturing a cell or cells in the trenches, culturing a cell or cells in the trenches, exposing a cell or cells to different reagents in the trenches, and/or monitoring a response of a cell or cells in the trench.

59.    Moreover, as discussed above, Dimov itself discloses the selective recovery of cells by removing them from individual trenches. *See* Ex. 1003 (Dimov) at 11:21-30. This further confirms that Dimov's devices are an appropriate starting point for methods of use that include a step of selective cell recovery.

> **b)    A POSA would have based selective cell recovery in Dimov's devices on a monitored response in the trenches.**

60.    If a POSA would not have understood the selective recovery disclosed by Dimov to be based on the monitored response disclosed by Dimov, then it would

- 30 -

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

have been obvious for a POSA to base the selective recovery on the response. *See* Ex. 1002 (Meinhart Decl.) at ¶¶ 106-110. The POSA would have been motivated to do so "to make use of Dimov's individual trench monitoring" by basing the selective recovery "on a response observed through such monitoring." *Id.* at ¶108; *see also* Ex. 2010 (Meinhart Tr.) at 195:12-18 ("[S]o the monitoring of the cells, a POSA would know that if you monitor cells, from monitoring cells, they may want to recover the cell and do some other analysis with the cell.").

61.　　Additionally, the '408 patent application observed, as of its priority date, that:

> Cell recovery is often required to enable functional assays to be performed on the progeny of the input cells, or to select cells of interest for larger scale culture. A method to recover defined clonal populations is therefore a critical requirement for many applications of microfluidic cultures.

Ex. 1001 at 26:1-6. This is not a description of the experiments performed in the '408 patent, but rather is a statement by the applicants about what was already known in the art at the time they made their filing.

62.　　Dr. Gale does not dispute that Dimov discloses monitoring a response in the trenches of its devices. Ex. 2012 (Gale Decl.) at ¶ 75. Instead, he first argues that a POSA would not have modified Dimov's devices based on his contentions that Dimov "does not disclose or include any example of the removal of cells from "a

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

capture chamber/trench." *Id.*; *see also id.* ¶¶ 74-78. I disagree for the same reasons set forth in Section III.A above.

63.     Dr. Gale next argues that because Dimov allegedly does not "disclose or suggest removing macrophages or any cells," and because the monitoring steps occur within the chamber, that a POSA would not have had a reason to selectively recover such cells. Ex. 2012 (Gale Decl.) at ¶ 79. In my opening declaration, I explained that observing a high surface protein concentration on macrophages in Dimov's experiment using fluorescently-labeled anti-CD86 antibodies would have motivated a POSA to remove one or more macrophages for further characterization, such as by sequencing, and that it would have been obvious to selectively recover, based on detected fluorescence, one or more cells from a trench in Dimov's protein analysis experiments. *See* Ex. 1002 (Meinhart Decl.) at ¶¶ 92-93, 100, 106, 108-110.

64.     Dr. Gale states that these experiments were "conducted for "the purpose of demonstrating that the Dimov device can be used for 'real-time measurement,' including 'real-time surface protein expression detection' within the capture chamber/trench." Ex. 2012 (Gale Decl.) at ¶ 80. Dr. Gale does not dispute that these experiments demonstrate monitoring a response in the trenches of Dimov's devices. Nor does he dispute that the results of such experiments will show different responses in different trenches, such that a POSA would have been interested in

learning more about cells with "[a] particularly high surface protein concentration observed via fluorescence." Ex. 1002 (Meinhart Decl.) at ¶¶ 109-110.

65.     Instead, Dr. Gale reiterates his arguments about the structure of Dimov's devices, Dimov's alleged focus on retaining cells, and Dimov's use of lysis reagents in some experiments. These arguments lack merit for all the reasons previously stated. Notably, the protein analysis workflows of Dimov do not utilize lysis agents. *See* Ex. 1003 (Dimov) at Fig. 24. Moreover, the fact that some analyses, such as sequencing, may be performed in the chamber, does not mean that a POSA would not have also been motivated to perform such analyses (or different analysis) off-chip, including because doing so would allow further use of the cell for subsequent investigation.

66.     Moreover, while Dr. Gale contends that a POSA would allegedly not have been motivated to selectively recover cells for sequencing, he does not dispute that a POSA would have been motivated to selectively recover interesting cells for expansion. Nor does he allege that expansion of such cells would have or could have been performed within Dimov's trenches. *See* Ex. 1002 (Meinhart Decl.) at ¶¶ 110-111 ("[F]urther study could have included . . . expansion of the cell, via conventional cell culture techniques, into a larger population of cells for further analysis.").

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

67.     Dr. Gale's declaration also implies that Dimov's disclosure of using a "fixing buffer" is a disclosure that such buffers are used to attach cells to a physical location in the device:

> For example, in the experiment in column 15, the protein analysis cited by Dimov expressly states that "a fixing buffer is introduced to fix the cells within the chamber" prior to introducing antibodies for immunostaining into the chip *Id.* at 15:21-22. Here, a POSA would have understood that Dimov is expressly teaching retaining cells in the capture chambers/trenches, not the removal of cells, much less selectively [sic] recovery of cells.

Ex. 2012 (Gale Decl.) at ¶ 80. But "fixing buffer" is not a buffer that is used to attach a cell in a particular location; rather it is a reagent used to lock the chemical state of a cell in place at a particular time point. Dr. Gale conceded this at his deposition. Ex. 1038 (Gale Tr.) at 77:19-21 ("Fixing buffer generally refers to whatever state the cell is in is preserved, kept, locked.").

68.     Finally, Dr. Gale opines that "the existence of very long, maze-like waste channels that lead to a single common waste output, of Dimov would have led a POSA away from making any modifications to accommodate selective recovery of cells from its capture chambers/trenches." Ex. 2012 (Gale Decl.) at ¶ 81. But a POSA concerned about selectively recovering cells through such output channels would readily have recognized that one such (easy) modification would be to make

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

the output channels shorter and not "maze-like," such as those exemplified in Figure 25. Even if Dr. Gale's argument were correct, it is inapplicable to at least the direct recovery of cells from the individual trenches of Dimov's devices. Dr. Gale does not meaningfully dispute this. Accordingly, the fluid architecture described in some embodiments of Dimov's devices would not, in any event, have led a POSA away from manufacturing Dimov's devices in a manner that facilitated direct access to the trenches for selectively recovering a cell or clonal population of cells.

> **2.** **A POSA would have been motivated to modify Dimov in the manner I have proposed.**

69. Dr. Gale first argues that "a POSA would not have been motivated to use a micropipette and insert it into a trench of the Dimov device to aspirate one or more cells, as suggested by Dr. Meinhart. Ex. 1002 at ¶ 111." Ex. 2012 (Gale Decl.) at ¶ 83. Dr. Gale argues that Dimov itself does not disclose micropipetting cells out of a trench, and so POSA would not have been motivated to do so. But techniques like micropipetting were well known in the art. For example, Dimov discloses loading fluids into its devices using pipettes, *see, e.g.,* Ex. 1003 (Dimov) at 8:36-40, and the prior art describes "[c]ell retrieval from [a] device" using "a simple pipetting step, which is standard lab practice." Ex. 1007 (Kovac) at 9327-28. Further, Dr. Gale acknowledges that "there were times before 2010 where cells were moved around using micropipettes." Ex. 1038 (Gale Tr.) at 39:18-22. Thus, even if selective cell

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

recovery were not disclosed by Dimov, using a micropipette to selectively recover cells from a trench in one of Dimov's devices would have been obvious to a POSA.

70.　Dr. Gale next argues that "a POSA would not have been motivated to modify the Dimov device and construct a device with a top layer that can be peeled back, as suggested by Dr. Meinhart. Ex. 1002 at ¶ 112." Ex. 2012 at ¶ 84. Dr. Gale's conclusion is based on a narrow reading of Dimov itself, and based on ignoring PDMS manufacturing techniques that were well known in the art.

71.　Dr. Gale states that "[w]ith the exception of access to the input and common output, the device [of Dimov] is sealed. *See* Figs. 1-4, 7, 25." Ex. 2012 (Gale Decl.) at ¶ 30. The only basis he provides for the conclusion that the device is sealed is a "see" citation to unspecified portions of various figures. At deposition, Dr. Gale testified that "in column 15, it talks about where the device is fabricated," quoting language from column 15:34-46, and stating, "[t]hen if you look at Figure 25, it is clear that the layers are assembled and put together such that they are sealed." Ex. 1038 (Gale. Tr.) at 58:14-59:2. He then testified that he "was not aware of any other examples that they provided" for how to fabricate the device. *Id*. at 59:3-9 (Q. And is it your opinion that that's the only way to construct Dimov's device? A. I mean, this is the example that they provide here, that they provide a sealed device. I'm not aware of any other examples that they provided.").

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

72.     Dr. Gale reads too much into FIG. 25. The figure itself does not indicate sealing or the lack thereof, and Dimov's description of FIG. 25 says nothing about sealing. Rather, it merely teaches "bringing the first and second layers together and assembling them relative to one another onto a glass substrate." Ex. 1003 (Dimov) at 15:43-46. A POSA would have understood that although this encompasses sealing, it is not limited to it. Partial bonding of the PDMS layers, such that the top layer is removable, also is encompassed. But even if Dr. Gale were right that "the layers are assembled and put together such that they are sealed," the earlier portions of the paragraph Dr. Gale referenced make clear that what he identified is just one example of how Dimov disclosed manufacturing its device; the portion of Dimov he cited states that its devices "may be fabricated in any one of a number of different methodologies," and that "FIG. 25 shows an exemplary flow sequence that may be adopted . . . ." Ex. 1003 (Dimov) at 15:28-33.

73.     As I observed in my opening declaration, and as explained in detail above in Section III.A.2.d)(3) ("The PDMS fabrication of Dimov's devices allows selective recovery."), Dimov describes a number of methodologies for manufacturing its devices, which include methodologies for manufacturing the device to allow access to the microwells.

74.     In my opening declaration, I cited the Han reference as additional evidence confirming the POSA's knowledge of how to use a micropipette to recover

a cell or cells from wells of a device and of how to partially bond layers of PDMS such that a top layer could be peeled back to expose the microwells or trenches. Here, although Han arguably was published after the earliest priority date claimed by Patent Owner, it reports on a study done before that date, as evidenced by the record that it was "Received 5th May 2010." Ex. 1009 (Han) at 2848.

75.    A POSA would have understood that the "received date" of a journal article corresponds to the date the journal received the paper from the authors. *See* Ex. 1038 (Gale Tr.) at 77:24-78:12 (confirming that the "received" date is "when the journal received the article."). When an article is submitted, the experiments have already been performed. Han reports that it was "accepted" for publication on July 23, 2010. Ex. 1009 (Han) at 2848. The accepted date is "when they essentially said they would agree to publish it." Ex. 1038 (Gale Tr.) at 78:17-18. In between the submission and acceptance date, there is typically a peer review process that involves some textual edits and edits to the data analysis. *See* Ex. 1038 (Gale Tr.) at 78:25-79:3. However, it is in my opinion highly unlikely that substantial new experiments would have been conducted in the short time period between Han's submission and acceptance, and even less likely that the authors of Han constructed a new microfluidic device in that time. *See* Ex. 1038 (Gale Tr.) at 79:15-18 (Dr. Gale stating with respect to Park that "[i]t seems unlikely that there were a substantial

number of experiments done in" a time period of "one and a half months" between journal receipt and acceptance).

76.     Moreover, in my experience, when new experiments are called for by a journal during the peer review process, the article will typically bear a "resubmitted" date indicating when such resubmission occurred in light of new experiments. Han contains no such label. Finally, given that the subject matter of Han's article is "Integration of single oocyte trapping, *in vitro* fertilization in a microwell-structured device," in the unlikely event that any additional experiments did occur, they almost certainly did not relate to the manufacture of Park's device or its use of a micropipette, neither of which are the research focus of the article. Instead, Han's report of partially bonded PDMS and use of a micropipette to recover groups of cells are simply its report on the usage of common lab technique.

### 3.     Dr. Gale does not dispute that a POSA would have had a reasonable expectation of success.

77.     Dr. Gale does not contest that, assuming Dimov's devices allow direct access to individual trenches, a POSA would have had a reasonable expectation of success in selectively recovering a cell or clonal population of cells from an individual trench using a micropipette. With such access to the microwells, one skilled in the art would have been able to routinely recover cells of interest from microwells using a micropipette. Dr. Gale and Kovac both confirm my opinion that

- 39 -
Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

removing cells from a microwell device using a micropipette was well known before the priority date. See Ex. 1038 (Gale Tr.) at 39:18-22 ("[T]here were times before 2010 where cells were moved around using micropipettes."); Ex. 1007 (Kovac) at 9327-28 ("[A] simple pipetting step . . . is standard lab practice and unlikely to damage cells.").

78.     Moreover, Dr. Gale does not contend that a POSA's efforts in recovering cells from individual trenches of Dimov's devices using a micropipette would have been hampered by alleged adherence, adhesion, or attachment of the cells to the device. *Cf.* Ex. 2012 at ¶¶ 122-23 (contending that alleged adherence would hamper recover when using the combination of Dimov and Kovac).

### C.     Dimov in view of Kovac Discloses and/or Suggests Claim 1 of the '408 Patent

79.     Dr. Gale does not dispute that Dimov in view of Kovac discloses the preamble of claim 1 and claim elements 1[A]-1[D], as well as the limitations of dependent claims 6, 11, 19, 24, 26, 27, and 30. Ex. 2012 (Gale Decl.) at ¶ 87. For the reasons set forth below, Dr. Gale's arguments that Dimov in view of Kovac does not render obvious the subject matter of claim 1 as a whole are incorrect.

#### 1.     A POSA would have been motivated to modify Dimov to include a selective recovery step.

80.     As set forth above, a POSA would have been motivated to use Dimov's devices, to the extent not already disclosed, by including a step of selectively

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

recovering a cell or a clonal population of cells from an individual chamber in the devices. *See* Section III.B.1 ("A POSA would have been motivated to modify Dimov to include a selective recovery step based on a response in the monitoring step."), above. Moreover, a POSA would have been motivated by Dimov's disclosure to remove cells out of the trench, as discussed above.

81.     As I have previously stated, motivation to combine Dimov and Kovac to arrive at the claimed subject matter is found at least in Kovac: "[t]he need to isolate small numbers of specific cells from background populations is ubiquitous," and those skilled in the art were well aware that ways "to select a desired starting population of cells of known characteristics or can be a tool to analyze the results of an experiment and isolate particularly interesting cells for further investigation." Ex. 1007 (Kovac) at 9321; *see also* Ex. 2010 (Meinhart Tr.) at 31:16-32:23; Ex. 1002 (Meinhart Decl.) at ¶ 122. It can also be found in the knowledge of a POSA (including as reflected in the '408 patent's description of the state of the art). *See* Section III.B.1; *see also, e.g.,* Ex. 1002 (Meinhart Decl.) at ¶ 126; Ex. 2010 (Meinhart Tr.) at 37:24-38:4, 39:4-6, 40:16-20.

### 2.     A POSA would have been motivated to modify Dimov by implementing Kovac's technique.

82.     Dr. Gale further contends that "a POSA would not be specifically motivated to look to Kovac." Ex. 2012 (Gale Decl.) at ¶ 91. Yet in addition to the

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

recover such cells from Park's device using the Kovac technique, and would have had a reasonable expectation of success in doing so.

### b) The recirculation flow in Park's microwells would not hamper selective recovery.

190. Dr. Gale contends that "continuous flow through the device to remove a cell would conflict with the key feature of Park's device, which is the use of triangular-shaped microwells that were designed to trap cells in the wells through a recirculation flow zone within the wells." Ex. 2012 (Gale Decl.) at ¶ 162. Dr. Gale further contends that "Kovac is built on the concept that the lateral flows above the well would carry cells to the outlet," while "dynamic flow of fluid through the microwells in Park would counter the levitation force of the Kovac laser, preventing or at least hampering recovery." *Id.* at ¶ 163. He further states that "[t]he trapping flows in Park would knock the 'beach ball' or cell off the top of the laser column and trap the particle again, completely eliminating any chance of success in implementing Kovac." *Id.* I disagree for several reasons.

191. First, the lateral gradient force of the laser column will serve to counteract lateral flows within the wells to some degree. For example, even Kovac's circular microwells would have lateral flow within the well, but Kovac did not report issues with cells being knocked off the laser beam within the well as an issue that hampered cell recovery. *See* Ex. 1007 (Kovac) at 9325 ("[W]hen we focus our beam

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

onto a cell, the lateral gradient force quickly translates the cell to the lateral beam center . . . ."); Ex. 1006 (Park) at 266 (Fig. 2b) (showing flow lines within a circular microwell); Ex. 1038 (Gale Tr.) at 83:4-14 (describing flow patterns of Park's circular microwells as depicting "typical flow patterns").

192. Moreover, Dr. Gale's "knock-off" theory assumes many things, including that the laser column is narrower than the microwell such that if the flow knocked a cell of the column, the cell would fall back into the "trapping flow." But, as I explain above in Section III.C.2.b)(3)(a), a POSA would have been readily able, using ordinary skill in the art, to use a laser column with a waist that matches the width of Park's microwell, such that the flow could not knock the cell off into the trapping flow. Such techniques would similarly allow a POSA to levitate groups of cells out of Park's microwells.



193. Moreover, a POSA would have been able to circumvent this issue by first levitating the cell into Park's channel before turning the flow back on to sweep

Berkeley Lights Ex 1039
Berkeley Lights v UBC
IPR2021-01249

**Supporting Information for *Intuitive, Image-Based Cell Sorting Using Opto-fluidic Cell Sorting***

Joseph Kovac and Joel Voldman, Department of Electrical Engineering and Computer Science

77 Massachusetts Avenue, Building 36-824, Cambridge, Massachusetts 02139

**Contents**

Table S-1: Laser Parameters at Onset of Cell Damage from Literature

Table S-2: Quantification of Device Performance

Figure S-1: Enrichment of Target Cell Population

Video S-1: Levitation and Release of a Single Cell from a Microwell

Video S-2: Levitation and Release of a Single Cell from a Double-loaded Microwell

THE UNIVERSITY OF BRITISH COLUMBIA EXHIBIT 2004
Berkeley Lights, Inc. v. The University of British Columbia
IPR2021-01249

Appx3358

**Table S-1.** Laser Parameters at Onset of Cell Damage from Literature

| Ref. | Cell Type | $\lambda$ (nm) | Power (W) | Exposure Time (s) | Spot Size ($\mu$m) | Power Density (W/cm$^2$) | Energy Density (J/cm$^2$) | Energy (J) | Damage |
|------|-----------|------|-------|----------|-----|-----------|-----------|-------|--------|
| Liang[20] | CHO | 990 | 0.176 | 180 | 0.70 | 4.6e+7 | 8.2e+9 | 31.7 | Clonability |
| Liu[22] | Human Sperm | 1064 | 0.300 | 120 | 0.75 | 6.8e+7 | 8.1e+9 | 36.0 | Viability (propidium iodide) |
| Mohanty[23] | NC37 Lymphoblast | 1064 | 0.120 | 30 | 0.75 | 2.7e+7 | 8.1e+8 | 3.6 | DNA damage |
| Wang[24] | HeLa | 1070 | 13.2 | 0.004 | 4.9 | 7.0e+7 | 2.8e+5 | 0.053 | None |
| Our Device | BA/F3 | 980 | 0.125 | 20 | 8.6 | 2.2e+5 | 4.3e+6 | 2.5 | |

Table S-1 is an adaptation of a supplemental table from Wang *et al.* with some reference to original literature to use more relevant data points for comparison with our experiments. We report our spot size as the spot diameter measured across the beam between points of $1/e^2$ of maximum spot intensity as measured with an unsaturated CCD. Spot sizes listed for comparison are spot diameters calculated by $d=1.22\lambda/(n \ x \ NA)$ according to the cited NA and wavelength in the reference. The operating point of Wang *et al.* was reported to induce no damage and is shown for comparison. Our parameters are gentler than the damage threshold reported by Liang, Liu, and Mohanty, especially with respect to power density and energy density.

Appx3359

**Table S-2.** Quantification of Device Performance

| Before Sorting | Experiment 1 | Experiment 2 | Experiment 3 |
|---|---|---|---|
| Cell Concentration | 2.2e6 mL$^{-1}$ | 3.0e6 | 3.0e6 |
| Loading Efficiency | 32 % | 20 | 32 |
| # Total Cells | 3337 cells | 2079 | 3294 |
| Target Cell Purity | 5 % | 5 | 6 |
| Target Cell Ratio | 1/19.0 | 1/19.2 | 1/14.7 |
| During/After Sorting | | | |
| # Removals Attempted | 119 | 92 | 156 |
| % Removed | 66 % | 97 | 82 |
| Target Cell Purity | 81 % | 89 | 84 |
| Target Cell Ratio | 4.1/1 | 8.1/1 | 5.4/1 |
| % Cells Lost | 21% | 18 | 28 |
| # Cells In Output | 62 target : 15 unwanted | 73 : 9 | 92 : 17 |
| Enrichment | 78.4 | 155.4 | 79.4 |

Table S-2 quantifies various aspects of device operation. Cell concentration is the concentration of the cell suspension prior to injection. Loading efficiency is the percentage of trap sites containing at least one cell following device loading. Total cell number refers to the total number of cells residing in microwells after loading. Target cell purity is the percentage of target cells comprising the total cell population. Target cell ratio is the ratio of target cells to unwanted cells. Number of removals attempted refers to the number of target cells that we attempted to remove. Percent removed refers to the percentage of target cells successfully removed in all attempted optical removals. Percent of cells lost is the percentage of target cells unaccounted for between release from the array and arrival at the output reservoir. Number of cells in output states the number of target and unwanted cells which arrived at the output reservoir. Enrichment is the target cell ratio after sorting divided by the target cell ratio before sorting. We intentionally did not remove a fraction of target cells from the array in each experiment in order to have reference particles for unperturbed target cells to more easily determine reasonable fluorescence exposures for reservoir analysis images.

Appx3360

**Figure S-1:** Enrichment of Target Cell Population



Figure S-1 qualitatively illustrates the enrichment in the 155-fold enrichment case. (A) shows a part of the original cell array with an approximately representative ratio of minority population to majority population cells. (B) is a fluorescence image of part of the bottom of the collection reservoir illustrating part of the sorted population. We used images similar to these to produce the data in Table S-2. Green channel in (A) and red channel in (B) are oversaturated for easier visualization.

**Video S-1.** Levitation and Release of a Single Cell from a Microwell

Video S-1 shows cells initially resting in a section of a microwell array. We focus the laser (which appears as the bright spot on the cell) onto a particular cell soon after the video begins. The cell moves laterally into the beam center and is subsequently levitated into the flow field of the chamber, where drag eventually carries the cell away. This video is available free of charge at http://pubs.acs.org.

**Video S-2.** Levitation and Release of a Single Cell from a Double-loaded Microwell

Video S-2 shows cells initially resting in a section of a microwell array. We focus the laser onto a single cell in a doubly-loaded microwell and selectively remove the single cell while leaving behind the untargeted cell. This video is available free of charge at http://pubs.acs.org.

5                  BERKELEY LIGHTS, INC.,

6                        Petitioner,

7                          v.

8          THE UNIVERSITY OF BRITISH COLUMBIA,

9                      Patent Owner.

10         ------------------------------------

11                 Case IPR2021-01249

12                 Patent 10,087,408

13

14

15         DEPOSITION OF CARL MEINHART, PH.D.

16              Wednesday, May 4, 2022

17                   9:03 a.m.

18

19

20

21    Job No.:  445468

22    Pages:  1 - 224

23    Reporter: Debra Bollman Farfan, RDR-RMR-CRR

24            CA CSR No. 11648

25

```
 1            DEPOSITION OF CARL MEINHART, PH.D.,

 2   held at the offices of:

 3        Paul Hastings LLP's

 4        1999 Avenue of the Stars

 5        27th Floor

 6        Century City, CA 90067

 7

 8

 9

10

11

12        Pursuant to notice, before Debra Bollman

13   Farfan, Certified Shorthand Reporter, in and

14   for the State of California.

15

16

17

18

19

20

21

22

23

24

25
```

Appx3393

```
 1                A P P E A R A N C E S

 2         ON BEHALF OF PETITIONER BERKELEY LIGHTS:

 3                 BY: ANDREW KRAUSE, ESQUIRE

 4                 IRELL & MANELLA LLP

 5                 1800 Avenue of the Stars, Suite 900

 6                 Los Angeles, California 90067

 7                 BerkeleyLightsIPRs@irell.com

 8                 Akrause@irell.com

 9

10

11         ON BEHALF OF PATENT OWNER THE UNIVERSITY

12     OF BRITISH COLUMBIA:

13                 BY: MAX H. YUSEM, ESQUIRE

14                     ERIC DITTMANN, ESQUIRE

15                 PAUL HASTINGS, LLP

16                 200 Park Avenue

17                 New York, NY 10166

18                 maxyusem@paulhastings.com

19                 Phone: 1(212) 318-6375

20

21

22

23

24

25
```

1    sections?

2       A.   That is correct.

3       Q.   Okay.  And sitting here today, you don't

4    have any additional opinions in this proceeding

5    for Grounds 3 or 5 other than those that are

6    discussed in these paragraphs that we just

7    referenced?

8       A.   That is correct.

9       Q.   Okay.  And just to make sure I'm clear,

10   you don't provide an opinion in this

11   declaration that the challenge claims of the

12   '408 patent are obvious over Kovac alone,

13   correct?

14      A.   Yes.

15      Q.   When you say "yes," you mean that you

16   did not provide an opinion that the challenge

17   claims of the '408 patent are obvious over

18   Kovac alone?

19      A.   That is correct, in this declaration.

20      Q.   And you didn't provide an opinion in

21   this declaration that the challenged claims of

22   the '408 patent are obvious over Kovac in view

23   of Dimov, correct?

24      A.   Ground 3 is Dimov, as an obviousness

25   over Dimov in view of Kovac.

1      Q.   Right.

2      A.   But there's not a separate grounds

3   that's Kovac in view of Dimov.

4      Q.   Right.  So you've provided an opinion in

5   Ground 3 Dimov in view of Kovac, but in

6   your declaration you did not provide an opinion

7   for obviousness for Kovac in view of Dimov,

8   correct?

9      A.   That is correct.

10      Q.   Okay.  And you also didn't provide an

11   opinion in this declaration with the challenged

12   claims of the '408 patent are obvious over

13   Kovac in view of Park.

14      A.   Ground 5 is Park in view of Kovac, but

15   there's no separate grounds for Kovac in view

16   of Park.  That is correct.

17      Q.   When were you first contacted by counsel

18   for Berkeley Lights regarding this proceeding?

19      A.   I don't remember.  It was sometime about

20   a year ago.

21      Q.   So your declaration was submitted, let's

22   just see here, 7/9/2021?  It starts on the

23   last -- it starts on page 84 of Exhibit 1002.

24      A.   Yes.  7/9/2021.

25      Q.   And that's your signature on this page,

1       Q.  So, we were just looking in

2   paragraph 37, you said when there is such a

3   design need or market pressure to solve a

4   problem.  And I'm asking you what problem was

5   there to solve for Ground 3 when providing your

6   opinion regarding obviousness of Dimov in view

7   of Kovac?

8       A.  Well, this paragraph is talking about

9   general principles of obviousness.  If I did

10  so, I'd like to review Ground 3 to see if I

11  identified a particular market need.

12      Q.  Please, yeah.  And for your reference,

13  Ground 3 starts on page 52.

14      A.  Okay.  So can you please rephrase your

15  question, or restate your question?

16      Q.  Yeah, in applying the general principles

17  of obviousness you discussed in paragraph 37 of

18  your declaration, what was the problem you were

19  referencing in that paragraph?

20      A.  Well, I wouldn't specifically tie that

21  paragraph and the background of obviousness

22  that it specifically applies to Ground 3.

23          But if we just look at Ground 3 and what

24  I say in Ground 3, Kovac is trying to solve a

25  particular problem, and the problem that he's

1    trying to solve is how to selectively remove

2    cells from a well.  And that is the basis of

3    much of the description here.

4          So this Ground 3 talks about how Kovac

5    does selective removal.  Selectively removing

6    the cell or clonal population.

7          And the general scientific problem that

8    they're trying to solve, as Kovac states, if

9    you look at my declaration on paragraph 122,

10   the last sentence, it says Kovac further

11   identifies a need to "select a desired starting

12   population of cells of known characteristics,"

13   or "isolate particularly interesting cells for

14   further investigation."

15         And then goes on to say, quote:  The

16   need to isolate small numbers of specific cells

17   from background populations is ubiquitous, with

18   applications in pathology clinical diagnostic

19   cloning and cell biology.

20         So, Kovac is identifying a particular

21   problem and he says this problem is ubiquitous,

22   that many people would want to selectively

23   recover cells.

24     Q.  So the problem that you based your

25   obviousness opinion on originated from the

1   Kovac reference?

2        MR. KRAUSE:  Objection.

3   Mischaracterizes the testimony.

4        THE WITNESS:  Can you state the question

5   again, please.

6   BY MR. YUSEM:

7     Q.  Yes.  So you just provided me an

8   explanation of what you believe the problem

9   was, and you discussed several portions of

10  Kovac.  And I'm asking, did you identify any

11  problem outside of the Kovac reference?

12    A.  Yes, well, my knowledge as a POSA, I

13  would naturally know that there are many

14  situations where one would want to selectively

15  recover cells, so I knew that for many years.

16       And so Kovac reinforces that knowledge

17  and lays it out clearly.

18    Q.  Do you cite anything beyond Kovac for

19  your knowledge that one would selectively

20  recover -- sorry, strike that.

21       Do you cite anything in Ground 3 or

22  Ground 5 of your declaration beyond Kovac for

23  your knowledge that a POSA would naturally be

24  looking to selectively recover cells?

25    A.  So the concept of selectively recovering

Appx3424

1    recovering cells?

2        A.  I -- I feel that it would be best if I

3    review it so I can give the most accurate and

4    clear answer.  And going by memory, I'd prefer

5    not to go just by memory.

6        Q.  And you would agree with me that if a

7    discussion of Park specifically recovering

8    cells selectively is not in that section, then

9    it would not be part of your declaration?

10           MR. KRAUSE:  Objection.

11           THE WITNESS:  Can you say that again.

12   BY MR. YUSEM:

13       Q.  So you're referencing a section of your

14   report that you'd like to review.

15       A.  Yes.

16       Q.  And my question is if that section of

17   your report does not contain a disclosure in

18   Park about selectively recovering cells, then

19   it wouldn't be in your declaration?

20       A.  I would say what's in my declaration is

21   in my declaration.  And I don't want to say

22   what's not in my declaration without looking at

23   my declaration.

24       Q.  So, is it fair to say that the problem

25   that you've identified for the person of

Appx3428

1    ordinary skill to solve is the selective cell

2    recovery?

3        A.   There could be many problems.  That's

4    one problem.

5        Q.   Can you -- and can you point to me in

6    your declaration where you explain how you

7    identified that as the problem to solve,

8    selective cell recovery?

9        A.   Well, I identify it as a problem to

10   solve, and I relied on Kovac's -- Kovac

11   articulates it quite well.  And a knowledge

12   of -- a POSA would know to do that as well.

13       Q.   Can you think of any other problems,

14   sitting here today?

15       A.   There's many problems today.

16       Q.   Sorry.  I should be clear.  Sitting here

17   today, can you think of any other problems that

18   the person of ordinary skill would have been

19   trying to solve as of 2010?

20       A.   That's -- that's a very broad question.

21   There's many problems to solve.  Are you

22   referring specifically to the '408 patent or --

23   it seems like a very vague question.

24       Q.   I'm referring to your opinions in this

25   case regarding the '408 patent, yes.  Does that

1   previously marked Exhibit 1007 in proceeding

2   IPR2021-01249.  Do you have that?

3       A.  Yes.

4       Q.  And what is this reference?

5       A.  Yes, so this reference is the reference

6   of Kovac and Voldman entitled "Intuitive,

7   image-based cell sorting using optofluidic cell

8   sorting."

9       Q.  And looking at Figure 2A of Kovac, this

10  provides details of the fluid connections and

11  layout of Kovac's device, correct?

12      A.  Yes, Figure 2A does describe the fluidic

13  layout, yes.

14      Q.  And for all the experiments described in

15  the Kovac reference, they use the fluidic

16  arrangement shown here in Figure 2A, correct?

17      A.  I can't say this is all they used, but

18  this is what they report they used.  Right?

19  This is what's reported.

20      Q.  Well, let's take a look at page 9323 of

21  Kovac.

22      A.  Yes.

23      Q.  Sorry.  Let's take a look at page 9324

24  of Kovac.  The heading "Device Preparation" on

25  the lower left-hand side, do you see that?

1      A.  Yes.

2      Q.  And it says there that:  Prior to all

3   experiments, we used the fluidic arrangement

4   shown in Figure 2A.

5          Do you see that?

6      A.  Yes.

7      Q.  So you agree for all the experiments

8   described in the Kovac reference, they use the

9   fluidic arrangement shown in Figure 2A?

10     A.  That's what they're reporting, yes.

11     Q.  And looking back at Figure 2A of Kovac,

12  at the bottom we see the top view of the

13  device?

14     A.  Yes.

15     Q.  Okay.  And in that top view of Figure 2A

16  of Kovac, we see a cell input and a flushing

17  input on the left-hand side?

18     A.  Yes.

19     Q.  And then we see a microwell array in the

20  middle?

21     A.  Yes.

22     Q.  And then on the right-hand side we see a

23  reservoir output and a waste output; is that

24  correct?

25     A.  Yes.

1      A.   Can you say that again.

2      Q.   Yeah.

3      A.   Sorry.

4      Q.   Yeah.  It's the lack of flow through the

5    Kovac device that's allowing the cells to enter

6    the microwells?

7      A.   Yes, what they say is:  After the cell

8    suspension filled the device, we stopped the

9    flow for approximately five minutes, allowing

10   the cells to sediment into the wells.  Then we

11   pumped fresh media -- cell culture media --

12   first through both inputs at 40 microliters per

13   minute and then slowly through the flushing

14   input and briefly from the flushing input

15   backwards through the cell loading input.

16        So they slosh it back and forth a little

17   bit.  Just to move the cells around.

18        This protocol removes cells residing

19   outside the microarray and all chip regions as

20   well as cells trapped and stabling in the

21   array, while avoiding introduction of the

22   residual cells through the cell loading input.

23     Q.   Just to make sure I'm understanding.

24   It's the -- when the flow stops, it's gravity

25   that's pulling the cells into the microwells in

Appx3474

1    Q.   And then the next sentence after that.

2    A.   Yes.

3    Q.   Okay.  And during this process of cell

4    levitation described in Kovac, the cell is

5    being levitated up into the flow field of the

6    device?

7    A.   That's correct.

8    Q.   Okay.  And it's this flow field that is

9    then carrying away the levitated cell from the

10   microwell?

11   A.   That is correct.

12   Q.   Okay.  And we also see Kovac provides an

13   equation on page 9325 that he calls Equation 1.

14   Let me know when you're there.

15   A.   I'm here.

16   Q.   Okay.  This equation that he's provided,

17   each ray contributes a scattering force, which

18   he defines here as F sub S?

19   A.   Yes.

20   Q.   Okay.  And there's another -- a number

21   of other variables here, including N1 as the

22   refractive index in the medium that the laser's

23   passing through?

24   A.   Yes.

25   Q.   And P is the ray power?

Appx3480

1    very difficult for a cell.

2         However, we can understand the

3    phenomenon and appreciate what's happening in

4    the phenomenon by this equation without

5    actually calculating numbers from the equation.

6    Q.  And if the calculation is very difficult

7    for a cell, it would be more difficult for

8    multiple cells, right, if there were multiple

9    cells in the well?

10   A.  Yes, you'd probably use some sort of

11   computer simulation.  You can simulate the

12   effect if you have multiple cells because

13   there's interaction cells.  One cell may get

14   array and then scatter to another cell, which

15   then scatters it to another cell.

16        And so, it's very complicated to do

17   analytically, but you could possibly do it

18   numerically with computer simulations.  And he

19   does not get into that detail because that's

20   beyond the scope of this work.

21   Q.  And earlier, I think we were having a

22   discussion about the differences or

23   similarities between Kovac's method and the

24   more typical understanding of optical tweezers,

25   right?

1    saying there is no more than two.  People do

2    other methods of optical tweezing as well.

3    This field has been around for a while, right,

4    for many years.

5        Q.   Right.

6        A.   And there's all kinds of variants to

7    optical tweezing.  They use the same

8    fundamental physics, the photon scattering

9    which imparts momentum.

10            But there's probably many different

11   modes of operation.  I mean, it's like how many

12   modes of operation are there for a computer,

13   right?  There are many of them.

14       Q.   Can you provide me with any other modes,

15   apart from Kovac's method and the traditional

16   optical tweezers that we've discussed so far?

17       A.   Yes, there's holographic array methods.

18   So there's holographic methods that allow you

19   to create multiple laser tweezers at one time.

20   There is that mode.

21       Q.   Is that traditional optical tweezers, or

22   is that another mode?

23       A.   It could be both.  It could be both.

24   Traditional optical tweezers, it could easily

25   do the scattering.  It's easier to do the

1    scattering force because it doesn't require as

2    tight a focus.

3         So, there's also -- I've seen work by

4    Steve Quake where in the '90s he talked about

5    work at UCSD, he talked about work where he

6    would attach particles to DNA, and he could

7    then use optical tweezing to stretch the DNA

8    and measure strength forces on DNA.

9         He also took DNA and he could tie it

10   into a knot.  So he could use two optical

11   tweezers and start tying molecules together in

12   a knot.  I don't know why, but he did.  It was

13   kind of cute.  But, you know, so there's all

14   kinds of ways in which you can use optical

15   tweezers.

16      Q.  Okay.  So there's all kinds of ways in

17   which you can use optical tweezers.  Can we at

18   least agree that the method that Kovac is

19   describing in his paper, he's distinguishing

20   that from what he says is traditional optical

21   tweezers?  He distinguishes that in his paper,

22   correct?

23      A.  Yes.

24      Q.  That's my only question.  Thank you.

25         MR. YUSEM:  I think we've been going for

Appx3501

1    a little over an hour.  Why don't we take a

2    break?

3            THE WITNESS:  Sure, thank you.

4            (Lunch Recess ensued from 11:39 a.m.

5    to 12:43 p.m.)

6    BY MR. YUSEM:

7        Q.  So, Dr. Meinhart, before the break we

8    were talking about the Kovac reference.  Do you

9    still have that in front of you?

10       A.  I do.

11       Q.  Can we turn to page 9326.  And this is

12   the Kovac reference Exhibit 1007.

13       A.  Yes.

14       Q.  On the left-hand side, about halfway

15   through the first paragraph, Kovac states that:

16   As the cell diameter approaches the well

17   diameter, Stokes drag wall effect become more

18   significant, leading to longer removal times

19   for larger cells in the population.

20           Do you see that?

21       A.  I don't.  Can you --

22       Q.  Oh, yeah.  Sorry.  Left-hand side.

23       A.  Yeah.

24       Q.  In the middle of the first paragraph,

25   it's about -- one, two, three, four, five,

1    six -- nine lines down from the top.

2       A.  Okay, yes.  As the cell diameter

3    approaches the well diameter.  Okay.  The well

4    diameter.

5       Q.  Uh-huh.  And then it goes on to say:

6    Stokes drag wall effects become more

7    significant, leading to longer removal times of

8    larger cells in the population.

9          Are you there?

10      A.  Yes, uh-huh.

11      Q.  What is Stokes drag wall effect?

12      A.  Well, Stokes drag -- I think this is

13   phrased a little poorly, but in general,

14   Stoke's drag refers to the hydrodynamic drag on

15   a particle in a flow at very low Reynolds

16   number.

17      Q.  And what is Reynolds number?

18      A.  So Reynolds number is a non-dimensional

19   number that we use in fluid mechanics to

20   determine the ratio of inertial forces to

21   viscous forces.

22      Q.  So, just to make sure I understand what

23   Kovac is describing here, then.  As the closer

24   the cell is to the microwell wall, the more

25   difficult it'll be for the cell to be

Appx3503

1    levitated?

2        A.   Well, yeah, so what happens, the

3    Stokes -- so there's really two effects when he

4    says Stokes drag wall effect.  He means Stokes

5    drag and wall effects, would be better phrased.

6            So, Stokes drag, typically the drag

7    force is proportional to the diameter of the

8    particle.  So, a smaller particle will have

9    less force, and the larger particles have more

10   drag force.

11           So, if you're levitating against

12   gravity, then there's going to be more Stokes

13   drag.  As the particle moves up the well

14   relative to the fluid, there is going to be a

15   drag resistance.

16       Q.   So, I think we're focused right now on

17   the actual drag on the wall of the well,

18   correct?

19       A.   Yeah, so, you have the drag effect.

20       Q.   Right.

21       A.   And then when it's near a wall, there's

22   wall interactions with the particle that also

23   resist movement.

24       Q.   Right.  So those wall interactions make

25   the levitation of the cell using the scatter

Appx3504

1   force more difficult?

2      A.  Yeah, the move -- so just levitating is

3   okay.  It doesn't affect just the positioning.

4   What it affects is the movement, the vertical

5   movement, right?  So you could have levitation

6   where you're balancing two forces and the

7   particle is levitated at a constant position.

8         So, this is referring to as the particle

9   is moving vertically through the well, there is

10  hydrodynamic resistance to the particle, and

11  wall interactions.  And that's what he's

12  talking about is the Stokes drag, as the

13  particle is lifted, and then wall interactions

14  due to the particle wall -- the fluid mechanics

15  between the particle and the wall.

16        So that's two forms of drag.  So, see

17  that's Stokes drag by itself, and then with the

18  wall, the drag goes up.

19     Q.  And these surface interactions, Kovac is

20  saying those appear to be the primary reason

21  that cell removal fails; is that right?

22     A.  I don't -- does he say that?

23     Q.  Yeah, so, if we look at -- a little bit

24  further down in the same paragraph, the second

25  to last sentence starts with:  In cases with

Appx3505

1    less than 100 percent removal efficiency.

2       A.   Okay, yeah.  "In some trials we achieved

3    less than 100 percent removal efficiency," is

4    that?

5       Q.   So it says -- so the line reads in

6    Kovac:  In cases with less than 100 percent

7    removal efficiency, non-specific surface

8    interactions appear to be the primary reason

9    that cell removal fails.

10      A.   In cases with 100 percent -- with less

11   than hundred percent removal efficiency,

12   non-specific interaction -- non-specific

13   surface interactions appear to be the primary

14   reason that cells -- cell removal fails.

15           Non-specific interactions.

16           Yeah, so he goes on to say:  Use of

17   larger diameter wells -- like 30 microns, for

18   example -- allows the optical forces to more

19   directly compete with the surface effects

20   rather than with increased Stokes drag wall

21   effects seen in smaller wells.

22      Q.   I understand that.

23           My question is Kovac reported that the

24   surface interactions appear to be the primary

25   reason that cell removal fails; is that right?

Appx3506

1    A.   He reports non-specific surface

2    interactions.

3    Q.   And those non- specific surface

4    interactions, those are surface interactions

5    with the well wall?

6    A.   So, from reading this, it's not -- he

7    doesn't specifically spell out what he means by

8    non-specific surface reactions.  But he talks

9    about --

10   Q.   Interactions, sorry.

11   A.   I'm sorry, yes.

12   Q.   Yeah.

13   A.   So he doesn't spell out what he means by

14   non-specific surface interactions.  That seems

15   to be somewhat of a vague word, because he even

16   says it's non-specific.

17        So non-specific surface interactions

18   appear to be the prime reason that cells fail.

19        So he does say that non-specific surface

20   reactions appear to be -- appear to be the

21   primary reason.  But he doesn't say what non-

22   specific surface interactions he's talking

23   about.

24        But as you point out, early in the

25   paragraph he talks about hydrodynamic wall

Appx3507

1   effects and the cell -- if the well diameter is

2   small, where it's the same size as the cell.

3          So, if you make the well smaller, rather

4   than 30 microns, make the well 10 microns, then

5   it's very close to the same size as the cell.

6   And he's saying the interaction of that cell

7   with the walls and the hydrodynamic drag force

8   make it -- make it difficult to remove.

9       Q.   Right.

10      A.   Because it's basically blocking flow

11  from going around.

12      Q.   So just to summarize to make sure I

13  understand.  The closer the cell is to the well

14  wall, the more difficult it is for the scatter

15  force to levitate that cell out of the well?

16      A.   I think what he's -- he doesn't spell it

17  out here very clearly, unfortunately.  But I

18  think what he is referring to would be -- let's

19  say this is the well, and let's say we have --

20      Q.   Sorry, Dr. Meinhart, we're not going to

21  be able to see any of this on the record.

22      A.   So let's say this water glass is the

23  well.  And if the water glass diameter was

24  small, made smaller, smaller, smaller, such

25  that it was basically about the same size as

Appx3508

1    the cell, and if that cell was trying to rise

2    through this column of liquid, there would

3    basically be -- what would happen, as the cell

4    rises, water would have to flow around the

5    cell, right?

6          But if the cell and the wall are about

7    the -- the well diameter and the cell diameter

8    are about the same, then there is blockage, so

9    water cannot flow around the cell.

10          I think that's what he's talking about.

11    Q.   Right.  And would that same blockage

12    occur if the cell was surrounded by other

13    cells?

14    A.   Not necessarily.  Because other cells

15    would be -- could be movable, and so they would

16    slide out of the way.

17    Q.   What if the cells were adhered together

18    like cultured cells?

19    A.   Well, not all cultured cells adhere

20    together, but cells --

21    Q.   I understand.  What about -- I'm asking

22    in a specific --

23    A.   If cells were adhered together.

24    Q.   If cells were adhered together, would

25    that make the cell more difficult to be able to

1    be levitated out of the well.

2          MR. KRAUSE:  Objection.

3          THE WITNESS:  So, if you had multiple

4    cells that were networked together, that formed

5    a blockage where water could not travel around

6    the cell, a blockage of water would make it

7    more difficult.

8    BY MR. YUSEM:

9       Q.  Okay.

10         (Court Reporter Clarification.)

11         (Recess ensued from 12:53 p.m.

12   to 12:53 p.m.)

13   BY MR. YUSEM:

14      Q.  Dr. Meinhart, can we turn to page 9329

15   of Kovac.

16      A.  Yes.

17      Q.  On the right-hand side, in the first

18   paragraph -- one, two, three, four, five, six,

19   seven -- eight lines down from the top, the

20   sentence starting "Improving removal speed."

21         Do you see that?

22      A.  Yes.

23      Q.  Kovac says that:  Improving removal

24   speed would also improve purity as the number

25   of contaminating cells collected varies

Appx3510

1    directly with the total time during which

2    target cells are removed.

3         Do you see that?

4    A.   Yes, I do.

5    Q.   So just to make sure I'm understanding

6    what Kovac is talking about here, the longer

7    the removal time, the more likely you are to

8    have contaminating cells collected using

9    Kovac's method?

10   A.   Okay, can you -- I was able to read this

11   paragraph.  Can you state your question, again,

12   please?

13   Q.   Yeah, Kovac is saying that the longer

14   the removal time, the more likely the person of

15   ordinary skill is going to find contaminating

16   cells collected using the Kovac method?

17   A.   And what he's referring to here, I

18   believe, is not the time that it takes to

19   remove a cell from the wall, but it's the total

20   time in which you're performing the removal

21   process, right?  So if it's an hour or

22   whatever.

23        So, the longer you spend removing cells,

24   the more -- the higher the probability that

25   spurious cells in that solution are collected.

1      Q.  Right.

2      A.  Yeah, so it's not talking about the time

3   it takes to leave a cell or a cell to leave a

4   well, but the total time you spent collecting

5   cells.

6      Q.  Right, so the total time.  Yeah, I

7   think -- okay, I think we understand.

8      A.  Okay.

9          (Previously marked Deposition Exhibit

10  1006 was reviewed.)

11     Q.  Okay.  So you can put Kovac to the side.

12         I'm going to hand you the Park

13  reference.  This was previously marked

14  Exhibit 1006 for IPR2021-01249.

15         Do you have the Park reference in front

16  of you?

17     A.  I do.

18     Q.  And do you recognize this reference?

19     A.  I do.

20     Q.  This is one of the references that you

21  discuss in your declaration, correct?

22     A.  That is correct.

23     Q.  Okay.  And this Park reference describes

24  a microfluidic device; is that right?

25     A.  It does.

1    that you could -- so that -- sorry.  Strike

2    that.

3         The Park device is designed to enable

4    single cell trapping in the microwell to allow

5    this attachment and division of captured cells?

6       A.  Yes.

7       Q.  Okay.  And having microwells that were

8    large enough for the single cell to be trapped,

9    so then it could then be cultured in the well,

10   was Park's focus?

11      A.  Can you say that one more time, that

12   question?

13      Q.  Yeah, having microwells that were large

14   enough for a single cell to be trapped to then

15   be cultured within the well was Park's focus?

16      A.  One of his focus, yes, yeah.  I mean,

17   there's multiple ones, but that's an objective,

18   for sure.

19      Q.  Right.

20      A.  Yeah.

21      Q.  Okay.  And, in fact, that was one of the

22   two requirements that Park set out.  Let's take

23   a look at page 264, on the right-hand side.

24   Let me know when you're there.

25      A.  Okay.

1    Kovac technique, right?

2        A.  In Park?

3        Q.  There's no mention in the Park reference

4    of the Kovac laser technique.

5        A.  Yeah, when I look at the references for

6    Park, he does not reference the Kovac paper.

7        Q.  And my question's a little bit broader

8    than that.

9            So there's no mention in Park at all

10   about the Kovac laser technique?

11       A.  I don't think so.

12       Q.  Okay.  And it's your opinion that the

13   Kovac laser technique could be used the same

14   regardless of if it was a single cell in the

15   well or if it was multiple cultured cells

16   adhered together in a well; is that correct?

17       A.  It could be used for both, yes.

18       Q.  It could be used the same for both?  The

19   technique would be the same, regardless if it

20   was one cell in the well or multiple cells that

21   were adhered together after culturing in the

22   well?

23       A.  As a POSA, what one would do is widen

24   the laser beam.  So if the laser beam had a

25   spot size of, say, 8 microns for a single cell,

Appx3523

1    one might make the laser beam 15 microns wide

2    for multiple cells.

3         So you would want to tune the laser beam

4    to the size of the object that you're

5    levitating.

6    Q.   So modifications would have to be made

7    to Kovac's laser technique if multiple cells

8    were cultured together in the well?

9    A.   It would -- it would be a simple change

10   of lens.  Yeah, you would change the lens

11   focus.  Yeah, so you change out a lens.

12   Q.   So, you agree with me a change would

13   need to be made to the technique described in

14   Kovac, if a person of ordinary skill was

15   attempting to levitate a cell out of a well

16   with multiple cells that had been cultured in

17   the well?

18        MR. KRAUSE:  Objection.

19        THE WITNESS:  Yeah, it would be a -- a

20   different parameter.  You would use a different

21   parameter.  You wouldn't modify the technique,

22   you would just choose a different lens.

23        So a very simple parameter.  Because if

24   you're using the Kovac technique, you would

25   have to choose the lens, and you would use a

1    That's what recirculation means.

2        Q.   Right.  And Park is using this

3    recirculation phenomenon to capture and trap

4    the cell in the well?

5        A.   Yes.

6        Q.   Got it.

7        A.   Yes.

8        Q.   And so, just to make sure I understand,

9    Park is actually using flow through the device

10   to trap the cell in the well with this

11   recirculation pattern?

12       A.   Park is using -- as I read this, Park is

13   using flow and gravity to capture the cells,

14   yes.

15       Q.   And the triangular geometry was selected

16   by Park because it had the strongest

17   recirculation in the well to drag the cell

18   downwards into the cell.

19            Sorry, let me say that over because

20   I'm -- "cell" and "well," I'm getting a

21   little --

22       A.   Me too.

23       Q.   Yeah.  The triangular geometry was

24   selected by Park because it had the strongest

25   recirculation in the well to drag the cell

1    downwards into the well?

2        A.  Yes, to drag it downwards and also to

3    drag it back forwards towards the APEX of the

4    triangle.

5        Q.  Right.  So just so I make sure I

6    understand.  The recirculation moves the cell

7    downwards and then upstream into the corner of

8    the triangular shaped well?

9        A.  That is correct.

10       Q.  Okay.  And turning back to your

11   declaration, 1002 exhibit, in Ground 5 on

12   page 76.

13       A.  Okay.

14       Q.  Can you point to a paragraph where you

15   discuss how a person of ordinary skill would

16   have addressed this recirculation force when

17   employing the Kovac laser to selectively

18   recover a cell?

19       A.  Well, from a POSA, the --

20       Q.  My question is just looking at your

21   declaration, Exhibit 1002, in Ground 5, can you

22   point to a paragraph where you address how a

23   person of ordinary skill would have addressed

24   this recirculation force when employing the

25   Kovac laser in an attempt to levitate the cell?

Appx3530

1    A.  Let me review it for a second.

2    Q.  Uh-huh.

3    A.  (Reviewing document.)

4        So I don't specifically talk about the

5    recirculation because a POSA would know that

6    it's a non-issue and that the recirculation

7    actually would help with the method of Kovac.

8    Q.  So it's your opinion that the

9    recirculation pattern does not need to be

10   addressed by a POSA?

11   A.  No, the recirculation pattern would

12   actually help the technique of Kovac levitate a

13   cell out.

14   Q.  Okay.  Thank you.

15       And your opinion in this case is based

16   on your understanding that this recirculation

17   pattern described in Park would help to

18   levitate a cell?

19   A.  It would, yes.

20   Q.  Okay.

21   A.  And I can explain why, if you like.

22   Q.  If you take a look at the Abstract of

23   Park.  The last sentence says that:  About

24   62 percent of the microwells were filled with a

25   single cell after the 20-minute loading

1    procedure.

2         Do you see that?

3      A.  Yes.

4      Q.  That leaves approximately 40 percent of

5    the microwells opened after the loading

6    procedure in Park?

7      A.  Yes.

8      Q.  If a cell was successfully levitated out

9    of a Park microwell, it would then need to flow

10   through the device and pass over these other

11   empty wells before reaching the outlet; is that

12   right?

13     A.  That's right.

14     Q.  Okay.  And Park only describes a single

15   outlet in its device, do you agree with that?

16     A.  Yes.

17     Q.  And that outlet is actually connected to

18   a pulling syringe pump, if you take a look

19   at -- well, why don't we take a look at Park,

20   Figure 1B.

21     A.  Yes.

22     Q.  Do you agree that the outlet in Park is

23   connected to a pulling syringe pump?

24     A.  I don't see it in the Figure 1B, but I

25   could read the caption.  Maybe it says.  Can

1    you show me where it says it.

2       Q.  Yeah, in the caption on the left-hand

3    side, it says:  "The outlet which is connected

4    to a pulling syringe pump."

5       A.  Oh, okay.  Hang on.  Okay.

6       Q.  So do you agree that the outlet in Park

7    is connected to the pulling syringe pump?

8       A.  Yes.

9       Q.  And this syringe pump is what generates

10   the flow through the Park device, right?

11      A.  So I need to read what's going on at the

12   inlet reservoir.

13      Q.  Why don't we turn to Park page 267.  On

14   the right-hand side, do you see it says:  Our

15   system design utilizes a syringe pump to

16   generate flow of a cell suspension?

17          Do you see that?

18      A.  Yes.

19      Q.  Okay.  So can you -- do you agree that

20   the syringe pump is what's generating the flow

21   through the Park device?

22      A.  Yes.  The syringe pump is generating the

23   flow through the Park device, yes.

24      Q.  And so, I want to discuss a little bit

25   of your opinion that a person of ordinary skill

1      Q.   Okay.  And that's your motivation that

2   you state here in your declaration for why a

3   person of ordinary skill would have looked to

4   the Kovac reference?

5      A.   That's right.

6      Q.   Okay.  And continuing in paragraph 180,

7   I think we talked about this sentence, about

8   focusing the infrared IR laser beam.  Do you

9   see that at the bottom, and it goes on to the

10  next page?

11     A.   Yes.

12     Q.   And then in paragraph 181, on the next

13  page, you state that:  After levitating a cell

14  of interest from a microwell in the Park

15  device, the levitated cell would then be flowed

16  down the main channel to the existing outlet,

17  which is connected to the pulling syringe pump.

18     A.   Yes.

19     Q.   Okay.  So -- so as in Kovac, the flow in

20  the Park device would be on during this process

21  to accomplish selective cell recovery that

22  you're describing here in paragraphs 180 and

23  181.

24     A.   Say it again.

25     Q.   As in Kovac, the flow in the Park device

Appx3537

1    would be on during this process to selectively

2    recover a cell that you're describing here in

3    paragraphs 180 and 181.

4        A.   Yes, you'd turn on the flow device when

5    you want to remove cells.

6        Q.   And that flow would be on during the

7    levitation of the cell; that's your opinion

8    here in 180, 181?

9        A.   That's one mode of operation, is that

10   you can levitate the cell while it's flowing,

11   and then the hydrodynamic forces in the channel

12   can flow it.

13       Q.   And that's what you're describing here

14   in your declaration?

15       A.   Yes.

16       Q.   Okay.  And the recovery of the cell that

17   has been selected and levitated would be

18   through Park's outlet, as you describe here?

19       A.   Yes.

20       Q.   Okay.  And just to make sure that I'm

21   reading this section correctly, you don't

22   provide an opinion in Ground 5 of your

23   declaration that a person of ordinary skill

24   would have made any modifications to the Park

25   device to accomplish the select cell recovery

1    discussing its technique using its device?

2        A.   It's from Kovac not discussing its

3    technique.   It's Kovac discussing what's well

4    known to a POSA.

5        Q.   Okay.

6        A.   Comparing it to his device.   That's --

7        Q.   And this paragraph is about reasonable

8    expectation of success, correct?   The next

9    sentence states:   Accordingly, a person of

10   ordinary skill would have had a reasonable

11   expectation of success in combining Park and

12   Kovac in view of the knowledge of a POSA as

13   described above.

14       Correct?

15       A.   That is correct, yes.

16       Q.   So the modifications that need to be

17   made to the Park device -- sorry.   Strike that.

18       Apart from the use of PDMS that we

19   already talked about that you mentioned in

20   paragraph 181, you don't describe any

21   additional modifications that need to be made

22   to the Park device?

23       A.   Yes, and that's because any other

24   modifications would have been very simple.

25       Q.   But you don't describe them here,

 1    correct?

 2        A.   That is correct, yeah.

 3        Q.   Okay.   And looking at paragraph 182 that

 4    we were just talking about with respect to

 5    reasonable expectation of success, one of the

 6    things that you mentioned earlier in the

 7    paragraph is that Park disclosed triangular

 8    microwells having a comparable side-length

 9    dimension of 50 micron with a depth of 20

10    micron.   Do you see that?

11        A.   Which paragraph?

12        Q.   182 of your declaration.

13        A.   Yeah, yeah.   Side dimension of 50 micron

14    with depth of 20 micron, yes.

15        Q.   So your reasonable expectation of

16    success opinion that's provided here in

17    paragraph 182 is based on the similarity of the

18    well dimensions comparing Park and Kovac?

19        A.   Well, the way I would say it is that

20    they're both -- they both have wells, and they

21    both have wells that are on the order of tens

22    of microns, so they're both microwells.

23             And when I use the word 50 micron and

24    depth of 20 micron, I'm describing the Park

25    microwells.   When I say that the Kovac ones are

1      A.   Yes, I see a couple of them.

2      Q.   And generally, what would the person of

3   ordinary skill have understood the term "lab on

4   a chip" to mean?

5      A.   Yeah, so my definition of it, and what I

6   think a POSA would understand, is a laboratory

7   on a chip.  So, the idea is that taking

8   laboratory processes, like cell culturing or

9   some chemistry process, shrinking that down and

10  putting it on a chip.

11     Q.   Uh-huh.

12     A.   Chips until this time were primarily

13  electronic chips, like integrated circuits,

14  computer chips.  So, it's kind of a merging of

15  using the techniques developed to make computer

16  chips, but combining that with laboratory

17  principles and making a laboratory on a chip.

18          That's kind of the high-level way to

19  describe it.

20     Q.   And the Dimov reference that we're

21  looking at here, Exhibit 1003 describes this

22  lab on a chip technology?

23     A.   It's one example of lab on a chip

24  technology, yes.

25     Q.   And Dimov includes several examples of

Appx3550

1    applying this kind of lab on a chip analysis

2    that you're describing?

3       A.  Yes.

4       Q.  Okay.  And as part of lab on a chip, the

5    Dimov device is designed to be a complete

6    analysis system, so the analysis can be

7    conducted actually on the chip itself?

8       A.  Well, I wouldn't say that it describes a

9    complete analysis.  It describes analysis that

10   you can do on a chip.  It describes a

11   microfluidic multiplexed cellular and molecular

12   analysis device.

13          That doesn't mean that you can't analyze

14   cells removed from it and off the chip.  But it

15   is an example of a laboratory process on a

16   chip.

17      Q.  Right.  And I understand your opinion

18   that you could perform analysis off the chip,

19   but the Dimov device is designed to perform

20   certain analysis completely on the chip, right?

21      A.  Yes.  Some analysis could be done

22   completely on the chip.

23      Q.  Uh-huh.  And the analysis that is being

24   done in the chip on Dimov is being performed

25   within the capture chamber that Dimov

Appx3551

1   discusses?

2       A.  Can you repeat that question.

3       Q.  Yeah, the analysis that's being done on

4   the chip in Dimov is being performed within the

5   capture chamber that Dimov discusses?

6       A.  Dimov discusses analysis techniques that

7   are performed on the chip.  But they also

8   provide for other things that could be done off

9   chip.  But they disclose certain analysis that

10  are done on chip.

11      Q.  And those analysis that are done on

12  chip, those are performed within the capture

13  region?

14      A.  Yes.

15      Q.  Okay.  And Dimov is also designed to

16  perform a plurality of tests, not just one,

17  right?

18      A.  Yes, it's not limited to one test.  You

19  could do many different things.

20      Q.  And it's actually designed to do many

21  different things all at the same time, right?

22      A.  Yes, the title says Microfluidic

23  Multiplexed Cellular Analysis.  So it's a

24  multiplexed analysis, meaning more than one.

25      Q.  Yeah.

Appx3552

1    with the same or different materials -- be that

2    particles within a fluid or particles

3    directly -- such that each array either

4    replicates the process of the other or is

5    operable to conduct a different process

6    concurrently with that of the other.

7        A.  Yes.

8        Q.  Okay.  And I just want to make sure I'm

9    understanding this correctly.  Dimov is

10   designed with a variety of arrays so you can

11   conduct the same analysis repeatedly, right?

12       A.  Uh-huh.

13       Q.  That's one option.  And the other option

14   is, with all of these different arrays, you can

15   conduct different experiments?

16       A.  That's one mode of operation, yes.

17       Q.  Those are two different ones that it

18   describes in this paragraph that I just read.

19       A.  Can you say it again?

20       Q.  This portion that I just read describes

21   two different ways to use this multiplexed

22   device.

23       A.  Yes.

24       Q.  Okay.  And we talked earlier, Dimov

25   describes what it calls a capture chamber,

Appx3554

1    before I show it to you, do you understand the

2    Dimov device generally to be providing examples

3    of capture regions that would allow for

4    biomimetic experiments?

5        A.  So, it allows for cellular experiments,

6    so I'm just having the question about

7    biomimetic.

8        Q.  Yeah.  So, why don't we go to column 11

9    of Dimov example, 1003.

10            If you look at line 3, it starts with:

11   As the dimensions of the capture trench are

12   much greater than the particles which are

13   retained therein, devices such as those

14   heretofore described can be usefully employed

15   in biomimetic experiments.

16       A.  Yes.  Sure.

17       Q.  So you agree that the depth of Dimov's

18   trenches was specifically designed to be much

19   greater than the particles which are retained

20   there to conduct these biomimetic experiments?

21       A.  Yes.

22       Q.  And do you agree that the levitation out

23   of the Dimov device's deeper wells would

24   require either prolonged or increased exposure

25   to the IR laser compared to what we see in

1    Kovac?

2       A.  Well, what we can say is that if you

3    compare a 35-micron well to a 300-micron-depth

4    well, and the cells are at the bottom of the

5    well, then they have a longer distance to

6    travel.  So that's fair to say.

7            Now the question is:  Does it cause more

8    exposure, like radiation exposure?

9       Q.  Sorry, I'm not talking about -- I'm

10   talking about just prolonged exposure to the IR

11   laser.

12      A.  During levitation?

13      Q.  During levitation.

14      A.  So maybe.  There's a lot of factors at

15   play that -- so we can safely say that the cell

16   has to travel longer distance.

17           Now, does that cell take longer to

18   travel -- does it take more time to travel?

19   That's -- that's another story.  That depends

20   upon lots of factors, like cell size, whether

21   cells are conglomerated together or if they're

22   single cells, also what we talked about with

23   this wall interaction.

24           So Dimov's deeper cells but wider cells

25   would actually provide for less fluid drag as

1    the cell lifts.  So, that may allow to levitate

2    out easier than the wells of, say, Kovac or

3    Park.

4           So it's hard to say that it would

5    necessarily take longer.  What we can say is

6    that it would travel further.  I think that's a

7    fair thing.

8           But there's other factors like

9    recirculation patterns, things like that, that

10   could enter into this as well.  Hydrodynamic

11   drag.  So it would be very difficult to say.

12   Q.  So, if I understand your testimony

13   correctly, there are lots of different factors

14   that a person of ordinary skill is going to

15   have to consider to determine how much exposure

16   a cell is going to be subjected to if the goal

17   is to levitate that cell out of a well using a

18   laser?

19   A.  It'd be difficult to determine how much

20   time would be necessary to be exposed.

21   Q.  Uh-huh.  And some of those factors

22   include -- I think you mentioned the depth of

23   the well, the width of the well, whether

24   there's other cells present in the well, and

25   the recirculation pattern?

Appx3561

1      A.   And how big the cells are.

2      Q.   And how big the cells are.

3      A.   And things like that, yeah.  So there's

4   a lot of factors.

5      Q.   Any other factors that you can think of?

6      A.   Those are the predominant ones at this

7   point, yes.

8      Q.   Okay.  So, we were talking about some of

9   the different types of experiments that can be

10  performed within the Dimov device, and I just

11  want to talk a little bit more about some of

12  those specific examples.

13     A.   Okay.

14     Q.   One of the experimental techniques that

15  Dimov discusses includes releasing the contents

16  of the cell in the trench using a lysing agent,

17  right?

18     A.   Yes.

19     Q.   And for example, if you look at Figure 8

20  of Dimov.

21     A.   Yes.

22     Q.   This is one of the experiments that

23  Dimov describes using a lysing agent within the

24  trench to lyse the cells?

25     A.   There's no description.

1     Q.  Yeah, so why don't we go to column 8 of

2  Dimov, Exhibit 1003, line 4.

3     A.  Column 8, line 4:  "Each microfluidic

4  device 100 or COPE element module can be

5  configured to capture cells from" fluid passing

6  within a fluid device.

7     Q.  And then if you continue on, it states

8  that the "captured cells from the fluid passing

9  within the device flow," and it goes on to say

10  "lyse them and finally perform real-time NASBA

11  analysis and/or an immunoassay analysis all

12  within the same chamber.  An example of such a

13  methodology will be described with reference to

14  Figure 8."

15     A.  Yes.  Okay.  Uh-huh.

16     Q.  So you agree that Figure 8 of Dimov

17  provides an example of this type of

18  experimental technique using an agent that

19  would cause cell lysis?

20     A.  Yes.

21     Q.  And there is additional experiments

22  using lysis provided in Figure 16 and 17.  Are

23  you aware of that?

24     A.  I'd have to review it.  But I'm happy to

25  take your word on it.

1    Q.  Well, you have no reason to disagree --

2    I mean, we can go through it, but you have no

3    reason to disagree that there are multiple

4    experiments that are provided in the Dimov

5    reference that use a lysing agent to lyse cells

6    within the capture chamber?

7    A.  Sure.

8    Q.  Okay.  And because Dimov's trenches

9    share common outputs, if a lysing experiment is

10   being performed anywhere in the device, the

11   cell lysing agent may be present in the common

12   waste?

13   A.  So I'm looking for the outlet figure.

14   Q.  You know, we're going -- yeah, go ahead.

15   A.  So Figure 3 shows an outlet, and it

16   shows a common outlet.  So, if there is one

17   common outlet, and there is lysing agents

18   introduced into one part, then that lysing

19   agent will most likely show up in the outlet.

20   Yes.

21   Q.  Okay.  And can we at least agree that if

22   a lysing agent is being used as part of an

23   experiment in the trench, the Kovac cell

24   recovery method for selectively recovering a

25   cell isn't going to work?

1    A.   If the cell is lysed, that means it's

2    been opened up and its contents are out.

3    There's probably not a lot of reason to use the

4    laser technique to levitate that cell because

5    it's not really a cell anymore.

6    Q.   Got it.

7    A.   Yeah.

8    Q.   And we were just talking a little bit

9    about this, but I just want to get a better

10   understanding of how the device of Dimov is

11   actually set up.  I think you were looking at

12   Figure 2 of Dimov.  So let's turn to that.  Let

13   me know when you get to Figure 2 of Dimov.

14   A.   Yes, I'm at Figure 2.

15   Q.   What we're looking at here in Figure 2

16   of Dimov is an example of the entire

17   multiplexed microfluidic structure Dimov

18   describes, right?

19   A.   Yeah, Figure 2 is a photograph of an

20   exemplary multiplexed structure including a

21   plurality of devices.

22   Q.   And then if you look at Figure 1 of

23   Dimov.

24   A.   Yes.

25   Q.   On the top, this is a closer view of one

Appx3565

1    of the rows that we saw in Figure 2?

2        A.   Yes.

3        Q.   And at the bottom of Figure 1, that's an

4    even closer image of two of the arrays that are

5    seen in the larger row?

6        A.   Yes, yeah.

7        Q.   Okay.  And each of the arrays in this

8    configuration that we can see in Figure 1

9    comprises eight identical devices, right?

10       A.   So, there is a hierarchal structure,

11   right.

12       Q.   Uh-huh.

13       A.   There's a smaller section where there's

14   six -- no, eight -- well, okay, on the bottom

15   of Figure 1 it shows six devices, and on the

16   right side of the bottom of Figure 1 it shows

17   eight devices, and then those look like they

18   fit into a row of even more devices on top.

19           So it's a hierarchical structure.

20       Q.   Right.  So I'm looking at the furthest

21   zoomed-in version of Figure 1.  There's eight

22   identical devices there that are all connected?

23       A.   Eight on the left, and it looks like --

24   oh yeah, eight on the left and eight on the

25   right, yes, yes.

1     Q.   Right.  And then when you zoom out,

2   again, there's eight of those devices that each

3   contain eight of their own individual devices?

4     A.   Yes.

5     Q.   Okay.  And that's just one row of the

6   multiplexed structure that we see in Figure 2?

7     A.   That's correct.

8     Q.   Okay.  Now, taking a look at these --

9   let me see which one is the easiest one to look

10   at for this.

11        So taking a look at Figure 1 of Dimov.

12   Each of these eight devices on the most

13   zoomed-in version all share a common input

14   which is 120.  It's labeled as 120 in Figure 1.

15     A.   Yes, 120 then goes into 121, that feeds

16   into it, yeah.

17     Q.   And so, all those devices are sharing

18   the common input, 120 to 121?

19     A.   That's correct.

20     Q.   Okay.  And then each of these eight

21   devices also share a common output that flow

22   together with all of the devices on the top row

23   of Figure 1 to eventually end up in the common

24   output, which is labeled 130?

25     A.   Yes.

1      Q.   Okay.

2      A.   That's right.

3      Q.   So, just to make sure I understand, if a

4    cell was levitated out of one of the trenches

5    in one of these devices, it would have to

6    travel its own dedicated waste line to connect

7    with all of the other dedicated waste lines

8    that we see here to eventually group together

9    in the common output 130?

10     A.   Yes.

11     Q.   Okay.  And this common output 130 is

12   actually in fluid communication with the common

13   waste 140 that we see in Figure 2.

14     A.   Yes.

15     Q.   And as seen in Figure 2 of Dimov, this

16   common waste labeled 140 is shared with all of

17   the arrays of the device?

18     A.   All the rows, yes, and then each row has

19   its own output.

20     Q.   Right.  So, each row has its own output,

21   and all of the outputs are in fluid

22   communication with the common waste labeled 140

23   in Figure 2?

24     A.   That's correct.

25     Q.   Okay.  And Dimov actually describes all

Appx3568

1      of these arrays sharing this common waste as an

2      advantage of the device?

3          A.   What is --

4          Q.   Yeah, so why don't we go to Dimov

5      Exhibit 1003, column 4.

6          A.   Okay.

7          Q.   And let's look at line 18.

8          A.   Okay.

9          Q.   And it reads:  Where a plurality of

10     arrays are provided along a common axis, they

11     may advantageously be configured so as to share

12     a common waste.

13         A.   Yes, and I think the key there is "they

14     may advantageously be configured."  So, that

15     doesn't mean that they have to be configured,

16     but they may be configured to share a common

17     waste.

18         Q.   Right.  And that's described in Dimov as

19     an advantage for them to share a common waste?

20         A.   May be an advantage.  So it may be

21     advantageously configured.  So I would apply

22     the word "may" to the term "advantageously

23     configured."  Meaning that it doesn't have to

24     be configured that way, and it may be an

25     advantage or it may not be an advantage.  So

1    that's how I read that word.

2         So "may" and then "advantageously be

3    configured."

4         So the operative word "may" would say

5    that there may be other situations where you

6    wouldn't want it configured that way.  Or there

7    may be advantages.

8    Q.  Is there any description in Dimov of

9    having an advantage not to be configured in

10   that way?

11   A.  Again, I can't tell you what is not in

12   Dimov, but I can tell you what is in Dimov.

13   Q.  Okay, well, how about this.  In

14   preparation of your declaration and in

15   preparation for the deposition, you reviewed

16   Dimov.  Do you recall any discussion of Dimov

17   where it describes it being advantageous to not

18   have the arrays share a common waste?

19   A.  I don't recall seeing that.

20   Q.  Okay.  And this common output connected

21   to the common waste that we've been discussing

22   is the only output that's described in Dimov?

23   A.  I believe that is true.

24   Q.  And if we turn to your declaration,

25   Exhibit 1002, I'd like to go to paragraph 129,

1   bit different, though.

2       A.   Okay.

3       Q.   I understand your opinion that Dimov

4   discusses the removal of cells from the trench.

5   My question is does Dimov provide any examples

6   where a cell was selectively recovered from the

7   device successfully?

8       A.   I don't believe Dimov provides any

9   specific examples.

10      Q.   Thank you.

11      A.   Yes.

12      Q.   And turning back to the motivation to

13  combine Dimov with Kovac in Ground 3 of your

14  declaration, we've discussed paragraphs 130 and

15  122.

16           Do you provide any additional support

17  for your opinion in Ground 3 that a person of

18  ordinary skill would have been motivated to

19  combine Dimov with Kovac?

20      A.   So there's a number of ways.  I think I

21  have most of them here that I would view.  One

22  is they're similar devices, with microfluidic

23  device with wells that are capturing cells.

24  So, that's one reason, the pure geometry of the

25  system, the field of use of the system, that

1   they're both cell analysis.

2         The idea that one monitors the cells in

3   Dimov's device, that would be another reason.

4   That if you're monitoring it, you do that for a

5   reason, and you may want to use that.  You may

6   want to remove a cell.  That would be one

7   reason.

8         Dimov specifically expressly discloses

9   the idea of using laser tweezers.  So, the idea

10  of manipulating cells with laser tweezers in a

11  microfluidic environment, there's not a lot of

12  publications on that.

13        There's -- I mean, there is a whole

14  field of laser tweezers, there is a whole field

15  of microfluidics, there is a whole field of

16  cell analysis, but if you look at publications

17  that have all three of those, you know, there's

18  not a lot of publications like that.  There's a

19  few, and Kovac is one of them.  So that would

20  be a natural reason to draw you in to Kovac.

21     Q.  Just to ask a question about that.

22     A.  Yes.

23     Q.  Have you provided in your declaration a

24  determination for how many references you

25  believe fall into that category of Park and

Appx3576

1    Kovac?

2        A.   I have not.

3        Q.   Okay.

4        A.   But as a POSA, I can tell you that

5    combining three different fields in that way,

6    it's -- you know, it's a finite number.  So

7    that would be a natural motivation.  Also --

8        Q.   And just to be clear, though, what we're

9    talking about right now is the motivation to

10   combine Dimov with Kovac to selectively recover

11   a cell?

12       A.   Yes.

13       Q.   Do all of these apply to the opinion of

14   why you'd be motivated to modify Dimov in the

15   first place to selectively recover?

16            You know what?  Let me strike that

17   question because it's unclear.

18            You mentioned the monitoring of cells in

19   Dimov as one of the reasons for the motivation,

20   correct?

21       A.   Yes.

22       Q.   Okay.  You agree that Dimov does not

23   provide an example of using cell recovery to

24   monitor cells, right?  There is no example of

25   that provided in Dimov?

```
 1      A.   The monitoring of the cells occurs in

 2   the trenches.

 3      Q.   Right.  Thank you.

 4      A.   Similar to how it occurs with Kovac.

 5      Q.   Why don't we take a short break.  I just

 6   want to go through my notes and see what else I

 7   have.

 8      A.   Sure.  Yeah.

 9           (Recess ensued from 2:49 p.m.

10   to 3:02 p.m.)

11   BY MR. YUSEM:

12      Q.   So, earlier today, Dr. Meinhart, we were

13   talking about the knowledge a POSA has

14   regarding selective recovery.  Do you recall

15   that discussion?

16      A.   Yes.

17      Q.   And I think you mentioned, and please

18   correct me if I'm wrong, that the person of

19   ordinary skill's knowledge is that selective

20   cell recovery is something that they are going

21   to want from these microfluidic devices,

22   generally; is that correct?

23      A.   It's something that -- it depends on the

24   question that's being asked.  So it depends

25   upon what the investigator is trying to
```

Appx3578

1       Q.   Okay.

2       A.   While the cells are in the wells.

3       Q.   Right.  And my question is:  Does Kovac

4    disclose the replication of cells in the wells

5    of its device?  And the Kovac reference, if you

6    have it, is Exhibit 1007.

7       A.   And by "replication," you mean like

8    division, cell division.

9       Q.   Yeah.

10      A.   I don't believe Kovac discloses cell

11   division or analyzing cell division.

12      Q.   Okay.  So I'd like to turn to Dimov

13   1003.  Specifically column 11.

14      A.   Okay.

15      Q.   Now, you've referenced this disclosure

16   in Dimov in column 11 a few times where it's

17   discussing laser tweezers and the removal of a

18   cell   m the t ench, an  that appea s he e in

19   column 11, right?

20      A.   Which line?  Oh, yeah, right.  Sure,

21   laser tweezers, yes, uh-huh.

22      Q.   Right.  And you've referenced this part

23   of Dimov several times today?

24      A.   Yes, correct.

25      Q.   Okay.  And I'd like to take a look at

1   in column 11 that we've been discussing today

2   appears in the context of these biomimetic

3   experiments?

4       A.   I don't -- yeah, so I -- they're in

5   close spatial position in the specification,

6   but I don't think that they're limited to the

7   biomimetic -- biomimetic experiments, and I

8   don't believe that it's limited to groups of

9   cells.

10          The removal of cells could be individual

11  particles, or it could be groups of particles.

12      Q.   So I'm not asking if it's limited.  I

13  was just asking if this discussion of cell

14  removal that you point to in column 11 is

15  occurring within the discussion of these

16  biomimetic experiments that we see, for

17  example, in Figure 21 of Dimov?

18      A.   Yes.

19      Q.   Okay.  And can we at least agree that a

20  person of ordinary skill would not have been

21  able to use the Kovac technique to remove a

22  single cell selectively in a biomimetic

23  experiment that had cells layered on top of

24  each other, like we see in Figure 21?

25      A.   I think it would depend upon how many

1    9326?

2        A.  Yes.

3        Q.  And you see in column 9326 there is a

4    reference to mitosis?

5        A.  Can you point me to that?

6        Q.  So, it's about halfway down the

7    left-hand, the first paragraph.

8        A.  Yes.

9        Q.  And so what is your understanding of

10   what mitosis is?

11       A.  Mitosis is cell division.

12       Q.  Okay.  And have you reviewed --

13           MR. YUSEM:  Sorry, Counsel, can you,

14   just for the record, just point me to where

15   that is?  I don't see it.

16           MR. KRAUSE:  We're in page 9326 of

17   Dimov, left-hand column, and then line 13, by

18   my count.

19           THE WITNESS:  Thank you.

20   BY MR. KRAUSE:

21       Q.  And then, Dr. Meinhart, have you also

22   reviewed the second paragraph in page 9326, or

23   would you take a moment to do that?

24       A.  Yes.

25       Q.  And does Kovac describe anything --

Appx3610

1    strike that.

2         Does Kovac say anything about removing

3    single cells from wells that contain multiple

4    cells?

5       A.  Yes, the last sentence it says:  A

6    single cell can, in general, even be removed

7    selectively from a well with multiple cells.

8         MR. KRAUSE:  I have no further questions

9    at this time.

10        MR. YUSEM:  All right.  Can we just take

11   a short break?

12        MR. KRAUSE:  Sure.

13        (Recess ensued from 4:04 p.m.

14   to 4:06 p.m.)

15

16              RECROSS-EXAMINATION

17   BY MR. YUSEM:

18      Q.  Dr. Meinhart, before the last break, did

19   you discuss your testimony at all with counsel

20   before the redirect questions?

21      A.  No.

22      Q.  Okay.  During redirect, your counsel

23   asked you a question about Kovac, Exhibit 1007.

24   Do you have that in front of you?

25      A.  I do.

1      Q.   Uh-huh, and specifically page 9326.  Let

2   me know when you're there.

3      A.   Yeah.

4      Q.   And on page 9326, you read a sentence

5   that stated, in Kovac:  A single cell can, in

6   general, even be removed selectively from a

7   well with multiple cells.

8           Is that right?

9      A.   That's correct.

10     Q.   And there it cites Figure 3B, right?

11     A.   Yes.

12     Q.   Okay.  So let's take a look at Figure 3B

13  of Kovac on the right-hand side of page 9326.

14  Do you see that?

15     A.   Yes, I see Figure 3B.

16     Q.   And the caption for 3B reads:  Tight

17  localization of the optical force we

18  demonstrated the ability to remove a single

19  targeted cell residually in a doubly loaded

20  well.

21     A.   Uh-huh.

22     Q.   So, in Kovac, when they're talking about

23  multiple cells, the example they cite for that

24  is a single cell in a doubly loaded well,

25  correct?

1      A.   You know, selectively removing a single

2    cell from a two cell -- a well of two cells --

3      Q.   Right.

4      A.   -- that's the example?  Yes.

5      Q.   Okay.

6           MR. YUSEM:  That's all the questions I

7    have.

8           MR. KRAUSE:  Nothing further from our

9    side.

10          (Deposition concluded at 4:08 p.m. 222)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**
_____

BERKELEY LIGHTS, INC.,
Petitioner,

v.

THE UNIVERSITY OF BRITISH COLUMBIA,
Patent Owner.
_____

_____

Case No.: IPR2021-01249
U.S. Patent No. 10,087,408

_____

**DECLARATION OF BRUCE K. GALE, Ph.D.**

THE UNIVERSITY OF BRITISH COLUMBIA EXHIBIT 2012
Berkeley Lights, Inc. v. The University of British Columbia
IPR2021-01249

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................ 5

II.  PROFESSIONAL BACKGROUND AND QUALIFICATIONS ............... 5

III.  MATERIALS CONSIDERED ................................................ 10

IV.  SUMMARY OF OPINIONS ................................................. 11

V.  OVERVIEW OF THE '408 PATENT ..................................... 11

VI.  LEVEL OF ORDINARY SKILL IN THE ART ......................... 14

VII.  CLAIM CONSTRUCTION ................................................ 15

VIII.  PRIORITY FILING DATE ............................................... 15

IX.  THE ALLEGED PRIOR ART REFERENCES RELIED UPON BY
     DR. MEINHART ............................................................ 15

    A.  Dimov (Ex. 1003) ..................................................... 15

    B.  Park (Ex. 1006) ........................................................ 24

    C.  Kovac (Ex. 1007) ...................................................... 30

X.  DETAILED OPINIONS ...................................................... 36

    A.  Ground 1: Dimov Does Not Disclose the Combination of Features
        Recited in Claims 1, 6, 11, 19, 24, 26, 27, and 30 of the '408
        Patent. ................................................................. 36

    B.  Ground 2: Dimov Does Not Disclose or Suggest the Combination of
        Features Recited in Claims 1, 6, 11, 19, 24, 26, 27, and 30 of the '408
        Patent. ................................................................. 45

        1.  No General Motivation to Modify Dimov To Include a
            Selective Recovery Step, Much Less After Monitoring a
            Response ......................................................... 46

        2.  No Motivation to Make Dr. Meinhart's Modifications .......... 52

C.   Ground 3:  Dimov in View of Kovac Does Not Disclose or Suggest
the Combination of Features Recited in Claims 1, 6, 11, 19, 24, 26,
27, and 30 of the '408 Patent............................................................. 55

    1.   No Motivation to Modify Dimov to Include a Selective
Recovery Step, Much Less After Monitoring a Response ..... 56

    2.   No Motivation to Modify Dimov with Kovac ....................... 57

        (a)   The Structural Features of Dimov are Incompatible with
the Laser Levitation Technique of Kovac .................... 57

        (b)   Dr. Meinhart's Suggested Modifications Do Not
Overcome the Structural Incompatibility ..................... 62

        (c)   The Purpose of Dimov is Incompatible with the Laser
Levitation Technique of Kovac .................................... 67

        (d)   A POSA would not have been motivated to modify
Dimov with  Kovac based on the disclosure of allegedly
similar laser techniques ................................................ 71

    3.   No Reasonable Expectation of Success ................................. 73

D.   Ground 4:  Park Does Not Disclose or Suggest the Combination of
Features Recited in Claims 1, 11, 16, 24, 26, 27, and 30 of the '408
Patent. ............................................................................................... 79

E.   Ground 5:  Park in View of Kovac Does Not Disclose or Suggest the
Combination of Features Recited in Claims 1, 11, 16, 24, 26, 27, and
30 of the '408 Patent. ....................................................................... 83

    1.   No General Motivation to Modify Park to Include Selective
Recovery, Much Less After Monitoring a Response.............. 85

    2.   No Motivation to Modify Park with Kovac ........................... 86

        (a)   The Purpose of Park is Incompatible with the Laser
Technique of Kovac...................................................... 87

        (b)   The Structural Features of Park are Incompatible with
the Laser Levitation Technique of Kovac .................... 89

    3.   No Reasonable Expectation of Success ................................. 93

Appx3659

**TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---|---|
| Ex. 2001 | Joint Claim Construction and Prehearing Statement (Dkt. #10) in *Abcellera Biologics Inc. and the University of British Columbia v. Berkeley Lights, Inc.*, 5:20-cv-08624 (N.D. Cal. July 16, 2021) |
| Ex. 2002 | U.S. Patent No. 10,723,988 |
| Ex. 2003 | U.S. Provisional Application No. 61/362,213 |
| Ex. 2004 | Supporting Information for Kovac, J. and Voldman, J., *Intuitive, Image-Based Cell Sorting Using Opto-fluidic Cell Sorting*, 79 Anal. Chem. 24, 9321-9330 (2012) |
| Ex. 2005 | Liang, H. et. al., *Wavelength Dependence of Cell Cloning Efficiency after Optical Trapping*, 70 Biophysical J. 1529-1533 (1996) ( "Liang" ) |
| Ex. 2006 | Neuman, K. et al., *Characterization of Photodamage to Escherichia coli in Optical Traps*, 77 Biophysical J. 2856-2863 (1999) ( "Neuman" ) |
| Ex. 2007 | Mohanty, S.K. et al., *Comet Assay Measurements of DNA Damage in Cells by Laser Microbeams and Trapping Beams with Wavelengths Spanning a Range of 308 nm to 1064 nm*, 157 Radiation Research 378-385 (2002) ( "Mohanty" ) |
| Ex. 2010 | Transcript of the May 4, 2022 deposition of Dr. Carl Meinhart in this Proceeding |
| Ex. 2011 | *Curriculum Vitae* of Dr. Bruce K. Gale |

I, Bruce K. Gale, Ph.D., declare as follows:

## I. INTRODUCTION

1.     I have been retained by the University of British Columbia ("UBC" or "Patent Owner") as an independent technical expert in this proceeding before the United States Patent and Trademark Office ("PTO") Patent Trial and Appeal Board ("Board") regarding U.S. Patent No. 10,087,408 ("the '408 patent") (Ex. 1001).

2.     I understand that Berkeley Lights, Inc. ("BLI" or "Petitioner") filed a petition for *Inter Partes* Review of claims 1, 6, 11, 16, 19, 24, 26, 27, and 30 of the '480 patent ("the Challenged Claims"), which includes the Declaration of Dr. Carl Meinhart ("Meinhart Declaration") (Ex. 1002).

3.     I have been asked by counsel for Patent Owner to analyze and explain why I disagree with certain opinions set forth in the Meinhart Declaration.

4.     I am being compensated at my customary consulting rate of $500 per hour for the time I spend on this matter.  My compensation is in no way contingent on the substance of my opinions and testimony or the outcome of this or any other proceeding.  I have no other interest in this proceeding.

## II. PROFESSIONAL BACKGROUND AND QUALIFICATIONS

5.     My qualifications and professional experience, including a list of my publications and my expertise and professional activities, are described in my

Appx3661

*curriculum vitae*, a copy of which is provided with this Declaration as Ex. 2011.

The following is a summary of my qualifications and professional experience.

6.     I am currently a Professor and the Chair of the Department of Mechanical Engineering at the University of Utah.  I am also the Director of the State of Utah Center of Excellence for Biomedical Microfluidics, and a co-founder of the Manufacturing Extension Partnership Center (MEP).  I am also an Adjunct Professor at the University of Utah in the Departments of Bioengineering, Electrical and Computer Engineering, and Materials Science and Engineering.  I previously served as the Director of the College of Engineering Nanofabrication Lab at the University of Utah.

7.     I received a Bachelor of Science degree in Mechanical Engineering from Brigham Young University in 1995 and received my Ph.D. in Bioengineering from the University of Utah in 2000.  My doctoral thesis was on the development, fabrication, and testing of a microfluidic electrical field flow fractionation system, a type of liquid chromatography system.  My doctoral research involved the development of this new chromatography technique, as well as all the liquid handling, connection, and detection components.  I was involved in the research and design of all fluid handling components for both macroscale and microscale versions of multiple other types of field flow fractionation systems.  I also

Appx3662

conducted research on electrical particle detection systems, biocompatibility studies, and microfluidic research on low aspect ratio channels.

8.      For over twenty-five years, I have been working in microfluidics, nanotechnology, and micro-total-analysis systems (μ-TAS).  My research interests include lab-on-a-chip devices that require a variety of microfluidic components for the completion of complex medical and biological assays.  These components fall into three broad categories:  sample preparation, sample separation or analysis, and detection.  My work has also involved micromachined nanoparticles separation systems and detectors, microarray manufacturing methods, high-speed PCR, miniature medical and drug delivery devices, and sensors related to these applications.  My research involves the development of a microfluidic toolbox for the rapid design, simulation, and fabrication of devices with medical and biological applications, with the ultimate goal of developing platforms for personalized medicine that allows medical treatments to be customized to the needs of individual patients.

9.      I have been recognized for my research in microfluidics.  For example, I have received the Governor's (Utah) Medal for Science and Technology and been named a Fellow of the National Academy of Inventors.  I have been awarded the University of Utah Distinguished Research Award in 2020.  I have been named Researcher of the Year in 2012, 2013, and 2016 for the Mechanical Engineering

Department at the University of Utah. I also received the TVC Star Award in 2016. I was recently named the Merit Medical Systems, Inc. College of Engineering Chair for my research and service to the College of Engineering. I have also served as a Fulbright Specialist in Microfluidics for colleges in India.

10. I have published more than 400 articles, more than 150 of which are published in peer-reviewed journals, such as *Lab on a Chip*, *Journal of Micromechanics & Microengineering*, *Microfluidics & Nanofluidics*, *Analytical Chemistry*, *Analytical & Bioanalytical Chemistry*, *Journal of Chromatography*, *Journal of Fluids Engineering*, *Analyst*, *Electrophoresis*, *Journal of the Electrochemical Society*, *Sensors & Actuators*, *Biomedical Microdevices*, *Langmuir*, *Biomicrofluidics*, *Journal of Microlithography, Microfabrication, & Microsystems*, and other top microfluidics, engineering, and chemistry journals. I have also written four book chapters, including a book chapter titled "Applications of Microfluidics for Molecular Diagnostics," in *Microfluidic Diagnostics: Methods and Protocols, Volume 2: Application Protocols and Commercialization* (2012). In addition, I have presented my research at numerous research conferences. These papers and book chapters cover a wide range of topics, but primarily center on microfluidic devices for biology and chemistry. About two-thirds of my papers relate to the design, use, and fabrication of microfluidic devices to perform a variety of biomedical functions. I have several papers detailing the design and fabrication

of micropumps and microvalves. I also have several papers discussing highly parallel microfluidic systems for protein characterization, DNA and RNA extraction from a biological sample and analysis, drug discovery, or drug screening using surface plasmon resonance or biological cells. I have also published papers on microfluidic separation techniques for separating micro- and nano-particles based on size or charge.

11. My research has led to a few companies that have spun out of my research lab. The development of a "Continuous Flow Microspotter" led to the formation of Carterra (formerly Wasatch Microfluidics) in 2005. Carterra is now a 60-person company with $40 million in investment and sales of over $50 million (at least $15 million this year) with exponential growth expected in the next few years. My research on pathogen detection has resulted in multiple technologies in this area, including microfluidic chips for rapid PCR (licensed by a Boston area company), multipathogen detection platforms (licensed to Espira), digital PCR (Espira), nanoscale detection systems (Guanine), and extreme PCR in a microfluidic chip (Biofire/BioMerieux). Applications of this technology to zebrafish embryo processing resulted in a recent spinout, wFluidx, that has commercialized an instrument for rapid cell collection for genotyping zebrafish embryos. wFluidx started in June 2018 and has already sold over 100 instruments to labs around the world. Another company I started, Advanced Conceptions, uses

the principles of high-speed flow in microscale fluid channels to separate sperm and other particles from contaminants, and was recently purchased by a public company, Co-Diagnostics Inc.  Microsurgical Innovations is another company that designs and manufactures medical devices and surgical tools for use in repairing blood vessels and damaged nerves.

12.     I have been a principal investigator or co-principal investigator on over $40 million of research in the past or ongoing related to microfluidics.  I am a named inventor on 21 U.S. patents, with additional patents pending.

## III.     MATERIALS CONSIDERED

13.     The opinions contained in this Declaration are based on the documents I reviewed, as well as my education, years of professional experience, and knowledge.  In forming my opinions expressed in this Declaration, I reviewed the following documents and other materials cited herein in this Declaration:

- Petition for *Inter Partes* Review of the '408 patent ("Petition");

- Petitioner's exhibits filed with the Petition, including the Meinhart Declaration;

- Patent Owner's exhibits filed with the Patent Owner's Preliminary Response (Ex. 2001 – Ex. 2007);

- A claim chart of the Challenged Claims and Provisional Application No. 61/362,213 (Appendix A to the Patent Owner's Response);

- Transcript of the May 4, 2022 deposition of Dr. Carl Meinhart in this proceeding (Ex. 2010); and

- Any additional exhibits listed in the Table of Exhibits appended after the Table of Contents of this Declaration.

## IV.    SUMMARY OF OPINIONS

14.    In my opinion, none of the references Dr. Meinhart relies on in each of Grounds 1-5 disclose, teach, or suggest at least the "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring" step that is part of each of the claims challenged by BLI.  In particular, as I explain in detail below, Dimov alone does not disclose, teach, or suggest this step, nor would a POSA have understood that Dimov in combination with Kovac discloses, teaches, or suggests that step.  *See* Sections X.A-C (Grounds 1-3).  Similarly, Park by itself does not disclose, teach, or suggest this step, nor would a POSA have understood that Park in combination with Kovac discloses, teaches, or suggests that step.  *See* Sections X.D-E (Grounds 4-5).

## V.    OVERVIEW OF THE '408 PATENT

15.    The '408 patent is entitled "System and Method for Microfluidic Cell Culture" and is based on Provisional Application No. 61/362,213 ("the '213 provisional application"), filed on July 7, 2010, and related Application No. 13/178,395, filed on July 7, 2011.  Ex. 1001 at 1 (patent cover page).

16.    The '408 patent describes microfluidic devices and methods of using the microfluidic devices for culturing cells and performing related studies. *See* Ex. 1001. Claim 1, the only independent claim in the '408 patent, is reproduced below (emphasis added):

1.    A method of culturing a cell, the method comprising:

retaining the cell at a retaining position within an individual chamber of a microfabricated device;

perfusing the cell with a perfusion fluid by flowing the perfusion fluid into the individual chamber through an inlet and out of the chamber through an outlet,

wherein the outlet is positioned such that gravitational forces acting on the cell to keep it at or near the retaining position exceed hydrodynamic forces acting on the cell to move it toward the outlet;

culturing the cell within the chamber and monitoring a response in the chamber; and

*selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step*.

17.    Claims 6, 11, 16, 19, 24, 26, 27, and 30 are reproduced below:

6.    The method of claim 5, wherein the speed of the perfusion fluid is decreased to about 0 µm/s as the

Appx3668

perfusion fluid approaches the retaining position.[1]

**11.** The method of claim 1, wherein the perfusion fluid comprises any one or more of a cell culture medium, an immunostaining agent, an enzymatic reagent, a dye, a buffer, an oil, and a bead-containing solution.

**16.** The method of claim 1, further comprising tracking the progeny of the cell.

**19.** The method of claim 1, further comprising characterizing the cells by lineage staining, antibody staining, enzymatic assaying, RT-PCR analysis, sequencing, functional assaying, or bead capturing to characterize the cells.

**24.** The method of claim 1, wherein the chamber volume is less than about 10 nL.

**26.** The method of claim 1, further comprising imaging the chamber to obtain an image of the chamber comprising the cell.

**27.** The method of claim 26, further comprising analyzing the image of the chamber to determine a

---

[1] Claim 5 states: "The method of claim 1, wherein a speed of the perfusion fluid is decreased to less than 50 μm/s as the perfusion fluid approaches the retaining position."

cellular response.

**30.** The method of claim 1, wherein the cellular response is determined using a fluorescent reporter.

18. Each of claims 6, 11, 16, 19, 24, 26, 27, and 30 depends on claim 1, either directly or through another claim (*e.g.*, claim 6 depending on claim 5, which depends on claim 1). Each of the Challenged Claims includes the claim limitation recited by claim 1 that requires "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step."

## VI. LEVEL OF ORDINARY SKILL IN THE ART

19. For purposes of this Declaration, I have been asked to apply the following definition of a person of ordinary skill in the art ("POSA"), proposed by Petitioner, with respect to the '408 patent as of the priority filing date, July 7, 2010:

> [A] POSA . . . would have had a bachelor's degree in mechanical engineering, chemical engineering, biomedical engineering, molecular biology, (bio)chemistry, or an equivalent degree relevant to microfluidic biological cell analysis, and at least three to five years of experience with the construction and application of microfluidic devices to cell culture and analysis.

Ex. 1002 at ¶ 40.

Appx3670

20. All my opinions in this Declaration are from the perspective of a POSA, as defined above. At the relevant time, I possessed at least the qualifications of the POSA as defined above.

## VII. CLAIM CONSTRUCTION

21. For purposes of this Declaration, I have used the claim constructions that Dr. Meinhart has applied in his declaration. I otherwise express no opinions on claim construction.

## VIII. PRIORITY FILING DATE

22. I understand that Dr. Meinhart has used July 7, 2010 as the priority filing date to assess the validity of the Challenged Claims. Ex. 1002 at ¶ 40; *see also* Meinhart Tr. at 46:13-19. Moreover, I have also reviewed what I understand is being submitted as Appendix A to Patent Owner's Response, which contains a chart showing where various claim limitations are supported in the '213 provisional application filed on July 7, 2010. Based on Dr. Meinhart's use of the July 7, 2010 priority date, and based on my analysis of Appendix A, I have also used July 7, 2010 as the priority filing date to assess the validity of the Challenged Claims.

## IX. THE ALLEGED PRIOR ART REFERENCES RELIED UPON BY DR. MEINHART

### A. Dimov (Ex. 1003)

23. Dimov is a patent that issued on December 9, 2014 as U.S. Patent No. 8,906,669, titled "Microfluidic multiplexed cellular and molecular analysis

device and method." I understand that the face of the patent indicates that it was filed on October 9, 2009 as a PCT application, PCT/EP2009/063229. The inventors listed on the face of the patent are Ivan Dimov, Jens Ducree, Luke Lee, and Gregor Kijanka. Ex. 1003 at 1 (patent cover page).

24. Dimov describes a microfluidic device that is designed to collect particles, such as cells, in an array of capture chambers and analyze the captured cells by introducing a plurality of fluids in a sequential flow utilizing a fluid path configured to have a common input for each microarray and a common output for all fluids. The device can include a multiplex of arrays that all likewise share a common output.

25. Specifically, Dimov describes "a sequential flow microfluidic device having a fluid path defined within a substrate between an input and an output," where the device has a capture chamber, preferentially in the shape of a trench,[2] that extends "into the substrate [of the device] in a direction substantially perpendicular to the fluid path such that operably particles provided within a fluid flowing within the fluid path will preferentially collect within the capture chamber."

---

[2]  Throughout this Declaration, I note that the terms "chamber," "capture chamber," and "trench" are often used interchangeably by Dimov as well as by Dr. Meinhart. I too use these terms interchangeably in this Declaration.

Ex. 1003 at 1:40-56. Dimov explains that "the capture chamber is desirably dimensioned such that cells entrained within the fluid will preferentially be displaced from the fluid and will remain in the capture chamber." *Id.* at 1:57-60.

26.    Figure 4B of Dimov shows a sectional view of the device:



*FIG. 4B*

27.    Figures 1 and 2 of Dimov show an exemplary structure incorporating the microfluidic device 100.



FIG. 1

Appx3673



FIG. 2

28.    Figure 3 of Dimov shows a drawing of the loading of fluid into a structure shown in Figure 2:



FIG. 3

29.     Figure 7 of Dimov shows a scheme of fluid flow within the device and

retention of cells "within the capture region" of the capture chamber/trench:



FIG. 7

30.     Dimov states that:

> Each device 100 comprises a fluid path 103 defined within
> a substrate 105 between an input 120 and an output 130.
> A capture chamber 160 is provided within the fluid path.

Ex. 1003 at 3:24-26.  Figures 1 and 2 show how Dimov configured the devices into

multiple arrays that were integrated into a multiplexed structure.  *Id.* at 3:54-56.

Figures 1 and 2 provide 512 identical devices multiplexed into a single monolithic

device.  *Id.* at 3:56-62.  In Figures 1 and 2, each array has eight microfluidic devices.

*Id.* at 3:62-67.  Dimov states that:

> Each array 110 in this configuration comprises eight
> identical devices 100, sharing a common input 120 and a

Appx3675

common output 130. The common input branches into 8 feed lines 122a, 122b, 122c etc., provided upstream of capture chambers for each device respectively. Each device has a dedicated waste line 132a, 132b, 132c etc., provided downstream of the capture chamber and configured to distribute fluid out of the devices into the common output 130. Within each array it will therefore be understood that a plurality of capture chambers are provided. Where they share a common input the fluids that are discharged into the individual chambers will be the same.

*Id.* at 4:1-11. Dimov further states that:

Where a plurality of arrays are provided along a common axis, they may advantageously be configured so as to share a common waste. In this exemplary arrangement the common output 130 for each row is then in fluid communication with common waste 140 for the multiplexed structure.

*Id.* at 4:18-22. With the exception of access to the input and common output, the device is sealed. *See, e.g.*, Figs. 1-4, 7, 25.

31. Dimov explains that its microfluidic device is designed to capture and retain cells in the capture chamber. The capture chamber of the device is illustrated in the form of a trench. *See, e.g.*, Ex. 1003 at Figs. 4, 7, 8, 16, 18, 25. Dimov states

that the depth of the capture chamber/trench is "approximately 300 microns." *Id.* at 5:43-45; *see also id.* at 9:16, 9:38. Dimov explains that the "capture chamber" is "provided to selectively capture particles travelling within the fluid such that these particles will be displaced out of the fluid and remain in the capture chamber while the fluid exits the device." *Id.* at 5:20-24; *see also id.* at 6:44-47.

32. Dimov states that each microfluidic device 100 "can be configured to capture cells from a fluid passing within the device" and to conduct further experiments and analysis on the captured cells, including lysing the cells to analyze the cellular contents, "all within the same chamber." Ex. 1003 at 8:4-9; *see also id.* at 7:30-37, 10:55-58, 12:13-19.

33. Dimov states that the devices "are particularly well suited for providing analysis and/or treatment of very small volumes of available analyte." Ex. 1003 at 5:10-12. Dimov further states that "captured cells can be exposed to different environments and their responses can be tested," or the cells can be lysed so that their contents are released in the capture chamber/trench for further analysis. *Id.* at 7:37-41. There is no discussion or disclosure of a need or desire to selectively recover any of the captured cells from the capture chamber/trench subsequent to any analysis.

34. Dimov describes conducting experiments on the captured cells within the capture chamber/trench. Dimov states that "[a] variety of tests may be

conducted on cells that are constrained within the capture region" within the capture chamber/trench. *Id.* at 10:11-12. Dimov includes several examples of applying this kind of "lab on chip" analysis using its device. *See, e.g.*, *id.* at 10:12-49 (describing real-time immunoassay and NASBA analysis); 11:44-56 (describing experiments using the device for the analysis of *E. Coli* bacteria); 13:59-14:57 (describing experiments using the device for real time protein analysis); 15:1-26 (describing experiments using the device for RNA and protein analysis). None of the examples include selectively recovering cells or colonies of cells from the capture chambers/trenches of the device, which I understand Dr. Meinhart does not dispute. Meinhart Tr. at 184:3-9. In many of the examples, the cells are lysed within the capture chambers/trenches, eliminating any possibility of recovering cells generally and strongly indicative that Dimov has no interest in selectively recovering cells. Ex. 1003 at Figs. 8, 16, 17; 2:59-61, 7:37-41, 8:4-10, 8:20-45, 9:55-10:9, 15:14-19.

35.     The Dimov device is therefore designed to "preferentially retain the particles in the trench." Ex. 1003 at 11:21-23. There is no disclosure of selective recovery of cells from the capture chamber/trench. The only mention in Dimov of "possibl[y]" "remov[ing]" particles out of the capture chamber/trench does not describe the selective recovery of particles or cells. *Id.* at 11:21-26.

36.     Specifically, the paragraph containing the sentence that mentions possibly removing particles begins by stating that "[t]he retention characteristics of

the capture region [in the capture chamber/trench] make it particularly effective for also mimicking in vivo conditions of cellular activities." Ex. 1003 at 11:1-3. Dimov explains that "[a]s the dimensions of the capture trench are much greater than the particles which are retained therein, devices such as those heretofore described can be usefully employed in biomimetic experiments." *Id.* at 11:3-6. Dimov then describes examples of such biomimetic experiments "to generate 3D cell structures" within the capture chamber/trench so as to "recreate cellular conditions similar to in-vivo tumours or other structures." *Id.* at 11:6-15; *see also id.* at Fig. 21. Dimov explains that "[b]y selectively varying the nature of the fluid passing over the capture chamber it is possible to selectively layer the particles that are ultimately captured within the chamber," and that "[a]s these will typically be retained in the order that they were introduced into the chamber, this allows for subsequent experiments to be conducted within pseudo in vivo conditions." *Id.* at 11:16-21. Thus, Dimov describes using the capture chamber/trench to retain layers of cells to generate biomimetic 3D cell structures in the capture chamber/trench.

37. Dimov then states that "[w]hile the arrangements described herein preferentially retain the particles within the trench, it is possible to modify the arrangement so as to provide for subsequent movement of the particles—either within the trench so as to provide for mixing or the like, or to effect removal of the particles out of the trench." Ex. 1003 at 11:21-26. Dimov then lists generally nine

techniques that "could" be used to provide for such "subsequent movement of the particles." *Id.* at 11:30-43. Thus, and as discussed further below, Dimov merely states that "it is possible to modify" its device to "provide for subsequent movement of the particles," including "removal" of particles, and lists the techniques that "could" be used in general. Dimov does not describe specifically any particular modifications to the disclosed devices to allow for removal of particles out of the capture chamber/trench. Nor does Dimov disclose any selective recovery of particles or cells. In contrast, Dimov states that "[t]he device is suitable for in situ cell culturing and can also be considered for providing 3-D cell co-culturing," and that "[a]n exemplary application has been demonstrated in multi-flow analysis techniques which may be effected ***without removal*** of the captured cells from their capture chamber." Ex. 1003 at 13:42-46 (emphasis added). Dimov in every case teaches away from selective recovery of cells.

### B. Park (Ex. 1006)

38. Park is a paper published by Park et al., titled "Single cell trapping in larger microwells capable of supporting cell spreading and proliferation," in the journal *Microfluid Nanofluid* (2010) 8:263-268. *See* Ex. 1006. I understand that Dr. Meinhart and Petitioner contend that Park was published online on October 10, 2009, and in the printed issue of the journal "no later than February 1, 2010." Ex. 1002 at ¶ 52; Ex. 1020 at ¶¶ 29-30.

39.     Park describes a microfluidic device for single cell trapping that has microwells with a size sufficient for attachment and division of the captured cells in the microwells.  According to Park, "[c]onventional cell trapping methods using microwells with small dimensions (10-20 µm)" had "insufficient space for longer duration screening tests that require observation of cell attachment and division." Ex. 1006 at 263.  Park describes "a flow method that enables single cell trapping in microwells with dimensions of 50 µm, a size sufficient to allow attachment and division of captured cells." *Id.*

40.     Park describes "a method for high-throughput single cell trapping in larger, more readily fabricated microwells by utilizing slow laminar flow and optimized microwell shape to achieve high cell-entrapment rates." Ex. 1006 at 264. Park depicts the overall design of the Park device in Figure 1:



*Id.* at 264 (Fig. 1). The device has "two components"—"the microwell array and the main channel." *Id.* at 265. As shown in the above figures, the main channel "fits over the microwell array to allow cell solution flow across the array." *Id.*

41.     The only experiments reported by the Park authors were designed to investigate "how geometry of microwells affects the flow pattern and ability of microwells to trap single cells," and tested five different microfluidic devices with different shapes of microwells (triangle, square, circle, diamond, and cone). Ex. 1006 at 265; *id.* at Fig. 1c. Park states that triangular-shaped microwells were the

"most efficient for single cell trapping while providing ample space for cells to grow and spread." *Id.* at 263.

42.     Park describes its device and the method of its use as follows:

> The system consists of a microwell array that covers the bottom of the chip, and a long narrow channel (5 mm width, 15 mm length, and 200 μm height) that guides fluid flow over it. A 50 x 200 array of triangular microwells (typical side length dimension of 50 μm with depth of 20 μm) extends downward into the bottom layer giving a total of 10,000 microwells. At the inlet of this chip, a reservoir . . . was equipped, and at the outlet . . . a syringe pump . . . loaded with a 1 ml syringe, pulls the fluid to generate flow rates varying from 0.05 to 0.18 ml/h (average velocity in channel = 14–50 μm/s). The cell suspension enters the microchip, flows through the channel, and cells settle into the microwells. Cell perfusion times were limited to 20 min.

Ex. 1006 at 265; *id.* at 267 (describing "a step-down flow rate sequence[:] initially 0.18 ml/h for 5 min to fill the channel with cells, and then 0.1 ml/h . . . for cell trapping for 10 min, followed by washing out 0.18 ml/h for 5 min"). Park only discloses perfusing a cell suspension through its device for a time period of 20 min to trap single cells in the microwells. It does not disclose perfusing any other fluid or media after this cell perfusion takes place. Based on these disclosures, a POSA

would have understood that Park is not maintaining fluid flow during its cell experiments.

43.     Park explains that its "system design utilizes a syringe pump to generate flow of a cell suspension, captures cells in a microarray (10,000 microwells) using the principle of recirculation in microwells, and eliminates excess media using a second rinsing step." Ex. 1006 at 267.  Park states that "[t]he system design is such that after a cell suspension is flown across the microarray, the user can easily flush the system with either cell culture media or a phosphate buffer saline (PBS) at 0.18 ml/h to remove excess cells." *Id.* at 268.

44.     As noted, Park reports that triangular microwells were the "most efficient for single cell trapping while providing ample space for cells to grow and spread." Ex. 1006 at 263.  According to Park, "[a]n important trapping mechanism is the formation of fluid streamlines inside, rather than over, the microwells." *Id.* Park states that "[a] strong flow recirculation occurs in the triangular microwell so that it efficiently catches cells." *Id.*; *see also id.* at 265-66 ("Among the five different microwell geometries listed in Fig. 1c (equilateral triangle, square, circle, rhombus, and cone), we determined the equilateral triangle to be the best well shape because it had the strongest recirculation pattern in the microwell . . . .").

45.     Park illustrates the fluid streamline in different shaped microwells in Figure 2b, with triangular microwells having a vortex flow pattern to trap cells:



Ex. 1006 at 266 (Fig. 2b depicting the recirculation flow in triangular microwell).

46.     Park describes the validation results of single cell trapping of human PC3 prostate cancer cells in triangular microwells, noting that "[t]he trapping rate was 62 ± 10%, with a minimum rate of 48% and a maximum rate of 79%," which was measured from three experiments by imaging about 100 microwells in each experiment.  Ex. 1006 at 267.  Park also reports that 5.7% of microwells with cells were occupied with two cells.  *Id.*  Park observes that "lower flow velocities slightly increased the trapping rate but also increased the likelihood of multiple-cell trapping," and that "the recirculating streamline profile in the microwell does not change according to the flow rates . . . implying same efficacy for trapping cells in different flow velocities."  Ex. 1006 at 268.  Park also reports that that they observed successful proliferation of trapped cells in their wells over a two-day analysis.  Ex. 1006 at 267 (Fig. 3c).

Appx3685

47.     Park describes the "main limitations" of its device as follows:  "that trapping rate cannot exceed 60-70% in 20 min due to the settling probability, that a cover is required to create the channel, restricting access to the microwells during cell seeding and that a pump is necessary."  Ex. 1006 at 268.  Park concludes that "[t]he methodology introduced in this article will lead to an effective and high-throughput cell-trapping device for screening that requires single cell capture and culture."  *Id.*  There is no disclosure anywhere in Park of recovery of cells from the microwells of the device, much less selective recovery.

### C.     Kovac (Ex. 1007)

48.     Kovac is a paper published by J.R. Kovac and J. Voldman, titled "Intuitive, Image-Based Cell Sorting Using Optofluidic Cell Sorting," in the journal *Analytical Chemistry* (2007) 79:9321-9330.  *See* Ex. 1007.  I understand that Dr. Meinhart and Petitioner contend that Kovac was published in December 2007. Ex. 1002 at ¶ 51; Ex. 1020 at ¶ 51.

49.     Kovac describes "a microfluidic cell-sorting device which augments microscopy with the capability to perform facile image-based cell sorting." Ex. 1007 at 9321.  The device of Kovac "contains a microwell array that can be passively loaded with mammalian cells via sedimentation and can be subsequently inspected with microscopy."  *Id.*  After inspection, Kovac uses "the scattering force from a focused infrared laser to levitate cells of interest from their wells into a flow

field [above the wells] for collection." *Id.* Kovac illustrates the concept of its cell-sorting device in Figure 1:



Ex. 1007 at 9322 (Fig. 1).

50. Kovac describes the various drawbacks of other optical manipulation methods, such as optical tweezers, optoelectronic tweezers, and dielectrophoretic (DEP) trap arrays. Ex. 1007 at 9321-9322. Kovac uses a different method to sort cells, one that utilizes the optical scattering force of an infrared laser. *Id.* at 9322. More specifically, Kovac uses the infrared laser "to directly apply radiation pressure to actuate and levitate cells of interest," by "focus[ing] the laser into a low-divergence shape, which results in gradient forces that are significant in the lateral

Appx3687

direction but miniscule in the axial direction." *Id.* at 9325. Kovac explains that the effect of its low-divergence infrared laser "is analogous to a beach ball being pushed vertically by a fire hose." *Id.*

51. Kovac describes its cell-sorting device as having "a sealed flow chamber with a microwell array patterned into the chamber floor." Ex. 1007 at 9322-23. Kovac depicts its device and system in Figure 2:



Ex. 1007 at 9323 (Fig. 2).

52. Kovac describes the use of its device as follows:

> After injecting cells into a 100 *μ*L sample loop via the injection port/valve assembly, we pumped the cell

suspension into the cell loading input at a flow rate of 100 $\mu$L/min with the syringe pump while flowing media through the flushing input at 30 $\mu$L/min to provide sheath flow. After the cell suspension filled the device, we stopped flow for ~5 min, allowing cells to sediment into the wells. We then pumped fresh media first through both inputs at ~40 $\mu$L/min, and then solely through the flushing input, and briefly from the flushing input backward through the cell loading input. This protocol removed cells residing outside the microwell array in all chip regions as well as cells trapped unstably in the array while avoiding introduction of residual cells through the cell loading input. Using our software, we scanned the entire array, inspected and marked individual sites, and returned to specific sites to remove cells using the laser. During removal, we used a flow rate of 2.5-5 $\mu$L/min and applied 100-150 mW of laser power to each cell until the cell was levitated high enough that the flow displaced the cell and carried it downstream.

Ex. 1007 at 9324-25.

53.     Kovac describes the efforts undertaken by its authors to prevent cell adhesion to the microfluidic device, which would hamper its laser-assisted cell sorting. For example, when fabricating the microfluidic device, Kovac states that the chip was placed in an oven "to accelerate PDMS hydrophobicity recovery after

plasma bonding to facilitate later adsorption of bovine serum albumin (BSA)." *Id.*
at 9323. Kovac explains that "cells adhered less to BSA-treated hydrophobic
PDMS than to BSA-treated hydrophilic PDMS." *Id.* And before loading cells into
the chip for the cell-sorting experiments, Kovac states that "we flowed a 75 mg/mL
BSA fraction V solution prepared in PBS . . . into the cell injection and flushing
inputs and filled the device." *Id.* at 9324. Kovac explains that "[t]he BSA remained
in the chamber at room temperature for 1 h to adsorb to the PDMS surface to help
block cell adhesion in the subsequent experiment." *Id.* Prior to injecting the cells
into the device, Kovac suspended cells in a standard culture medium, and there is
no indication the cells did not remain in suspension throughout the duration of the
experiments. *See, e.g.*, *id.* at 9324; Figs. 3-5.

54.     Kovac reports the results of its cell sorting experiments as follows:

> On average, levitation and release of a cell from a well
> takes about 15-20 s but can ultimately range from 3 to 30 s.
> This range is largely due to variations in cell size and
> shape. As the cell diameter approaches the well diameter,
> Stokes drag wall effects become more significant, leading
> to longer removal times for larger cells in the population.
> Significantly aspheric cells, such as those undergoing
> mitosis, can be removed quickly, as their asymmetry
> makes them easier to remove via the fluid flow after they
> are levitated slightly. The removal efficiency, defined as

> the percentage of cells we successfully removed from a well out of the total number of cells which we attempted to remove, can vary between 25% and 100%, depending on the well dimensions used. In some trials, we achieved a 100% removal efficiency by using wells 30 $\mu$m in diameter and 35 $\mu$m in depth and therefore used these dimensions for experiments reported here. In cases with less than 100% removal efficiency, nonspecific surface interactions appear to be the primary reason that cell removal fails.

Ex. 1007 at 9326. Thus, as Kovac observes, the efficiency of cell removal is affected by nonspecific surface interactions between the cell and the interior surface of the microwell. *Id.* The efficacy of cell removal is also affected by the design of the reservoir output which has significant dead volume that can trap the cells. Ex. 1007 at Fig. 2. The efficiency of removal of trapped cells is dependent on flow velocity as well as unpredictable factors beyond the operator's control.

55. Kovac also describes certain safety considerations with using the laser, noting that "[t]he optical power levels used are dangerous without safety precautions." Ex. 1007 at 9325. Additionally, Kovac discusses extensively the effect of its laser (both its power and its duration of use) on cell viability and the potential for cell damage. Ex. 1007 at 9327; *see also id.* at Ex. 2004 at S-2.

Appx3691

56.     The only two studies disclosed by Kovac are proof of concept experiments conducted to demonstrate the feasibility of using the levitation technique with its designed device to optically sort intentionally labeled target cells interspersed into a background population of cells.

## X.     DETAILED OPINIONS

57.     I have been asked to consider whether certain references, discussed below, disclose or suggest limitations recited in certain claims of the '408 patent. My detailed opinions are set forth below.

### A.     Ground 1:  Dimov Does Not Disclose the Combination of Features Recited in Claims 1, 6, 11, 19, 24, 26, 27, and 30 of the '408 Patent.

58.     As I explain below in this Section, Dimov does not disclose at least the claim limitation of "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step," and, therefore, in my opinion, Dimov does not disclose each and every limitation of the claims 1, 6, 11, 19, 24, 26, 27, and 30.

59.     *First*, Dr. Meinhart contends that Dimov discloses "selective recovery" based on a monitored response, relying heavily on a single sentence from Dimov, which states:

> While the arrangements described herein preferentially retain the particles within the trench, it is possible to modify the arrangement so as to provide for subsequent movement of the particles—either within the trench so as to provide for mixing or the like, ***or to effect removal of the particles out of the trench***.

Ex. 1002 at ¶ 85 (citing Ex. 1003 at 11:21-26 with emphasis). I note that this is the first of only two times the word "removal" is found in the entirety of Dimov. *See* Ex. 1003 at 11:21-26, 13:42-46. Dr. Meinhart then points to a list of techniques that he contends can be allegedly used to selectively remove one or more particles from a capture chamber/trench as further support for his position. Ex. 1002 at ¶ 87 (citing Ex. 1003 at 11:27-43). In my opinion, this is not a disclosure of the recovery of cells from a capture chamber/trench, let alone the selective recovery of a cell or clonal population of cells from a trench, much less based on a response from monitoring a cell or cells.

60. As discussed above in Paragraphs 35-37, the relied upon passages in Dimov from column 11 are part of a discussion wherein Dimov describes the use of its device for biomimetic experiments, including generating 3D cell structures within the capture chambers/trenches. Part of the relied-upon passage plainly states that "the arrangements described herein preferentially ***retain*** the particles ***within*** the trench," and that "it is ***possible to modify*** the arrangement so as to provide for

subsequent movement of the particles." Ex. 1003 at 11:21-26 (emphases added).

In other words, the focus in this passage of Dimov describes retaining particles within the capture chamber/trench in a particular arrangement, and possibly rearranging cells to change the arrangement, not selectively recovering cells based on the response in a monitoring step. There is no discussion of what is removed (if anything) or the fate of what could be removed because the focus is on what remains inside the capture chamber/trench. A POSA would have understood that because this passage describes the manipulation of particles within the capture chamber/trench to arrive at a preferred arrangement, any removal would be removal of unwanted particles from the capture chamber/trench. This is validated in the passage of Dimov that contains the second instance of the word "removal" discussing the 3D arrangement of cells in a capture chamber/trench. Here it is clear that the focus of Dimov is on the selective retention of what is in the capture chamber/trench:

> The device is suitable for in situ cell culturing and can also be considered for providing 3-D cell co-culturing. An exemplary application has been demonstrated in multi-flow analysis techniques which may be effected **without removal** of the captured cells from their capture chamber.

Ex. 1003 at 13:42-46 (emphasis added); *see also id.* at 11:1-21 ("The retention characteristics of the capture region make it particularly effective for also

mimicking in vivo conditions of cellular activities. . . . By selectively varying the nature of the fluid passing over the capture chamber it is possible to selectively layer the particles that are ultimately captured within the chamber. As these will typically be retained in the order that they were introduced into the chamber, this allows for subsequent experiments to be conducted within pseudo in vivo conditions").

61. This is consistent with the overall purpose of Dimov and other examples disclosed in Dimov, none of which includes selectively recovering cells from the capture chamber/trench based on a monitored response, but rather each requires retaining cells in the capture chamber/trench for further analysis. *See, e.g.*, Ex. 1003 at 1:40-60, 5:20-24, 6:44-47, 7:30-41, 8:4-9, 10:11-12, 10:55-58, 12:13-19, 13:42-46; *see also id.* at 10:12-49, 11:44-56, 13:59-14:57, 15:1-26. As discussed above in Paragraphs 23-37, Dimov consistently emphasizes the ability of its device to capture cells, retain them, and analyze them within the same capture chamber/trench by exposing them to different fluids, or lyse the cells to analyze their contents. Dr. Meinhart agreed at his deposition that Dimov does not include any examples of selective recovery of cells. *See* Meinhart Tr. at 184:3-9. Rather, Dimov teaches away from selective cell recovery because of the emphasis on the benefits of keeping all the cells and analysis in the capture chamber/trench, lysing cells within the capture chamber/trench in a number of examples, and removal of only unwanted materials.

62.     Moreover, as Dimov explains, "[a] variety of tests may be conducted on cells that are constrained within the capture region." *Id.* at 10:11-12. Dimov states:

> Each microfluidic device 100 or COPE element module can be configured to capture cells from a fluid passing within the device flow, long term culture them, stimulate them with drugs and agonists, stain them, lyse them and finally perform real-time NASBA analysis and/or an immuno assay analysis ***all within the same chamber***.

*Id.* at 8:4-9 (emphasis added). The above demonstrates that Dimov discloses retaining and analyzing cells or their characteristics ***within*** the chamber/trench itself.

63.     The structure and design of Dimov's devices further confirms that Dimov does not disclose selectively recovering cells based on a monitored response. For example, Dimov does not disclose a specific way to recover cells from a capture chamber/trench either directly or via the channel network. The device is sealed with the exception of the inlets and common outlet. Dimov refers to the flow channel immediately downstream to the capture chamber/trench as a "waste line" that is "configured to distribute fluid out of the devices into the common output," referred to as "a common waste" shared by a "plurality of arrays." Ex. 1003 at 4:5-8. As shown in Dimov's Figures 1 and 2, this "common waste" is

a collection point for all discarded materials removed from the trenches. Dimov describes the configuration of the multiplex device that shares a common waste as "advantageous[]." Ex. 1003 at 4:18-22 ("Where a plurality of arrays are provided along a common axis, they may advantageously be configured so as to share a common waste.). The term "waste line" alone indicates that there is no interest in recovering any materials. Moreover, the channels leading out of the structure 100 to the output are very long and convoluted, which also would not be conducive to recovery of viable cells as the length of the channels and regular changes in flow direction result in increased time of recovery which introduces complications such as loss of cells to interior walls, an inability to follow any specific cells of interest, significant dilution, shear stresses, and congestion which can be associated with completely losing the cells of interest or at least an increased time of recovery. As such, Dimov does not include a way to recover a specific cell or cells from its device. In fact, from the examples included in Dimov, Dimov at best may suggest removing cellular materials (rather than intact cells) after capture, when it describes "expos[ing] [cells] to a suitable lysis agent" so that they burst and "their contents may be released" into the liquid media. *Id.* at 7:37-41; *see also id.* at 8:6-9. In such cases, individual cells are not recovered, much less "selectively recover[ed]." Moreover, an experiment using a lysing agent in one or more trenches within the multiplex device that has hundreds of trenches sharing a common waste would

result in the lysing agent flowing into the common waste, where it would burst cells (if any) there. This further shows that the Dimov device is not designed for recovery of intact cells.

64. Moreover, Dr. Meinhart's reliance on the list of nine techniques in column 11 of Dimov is misplaced. *See* Ex. 1002 at ¶ 87 (citing Ex. 1003 at 11:30-40, 11:41-43). This list of Dimov at best identifies, without further guidance, certain techniques that "may be employed" for manipulating particles, which could involve only moving or mixing of the particles within the capture chamber/trench or removing waste or other unwanted particles out of the capture chamber/trench. Moreover, Dimov does not explain anywhere if and how to apply these techniques to modify the devices or methods that are actually disclosed in Dimov to manipulate the particles. In my opinion, this not a disclosure of selectively recovering a cell or clonal population from the device based on the response of a monitoring step. Dimov does not disclose any examples where any of the nine exemplary techniques is used to manipulate particles in any way.

65. ***Second***, Dr. Meinhart argues that the use of the singular form of "trench" in the phrase "removal of the particles out of the trench" is a purported disclosure of "selectively recovering" cells "from the individual chamber," because Dimov's device has multiple trenches as shown in its Figures 1 and 2. Ex. 1002 at ¶ 88. But as discussed above in Paragraphs 59-64, the cited statement from Dimov

regarding "removal of the particles out of the trench" is not a disclosure of selective recovery of cells. For example, it is more likely referring to removal of waste or other unwanted particles from the trench, not selective recovery of cells.

66. Likewise, Dr. Meinhart's argument that "a POSA would have understood that at least some of the above techniques, such as laser tweezers, are techniques that, by their very nature and because of their technical limitations, would necessarily be directed to individual trenches, as opposed to over all of the trenches spread out on an integrated substrate" is beside the point. Ex. 1002 at ¶ 89. As discussed above, Dimov's listing, without further guidance, of certain techniques that "could" be used to manipulate particles is not a disclosure of selective recovery of cells. Moreover, it is my opinion that the listing of these techniques is directed to manipulation of particles (whether within or out of a capture chamber/trench) in order to arrive at a preferred arrangement of remaining particles *within the capture chamber/trench*. The techniques are not contemplated for "selective recovery" as Dr. Meinhart assumes.

67. *Third*, Dr. Meinhart contends that "a POSA would have understood Dimov's reference to removing particles out of the trench 'subsequent to capture of the particles within the trench' . . . to disclose removal after, and based on the 'subsequent analysis or experimentation' that motivated the capturing of the particles in the first place." Ex. 1002 at ¶ 90 (pointing to Ex. 1003 at 12:13-18).

Dr. Meinhart is improperly combining two disparate parts of the Dimov reference to make this argument. The passage in column 12 Dr. Meinhart points to is completely silent about removal of cells from a capture chamber/trench after "subsequent analysis or experimentation" takes place. Rather, the passage explains that the capture chamber/trench is a place where particles are displaced and "***remain in the capture chamber*** for subsequent analysis or experimentation." Ex. 1003 at 12:13-18.

68. ***Fourth***, with respect to the claims' requirement that the selective recovery is "based on the response in the monitoring step," Dr. Meinhart also argues that a POSA "would have at once envisaged basing the removal of the cell on the response in the monitoring step," citing certain examples from Dimov. Ex. 1002 at ¶¶ 91-93 (citing, *e.g.*, Ex. 1003 at 14:26-56). None of these disclosures or examples disclose or even mention removing cells from the device, let alone the selective recovery of cells or clonal populations based on a monitored response. As I stated above, Dr. Meinhart agrees that Dimov provides no examples of selective recovery. *See* Meinhart Tr. at 184:3-9. Indeed these disclosures of Dimov lead the POSA to envisage retaining the cells within the device, which is the focus of Dimov, rather than selectively recovering cells.

69. In summary, the claim limitation requiring "selectively recovering the cell or a clonal population thereof from the individual chamber based on the

response in the monitoring step" is not disclosed anywhere in Dimov, including the sections cited by Dr. Meinhart.

**B.** **Ground 2: Dimov Does Not Disclose or Suggest the Combination of Features Recited in Claims 1, 6, 11, 19, 24, 26, 27, and 30 of the '408 Patent.**

70. As I explain below in this Section it is my opinion that a POSA would not have found claims 1, 6, 11, 19, 24, 26, 27, and 30 of the '408 patent, each requiring "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step," to be disclosed or suggested by Dimov in view of the knowledge of a POSA.

71. As discussed above with respect to Ground 1, Dimov does not disclose selectively recovering cells, much less "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step" as required by each of the Challenged Claims. Rather, as discussed above in Sections IX.A and X.A, Dimov discloses devices and methods that retain cells and analyze them *within* the capture chambers/trenches. Dimov is silent on the selective recovery of cells *out of* the capture chambers/trenches.

72. Dr. Meinhart principally argues that a POSA would modify the Dimov device to allow access to the individual capture chambers and then use a micropipette to extract cells. I disagree. *First*, Dr. Meinhart presupposes the existence of a motivation to selectively recover cells from Dimov. *Second*, without

a general motivation to selectively recover, there is likewise no specific motivation to modify Dimov as suggested by Dr. Meinhart. Moreover, nothing in Dimov teaches or suggests using a micropipette to selectively recover cells from the chambers, nor a top layer of the device that can be peeled back.

### 1. No General Motivation to Modify Dimov To Include a Selective Recovery Step, Much Less After Monitoring a Response

73. Dr. Meinhart's reasons why a POSA would have been motivated to modify the Dimov device are not compelling because he does not identify selective recovery of cells from the device to be a problem in the art that a POSA would have a particular desire to solve. Absent hindsight, a POSA would not have been motivated to modify Dimov to include selective recovery of cells.

74. As an initial matter, Dimov itself identifies problems in the art, none of which includes the need for selective recovery of cells. *See* Ex. 1003 at 1:25-36. Dimov states that there are problems in the art "in using [microfluidic] devices for complete analysis systems"; that is, a system "that enables the provision of an analyte, the modification of that analyte and the obtaining of results from that modification." *Id.* at 1:25-30. Dimov also states that there is a need for a system that can have a plurality of data signal outputs and parallel processing of a plurality of tests. *Id.* at 1:30-36. Dimov, however, states that its device "addressed" the problems. *Id.* at 1:40-47. The Dimov device is designed to be such a "complete

analysis system" (or lab-on-chip device) that can preferentially collect and retain subject particles (including cells) within its capture chambers/trenches for sequential treatments or experimentation and analysis, all conducted within the capture chambers/trenches of its device.

75.     ***First***, Dr. Meinhart argues that "Dimov expressly discloses both monitoring a response in the trench of its device . . . and removing particles, such as cells, from the trench." Ex 1002 at ¶ 107. I disagree with this. As I already noted above, and as Dr. Meinhart admitted in his deposition, Dimov does not disclose or include any example of the removal (selective or otherwise) of captured cells from a capture chamber/trench. *See* Meinhart Tr. at 184:3-9.

76.     As discussed above in Sections IX.A and X.A, Dimov discloses devices with capture chambers/trenches that capture and retain particles such as cells in the capture chamber/trench. Dimov repeatedly describes its capture chamber/trench as designed to capture cells and to retain the captured cells for further experiments in the same chamber through sequential fluid flow. *See, e.g.*, Ex. 1003 at 5:20-24, 6:44-47, 7:30-41, 8:4-9, 10:11-12, 10:55-58, 11:1-6, 11:21-23, 12:13-19, 13:42-46. In line with the fact that the Dimov device is a lab-on-chip device intended to allow all analyses to be conducted within the capture chambers/trenches of its device, it is of no surprise that Dimov does not teach or suggest any subsequent removal (selective or otherwise) of the captured particles

or cells of its device to obtain results or for further analysis. Dimov also does not identify a need to do so. Nor does Dimov identify or suggest any problems encountered when analyzing and treating the retained particles or cells within the capture chambers/trenches of its device that would have motivated a POSA to selectively recover any particular particles or cells for experimentation outside of that very device.

77.     As also discussed above, Dr. Meinhart's reliance on the passage in Dimov's column 11 is centered on one sentence. Dimov states that "[w]hile the arrangements described herein preferentially retain the particles within the trench it is possible to modify the arrangement so as . . . to effect removal of the particles out of the trench." Ex. 1003 at 11:21-26. Not only is the reference to "removal" ambiguous because there is no actual example of removal or any further detail, it is silent as to whether it includes selective recovery of cells. Indeed, as I also explained above, even in this sentence, the focus of Dimov remains on controlling selectivity of what is ***retained*** in the capture chambers/trenches. *Id.* at 11:16-21 ("By selectively varying the nature of the fluid passing over the capture chamber it is possible to selectively layer the particles that are ultimately captured within the chamber. As these will typically be retained in the order that they were introduced into the chamber, this allows for subsequent experiments to be conducted within pseudo in vivo conditions."). There is no disclosure of any instance of selective

removal of any particular or individual particles or cells from a capture chamber/trench, even in this context of modifying an arrangement of particles. A POSA would have understood that any removal of particles from the capture chamber/trench would be to dispose of unwanted particles to ensure the integrity and selectivity of what is retained within the capture chamber/trench. Certainly, there is no disclosure of the recovery of particular particles or cells from a capture chamber/trench based on a monitored response. In my opinion, absent hindsight, there would be no motivation for a POSA to look to Dimov to modify its methods and device to include the selective recovery of cells.

78.     As also discussed above, a POSA would have understood that selective recovery is not contemplated by Dimov because its microfluidic device does not accommodate access directly into the capture chambers/trenches because it has a cover. With the exception of inlets and the common outlet, the device is sealed and does not permit direct access to the capture chambers/trenches to allow the recovery of particles or cells (let alone their selective recovery). Dimov also does not have and cannot accommodate a separate collection output or reservoir for any "selected" particles or cells. The device described in Dimov is designed to have all fluid accumulate into a common waste output only. Because Dimov does not include compartmentalization of the fluid flow, it does not allow selective recovery of particles or cells. The architecture and design of the Dimov device is consistent

with its overall goal: a complete analysis system or lab-on-chip device for the investigation and analysis of particles or cells while they are retained in the capture chambers/trenches. Based on the configuration of the Dimov device, absent hindsight, a POSA would not be motivated to selectively recover cells from those capture chambers/trenches.

79.     *Second,* Dr. Meinhart points to disclosures in Dimov and argues that **(1)** "a POSA [would have] selectively remove[d], based on a monitored surface protein concentration, one or more macrophage cells from a trench in the Dimov experiment that used fluorescently-labeled anti-CD86 antibodies as markers . . . for further investigation," such as "further characterization of the cell, including by sequencing"; and **(2)** a POSA would have "selectively remove[d], based on detected fluorescence, one or more cells from a trench in the protein analysis experiment disclosed in column 15 of Dimov . . . for further study," such as "sequencing the DNA in the cell or expansion of the cell." Ex. 1002 at ¶¶ 109-110. I disagree.

80.     At best, Dr. Meinhart is speculating (without basis) that there might be a reason for a POSA to want to selectively remove cells from the Dimov capture chambers/trenches. Notably, the experiments that he points to do not disclose or suggest removing macrophages or any cells, much less selective recovery for further investigation. As discussed above, Dimov is a lab-on-chip device and discloses many examples in which the captured cells were studied and analyzed as

they remained within the capture chamber/trench, without any selective recovery of the captured cells. For many of the examples in Dimov, the cells were lysed *within* the capture chamber/trench to release its cellular contents for further analysis, including for genetic sequencing, which was only done using NASBA in this work. Any sequencing that would be necessary would be done in the capture chambers/trenches of Dimov after lysing the cells. Dimov indicates that the two types of assays contemplated for the Dimov device are "real-time NASBA analysis and/or an immuno assay analysis *all within the same chamber*." Ex. 1003 at 8:8-9 (emphasis added). In fact, the two experiments Dr. Meinhart identifies as bases for his opinion are conducted for the purpose of demonstrating that the Dimov device can be used for "real-time measurement," including "real-time surface protein expression detection" within the capture chamber/trench. *See generally* Ex. 1003 at 14:1-15:26. For example, in the experiment in column 15, the protein analysis cited by Dimov expressly states that "a fixing buffer is introduced to fix the cells within the chamber" prior to introducing antibodies for immunostaining into the chip. *Id.* at 15:21-22. Here, a POSA would have understood that Dimov is expressly teaching retaining cells in the capture chambers/trenches, not the removal of cells, much less selectively recovery of cells. Thus, a POSA would not have been motivated to selectively recover certain cells, much less intact cells, for further characterization such as sequencing the DNA, because that analysis was or

contemplated to be conducted within the capture chamber/trench of the Dimov device. For example, the sequencing of DNA as described in Dimov requires lysing the cells within the capture chamber/trench. Moreover, the very purpose of the experiments disclosed in Dimov were all demonstrations of examples of how its device was intended to conduct real-time on chip measurements *in a single capture chamber/trench*.

81. Accordingly, for at least these reasons, a POSA would not have been motivated to modify Dimov absent hindsight. In addition, it is my opinion that for the same reasons, the clearly stated goal of analysis in a single capture chamber/trench and structural constraints, such as the existence of very long, maze-like waste channels that lead to a single common waste output, of Dimov would have led a POSA away from making any modifications to accommodate selective recovery of cells from its capture chambers/trenches.

### 2. No Motivation to Make Dr. Meinhart's Modifications

82. Without a general motivation to include the selective recovery step, there would likewise be no specific motivation to make the particular modifications suggested by Dr. Meinhart. Thus, setting aside the lack of a general motivation for a POSA to selectively recover cells in Dimov, it is my opinion that a POSA would not have been motivated to make the specific modifications to Dimov suggested by Dr. Meinhart.

83. ***First***, a POSA would not have been motivated to use a micropipette and insert it into a trench of the Dimov device to aspirate one or more cells, as suggested by Dr. Meinhart. Ex. 1002 at ¶ 111. Nothing in Dimov teaches or suggests using a micropipette to selectively recover cells from the capture chambers/trenches. According to Dr. Meinhart, Dimov discloses nine techniques that "could" be used for manipulating particles. *Id.* (citing Ex. 1003 at 11:30-40). While it is debatable whether and how those nine techniques could be used, it is notable that micropipettes are not even on that list of techniques disclosed by Dimov. Thus, absent the hindsight knowledge of the disclosures of the '408 patent discussing the use of micropipettes to selectively recover cells, a POSA would not have had a reason to use micropipettes to manipulate, much less retrieve cells from the Dimov device.

84. ***Second***, a POSA would not have been motivated to modify the Dimov device and construct a device with a top layer that can be peeled back, as suggested by Dr. Meinhart. Ex. 1002 at ¶ 112. Dimov describes a process for making a microfluidic device. Ex. 1003 at 15:27-46. But Dimov does not disclose or even suggest creating a device in which the two layers are only "partially" bonded such that the top layer may be "peeled back," as Dr. Meinhart suggests. Ex. 1002 at ¶ 114. Rather, Dimov expressly states that the device is created by "bringing the first and second layers together and assembling" the two layers "onto a glass

substrate." Ex. 1003 at 15:44-45. There is no teaching or suggestion of partially bonding the two layers to allow the top layer to be peeled back at a later time. I understand that Dr. Meinhart's reliance on Han is inappropriate because Han was published after the priority filing date of the '408 patent and is not prior art to the Challenged Claims. As such, absent the hindsight knowledge of the disclosures of the '408 patent with its device that has a top layer that may be peeled back, a POSA would not have had a reason to modify the Dimov device to construct a device with a partial bonding of the two layers.

85. Moreover, it was known that PDMS had a number of limitations. As the background section of the '408 patent explains, PDMS is "permeable to some small molecules and allows for rapid transport of water vapor, which may result in dehydration." Ex. 1001 at 2:42-48. The '408 patent further explains:

> The high surface-to-volume ratios characteristic of nano-volume culture chambers further promote dehydration of microfluidic devices. In addition, small hydrophobic molecules can diffuse in the elastomeric material and be depleted from the medium. These variations may lead to spurious biological responses, reduced growth rates and even cell death.

Ex. 1001 at 2:48-54.

86.     For all of these reasons, a POSA would not have been motivated to make the particular modifications to Dimov as suggested by Dr. Meinhart absent hindsight.  For the same reasons, a POSA would have been discouraged from making the particular modifications.

**C.      Ground 3:  Dimov in View of Kovac Does Not Disclose or Suggest the Combination of Features Recited in Claims 1, 6, 11, 19, 24, 26, 27, and 30 of the '408 Patent.**

87.     As I explain below in this Section, it is my opinion that a POSA would not have found claims 1, 6, 11, 19, 24, 26, 27, and 30 of the '408 patent, each requiring "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step," to be disclosed or suggested by Dimov in view of Kovac.

88.     In my opinion, a POSA would not have been motivated to modify Dimov with Kovac.  *First*, as I already discussed above, a POSA would not be motivated to modify Dimov because there was no need to modify Dimov to include a technique for the "selective[] recover[y]" of cells.   Again, Dr. Meinhart presupposes this general motivation.  *Second*, without a motivation to selectively recover cells, there would have been no reason to look to Kovac.  Nevertheless, there also would have been no reason to modify Dimov in light of Kovac given the nature of the levitation technique and given the differences in the uses and structures of the microfluidic devices of Dimov and Kovac.  *Third,* even if a POSA were to

modify the Dimov device with the levitation technique of Kovac, a POSA would not have reasonably expected to be able to successfully selectively recover cells from the modified device.

### 1. No Motivation to Modify Dimov to Include a Selective Recovery Step, Much Less After Monitoring a Response

89.    Dr. Meinhart's reasons why a POSA would be motivated to modify the Dimov device with the levitation technique of Kovac are not compelling for the same reasons I discussed above in Section X.B—rather than identify a problem to be solved, Dr. Meinhart presupposes a general motivation to modify Dimov to include a selective recovery step.

90.    Further to my explanation above in Sections IX.A and X.A, the focus of Dimov on the selective retention of particles and the lack of any disclosure or suggestion that selective recovery of cells is necessary or contemplated contradicts Dr. Meinhart's statements that there is a ubiquitous need for a POSA to selectively recover cells of interest.  Indeed, as acknowledged by Dr. Meinhart in his deposition, problems in the art are dependent on what you are trying to achieve. Meinhart Tr. at 40:21-41:16.  Here, the descriptions and examples in Dimov show that what Dimov is focused on achieving is the retention of particles and cells into capture chambers/trenches where all analyses are done within the capture chamber/trench.  As such, what Dimov is attempting to achieve does not

contemplate or intend for any captured cells to be selectively recovered and is therefore incongruent with Dr. Meinhart's conclusory statement that there is a need to selectively recover cells of interest and in particular, from the Dimov device.

### 2. No Motivation to Modify Dimov with Kovac

91. Without a general motivation to modify Dimov to include a selective recovery step, a POSA would not be specifically motivated to look to Kovac. Setting aside the lack of a general motivation, I also disagree with Dr. Meinhart's reasons for modifying Dimov with the teachings of Kovac. In my opinion, a POSA would not be motivated to modify the Dimov device based on Kovac.

### (a) The Structural Features of Dimov are Incompatible with the Laser Levitation Technique of Kovac

92. Dr. Meinhart states: "Kovac asserts that [its] technique 'was straightforward, user-friendly, and conceivably automatable,' and 'was simple to implement in a standard microscope with minimal modification,' . . . 'requir[ing] only flow and a clear optical path to the chip.'" Ex. 1002 at ¶ 126. This quoted language, however, is talking about the Kovac device, not other microfluidic devices, much less the device of Dimov. The success of the removal of cells using the optical laser in Kovac is *dependent* on the specific features and parameters of the Kovac device.

93.     Kovac designed its device with particular structural features and its method of using that device with particular parameters in order to attempt to accommodate the removal of cells using the optical laser and levitation technique. The device is optimized for tracking a small subset of cells from a background population of cells dispersed across an array of microwells and levitating those cells into a designated reservoir output in the device. Ex. 1007 at 9330 ("Our architecture exhibits core sorting functionality with enrichment and purity performance immediately useful in applications where low-incidence cell purification and isolation is desired."). As such, the Kovac device must have both the structural architecture and optical capability to efficiently image and sort through large numbers of cells to find low-incidence cells.

94.     Here, Kovac has laid out a specific method for removing the target cells from its device. It uses a microwell array wherein a cell suspension is flowed in until the device is filled. At that time, the flow is stopped so that individual cells can physically enter the microwells. Ex. 1007 at 9324. As seen from the figures in Kovac, the cells spread out in the microwell array such that many wells include only a single cell. Ex. 1007 at 9322 (Fig. 1), 9327 (Fig. 4). Using microscopy and the corresponding software, the individual sites in the array are marked so that the optical laser can return to those specific sites to remove the targeted cells. *Id.* at 9324. The levitated cells are then flowed downstream to the reservoir output. In

order to ensure that targeted cells are not flowed into the waste output, at the time of collection, Kovac closes the waste output, allowing target cells to flow to the reservoir for subsequent removal.  *Id.* at 9323 (Figure 2(a)).

95.    Kovac discloses what was found to be the optimal features and parameters for its device.  It discloses the optimal well depth and diameter for levitation of cells to be 35 μm in depth and 30 μm in diameter.  Ex. 1007 at 9326. The architecture of the device critically includes a reservoir output for the collection of the target cells downstream from their wells.  *See, e.g.*, *id.* at 9232 (Fig. 2(a)). The device and its method of use specifically manage the fluid flow with a system of separate inlet and outlet channels that prevent contamination of the reservoir output.  The fluid flow is also carefully calculated to be close enough to allow the levitation of cells from the microwells of the Kovac device into the fluid flow.  *Id.* at 9324-9325.  Moreover, the proximity of the fluid flow to the wells is also a limiting factor for allowing levitation of the cells into the collection reservoir.

96.    Kovac is silent as to whether it would be "simple to implement" the levitation technique with any device other than its own.  Indeed, given the very particular parameters that are identified to demonstrate its levitation technique, a POSA would not have been motivated to make modifications to the Kovac device, much less use an entirely different device such as the Dimov device.  Moreover, Kovac itself teaches a POSA that given the complexity of the model of the optical

forces involved in levitation using the laser beam, "intuitive reasoning about behavior" is "difficult." Ex. 1007 at 9325; Meinhart Tr. at 100:6-20. This means that depending on the specific device and experimental needs, a POSA would need to experiment to figure out how or if a cell could be levitated out of a well. Not only that, but optical analysis of this type is well outside of the definition of a POSA as used in these proceedings. Optical techniques of this complexity are not taught to or used regularly by individuals with typical expertise in microfluidics or the degrees proposed to be held by a POSA.

97. In contrast, the parameters Kovac identifies as important for its device differ from those important to the Dimov device. For example, the devices have different well depth, fluid management, channel length, and proximity to fluid flow. Because the Dimov device is designed to capture and retain particles in the capture chambers/trenches, the chambers are deep, allowing sufficient depth to capture particles and conduct analyses within the capture chambers/trenches. The difference in depth between Dimov's capture chambers/trenches and Kovac's wells are about 10-fold. Specifically, Dimov states that the capture chamber/trench has "a depth of 300 microns." Ex. 1003 at 5:39-45. In contrast, in Kovac, the wells were only 35 microns deep. Ex. 1007 at 9326 ("In some trials, we achieved a 100% removal efficiency by using wells 30 μm in diameter and 35 μm in depth and therefore used these dimensions for experiments reported here."). Moreover, unlike

Kovac, the capture chambers/trenches of the Dimov device are not arranged to be in close proximity to the common fluid outlet. As already discussed above, Dimov does not contemplate a reservoir output which is yet another critical structure in the Kovac device.

98. In my opinion, a POSA would not have modified Dimov's microfluidic device because the levitation of cells (setting aside feasibility) into the fluid flow of Dimov would not be sufficient to selectively recover any particular cell. Dr. Meinhart suggests that the levitated cells would be collected into the common waste but does not explain how a particular cell would be tracked from its capture chamber/trench to the common waste for subsequent pipetting. As discussed above, the length of the channels in the Dimov device would complicate any attempt for selective recovery of cells, for example, subjecting any cells to shear forces, dilution, and/or congestion. A POSA would have understood that the optical field for microscopy and the levitation path in the device of Dimov would need complicated modifications to overcome an order of magnitude difference in trench depth that are not contemplated in the disclosures of either Dimov or Kovac. In the face of such complications, a POSA would not have been motivated to introduce the levitation technique of Kovac into the device of Dimov.

99. Due to the structural differences in the devices of Kovac and Dimov, a POSA would not be motivated to use the Kovac levitation technique with the

device of Dimov absent hindsight. It is also my opinion that in order for the Kovac device to successfully levitate target cells into the collection reservoir, it requires the specific features and parameters tailored to its device as discussed above. And so, the teachings of Kovac would have discouraged a POSA from any modification of the Dimov device.

### (b) Dr. Meinhart's Suggested Modifications Do Not Overcome the Structural Incompatibility

100. **First,** Dr. Meinhart states that a POSA would have modified the Dimov device by "replac[ing] 'Layer 1' of the Dimov device with a glass slide or plate to provide the clear optical path to the chip required to implement Kovac's selective levitation and flow technique to remove cells from Dimov's trench." Ex. 1002 at ¶ 127. A POSA would not be motivated to modify Layer 1 of the Dimov device. Dimov does not disclose or suggest replacement or alternate materials for fabricating Layer 1 of its device. Nor does Dimov identify any problem with its device that would require or suggest replacing Layer 1 as proposed by Dr. Meinhart. Absent hindsight, there would be no reason to make this modification.

101. **Second,** Dr. Meinhart states that a POSA would have monitored the Dimov trenches using microscopy and then focused the Kovac laser "onto target cells from below through the glass substrate and bottom PDMS layer, as described

Appx3718

in Kovac, levitating the cells into the flow field with the optical scattering force."
Ex. 1002 at ¶ 128. As I explained above, because the devices of Dimov and Kovac
differ in their structure and configuration for managing fluid flow, a POSA would
not be motivated to levitate cells into the fluid flow of the Dimov device. The
Kovac device is configured to isolate a reservoir from other fluids in the device so
that collection of levitated targets from that reservoir is feasible. The flushing and
cell inputs as well as the waste output of the Kovac device are likewise separated
from each other and the flow of fluids is independently controlled to and from the
different inputs and outputs in order to prevent fluid contamination of the collection
reservoir. *See* Ex. 1007 at 9323 (Figure 2). Contrary to Dr. Meinhart's suggestion,
a POSA would not equate the reservoir of Kovac to the common waste area of
Dimov and therefore would not be motivated to use the devices interchangeably,
much less with the levitation technique of Kovac.

102. ***Third,*** Dr. Meinhart goes on to state that a POSA would have
recognized that after levitating the cells of interest from a capture chamber/trench
in the modified Dimov device, the levitated cells could be flowed through the device
to the output and even further to the "common waste" area, where it could then be
removed from the device by a micropipette. Ex. 1002 at ¶ 129. As already
discussed, the difference in depth between Dimov's capture chambers/trenches and
Kovac's wells are about 10-fold. Specifically, Dimov states that the capture

chamber/trench has "a depth of 300 microns." Ex. 1003 at 5:39-45. While, in Kovac, the wells that allowed them to achieve optimal removal efficiency were 35 microns deep. Ex. 1007 at 9326 ("In some trials, we achieved a 100% removal efficiency by using wells 30 μm in diameter and 35 μm in depth and therefore used these dimensions for experiments reported here.").

103. Dr. Meinhart's declaration does not provide any explanation as to how the laser technique used by Kovac in its device could be applied to the deeper and larger capture chambers/trenches of Dimov in addition to the complications that stem from channel length and recovery time. Because of the difference in depth, a POSA would not have been motivated to use the laser technique of Kovac with Dimov's device.

104. A POSA would have also not been motivated to use the laser technique of Kovac with the Dimov device given the depth of the capture chamber/trench because as Kovac itself explains that "[a]s the cell is levitated away from the laser focus, the local intensity and lateral gradient force drop due to beam divergence." Ex. 1007 at 9326. The cells in Dimov would need to be levitated to a height of 300 microns—a height about ten times that of the Kovac wells—before they can exit into the flow stream of the channels. Accordingly, if a POSA were to use the Kovac laser to try to recover cells from the capture chamber/trench, either the amount of time the cell is exposed to the laser or the power/strength of the laser

would need to increase so that a cell or group of cells could be levitated to a height of 300 microns and exit the Dimov capture chamber/trench. A POSA would have no basis to prolong or increase the exposure of a cell or cells to the infrared laser because she would have been concerned with any resulting damage or other changes that could affect the exposed cells.

105. Kovac itself states that "[c]ell viability and potential for cell damage is a point of concern when using any cell manipulation technique." Ex. 1007 at 9327. The lasers used in Kovac are capable of melting plastic and cutting tissues. *See, e.g.*, Ex. 1007 at 9325 ("The optical power levels used are dangerous without safety precautions."). Indeed, Kovac devotes a significant amount of discussion to studies that have made efforts to "determine cell damage thresholds for optical manipulation." *Id.* at 9327. In its Supporting Information Table S-1, Kovac includes literature that reported the minimum harmful levels for various laser beam parameters. *Id.* at 9327 & Supporting Information Table S-1 (Ex. 2004 at 2). These reports indicate that cellular damage is possible when using infrared light under parameters different than the ones used in Kovac, reporting that damage to a cell's clonability, viability, and/or DNA can occur with increased exposure time, power density, and/or energy density. *See, e.g.*, Ex. 1007 at 9327; Ex. 2004 at 2.

106. For example, Liang (cited in Kovac at 9327) reported that "[c]lonal growth generally decreased as the power density and the duration of laser exposure

increased." Ex. 2005 at 1529. Liang further observed that "the most commonly used trapping wavelength . . . strongly reduced clonability, depending upon the power density and exposure time." *Id.* In similar fashion, Neuman (cited in Kovac at 9327) reported that the usefulness of "[o]ptical tweezers (infrared laser-based optical traps) . . . has been limited . . . by the potential for damage to specimens resulting from the trapping laser," and that "such damage limits the exposure time for trapped specimens and has proved to be a significant problem for some optical trapping studies." Ex. 2006 at 2856. Neuman (cited in Kovac at 9327) went on to identify multiple wavelengths within the near-infrared spectrum that would damage cells. *Id.* at 2862. While Neuman is specifically directed to optical tweezers which is different from the Kovac technique, the risks of affecting cell viability would apply to the use of laser-based technology. Likewise, Mohanty reported "damage in DNA" at various wavelengths within the near-infrared spectrum and that "[f]or the same power density, the severity of the DNA damage increases when the exposure time is increased." Ex. 2007 at 378, 382.

107. Accordingly, a POSA would not have been motivated to modify Dimov with Kovac absent hindsight because they would have understood that levitation of a cell out of Dimov's deeper capture chambers/trenches (if even possible) would require prolonged and/or increased exposure to lasers, increasing the risk of damage to the cell.

108.  For all of these reasons, a POSA would not have been motivated to make the particular modifications to Dimov as suggested by Dr. Meinhart absent hindsight.  In my opinion, the disclosures of Kovac and Dimov would have discouraged a POSA from any modification of Dimov to selectively recover cells using the technique of Kovac.

### (c)  The Purpose of Dimov is Incompatible with the Laser Levitation Technique of Kovac

109.  Dr. Meinhart states that based on "the need to 'select a desired starting population of cells of known characteristics' or 'isolate particularly interesting cells for further investigation' . . . , a POSA would have been motivated to modify Dimov to add the selective recovery method described in Kovac.'"  Ex. 1002 at ¶ 126.  I disagree because this quoted language should not be imputed to Dimov.  The language resides in the background of Kovac which explains that there is a particular need in the art for a better way to sort small numbers of cells from large background populations of cells.  The problems identified in Kovac are all in the context of cell sorting, with Kovac searching for more efficient cell-sorting technology.  Kovac is devoted to describing a device and technique designed to fulfill that stated need.  Specifically, Kovac states that "[o]ur device fills a role effectively unaddressed with traditional cell-sorting techniques:  practical selection of cells based on microscopy."  Ex. 1007 at 9330.  The "Conclusions" section of

Kovac likewise reiterates that its technique addresses the need for "low-incidence cell purification and isolation" from "significantly large cell populations." *Id.*

110. The disclosure of Kovac is limited to two preliminary studies demonstrating proof of concept that its device and laser technique could be used to levitate target cells from the microwells of its device. Kovac sets up the experiments to demonstrate the feasibility of using its device and optical laser technique to sort labeled target cells from a larger background population of non-labeled cells. Kovac does not teach or suggest the use of its technique, and more particularly its optical laser, in any other context.

111. In particular, there are no experiments in Kovac that suggest or contemplate culturing the cells within the microwells of its device or utilizing its fluid flow to expose the cells to any reagents or other treatment to monitor a result within the microwells. What Kovac does disclose would direct a POSA away from the use of its technique with a device that is used to attach or culture cells within its microwells. Kovac describes the efforts undertaken by its authors to prevent cell adhesion to the microfluidic device, which would hamper its laser-assisted cell sorting. For example, when fabricating the microfluidic device, Kovac states that the chip was placed in an oven "to accelerate PDMS hydrophobicity recovery after plasma bonding to facilitate later adsorption of bovine serum albumin (BSA)." Ex. 1007 at 9323. Kovac explains that "cells adhered less to BSA-treated

hydrophobic PDMS than to BSA-treated hydrophilic PDMS." *Id.* And before loading cells into the chip for the cell-sorting experiments, Kovac states that "we flowed a 75 mg/mL BSA fraction V solution prepared in PBS . . . into the cell injection and flushing inputs and filled the device." *Id.* at 9324. Kovac explains that "[t]he BSA remained in the chamber at room temperature for 1 h to adsorb to the PDMS surface to help block cell adhesion in the subsequent experiment." *Id.* In each experiment disclosed in Kovac, the cells are loaded into the device in suspension and the measures taken to block cell adhesion ensured that the cells stayed in suspension throughout the duration of the experiment, or at least did not attach or adhere to the microwells of the plate or to each other.

112. In contrast, the only disclosure in Dimov that Dr. Meinhart has identified that pertains to the possible removal of particles from the trenches is in the context of cells layered into the capture chambers/trenches, cultured to generate 3D arrangements that mimic *in vivo* tumors and cellular conditions. *See supra* at ¶¶ 35-37, 59-60. As depicted in Figure 21 of Dimov, the cells are attached to both the capture chamber/trench's interior surfaces and to each other. Moreover, the focus of Dimov is the capture and trapping of particles, the retention of the particles, and subsequent performance of analysis and experiments, all within the capture chambers/trenches of its device. Consistent with this, the cells used in Dimov are

predominantly adherent and would not be amenable to levitation by optical laser without measures taken to prevent or block cell adhesion.

113.  Certainly, Kovac does not teach or suggest the use of its levitation technique with any microfluidic devices other than its own and certainly not ones that are designed to retain and culture cells inside of wells for extended periods of time.  As discussed previously, the cells of the Kovac device are flowed in as a suspension into the microwell array and there is no indication that the cells adhere to the wells or to one another during the duration of the experiments.  Unlike in Dimov, Kovac takes care to ensure that the cells it is using do not adhere to the microwells or to one another by pretreating the device with BSA.  In my opinion, Kovac takes such steps to prevent cell adhesion because it would be more difficult and possibly impede its levitation experiments if the cells had adhered to the microwells or to one another.  As such, there is no rationale to use the Kovac laser in a system where cells are attached to the microwell surfaces or to each other as disclosed in Dimov.

114.  For these reasons, a POSA would not have been motivated to use Kovac to modify the device of Dimov absent hindsight.

Appx3726

> **(d)   A POSA would not have been motivated to modify Dimov with  Kovac based on the disclosure of allegedly similar laser techniques**

115.   Dr. Meinhart opines that a POSA would have been motivated to modify Dimov because of alleged similarities between the Kovac technique and the techniques identified in Dimov:  "Dimov expressly discloses removing particles, such as cells, from trenches using 'Dielectrophoretic' and 'laser tweezers' techniques . . . and Kovac uses similar techniques to accomplish its 'selective levitation.'"  Ex. 1002 at ¶ 130.  I disagree.

116.   As already discussed above, Dimov does not disclose the actual use of dielectrophoretic or laser tweezer techniques to remove particles or cells, selectively or otherwise.  In addition, the exemplary techniques listed in Dimov are not even techniques that a POSA would instinctively turn to for removal of cells, much less selective recovery of cells from its device.  At best, the techniques arguably could be employed to manipulate particles to modify their arrangement in the capture chambers/trenches.  Setting aside the applicability of the nine exemplary techniques, more notably, the optical laser technique of Kovac is not even included in the nine exemplary techniques even though Kovac was published nearly 3 years prior to Dimov.  *See* Ex. 1003 at 11:27-40; *see* Meinhart Tr. at 62:23-63:3.

117.   Absent hindsight, a POSA would not assume that the Kovac technique would similarly be contemplated along with the exemplary techniques listed in

Dimov. Contrary to what Dr. Meinhart implies, the Kovac levitation technique is not an optical tweezer. While both utilize laser technology, the two are very different. They differ in theory and in execution. Laser tweezers are specifically used for trapping particles, such as cells, at a specific location in 3D space and then moving them around by moving the "trap" location relative to the fluid device. Laser tweezers require a tight focus, small observation area, and a short focal length associated with a high numerical aperture in the optics. The laser levitation approach proposed by Kovac does not trap particles, as occurs in laser tweezers, but rather balances particles on a column of laser light, meaning the particles are not held tightly in three dimensions. *See* Ex. 1007 at 9325 (analogizing to "a beach ball being pushed vertically by a fire hose"). The focal distance is longer (but still likely not long enough to compensate for the depth of the trenches in Dimov) than in laser tweezers, but still subject to the optical disturbances present in the surrounding materials. And Kovac itself distinguishes the infrared laser technique it uses from optical laser tweezers and dielectrophoretic techniques throughout the publication. *See* Ex. 1007 at 9321-9322, 9325; *see* Meinhart Tr. at 110:16-23. Moreover, the exemplary techniques identified in Dimov are only suggested in the context of modifying 3D cell arrangements. A POSA would know that the Kovac optical scattering force cannot levitate the cell arrangements because the cultured cells are attached to the interior surface of the capture chambers/trenches and to each other

Appx3728

within the capture chambers/trenches of Dimov. For this additional reason, it is not surprising that Dimov would not include the Kovac technique in its listing of exemplary techniques useful for modifying arrangements of cells within its capture chambers/trenches.

118. For these reasons, and also for the reasons discussed in the next section, it is my opinion that not only would a POSA not have been motivated to modify Dimov with the levitation technique of Kovac absent hindsight, a POSA would have been affirmatively discouraged from the modification as well.

### 3. No Reasonable Expectation of Success

119. For the reasons above, as well as the additional reasons below, it is my opinion that even if a POSA were to modify the device of Dimov with the teachings of Kovac, a POSA would not have had a reasonable expectation of success in selectively recovering cells from the modified device.

120. Dr. Meinhart opines that a POSA would have had a reasonable expectation of success because (1) his suggested modification of the top layer of Dimov would have been routine and (2) Kovac's levitation technique would have been expected to yield viable cells. Ex. 1002 at ¶ 131. I disagree. As an initial matter, I already explained above that there is significant risk to the viability of cells if exposed to the optical laser described in Kovac. Not only would a POSA not have been motivated to use the laser because of the concerns with cell viability, the

POSA also would not have had a reasonable expectation of success in selectively recovering viable cells. Furthermore, a POSA as defined in this proceeding would not have been familiar enough with optics to implement a method as complicated as that shown in Kovac, especially when needing to interpret Equation 1 of Kovac (Ex. 1007 at 9325) in a completely different environment and device, including an order of magnitude difference in capture chamber/trench depth. Kovac specifically points out that this optical technique is not readily understood when stating: "Equation 1 clearly shows that the scattering force is linearly proportional to power. However, the underlying richness of the Fresnel coefficients makes further intuitive reasoning about behavior difficult without focusing on a specific set of optical parameters." Ex. 1007 at 9325.

121. Moreover, Dr. Meinhart's analysis is flawed because he does not take into account all of the differences between the Dimov and Kovac devices. He only suggests modifying the top layer of Dimov. However, as I explained in more detail above, without the specific configuration and structural features of the Kovac device, the use of the Kovac optical laser to sort cells would not be feasible. In particular, the Kovac device has shallow wells that allow the optical laser to levitate cells into a carefully controlled fluid flow and utilizes a collection reservoir.

122. *First*, a POSA would not have had a reasonable expectation of being capable of levitating a cell from the Dimov capture chamber/trench, much less

selectively recovering a cell. Not only are they much deeper than the Kovac wells, the Dimov capture chambers/trenches are also specifically designed to be at a depth much greater than the particles retained in it.

123. For example, Dimov states that "[t]he retention characteristics of the capture region make it particularly effective for also mimicking in vivo conditions of cellular activities. As the dimensions of the capture trench are much greater than the particles which are retained therein, devices such as those heretofore described can be usefully employed in biomimetic experiments." Ex. 1003 at 11:1-6. Dimov goes on to provide a further example of such an experiment:

> For example as shown in FIG. 21 a device 100 can be used to generate 3D cell structures 2100 of individual cancer cells 2105 so as to recreate cellular conditions similar to in-vivo tumours or other structures. This can also be combined with the fact that multiple cell types can be incorporated in a layered fashion to form co-cultures that further approximate in-vivo like conditions. An example of such a 3D co-culture like experimental setup for investigating cancer cell dynamics close to blood vessels 2110 (endothelial cells) is shown in Step 2 of FIG. 21.

Ex. 1003 at 11:6-15. Given that the Dimov capture chambers/trenches were designed to employ biomimetic experiments, allowing for multiple cell types to be layered and cultured within a single capture chamber/trench, a POSA would not

have expected the laser technique used in Kovac, to be able to selectively recover a single cell-type or colony from the capture chamber/trench. Moreover, given that it would be more difficult to levitate cells that are adhered to a well or to one another as explained above, a POSA also would not have expected the laser technique to have been able to dislodge and levitate cultured cells arranged in the layers in the capture chambers/trenches of the Dimov device. *See supra* at ¶¶ 53, 63-64, 113.

124. ***Second****,* even if a POSA would have been able to use Kovac's technique to remove a cell from Dimov's capture chamber/trench (setting aside the issue of possible cell damage due to laser exposure), it is my opinion that a cell would still not have been able to be recovered.

125. Dr. Meinhart states that after levitating the cells of interest from the capture chamber/trench in the modified Dimov device, the levitated cells could be flowed down to an output **130** or even further to the common waste **140** where it could then be removed by micropipette. Ex. 1002 at ¶ 129. However, each capture chamber/trench as shown in Figure 4B of Dimov does not have a dedicated waste line that would allow a levitated cell to be collected immediately from the system's output. Rather as shown in Figure 1 of Dimov and as explained in the specification, the cell would have entered the "waste line 132," which is "downstream of the capture chamber and configured to distribute fluid out of the devices into the common output 130." Ex. 1003 at 4:5-8. In at least one embodiment, seven other

"waste lines" from other trenches join together, however, before joining with common waste lines from still more trench configurations, before entering the "common output" (i.e., output **130**). Ex. 1003 at Fig. 1. As seen in Figure 2 of Dimov, only this common output is in "fluid communication with common waste 140," where the fluid would exit "the multiplexed structure." Ex. 1003 at 4:20-22, *see also id*. at Fig. 2.

126. Given that a cell levitated out of a capture chamber/trench would then need to flow from waste line 132 to common output 130 to possible common waste 140, a POSA would not have had a reasonable expectation to be able to successfully monitor the cell by microscope along that entire pathway. As an initial matter, even if the levitated cell made its way through the entire pathway to either output 130 or common waste 140, a POSA would not be able to follow the path of the cell as it would be out of the microscope's field of view. Moreover, because there are multiple trenches feeding into the common output, waste from other trenches could also be mixed in with the targeted cell making it not possible to isolate or select the cell that was levitated. Indeed, the outlets of the capture chambers/trenches, including the common output and the common waste, are designed for removing waste and not selectively recovering cells.

127. In addition, all of the "eight identical devices" of Dimov share a "common input 120," which "branches into 8 feed lines" as seen in Figure 1.

Ex. 1003 at 4:1-5; *see also id.* at Fig. 1. Therefore, a levitated cell that has entered the waste line will not be able to travel this elongated path without a significant amount of fluid flushed into device 110 from the only common input 120, which is shared with at least seven other capture chambers/trenches. Adding a significant amount of fluid to flush the levitated cell through this long path will further disturb the cell and could result in mixing with other particles and cells from other trenches. For example, a POSA would expect complications such as congestion, shear stress, exposure to harmful reagents, and dilution by contaminants. Even if the levitated cell wasn't damaged by the overexposure to the laser, or damaged further by travel and combination with additional particles in the common waste line, it still would have been impossible for the POSA to follow the cell through the device to identify the levitated cell for collection out of the "common waste 140."

128. Indeed, because Kovac is reporting on proof of concept, Kovac reports limitations to its technique that would likewise be a reason why a POSA would not have had a reasonable expectation of success in modifying Dimov to incorporate the Kovac technique. Kovac reports collecting 50-100 cells at a time, but the target percentage purity for an extracted population of cells is set at only 80-90 percent. This means that 10-20 percent of the cells collected are not target cells. As reported in Kovac, as many as 20 cells from a collection of 50-100 are not the cells of interest.

129. For the reasons discussed above, in my opinion, a POSA would not have had a reasonable expectation of succeeding in modifying the Dimov device with the laser technique discussed in Kovac.

**D.  Ground 4:  Park Does Not Disclose or Suggest the Combination of Features Recited in Claims 1, 11, 16, 24, 26, 27, and 30 of the '408 Patent.**

130. As I explain below in this Section, it is my opinion that a POSA would not have found claims 1, 11, 16, 24, 26, 27, and 30, each requiring "selectively recovering the cell or a clonal population thereof from the individual chamber based on the response in the monitoring step," to be disclosed or suggested by Park in view of the knowledge of a POSA.

131. As an initial matter, I note that Dr. Meinhart does not and cannot contend that Park itself discloses the "selective recovery" limitation required by the Challenged Claims of the '408 patent.  Instead, Dr. Meinhart argues that in view of knowledge in the art, a POSA would have been motivated to modify Park to include the "selective recovery" step.  For the reasons below, I disagree.

132. *First*, Park does not identify or suggest any problems encountered with its device that would have motivated a POSA to modify it in order to selectively recover any particular cells, much less based on a monitored response.  Notably, Dr. Meinhart also does not identify or state that there was a problem known in the art as of the priority date of the '408 patent—July 7, 2010—with the Park device

itself, let alone a problem that would have motivated a POSA to modify the Park device in any way. For this reason alone, I disagree with Dr. Meinhart.

133. Instead, Dr. Meinhart contends that "a POSA [would have] ma[de] use of [the] monitoring [in Park] by selectively removing one or more cells from an individual microwell based on a response—e.g., a long-term cell response or an instantaneous cell reaction—observed through such monitoring." Ex. 1002 at ¶ 160. Park, however, does not disclose any experiments beyond comparing different microwell shapes and dimensions for successfully trapping a single cell into a microwell and culturing that cell within the same microwell.

134. Park instead focuses exclusively on investigating which microwells are best able to selectively retain cells into microwells, which is diametrically different from recovering cells out of the microwells, selectively or otherwise. The Park device is designed for a particular purpose: to facilitate "high-throughput single cell trapping, culture, and analysis" in a single device that has microwells with "a size sufficient to allow attachment and division of captured cells." Ex. 1006 at 263 ("[T]here is a need for development of tools for high-throughput single cell trapping, culturing, and analysis."); *id.* (noting that prior devices had microwells with "insufficient space for longer duration screening tests that require observation of cell attachment and division," and describing a method for "single cell trapping in microwells with dimensions of 50 μm, a size sufficient to allow attachment and

division of captured cells"). Park explains that the advantage of its device over "pre-reported" devices is that "cell culture is possible due to the ample space of the microwells . . . allowing investigation of both long-term cell responses and instantaneous cell reactions" in the device. *Id.* at 268. In other words, Park was focused on investigating different well shapes in order to determine how to best to trap, culture, and proliferate cells in a microfluidic device. During his deposition, Dr. Meinhart agreed that the overall design and purposes of the Park device were to trap single cells to allow them to be cultured and grown within the microwells. *See* Meinhart Tr. at 122:1-5; 123:3-18; 124:5-125:1. The design and purpose of Park does not include or contemplate the selective recovery of cells.

135. The only reference in Park to cells leaving the device concerns the *removal* of "excess cells"—that is, cells that were not trapped in the microwells and, therefore, were not cells ultimately cultured and investigated in the device. *See* Ex. 1006 at 268 ("The system design is such that after a cell suspension is flown across the microarray, the user can easily flush the system with either cell culture media or a phosphate buffer saline (PBS) at 0.18 ml/h to remove excess cells. This is fast enough to wash away untrapped cells, but slow enough to not dislodge trapped cells."). The removal of "excess cells" does not contemplate or suggest selective recovery, and Park does not describe any experiments where a cell is selectively recovered from any of the device's microwells. Dr. Meinhart admitted

this as well during his deposition. *See* Meinhart Tr. at 131:20-23. As such, in my opinion, Park does not teach or suggest the recovery, selective or otherwise, of cells from its microwells; rather it is focused on trapping and retaining cells within the microwells.

136. ***Second***, without a general motivation to selectively recover a cell from the microwells of the Park device, there is likewise no specific reason or motivation to modify the device at all, much less as suggested by Dr. Meinhart. Dr. Meinhart contends that a POSA would have accomplished the "selective recovery" step by modifying the Park device to allow for its top layer to be "removed or peeled back" so that the triangular microwells of the Park device could be access directly by a micropipette. Ex. 1002 at ¶ 161; *see also id.* at ¶¶ 162-165. Nevertheless, setting aside the lack of any general motivation to include a selective recovery step, Park also does not provide any specific motivation to modify its device to remove its top layer because the structure of its device is sealed by design. Park specifically states "that a cover is required to create the channel, restricting access to the microwells during cell seeding." Ex. 1006 at 268. This cover does not permit access to the microwells. The purpose of the cover is to form the channel through which the fluid passes in seeding the microwells. Ex. 1006 at 264-265. Absent hindsight, a POSA would not have thought to modify what is described by Park as a noteworthy structural feature of its device. Further, in my opinion, there is no indication that

this cover or top layer would or could be removable or partially bonded, and that a micropipette would then be used with the device. Given that Park does not explain the materials that are used to fabricate its device (as admitted by Dr. Meinhart in his declaration at ¶ 162), a POSA would not have sufficient information to have been motivated to make such specific modifications as suggested by Dr. Meinhart.

137. **Third**, Dr. Meinhart states that modifying the Park device to allow for the removal of the top layer of Park was known in the art (pointing to a reference by Han). Ex. 1002 at ¶ 165. Contrary to Dr. Meinhart's statement and as discussed above, Han was not part of the prior art and would not have motivated a POSA to modify the device of Park.

138. Accordingly, for at least these reasons, a POSA would not have been motivated to modify Park at all, let alone how Dr. Meinhart suggests, absent hindsight. In addition, it is my opinion that for the same reasons, the purpose and structural constraints of Park would have discouraged a POSA from making any modifications to accommodate selective recovery of cells.

**E.    Ground 5:  Park in View of Kovac Does Not Disclose or Suggest the Combination of Features Recited in Claims 1, 11, 16, 24, 26, 27, and 30 of the '408 Patent.**

139. As I explain below in this Section, it is my opinion that a POSA would not have found claims 1, 11, 16, 24, 26, 27, and 30 of the '408 patent, each requiring "selectively recovering the cell or a clonal population thereof from the individual

chamber based on the response in the monitoring step," to be disclosed or suggested by Park in view of Kovac.

140. As an initial matter, Dr. Meinhart did not expressly state why a POSA would have been motivated to modify the Park device with the Kovac levitation technique in the first instance. Rather, Dr. Meinhart states that "[a] POSA would have been motivated to add the 'selective levitation' technique of Kovac, as described in Section IX, above, to the methods disclosed in Park." Ex. 1002 at ¶ 180. Given that Section IX of Dr. Meinhart's declaration concerns his opinions regarding *Dimov* in view of Kovac, it is unclear from my perspective what exactly Dr. Meinhart's basis is for modifying *Park* with Kovac. In his deposition transcript, Dr. Meinhart explained that he was relying on his discussion of Kovac rather than Dimov in Section IX (Meinhart Tr. at 144:16-145:15), but I did not see him provide any specific basis for modifying Park with Kovac.

141. Nevertheless, to the extent I can understand what Dr. Meinhart is saying, I disagree. *First*, a POSA would not have been motivated to modify Park because there was no problem to be solved. As he did for Dimov, Dr. Meinhart has presumed that there was a general need or motivation to modify Park to include a technique for selective recovery of cells. *Second*, without a general motivation to selectively recover cells, there would have been no reason to look to Kovac. Moreover, given the differences in the uses and structures of Park and Kovac, a

POSA also would not have been motivated to make the specific modifications suggested by Dr. Meinhart. **Third**, even if a POSA were to modify the device of Park with the teachings of Kovac, a POSA would not have reasonably expected to be able to selectively recover cells from the modified device.

### 1. No General Motivation to Modify Park to Include Selective Recovery, Much Less After Monitoring a Response

142.   As I explained above, I disagree with Dr. Meinhart that a POSA would be generally motivated to modify Park to include a selective recovery step.  Here, Dr. Meinhart does not state that there was a problem known in the art as of the priority date of the '408 patent—July 7, 2010—with the Park device itself, let alone a problem that would have motivated a POSA to modify the Park device in any way.  As I noted above, Dr. Meinhart already admitted that the purpose of an experiment would dictate the problems a POSA would solve.  As discussed below, the purpose of Park does not include the selective recovery of cells.  Absent hindsight, a POSA would not have been motivated to modify Park to include selective recovery of cells, much less after monitoring a response.

143.   As I explained above, Park does not teach or suggest the recovery, selective or otherwise, of cells from its wells.  Nor does Park identify or suggest any experiments or problems encountered when fabricating or using its device that would have motivated a POSA to selectively recover any particular cells from its

device. In Section IX and elsewhere in his declaration and in his deposition, Dr. Meinhart does not identify anything in Park that discloses the selective recovery of cells from its device. As also discussed above, the only reference to removing cells in Park is directed at removing "excess cells"—that is, cells that were not trapped in the microwells after loading. Ex. 1006 at 268. There is no other mention in Park of removing cells, much less for selective recovery. In my opinion, absent hindsight, there would have been no motivation for a POSA to look to Park to modify its methods and device to include the selective recovery of cells.

144. Accordingly, for at least these reasons, a POSA would not have been motivated to modify Park. In addition, it is my opinion that for the same reasons, the purpose and structural constraints of Park would have taught a POSA that making any modifications to accommodate selective recovery of cells would be discouraged.

## 2. No Motivation to Modify Park with Kovac

145. Without a general motivation to include a selective recovery step, there would likewise be no specific motivation for a POSA to modify Park with the teachings of Kovac. Nevertheless, setting aside the lack of motivation for a POSA to selectively recover cells in Park, it is also my opinion that a POSA would not have been motivated to modify Park with the laser levitation technique of Kovac.

### (a) The Purpose of Park is Incompatible with the Laser Technique of Kovac

146. Dr. Meinhart states that "in connection with the microwell monitoring expressly disclosed by Park, a POSA would have been motivated by Kovac to inspect the microwells of the Park device 'using any desired microscopy technique' . . . and then focus an infrared (IR) laser beam onto target cells from below, as described in Kovac, levitating the cells into the flow field with the optical scattering force." Ex. 1002 at ¶ 180.

147. The purpose of Park, however, is incompatible with the use of the Kovac levitation technique. As noted above, Dr. Meinhart has agreed that the purpose of an experiment informs what problems should be solved. Here, the purpose of Park does not dictate searching for a solution to selectively recover cells, but is instead focused on the ability to trap and culture single cells. While I disagree with Dr. Meinhart (as discussed above) that Dimov included techniques for removal of particles that were similar to the laser levitation technique of Kovac, here, Park is completely silent as to any suggested techniques for removal of particles, and certainly silent with respect to cell removal, much less selective recovery of cells. For this additional reason, there is no apparent motivation for a POSA to modify Park with the laser technique of Kovac.

148.    Indeed, as discussed above, Park is entirely focused on fabricating a device that is retaining, rather than recovering cells.  The device designed by Park ***traps*** single cells into the microwells.  *See, e.g.*, Ex. 1006 at 264 ("Here we report a method for high-throughput single cell trapping . . . to achieve high cell-entrapment rates.").  In addition, these microwells are specifically sized to allow attachment and division of the trapped cells within the microwells.  *Id.* at 263 ("Here we describe a flow method that enables single cell trapping in microwells with dimensions of 50 µm, a size sufficient to allow attachment and division of captured cells.").  In Park, the cells are shown to adhere and proliferate.  *Id.* at Fig. 3.

149.    In contrast, Kovac does not disclose or suggest the use of its infrared laser to levitate attached cells.  *See supra* at ¶¶ 53, 63-64, 113.  The cells must remain in suspension.  The levitation technique of Kovac is used to levitate suspended cells from their wells.  It is not used to levitate attached or cultured cells from a well because, as admitted by Dr. Meinhart, it would be more difficult for the optical scattering force to overcome the cell attachment forces.  *See* Meinhart Tr. at 118:24-119:7.  In my opinion, this difficulty would dissuade a POSA from using the Kovac levitation technique with the Park device.  In his deposition, Dr. Meinhart noted that Kovac states that "aspheric cells, such as those undergoing mitosis, can be removed quickly," and in another paragraph, that "[a] single cell can, in general, even be removed selectively from a well with multiple cells."  Meinhart Tr. at

219:3-11, 220:2-7 (citing Ex. 1007 at 9326). But these statements do not describe or suggest levitating attached or cultured cells from a well. Kovac's discussion of "a well with multiple cells" refers to Figure 3B, which illustrates the removal of a suspended cell from "a doubly loaded well." Ex. 1007 at 9326. Kovac's reference to cells undergoing mitosis merely reflects that when a suspension of cells were loaded onto the Kovac device, some cells may be undergoing mitosis and "can be removed quickly." Ex. 1007 at 9326.

150. As such, a POSA would not have been motivated to modify Park based on the levitation technique of Kovac. Moreover, Park would have led a POSA away from any modifications that would include a technique for removing successfully trapped cells from their microwells.

### (b) The Structural Features of Park are Incompatible with the Laser Levitation Technique of Kovac

151. As I explained above, the successful use of the Kovac laser levitation technique is contingent on the particular parameters of its microfluidic device. The structural differences between the Kovac device and the Park device are not surprising given that Park is focused on retaining cells, rather than recovering cells. Given the differences, a POSA would not be motivated to make the modifications suggested by Dr. Meinhart.

152. **First**, Dr. Meinhart asserts that a POSA could have inspected the microwells of Park from above or below the device to identify a target cell. Ex. 1002 at ¶ 181. He states that a POSA would have been motivated "to use a transparent or semi-transparent material, such as PDMS, to construct the top layer of the Park device so as to permit visual observation of microwells from above." *Id.* Dr. Meinhart does not explain how or why a POSA would have modified Park by using "a transparent or semi-transparent material, such as PDMS, to construct the top layer of the Park device so as to permit visual observation of microwells from above." Ex. 1002 at ¶ 181. Dr. Meinhart does not identify any disclosure or suggestion in Park that its device could or should be modified by entirely reconstructing its top layer for the purpose of selective recovery of cells by optical laser. Absent hindsight, a POSA would have no reason to reconfigure the device of Park to accommodate the optical laser technology of Kovac.

153. **Second**, Dr. Meinhart states that "[a] POSA would have readily recognized that after levitating a cell of interest from a microwell in the Park device, the levitated cell could then be flowed down the 'main channel' to the existing 'outlet,' 'which is connected to a pulling syringe pump' to evacuate the cell from the device." Ex. 1002 at ¶ 181. Dr. Meinhart does not explain how the POSA would have readily recognized levitating a cell of interest to evacuate the cell from the device of Park.

154.     As discussed already above, the successful levitation of cells into the fluid flow of Kovac is dependent on particular parameters, such as requiring a continuous flow and a separate collection reservoir.  *See supra* at ¶¶ 48-56, 92-99. In contrast, Park discloses a device that relies on a different set of parameters.

155.     For example, as seen in Figure 1b, in Park, Park explains that the single outlet "is connected to a pulling syringe pump," which is what generates flow through the device.  Ex. 1006 at 264 (Figure 1(b) & caption); *see also* Meinhart Tr. at 142:6-8, 142:19-23.  Because the pump at the outlet is required for flow in Park, a POSA would not have been able to access any cells in the outlet without disassembling its device, including disengaging the pump, which would have also disrupted any flow through the device.  A POSA would have found these differences between the Park and Kovac devices as incompatible and would not have been motivated to use the levitation technique with the Park device.

156.     Another example of the differences between Park and Kovac concerns the manner in which cells are trapped in the Park device.  In particular, the device of Park utilizes a specific interaction of hydrodynamic and gravitational forces to trap the cells into its triangular shaped microwells.  Ex. 1006 at 264 (Figure 1(a)); *see also id.* at 266 (Figure 2).  The precise architecture and operation of the device of Park is crucial to the successful trapping of the cells.  For example, the triangular

geometry of the microwells and the exact placement and speed of the fluid flow are carefully configured to trap the cells.

157.   Indeed, this geometry is consistent with the aim of Park:  to "allow attachment and division of captured cells." Ex. 1006 at 263.  The optical scattering force necessary to levitate a cell from Park (setting aside that the cells in Park are attached to the microwells), would also need to overcome the hydrodynamic forces trapping the cells.  Park emphasizes that the triangular shaped microwells create a "strong" flow recirculation zone to trap any captured cells.  Ex. 1006 at 263; *see also id.* at 265-266 ("[W]e determined the equilateral triangle to be the best well shape because it had the strongest recirculation pattern in the microwell . . . ."). Given the complications stemming from counter-forces on the cells from the recirculation flow in Park's triangular shaped wells, a POSA would not have been motivated to modify Park to accommodate the optical laser of Kovac.

158.   Moreover, the particular fluid management disclosed in Kovac is also not present in Park.  Park has one main channel that is the conduit for fluid flow. There is a common inlet and a common outlet and the flow is unidirectional.  Unlike the Kovac device which was designed to recover specific cells levitated from their microwells into a separate reservoir output, the only exit for the Park device is a waste outlet. *See, e.g.*, Ex. 1006 at 264 (Figure 1(b)).  Without a collection reservoir

or a separate waste outlet, there would have been no motivation for a POSA to modify Park to incorporate the optical laser of Kovac.

159. Accordingly, for these reasons, and for the reasons discussed in the next section, a POSA would not have been motivated to modify Park to incorporate the optical laser of Kovac absent hindsight. In addition, given the differences in the microwell architecture and fluid configuration in the two devices, the teachings of Kovac also would have discouraged a POSA from making modifications to Park to accommodate the optical laser of Kovac.

### 3. No Reasonable Expectation of Success

160. For the reasons above, as well as the additional reasons below, it is my opinion that even if a POSA were to modify the device of Park with the teachings of Kovac, a POSA would not have had a reasonable expectation of successfully being able to selectively recover cells from the modified device.

161. *First*, as discussed in detail above, a POSA would not have had a reasonable expectation of success levitating cells from the wells because the Kovac technique is not applicable to cells attached to the microwells as they are in Park. *See supra* at ¶¶ 53, 63-64, 113.

162. *Second*, even setting aside the difficulty levitating attached cells, a POSA also would not have had a reasonable expectation of success levitating the cells because the Park device is not designed for selective recovery. Specifically,

Kovac discusses a continuous flow to remove the cell levitated by the laser. *See* Ex. 1007 at 9322, 9324-9325. But such continuous flow through the device to remove a cell would conflict with the key feature of Park's device, which is the use of triangular-shaped microwells that were designed to trap cells in the wells through a recirculation flow zone within the wells. Ex. 1006 at 266.

163. For example, a POSA would not have had a reasonable expectation of success in levitating the cells in Park because the dynamic flow of fluid through the microwells in Park would counter the levitation force of the Kovac laser, preventing or at least hampering recovery. The trapping flows in Park would knock the "beach ball" or cell off the top of the laser column and trap the particle again, completely eliminating any chance of success by implementing Kovac. In Park, the flow streamlines (as shown in Figure 2b of Park) move lateral to the well and quickly drag particles in the well down into a trapping location. Kovac is built on the concept that the lateral flows above the well would carry the cells to the outlet (Figure 1 of Kovac); thus, the flow designs of Kovac and Park are mutually exclusive and combining the two approaches would not work.

164. Dr. Meinhart states in his deposition (Meinhart Tr. at 156:5-8, 157:11-14) that the flow lines near the apex of the triangle would actually help levitate the cells in this area because the flow lines are directed upward. While the flow at this point would assist the levitation, this assistance would be very small as the flow is

very low at that point as shown by the spacing between the lines in the figure indicating the strength of the flow. What Dr. Meinhart neglects though is that once cells begin to be levitated out of the chamber, they will encounter a very strong flow (as shown by the closely spaced lateral streamlines) that will push the cell downstream and back down into the well (which is the entire premise of how the Park device works), making levitation as practiced by Kovac extremely unlikely to be effective in the Park device. It is unlikely because the flow in Park would defeat the levitation force on the cell once it reaches these fast cross flow lines that then push the cell sideways and away from the laser spot and then down into the well again. Thus, Park and Kovac are mutually exclusive based on the physics implemented in the two systems.

165. Further, as Kovac explains, there are other interactions with the cells in the wells that can have significant effects on the removal of those cells such as Stokes drag wall effect. Ex. 1007 at 9326 ("As the cell diameter approaches the well diameter, Stokes drag wall effects become more significant, leading to longer removal times for larger cells in the population."); *see also* Meinhart Tr. at 112:22-113:23 ("[W]hen [a cell is] near a well, there's wall interactions with the particle that also resist movement"). With respect to Park, a POSA would have understood that the recirculating flow could push a cell trapped in Park's triangular-shaped microwell against the back two walls, which could cause the cell to resist the

levitating force of the Kovac laser. Kovac itself reported that "nonspecific surface interactions appear to be the ***primary reason*** that cell removal fails." Ex. 1007 at 9326 (emphasis added); Meinhart Tr. at 115:5-117:11 ("[I]nteraction of that cell with the walls and the hydrodynamic drag force make [the cell] difficult to remove."). These wall effects can be part of those nonspecific surface interactions.

166. In addition, Dr. Meinhart fails to consider that the continuous flow required for Kovac's levitation technique would most likely cause microwells that contain more than a single cell or contain a population of cells to have some of those cells escape once fluid flow is re-started. As mentioned above, Park only disclosed perfusing fluid containing a cell suspension for 20 min in order to maximize the number of cells trapped in the triangular microwells. There was no disclosure of perfusing fluid after initial cell trapping or after cells had divided in the microwells. In my opinion, if flow is restarted in the modified Park device, then it is very likely that cells from microwells containing multiple cells that have not had time to adhere will also be removed from the wells. This would counter any effort to selectively recover cells using the levitation technique.

167. ***Third***, even if the Kovac levitation method managed to get a cell out, it would highly likely be caught in an empty triangular well downstream, where no laser levitation is at work. In addition, as discussed above, even if it were possible to levitate a cell out of the Park microwell against such a counteracting force, it

would require prolonged and/or increased exposure to lasers, increasing the risk of damage to the cell. *See supra* at ¶¶ 104-107. For example, the attachment of cells to each other and to the interior walls of microwells, as well as the forces from recirculation flow, would require prolonged and/or increased exposure to lasers, increasing the risk of damage to the cell.

168. **Fourth,** as discussed above, a POSA would not have been able to recover a cell from the outlet of Park's device given that the pump required to ensure flow for the laser levitation technique would have had to be removed from the Park device, and therefore, the flow would have been disrupted. Dr. Meinhart does not propose any modification that could be made to the Park device that would allow for any recovery using the levitation technique, much less selective recovery, without the use of Park's pump.

169. **Fifth,** while Dr. Meinhart states that a POSA would have had a reasonable expectation of success based on the comparability of the well depth of Kovac and Park (Ex. 1002 at ¶ 182), in my opinion, the overall size, shape, and design of the Park device is different from the Kovac device such that a POSA would not have had a reasonable expectation of successfully integrating the Kovac laser with the Park device. For instance, Figure 1 of Park shows Park's microwells arrayed in multiple parallel rows, all with a common outlet that serves as the exit. Ex. 1006 at 264. A levitated cell, therefore, would have to travel across these rows

of wells to the outlet of the device. In my opinion, given that Park reports only "62% of microwells were filled" during the "loading procedure" (Ex. 1006 at 263), it is highly likely that while flowing towards the outlet the levitated cell is recaptured in the 40% of microwells that remain open and available to trap cells.

170. In addition, the levitated cell could be otherwise lost or damaged on the way to the outlet because the levitated cell would quickly be out of the field of view of the microscope discussed in Kovac. The field of view of the microscope in Kovac would not have captured all of the wells of the Park device and therefore would have been impossible to track and recover.

171. For the reasons discussed above, in my opinion, a POSA would not have had a reasonable expectation of success in modifying the Park device with the laser technique discussed in Kovac.

I, Bruce K. Gale, do hereby declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed on May 20, 2022

_____
Bruce K. Gale, Ph.D.

```
 1        UNITED STATES PATENT AND TRADEMARK OFFICE

 2        ------------------------------------

 3     BEFORE THE PATENT TRIAL AND APPEAL BOARD

 4        ------------------------------------

 5            BERKELEY LIGHTS, INC.,

 6                 Petitioner,

 7                    v.

 8      THE UNIVERSITY OF BRITISH COLUMBIA,

 9                Patent Owner.

10        ------------------------------------

11           Case No. IPR2021-01249

12            Patent 10,087,408

13

14

15     DEPOSITION OF CARL MEINHART, PH.D.

16                VOLUME II

17       Wednesday, September 21, 2022

18                9:22 A.M.

19

20

21

22  Job No.:  464141

23  Pages:  225 - 398

24  Reported By:  Debra B. Farfan, RDR, CRR, CRC

25            CA CSR No. 11648
```

THE UNIVERSITY OF BRITISH COLUMBIA EXHIBIT 2013
Berkeley Lights, Inc. v. The University of British Columbia
IPR2021-01249

1           DEPOSITION OF CARL MEINHART, PH.D.,

2     held at the offices of:

3

4         Paul Hastings LLP

5         1999 Avenue of the Stars

6         27th Floor

7         Century City, CA 90067

8

9

10

11

12

13

14          Pursuant to notice, before Debra Bollman

15     Farfan, Certified Shorthand Reporter, in and

16     For the State of California.

17

18

19

20

21

22

23

24

25

Appx3757

1                  A P P E A R A N C E S

2

3       ON BEHALF OF PETITIONER BERKELEY LIGHTS:

4               BY: Andrew Krause, ESQUIRE

5               IRELL & MANELLA LLP

6               1800 Avenue of the Stars, Suite 900

7               Los Angeles, California 90067

8               BerkeleyLightsIPRs@irell.com

9               Akrause@irell.com

10

11

12       ON BEHALF OF PATENT OWNER THE UNIVERSITY

13   OF BRITISH COLUMBIA:

14               BY: Max H. Yusem, ESQUIRE

15               PAUL HASTINGS, LLP

16               200 Park Avenue

17               New York, NY 10166

18               Maxyusem@paulhastings.com

19               Phone: 1(212) 318-6375

20

21

22

23

24

25

Appx3758

1   word "static" and "dynamics" have particular

2   meanings in physics.

3        Statics generally refers to non-motion.

4   Dynamics refers to motion, but more importantly

5   to forces causing motion, when you study the

6   field of dynamics.

7        And we do talk -- in microfluidics we do

8   talk about fluid dynamics, which is the motions

9   of fluids.  We also talk about fluid statics,

10  which is when fluids don't move.

11       So, there is regions of the device where

12  things flow and regions of the device where the

13  velocity is very, very small.  Such as in the

14  wells.  So there is both fluid dynamics and

15  some fluid statics in the device when it

16  functions.

17   Q.  Uh-huh.  But during the process of the

18  sequential flow analysis, to make sure I'm

19  understanding, that's "sequential" meaning the

20  flow is occurring at multiple time points?

21   A.  When they start talking about sequential

22  flow, what they mean is that there's different

23  flows occurring, yeah, one after another.  So,

24  the different flow conditions that happen

25  sequentially, one after another.

Appx3799

1      Q.   And during that sequential flow, would

2   you describe that process as dynamic or static?

3      A.   So, there are regions in the device

4   where there's fluid dynamics, and there are

5   regions in the device where it's basically

6   static flow.  So there's both.

7      Q.   How about in the trench?  In the trench,

8   would that be dynamic or static?

9      A.   It would -- there's regions in the

10  trench that would be static and regions that

11  would be dynamic, depending upon whether

12  there's flow or no flow.

13     Q.   Uh-huh.  So, for example, there could be

14  more dynamic regions towards the top of the

15  trench compared to the bottom of the trench in

16  the Dimov device?

17     A.   In the sense of fluid motion, yes.

18     Q.   And one of the things that the Dimov

19  device is also capable of doing is what's

20  described here as constant perfusion and

21  refreshment of the soluble factors within the

22  trench?

23     A.   Can you tell me where you're --

24     Q.   Oh, yeah.  Sorry.  If you go to column

25  14.  It starts on line 11 through 20.  And this

Appx3800

1    is Exhibit 1003.

2        A.  Yes.

3        Q.  Sorry, you're saying "Yes" to my

4    question or --

5        A.  No, no, no, I read the paragraph.  So

6    please --

7        Q.  Just want to make sure.

8        A.  -- ask the question.

9        Q.  Yeah.  So, here, Dimov discusses the

10   capability of constant perfusion and

11   refreshment of the soluble factors within the

12   trench.

13           Is that the same as the sequential flow,

14   or is that different?

15       A.  So, can you repeat the question, please.

16       Q.  Yeah, in Dimov, column 14, it discusses

17   constant perfusion and refreshment of the

18   soluble factors within the trench.

19           And my question is whether that is the

20   same as the sequential flow that's discussed in

21   the abstract of Dimov?

22       A.  So, as I read this, the constant

23   perfusion and refreshment of soluble factors

24   within the trench is part of the sequential

25   flow, yes.

1    Q.  Is that cell still going to be a living

2    cell?

3    A.  I understand that it locks the chemical

4    state of the cell.  I don't know what the

5    fixing buffer does to the cells in these

6    experiments.

7    Q.  I'm just asking in general.  If a fixing

8    buffer is used to lock the chemical state of a

9    cell, is that cell still going to be living?

10   A.  I would have to check on that.

11   Q.  If you were using a fixing buffer to

12   lock the chemical state of the cell, is there

13   any damage that can occur to the cell or the

14   cell components as a result of that process?

15   A.  As I sit here today, I cannot tell you.

16   Q.  Okay.  One of the things that you talk

17   about in your declarations is the ability to

18   make the top layer of a device removable or

19   able to be peeled back?

20   A.  Uh-huh.

21   Q.  And you talk about doing that using

22   partial bonding?

23   A.  Yes.

24   Q.  And how -- is that partial bonding done

25   by treating the PDMS with oxygen plasma; is

1    that correct?

2       A.   Yeah, so, how it typically works is that

3    when you take PDMS and expose it to an oxygen

4    plasma or even ozone cleaning, it opens up the

5    bonds on the surface and then causes them to

6    then be bonded to things like other PDMS or to

7    glass.  So exposing it to O2 plasma or ozone

8    causes or allows you to have an irreversible

9    bond.

10          If you pattern that surface where only a

11   portion of that surface is exposed to the O2 or

12   plasma, the other part would not create a bond.

13   So you get a much softer adhesion.

14          A good example would be like 3M sticky

15   notes, right.  So they adhere, but not very

16   well.  So you could do the same thing with the

17   PDMS.

18      Q.   Right.  So with PDMS that's been treated

19   with the oxygen plasma that's actually

20   weakening the bond between the PDMS layers?

21      A.   No, it increases it, yeah.

22      Q.   So that prevents partial bonding?

23      A.   Well, okay.  So the PDMS, when you treat

24   a surface with PDMS -- sorry.  You treat a PDMS

25   surface with O2 plasma, it opens up the

Appx3838

1   to pull, you're applying a negative pressure.

2          Such as, for example, Park does that.

3   And there really wouldn't be any detrimental

4   effects.  It would only be if you're using very

5   high pressures over extended periods of time

6   that it could possibly be a factor.  But it

7   would vary a lot.  It could vary significantly.

8       Q.  So is it possible that even if you

9   weren't using high pressures, you were using

10  more normal pressures, but you were doing it

11  frequently, it's possible that could also cause

12  a problem?

13      A.  Yeah, it would depend upon the

14  particular situation.  It would, yeah.

15      Q.  So it's possible.

16      A.  It's possible.

17      Q.  How we doing on time?  Do you need a

18  break?

19      A.  It's ten to 12:00.  We can go a bit

20  longer and take a lunch.

21      Q.  Just let me know.

22          So we talked a little bit about the

23  Kovac reference today.  I just want to talk a

24  little bit more about that.  Kovac is

25  Exhibit 1007.  Do you have that in front of

1  Kovac device uses a relatively small wavelength

2  in the near IR, below 1,000 nanometers.  So

3  heating effects are much more important when

4  you're above 1,000 nanometers.

5      So water tends to absorb less energy for

6  shorter wavelengths.  And I didn't see anywhere

7  in Kovac where heating was an issue.

8    Q.  And heating wasn't an issue because the

9  cell medium was dissipating that heat?

10   A.  Well, the cell medium dissipates the

11  heat and also the wavelength.  The choice of

12  wavelengths.  Using the same energy at a higher

13  wavelength would cause more heating.

14   Q.  So, it's both the dissipation by the

15  absorption of the cell media and the

16  wavelength, both?

17   A.  Yes.

18   Q.  Can affect the heat of the device?

19   A.  Yes.  And at the micron scale, the

20  dissipation of thermal energy is very

21  effective.

22   Q.  And one of the other things that Kovac

23  discusses is the lateral gradient force.

24   A.  Yes.

25   Q.  What is that, exactly?

1    A.   So, the whole premise on how optical

2  tweezers or laser tweezers work, the reason

3  that they trap is that cells want to migrate

4  towards the more intense part of the beam.

5       And the reason is that there's a

6  gradient in the intensity of the optical wave

7  where in the center of the beam it's stronger,

8  so the Gaussian beam, the center of the beam

9  that's higher, and then as you go to the edge

10  of the beam it drops off.

11       And due to photon scattering, the

12  particle naturally want to center into the

13  middle of the beam.  Due to the gradient, what

14  they call the gradient of the optical force or

15  the scattering force.

16       So it's that gradient where it wants to

17  center to where it's highest.

18    Q.   And as the spot size increases, is the

19  force of the lateral gradient going to change?

20    A.   Holding everything else constant?

21    Q.   Sure.

22    A.   Okay, well --

23    Q.   Let's start there.

24    A.   Okay.  Holding the wavelength constant,

25  holding the -- let's say the power density

Appx3875

1    constant, and increasing the width of the

2    Gaussian beam will decrease the degree of the

3    amount of the gradient of the intensity

4    laterally.  So it will decrease the lateral

5    gradient force.

6         Q.  Do you have Kovac Exhibit 1007 in front

7    of you?

8             (Previously marked Deposition Exhibit

9    1007 was reviewed.)

10            The Kovac paper.  I think it's right.

11        A.  Yeah, I do exactly have it in front of

12   me.

13        Q.  I just want to be sure of something.  In

14   the Kovac preparation of the cells, which is on

15   page 9324, the cell culture that Kovac is

16   describing, is that done before the cells enter

17   the device?

18        A.  Hang on.  9324, which paragraph?

19        Q.  So it's "Cell Culture and Preparation"

20   on the top right-hand side of Kovac

21   Exhibit 1007.

22        A.  Uh-huh.  Okay.  I'll have to refresh my

23   memory.  And tell me the question again.

24        Q.  The question is, is the cell culturing

25   that Kovac is discussing here, is that done

Appx3876

1    the flow to turn off and on.

2        A.  Oh, once -- once you apply, say, a

3    pressure gradient, how long does it take for

4    the flow to establish itself?

5        Q.  Yes, exactly.

6        A.  No, that -- yeah, these numbers are not

7    describing that.  And as a POSA, I would say

8    it's much quicker than a minute.  It's more

9    like on the order of a second or a few seconds.

10   It happens quite quickly.

11       Q.  Quite quickly, but is it instantaneous

12   or it could be a few seconds or up to a minute,

13   depending on the device?

14       A.  Well, nothing's -- so, it's more of a

15   function of the microfluidics.  And so nothing

16   is instantaneous.  So there's a certain finite

17   amount of time it takes to start the flow.  And

18   that's a function of how much inertia is there.

19   And at these small scales, they typically have

20   low amounts of inertia, so things respond

21   rather quickly.

22           The caveat to that is with PDMS, because

23   PDMS is more flexible, there may be some

24   changes in what we call the capacitance of the

25   system.  Like the channels may expand or

Appx3886

1    contract.  So there might be some time response

2    between what the device is doing that causes

3    the flow -- the flow will exponentially, say,

4    increase.

5         But that happens pretty fast if the

6    device is rigid.  If the device like PDMS is a

7    little flexible, then the turn-on time constant

8    can be a little bit longer.  But it's

9    usually -- it's much less than a minute.

10    Q.  And what do you refer to that when the

11    flow reaches whatever the constant speed is

12    that you're targeting?

13    A.  We call that steady state.

14    Q.  Steady state.  And sitting here today,

15    do you know how long it took the flow in Park

16    to reach steady state?

17    A.  I do not.

18    Q.  Do you know how long it took the flow in

19    Park to stop completely after it was -- the

20    flow was turned off?

21    A.  Based on reading this paragraph, I don't

22    see it.  They may report it in another part of

23    the paper, but I don't see it in that

24    paragraph.

25    Q.  You can look in other passages, too.  I

Appx3887

1    didn't see it.  So I wanted to see if you knew.

2       A.  I can take some time and look.  But I --

3    it's going to be considerably less than five

4    minutes.  It's going to be much less than five

5    minutes.

6       Q.  All right.  Well, sitting here today, do

7    you know how long it would take the flow in

8    Park to stop completely after it was turned off

9    after it had reached steady state?

10      A.  So they don't report specific numbers

11   for steady state.  But there's a few

12   observations I can make as a POSA even though

13   they don't report the start-up time or the time

14   it takes -- or the time constant to reach

15   steady state.  I could explain that if you

16   like.

17      Q.  The observations that they relate to the

18   time it takes to stop completely after reaching

19   steady state?

20      A.  Yeah.  So the time constant to reach

21   steady state.  Whether it's steady state and

22   flowing or steady state and stopping.

23          So, the fact that they report five

24   minutes, ten minutes, five minutes, as a POSA,

25   when I read that, I would assume that the time

Appx3888

1    constant for each -- the time constant of the

2    system would be significantly less than the

3    five minutes.

4         If it was on the order of five minutes,

5    then they would have reported that because that

6    would have been a relevant fact.

7         So, as a POSA, it seems like it would be

8    much less than five minutes.

9         I can also tell you, based on

10   experiments that I've done in my lab over

11   25 years, the time constant is more like on the

12   order of a few seconds, generally.  Not -- not

13   minutes.

14     Q.  But you --

15     A.  But I don't know.  But Park doesn't

16   report specific numbers here, but I can just go

17   by my own experience.

18     Q.  Got it.  And after the cells are

19   actually cultured in Park's device, they don't

20   run any experiments where they turn on and off

21   the flow to determine what would happen to the

22   cells that have been cultured in the wells; is

23   that correct?

24     A.  Can you say the question one more time.

25     Q.  After the cells are actually cultured in

Appx3889

1    Park's device, they don't run any experiments

2    where they turn on and off the flow to

3    determine what would happen to the cells that

4    have been cultured in the wells?

5        A.  As I sit here today, I don't see any

6    reports of experiments turning on and off the

7    flow during cell culturing.  They just report

8    that cell capture -- cell culturing works in

9    their system and flow design for it.

10       Q.  If you turn to paragraph 187 of your

11   reply declaration, Exhibit 1039.

12       A.  Okay.

13       Q.  Towards the bottom of this paragraph,

14   you discuss that those skilled in the art would

15   have been aware of syringes of other sizes?

16       A.  Sure.

17       Q.  And then discuss syringes from 10

18   microliters to 140mL.  Do you see that?

19       A.  I don't see the 10 microliter to 140mL.

20       Q.  Five lines from the bottom of page 101.

21       A.  Yep, okay.

22       Q.  Are -- just to make sure I understand,

23   are you proposing that a person of ordinary

24   skill would use a different-size syringe than

25   the one that Park used in its reference,